## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **SIGNAL INTERNATIONAL, INC., et al.**[1] | Case No. 15-11498 (____) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO PRE-PETITION LENDERS, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")

hereby submit this motion (the "**Motion**") for interim and final orders:

      i.       authorizing the Debtors to obtain post-petition financing from the Teachers' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.,* of the Alabama Code ("**TRSA**"), and the Employees' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.,* of the Alabama Code ("**ERSA**," together with TRSA, each a "**DIP Lender**," and collectively, the "**DIP Lenders**"), consisting of (x) a superpriority, secured revolving credit facility in the principal amount of up to $15,000,000.00 (the "**DIP Working Capital Facility**") to be used for general working capital and liquidity purposes, including the payment of Administrative Expenses as described in the that certain *Debtor-In-Possession Loan and Security Agreement* by and among the DIP Lenders, as lenders, and the Debtors, as borrowers (substantially in the form attached to this Motion as **Exhibit A**, together with all schedules, exhibits and annexes thereto, and as any time amended, the "**DIP Loan Agreement**"),[2] (y) a superpriority, secured revolving credit facility in the principal amount of up to $5,000,000.00 (the "**DIP Credit Enhancement Facility**") to be used for credit enhancement obligations under customer contracts as described in the DIP Loan Agreement, and (z) subject only to and effective upon entry of the Final Order, a superpriority, secured term loan facility in an aggregate principal amount of $70,088,952.00 (the "**DIP Term Facility**, and together with the DIP Working Capital Facility and the DIP Credit Enhancement Facility, the "**DIP Facility**"), of which amount

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Signal International, Inc. (4248) ("**SI Inc.**"); Signal Ship Repair, LLC (2642); Signal International, LLC (5074) ("**SI LLC**"); Signal International Texas GP, LLC (3050) ("**SI GP**"); and Signal International Texas, L.P. (5066) ("**SI Texas**"). The Debtors' principal offices are located at RSA Battle House Tower, 11 North Water Street, Mobile, Alabama 36602.

[2] All terms not otherwise defined herein shall be given the meanings ascribed to them in the DIP Loan Agreement.

$2,500,000 will be available under the DIP Working Capital Facility and the DIP Credit Enhancement Facility on an interim basis (the "**Interim Amount Limit**"), on the terms and conditions set forth in the DIP Loan Documents and in the proposed interim order substantially in the form attached hereto as **Exhibit B** (the "**Interim Order**")

ii. authorizing the Debtors to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents;

iii. authorizing the Debtors to use proceeds of the DIP Facility solely as expressly permitted in the DIP Loan Documents and in accordance with the Interim Order and Final Order (defined below);

iv. granting automatically perfected (a) priming security interests in and liens on all of the DIP Collateral (as defined below) and (b) non-priming security interests in and liens on all DIP Collateral upon which there are either pre-existing permitted senior liens or no pre-existing liens, to the DIP Lenders to the extent provided herein, and granting superpriority administrative expense status to the DIP Obligations;

v. authorizing the Debtors to use Cash Collateral (as defined below), subject to the Interim Amount Limit during the Interim Period;

vi. providing adequate protection to the Pre-Petition Lenders (as defined below) to the extent of any diminution in value of their interests in the DIP Collateral and subject to the Carve-Out;

vii. authorizing the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

viii. vacating and modifying the automatic stay pursuant to Section 362 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "**Bankruptcy Code**") to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Loan Documents;

ix. subject only to and effective upon entry of a final order approving the relief requested herein (the "**Final Order**"), waiving the Debtors' ability to surcharge against collateral pursuant to Section 506(c) of the Bankruptcy Code;

x. subject only to and effective upon entry of the Final Order, granting liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code;

xi. scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on this Motion; and

xii. granting the Debtors such other and further relief as is just and proper.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Christopher S. Cunningham in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), which was filed with the Court concurrently herewith.   In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.   Venue of the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.   The legal authority for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014 and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

## I.      GENERAL BACKGROUND

2.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No request has been made for the appointment of a trustee or examiner and no official committee has been established in these chapter 11 cases.

4. Additional information about the Debtors' business, their capital and debt structure, and the events leading up to the Petition Date can be found in the First Day Declaration.

## II. BACKGROUND SPECIFIC TO THE RELIEF REQUESTED

5. As described in the First Day Declaration, the Debtors have experienced liquidity constraints due in large part to a decline in oil and gas prices, resulting in a slowdown of drilling operations in the Gulf region that directly impacts the demand for Signal's oil and gas equipment and marine services. Moreover, the Debtors have incurred significant legal fees and expenses defending numerous pending litigations in New York, Texas and Louisiana, and have had a judgment entered against them in the approximate amount of $12 million dollars, plus fees, costs and expenses. Consequently, the Debtors and their advisors have been considering a variety of potential transactions, including refinance and sale options. At this time, the Debtors deemed that it was in the best interests of their business to commence these chapter 11 cases and effectuate a comprehensive restructuring. The Debtors enter these chapter 11 cases after engaging in significant pre-petition restructuring efforts, culminating in a plan support agreement (the "Plan Support Agreement") that will pave the way for their successful restructuring. Specifically, the Debtors, the Pre-Petition Lenders, and their largest unsecured creditor constituency have executed the Plan Support Agreement providing for an open market sale of substantially all of the Debtors' assets with the TRSA and ERSA (or their respective designee(s)) serving as the stalking horse bidder. The Debtors are confident that they will quickly seek approval of a disclosure statement, begin solicitation of a chapter 11 plan, effectuate the sale of their assets, and confirm a chapter 11 plan.

6.       The DIP Facility, coupled with the use of Cash Collateral, will permit the Debtors to fund the administration of these chapter 11 cases and is vital to the confidence of the Debtors' employees and vendors and to the preservation and maintenance of the going-concern value of the Debtors' estates.  Without Court approval of the DIP Facility, the Debtors will not have sufficient cash to make timely payments to vendors and employees that are required to support the Debtors' continued operations.

### A.       The Debtors' Prepetition Indebtedness

7.       As of the Petition Date, the Debtors had outstanding obligations under that certain *Credit Agreement,* dated as of January 31, 2014, among SI Inc., as Borrower, Signal SR, SI LLC, and SI Texas GP, and SI Texas LP, as Guarantors, TRSA, as administrative and collateral agent (together, the "**Pre-Petition Agent**"), and the Lenders from time to time party thereto (as amended, the "**Pre-Petition Loan Agreement**"), TRSA and ERSA, as Lenders (the "**Pre-Petition Lenders**," and collectively with the Pre-Petition Agent, the "**Pre-Petition Credit Parties**").[3]  The Pre-Petition Loan Agreement provided for a term loan facility in the aggregate principal amount of $75,000,000.00.  The Pre-Petition Loan Agreement, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, financing statement, pledge, assignment, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "**Pre-Petition Loan Documents**").

### B.       The Debtors' Efforts to Obtain DIP Financing

8.       In connection with the planning for these chapter 11 cases, the Debtors and their advisors determined that the Debtors would require the DIP Facility to sustain the liquidity

---

[3] As of the Petition Date, an affiliate of the TRSA and the ERSA, RSA-Signal Holdings, LLC, holds approximately 47.44% of SI Inc.'s common voting stock.

necessary to continue their operations during these chapter 11 cases. Without such financing, the Debtors will be unable to preserve and maintain the going-concern value of their estates. The Debtors' ability to pay their employees and vendors and otherwise finance their continued operations is dependent on their ability to obtain and use the funds that would be made available under the DIP Loan Documents.

9. On March 6, 2015, the board of directors of SI Inc. approved the Debtors' retention of Skip Victor to serve as their pre-petition chief restructuring officer and financial advisor to assist with analyzing restructuring alternatives. The Debtors and Mr. Victor began to consider potential sources of debtor in possession ("**DIP**") financing. Naturally, the Debtors asked the Pre-Petition Agent whether the Pre-Petition Lenders would be willing to extend DIP financing in these chapter 11 cases. As part of the DIP financing discussions, the Debtors also asked the Pre-Petition Agent whether the Pre-Petition Lenders would agree to allow a priming DIP loan provided by a third-party lender. The Pre-Petition Agent advised the Debtors that the Pre-Petition Lenders would not agree to a priming DIP facility.

10. In addition to seeking a financing proposal from the Pre-Petition Lenders, the Debtors did consider obtaining DIP financing from other sources. During these efforts to identify potential DIP lenders, the Debtors and Mr. Victor contacted several potential DIP lenders, including Crystal Financial, LLC and Cerberus Business Finance, LLC, both of whom are not only familiar with the Debtors and their operations, but also are market leaders with the ability to promptly evaluate potential investment opportunities. Unfortunately, despite these efforts, the Debtors were unable to obtain any alternative proposals for DIP financing.

11. The Debtors and the Pre-Petition Lenders, as proposed DIP lenders, negotiated the DIP Loan Agreement. These negotiations, which were extensive and at arm's

length, culminated in the proposed DIP Facility in a principal amount of up to $90,088,952 comprised of (i) the DIP Working Capital Facility in the amount of up to $15,000,000, (ii) the DIP Credit Enhancement Facility in the amount of up to $5,000,000, and (iii) the DIP Term Facility in the amount of up to up to $70,088,952.

12.     The DIP Loan Agreement permits the Debtors to incur expenditures in accordance with an approved budget (the "**DIP Budget**"), a copy of which is attached hereto as **Exhibit C**.  The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to finance these chapter 11 cases, will be used (i) for working capital and general corporate purposes of the Debtors and (ii) to pay fees and expenses related to the DIP Facility and these chapter 11 cases.

13.     The terms of the DIP Facility require the Debtors to complete a sale of their assets in accordance with certain milestones.  To maximize the value of their estates, and in compliance with the milestones under the proposed DIP Facility, the Debtors will file a motion seeking authority to conduct an auction process by which the Debtors will solicit offers and, ultimately, seek approval to sell substantially all of their assets to the bidder with the highest or otherwise best offer.  The Debtors also will seek authority to retain SSG Capital Advisors, LLC to serve as their investment bankers to assist with conducting the marketing and sale of their assets.

**C.     The DIP Facility**

14.     Prior to the Petition Date, the Debtors engaged in good faith, arm's-length negotiations with the DIP Lenders, leading to the terms and conditions contained in DIP Loan Agreement.  The significant terms of the DIP Facility include:[4]

---

[4]  This summary is provided in accordance with Local Rule 4001-2(a)(ii) and is qualified in its entirety by reference to the provisions of the DIP Loan Agreement.  Each capitalized term used and not otherwise defined herein shall

| Local Rule Requirement | Description of Provision |
|---|---|
| **Borrowers** <br><br> *Local Rule 4001-2(a)(ii)* | Signal International, LLC, Signal Ship Repair, LLC, Signal International Texas, L.P., and Signal International Texas GP, LLC <br><br> *See* DIP Loan Agreement Preamble. |
| **DIP Lenders** <br><br> *Local Rule 4001-2(a)(ii)* | The Teachers' Retirement System of Alabama, and the Employees' Retirement System of Alabama <br><br> *See* DIP Loan Agreement Preamble. |
| **DIP Facility Amount** <br><br> *Local Rule 4001-2(a)(ii)* | The Aggregate Commitment is $90,088,952. <br><br> *See* DIP Loan Agreement Section 1.1. |
| **Interim Funding** <br><br> *Local Rule 4001-2(a)(ii)* | During the Interim Period the Debtors may not use more than $2,500,000.00 in Cash Collateral or DIP Loans. <br><br> *See* Interim Order ¶ 7.b. |
| **Priming** <br><br> *Local Rule 4001-2(a)(ii)* | The DIP Liens shall be first priority priming liens with seniority over the Pre-Petition Debt. <br><br> *See* DIP Loan Agreement Section 3.6; Interim Order ¶ 9.c. |
| **Use of DIP Facility and Cash Collateral** <br><br> *Local Rule 4001-2(a)(ii)* | The proceeds of the DIP Facility will be used to: (i) fund costs and expenses set forth in the DIP Budget; (ii) provide credit enhancement support in connection with the issuance by third parties of bonds or letters of credit to assure performance of the Debtors' obligations under customer contracts; and (iii) subject to the entry of the Final Order, fund the repayment in full of the First Lien Debt. <br><br> *See* DIP Loan Agreement Section 2.2; Interim Order ¶ 7.b. |

have the meaning assigned thereto in the DIP Loan Agreement. To the extent there exists any inconsistency between this summary and the provisions of the DIP Loan Documents, the Interim Order or the Final Order, the provisions of the DIP Loan Documents, the Interim Order and the Final Order, as applicable, shall control.

| Local Rule Requirement | Description of Provision |
|---|---|
| **Termination Date**<br><br>*Local Rule 4001-2(a)(ii)* | The earliest to occur of (i) November 24, 2015, (ii) the date upon which Lender shall elect to terminate the Availability Period and accelerate the Obligations in accordance with Section 7.2 of the DIP Loan Agreement following the occurrence and continuance of an Event of Default, and (iii) the Closing Date.<br><br>*See* DIP Loan Agreement Section 1.01. |
| **Interest Rate**<br><br>*Local Rule 4001-2(a)(ii)* | The outstanding principal balance of the DIP Facility shall bear simple interest at eight and one-fourth of one percent (8.25%) per annum.<br><br>*See* DIP Loan Agreement Section 1.01. |
| **Default Interest**<br><br>*Local Rule 4001-2(a)(ii)* | A fixed rate of interest equal to ten and one-fourth percent (10.25%) per annum.<br><br>*See* DIP Loan Agreement Section 1.01. |
| **Fees**<br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | Commitment Fee:  Debtors shall pay a commitment fee in an amount equal to two hundred basis points (2.00%) of the Credit Amount ($400,000), which shall be included in the DIP Budget and deemed fully earned and non-refundable on the date of entry of the Interim Order, and shall be due and payable by the Debtors on the Termination Date.<br><br>Monthly Fee:  Debtors shall pay to DIP Lenders a monthly fee in the amount of $7,500, the first of which shall be fully earned and non-refundable on the date of entry of the Interim Order.  Thereafter, on each successive monthly anniversary of the date of entry of the Interim Order during the Availability Period, Debtors shall pay DIP Lenders a Monthly Fee, which shall be fully earned and non-refundable upon each such monthly anniversary date.<br><br>*See* DIP Loan Agreement Section 2.8. |
| **Challenge Deadline** | The date that is the later of (i) in the case of a party in interest with requisite standing other than the Committee, including a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code, 75 days after the Petition Date, (ii) in the case of any Committee, 60 days after the filing of notice of appointment of a Committee (and subject to the Investigation Budget), (iii) any such later date agreed to in writing by DIP Lenders, in their sole discretion, and (iv) any such later date ordered by the Court for the cause shown after notice and an opportunity to be heard, provided that such order is entered before the expiration of any applicable period as set forth in clauses (i) through (iii) of this sentence.  For the avoidance of doubt, if the Challenge Deadline has not expired before the date of conversion of the Debtors' bankruptcy cases to ones under chapter 7 of the Bankruptcy Code, the |

| Local Rule Requirement | Description of Provision |
|---|---|
| *Local Rule 4001-2(a)(ii)* | remaining period prior to expiration of the Challenge Deadline shall be available to any Chapter 7 trustee appointed or elected in a Successor Case.<br><br>*See* Interim Order ¶¶ 26.b. |
| **Security**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | Each DIP Lender shall have and be granted valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens upon all of each Debtor's pre-petition and post-petition real and personal property, including, without limitation, all of each Debtor's cash, accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, the BP Claim, commercial tort claims, investment property, intellectual property, real property and leasehold interests, contract rights, and books and records relating to any assets of such Debtor and all proceeds (including, without limitation, insurance proceeds) of the foregoing, whether such assets were in existence on the Petition Date or were thereafter created, acquired or arising and wherever located. Subject to entry of the Final Order, the DIP Collateral shall include Avoidance Claims and Avoidance Proceeds. For the avoidance of doubt, the priority of the DIP Lenders' security interests in the DIP Collateral shall be subject to any valid, perfected, enforceable and unavoidable liens existing as to such DIP Collateral on the Petition Date, and to any valid, perfected and unavoidable interests in such DIP Collateral arising out of liens arising subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code..<br><br>*See* Interim Order ¶¶ 6.e., 9. |
| **Adequate Protection** | <u>Adequate Protection Liens</u>. The Pre-Petition Agent, for the benefit of the Pre-Petition Credit Parties, shall be granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by any Debtor of security agreements, pledge agreements, mortgages, financing statements or other agreements) valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "**Adequate Protection Liens**"); *provided* that the Adequate Protection Liens will attach to Avoidance Claims and Avoidance Proceeds only upon entry of the Final Order. The Adequate Protection Liens on DIP Collateral shall be junior and subordinate only to the DIP Liens. The Adequate Protection Liens shall not be subject to Sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code, and unless otherwise ordered by the Court, no lien avoided and preserved for the benefit of any estate pursuant to Section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any Adequate Protection Liens.<br><br><u>Priority of Adequate Protection Claims</u>. The Adequate Protection Claims, if any, will be allowed as superpriority administrative claims pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, which, subject to the Carve-Out, any unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 |

| Local Rule Requirement | Description of Provision |
|---|---|
| | U.S.C. 1930(a), the Superpriority Claims and any break-up fees and expense reimbursement obligations of the Debtors approved by the Court with respect to the APA (as defined in the DIP Loan Agreement), shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, which shall at all times be senior to the rights of each Debtor, and any successor trustee or any creditor in these Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code; *provided that,* prior to the entry of a Final Order, the Adequate Protection Claims shall not be payable from or have recourse to Avoidance Claims or Avoidance Proceeds. <br><br> Interest Payments. The Debtors shall pay to the Pre-Petition Credit Parties all interest accrued or accruing on the Pre-Petition Debt, which may be paid through advances of DIP Loan proceeds in accordance with the DIP Loan Agreement and as set forth in the Budget. In the event that the value of the Pre-Petition Collateral does not exceed the principal amount of the Pre-Petition Loans, the amount of any interest payments paid to the Pre-Petition Credit Parties in accordance with the Interim Order shall be deemed reclassified as principal payments. <br><br> Fees and Expenses of Professionals for Pre-Petition Credit Parties. The Debtors shall pay (i) the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, financial advisors, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising prior to the Petition Date, and (ii) on a current basis, the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising on or subsequent to the Petition Date, in each case in compliance with the Budget. At the option of the Pre-Petition Credit Parties, all such amounts may be added to the Pre-Petition Debt in lieu of current payment thereof by the Debtors. |
| *Local Rule 4001-2(a)(ii)* | *See* Interim Order ¶13. |
| **DIP Budget** | The use of the proceeds of the DIP Facility shall be in compliance with the DIP Budget, which is attached hereto as Exhibit C and to the DIP Loan Agreement as Exhibit B, and which DIP Budget may be adjusted only in accordance with the DIP Loan Agreement. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Exhibit B; Exhibit C. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Carve-Out**<br><br>*Local Rule 4001-2(a)(ii)* | The sum of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court that are incurred prior to the Termination Date, with respect to the U.S. Trustee, in such amounts as agreed to by the U.S. Trustee or determined by order of the Court (for the avoidance of doubt, there is no limitation on the obligations of the Debtors and their estates with respect to unpaid fees payable to the U.S. Trustee and Clerk of the Court pursuant to 28 U.S.C. § 1930), (b) all of the reasonable hourly fees and expenses from time to time incurred by Professionals retained by the Borrower and the Committee that are (i) incurred prior to the Termination Date, and (ii) included in an approved Budget, and (c) a maximum of $125,000.00 for all of the reasonable hourly fees and expenses from time to time incurred by Professionals retained by Borrower that are incurred after the Termination Date to the extent the Termination Date occurred as a result of the events described in either clause (i) or (ii) of the definition of the term "Termination Date".<br><br>See DIP Loan Agreement Section 1.01; Interim Order ¶ 17. |
| **Covenants**<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Loan Agreement requires compliance with affirmative and negative covenants that are usual and customary for DIP financings.<br><br>*See* DIP Loan Agreement Article VI. |
| **Milestones**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | The Debtors will need to comply with the following milestones:<br><br>(a) File the Sale Motion on or before July 15, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion.<br><br>(b) Subject to the Bankruptcy Court's availability, the order approving the assumption of the PSA shall be entered on or before August 15, 2015.<br><br>(c) Subject to the Bankruptcy Court's availability, the Final Order shall be entered on or before August 19, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion.<br><br>(d) Subject to the Bankruptcy Court's availability, the Sale Procedures Order shall be entered on or before August 19, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion.<br><br>(e) The Auction shall be held on or before October 3, 2015.<br><br>(f) Subject to the Bankruptcy Court's availability, the "Sale Approval Order" and the "Confirmation Order" contemplated by the PSA shall be entered on or before November 24, 2015.<br><br>(g) The Closing shall occur on or before December 14, 2015.<br><br>*See* DIP Loan Agreement Section 7.1. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Events of Default** | Usual and customary for comparable financings:<br><br>(a) Borrower shall fail to pay any Obligation within five (5) Business Days of when such Obligation is due and payable;<br><br>(b) Any representation or warranty of Borrower made in the DIP Loan Agreement, in any other DIP Loan Document or in any certificate, agreement, instrument or statement furnished or made or delivered pursuant hereto or thereto shall prove to have been untrue or incorrect in any material respect (or in the case of any representation or warranty qualified by a materiality standard, in any respect) when made or effected;<br><br>(c) Borrower shall fail to perform or observe any term, covenant, condition or agreement contained in the DIP Loan Agreement or in any other DIP Loan Document, or if there shall at any time exist any event, occurrence, condition or state of facts which constitutes a breach or violation of any term, covenant, condition or agreement contained in the DIP Loan Agreement or in any other DIP Loan Document and Borrower shall not have cured such failure to perform or breach within fifteen (15) days after the receipt of notice of such failure to perform or breach from Lender.<br><br>(d) If there shall occur or exist any "Default" or "Event of Default" under, and as defined in, any DIP Loan Document other than the DIP Loan Agreement and Borrower shall not have cured such "Default" or "Event of Default" within any notice, grace or cure period specified with respect thereto in such other DIP Loan Document.<br><br>(e) The DIP Loan Agreement or any other DIP Loan Document shall at any time for any reason (other than permitted cancellation by Lender) cease to be in full force and effect or shall be declared to be null and void by a court of competent jurisdiction, or if the validity or enforceability hereof or thereof shall be contested or denied by Borrower, or if the transactions contemplated hereunder or thereunder shall be contested by Borrower, or if Borrower shall repudiate or deny any liability or obligation hereunder or thereunder.<br><br>(f) If any enforcement action is successfully brought against Borrower with respect to any Pre-Petition Indebtedness in excess of $50,000 owing to any other creditor, and collection in respect of such action is not effectively stayed by the automatic stay in the Case.<br><br>(g) If any judgment, decree, arbitration award or ruling shall be entered against Borrower involving, in the aggregate, a Post-Petition liability (not paid or covered by insurance) of $50,000.00 or more and enforcement or collection in respect of such judgment, decree, award or ruling shall not have been vacated, paid, discharged, stayed or suspensively appealed within thirty (30) days from the entry thereof. |

| Local Rule Requirement | Description of Provision |
|---|---|
| | (h) The Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or Borrower shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or an application shall be filed by Borrower for the approval of any other Superpriority Claim (other than the Carve Out) in the Case which is pari passu with or senior to the claims of Lender with respect to the Collateral hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim with respect to the Collateral.

(i) The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the Collateral if the loss of such Collateral by Borrower would have a Material Adverse Effect, or an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying any Financing Order, as applicable.

(j) Except as permitted by the Financing Orders or the First Day Orders, Borrower shall make any payment (in cash, in kind or otherwise) of any Pre-Petition Indebtedness (other than indebtedness owing under the Pre-Petition Loan Documents).

(k) Other than as permitted by the Carve-Out and subject to entry of the Final Order, Borrower (or any successor in interest to Borrower, including, without limitation, any trustee in the Case) shall assert any claim for Administrative Expenses against any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise.

(l) Any change having a Material Adverse Effect shall have occurred since the Effective Date.

(m) Borrower shall not have filed the Sale Motion with the Bankruptcy Court on or before July 15, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion.

(n) Subject to the Bankruptcy Court's availability, the Bankruptcy Court shall not have entered an order approving the Borrower's assumption of the PSA on or before August 15, 2015.

(o) Subject to the Bankruptcy Court's availability, the Final Order shall not have been entered by the Bankruptcy Court on or before August 19, 2015, or such later |

| Local Rule Requirement | Description of Provision |
|---|---|
| | date as may be agreed to in writing by Lender in its sole discretion. |
| | (p) Subject to the Bankruptcy Court's availability, the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before August 19, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion. |
| | (q) The Auction shall not have been held on or before October 3, 2015. |
| | (r) Subject to the Bankruptcy Court's availability, the "Sale Approval Order" and the "Confirmation Order" contemplated by the PSA shall not have been entered by the Bankruptcy Court on or before November 4, 2015. |
| | (s) The Closing shall not have occurred on or before November 24, 2015. |
| | (t) Borrower shall be in material default of its obligations under the PSA, the APA, the Financing Orders, the Sale Orders or any other orders of the Bankruptcy Court. |
| | (u) The APA shall be rescinded, terminated, repudiated, declared to be null and void by a court of competent jurisdiction, or otherwise cease to be in full force and effect for any reason other than (i) cancellation or default thereunder by Lender, or (ii) failure by Lender to be the successful bidder at the Auction. |
| | (v) If Lender shall not be the successful bidder at the Auction, and the sale transaction between Borrower and the successful bidder (or a successful back-up bidder) at such sale shall fail to close in accordance with its terms as approved by order of the Bankruptcy Court. |
| | (w) The Bankruptcy Court shall enter any order the effect of which is to materially limit, restrict, curtail, reduce, suspend, stay or enjoin the right of Lender, as purchaser under the APA, to tender the Credit Bid in the full Credit Bid Amount, each as therein defined. |
| | (x) If any Variance Report shall reflect a negative variance exceeding the Permitted Variance or Permitted Variance Exception, as applicable. |
| | (y) If Borrower shall challenge the application of any payments authorized by the Financing Orders pursuant to Section 506(b) of the Bankruptcy Code. |
| | (z) If Borrower shall seek any relief under the Bankruptcy Code including, without limitation, Section 105 of the Bankruptcy Code, to the extent such relief would in any way restrict or impair the rights and remedies of Lender or Pre-Petition Lender provided in the Financing Orders or in any DIP Loan Document. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Section 7.1. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **506(c) Waiver**<br><br>*Local Rules 4001-2(a)(i)(C)* | Effective upon entry of the Final Order, no costs or expenses of administration shall be imposed upon any DIP Lender, any Pre-Petition Credit Party or any of the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Lender or Pre-Petition Credit Party.<br><br>*See* Interim Order ¶ 16. |
| **Roll-up**<br><br>*Local Rule 4001-2(a)(i)(E)* | Upon entry of the Final Order the Debtors shall be deemed to have paid in full in cash, by way of a dollar-for-dollar roll-up, all Pre-Petition Debt to the Pre-Petition Credit Parties from the amount available to be drawn under the DIP Loans for such purpose.<br><br>*See* Interim Order ¶11.a. |
| **Equities of the Case**<br><br>*Local Rules 4001-2(a)(i)(H)* | Upon the entry of the Final Order the Debtors shall waive "equities of the case" exception under section 552(b) of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 14. |

### D.     <u>Proposed Adequate Protection and Use of Cash Collateral</u>

15.     All cash, securities or other property of Debtors as of the Petition Date, including, without limitation, all amounts on deposit or maintained by any Debtor in any account was subject to rights of setoff or to valid, perfected, enforceable first-priority liens under the Pre-Petition Loan Documents and applicable law, and therefore the Debtors' cash balances are cash collateral of the Pre-Petition Credit Parties within the meaning of Section 363(a) of the Bankruptcy Code. All such cash (including, without limitation, all proceeds of Pre-Petition Collateral and all proceeds of property encumbered by liens and security interests granted under the Interim Order), is referred to herein as "**<u>Cash Collateral</u>**."

16. In addition to the DIP Facility, the Debtors also require the use of the Cash Collateral. The Pre-Petition Lenders have consented to the use of the Cash Collateral. The proceeds of the DIP Facility, coupled with the use of Cash Collateral (consistent with the DIP Budget) will provide the Debtors with the capital necessary to operate and preserve the value of their business during these chapter 11 cases.

17. The Debtors submit that the Pre-Petition Lenders are entitled to receive adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code for, and to the extent of, any postpetition diminution in the value of their interest in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, and the subordination to the Carve Out and the DIP Facility (collectively, the "**Diminution in Value**"). Accordingly, the Debtors and the Pre-Petition Lenders have agreed that the Debtors will provide the following primary forms of adequate protection (the "**Adequate Protection Package**"):

    i.    continuing, valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral;

    ii.    an allowed superpriority administrative expense claim in these chapter 11 cases;

    iii.    the Debtors shall pay to the Pre-Petition Credit Parties all interest accrued or accruing on the Pre-Petition Debt, which may be paid through advances of DIP Loan proceeds in accordance with the DIP Loan Agreement and as set forth in the Budget; and

    iv.    the Debtors shall pay the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, financial advisors, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising prior to the Petition Date, and on a current basis, the reasonable and documented professional fees and expenses payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising on or subsequent to the Petition Date, in each case in compliance with the DIP Budget and following receipt of a reasonably detailed invoice from the professional seeking any such payment.

18. The Adequate Protection Package will adequately protect the Pre-Petition Lenders' interests in the Prepetition Collateral from Diminution in Value, as well as for any decline in, or diminution of, the value of the Pre-Petition Lenders' liens or security interests under any of the Pre-Petition Loan documents. Further, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection. The Pre-Petition Lenders will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent Diminution in Value and enhance the likelihood of preserving and maximizing the Debtors' overall going-concern value.

### BASIS FOR RELIEF REQUESTED

**I.  ENTRY INTO THE PROPOSED DIP LOAN AGREEMENT SHOULD BE AUTHORIZED.**

19. Absent the relief requested herein, the Debtors will not have sufficient cash to make timely payments to vendors and employees that are required to support the Debtors' continued operations. Failure to pay these expenses would result in immediate cessation of the Debtors' operations.

**A.  Approval Under Section 364(c) of the Bankruptcy Code is Merited.**

20. The Debtors propose to obtain the DIP Facility by providing to the DIP Lenders security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).

21. Section 364(c) financing is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to

enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

22.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

i.      the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

ii.     the credit transaction is necessary to preserve the assets of the estate; and

iii.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re L.A. Dodgers LLC*, 457 B.R. at 312; *see also In re Ames Dep't Stores*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990); *Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991).  As is fully set forth below, the Debtors have satisfied each of these conditions.

**B.      The Debtors Do Not Have an Alternative to the DIP Facility.**

23.     As set forth above, financing of the type and in the amount needed in these cases was likely unobtainable on an unsecured basis.  There were no potential sources of postpetition financing for the Debtors, obtainable on an expedited basis and on reasonable terms, because, among other reasons, third-party financiers would have been required to prime the Pre-Petition Lenders.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (finding that the debtor satisfied its burden to show

an inability to obtain credit on other terms through time and effort); *see also In re Ames Dep't Stores*, 115 B.R. at 37.

24.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and 364(d) of the Bankruptcy Code. *See Snowshoe*, 789 F.2d at 1088; *see also In re Antico Mfg. Co.*, 31 B.R. 103, 105 (Bankr. E.D.N.Y. 1983). Moreover, where there are few lenders likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989). Thus, the Debtors submit that they can satisfy the requirement of section 364(c) of the Bankruptcy Code that alternative credit was not available on an unsecured basis allowable as an administrative claim under section 503(b)(1) of the Bankruptcy Code.

### C.     The DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates.

25.     The Debtors need immediate access to financing. Access to substantial credit is necessary to meet the day-to-day costs associated with operating the Debtors' business, including funding for employee wages and other costs necessary for operations while these cases are pending. Access to sufficient cash is therefore critical to the Debtors. In the absence of immediate liquidity, many of the Debtors' employees and contractors may refuse to continue providing services to the Debtors, rendering the Debtors unable to operate their business. A loss of confidence among employees and other interested parties in the Debtors' ability to access credit at this crucial time would have a material adverse impact on the Debtors' efforts during these chapter 11 cases.

26.     For these reasons, immediate access to the funds available under the DIP Loan Agreement is critical to the Debtors. The ongoing smooth operations of their business demand

that the Debtors not be delayed in receiving the beneficial effects of the DIP Facility; any substantial delay could have the same impact as denial of this Motion.

**D.**     **The DIP Loan Agreement is Fair, Reasonable, and Appropriate.**

27.     The DIP Facility reflects the exercise of the Debtors' sound and prudent business judgment. As described above, the Debtors were not able to obtain alternative financing on an unsecured basis, nor were they able to obtain any financing on terms as favorable to them as the terms negotiated with the DIP Lenders. The proceeds of the DIP Facility are sized to support the Debtors through the anticipated pendency of these chapter 11 cases and preserve and promote the health and viability of the business. Specific to these chapter 11 cases, the DIP Facility sets certain milestones for certain restructuring initiatives, including a sale process, and entitles the DIP Lenders to certain fees. Based on the extensive negotiations that took place, the Debtors believe that these are the only terms on which the DIP Lenders will provide the financing. Moreover, the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.

28.     The DIP Loan Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve Out. In *Ames Department Stores*, the bankruptcy court found that such "carve outs" are not only reasonable, but are necessary to ensure that official committees and debtors' estates will be assured of the assistance of counsel. *See Ames Dep't Stores*, 115 B.R. at 40

29.     The terms and conditions of the DIP Loan Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's-length. The interest rate under the DIP Loan Agreement is within the range of market rates and fair and reasonable in light of the credit profile of the Debtors, the nature and extent of the Collateral, and the business risks associated

with lending to the Debtors in these chapter 11 cases. Accordingly, the Debtors submit that the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### E. The Debtors Have Exercised Sound Business Judgment in Determining that the DIP Facility is Necessary.

30. As described above, after appropriate investigation and analysis, and given the exigencies of the circumstances, the Debtors have concluded that alternative credit of the type and in the amount required by the Debtors is not available on an unsecured basis. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (stating that debtor "is entitled to some free reign in fulfilling its perceived mission of . . . keeping an ongoing business afloat"). Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debto'rs estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

31. The Debtors have exercised sound business judgment in determining that the DIP Facility is not only appropriate, but that it is necessary. Without the liquidity provided by the DIP Facility, the Debtors would be unable to pay employees, contractors, vendors, and other constituencies that are essential to the operation of the business. Furthermore, the Debtors believe that they will satisfy the legal prerequisites to borrow under the DIP Loan Agreement.

The terms of the DIP Loan Agreement are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Loan Agreement, to borrow funds on the secured basis described above, and to take the other actions contemplated by the DIP Loan Agreement and as requested herein.

## II.     USE OF CASH COLLATERAL SHOULD BE APPROVED.

32.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the use of the Cash Collateral to fund their operations in accordance with the DIP Loan Agreement. Indeed, absent such relief, the Debtors would be unable to maintain operations, which would result in damaging consequences for the Debtors and their estates and creditors. The interests of the Pre-Petition Lenders in the Cash Collateral will be protected by the Adequate Protection Package. Moreover, as noted above, the Pre-Petition Lenders have consented to the use of the Cash Collateral. Accordingly, as part of the DIP Facility, the Debtors' request to use the Cash Collateral in the operation of their business and administration of these chapter 11 cases should be approved.

## III.    THE PROPOSED ADEQUATE PROTECTION PACKAGE SHOULD BE AUTHORIZED.

33.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. *See* 11 U.S.C. § 361. What constitutes adequate protection must be

decided on a case-by-case basis.  *See MNBank Dall., N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396–97 (10th Cir. 1987); *Martin v. U.S. (In re Martin),* 761 F.2d 472, 474 (8th Cir. 1985); *In re Shaw Indus., Inc.,* 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).  The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Grp., Inc.,* 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." (internal citations omitted)).

34.     As noted above, as adequate protection for the interests of the Pre-Petition Lenders, the Debtors will provide the Pre-Petition Lenders with the Adequate Protection Package.  In consideration for the Adequate Protection Package, the Pre-Petition Lenders have consented to the Debtors' use of the Cash Collateral.  Without access to the proposed DIP Facility and use of the Cash Collateral, the Debtors' liquidity will quickly dry up and the Debtors will be forced to cease operations, destroying the value of these estates to the detriment of all creditors.  In contrast, the value of the interest of the Pre-Petition Lenders in their collateral will be preserved, if not increased, by the DIP Facility because it ensures a more orderly wind-down of the business.

35.     The Adequate Protection Package will sufficiently protect the Pre-Petition Lenders' interest in their collateral.  Accordingly, the Adequate Protection Package is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## IV.     REQUEST FOR MODIFICATION OF AUTOMATIC STAY

36.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed DIP Loan Agreement contemplates a modification of the automatic stay, to the extent applicable, to permit the exercise of all rights and remedies

provided for in the DIP Loan Agreement upon the occurrence and during the continuation of any Event of Default, provided that prior to the exercise of any enforcement remedies against the Collateral, the DIP Lenders shall be required to give five business days' notice to the Debtors, any official unsecured creditors' committee's counsel, and the U.S. Trustee as provided for in paragraph 23 of the Interim Order. Provisions of this kind allowing for a modification of the automatic stay are typically features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

## V.    REQUEST FOR IMMEDIATE INTERIM RELIEF

37.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen days after the service of such motion. *See* Bankruptcy Rules 4001(b)(2), 4001(c)(2). Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion, and to authorize the obtaining and use of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. *See* Local Rule 4001-2(b). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985). After the fourteen-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. *See*, *e.g.*, *id*. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

38.    Pending the Final Hearing, the Debtors require immediate use of funds up to the Interim Amount Limit for, among other things, working capital needs. It is essential that the Debtors immediately have the ability to pay for postpetition operating expenses, as well as the

prepetition expenses approved in the various first-day orders pending before the Court, to minimize the damage occasioned by their constrained liquidity.

39.     Absent immediate use of the DIP Facility, the Debtors will be unable to pay ongoing operational expenses and will not be able to continue to make payments to key constituencies, such as employees and vendors, that are be integral to the operation of the Debtors' business.  Consequently, if interim relief is not obtained, the Debtors' efforts in these chapter 11 cases will be jeopardized immediately and irreparably harmed to the detriment of the Debtors' estates, their creditors, and other parties in interest.

40.     As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient to maintain their operations.  Without the DIP Facility, the Debtors' objective of stabilizing operations and facilitating their restructuring will be severely jeopardized.  The terms and conditions of the DIP Loan Agreement are fair and reasonable, and were negotiated by well-represented parties in good faith and at arm's-length.  In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtors' operations, the Debtors respectfully submit the granting of the relief requested by this Motion is warranted.

## VI.     THE DIP FINANCING SHOULD BE ACCORDED THE BENEFITS OF SECTION 364(e)

41.     Because the DIP Loan Agreement has been negotiated in good faith and at arm's-length and no consideration is being provided to any party for obligations arising under the DIP Loan Agreement, other than as disclosed therein, the Debtors request that the DIP Loan Agreement be accorded the benefits of section 364(e) of the Bankruptcy Code.

**NOTICE**

42.     Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Securities and Exchange Commission; (iii) the Office of the United States Attorney General for the District of Delaware; (iv) the Internal Revenue Service; (v) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (vi) counsel to the Pre-Petition Lenders and DIP Lenders; and (vii) the Debtors' banks.  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion on an interim basis; (ii) after the final hearing, enter the Final Order substantially in the form that shall be filed with the Court; (iii) grant such other and further relief as may be just and proper.

Dated: July 12, 2015
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jaime Luton Chapman*
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Travis G. Buchanan (No. 5595)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

## Interim Order

| | |
|---|---|
| In re: | Chapter 11 |
| **SIGNAL INTERNATIONAL, INC., et al.**[1] | Case No. 15-11498 (____) |
| Debtors. | (Joint Administration Requested) |
| | Ref. Docket No. _____ |

### INTERIM ORDER AUTHORIZING DEBTORS IN POSSESSION TO (I) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364, (II) GRANT LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 364; (III) USE CASH COLLATERAL, (IV) PROVIDE ADEQUATE PROTECTION TO PREPETITION CREDIT PARTIES AND MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (V) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL BANKRUPTCY RULE 4001-2

This matter is before the Court on the Motion (the "Motion") of Signal International, Inc. ("SI Inc."), Signal Ship Repair, LLC ("Signal SR"), Signal International, LLC ("SI LLC"), Signal International Texas GP, LLC ("SI Texas GP"), and Signal International Texas, L.P. ("SI Texas LP, and collectively with SI Inc., Signal SR, SI LLC, and SI Texas GP, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases"), requesting entry of an interim order (this "Interim Order") and final order (a "Final Order") pursuant to Sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (as amended, the "Local Bankruptcy Rules"):

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Signal International, Inc. (4248); Signal Ship Repair, LLC (2642); Signal International, LLC (5074); Signal International Texas GP, LLC (3050); and Signal International Texas, L.P. (5066). The Debtors' principal offices are located at RSA Battle House Tower, 11 North Water Street, Mobile, Alabama 36602.

(1) authorizing Debtors to obtain post-petition financing from the Teachers'
Retirement System of Alabama, a body corporate of the State of Alabama created under Section
§§ 16-25-1 *et seq.,* of the Alabama Code ("TRSA"), and the Employees' Retirement System of
Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.,* of
the Alabama Code ("ERSA," together with TRSA, each a "DIP Lender," and collectively, the
"DIP Lenders"), consisting of (x) a superpriority, secured revolving credit facility in the
principal amount of up to $15,000,000.00 (the "DIP Working Capital Facility") to be used for
general working capital and liquidity purposes, including the payment of Administrative
Expenses as described herein and in the that certain *Debtor-In-Possession Loan and Security
Agreement,* by and among the DIP Lenders, as Lenders, and the Debtors, as Borrower
(substantially in the form attached to the Motion, together with all schedules, exhibits and
annexes thereto, and as any time amended, the "DIP Loan Agreement"), (y) a superpriority,
secured revolving credit facility in the principal amount of up to $5,000,000.00 (the "DIP Credit
Enhancement Facility") to be used for credit enhancement obligations under customer contracts
as described in the DIP Loan Agreement, and (z) subject only to and effective upon entry of the
Final Order, a superpriority, secured term loan facility in an aggregate principal amount of
$70,088,952.00 (the "DIP Term Facility, and together with the DIP Working Capital Facility and
the DIP Credit Enhancement Facility, the "DIP Facility"), of which amount $2,500,000 will be
available under the DIP Working Capital Facility and the DIP Credit Enhancement Facility on an
interim basis (the "Interim Amount Limit") during the Interim Period (as defined below), on the
terms and conditions set forth in the DIP Loan Documents (as defined below) and in this Interim
Order.

(2) authorizing Debtors to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents;

(3) authorizing Debtors to use proceeds of the DIP Facility solely as expressly permitted in the DIP Loan Documents (as defined below) and in accordance with this Interim Order;

(4) granting automatically perfected (i) priming security interests in and liens on all of the DIP Collateral (as defined below) and (ii) non-priming security interests in and liens on all DIP Collateral upon which there are either pre-existing permitted senior liens or no pre-existing liens, to the DIP Lenders to the extent provided herein, and granting superpriority administrative expense status to the DIP Obligations (as defined below);

(5) authorizing Debtors to use Cash Collateral (as defined below), subject to the Interim Amount Limit during the Interim Period;

(6) providing adequate protection to the Pre-Petition Lender (as defined below) to the extent of any diminution in value of its interests in the DIP Collateral (as defined below) and subject to the Carve-Out (as defined below);

(7) authorizing the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

(8) vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents;

(9) subject only to and effective upon entry of the Final Order, waiving the Debtors' ability to surcharge against collateral pursuant to Section 506(c) of the Bankruptcy Code;

(10) subject only to and effective upon entry of the Final Order, granting liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code;

(11) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion; and

(12) granting the Debtors such other and further relief as is just and proper.

Based upon the Court's review of the Motion, the exhibits attached thereto, the *Declaration of Christopher S. Cunningham in Support of Chapter 11 Petitions and First Day Motions*, sworn to as of July 12, 2015 (the "First Day Declaration"), and all matters brought to the Court's attention at the interim hearing, which was held on July 14, 2015, pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "Interim Hearing"), and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, AND ADJUDGED,** that:[2]

1.     <u>Disposition</u>.     The Motion is hereby GRANTED, as and to the extent provided herein.  Any and all objections to the relief requested in the Motion, to the extent not otherwise withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

2.     <u>Jurisdiction; Core Proceeding</u>.   This Court has jurisdiction over these Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.    This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     <u>Service of Motion and Notice of Interim Hearing</u>.   Debtors have caused to be served copies of the Motion (together with the annexed copies of the proposed DIP Loan Agreement and Budget (defined below) annexed thereto), and notice of the Interim Hearing by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the Office of the United States Trustee (the "<u>U.S. Trustee</u>"), the 30 largest unsecured creditors of the Debtors, the Internal Revenue Service, all parties who have filed requests prior to the date of service for notices under Rule 2002 of the Bankruptcy Rules, and all parties known by a Debtor to hold or assert a lien on any asset of a Debtor.  The foregoing notice of the Motion, as it relates to this Interim Order and the Interim Hearing, is appropriate, due and sufficient under the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b), (c) and (d), and that no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.     <u>Petition Date</u>.   On July 12, 2015 (the "<u>Petition Date</u>"), each of Debtors filed with the Court its respective voluntary petition for relief under chapter 11 of the Bankruptcy Code, and each is continuing to manage its properties and to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed for any Debtor herein.

5. <u>Debtors' Stipulations</u>.  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in Paragraph 26 below), each Debtor admits, stipulates, acknowledges and agrees as follows:

a. <u>Pre-Petition Loan Documents</u>.  Pursuant to that certain *Credit Agreement,* dated as of January 31, 2014, among SI Inc., as Borrower, Signal SR, SI LLC, and SI Texas GP, and SI Texas LP, as Guarantors (collectively, with SI Inc., as Borrower, the "<u>Pre-Petition Obligors</u>"), TRSA, as administrative and collateral agent (together, the "<u>Pre-Petition Agent</u>"), and the Lenders from time to time party thereto (as amended, the "<u>Pre-Petition Loan Agreement</u>"), TRSA and ERSA, as Lenders (the "<u>Pre-Petition Lenders</u>," and collectively with the Pre-Petition Agent, the "<u>Pre-Petition Credit Parties</u>"), made a term loan facility available to the Pre-Petition Obligors in the aggregate principal amount of $75,000,000.00.   The Pre-Petition Loan Agreement, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, financing statement, pledge, assignment, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "<u>Pre-Petition Loan Documents</u>").

b. <u>Pre-Petition Collateral</u>.  Pursuant to certain Collateral Documents (as defined in the Pre-Petition Loan Agreement) executed by the Pre-Petition Obligors in favor of the Pre-Petition Agent, each of the Pre-Petition Obligors granted the Pre-Petition Agent, for the benefit of the Pre-Petition Credit Parties and to secure such Pre-Petition Obligors' obligations and indebtedness under the Pre-Petition Loan Documents, first priority liens on and security interests (the "<u>Pre-Petition Security Interests</u>") in the Collateral, as defined in the Pre-Petition Loan Agreement and Collateral Documents (hereafter, the "<u>Pre-Petition Collateral</u>").

c.     <u>Pre-Petition Obligations</u>.  As of the Petition Date, the Pre-Petition Obligors, jointly and severally, were justly and lawfully indebted and liable under the Pre-Petition Loan Documents to the Pre-Petition Credit Parties for term loans in the outstanding principal amount of $70,088,952.00 (the "<u>Pre-Petition Loans</u>", and together with all other obligations of any Pre-Petition Obligor in respect of indemnities, guaranties and other payment assurances given by any Pre-Petition Obligor for the benefit of Pre-Petition Credit Parties, and all interest, fees, costs, legal expenses and all other amounts heretofore or hereafter accruing thereon or at any time chargeable to any Pre-Petition Obligor in connection therewith, collectively referred to as the "<u>Pre-Petition Debt</u>").  Each Debtor acknowledges and stipulates that: (i) the Pre-Petition Debt is due and owing to Pre-Petition Credit Parties without any defense, offset, recoupment or counterclaim of any kind; (ii) the Pre-Petition Debt constitutes the legal, valid and binding obligation of each Pre-Petition Obligor, enforceable in accordance with its terms; (iii) and none of the Pre-Petition Debt or any payments made to any Pre-Petition Credit Party or applied to the obligations owing under any Pre-Petition Loan Document prior to the Petition Date is subject to avoidance, subordination, re-characterization, recovery, attack, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

d.     <u>Cash Collateral</u>.  Substantially all cash, securities or other property of the Pre-Petition Obligors (and the proceeds therefrom) as of the Petition Date, including, without limitation, all amounts on deposit or maintained by any Pre-Petition Obligor in any account with any Pre-Petition Credit Party or any bank or other depository institution (each a "<u>Depository Institution</u>"), was subject to rights of setoff or to valid, perfected, enforceable first-priority liens under the Pre-Petition Loan Documents and applicable law, and is included in the

Pre-Petition Collateral, and therefore the Pre-Petition Obligors' cash balances are cash collateral of the Pre-Petition Credit Parties within the meaning of Section 363(a) of the Bankruptcy Code. All such cash (including, without limitation, all proceeds of Pre-Petition Collateral and all proceeds of property encumbered by liens and security interests granted under this Interim Order), is referred to herein as "Cash Collateral."

e.    Releases.    Subject to Paragraph 26 below, the Debtors hereby absolutely, unconditionally and irrevocably waive, discharge and release each of the Pre-Petition Credit Parties of and from any and all "Claims" (as defined in the Bankruptcy Code), counterclaims, actions, debts, accounts, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses or setoff rights that any of them may have against any Pre-Petition Credit Party or any of the respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates of any Pre-Petition Credit Party which arise out of or in any manner relate to any of the Pre-Petition Loan Documents or any acts, inaction, or transactions thereunder, whether known or unknown, disputed or undisputed, at law or in equity, including, without limitation, (i) any re-characterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable Pre-Petition Debt or any payments made on account of the applicable Pre-Petition Debt, or the validity, enforceability, priority or non-avoidability of the applicable Pre-Petition Security Interests securing the applicable Pre-Petition Debt.

f.     Need for Financing.  An immediate and ongoing need exists for the Debtors to obtain the DIP Facility in order to permit, among other things, the orderly continuation of the operation of their business, to maintain business relationships with vendors, suppliers and customers, to pay payroll obligations, and to satisfy other working capital and operational needs so as to maximize the value of their respective businesses and assets as debtors in possession under chapter 11 of the Bankruptcy Code. The Debtors do not have sufficient available resources of working capital to operate their businesses in the ordinary course without post-petition financing.  The Debtors' ability to maintain business relationships with vendors and customers, to pay employees, and otherwise to fund operations is essential to Debtors' viability and to the preservation of the going concern value of their businesses pending a sale of their assets.

6.     Findings Regarding the DIP Facility.

a.     Good Cause.  Good cause has been shown for the entry of this Interim Order and authorization for the Debtors to incur DIP Obligations pursuant to the DIP Loan Agreement and use Cash Collateral as hereinafter provided up to the Interim Amount Limit during the Interim Period.  Each Debtor's need for financing of the type afforded by the DIP Loan Agreement and the use of Cash Collateral is immediate and critical.   Entry of this Interim Order will preserve the assets of each Debtor's estate and its value and is in the best interests of Debtors, their creditors and their estates.   The terms of the proposed financing are fair and reasonable, reflect each Debtor's exercise of business judgment, and are supported by reasonably equivalent value and fair consideration.

b.     Proposed DIP Facility.  The Debtors have requested that the DIP Lenders establish the DIP Facility pursuant to which the Debtors may obtain loans from time to

time (the "DIP Loans", and collectively with all related obligations of the Debtors under the DIP Loan Documents (as defined in the DIP Loan Agreement), the "DIP Obligations"), all in accordance with and subject to the terms of the DIP Loan Documents, with all DIP Obligations being secured by a security interest in and lien upon all of each Debtor's pre-petition and post-petition real and personal property, including, without limitation, all of each Debtor's cash, accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, the BP Claim (as defined in the DIP Loan Agreement), commercial tort claims, investment property, intellectual property, real property and leasehold interests, contract rights, and books and records relating to any assets of such Debtor and all proceeds (including, without limitation, insurance proceeds) of the foregoing, whether such assets were in existence on the Petition Date or were thereafter created, acquired or arising and wherever located, (all such real and personal property, including, without limitation, all Pre-Petition Collateral and the proceeds thereof, being collectively hereinafter referred to as the "DIP Collateral").  Subject to entry of the Final Order, the DIP Collateral shall include Avoidance Claims and Avoidance Proceeds.  For the avoidance of doubt, the priority of the DIP Lenders' security interests in the DIP Collateral shall be subject to any valid, perfected, enforceable and unavoidable liens existing as to such DIP Collateral on the Petition Date, and to any valid, perfected and unavoidable interests in such DIP Collateral arising out of liens arising subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  The DIP Lenders are willing to establish the DIP Facility upon the terms and conditions set forth herein and in the DIP Loan Agreement, substantially in the form attached to the Motion as **Exhibit A**, and the other DIP Loan Documents.

c. <u>No Credit Available on More Favorable Terms</u>. Despite diligent efforts, the Debtors have been unable to obtain financing on more favorable terms from sources other than DIP Lenders under the DIP Loan Documents and are unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. Debtors are also unable to obtain secured credit allowable under Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting priming liens under Section 364(d)(1) of the Bankruptcy Code and the Superpriority Claims (as defined in Paragraph 10 below) under the terms and conditions set forth in this Interim Order and in the DIP Loan Documents.

d. <u>Budget</u>. The Debtors have prepared and annexed to the Motion as **Exhibit C** thereto a budget (as at any time amended or supplemented with the written consent of the DIP Lenders, the "<u>Budget</u>") which sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby and which the Debtors believe in good faith to be realistic and achievable. The DIP Lenders are relying upon the Budget in entering into the DIP Loan Agreement and Pre-Petition Credit Parties are relying upon the Budget in consenting to the terms of this Interim Order. The Debtors shall provide the DIP Lenders and counsel for any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>Committee</u>") with an updated 13-week Budget every four weeks, which shall be subject to the approval requirements in the DIP Loan Documents. Commencing on the first Monday following the end of the fourth (4th) Loan Week (as defined in the DIP Loan Agreement) and continuing on each Monday thereafter, Borrower shall deliver to DIP Lenders (i) a comparison of actual to budgeted results of operations for the preceding four (4) Loan Weeks, and (ii) a report of all income and expense variance on a line-item basis for the preceding four (4) Loan Weeks. All

references restricting the use of Cash Collateral and DIP Loan proceeds to payment of amounts set forth in the Budget shall mean the most recent approved Budget, subject to the "Permitted Variances" and "Permitted Variance Exceptions" (each as defined in the DIP Loan Documents). Any amendments to the DIP Budget must be consistent with the terms of this Interim Order, and served upon counsel for the Committee and the U.S. Trustee.

        e.      <u>Certain Conditions to DIP Facility</u>. The DIP Lenders' willingness to make DIP Loans pursuant to the DIP Loan Documents, and the Pre-Petition Credit Parties' willingness to allow Debtors to use Cash Collateral, is conditioned upon, among other things, (i) the Debtors' obtaining Court approval of the DIP Loan Agreement and all DIP Obligations of Debtors and all rights and remedies of DIP Credit Parties thereunder; (ii) the Debtors' provision of adequate protection for Pre-Petition Credit Parties' interests in the Pre-Petition Collateral pursuant to Sections 361 and 363(e) of the Bankruptcy Code; and (iii) each DIP Lender receiving, as security for the prompt payment of all DIP Obligations, a security interest in and lien upon the DIP Collateral, and (iii) that such security interests and liens have the priorities hereinafter set forth. Subject to entry of the Final Order, the DIP Collateral shall include Avoidance Claims and Avoidance Proceeds.

        f.      <u>Interim Hearing</u>. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Bankruptcy Rule 4001-2, the Court has held the Interim Hearing and hereby authorizes Debtors to use Cash Collateral and obtain DIP Loans during the period from the date of entry of this Order through the date on which the final hearing on the Motion pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) scheduled pursuant to Paragraph 32 of this Interim Order (the "<u>Final Order</u>") is concluded (the "<u>Interim Period</u>"), for purposes specified in the initial Budget.

g.     <u>Finding of Good Faith</u>.  Based upon the record presented at the Interim Hearing, the DIP Facility and Debtors' use of Cash Collateral were negotiated in good faith and at arm's-length between the Debtors, on the one hand, and the DIP Lenders and Pre-Petition Credit Parties, on the other.  All of the DIP Obligations including, without limitation, all DIP Loans made pursuant to the DIP Loan Agreement and all other liabilities and obligations of any Debtors under this Interim Order owing to the DIP Lenders and Pre-Petition Credit Parties, as applicable, including the Debtors' use of Cash Collateral, shall be deemed to have been extended by DIP Lenders and Pre-Petition Credit Parties in "good faith," as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code.  The DIP Lenders and Pre-Petition Credit Parties shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

h.     <u>Immediate Entry</u>.  Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the interim relief sought by the Motion, each Debtor's estate will be immediately and irreparably harmed pending the Final Hearing.  Debtors' consummation of the DIP Facility in accordance with the terms of this Interim Order and the DIP Loan Agreement and Debtor's immediate access to Cash Collateral is in the best interest of each Debtor's estate and is consistent with each Debtor's exercise of its fiduciary duties.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with  Bankruptcy Rules 4001(b) and (c) and the Local Rules.   No further notice of the relief sought at the Interim Hearing is necessary or required.

7. <u>Authorization of Interim Financing; Use of Proceeds</u>.

a. The Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Loan Agreement in substantially the form annexed as **Exhibit A** to the Motion (with such changes, if any, as were made prior to or as a result of the Interim Hearing or are otherwise authorized to be made as amendments to the DIP Loan Agreement in accordance with this Interim Order) and all DIP Loan Documents.

b. So long as no Event of Default (as defined in the DIP Loan Agreement) has occurred and subject to the terms and conditions of the DIP Loan Documents (including any funding conditions, lending formulae and sub-limits contained therein), Debtors are hereby authorized to borrow money: (i) upon entry of this Interim Order and subject to its additional terms and conditions, during the Interim Period, DIP loans not to exceed the Interim Amount Limit of $2,500,000.00; and (ii) upon entry of the Final Order and subject to its additional terms and conditions, DIP Loans up to an aggregate principal amount outstanding at any time equal to (A) $15,000,000.00 in the case of the DIP Loans under the DIP Working Capital Facility (less the outstanding balance of any DIP Loans borrowed during the Interim Period), (B) $5,000,000.00 in the case of DIP Loans under the DIP Credit Enhancement Facility, and (C) $70,088,952.00 in the case of DIP Loans under the DIP Term Facility. Debtors are further authorized, in each case, as to DIP Loans made under any part of the DIP Facility, together with applicable interest, protective advances, expenses, fees and other charges payable in connection with such DIP Loans, to incur any and all liabilities and obligations under the DIP Loan Documents and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Loan Documents (including any obligations, to the extent provided for in the DIP Loan Documents, to indemnify the DIP Lenders); <u>provided, however</u>, that, during the

Interim Period and subject to all of the terms and conditions in the DIP Loan Agreement, Debtors may use DIP Loans to the extent necessary to avoid immediate and irreparable harm to Debtors, which, for purposes hereof, shall mean DIP Loans used (i) to pay (or in the case of contingent obligations, cash collateralize) amounts owed by any Debtor at any time to the DIP Lenders under any of the DIP Loan Documents, including, without limitation, costs, fees and expenses at any time due thereunder, (ii) to make disbursements specified in the Budget and in amounts not to exceed the Permitted Variances provided in the DIP Loan Agreement, (iii) to make adequate protection and other payments to Pre-Petition Credit Parties to the extent authorized or required herein, (iv) for any other purposes specified in the Budget, (v) to pay other expenses that are required or authorized to be paid, prior to the Final Hearing, under any of the DIP Loan Documents, and (vi) to pay the Carve-Out (as defined below).

c.  No DIP Lender shall have any obligation or responsibility to monitor any Debtor's use of the DIP Loans, and each DIP Lender may rely upon each Debtor's representations that the amount of DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the DIP Loan Documents, and Bankruptcy Rule 4001(c)(2).

d.  No proceeds of any DIP Loan shall be used to (i) make any payment in settlement or satisfaction of any pre-petition claim (excluding the Pre-Petition Debt) or administrative claim (excluding the DIP Obligations), unless such payment is in compliance with the Budget, permitted under the DIP Loan Documents, and separately approved by the Court upon notice to, and no formal objection having timely filed with the Court from the DIP Lenders;  (ii) except as expressly provided or permitted hereunder, to make any distributions not in compliance with the Budget, or as otherwise approved by the DIP Lenders, including without

limitation, to make any payment or distribution to any equity holder, or insider of any Debtor; or (iii) to make any payment otherwise prohibited by this Interim Order.

8. <u>Execution, Delivery and Performance of DIP Loan Documents</u>. The DIP Loan Documents may be executed and delivered on behalf of each Debtor by any officer, director, or agent of such Debtor, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute the DIP Loan Documents for and on behalf of such Debtor. The DIP Lenders shall be authorized to rely upon any such person's execution and delivery any of the DIP Loan Documents as having been done with all requisite power and authority so to do, and the execution and delivery of any of the DIP Loan Documents or amendments thereto by any such person on behalf of such Debtor shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company, or other entity action (as applicable) of such Debtor. Upon execution and delivery thereof, each of the DIP Loan Documents shall constitute valid and binding obligations of each Debtor, enforceable against each Debtor in accordance with their terms for all purposes during its Chapter 11 Case, any subsequently converted case of such Debtor under Chapter 7 of the Bankruptcy Code (each, a "<u>Successor Case</u>"), and after the dismissal of its Chapter 11 Case with respect to those provisions of the DIP Loan Documents which expressly survive the Termination Date and any such dismissal. Subject to Paragraph 26 of this Interim Order, no obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under Sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any

defense, reduction, setoff, recoupment or counterclaim. In furtherance of the provisions of Paragraph 7 of this Interim Order, each Debtor is authorized and directed to do and perform all acts; to make, execute and deliver all instruments and documents (including, without limitation, security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements, amendments, waivers, consents, other modifications, and intellectual property filings), and; to pay all fees, costs and expenses, in each case as may be necessary or, in the opinion of either DIP Lender, desirable to give effect to any of the terms and conditions of the DIP Loan Documents, to validate the perfection of the DIP Liens (as defined below), or as may otherwise be required or contemplated by the DIP Loan Documents.

9.      DIP Liens.  As security for Debtors' payment and performance of all DIP Obligations, each DIP Lender shall have and is hereby granted valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens upon all of the DIP Collateral, subject to the provisions in Paragraph 9(d) (collectively, the "DIP Liens") and in the priorities set forth herein.  Subject to the provisions of Paragraph 26 hereof and the Carve-Out, the DIP Liens shall be:

a.      Unencumbered Property.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected, first priority senior liens on, and security interests in, all DIP Collateral that is not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, or to any valid, perfected and unavoidable interests in such property arising out of liens arising subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

b.      Liens Junior to Certain Other Liens.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, junior only to valid, binding, perfected and unavoidable interests of any

other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date that were senior in priority to the liens of the Pre-Petition Credit Parties, or to any valid, perfected and unavoidable interests in such property arising out of liens arising subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code that are senior in priority to the liens of the Pre-Petition Credit Parties.

   c. <u>Priming DIP Liens</u>. Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests in and liens upon the DIP Collateral, which security interests and liens shall be prior and senior in all respects to (i) the security interests and liens in favor of Pre-Petition Credit Parties with respect to the Pre-Petition Collateral, and (ii) the Adequate Protection Liens (as defined below) with respect to the Pre-Petition Collateral.

   d. <u>Liens Senior to Certain Other Liens</u>. The DIP Liens and the Adequate Protection Liens, unless the Adequate Protection Liens are successfully challenged pursuant to Paragraph 26 below, shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any Debtor or its estate under Section 551 of the Bankruptcy Code, (B) any lien or security interest of any lessor or landlord under agreement or applicable state law, (C) any liens or security interests granted by any Debtor to other persons or entities or otherwise arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of Debtors, or (D) any intercompany or affiliate liens or security interests of Debtors; (ii) subordinated to or made *pari passu* with any other lien or security interest under Section 363 or 364 of the Bankruptcy Code or otherwise; or (iii) subject to Sections 510, 549 or 550 of the Bankruptcy Code.  In no event

shall any person or entity who pays (or, through the extension of credit to any Debtor, causes to be paid) any of the DIP Obligations or the obligations and indebtedness of the Pre-Petition Credit Parties, be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, any DIP Lender by the terms of any DIP Loan Documents or this Interim Order unless such person or entity contemporaneously causes Full Payment of the Pre-Petition Debt owed to such DIP Lender to be made.[3]

      10.    <u>Superpriority Claims</u>.  All DIP Obligations shall constitute joint and several allowed superpriority claims (the "<u>Superiority Claims</u>") against each Debtor (without the need to file any proof of claim) pursuant to Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over all other obligations, liabilities and indebtedness of each Debtor, whether now in existence or hereafter incurred by any Debtor, and over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order approving the grant), 507, 546(c), 552(b) 726, 1113 or 1114 of the Bankruptcy Code. Such Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all pre-petition and post-petition property of Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, all Avoidance Proceeds received or recovered in respect of any Avoidance Claims; *provided, however*, that the

---

[3] As used herein, the term "Full Payment," as applied to DIP Obligations or Pre-Petition Debt, shall mean full and final payment of such indebtedness in cash, the cash collateralization of any contingent obligations as and to the extent required by the applicable loan documents, termination of any commitments to lend under any of the applicable loan documents, expiration of the Challenge Deadline (as defined below) without a challenge having been timely asserted, and, in the case of the DIP Obligations, termination of the DIP Facility.

Superpriority Claims in favor of the DIP Lenders shall be subject to the Carve-Out (as defined below).

11.    Repayment.

a.    Repayment of Pre-Petition Debt.    Upon entry of the Final Order and subject to Paragraph 26 of this Interim Order, the Debtors shall be deemed to have paid in full in cash, by way of a dollar-for-dollar roll-up, all Pre-Petition Debt to the Pre-Petition Credit Parties from the amount available to be drawn under the DIP Loans for such purpose.

b.    Repayment of DIP Obligations.    The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as provided herein, without offset or counterclaim.    Without limiting the generality of the foregoing, in no event shall any Debtor be authorized to offset or recoup any amounts owed, or allegedly owed, by any Pre-Petition Credit Party or any DIP Lender to any Debtor or any of its respective subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of each Pre-Petition Credit Party or DIP Lender that would be affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by any Pre-Petition Credit Party or DIP Lender.

12.    Use of Cash Collateral.    The Debtors are authorized, by this Interim Order, subject to the terms and conditions of the DIP Loan Documents and the Interim Order, to use all Cash Collateral, including, without limitation, any Cash Collateral on which the Pre-Petition Credit Parties hold a lien, to fund any post-petition cost or expense incurred by the Debtors to the same extent that the use of DIP Loan proceeds would be permitted to fund such cost or expense under the terms of the DIP Loan Agreement and subject to the Budget; *provided, however,* that no Cash Collateral shall be used in a manner that would be a Prohibited Purpose (as defined

herein). The Debtors' right to use Cash Collateral, other than the Carve-Out, shall terminate automatically on the Termination Date as defined in the DIP Loan Agreement. Notwithstanding the foregoing, the Debtors' right to use Cash Collateral shall immediately terminate upon two Business Days' notice from the DIP Lenders or the Pre-Petition Credit Parties at the time that any Debtor has actual knowledge of the existence of an Event of Default if the Debtors fail to promptly notify the DIP Lenders and the Pre-Petition Credit Parties of such Event of Default.

13. <u>Adequate Protection of Pre-Petition Credit Parties</u>. As adequate protection for any Collateral Diminution (as defined below) suffered by any Pre-Petition Credit Party, the Pre-Petition Agent is entitled, pursuant to Sections 105, 361, 363(e) and 364 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral in an amount equal to the Collateral Diminution (the "<u>Adequate Protection Claims</u>"). As used in this Interim Order, "<u>Collateral Diminution</u>" shall mean an amount equal (and limited) to the aggregate diminution of the value of any of the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date for any reason provided for in the Bankruptcy Code, including, without limitation, any such diminution resulting from the use of Cash Collateral, the priming of the Pre-Petition Agent's security interests in and liens on the Pre-Petition Collateral by the DIP Liens pursuant to the DIP Loan Documents and this Interim Order, the depreciation, sale, loss or use by any Debtor (or any other decline in value) of such Pre-Petition Collateral, the amount of any fees and expenses paid to retained professionals in these Chapter 11 Cases, in accordance with the Budget, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code. The Pre-Petition Agent is hereby granted, subject to the rights of third parties preserved under Paragraph 26, the following for the benefit of Pre-Petition Credit Parties:

a. <u>Adequate Protection Liens</u>. The Pre-Petition Agent, for the benefit of the Pre-Petition Credit Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by any Debtor of security agreements, pledge agreements, mortgages, financing statements or other agreements) valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "<u>Adequate Protection Liens</u>"); *provided* that the Adequate Protection Liens will attach to Avoidance Claims and Avoidance Proceeds only upon entry of the Final Order. The Adequate Protection Liens on DIP Collateral shall be junior and subordinate only to the DIP Liens. The Adequate Protection Liens shall not be subject to Sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code, and unless otherwise ordered by the Court, no lien avoided and preserved for the benefit of any estate pursuant to Section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any Adequate Protection Liens.

b. <u>Priority of Adequate Protection Claims</u>. The Adequate Protection Claims, if any, will be allowed as superpriority administrative claims pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, which, subject to the Carve-Out, any unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. 1930(a), the Superpriority Claims and any break-up fees and expense reimbursement obligations of the Debtors approved by the Court with respect to the APA (as defined in the DIP Loan Agreement), shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, which shall at all times be senior to the rights of each Debtor, and any successor trustee or any creditor in these Chapter 11 Cases or any

subsequent proceedings under the Bankruptcy Code; *provided that,* prior to the entry of a Final Order, the Adequate Protection Claims shall not be payable from or have recourse to Avoidance Claims or Avoidance Proceeds.

        c.      <u>Interest Payments</u>.  As additional adequate protection, the Debtors shall pay to the Pre-Petition Credit Parties all interest accrued or accruing on the Pre-Petition Debt, which may be paid through advances of DIP Loan proceeds in accordance with the DIP Loan Agreement and as set forth in the Budget.  In the event that the value of the Pre-Petition Collateral does not exceed the principal amount of the Pre-Petition Loans, the amount of any interest payments paid to the Pre-Petition Credit Parties in accordance with this Interim Order shall be deemed reclassified as principal payments.

        d.      <u>Fees and Expenses of Professionals for Pre-Petition Credit Parties</u>. As additional adequate protection, Debtors shall pay (i) the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, financial advisors, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising prior to the Petition Date, and (ii) on a current basis, the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising on or subsequent to the Petition Date, in each case in compliance with the Budget.  No later than ten (10) business days following the end of a calendar month, professionals retained by any Pre-Petition Credit Party must submit an invoice (redacted for privileges, attorney work product and confidentiality) containing a reasonably detailed summary of the work performed and the

expenses incurred during the prior calendar month to the Debtors, counsel to the Debtors, counsel to the Committee, and the U.S. Trustee, each of whom shall have ten (10) calendar days following receipt of such invoice to object to the invoice in question by providing a written notice setting forth the basis for the objection. If no timely objection shall have been received in accordance herewith, the Debtors shall pay such invoice within ten (10) business days after such professional has delivered such invoice to the Debtors. If an objection to a professional's invoice is timely received in accordance herewith, the Debtors shall only be required to pay the undisputed amount of the invoice and the Bankruptcy Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. No recipient any such fees or expenses shall be required to file with respect thereto any interim or final fee application with this Court. Except in the event of an unresolved objection as provided herein, no such fees or expenses shall be subject to Court approval. For the avoidance of doubt, section 330 of the Bankruptcy Code, Bankruptcy Rule 2016 and the U.S. Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 for Attorneys in Larger Chapter 11 Cases, dated June 11, 2013 shall not apply in the event of any dispute involving such fees and expenses. The failure of any professional to submit an invoice within ten (10) business days following the end of a calendar month shall not constitute a waiver of that professional's right to receive payment from the Debtors for work performed and expenses incurred during the prior calendar month provided that an appropriate invoice is submitted as set forth above in any month prior to the effective date of any plan confirmed in these Chapter 11 Cases. Alternatively, in lieu of the above, in the sole discretion of the Pre-Petition Credit Parties, any or all such amounts may be added to the Pre-Petition Debt, subject to the above procedures. Additionally, any Pre-Petition Credit Party may

elect not to add some or all of its professional fees and expenses to the Pre-Petition Debt. In the event that some or all of any Pre-Petition Credit Party's professional fees and expenses are not added to the Pre-Petition Debt, the above review procedures shall not be applicable to those fees and expenses. Any such election shall be made and notice thereof shall be provided by the electing Pre-Petition Credit Party to counsel for the Debtors, counsel for the Committee and the U.S. Trustee no later than five (5) days prior to any auction held pursuant to 11 U.S.C. § 363 in which any Pre-Petition Credit Party credit bids. For the avoidance of doubt, the failure by any Pre-Petition Credit Party to timely provide notice of its election is without prejudice to its right to request the Debtors to pay some or all its professional fees and expenses or to add some or all of its professional fees and expenses to the Pre-Petition Date, provided that such Pre-Petition Credit Party complies with the review procedures set forth in this paragraph.

e. <u>Reservation of Rights</u>. Nothing herein shall be deemed to be a waiver by any Pre-Petition Credit Party of its right to request additional or further protection of its interests in any Pre-Petition Collateral, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner for any Debtor or the conversion or dismissal of any of these Chapter 11 Cases, or to request any other relief in these cases; nor shall anything herein or in any of the DIP Loan Documents constitute an admission by a Pre-Petition Credit Party regarding the quantity, quality or value of any DIP Collateral securing the Pre-Petition Debt or constitute a finding of adequate protection with respect to the interests of Pre-Petition Agent in any DIP Collateral. Pre-Petition Credit Parties shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale, encumbering or other disposition of any of the DIP Collateral, to

the extent that the protection afforded by this Interim Order to Pre-Petition Agent's interests in any DIP Collateral proves to be inadequate.

14. <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted (a) to the DIP Lenders or (b) subject only to the potential challenges by third-parties as permitted but limited by Paragraph 26 below, to Pre-Petition Agent on behalf of any Pre-Petition Credit Party, in each case pursuant to the provisions of this Interim Order or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, Sections 506(c) (subject to entry of the Final Order approving the grant) or the "equities of the case" exception of 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

15. <u>Fees and Expenses of Estate Professionals</u>. Subject to the terms of the DIP Loan Agreement and the Budget, for so long as no Event of Default has occurred and is continuing, each Debtor is authorized to use DIP Loans to pay such compensation and expense reimbursement (collectively, "<u>Professional Fees</u>") of professional persons (including attorneys, financial advisors, accountants, investment bankers, appraisers, and consultants) retained by any Debtor with Court approval or as an ordinary course professional (the "<u>Debtors Professionals</u>") or the Committee with Court approval (the "<u>Committee Professionals</u>," collectively with the Debtors Professionals, the "<u>Professionals</u>"), to the extent that such compensation and expense reimbursement is allowed and approved by the Court, other than with respect to ordinary course professionals of the Debtors (including through any interim compensation procedures approved by the Court); *provided, however*, that, notwithstanding anything herein or in any other order of

this Court to the contrary, no proceeds of any DIP Loans or any Cash Collateral shall be used to pay Professional Fees incurred for any Prohibited Purpose (as defined below).

16. <u>Section 506(c) Claims</u>. Effective upon entry of the Final Order, no costs or expenses of administration shall be imposed upon any DIP Lender, any Pre-Petition Credit Party or any of the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Lender or Pre-Petition Credit Party, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Lender or Pre-Petition Credit Party.

17. <u>Carve-Out</u>. Notwithstanding anything in this Interim Order, any DIP Loan Documents, or any other order of this Court to the contrary, prior to Full Payment of the DIP Obligations, the DIP Liens and Superpriority Claims in favor of the DIP Lenders, the Adequate Protection Liens in favor of the Pre-Petition Agent, and the Adequate Protection Claims in favor of the Pre-Petition Credit Parties shall be subject and subordinate in all respects to the payment of the following Carve-Out. As used in this Interim Order, "<u>Carve-Out</u>" means the sum of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court that are incurred prior to the Termination Date, with respect to the U.S. Trustee, in such amounts as agreed to by the U.S. Trustee or determined by order of the Court (for the avoidance of doubt, there is no limitation on the obligations of the Debtors and their estates with respect to unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 1930), (b) all of the reasonable hourly fees and expenses from time to time incurred by Professionals retained by the Borrower and the Committee that are (i) incurred prior to the Termination Date, and (ii) included in an approved Budget, and (c) a maximum of $125,000.00 for all of the reasonable hourly fees and expenses from time to time

incurred by Professionals retained by Borrower that are incurred after the Termination Date to the extent the Termination Date occurred as a result of the events described in either clause (i) or (ii) of the definition of the term "Termination Date"; *provided,* that nothing in this Interim Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursements or compensation of any Professional, whether or not in excess of the coverage provided by the Carve-Out.  In no event shall the Carve-Out, or the funding of the DIP Loans to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations or the Pre-Petition Debt.

18.     Excluded Professional Fees.  Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out, nor the proceeds of the DIP Facility in any respect, including without limitation any DIP Loans, Cash Collateral or DIP Collateral, shall be used to pay any Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following (each a "Prohibited Purpose"):  (a) objecting to or contesting the validity or enforceability of this Interim Order, any DIP Obligations or Pre-Petition Debt, *provided* that the Committee may spend up to $50,000.00 (the "Investigation Budget") for the fees and expenses incurred in connection with the investigation of, but not the litigation, objection or any challenge to, any Pre-Petition Security Interest, Pre-Petition Debt, or Pre-Petition Loan Documents; (b) asserting or prosecuting any claim or cause of action against any DIP Lender or any Pre-Petition Credit Party, other than to enforce the terms of the DIP Facility or this Interim Order; (c) seeking to modify any of the rights granted under this Interim Order to any DIP Lender or any Pre-Petition Credit Party; or (d) objecting to, contesting, delaying, preventing or interfering in any way with the exercise of rights and remedies by any DIP Lender or Pre-Petition Credit Party with respect to any DIP Collateral or Pre-Petition

Collateral after the occurrence and during the continuance of an Event of Default, provided that Debtors may contest or dispute whether an Event of Default has occurred and shall be entitled to any notice provisions provided in this Interim Order.

19. Preservation of Rights Granted Under This Interim Order.

a. Protection from Subsequent Financing Order. There shall not be entered in any of these Chapter 11 Cases or in any Successor Case any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is (i) secured by a security interest, mortgage or collateral interest or lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens or (ii) entitled to priority administrative status that is equal or senior to the Superpriority Claims granted to DIP Lenders herein; *provided, however,* that nothing herein shall prevent the entry of an order that specifically provides for, as a condition to the granting of the benefits of clauses (i) or (ii) above, the Full Payment of all of the DIP Obligations, in the manner required by the DIP Loan Agreement, from the proceeds of such credit or indebtedness, and the termination of any funding commitments under the DIP Facility.

b. Rights Upon Dismissal, Conversion or Consolidation. If any of the Chapter 11 Cases are dismissed, converted or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of any of the Chapter 11 Cases shall affect the rights or remedies of any DIP Lender under the DIP Loan Documents or the rights or remedies of any DIP Lender or Pre-Petition Credit Party under this Interim Order, and all of the respective rights and remedies hereunder and thereunder of each DIP Lender and each Pre-Petition Credit Party shall remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, or substantively consolidated. Unless

and until Full Payment of all DIP Obligations and Adequate Protection Claims has occurred, it shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 Cases. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, the Adequate Protection Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until Full Payment of all DIP Obligations and all Adequate Protection Claims, (ii) such Superpriority Claims, Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest, (iii) the other rights granted by this Interim Order shall not be affected, including the rights granted by Paragraph 26 of this Interim Order, and (iv) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph and otherwise in this Interim Order.

c. <u>Survival of Interim Order</u>. The provisions of this Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases or any Successor Case.

d. <u>No Discharge</u>. None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in any of these Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Debtor has waived such discharge.

e. <u>Credit Bid Rights</u>. Following entry of the Final Order, but without prejudice to any successful challenge brought prior to the Challenge Deadline, the DIP Lenders

and the Pre-Petition Credit Parties shall each have the right to credit bid, individually or on a combined basis, up to the full amount of the applicable outstanding DIP Obligations and Pre-Petition Debt (as applicable), in each case including any accrued interest or other agreed charges, in any sale of the DIP Collateral (or any part thereof) or Pre-Petition Collateral (or any part thereof), as applicable, without the need for further Court order authorizing same, and whether such sale is effectuated through Section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise. For the avoidance of doubt, without prejudice to any successful challenge brought prior to the Challenge Deadline, no plan of reorganization or liquidation, nor any order entered in connection with a sale of any Debtor's assets under Section 363 of the Bankruptcy Code, in any of these Chapter 11 Cases shall limit or otherwise restrict the right of Pre-Petition Agent or the DIP Lenders to credit bid for all or any part of the Pre-Petition Collateral or DIP Collateral.

f.     No Marshaling. Subject to entry of a Final Order, in no event shall any DIP Lender or Pre-Petition Credit Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral, and in no event shall any DIP Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of any Debtor's estate pursuant to Section 551 of the Bankruptcy Code.

g.     No Requirement to File Claim for DIP Obligations or Pre-Petition Debt. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar order establishing a deadline for the filing of proofs of claims entitled to administrative expense treatment under Section 503(b) of the Bankruptcy Code, no DIP Lender shall be required to file any proof of claim with respect to any of the DIP Obligations and no Pre-Petition Credit Party shall be required to file any proof of claim with

respect to any Pre-Petition Debt, all of which shall be due and payable in accordance with the DIP Loan Documents and the Pre-Petition Loan Documents, as applicable, without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Loan Documents or Pre-Petition Loan Documents, or prejudice or otherwise adversely affect any rights, remedies, powers or privileges of any DIP Lender under any of the DIP Loan Documents, any Pre-Petition Credit Party under any of the Pre-Petition Loan Documents, or any DIP Lender or Pre-Petition Credit Party under this Interim Order.

20. <u>Automatic Perfection of Liens</u>. The DIP Liens, and subject to the third party challenge rights in Paragraph 26, the Adequate Protection Liens, shall be deemed valid, binding, enforceable and duly perfected upon entry of this Interim Order. Neither any Pre-Petition Credit Party nor any DIP Lender shall be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including taking possession of any of the DIP Collateral) in order to validate the perfection of any DIP Liens or the Adequate Protection Liens, but all of such filings and other actions are hereby authorized by the Court. The DIP Lenders shall be deemed to have "control" over all deposit accounts for all purposes of perfection under the Uniform Commercial Code. If the Pre-Petition Agent or the DIP Lenders shall, in their discretion, choose to file or record any such mortgages, deeds of trust, security deeds, notices of lien, or UCC-1 financing statements, or take any other action to evidence the perfection of any part of the DIP Liens or the Adequate Protection Liens, each Debtor and its respective officers are directed to execute any documents or instruments as the Pre-Petition Agent or DIP Lenders shall request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the

date of entry of this Interim Order. Any Pre-Petition Credit Party or DIP Lender may, in its discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which any Debtor is organized or has or maintains any DIP Collateral or an office, and each filing office is directed to accept such certified copy of this Interim Order for filing and recording. Any provision of any lease, license, contract or other agreement that requires the consent or approval of one or more counterparties or requires the payment of any fees or obligations to any governmental entity, in order for a Debtor to pledge, grant, sell, assign or otherwise transfer any such interest or the proceeds thereof is hereby found to be (and shall be deemed to be) inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting the DIP Lenders a security interest in and lien on such interest, or the proceeds of any assignment and/or sale thereof by any Debtor, accordance with the terms of the applicable DIP Loan Documents and this Interim Order.

21.     Reimbursement of Expenses. All reasonable costs and expenses incurred by the DIP Lenders in connection with (a) the negotiation and drafting of any DIP Loan Documents or any amendments thereto, (b) the preservation, perfection, protection and enforcement of any DIP Lender's rights hereunder or under any DIP Loan Documents, (c) the collection of any DIP Obligations, or (d) the monitoring of these Chapter 11 Cases, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, consultants, financial advisors, appraisers and other professionals incurred by a DIP Lender in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations owing to such DIP Lender and shall be paid by Debtors (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the applicable DIP Loan

Documents. For the avoidance of doubt, any costs and expenses incurred by the TRSA or the ERSA that are not related to (a)-(d) of this paragraph but are instead solely related to the Pre-Petition Debt are not covered under this paragraph.

22. <u>Amendments to DIP Loan Documents</u>. The Debtors and DIP Lenders are hereby authorized to implement, in accordance with the terms of the applicable DIP Loan Documents and without further order of the Court, any amendments to and modifications of any of such DIP Loan Documents on the following conditions: (a) the amendment or modification must not constitute a material change to the terms of such DIP Loan Documents, (b) copies of the amendment or modification must be served upon counsel for the Committee (and, prior to the appointment of a Committee, upon each Debtor's 30 largest unsecured creditors), the U.S. Trustee, and other interested parties specifically requesting such notice, and (c) notice of the amendment must be filed with the Court. Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court. For purposes hereof, a "material change" shall mean a change to a DIP Loan Document that operates to shorten the DIP Facility or the maturity of the DIP Obligations, to increase the aggregate amount of the commitments of DIP Lenders under the DIP Facility, to increase the rate of interest other than as currently provided in or contemplated by the DIP Loan Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to a DIP Lender following the occurrence of an Event of Default. Without limiting the generality of the foregoing, any amendment of a DIP Loan Document to postpone or extend any date or deadline therein (including, without limitation, the expiration of the term of the DIP Facility) shall not constitute a "material change" and may be effectuated by Debtors and the DIP Lenders without the need for further approval of the Court.

23. <u>Events of Default; Remedies</u>.

a. <u>Events of Default</u>. The occurrence of any "Event of Default" under (and as defined in) the DIP Loan Agreement shall constitute an Event of Default under this Interim Order.

b. <u>Default Remedies</u>. Upon the occurrence and continuance of an Event of Default, and following the expiration of any applicable cure period set forth in the DIP Loan Agreement, (a) the DIP Lenders may file with the Court and serve upon the Debtors, counsel for the Debtors, counsel for the Committee and the U.S. Trustee a written notice (a "<u>Default Notice</u>") describing the Events of Default that exist, in which event effective five (5) business days thereafter (the "<u>Default Notice Period</u>"), DIP Lenders shall be fully authorized, in their sole discretion, to demand payment of all DIP Obligations, and hold and apply any balances in any accounts of Debtors to the payment or cash collateralization of any of the DIP Obligations; and (b) each DIP Lender and the Pre-Petition Agent shall be deemed to have received complete relief from the automatic stay imposed by Section 362(a) of the Bankruptcy Code with respect to all of the Collateral, effective following the expiration of the Default Notice period, unless the Court has determined that an Event of Default has not occurred and/or is not continuing. Unless otherwise determined by the Court, any party in interest's sole recourse with respect to opposing such modification of the automatic stay under Section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default. Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted, the DIP Lenders and the Pre-Petition Agent may enforce its DIP Liens, the Pre-Petition Security Interests, and the Adequate Protection Liens, as applicable, with respect to the DIP Collateral, take all other actions and exercise all other remedies under the DIP Loan Documents,

the Pre-Petition Loan Documents and applicable law that may be necessary or deemed appropriate to collect any of its DIP Obligations and/or the Pre-Petition Debt, proceed against or realize upon all or any portion of the Collateral as if these Chapter 11 Cases or any superseding Chapter 7 case was not pending, and otherwise enforce any of the provisions of this Interim Order. Any delay or failure to exercise rights and remedies by the DIP Lenders or Pre-Petition Agent under the DIP Loan Documents or this Interim Order shall not constitute a waiver of such DIP Lender or Pre-Petition Agent's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Loan Agreement. In furtherance of Paragraph 17 above, the DIP Lenders shall provide for cash payment of the Carve-Out from the proceeds of the DIP Collateral before any sums are paid to the DIP Lenders from such proceeds.

c. <u>Rights Cumulative</u>. The rights, remedies, powers and privileges conferred upon DIP Credit Parties pursuant to this Interim Order shall be in addition to and cumulative with those contained in the applicable DIP Loan Documents.

24. <u>Loan Administration</u>.

a. <u>Continuation of Pre-Petition Procedures</u>. To the extent that this Court enters an Order authorizing the Debtors' continued use of their cash management system, all pre-petition cash management practices and procedures of the Debtors, including any lockbox and/or blocked depository bank account arrangements, shall continue without interruption after the commencement of the Chapter 11 Cases and shall be deemed effective for the benefit of the DIP Lender in a manner consistent with the DIP Loan Agreement.

b. <u>Inspection Rights</u>. Representatives of each DIP Lender shall be authorized, with prior notice to Debtors, to visit the business premises of any Debtor and its

subsidiaries to (i) inspect any Collateral, (ii) inspect and make copies of any books and records of any Debtor, and (iii) verify or obtain supporting details concerning the financial information to be provided by any Debtor hereunder or under any of the DIP Loan Documents, and the Debtors shall facilitate the exercise of such inspection rights.

        c.        <u>DIP Lenders' Right to Retain Professionals</u>.  Subject to paragraph 21, each DIP Lender shall be authorized to retain attorneys (including local counsel in the United States), appraisers, consultants, auditors, field examiners and financial advisors, at Debtors' expense, which attorneys, appraisers, consultants, auditors, field examiners and financial advisors shall be afforded reasonable access to the Collateral and each Debtor's business premises and records, during normal business hours, for purposes of monitoring the businesses of Debtors, verifying each Debtor's compliance with the terms of the DIP Loan Documents and this Interim Order, and analyzing or appraising all or any part of the Collateral.   All such amounts payable to or incurred under this clause (c) shall be payable in accordance with Paragraph 21 above.

        25.        <u>Modification of Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified and lifted to the extent necessary to implement the provisions of this Interim Order and the DIP Loan Documents, thereby permitting the DIP Lenders and Pre-Petition Agent to receive collections and proceeds of Collateral for application to the DIP Obligations and the Pre-Petition Debt as and to the extent provided herein, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens or Adequate Protection Liens, and to enforce the DIP Liens and Adequate Protection Liens as and to the extent authorized by this Interim Order.

26. <u>Effect of Stipulations on Third Parties; Deadline for Challenges</u>.

a. Each Debtor's admissions, stipulations, agreements and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order, shall be binding upon such Debtor and any successor thereto (including, without limitation any Chapter 7 trustee or Chapter 11 trustee or examiner appointed or elected for such Debtor) under all circumstances and for all purposes.

b. Each Debtor's admissions, stipulations, agreements and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order, shall be binding upon all other parties in interest (including, without limitation, any Committee) under all circumstances and for all purposes unless (i) the Committee or another party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) having requisite standing has timely and properly filed an adversary proceeding or contested matter by no later than the Challenge Deadline (A) objecting to or challenging the amount, validity, perfection, enforceability priority or extent of the Pre-Petition Debt or any Pre-Petition Credit Party's Liens, or (B) otherwise asserting any defenses, claims, causes of action, counterclaims or offsets against any Pre-Petition Credit Party or its respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter.  As used herein, the term "<u>Challenge Deadline</u>" means the date that is the later of (i) in the case of a party in interest with requisite standing other than the Committee, including a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code, 75 days after the Petition Date, (ii) in the case of any Committee, 60 days after the filing of notice of appointment of a Committee (and subject to the Investigation

Budget), (iii) any such later date agreed to in writing by DIP Lenders, in their sole discretion, and (iv) any such later date ordered by the Court for the cause shown after notice and an opportunity to be heard, provided that such order is entered before the expiration of any applicable period as set forth in clauses (i) through (iii) of this sentence. For the avoidance of doubt, if the Challenge Deadline has not expired before the date of conversion of the Debtors' bankruptcy cases to ones under chapter 7 of the Bankruptcy Code, the remaining period prior to expiration of the Challenge Deadline shall be available to any Chapter 7 trustee appointed or elected in a Successor Case.

c.     If no such adversary proceeding or contested matter is timely and properly filed as of the applicable Challenge Deadline against a Pre-Petition Credit Party or the Court does not rule in favor of the plaintiff in any such proceeding, then in these Chapter 11 Cases and in any Successor Case each Debtor's admissions, stipulations, agreements and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order, shall be binding on all parties in interest. If any such adversary proceeding or contested matter is properly filed by the applicable Challenge Deadline, each Debtor's admissions, stipulations, agreements and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order, shall nonetheless remain binding and preclusive on such party, except to the extent that such admissions, stipulations, agreements and releases were expressly challenged in such adversary proceeding or contested matter and the party bringing such challenge prevails on the merits. Nothing contained in this Interim Order shall vest or confer any person or entity, including any Committee, standing or authority to pursue or commence any such adversary proceeding or contested matter.

d.     Notwithstanding anything else contained in this Interim Order, if an adversary proceeding or contested matter is timely and properly filed as of the applicable Challenge Deadline against a Pre-Petition Credit Party, the entity prosecuting that timely adversary proceeding or motion can, if successful, challenge the adequate protection provided with respect to any lien avoided and payments made to any Pre-Petition Credit Party and all of the provisions regarding Adequate Protection Claims and Adequate Protection Liens in this Order are qualified by this reservation of the rights of third parties.   If the Adequate Protection payments made exceed the amount of adequate protection to which any Pre-Petition Credit Party is entitled, that excess shall be applied to that Pre-Petition Credit Party's allowed secured claim.

27.     Debtors' Waivers.  At all times during the Chapter 11 Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to seek authority (i) until Full Payment of all DIP Obligations and, upon entry of a Final Order, Pre-Petition Debt, to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the DIP Lenders on the terms and conditions set forth herein; and (ii) to propose or support a plan of reorganization or liquidation that does not provide for the indefeasible payment in full and satisfaction of all DIP Obligations, and, subject to entry of the Final Order, all Pre-Petition Debt on or before the effective date of such plan.

28.     Service of Interim Order.  Promptly after the entry of this Interim Order, Debtors shall mail, by first class mail, a copy of this Interim Order, the Motion (and all exhibits attached to the Motion), and a notice of the Final Hearing, to (without duplication) counsel for the DIP Lenders and Pre-Petition Agent, the U.S. Trustee, counsel for the Committee (or, if the Committee has not been formed and selected counsel as of the entry of this Interim Order, then

the 30 largest unsecured creditors of each Debtor), the Internal Revenue Service, all parties who have filed requests for notices under Rule 2002 of the Bankruptcy Rules prior to the time of such service, and all parties known by a Debtor to hold or assert a lien on any assets of a Debtor, and shall file a certificate of service regarding same with the Clerk of the Court. Such service shall constitute good and sufficient notice of the Final Hearing and the relief sought by the Debtors pursuant to the proposed Final Order.

29.　　No Deemed Control.  In determining to make any DIP Loan under the DIP Facility, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, any Final Order or the DIP Loan Documents, no DIP Lender and no Pre-Petition Credit Party shall be deemed to be in control of any Debtor or its operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.,* as amended, or any similar state or federal statute) with respect to the operation or management of such Debtor.

30.　　Exculpation.  Nothing in this Interim Order, the DIP Loan Documents, or any other document related to the DIP Facility shall in any way be construed or interpreted to impose upon any DIP Lender or any Pre-Petition Credit Party any liability for any claims arising from the pre-petition or post-petition activities of any Debtor in the operation of its business or in connection with its restructuring efforts.  So long as a DIP Lender or Pre-Petition Credit Party complies with its obligations under the applicable DIP Loan Documents and its obligations, if any, under this Interim Order and applicable law (i) such DIP Lender or Pre-Petition Credit Party shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C)

any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person or entity; and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

31.     Binding Effect; Successors and Assigns.   The provisions of the DIP Loan Documents and this this Interim Order, including all findings herein (subject to Paragraph 26 of this Interim Order) shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Lenders and Debtors and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed for the estate of any Debtor, any Chapter 7 trustee appointed or elected in a Successor Case, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor), and shall inure to the benefit of DIP Lenders and their respective successors and assigns.   In no event shall any DIP Lender or Pre-Petition Credit Party have any obligation to make DIP Loans to, or permit the use of the Collateral (including Cash Collateral) by, any Chapter 7 trustee, Chapter 11 trustee or similar responsible person appointed or elected for the estate of any Debtor.

32.     Final Hearing.   The Final Hearing to consider entry of the Final Order shall be held at ___:00 o'clock  _.m., prevailing Eastern time on _____, 2015, at Courtroom _____, United States Bankruptcy Court, 824 Market Street North, Wilmington, Delaware 19801.   The Final Hearing may be adjourned or postponed without further notice except as may be announced in open Court or posted on the Court's docket.   If any or all of the provisions of this Interim Order are modified, vacated or stayed as the result of any Objection (as defined below) timely filed and asserted at the Final Hearing, then, without limiting the provisions of Paragraph 26 hereof, any DIP Obligations incurred prior to the effective date of such

modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders shall be entitled to the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, without limitation, the DIP Liens and Superiority Claims granted herein and pursuant to the DIP Loan Documents with respect to all such DIP Obligations.

33.     Objection Deadline.  If any party in interest shall have an objection to any of the provisions of this Interim Order, any provisions of the DIP Loan Documents, or any provisions of the proposed Final Order (collectively, an "Objection"), such party may assert such Objection at the Final Hearing, if a written statement setting forth the basis for such Objection is filed with the Court and concurrently served so as to be received on or before ____:00 _.m., prevailing Eastern time on _____, 2015, by the following: (a) the Office of the United States Trustee, Tiiara N. A. Patton, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, tiiara.patton@usdoj.gov; (b) counsel for the Debtors, Chris Donoho, Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, chris.donoho@hoganlovells.com; and M. Blake Cleary, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, mbcleary@ycst.com ; (c) counsel for the Pre-Petition Agent and DIP Lenders, Derek F. Meek, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, AL 35203, dmeek@burr.com; and Eric D. Schwartz and Gregory W. Werkheiser, Morris, Nichols, Arsht & Tunnell, LLP, 1201 North Market Street, 16th Floor, Wilmington, DE 19899, eschwartz@mnat.com and gwerkheiser@mnat.com.  If an objecting party shall fail to appear at the Final Hearing and assert the basis for such Objection before the Court, such Objection may be deemed to have been waived and abandoned by such objecting party.

34. <u>Insurance</u>. To the extent the Pre-Petition Agent is listed as mortgagee, loss payee or additional insured under any Debtor's insurance policies, the DIP Lenders shall also deemed to be the loss payee, mortgagee or additional insured under such Debtor's insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies.

35. <u>Effectiveness; Enforceability</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

36. <u>Retention of Jurisdiction</u>. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for any Debtor notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.


Dated: July __, 2015
      Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**DIP Loan Agreement**

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is made and effective as of the [X] day of July, 2015 (the "Effective Date"), by and among **SIGNAL INTERNATIONAL, INC.**, a Delaware corporation ("Signal"), **SIGNAL INTERNATIONAL, LLC**, a Delaware limited liability company ("International"), **SIGNAL SHIP REPAIR, LLC**, a Delaware limited liability company ("Repair"), **SIGNAL INTERNATIONAL TEXAS, L.P.**, a Delaware limited partnership ("Limited Partner"), and **SIGNAL INTERNATIONAL TEXAS GP, LLC**, a Delaware limited liability company ("General Partner", and together with Signal, International, Repair, and Limited Partner, individually and collectively, the "Borrower"), and **TEACHERS' RETIREMENT SYSTEM OF ALABAMA**, a body corporate of the State of Alabama created under §§ 16-25-1 *et seq.*, of the Alabama Code ("TRSA"), and **EMPLOYEES' RETIREMENT SYSTEM OF ALABAMA**, a body corporate of the State of Alabama created under §§ 36-27-1 *et seq.*, of the Alabama Code (together with TRSA, individually and collectively, "Lender").

## R E C I T A L S:

**WHEREAS**, on July 12, 2015 (as of the actual time of filing, the "Petition Date"), Signal, International, Repair, Limited Partner and General Partner each filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (including any other court having jurisdiction over the Case, the "Bankruptcy Court"), initiating cases under Chapter 11 of the Bankruptcy Code, jointly administered under Case No. [_____] (collectively, the "Case"), and the Borrower has continued in possession of its assets and in the operation and management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** Borrower and Lender have entered into that certain Asset Purchase Agreement dated as of July 13, 2015 (as such agreement may be modified or amended from time to time, the "APA"), pursuant to which Lender has agreed to purchase certain assets of the Borrower's bankruptcy estate in a sale pursuant to Section 363 of the Bankruptcy Code, subject to the approval of the Bankruptcy Court; and

**WHEREAS**, the Borrower has requested that the Lender enter into this Agreement to provide to Borrower a debtor in possession credit facility in a principal amount of up to $90,088,952.00 comprised of (i) revolving credit in the amount of up to $15,000,000 to be used for general working capital and liquidity purposes and for the payment of Administrative Expenses as herein described, and (ii) revolving credit in the amount of up to $5,000,000 to be used for credit enhancement obligations under customer contracts as herein described, and (iii) up to $70,088,952.00  to be used for repayment of the principal indebtedness owing under the Pre-Petition Loan Documents as herein described, all of the Borrower's obligations under which are to be secured as provided herein and in the Financing Orders (as herein defined), the proceeds of which may only be used as expressly permitted by the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby mutually promise and agree as follows:

## AGREEMENT

## ARTICLE ONE - DEFINITIONS

1.1 <u>Definitions</u>. In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule hereto, when used in this Agreement, the following terms shall have the following respective meanings (such meanings shall be equally applicable to the singular and plural forms of the terms used, as the context requires):

"<u>Administrative Expenses</u>" shall collectively mean, to the extent approved by the Bankruptcy Court if such approval is required under the Bankruptcy Code, (i) all fees payable pursuant to 28 U.S.C. § 1930, (ii) all fees and expenses incurred by Borrower's Professionals, (iii) all fees and expenses incurred by Professionals retained by any statutory committee appointed in the Case, including the Committee, (iv) the actual and necessary costs and expenses involved in preserving the bankruptcy estate of the Borrower, including wages, salaries and other general administrative expenses incurred by the Borrower, (v) all fees and expenses of the notice and claims agent in the Case, (vi) all fees and expenses of the United States Trustee (the "<u>US Trustee</u>"), and (vii) all such other expenses incurred by the Borrower as may be permitted by the Bankruptcy Code or approved by the Bankruptcy Court.

"<u>Advance</u>" means each principal disbursement or deemed principal disbursement, as applicable, of DIP Loan proceeds made to Borrower in accordance with this Agreement.

"<u>Affiliate</u>" shall have the meaning set forth in the Bankruptcy Code.

"<u>Approved Budget</u>" means the Borrower's operating budget as submitted to and approved by Lender from time to time pursuant to <u>Section 2.9</u> of this Agreement.

"<u>Auction</u>" has the meaning set forth in the definition of Sale Procedures Order.

"<u>Availability Period</u>" means the period during which Advances of the DIP Loan shall be available hereunder, which period shall commence upon the entry of the Interim Order and end on the Termination Date.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, as heretofore and hereafter amended, and codified as 11 U.S.C. §§ 101, <u>et</u> <u>seq</u>.

"<u>Borrower</u>" means each of the borrower parties identified in the preamble to this Agreement severally and individually, and all of the borrower parties identified in the preamble to his Agreement jointly and collectively, it being the intention of the parties that the term "Borrower" shall for all purposes mean and refer to each such party, *mutatis mutandis*, with full and equal force and effect on both an individual and collective basis.

"<u>Borrower's Business</u>" means the business of marine construction, including the upgrade, conversion, retrofit, renovation, maintenance, repair and new construction of mobile offshore drilling rigs and floating production platforms for the offshore energy industry, together with all such other business activities as may reasonably be necessary or convenient thereto.

"<u>Borrower's Representative</u>" means the CRO or any other authorized person reasonably acceptable to Lender to communicate with Lender in matters pertaining to this Agreement.

"<u>BP Claim</u>" means all rights, claims, interests and causes of action of any kind whatsoever related to or arising from the "Deepwater Horizon Incident" as defined by that certain Economic and Property Damages Settlement Agreement dated as of April 18, 2012, among BP Exploration and Production Inc., BP America Production Company and the other parties thereto, including any Business Economic Loss Claim filed under and in accordance therewith.

"Business Day" means any day other than a Saturday, Sunday or recognized holiday on which commercial banks in Alabama are authorized or required to be closed for business.

"Capitalized Lease" means any lease of Property by a Person as lessee which, as determined in accordance with GAAP, is required to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" of any Person means, as of the date of any determination thereof, the amount at which the aggregate rental obligations due and to become due under all Capitalized Leases under which such Person is a lessee would be reflected as a liability on a balance sheet of such Person as determined in accordance with GAAP.

"Carve Out" means an amount equal to the aggregate sum of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court that are (i) incurred prior to the Termination Date, and (ii) included in an Approved Budget, (b) all of the reasonable hourly fees and expenses from time to time incurred by Professionals retained by the Borrower and the Committee that are (i) incurred *prior to* the Termination Date, and (ii) included in an Approved Budget, (c) a maximum of $125,000.00 for all of the reasonable hourly fees and expenses from time to time incurred by Professionals retained by Borrower that are incurred *after* the Termination Date to the extent the Termination Date occurred as a result of the events described in either clause (i) or (ii) of the definition of the term "Termination Date", and (d) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court *after* the Termination Date to the extent the Termination Date occurred as a result of the events described in either clause (i) or (ii) of the definition of the term "Termination Date".

Change in Control" means (i) an event or series of events as a result of which any "person" or "group" (as such terms are used in Sections 13(d)(3) and 14(d) of the Exchange Act) is or becomes, directly or indirectly, the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, whether or not applicable) of more than 50% of the combined voting power of the then outstanding securities entitled to vote generally in elections of directors, managers or trustees, as applicable, of Borrower or any successor entity ("Voting Stock"), (ii) the completion of any consolidation with or merger of Borrower into any other Person, or any sale, conveyance, transfer or lease by Borrower of all or substantially all of its assets to any Person, or any merger of any other Person into Borrower in a single transaction or series of related transactions, and, in the case of any such transaction or series of related transactions, the outstanding common stock of Borrower is changed or exchanged as a result, unless the stockholders of Borrower immediately before such transaction own, directly or indirectly, immediately following such transaction, at least 51% of the combined voting power of the outstanding voting securities of the Person resulting from such transaction in substantially the same proportion as their ownership of the Voting Stock immediately before such transaction, or (iii) the occurrence of any event whereby less than a majority of the Board of Directors of Borrower shall be persons who were serving in such capacity on the Effective Date.

"Closing Date" means the date upon which a sale pursuant to Section 363 of the Bankruptcy Code shall be consummated pursuant to the Sale Order to the winning bidder (or back-up bidder) chosen at the Auction.

"Collateral" shall have the meaning set forth in Section 3.1 of this Agreement.

"Committee" means any statutory committee appointed by the Bankruptcy Court in the Case.

"Credit Amount" means a principal amount of Twenty Million and No/100 Dollars ($20,000,000.00), in DIP Loan proceeds available to be advanced to Borrower pursuant to this Agreement.

"Credit Enhancement Sublimit" has the meaning set forth in Subsection 2.2(b) of this Agreement.

"CRO" means the person from time to time serving as the Chief Restructuring Officer of the Borrower, if any.

"Default" means the occurrence or existence of any event, circumstance, state of facts or condition which, but for the giving of any required notice, the expiration of any applicable grace or cure period or the satisfaction of any other condition precedent, would constitute an Event of Default hereunder.

"Default Rate" means a fixed rate of interest equal to ten and one-fourth percent (10.25%) per annum.

"DIP Loan" means the credit facility made available to the Borrower pursuant to Article Two of this Agreement in an aggregate outstanding principal amount not exceeding the sum of (i) the Credit Amount, plus (ii) the Roll-Up Advance.

"DIP Loan Documents" means this Agreement, the DIP Loan Note, the Security Documents and all other agreements, documents and instruments heretofore, now or hereafter delivered to Lender in connection with or pursuant to this Agreement, all as the same may from time to time be amended, modified, extended or renewed. For the avoidance of doubt, the Pre-Petition Loan Documents are not DIP Loan Documents.

"DIP Loan Note" means that certain Promissory Note of even date herewith evidencing the DIP Loan and payable by Borrower to Lender in a principal amount equal to the Credit Amount.

"Distribution" in respect of any Person means (a) dividends or other distributions of cash, stock, assets or other property on or in respect of any shares of stock, membership interest or other equity interest in such Person; and (b) the redemption, repurchase or other acquisition of any shares of stock, membership interest or other equity interest in such Person or of any warrants, rights or other options to purchase any such stock, membership interest or other equity interest (except when solely in exchange for such stock, membership interest or other equity interest).

"Dollars" and "$" means legal tender of the United States of America.

"Effective Date" has the meaning set forth in the first paragraph of this Agreement.

"Environmental Law" means any federal, state or local statute, law, rule, regulation, order, consent decree, judgment, permit, license, code, deed restriction, common law, treaty, convention, ordinance or other governmental requirement, domestic or foreign, relating to public health, safety or the environment, including, without limitation, those relating to releases, discharges or emissions to air, water, land or groundwater, to the use of groundwater, to the use and handling of polychlorinated biphenyls or asbestos, to the disposal, treatment, storage or management of hazardous or solid waste, hazardous substances or crude oil, or any fraction thereof, to exposure to toxic or hazardous materials, to the handling, transportation, discharge or release of gaseous or liquid hazardous substances, in each case applicable to any of the Property owned, leased or operated by Borrower or any Subsidiary or the operation, construction or modification of any such Property, including, without limitation, the following:

the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, the Hazardous Materials Transportation Act, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Safe Drinking Water Control Act, the Clean Air Act of 1966, the Toxic Substances Control Act of 1976, the Occupational Safety and Health Act of 1977, the Emergency Planning and Community Right-to-Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, and any amendments to these laws and any rules and regulations promulgated thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time.

"Event of Default" has the meaning ascribed thereto in Section 7.1 of this Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities Exchange Commission.

"Excluded Assets" means those Properties of Borrower with respect to which no Lien shall be granted to Lender as security for the Obligations. The Excluded Assets shall be comprised solely of (i) the Carve Out, (ii) any inter-company claims between or among, as applicable, Signal, International, Repair, Limited Partner and General Partner, (iii) stock, membership interests or any equity interests in the Borrower, and (v) all proceeds from the foregoing.

"Final Order" means an order of the Bankruptcy Court, satisfactory to Lender in its sole discretion, approving the DIP Loan Documents and granting the Superpriority Claim status and Liens described in Article 3 of this Agreement, which Final Order (i) shall have been entered upon an application or motion of the Borrower satisfactory in form and substance to Lender in all material respects, on such prior notice to such parties as may in each case be entitled to notice under the Bankruptcy Code, (ii) shall be in full force and effect, and (iii) shall not have been stayed, reversed, modified or amended in any respect; and, if the Final Order is the subject of a pending appeal in any respect, neither the making of any Advances nor the performance by Borrower of any of its obligations hereunder or under the DIP Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

"Financing Orders" means, collectively, the Interim Order and the Final Order.

"First Day Orders" means all orders entered by the Bankruptcy Court based upon the following first-day motions filed by the Borrower in the Case: Joint Administration Motion, KCC Claims and Noticing Application, Cash Management Motion, Utilities Motion, Taxes Motion, Insurance Motion, Customer Programs Motion, Wages and Benefits Motion, Critical Vendors Motion, DIP Motion

"Fixed Rate" means a fixed rate of interest equal to eight and one-fourth of one percent (8.25%) per annum.

"GAAP" means the consistent application of such generally accepted accounting principles as may then be applicable in the United States of America.

"Indebtedness" means, with respect to any Person, without duplication, all indebtedness, liabilities and obligations of such Person including, without limitation, all (i) obligations of such Person

for borrowed money or for the deferred purchase price of Property or services (including, without limitation, all notes payable and all obligations evidenced by bonds, debentures, notes or other similar instruments), (ii) obligations secured by any Lien on, or payable out of the proceeds of production from, any Property or assets owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligations, (iii) indebtedness, liabilities and obligations of third parties, including joint ventures and partnerships of which such Person is a venturer or general partner, recourse to which may be had against such Person, (iv) obligations created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person, notwithstanding the fact that the rights and remedies of the seller, lender or lessor under such agreement in the event of default are limited to repossession or sale of such Property, (v) Capitalized Lease Obligations of such Person, (vi) all accounts payable of such Person, (vii) all indebtedness, liabilities and obligations of such Person under guarantees or endorsements, and (viii) all obligations of such Person, contingent or otherwise, relative to the face amount of letters of credit (as may be reduced pursuant to their terms), whether or not drawn.

"Interim Order" means an interim order of the Bankruptcy Court approving the DIP Loan to be made by Lender upon the entry of the Interim Order in accordance with this Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time with the express written consent of Lender, and granting the Superpriority Claim status and Liens described in Article 3 of this Agreement, which Interim Order (i) shall be in full force and effect, and (ii) shall not have been stayed, reversed, or, without Lender's consent, modified or amended in any respect; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of any Advances nor the performance by Borrower of any of its obligations hereunder or under the DIP Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

"Investment" means any investment by Borrower in any Person, whether payment therefor is made in cash, in kind, or in capital stock of Borrower, and whether such investment is by acquisition of stock or Indebtedness, or by loan, advance, transfer of property out of the ordinary course of business, capital contribution, equity or profit sharing interest, extension of credit on terms other than those normal in the ordinary course of business, guaranteeing or otherwise becoming liable (contingently or otherwise) in respect of the Indebtedness of any Person, or otherwise.

"IRS Code" means the Internal Revenue Code of 1986, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to sections of the IRS Code shall be construed to also refer to any successor sections.

"KEIP" means a Key Employee Incentive Plan for Signal International, Inc. and its affiliates with Richard Marler, Chris Cunningham, Ronald Schnooer and Rob Beckman, providing a maximum aggregate payment obligation not exceeding the sum of $500,000 and otherwise reasonably acceptable to Lender in form and content.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person who is not the owner of such Property, whether such interest is based on common law, statute or contract, including, without limitation, any security interest, mortgage, deed of trust, deed to secure debt, hypothecation, prior claim, right of retention, right in rem, pledge, assignment, judgment lien, deemed trust or other lien or encumbrance of any kind or nature whatsoever, any conditional sale or trust receipt, and any consignment or bailment for security purposes. The term "Lien" shall include reservations, exceptions, encroachments, easements, servitudes, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting Property.

"Loan Week" means each calendar week from and after the Petition Date.

"<u>Material Adverse Effect</u>" means a material adverse effect on the Properties, rights, duties, obligations, liabilities, business, operations, income, condition or prospects (financial or otherwise) of Borrower, or on any Liens or other rights granted to Lender under the DIP Loan Documents or the Financing Orders; provided, however, that the commencement and maintenance of the Case and the existence of those liabilities and litigations set forth in <u>Schedule 5.7</u> shall not, in and of themselves, be deemed as having a Material Adverse Effect, but any future event which materially worsens the effect of any such matters shall not be excluded from resulting in Material Adverse Effect.

"<u>Obligations</u>" means, without duplication, any and all present and future Indebtedness (including, without limitation, principal of the DIP Loan, interest thereon, fees, collection costs and expenses, attorneys' fees and other agreed charges under the DIP Loan Documents), liabilities and obligations of the Borrower evidenced by or arising under or in connection with this Agreement or any other DIP Loan Document, whether direct or contingent, due or to become due or now existing or hereafter arising.

"<u>Operating Account</u>" means the Borrower's general demand deposit account with BBVA Compass bearing account number 6720919840, or such other debtor in possession operating account opened by Borrower at the direction of the Bankruptcy Court.

"<u>Operating Sublimit</u>" has the meaning set forth in <u>Subsection 2.2(a)</u> of this Agreement.

"<u>Permitted Liens</u>" means any of the following: (a) Liens for property taxes and assessments or governmental charges or levies, provided that payment thereof is not then required by <u>Subsection 6.1(c)</u> of this Agreement; (b) (i) deposits to secure the performance of bids, tenders, trade contracts or leases (other than Capitalized Leases) or to secure statutory obligations, surety or appeal bonds or other Liens of like general nature incurred in the ordinary course of business and not in connection with the borrowing of money or the acquisition of inventory or other Property, and (ii) Liens (other than any Liens imposed by ERISA) arising in the ordinary course of business or incidental to the ownership of Properties and assets (including Liens in connection with worker's compensation, unemployment insurance and other like laws, carrier's, mechanic's, materialmen's, repairmen's, vendor's, warehousemen's and attorneys' liens and statutory landlords' liens); provided in each case that payment thereof is not then required by <u>Subsection 6.1(d)</u> of this Agreement; (c) Survey exceptions, issues with regard to the merchantability of title, easements or reservations, or rights of others for rights-of-way, servitudes, utilities and other similar purposes, or zoning or other restrictions as to the use of real properties, which could not reasonably be expected to have a Material Adverse Effect; (d) Liens permitted by Lender in writing; (e) Liens on Properties in respect of judgments or awards, the Indebtedness with respect to which is permitted by <u>Subsection 6.2(a)(iv)</u>; and (f) Pre-Petition Liens in favor of Lender under the Pre-Petition Loan Documents.

"<u>Person</u>" means any natural person or recognized legal entity of any kind whatsoever, including, without limitation, any individual, sole proprietorship, partnership, joint venture, trust, trustee, unincorporated organization, association, corporation, limited liability company, institution, entity or government (whether national, federal, state, county, city, municipal or otherwise including, without limitation, any instrumentality, division, agency, body or department thereof).

"<u>Permitted Variance</u>" has the meaning set forth in <u>Subsection 2.9(b)</u> of this Agreement.

"<u>Permitted Variance Exception</u>" has the meaning set forth in <u>Subsection 2.9(b)</u> of this Agreement.

"Post-Petition" means that the event or thing so described accrued, arose, attached, was created or otherwise came into existence on or after the Petition Date.

"Pre-Petition" means that the event or thing so described accrued, arose, attached, was created or otherwise came into existence prior to the Petition Date.

"Pre-Petition Collateral" means all Property of the Borrower which was, as of the Petition Date, subject to a valid and perfected Lien in favor Lender as security for the Pre-Petition Loans.

"Pre-Petition Loan Documents" collectively means (i) that certain Credit Agreement dated as of January 31, 2014, by and among Signal International, Inc., The Teachers' Retirement System of Alabama, and certain other signatories therein identified (the "Credit Agreement"), (ii) all "Credit Documents" as such term is defined in the Credit Agreement, (iii) all other instruments, documents and agreements evidencing or securing the Pre-Petition Loan, and (iv) all amendments, modifications, supplements or restatements of any of the foregoing.

"Pre-Petition Loan" means the Indebtedness of Borrower owing to Lender evidenced or secured by the Pre-Petition Loan Documents, together with all Pre-Petition amendments, modifications, extensions or renewals thereof.

"Professionals" means the attorneys, accountants, financial advisors and other professional consultants retained by any Person to provide representation or advice in connection with the Case, the Borrower's Business, the DIP Loan, the DIP Loan Documents, the Collateral, any sale transaction or any other transaction contemplated hereby or thereby; provided that in the case of Borrower such term shall refer only to Professionals retained Post-Petition by the Borrower or the Committee pursuant to order of the Bankruptcy Court.

"Property" means any interest of any kind whatsoever in any form of tangible or intangible property, asset, right, claim, benefit or entitlement, whether real, personal or mixed, and which shall include the Collateral with respect to Borrower. "Properties" means the plural of Property.

"PSA" means that certain Plan Support Agreement dated as of July 12, 2015, by and among Borrower, Lender and the other parties therein identified.

"Restricted Investment" means any Investment, or the incurrence of any liability to make any expenditure for an Investment, other than (i) Investments made Pre-Petition, (ii) Investments permitted by the First Day Orders or any other order of the Bankruptcy Court approved by Lender, and (iii) Investments in any Subsidiaries of Borrower existing on the Effective Date.

"Roll-Up Advance" means a deemed Advance of DIP Loan proceeds hereunder authorized by the Final Order in an amount equal to the then-outstanding principal Indebtedness of Borrower owing under the Pre-Petition Loan Documents.

"Sale Motion" means, collectively (i) that certain *Debtors' Motion for Entry of: (I) an Order (A) Approving Sales and Bidding Procedures in Connection with Sale of Assets of the Debtors, (B) Approving Bid Protections, (C) Approving Form and Manner of Notice, (D) Scheduling the Auction and Sale Hearing, (E) Authorizing Procedures Governing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving Purchase Agreement, (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief* to be filed by Borrower, and (ii) such other motions in the Case as Lender shall reasonably deem necessary or appropriate in order to effectuate the auction sale

of all of Borrower's Property (other than Excluded Assets or assets rejected pursuant to the APA) pursuant to Section 363 of the Bankruptcy Code, each of which shall be reasonably acceptable to Borrower and Lender in form and substance.

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance reasonably acceptable to Borrower and Lender, entered pursuant to the Sale Motion (i) approving the sale of Borrower's Property to Lender pursuant to the APA, or such other winning bidder chosen at the Auction pursuant to the asset purchase agreement submitted by such other winning bidder, (ii) approving the back-up bidder chosen at the Auction and the asset purchase agreement submitted by such back-up bidder, (iii) authorizing Lender to credit bid the Indebtedness of Borrower owing under the Pre-Petition Loan Documents and the DIP Loan Documents on a combined basis at the Auction sale in satisfaction of its purchase obligation under the APA, and (iv) authorizing consummation of the transactions contemplated thereby.

"Sale Procedures Order" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to Borrower and Lender, entered pursuant to the Sale Motion approving (i) sales and bidding procedures pursuant to Section 363 of the Bankruptcy Code for the solicitation of higher or better offers to purchase Borrower's Property, and (ii) the conduct of an auction for the sale of Borrower's Property in the event of receipt of any such offers (the "Auction").

"Security Documents" shall have the meaning set forth in Section 3.3(b) of this Agreement.

"Subsidiary" means (a) any corporation of which more than twenty percent (20%) of the issued and outstanding capital stock entitled to vote for the election of directors is at the time owned directly or indirectly by Borrower and/or any one or more Subsidiaries, or (b) any partnership, limited liability company, business trust, or any other similar entity of which more than twenty percent (20%) of the voting interests is at the time owned directly or indirectly by Borrower and/or any one or more Subsidiaries.

"Superpriority Claim" means, subject to the Carve Out, a claim against Borrower in the Case that is a superpriority Administrative Expense claim having priority over any and all Administrative Expenses, diminution claims and all other claims, now existing or hereafter arising, of any kind whatsoever including, without limitation, any and all Administrative Expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and any and all Administrative Expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"Termination Date" means the earliest to occur of (i) November 24, 2015, (ii) the date upon which Lender shall elect to terminate the Availability Period and accelerate the Obligations in accordance with Section 7.2 of this Agreement following the occurrence and continuance of an Event of Default, and (iii) the Closing Date.

"Variance Report" has the meaning set forth in Subsection 2.9(b) of this Agreement.

1.2    Accounting Terms and Determinations.    Except as otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP as in effect from time to time, applied on a basis consistent (except for changes accompanied by a concurrence from Borrower's independent certified public accountants) with the most recent audited financial statements of Borrower delivered to Lender.

1.3     Certain Matters of Construction.  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".  Article and section headings, tables of contents and lists of exhibits or schedules appear as matters of convenience only and shall not affect the interpretation of this Agreement.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  All references to any of the DIP Loan Documents shall include any and all amendment or modifications thereto and any and all restatements, extensions or renewals thereof.  All references to any Person shall mean and include the successors and permitted assigns of such Person.  All references to "including" and "include" shall be understood to mean "including, without limitation".  All references to the time of day shall mean the time of day on the day in question in Montgomery, Alabama, unless otherwise expressly provided in this Agreement.  All references to any Property of Borrower shall mean and include all Property of Borrower's estate.  A Default shall be deemed to exist and shall "continue" or be "continuing" at all times during the period commencing on the date that such Default occurs and ending on the date that such Default is either waived in writing by Lender or is cured by Borrower within any period of cure expressly provided in this Agreement; an Event of Default shall exist and shall "continue" or be "continuing" at all times commencing on the date such Event of Default occurs and ending (if at all) on the date that such Event of Default has been waived (permanently or temporarily) in writing by Lender.

## ARTICLE TWO - THE DIP LOAN

2.1     Advances of the DIP Loan.   Subject to the terms and conditions set forth in this Agreement, and so long as no Default or Event of Default has occurred and is continuing, during the Availability Period Lender shall make Advances to Borrower from time to time in an aggregate principal amount at any one time outstanding not to exceed the sum of the Credit Amount and, when authorized pursuant to the Final Order, the Roll-Up Advance.  Advances of the Credit Amount may be borrowed, repaid and re-borrowed by Borrower on a revolving basis during the Availability Period.

2.2     Use of Proceeds.

(a)     Operating Expenses.  Up to Fifteen Million and No/100's Dollars ($15,000,000.00) in proceeds of the Credit Amount (the "Operating Sublimit"), shall be available exclusively for the purpose of funding costs and expenses set forth in the Approved Budget including, without limitation (i) Post-Petition costs and expenses related to the continued operation of Borrower's Business in the ordinary course and consistent with past practices, as set forth in the Approved Budget, (ii) fees, costs and expenses incurred in connection with the administration of the DIP Loan as provided in this Agreement, and (iii) Administrative Expenses incurred by Borrower in connection with the Case.

(b)     Credit Enhancement.  Up to Five Million and No/100's Dollars ($5,000,000.00) in proceeds of the Credit Amount (the "Credit Enhancement Sublimit"), shall be available for purposes of providing credit enhancement support to Borrower in connection with the issuance by third parties of bonds or letters of credit to assure performance of Borrower's obligations under customer contracts.  All such proceeds shall be funded directly to the issuer of any such bond or letter of credit for the account of Borrower pursuant to documentation and procedures acceptable to Lender in its sole discretion.

(c)     Roll-Up Advance.  Subject to the entry, and terms, of the Final Order, proceeds of the Roll-Up Advance shall be used exclusively for the purpose of funding the repayment in full of the Indebtedness of Borrower owing to Lender under the Pre-Petition Loan Documents.  Borrower hereby

authorizes and directs Lender to fund the Roll-Up Advance immediately upon entry of the Final Order. Notwithstanding anything herein to the contrary, the amount of the Roll-Up Advance shall be deemed to have been funded by Lender to Borrower and then used by Borrower to immediately repay in full the Indebtedness of Borrower owing to Lender under the Pre-Petition Loan Documents without the necessity of Lender and Borrower actually transferring any funds.

(d)     Protective Advances.  Notwithstanding any contrary provision herein set forth, Lender shall at all times have the right, but not the obligation, to fund Advances to or for the benefit of Borrower in excess of amounts required under the Approved Budget, or in excess of the limitations set forth in this Section 2.2, if deemed necessary or appropriate by Lender.  Nothing herein shall limit the right of Lender to make such Advances as may from time to time be necessary for the protection and preservation of the Collateral.

(e)     Restricted Use of Proceeds.  Notwithstanding anything to the contrary contained herein or in the Approved Budget, in no event shall proceeds of the DIP Loan be used to pay any Administrative Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Obligations or the Liens in any of the Collateral granted to Lender under this Agreement or the Financing Orders, (b) declaring any of the DIP Loan Documents to be invalid, not binding or unenforceable in any respect, (c) preventing, enjoining, hindering or otherwise delaying Lender's enforcement of any of the DIP Loan Documents or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders), (d) declaring any Liens granted or purported to be granted under any of the DIP Loan Documents to have a priority other than as set forth in Section 3.6 of this Agreement, or (e) objecting to the amount or method of calculation by Lender of any of the Obligations; provided, however, that if a Committee is appointed, cash collateral of the Lender and, if needed, proceeds of the DIP Loan may be used by such Committee to pay its fees and expenses incurred in connection with the investigation of the Lenders' claims and pre-petition liens up to the maximum amount of $50,000, and provided that any such investigation is commenced within the challenge period set forth in, and otherwise complies with, the Final Order.  Nothing in this Subsection 2.2(e) shall be construed to waive Lender's right to object to any requests, motions or applications made in or filed with the Bankruptcy Court, including any applications for interim or final allowances of Professional fees and expenses or other Administrative Expenses.

(f)     Limitation on All Advances.  Notwithstanding anything to the contrary contained herein or in the Approved Budget, in no event shall proceeds of the Operating Sublimit be advanced to Borrower if, after giving effect to any requested Advance, Borrower's cash on hand would exceed the sum of $4,000,000.00  (the "Cushion Amount").  Borrower agrees that all available cash in excess of the Cushion Amount shall be expended by Borrower in payment of costs and expenses set forth in the Approved Budget prior to any application of DIP Loan Proceeds thereto.

2.3     Draw Requests; Representations.

(a)     Borrower shall be entitled to not more than two (2) Advances each calendar month.  Each request for an Advance shall be submitted to Lender not less than five (5) Business Days prior to the date upon which funding of such Advance is sought by Borrower, and shall be in the form of the Notice of Borrowing attached hereto as Exhibit A.

(b)     Each request for an Advance hereunder shall be deemed to constitute the Borrower's contemporaneous representation and warranty (i) that on the date of, and after giving effect to, such

Advance, no Default or Event of Default has occurred and is continuing; and (ii) that on the date of, and after giving effect to, such Advance, all of the representations and warranties of the Borrower contained in this Agreement and the other DIP Loan Documents are true and correct in all respects as if made on and as of the date of such Advance (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date); and (iii) that such Advance is in accordance with, and will be used to fund costs and expenses of the Borrower set forth in, the Approved Budget.

2.4     <u>Delivery of Advances</u>.  Each Advance shall be delivered to Borrower by wire transfer to the Operating Account pursuant to wiring instructions set forth in the Notice of Borrowing.

2.5     <u>DIP Loan Note</u>.  The DIP Loan, all Advances thereof, and all interest accruing thereon, shall be evidenced by and payable in accordance with this Agreement and the DIP Loan Note.

2.6     <u>Interest</u>.  Prior to the occurrence of an Event of Default, the outstanding principal balance of the DIP Loan shall bear simple interest at the Fixed Rate.  Upon the occurrence of any Event of Default, and for as long as the same shall remain outstanding, at the option of Lender all Obligations of Borrower shall bear interest at the Default Rate.  All interest accruing on the DIP Loan or on any other Obligation hereunder shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day).

2.7     <u>Term, Payments and Maturity</u>.

(a)     All interest accruing on the outstanding principal balance of the DIP Loan shall be due and payable in arrears on each successive monthly anniversary of the date of entry of the Interim Order. No interim payments of principal will be required prior to the Termination Date.

(b)     All Obligations of the Borrower shall be due and payable in full, without notice or demand, on the Termination Date.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, subject to <u>Section 7.3</u>, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that amounts necessary to fund the Carve Out shall be retained by Borrower in the Operating Account, with any excess to be returned to Lender by Borrower upon the entry of a final decree closing the last bankruptcy case commenced by a Borrower.

(c)     The outstanding principal balance of the DIP Loan may be prepaid by Borrower at any time and from time to time, in whole or in part, without premium or penalty.

(d)     All payments shall first be applied to accrued and unpaid interest, with any balance remaining then being applied in reduction of principal.

2.8     <u>Fees</u>.

(a)     In consideration of the extension of credit evidenced hereby, Borrower shall pay to Lender a commitment fee in an amount equal to two hundred basis points (2.00%) of the Credit Amount ($400,000.00).  Said commitment fee shall be included in the Approved Budget and deemed fully earned and non-refundable on the date of entry of the Interim Order, and shall be due and payable by Borrower on the Termination Date.

(b)     In further consideration of the extension of credit evidenced hereby, Borrower shall pay to Lender a monthly administrative fee in the amount of $7,500.00 (each, a "<u>Monthly Fee</u>"), the first of

which shall be fully earned and non-refundable on the date of entry of the Interim Order and shall be paid to Lender within two (2) Business Days thereof. Thereafter, on each successive monthly anniversary of the date of entry of the Interim Order during the Availability Period, Borrower shall pay Lender a Monthly Fee, which shall be fully earned and non-refundable upon each such monthly anniversary date. Said administrative fee shall be included in the Approved Budget.

2.9     Submission and Approval of Budgets; Variance Reports.

(a)     Proceeds of the DIP Loan will be advanced in accordance with, and for the purposes set forth in, the Approved Budget (subject to Permitted Variances and Permitted Variance Exceptions). The Approved Budget as of the Effective Date is attached hereto as Exhibit B. Commencing on the first Tuesday following the end of the fourth (4th) Loan Week, and on each Tuesday thereafter, Borrower shall submit to Lender a rolling 13-week update of the prior Approved Budget (each, a "Proposed Budget") showing the projected cash needs of Borrower for the applicable periods. Such budget, and any interim changes thereto, shall be subject to review and approval by Lender in its sole discretion before being deemed an Approved Budget hereunder, and shall include, at a minimum, the Borrower's good faith projection of all payroll costs and costs to be paid under the KEIP, operating expenses, general and administrative expenses, debt service payments, adequate protection payments, Administrative Expenses and other expenses to be incurred by Borrower for the applicable period, together with an aging of accounts receivable, projected cash receipts and estimate of gross and net operating income for the applicable period. Upon approval of any Proposed Budget, the same shall constitute the Approved Budget hereunder, but until such Proposed Budget shall have been approved, the prior Approved Budget (subject to Permitted Variances and Permitted Variance Exceptions) shall continue in full force and effect. Lender agrees that it shall not unreasonably withhold its consent to any changes in a Proposed Budget which are demonstrably tied to projected increases in expenses or revenue resulting from any new customer contract obtained by Borrower.

(b)     Commencing on the first Tuesday following the end of the fourth (4th) Loan Week and continuing on Tuesday of each week thereafter, Borrower shall deliver to Lender (i) a comparison of actual to budgeted results of operations for the preceding four (4) Loan Weeks, and (ii) a report of all income and expense variance on a line-item basis for the preceding four (4) Loan Weeks in the form attached hereto as Exhibit C (the "Variance Report"). If any Variance Report shall indicate that the Borrower's cumulative net cash flow for the trailing four (4) Loan Weeks shall be less than eighty percent (80%) of the amount of net cash flow projected in the Approved Budget(s) covering such period (negative variance of 20% or less being "Permitted Variance" hereunder), then an Event of Default shall be deemed to exist at the option of Lender and without further notice to Borrower; provided that Lender may, in its sole discretion, waive any violation of the Permitted Variance limit set forth herein or authorize Borrower to exceed the Permitted Variance by written notice to Borrower (each a "Permitted Variance Exception").

2.10    Effect on Pre-Petition Loan Documents. Borrower hereby reaffirms its obligations under the Pre-Petition Loan Documents. Upon entry of the Interim Order, the Pre-Petition Loan Documents and all liens and security interests granted thereby in the Pre-Petition Collateral shall continue in full force and effect, but Borrower shall have no obligation to perform any of the provisions of the Pre-Petition Loan Documents except as may otherwise be set forth herein or in any order of the Bankruptcy Court, it being the intention of the parties that this Agreement and the Financing Orders shall henceforth control the lending relationship between Borrower and Lender.

## ARTICLE THREE - SECURITY

3.1     Grant of Security Interest. As security for the prompt satisfaction of all Obligations, subject to the entry of the Financing Orders, the Borrower hereby grants, bargains, sells, conveys,

mortgages, assigns, transfers, sets over and delivers to Lender, and grants to Lender a continuing lien upon and security interest in, all right, title and interest of the Borrower in and to all Property of Borrower of every kind, nature and description, wherever located and whether now owned or hereafter acquired, other than the Excluded Assets (collectively, the "Collateral").  For the avoidance of doubt, and by way of explanation and not limitation, the Collateral shall include:

(a)    All of Borrower's assets which are or may be subject to Article 9 of the Uniform Commercial Code, together with all replacements therefor, additions and accessions thereto, and proceeds (including, but without limitation, insurance proceeds) and products thereof, including, without limitation, the following (each as defined by the Uniform Commercial Code):

(1)    Accounts (including, without limitation, notes, drafts, acceptances, letters of credit, and other rights to payment);

(2)    Chattel Paper;

(3)    Commercial Tort Claims (including, without limitation, the BP Claim);

(4)    Deposit Accounts;

(5)    Documents;

(6)    Equipment;

(7)    General Intangibles;

(8)    Goods;

(9)    Instruments;

(10)   Inventory;

(11)   Investment Property;

(12)   Letter-of-Credit Rights;

(13)   Payment Intangibles;

(14)   Software;

(15)   Supporting Obligations;

(16)   Rights as seller of Goods and rights to returned or repossessed Goods;

(17)   All existing and future leases and use agreements of personal property entered into by Borrower as lessor with other Persons as lessees, including without limitation the right to receive and collect all rentals and other monies, including security deposits, at any time payable under such leases and agreements;

(18)   All existing and future leases and use agreements of personal property entered into by Borrower as lessee with other Persons as lessors, including without limitation the

leasehold interest of Borrower in such property, and all options to purchase such property or to extend any such lease or agreement;

(19)     All Fixtures of Borrower;

(20)     All moneys of Borrower and all bank accounts, deposit accounts, lock boxes and other accounts in which such moneys may at any time be on deposit or held and all investments or securities in which such moneys may at any time be invested and all certificates, instruments and documents from time to time representing or evidencing any of the same;

(21)     All claims of Borrower in any pending litigation and claims for any insurance proceeds;

(22)     All Records pertaining to any of the Collateral (provided that Borrower shall be entitled to retain true and correct copies of all such Records in the event that Lender at any time takes possession thereof).

(b)     All real Property rights or interests now owned or hereafter acquired by Borrower, whether leasehold, fee or mixed, and all contingent remainders and rights of reversion.

(c)     All (i) tradenames, trademarks, trademark registrations, trademark applications, patents, patent applications, copyrights, trade secrets, and other intellectual property of Borrower and all continuations, divisions, renewals or reissues thereof, (ii) all income, royalties, damages and payments now or hereafter due or payable with respect thereto including, without limitation, damages and payments for past or future infringements thereof, (iii) the right to sue for past, present and future infringements thereof, and (iv) all rights corresponding thereto throughout the world.

(d)     All claims or causes of action that constitute property of the Borrower's bankruptcy estate under Section 541 of the Bankruptcy Code including, without limitation, claims and causes of action under Chapter 5 of the Bankruptcy Code.

(e)     Any and all other Property of Borrower of any kind, nature, or description whether or not identified in any one or more of the Security Documents.

(f)     All interest, dividends, proceeds, products, rents, royalties, issues and profits of any of the Property described above and all notes, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by Lender for or on behalf of Borrower in substitution for or in addition to any of said property.

(g)     All Pre-Petition Collateral.

3.2     Identification of Collateral.  No submission by the Borrower to Lender of a schedule or other particular identification of Collateral shall be necessary to grant to Lender a Lien upon or to vest in Lender security title to and a security interest in each and every item of Collateral now existing or hereafter created or acquired, but rather such Lien, security title and security interest shall vest in Lender immediately upon the creation or acquisition or any item of Collateral hereafter created or acquired, without the necessity for any other or further action by any Borrower or by Lender.

3.3     Perfection and Maintenance of Liens.

(a)     Pursuant to the terms of the Financing Orders, the Lien and security interest of Lender in and to all Collateral described herein or in any other Security Document shall be perfected automatically and without further action by Lender or Borrower.  No filing or registration of any kind shall be required in order to perfect the Liens granted herein or in any other Security Document.  Nevertheless, Lender may elect, from an abundance of caution and in order to remove uncertainty, to file or record all such financing statements, mortgages, deeds of trust, deeds to secure debt, security agreements, fixture filings, assignments, memoranda or other instruments or evidences of perfection as Lender may deem appropriate, and no such filing or recording shall in any manner alter, diminish or otherwise limit the automatic perfection of all Liens granted by the Financing Orders.

(b)     In order to further evidence and perfect the security interest of Lender in the Collateral, the Borrower agrees that it shall execute and deliver to Lender all such mortgages, deeds of trust, deeds to secure debt, assignments, pledge agreements, security agreements, affidavits, documents and instruments with respect to the Collateral as Lender may from time to time request (collectively referred to herein as the "Security Documents").

(c)     Borrower authorizes Lender to prepare and record or file all such notices or instruments of perfection as may be necessary or desirable, in the sole discretion of Lender, to establish, perfect and maintain Lender's Lien upon the Collateral including, without limitation, Uniform Commercial Code financing statements (collectively referred to herein as the "Perfection Documents").

(d)     The Borrower hereby appoints Lender as its true and lawful attorney-in-fact (without requiring Lender to act as such), which power shall be coupled with an interest and irrevocable, to prepare and record or file any Security Documents or Perfection Documents, and to perform all other acts that Lender deems appropriate, to establish, perfect, maintain and continue Lender's Lien upon the Collateral and to protect and preserve the Collateral.

3.4     <u>Costs of Perfection</u>.  The Borrower shall pay, or reimburse Lender upon demand for the payment of, all costs, expenses and taxes of any kind or character incurred in connection with filing or recording the Security Documents or the Perfection Documents in such jurisdictions as Lender may designate.  All such costs and expenses may be funded through Advances hereunder in Lender's sole discretion.

3.5     <u>Further Assurances</u>.  Upon request by Lender, the Borrower will make, execute and deliver or cause to be made, executed and delivered to the Lender and, where appropriate, cause to be recorded or filed, as applicable, and from time to time thereafter to be re-recorded or refiled, as applicable, at such time and in such offices and places as shall be deemed necessary by Lender, any and all such instruments of further assurance, certificates and other documents as may, in the opinion of Lender, be necessary or desirable in order to effectuate, complete, or perfect, or to continue and preserve, the operation and effect of this Agreement and the Security Documents.

3.6     <u>Priority of Liens</u>.  Borrower hereby covenants, represents and warrants that, upon entry of the Financing Orders and in accordance with the Financing Orders, the Obligations and the Liens against the Collateral securing the Obligations shall, subject to the Carve-Out (i) be Superpriority Claims other than in respect of the Excluded Assets, and (ii) pursuant to Section 364(d)(1) of the Bankruptcy Code, constitute perfected first priority priming Liens on all Collateral which shall prime any Liens existing on the Petition Date.

3.7     <u>No Discharge; Survival of Claims</u>.  Borrower agrees that (i) its Obligations hereunder and under the other DIP Loan Documents shall not be discharged by the entry of an order confirming any Reorganization Plan, dismissing the Case or converting the Case to a case under Chapter 7 of the

Bankruptcy Code (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge with respect to such Obligations), and (ii) the Superpriority Claims granted to the Lender pursuant to the Financing Orders and described in <u>Article Three</u> of this Agreement and the Liens granted to the Lender pursuant to the Financing Orders and described in <u>Article Three</u> of this Agreement shall not be affected in any manner by the entry of an order confirming any reorganization plan, dismissing the Case or converting the Case to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE FOUR - CONDITIONS TO ADVANCES

4.1     <u>General Conditions</u>.  Unless otherwise indicated herein, prior to making any Advance hereunder Lender shall be entitled, in its sole discretion, to require that any one or more of the following requirements be satisfied as of the date of such Advance (unless waived by Lender in its sole discretion):

(a)     This Agreement and all other DIP Loan Documents, each duly authorized and executed, shall have been delivered to Lender.

(b)     Prior to making the initial Advance, certified copy of resolutions of Borrower, duly adopted, which authorize the execution, delivery and performance of the DIP Loan Documents and specifically identify Borrower's Representatives shall have been received by Lender.

(c)     Prior to making the initial Advance, an incumbency certificate which shall identify by name and title and bear the signatures of all of the officers of each Borrower executing any of the DIP Loan Documents delivered at or prior to the closing shall have been received by Lender.

(d)     All Security Documents required by Lender shall have been filed or recorded in such offices as Lender shall direct, and all fees, taxes or other charges in connection with such filing or recording shall have been paid.  Lender confirms that, as of the Effective Date, no Security Documents are presently required.

(e)     All information, approvals, documents or other instruments as the Lender may reasonably request shall have been received by Lender.

(f)     On the date of and immediately after giving effect to each Advance, no Default or Event of Default shall have occurred and be continuing.

(g)     No change resulting in a Material Adverse Effect shall have occurred since the Effective Date.

(h)     Prior to making the initial Advance, all of the First Day Orders shall have been entered by the Bankruptcy Court and shall be satisfactory in form and substance to Lender in its sole discretion.

(i)     The Interim Order, and when required hereunder the Final Order, shall have been entered by the Bankruptcy Court and shall be satisfactory in form and substance to Lender in its sole discretion.

## ARTICLE FIVE - REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

5.1     <u>Existence and Power</u>.  Borrower (i) is a legal business entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization set forth in the preamble to this Agreement; (ii) has all requisite powers and all governmental and regulatory licenses,

authorizations, consents and approvals required to carry on Borrower's Business as now conducted; and (iii) is qualified to transact business as a foreign entity in, and is in good standing under the laws of, all states in which it is required by applicable law to maintain such qualification and good standing except for those states in which the failure to qualify or maintain good standing could not reasonably be expected to have a Material Adverse Effect.

5.2 <u>Authorization</u>. The execution, delivery and performance of this Agreement and the other DIP Loan Documents are within the powers of Borrower and, subject to entry of the Financing Orders, have been duly authorized by all necessary action of Borrower.

5.3 <u>Governmental Approvals</u>. Except for the entry of the Interim Order (and, where applicable, the Final Order), no consent or approval of any governmental agency or authority is required in connection with the execution, delivery and performance by Borrower of the DIP Loan Documents.

5.4 <u>Binding Effect</u>. Subject in each case to the entry of the Interim Order (or, where applicable, the Final Order), all DIP Loan Documents to which it is a party are legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms, and all future DIP Loan Documents not executed contemporaneously with the execution of this Agreement, when executed and delivered in accordance with this Agreement, will constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms.

5.5 <u>ERISA</u>. To the extent applicable, Borrower has fulfilled its obligations under the minimum funding standards of ERISA and the IRS Code with respect to each plan and is in compliance in all material respects with the presently applicable provisions of ERISA and the IRS Code, and has not incurred any liability to the Pension Benefit Guaranty Corporation or to a plan under Title IV of ERISA which the failure to comply with could have a Material Adverse Effect.

5.6 <u>No Defaults</u>. To Borrower is not in default in the performance, observance or fulfillment of any (i) obligations, covenants or conditions contained in any indenture, agreement or other instrument to which it is a party, and which could have a Material Adverse Effect, or (ii) judgment, order, writ, injunction, decree or decision of the Bankruptcy Court or any other court, tribunal, arbitral board, government agency or authority.

5.7 <u>Liabilities, Litigation</u>. Except as set forth in <u>Schedule 5.7</u> attached hereto, Borrower has no material (individually or in the aggregate) liabilities, direct or contingent, except as disclosed or referred to in the most recent balance sheet of Borrower delivered to Lender and, except as described in the most recent balance sheet of Borrower delivered to the Lender, Borrower has not received any written notice of any material (individually or in the aggregate) litigation, legal or administrative proceeding, investigation or other action of any nature pending or, to the knowledge of Borrower, threatened against or affecting Borrower.

5.8 <u>Tax Payments</u>. Borrower has filed all tax returns and reports with respect to which the failure to file could have a Material Adverse Effect, and has paid all taxes, assessments, fees and other governmental charges levied upon Borrower or upon any Property owned by Borrower or upon any income of Borrower, which are due and payable, including interest and penalties, with respect to which the failure to pay could have a Material Adverse Effect, or has provided adequate reserves for the payment thereof.

5.9 <u>Title to Property</u>. Borrower is the sole and absolute owner of, or has the legal right to use and occupy, all Property it claims to own which is necessary for Borrower to conduct Borrower's Business free and clear of all Liens other than Permitted Liens. Borrower enjoys peaceful and

undisturbed possession in all material respects under all leases under which it is operating as lessee which are necessary for the conduct of Borrower's Businesses free and clear of all Liens other than Permitted Liens.

5.10 <u>Compliance With Laws</u>.  Other than any non-compliance would not, individually or in the aggregate, reasonably be expected to have a Materially Adverse Effect, Borrower has complied in all material respects with all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses, authorizations, directions and requirements of all federal, state, county, municipal and other governments, agencies, departments, divisions, commissions, boards, courts, authorities, officials and officers, domestic or foreign, including, without limitation, (i) subject to any Bankruptcy Court orders limiting or conditioning such compliance, all laws regarding the collection, payment, and deposit of employees' income, unemployment, social security, sales, and excise taxes, (ii) all requirements of ERISA, (iii) all Environmental Laws, and (iv) all laws pertaining to occupational safety and health.

5.11 <u>Burdensome Agreements</u>.  Borrower is not a party to any indenture, agreement or other instrument affecting Borrower's Business or Borrower's Properties which could have a Material Adverse Effect except as disclosed in the most recent balance sheet of Borrower delivered to Lender.

5.12 <u>Subsidiaries</u>.  Borrower presently has no Subsidiaries (other than any Borrower which is itself a Subsidiary of another Borrower).

5.13 <u>Approved Budget</u>.  The Approved Budget as of the Effective Date reflects, and each Proposed Budget hereafter submitted by Borrower shall reflect, the Borrower's good faith estimate and projection of (i) all operating expenses to be incurred by Borrower in the ordinary course of business, consistent with past practices, and (ii) all Administrative Expenses to be incurred by Borrower in connection with the Case, in each case during the periods covered thereby.

5.14 <u>Investment Company</u>.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

5.15 <u>Margin Stock</u>.  No proceeds of the DIP Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Requirements of Law or by the terms and conditions of this Agreement or the other DIP Loan Documents.

## <u>ARTICLE SIX - COVENANTS</u>

6.1 <u>Affirmative Covenants of Borrower</u>.  At all times prior to payment in full of the Obligations, Borrower covenants and agrees as follows:

(a) <u>Notice of Default</u>.  Promptly upon, and in any event within three (3) Business Days of, becoming aware of the occurrence of any event which constitutes a Default, Borrower will deliver written notice thereof to Lender together with a detailed statement by a responsible officer of Borrower outlining the steps being taken to cure such Default.

(b)    Compliance with Laws.  To the extent the failure to comply could have a Material Adverse Effect, Borrower will observe and comply with all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses, authorizations, directions and requirements of all federal, state, county, municipal and other governments, agencies, departments, divisions, commissions, boards, courts, authorities, officials and officers, domestic or foreign, including, without limitation, (i) subject to any Bankruptcy Court orders limiting or conditioning such compliance, all laws regarding the collection, payment, and deposit of employees' income, unemployment, social security, sales, and excise taxes, (ii) all applicable requirements of ERISA, (iii) all applicable Environmental Laws, and (iv) all laws pertaining to occupational safety and health.

(c)    Payment of Taxes.  Borrower will pay and discharge all Post-Petition taxes, assessments and governmental charges or levies imposed upon it, or upon its income and profits, prior to the date on which penalties might attach thereto and all lawful claims which, if unpaid, might become a Lien upon the assets of Borrower; provided, however, that Borrower shall not be required to pay and discharge any such tax, assessment, charge, levy or claim so long as the legality thereof shall be contested in good faith and by appropriate proceedings and for which adequate provision in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such taxes, assessments and governmental charges forthwith upon the commencement of proceedings to sell, seize or collect any Property attached as security therefor, unless such sale, seizure or collection is stayed by the filing of an appropriate bond.

(d)    Payment of Claims.  Borrower will promptly pay and discharge all Post-Petition (i) trade accounts payable in accordance with usual and customary business practices, and (ii) claims for work, labor or materials which if unpaid might become a Lien upon any of its Property or assets; provided, however, that Borrower shall not be required to pay any such account payable or claim the payment of which is being contested in good faith and, if necessary, by appropriate proceedings and for which adequate provision as determined in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such accounts payable and claims forthwith upon the commencement of proceedings to foreclose any Lien which is attached as security therefor, unless such foreclosure is stayed by the filing of an appropriate bond.

(e)    Insurance.  Borrower shall maintain, and shall cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, insurance on all its Properties in such amounts and against such risks as Lender shall reasonably require, which shall at least be equal to such coverage and amounts as are usually insured against in the same general area by companies engaged in the same or a similar business; provided, however, such requirements shall not exceed those set forth in the Pre-Petition Loan Documents.  All such insurance may be subject to reasonable deductible amounts. Borrower shall deliver to Lender certificate(s) of insurance on the date hereof and upon the annual (or other shorter period of time) renewal of such policies specifying the details of all insurance then in effect, together with a certificate of an officer of Borrower that all premiums then due have been paid.  Borrower shall notify Lender immediately in writing of any material fire or other casualty to or accident involving any of the Collateral, whether or not such fire, casualty or accident is covered by insurance.  Borrower shall notify promptly the insurance company and submit an appropriate claim and proof of claim to the insurance company if any Collateral is damaged or destroyed by fire or other casualty.  Borrower shall not declare or agree with underwriters that any Collateral is a compromised, agreed, arranged or constructive total loss without the prior written consent of Lender.  All such policies of insurance shall cover the interest of Lender as mortgagee, loss payee or additional insured in accordance with the requirements of the Pre-Petition Loan Documents.

(f)    Maintenance of Property.  Borrower will at all times maintain, protect and keep in good repair, working order and condition (ordinary wear and tear excepted), all Property necessary to the operation of Borrower's Business.

(g)    Maintenance of Intellectual Property.  Borrower will obtain or maintain in full force and effect, all licenses, franchises, patents, trademarks, copyrights, intellectual property, permits, authorizations and other rights as are necessary for the conduct of Borrower's Business.

(h)    Existence.  Borrower will do all things necessary to (i) preserve and keep in full force and effect at all times its legal existence, and (ii) be duly qualified to do business in all jurisdictions where the nature of its business or its ownership of Property requires such qualification except for those jurisdictions in which the failure to qualify could not reasonably be expected to have a Material Adverse Effect.

(i)    Notice of Claims.  Promptly upon, and in any event within three (3) Business Days of, becoming aware of any adverse claim herein described, Borrower shall provide written notice to Lender of (i) the filing of any Lien against any Property of Borrower, or (ii) the existence of any material dispute under any contract or agreement to which Borrower is a party, or (iii) the filing of any lawsuit by or against Borrower, or (iv) the entry of any judgment against Borrower.

(j)    Maintenance of Books and Records, Consultations, Audits and Inspections, and Reporting.  Borrower will maintain books and records in accordance with GAAP and in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities. Borrower will, and it will cause each of its Subsidiaries to, permit Lender and Lender's Professionals to discuss the affairs, finances and accounts of Borrower with the CRO and other officers of Borrower and its independent public accountants, all at such reasonable times and as often as Lender may request; provided, however, that Borrower shall not be required to permit Lender or Lender's Professionals to engage in any such discussions that would or, in Borrower's reasonable discretion, could result of in a waiver of privilege with respect to any communications between Borrower and Borrower's Professionals. Borrower will also permit inspection of its Properties, books and records by Lender (and any Person appointed by Lender) during normal business hours and at other reasonable times.  In general, Borrower shall at all times cooperate fully with Lender and Lender's Professionals in the delivery of any and all such information related to Borrower's Business or any Properties of Borrower as may be reasonably requested.

(k)    Further Assurances.  Borrower will execute and deliver to Lender, at any time and from time to time, any and all further agreements, documents and instruments, and take any and all further actions which may be required under applicable law, or which Lender may from time to time reasonably request, in order to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents.

(l)    Use of Proceeds.  Borrower shall use the proceeds of the DIP Loan solely for the purposes permitted by this Agreement.

6.2    Negative Covenants of Borrower.  At all times prior to payment in full of the Obligations, Borrower covenants and agrees as follows:

(a)    Limitation on Indebtedness.  Borrower will not incur or be obligated on any Indebtedness other than: (i) obligations to Lender under the DIP Loan Documents; (ii) Indebtedness relating to employee benefit plans or the KEIP; (iii) Indebtedness in respect of taxes, assessments, governmental charges or levies and claims for labor, materials and supplies to the extent that payment therefor shall not then be required to be made in accordance with this Agreement; (iv) Indebtedness in respect of judgments or awards (which do not constitute an Event of Default) that have been in force for less than the applicable period for taking an appeal and for which adequate provision as determined in accordance with

GAAP has been made so long as execution is not levied thereunder and in respect of which Borrower shall at the time in good faith be prosecuting an appeal or proceedings for review and a suspending appeal bond in the full amount of such judgment or award shall have been obtained by Borrower with respect thereto; (v) current liabilities of Borrower incurred in the ordinary course of Borrower's Business or in connection with Borrower's prosecution of the Case and not incurred through (A) the borrowing of money, or (B) the obtaining of credit except for credit on an open account basis customarily extended and in fact extended in connection with normal purchases of goods and services; (vi) endorsements for collection, deposits or negotiation and warranties of products or services, in each case incurred in the ordinary course of business; (vii) Indebtedness in respect of performance, surety or appeal bonds obtained in the ordinary course of Borrower's Business; and (viii) Indebtedness existing as of the Petition Date.

(b)　　Consolidation, Merger, Sale of Assets, Dissolution, Etc.  Except in connection with any transaction approved by the Bankruptcy Court in connection with the Sale Procedures Order, Borrower will not (i) directly or indirectly merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it or (ii) sell, assign, lease, transfer, abandon or otherwise dispose of any of its Property, except for sales permitted under this Agreement.

(c)　　Changes in Nature of Business.  Borrower will not engage in any business if, as a result, the general nature of the business which would then be engaged in by Borrower, considered as a whole, would be substantially changed from Borrower's Business.

(d)　　Change in Control.  Borrower shall not allow any Change in Control to occur.

(e)　　Ownership of Subsidiaries.  Borrower will not acquire or cause to be formed any Subsidiaries.

(f)　　Liens.  Except with respect to Permitted Liens, Borrower will not mortgage or encumber any of its Property or suffer any Liens to exist on any of its Property without the prior written consent of the Lender.

(g)　　No Contest.  Borrower will not contest the validity, legality, binding effect or priority of the DIP Loan Documents or any Liens in favor of Lender upon the Collateral.

(h)　　Restricted Investments.  Borrower will not, directly or indirectly, make or hold any Post-Petition Restricted Investments.

(i)　　Critical Vendors.  Borrower will not pay any critical vendors for Pre-Petition claims without (i) the prior written consent of Lender, which consent shall not be unreasonably withheld, and (ii) an appropriate order from the Court.  Notwithstanding the foregoing, Lender agrees that Borrower shall be permitted to pay any Pre-Petition claims to critical vendors which are included in the Approved Budget (subject to Permitted Variances and Permitted Variance Exceptions) and authorized by the First Day Orders.

(j)　　Change in Senior Management.  Without the prior written consent of Lender, Borrower will not terminate or make any substantial change in the management duties or discretionary authority of any senior executives of Borrower, or retain any CRO other than Skip Victor.

(k)　　Executive Compensation.  Except as set forth in the KEIP, Borrower shall not increase the gross compensation or benefits paid to, for or on behalf of any executive officer or senior management employee of Borrower by more than 15% annually without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole discretion.

(l)  Agreements.  Borrower shall not contest or reject in the Case any Pre-Petition indenture, contract, agreement, lease or other instrument which is necessary to the continued conduct of Borrower's Business, other than as may be required by the APA.

(m)  State of Organization; Location of Chief Executive Office.  Borrower shall not change its state of organization, principal place of business or chief executive office, unless Borrower has obtained Lender's prior written consent and has taken such action as is necessary to cause the security interest of Lender in the Collateral to continue to be a first priority perfected security interest subject only to Permitted Liens.

## ARTICLE SEVEN - EVENTS OF DEFAULT AND REMEDIES

7.1  The occurrence of any of the following events or circumstances shall constitute an "Event of Default" hereunder:

(a)  Borrower shall fail to pay any Obligation within five (5) Business Days of when such Obligation is due and payable.

(b)  Any representation or warranty of Borrower made in this Agreement, in any other DIP Loan Document or in any certificate, agreement, instrument or statement furnished or made or delivered pursuant hereto or thereto shall prove to have been untrue or incorrect in any material respect (or in the case of any representation or warranty qualified by a materiality standard, in any respect) when made or effected.

(c)  Borrower shall fail to perform or observe any term, covenant, condition or agreement contained in this Agreement or in any other DIP Loan Document, or if there shall at any time exist any event, occurrence, condition or state of facts which constitutes a breach or violation of any term, covenant, condition or agreement contained in this Agreement or in any other DIP Loan Document and Borrower shall not have cured such failure to perform or breach within fifteen (15) days after the receipt of notice of such failure to perform or breach from Lender.

(d)  If there shall occur or exist any "Default" or "Event of Default" under, and as defined in, any DIP Loan Document other than this Agreement and Borrower shall not have cured such "Default" or "Event of Default" within any notice, grace or cure period specified with respect thereto in such other DIP Loan Document.

(e)  This Agreement or any other DIP Loan Document shall at any time for any reason (other than permitted cancellation by Lender) cease to be in full force and effect or shall be declared to be null and void by a court of competent jurisdiction, or if the validity or enforceability hereof or thereof shall be contested or denied by Borrower, or if the transactions contemplated hereunder or thereunder shall be contested by Borrower, or if Borrower shall repudiate or deny any liability or obligation hereunder or thereunder.

(f)  If any enforcement action is brought against Borrower with respect to any Pre-Petition Indebtedness in excess of $50,000 owing to any other creditor, and collection in respect of such action is not effectively stayed by the automatic stay in the Case.

(g)  If any judgment, decree, arbitration award or ruling shall be entered against Borrower involving, in the aggregate, a Post-Petition liability (not paid or covered by insurance) of $50,000.00 or more and enforcement or collection in respect of such judgment, decree, award or ruling shall not have

been vacated, paid, discharged, stayed or suspensively appealed within thirty (30) days from the entry thereof.

(h)     The Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or Borrower shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or an application shall be filed by Borrower for the approval of any other Superpriority Claim (other than the Carve Out) in the Case which is pari passu with or senior to the claims of Lender with respect to the Collateral hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim with respect to the Collateral.

(i)     The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the Collateral if the loss of such Collateral by Borrower would have a Material Adverse Effect, or an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying any Financing Order, as applicable.

(j)     Except as permitted by the Financing Orders or the First Day Orders, Borrower shall make any payment (in cash, in kind or otherwise) of any Pre-Petition Indebtedness (other than indebtedness owing under the Pre-Petition Loan Documents).

(k)     Other than as permitted by the Carve-Out and subject to entry of the Final Order, Borrower (or any successor in interest to Borrower, including, without limitation, any trustee in the Case) shall assert any claim for Administrative Expenses against any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise.

(l)     Any change having a Material Adverse Effect shall have occurred since the Effective Date.

(m)     Borrower shall not have filed the Sale Motion with the Bankruptcy Court on or before July 15, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion.

(n)     Subject to the Bankruptcy Court's availability, the Bankruptcy Court shall not have entered an order approving the Borrower's assumption of the PSA on or before August 15, 2015.

(o)     Subject to the Bankruptcy Court's availability, the Final Order shall not have been entered by the Bankruptcy Court on or before August 19, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion.

(p)     Subject to the Bankruptcy Court's availability, the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before August 19, 2015, or such later date as may be agreed to in writing by Lender in its sole discretion.

(q)     The Auction shall not have been held on or before October 3, 2015.

(r)     Subject to the Bankruptcy Court's availability, the "Sale Approval Order" and the "Confirmation Order" contemplated by the PSA shall not have been entered by the Bankruptcy Court on or before November 4, 2015.

(s)     The Closing shall not have occurred on or before November 24, 2015.

(t)     Borrower shall be in material default of its obligations under the PSA, the APA, the Financing Orders, the Sale Orders or any other orders of the Bankruptcy Court.

(u)     The APA shall be rescinded, terminated, repudiated, declared to be null and void by a court of competent jurisdiction, or otherwise cease to be in full force and effect for any reason other than (i) cancellation or default thereunder by Lender, or (ii) failure by Lender to be the successful bidder at the Auction.

(v)     If Lender shall not be the successful bidder at the Auction, and the sale transaction between Borrower and the successful bidder (or a successful back-up bidder) at such sale shall fail to close in accordance with its terms as approved by order of the Bankruptcy Court.

(w)     The Bankruptcy Court shall enter any order the effect of which is to materially limit, restrict, curtail, reduce, suspend, stay or enjoin the right of Lender, as purchaser under the APA, to tender the Credit Bid in the full Credit Bid Amount, each as therein defined.

(x)     If any Variance Report shall reflect a negative variance exceeding the Permitted Variance or Permitted Variance Exception, as applicable.

(y)     If Borrower shall challenge the application of any payments authorized by the Financing Orders pursuant to Section 506(b) of the Bankruptcy Code.

(z)     If Borrower shall seek any relief under the Bankruptcy Code including, without limitation, Section 105 of the Bankruptcy Code, to the extent such relief would in any way restrict or impair the rights and remedies of Lender or Pre-Petition Lender provided in the Financing Orders or in any DIP Loan Document.

7.2     Termination and Acceleration.  Upon the occurrence and during the existence of any Default, Lender shall be under no obligation to fund any Advance hereunder.  If an Event of Default shall have occurred and is continuing, then without further order of or application to the Bankruptcy Court, and without notice to any Person, Lender may, in its sole and absolute discretion, terminate the Availability Period and declare all Obligations to be immediately due and payable, whereupon all of the Obligations shall become and be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; provided, however, that upon the occurrence of any event described in Subsection 7.1(h) of this Agreement, the discretion of Lender to make Advances under this Agreement shall automatically terminate and all Obligations shall automatically become immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

7.3     Remedies; Relief from Stay.  Borrower acknowledges that, pursuant to the Financing Orders, Lender has been granted full and complete relief from stay to pursue any and all remedies to which it may be entitled, including the right to demand immediate possession of the Collateral and the Pre-Petition Collateral and to liquidate the same in the manner provided by applicable law, all without further order of or application to the Bankruptcy Court.  Upon the occurrence of any Event of Default, Lender shall be entitled to the exercise of any and all rights and remedies available to it under the DIP

Loan Documents and the Pre-Petition Loan Documents, at law or in equity. All such rights and remedies may be exercised successively or concurrently in such order and manner as Lender may in its sole discretion elect, and no such election shall constitute a waiver by Lender of any other right or remedy. Without limiting the generality of the foregoing, Lender may, without notice, take any or all of the following actions at the same or different times:

(a) Cancel Lender's obligations arising under the DIP Loan Documents.

(b) Institute appropriate proceedings to specifically enforce performance of the terms and conditions of the DIP Loan Documents.

(c) Take immediate possession of the Collateral.

(d) Appoint or seek appointment of a receiver, without notice and without regard to the solvency of Borrower or the adequacy of the security, for the purpose of preserving the Collateral, preventing waste, and to protect all rights accruing to Lender by virtue of this Agreement and the other DIP Loan Documents. All expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, or improving any Collateral shall be charged against the Borrower and shall be secured by Lender's Liens hereunder.

(e) Perform any and all of the duties and obligations and exercise all the rights and remedies of Borrower contained in any contracts of Borrower as fully as Borrower could itself.

(f) Notify customers that Accounts have been assigned to Lender, demand and receive information from customers with respect to Accounts, forward invoices to customers directing them to make payments to Lender, collect all Accounts in Lender's or Borrower's name and take control of any cash or non-cash proceeds of Collateral.

(g) Enforce payment of any Accounts, prosecute any action or proceeding with respect to any Accounts, extend the time of payment of any Accounts, make allowances and adjustments with respect thereto and issue credits against Accounts in the name of Lender or Borrower.

(h) Settle, compromise, extend, renew, release, terminate or discharge, in whole or in part, any Account or deal with the same as Lender may deem advisable.

(i) Require the Borrower to open all mail only in the presence of a representative of Lender, who may take therefrom any remittance on Collateral.

(j) Exercise any and all rights and remedies of Borrower under or in connection with any contracts or otherwise in respect of the Collateral, including, without limitation, any and all rights of any Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, any assigned agreement.

(k) Enter upon the premises of Borrower or any other place or places where any Collateral is located and kept, and through self-help and without judicial process, without first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender's claim, without any pre-seizure hearing as a condition to repossession through court action and without any obligation to pay rent to Borrower, remove the Collateral therefrom to the premises of Lender or of any agent of Lender, for such time as Lender may desire, in order effectively to collect or liquidate the Collateral.

(l)     Collect, receive, appropriate, repossess, foreclose upon and realize upon the Collateral, or any part thereof, and to sell, lease, assign, give option or options to purchase, or sell or otherwise dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more lots or parcels, at public or private sale or sales, at any exchange broker's board or at any of Lender's offices or elsewhere, at such prices as Lender may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Lender shall have the right upon any such public sale or sales, and to the extent permitted by law, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption, which equity of redemption Borrower hereby releases.   Borrower waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral.

(m)     Use, and permit any purchaser of any of the Collateral from Lender to use, without charge, any intellectual property, promotional or advertising materials or other property of a similar nature which pertains to, or is included in, any of the Collateral, in advertising for sale, preparing for sale and selling any Collateral, and all of Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit.

(n)     Send any written notice to Borrower required by law in the manner set forth in this Agreement; and any notice sent by Lender in such manner at least ten (10) days (counting the date of sending) prior to the date of a proposed disposition of the Collateral shall be deemed to be reasonable notice (provided, however, that nothing contained herein shall be deemed to require 10 days' notice if, under the applicable circumstances, a shorter period of time would be allowed under applicable Law).

(o)     Exercise, in addition to all other rights which it has under this Agreement or other applicable law, all of the rights and remedies of a secured party upon default under the Uniform Commercial Code or other applicable Law.

Borrower acknowledges that upon any sale or liquidation of the Collateral or the Pre-Petition Collateral pursuant to non-bankruptcy remedies under state law as permitted hereby, Lender shall be entitled (but shall not be required) to credit bid the Obligations hereunder and the Indebtedness of Borrower owing under the Pre-Petition Loan Documents on a combined basis in such order and manner as Lender may elect.

7.4     No Limitation on Rights and Remedies.  The enumeration of the powers, rights and remedies in this Article shall not be construed to limit the exercise thereof to such time as an Event of Default occurs if, under applicable law or any other provision of this Agreement or any other DIP Loan Document, Lender has any of such powers, rights and remedies regardless of whether an Event of Default has occurred, and any limitation contained herein or in any of the other DIP Loan Documents as to Lender's exercise of any power, right or remedy for a period of time during the continuance of an Event of Default shall only be applicable at such time as Lender shall have actual knowledge that such Event of Default is no longer continuing and for a reasonable time thereafter as may be necessary for Lender to cease the exercise of such powers, rights and remedies (it being expressly understood and agreed that until such time as Lender shall obtain such knowledge and after the expiration of such reasonable time, Lender shall have no liability whatsoever for the commencement of or continuing exercise of any such power, right or remedy).

7.5     Attorney-in-Fact.  Subject to entry of the Financing Orders, Borrower hereby constitutes and appoints Lender, or any other Person whom Lender may designate, as Borrower's attorney-in-fact (such appointment being coupled with an interest and being irrevocable until Lender's Liens and claims shall have been satisfied), at Borrower's sole cost and expense, to exercise any one or more of the rights, powers or remedies set forth below at any time after the occurrence and during the continuance of an Event of Default (and all acts of such attorney-in-fact or designee taken pursuant to this Section 7.5 are

hereby ratified and approved by Borrower, and said attorney or designee shall not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law):

(a)     To take or to bring, in the name of Lender or in the name of Borrower, all steps, action, suits or proceeding deemed by Lender necessary or desirable to effect collection of Accounts.

(b)     To settle, adjust, compromise, extend, renew, discharge, terminate or release any Accounts in whole or in part.

(c)     To settle, adjust or compromise any legal proceedings brought to collect any Accounts.

(d)     To notify customers to make payments on the Accounts directly to Lender or to a lockbox designated by Lender.

(e)     To transmit to customers notice of Lender's interest in the Accounts and to demand and receive from such customers at any time, in the name of Lender or of any Borrower or of the designee of Lender, information concerning the Accounts and the amounts owing thereon.

(f)     To sell or assign any of the Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable, and to execute and deliver in the name of Borrower any deeds, bills of sale, assignments or other instruments of transfer in connection therewith.

(g)     To take control, in any manner, of any item of payment on, or proceeds of, Collateral.

(h)     To prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar document against any customer of Borrower.

(j)     To prepare, file and sign Borrower's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Collateral.

(j)     To sign or endorse the name of Borrower upon any Chattel Paper, Document, Instrument, invoice, freight bill, bill of lading, warehouse receipt or similar document or agreement relating to the Collateral.

(k)     To use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Collateral to which Borrower has access.

(l)     To enter into contracts or agreements for the management of the Collateral and the further construction or completion thereof as said attorney-in-fact or designee or Lender may from time to time deem appropriate and charge any costs thereby incurred to Borrower's account.

(m)     To receive, take, endorse, assign and deliver in Lender's name or in the name of Borrower any and all checks, notes, drafts and other instruments.

(n)     To receive, open and dispose of all mail addressed to Borrower and to notify postal authorities to change the address for the delivery thereof to such address as Lender may designate.

(o)     To do all acts and things necessary, in Lender's discretion, to fulfill Borrower's obligations under this Agreement and to otherwise carry out the purposes of this Agreement.

## ARTICLE EIGHT - MISCELLANEOUS

8.1     No Waiver.  No failure or delay by the Lender in exercising any right, remedy, power or privilege hereunder or under any other DIP Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The remedies provided herein and in the other DIP Loan Documents are cumulative and not exclusive of any remedies provided by law.  Nothing herein contained shall in any way affect the right of Lender to exercise any statutory or common law lien or right of setoff.

8.2     Right of Setoff.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower) and to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by Lender and any and all other indebtedness at any time owing by Lender to or for the credit or account of Borrower against any and all of the Obligations.  The rights of Lender under this Section 8.2 are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which the Lender may have.  Nothing contained in this Agreement or any other DIP Loan Document shall impair the right of Lender to exercise any right of setoff or counterclaim it may have against Borrower and to apply the amount subject to such exercise to the payment of indebtedness of any Borrower unrelated to this Agreement or the other DIP Loan Documents.

8.3     Costs and Expenses.  Borrower shall reimburse Lender for all fees and expenses of any kind or character whatsoever reasonably incurred by Lender in connection with the Case including, without limitation, fees and expenses of Lender's Professionals (including all fees payable to Houlihan Lokey Capital, Inc. ("Houlihan Lokey"),  in its capacity as financial advisor pursuant to its engagement letter with Burr & Forman LLP dated as of March 11, 2015, as previously disclosed to Borrower by letter agreement between Borrower and Houlihan Lokey dated April 22, 2015) and fees and expenses in connection with (i) the negotiation and preparation of any of the DIP Loan Documents or any amendment or modification thereto, (ii) the preparation of any motions, orders or other pleadings in the Case, (iii) responding to any requests for waiver, restructuring or forbearance with respect to the Obligations, (iv) the administration of the DIP Loan Documents and the transactions contemplated thereby, (v) any action taken to perfect or maintain the perfection or priority of any Liens with respect to any of the Collateral, including any intangibles taxes, documentary stamp taxes or other taxes or costs which may be payable in connection therewith, (vi) any inspections or audits conducted with respect to Borrower's books and records or any of the Collateral, (vii) any effort to verify, protect, preserve, or restore any of the Collateral or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral, (viii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against Lender, Borrower or any other Person) in any way arising out of or relating to any of the Collateral or the validity, perfection or priority of any Liens thereon, or to any of the DIP Loan Documents or the validity, allowance or amount of any of the Obligations, (ix) the protection or enforcement of any rights or remedies of Lender, and (x) any other action taken by Lender to enforce any of the rights or remedies of Lender.  All amounts chargeable to Borrower under this Section 8.3 shall constitute Obligations that are secured by all of the Collateral and shall be payable to Lender on the Termination Date.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the DIP Loan Documents regarding the reimbursement by Borrower of costs, expenses or liabilities suffered or incurred by Lender.

8.4     Environmental Indemnity.  Borrower hereby agrees to indemnify the Lender, and the shareholders, officers, directors, employees, agents and Affiliates of the Lender (collectively, the "Indemnitees"), and hold the Indemnitees harmless from and against any and all losses, liabilities, damages, injuries, costs, expenses and claims of any and every kind whatsoever (including, without limitation, reasonable court costs and attorneys' fees and expenses), which at any time or from time to

time may be paid, incurred or suffered by the Indemnitees, with respect to or as a direct or indirect result of the violation by Borrower of any Environmental Laws; or with respect to, or as a direct or indirect result of the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from, properties owned or operated by any Borrower of any hazardous substances or any other hazardous or toxic waste, substance or constituent or other substance (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under the Environmental Laws); and the provisions of and undertakings and indemnification set out in this Section 8.4 shall survive the satisfaction and payment of the Obligations and the termination of this Agreement; provided that the Borrower shall have no obligation to an Indemnitee hereunder with respect to indemnified liabilities arising from the gross negligence, willful misconduct, bad faith, or criminal misconduct of that Indemnitee.

8.5     General Indemnity.  In addition to the payment of expenses pursuant to Section 8.3, Borrower hereby agrees to indemnify and pay the Indemnitees and hold the Indemnitees harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by or asserted against the Indemnitees, in any manner relating to or arising out of this Agreement, any of the other DIP Loan Documents or any other agreement, document or instrument executed and delivered by Borrower in connection herewith or therewith, the statements contained in any commitment letters delivered by the Lender, the agreement of Lender to make the DIP Loan hereunder, or the use or intended use of the proceeds of any Advance hereunder, and the management and operation of the Borrower's Business (collectively, the "Indemnified Liabilities"); provided that the Borrower shall have no obligation to an Indemnitee hereunder with respect to Indemnified Liabilities arising from the gross negligence, willful misconduct, bad faith, or criminal misconduct of that Indemnitee. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The provisions of the undertakings and indemnification set out in this Section 8.5 shall survive satisfaction and payment of the Obligations and the termination of this Agreement.

8.6     Authority to Act.  The Lender shall be entitled to act on any notices and instructions (telephonic or written) believed by the Lender in good faith to have been sent or delivered by any person identifying himself as Borrower's Representative, regardless of whether such notice or instruction was in fact delivered by such person, and Borrower hereby agrees to indemnify the Lender and hold the Lender harmless from and against any and all losses and expenses, if any, ensuing from any such action.

8.7     Notices.  Any notice, request, demand, consent, confirmation or other communication hereunder shall be in writing and shall be deemed received (a) when personally delivered (to the Person or department if one is designated), (b) one (1) business day following the date deposited with Federal Express, Airborne or other national overnight courier, fees prepaid, or (c) three (3) days following the date deposited with U.S. certified or registered mail, return receipt requested, postage prepaid, and addressed in each such case to the parties at their respective addresses set forth below or such other single address as either party may designate in a written notice given as herein provided (except that a change of address notice shall not be effective until actual receipt).

If to Borrower:            Signal International, Inc.
                          RSA Battle House Tower

11 North Water Street
Suite 16250
Mobile, Alabama 36602
Telephone: (251) 544-2623
Facsimile: (251) 544-2643
Attention: Chris Cunningham, CFO

with a copy to:    Hogan Lovells US, LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Attention:   Christopher R. Donoho III

If to Lender:    c/o The Retirement Systems of Alabama
201 South Union Street
Montgomery, AL 36130
Attn: M. Hunter Harrell
Telephone: (334) 517-7109
Facsimile: (334) 517-7099

with a copy to:    Jeff Baker
Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Telephone:  (205) 458-5279
Facsimile:  (205) 244-5601

8.8    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Alabama, without reference to principles of conflict of laws.

8.9    <u>Amendments and Waivers</u>.  Any provision of this Agreement or any of the other DIP Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by both Borrower and Lender.

8.10    <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign or otherwise transfer any of its rights or delegate any of its obligations under this Agreement.

8.11    <u>NO ORAL AGREEMENTS, ENTIRE AGREEMENT</u>.  ORAL AGREEMENTS OR COMMITMENTS TO LEND MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT, INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE.  TO PROTECT BORROWER AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS REACHED BY BORROWER AND LENDER COVERING SUCH MATTERS ARE CONTAINED IN THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS, WHICH COLLECTIVELY COMPRISE A COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN BORROWER AND LENDER.   THIS AGREEMENT EMBODIES THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES HERETO AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS (ORAL OR WRITTEN) RELATING TO THE SUBJECT MATTER HEREOF.

8.12     Severability.  In the event any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

8.13     Counterparts; Electronic Delivery.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  It shall not be necessary that all parties execute the same counterpart.  Counterparts of this Agreement or of any other DIP Loan Document may be executed and delivered by facsimile or email transmission, and any such facsimile or email signature shall be deemed fully effective as an original signature of the party delivering the same.

8.14     Resurrection of the Obligations.  To the extent that Lender receives any payment on account of any of the Obligations, and any such payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinated or required to be repaid to a trustee, receiver or any other Person under any contract, bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment received, the Obligations or part thereof intended to be satisfied and any and all Liens upon or pertaining to any Property or assets of Borrower and theretofore created or existing in favor of Lender as security for the payment of such Obligations shall be revived and continue in full force and effect, as if such payment had not been received by Lender and applied on account of the Obligations.

8.15     No Third Party Beneficiary.  This Agreement is solely for the benefit of the parties and, except as specifically provided in Sections 8.4, 8.5, and 8.18 of this Agreement, is not intended to be for the benefit of any other Person except for any successor or assignee of Lender.

8.16     Independence of Covenants.  All of the covenants contained in this Agreement and the other DIP Loan Documents shall be given independent effect so that if a particular action, event or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the provisions of, another covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken, such event occurs or such condition exists.

8.17     Conflicting Provisions.  In the event any of the terms and provisions of this Agreement conflict with any terms and provisions contained in any other DIP Loan Document, the terms and provisions of this Agreement shall govern.   In the event any of the terms and provisions of this Agreement conflict with any terms and provisions contained in any Financing Order, the terms and provisions of such Financing Order shall govern.

8.18     General Release of Claims.  In consideration of the agreements of Lender set forth herein, and as a material inducement therefor, subject to entry of Final Order, the Borrower, for and on behalf of itself and all those claiming by, through or under it including, without limitation, its bankruptcy estate (collectively, the "Releasing Parties"), do hereby remise, release and forever discharge Lender, Lender's Professionals, and their respective affiliates, parents, divisions, subsidiaries, successors, predecessors, stockholders, officers, directors, agents, employees, successors, and assigns (collectively, the "Released Parties"), of and from any and all claims, demands, liabilities, actions and causes of action of every kind or nature, whether known or unknown, suspected or unsuspected, contingent or matured, concealed, hidden, latent or patent, which may now exist or may in the past have existed, directly or indirectly, from the beginning of time through the Effective Date.

8.19   Waiver of Jury Trial.  **THE PARTIES HEREBY MUTUALLY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, OR IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATING TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES ACKNOWLEDGE THAT THE FOREGOING WAIVER FORMS A MATERIAL PART OF THE CONSIDERATION RECEIVED BY LENDER AS AN INDUCEMENT TO ENTER INTO THE DIP LOAN DOCUMENTS.**

**[No further text this page; Signature page follows.]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be properly executed and delivered as of the Effective Date.

**BORROWER:**

SIGNAL INTERNATIONAL, INC., a Delaware corporation

By: _____
    Print Name: _____
    Title: _____

SIGNAL INTERNATIONAL, LLC, a Delaware limited liability company

By: _____
    Print Name: _____
    Title: _____

SIGNAL SHIP REPAIR, LLC, a Delaware limited liability company

By: _____
    Print Name: _____
    Title: _____

SIGNAL INTERNATIONAL TEXAS, L.P., a Delaware limited partnership,

By: _____
    Print Name: _____
    Title: _____

SIGNAL INTERNATIONAL TEXAS GP, LLC, a Delaware limited liability company

By: _____
    Print Name: _____
    Title: _____

**LENDER:**

TEACHERS' RETIREMENT SYSTEM OF ALABAMA,
a body corporate of the State of Alabama


By: _____
      Print Name: _____
      Title: _____


EMPLOYEES' RETIREMENT SYSTEM OF
ALABAMA, a body corporate of the State of Alabama


By: _____
      Print Name: _____
      Title: _____

# EXHIBIT A - NOTICE OF BORROWING

_____, 2015

_____
_____
_____

RE:     Debtor in Possession Loan and Security Agreement dated _____, 2015, by and among by and among **SIGNAL INTERNATIONAL, INC.,** a Delaware corporation ("Signal"), **SIGNAL INTERNATIONAL, LLC**, a Delaware limited liability company ("International"), **SIGNAL SHIP REPAIR, LLC**, a Delaware limited liability company ("Repair"), **SIGNAL INTERNATIONAL TEXAS, L.P.**, a Delaware limited partnership ("Limited Partner"), and **SIGNAL INTERNATIONAL TEXAS GP, LLC**, a Delaware limited liability company ("General Partner", and together with Signal, International, Repair, and Limited Partner, individually and collectively, the "Borrower"), and THE TEACHERS' RETIREMENT SYSTEM OF ALABAMA, and THE EMPLOYEES' RETIREMENT SYSTEM OF ALABAMA (collectively, the "Lender") (as at any time amended, the "DIP Loan Agreement")

Ladies and Gentlemen:

This Notice of Borrowing is delivered to you pursuant to Section 2.3(a) of the DIP Loan Agreement. Unless otherwise defined herein, capitalized terms used herein shall have the meanings attributable thereto in the DIP Loan Agreement. Borrower hereby requests an Advance of DIP Loan proceeds as follows:

Funding Source:        [Operating Sublimit or Credit Enhancement Sublimit]
Principal Amount:      $_____
Funding Date:          _____, 2015
Wiring Instructions:   _____
                       _____
                       _____
                       _____

Attached hereto is a copy of the most recent Variance Report.

Borrower hereby certifies that (i) on the date of, and after giving effect to, the Advance requested hereby, no Default or Event of Default has occurred and is continuing; and (ii) on the date of, and after giving effect to, the Advance requested hereby, all of the representations and warranties of the Borrower contained in the DIP Loan Agreement and the other DIP Loan Documents are true and correct in all respects as if made on and as of the date of such Advance (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date); and (iii) that such Advance is in accordance with, and will be used to fund costs and expenses of the Borrower set forth in, the Approved Budget; and (iv) all prior Advances have been applied by Borrower in compliance with and for the purposes set forth in the DIP Loan Agreement and the Notice of Borrowing pursuant to which the same were disbursed. Borrower hereby ratifies and reaffirms all of the DIP Loan Documents and all Obligations arising thereunder.

IN WITNESS WHEREOF, Borrower has caused this Notice of Borrowing to be executed and delivered this _____ day of _____, 2015.

**EXHIBIT B - APPROVED BUDGET**

SEE ATTACHED

**Signal International**

**14 Week Cash Forecast**

**Forecast Start Date: Week Ending 7/19/15**

| $'000s | 1 Forecast 7/19 | 2 Forecast 7/26 | 3 Forecast 8/2 | 4 Forecast 8/9 | 5 Forecast 8/16 | 6 Forecast 8/23 | 7 Forecast 8/30 | 8 Forecast 9/6 | 9 Forecast 9/13 | 10 Forecast 9/20 | 11 Forecast 9/27 | 12 Forecast 10/4 | 13 Forecast 10/11 | 14 Forecast 10/18 | Bankruptcy Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Receipts:** | | | | | | | | | | | | | | | |
| AR Aging Collections | $ 599 | $ 541 | $ 279 | $ - | $ - | $ 212 | $ - | $ 75 | $ - | $ - | $ - | $ - | $ 33 | $ - | $ 1,419 |
| Mississippi Receipts | - | - | 172 | 33 | - | 97 | - | 302 | 281 | 300 | 306 | 300 | - | 300 | 2,410 |
| Alabama Receipts | 0 | 420 | 320 | 501 | 906 | 388 | 883 | 301 | 908 | 300 | 300 | 300 | 301 | 1,198 | 7,025 |
| Non-Operating Receipts | 429 | | | 206 | | | | | 206 | | | | 206 | | 1,046 |
| Total Receipts | 1,029 | 961 | 770 | 739 | 1,118 | 485 | 958 | 808 | 1,189 | 600 | 606 | 600 | 539 | 1,498 | 11,901 |
| **Disbursements** | | | | | | | | | | | | | | | |
| **Payroll-related** | | | | | | | | | | | | | | | |
| Weekly | 265 | 299 | 243 | 295 | 246 | 253 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 3,634 |
| Semi-monthly | | | 400 | | 400 | | 400 | | | 400 | | 400 | | 400 | 2,400 |
| Payroll, other | 124 | 62 | 62 | 62 | 124 | 62 | 62 | 62 | 62 | 124 | 62 | 62 | 62 | 124 | 1,115 |
| Total payroll-related | 390 | 361 | 704 | 357 | 770 | 315 | 715 | 316 | 316 | 779 | 316 | 716 | 316 | 779 | 7,149 |
| **Vendor payments** | | | | | | | | | | | | | | | |
| Material / Sub Contractors | 325 | 324 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 4,110 |
| Lease payments | 5 | 12 | 62 | - | 32 | 12 | 1 | 61 | 27 | 9 | 8 | 62 | 27 | 5 | 323 |
| Rent | 595 | 18 | 158 | 17 | 2 | 18 | - | 105 | - | 2 | 18 | 88 | 17 | 2 | 1,037 |
| Tax | - | 244 | - | - | - | 26 | - | 65 | - | 26 | - | - | 65 | 26 | 452 |
| Insurance | 159 | - | 23 | - | 100 | 159 | 23 | - | 100 | 159 | - | 23 | 100 | 159 | 1,005 |
| Utilities | 24 | 149 | 24 | 24 | 24 | 149 | 24 | 24 | 24 | 149 | 24 | 24 | 24 | 24 | 716 |
| Ordinary Course Professionals | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 140 |
| Total Operating Disbursements | 1,118 | 757 | 566 | 340 | 457 | 662 | 347 | 553 | 450 | 643 | 349 | 496 | 532 | 515 | 7,784 |
| Net Operating Cash Flow | $ (479) | $ (156) | $ (500) | $ 42 | $ (110) | $ (493) | $ (104) | $ (61) | $ 423 | $ (821) | $ (59) | $ (612) | $ (309) | $ 205 | $ (3,032) |
| Cumulative Cash Flow | (479) | (635) | (1,135) | (1,093) | (1,203) | (1,695) | (1,799) | (1,860) | (1,437) | (2,258) | (2,317) | (2,928) | (3,237) | (3,032) | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Texas Principal Transfer | | | | 206 | | | | 206 | | | | | 206 | | 617 |
| DIP Fees | 8 | - | - | - | 8 | - | - | - | - | 8 | - | - | - | 408 | 430 |
| DIP Interest | - | - | - | - | 507 | - | - | - | - | 519 | - | - | - | 542 | 1,568 |
| Total RSA Payments | 8 | - | - | 206 | 515 | - | - | 206 | - | 527 | - | - | 206 | 949 | 2,615 |
| **Professional Fees** | | | | | | | | | | | | | | | |
| Hogan Lovells | - | - | - | - | - | - | 110 | - | - | - | 110 | - | - | - | 220 |
| Young Conaway | - | - | - | - | - | - | 220 | - | - | - | 220 | - | - | - | 440 |
| Skip Victor | - | - | - | - | - | - | 40 | - | - | - | 40 | - | - | - | 80 |
| GGG | - | - | - | - | - | - | 67 | - | - | - | 67 | - | - | - | 134 |
| Houlihan Lokey | - | - | - | - | - | - | 110 | - | - | - | 110 | - | - | - | 220 |
| SSG | - | - | - | - | - | - | 50 | - | - | - | 50 | - | - | - | 100 |
| UCC Professional Fees | - | - | - | - | - | - | 62 | - | - | - | 62 | - | - | - | 124 |
| KCC Administrative Advisor | - | - | - | - | - | - | 8 | - | - | - | 6 | - | - | - | 14 |
| KCC Noticing Agent | - | - | - | - | - | - | 70 | - | - | - | 70 | - | - | - | 140 |
| Total Professional Fees | - | - | - | - | - | - | 737 | - | - | - | 735 | - | - | - | 1,472 |
| **Other Bankruptcy Payments** | | | | | | | | | | | | | | | |
| Trustee Fees | 2 | | | | | | | | | | | | | 20 | 22 |
| Utility Deposits | | | 266 | | | | | | | | | | | | 266 |
| Total Other Bankruptcy Payments | 2 | - | 266 | - | - | - | - | - | - | - | - | - | - | 20 | 288 |
| Net Cash Flow | (489) | (156) | (766) | (163) | (624) | (493) | (841) | (266) | 423 | (1,348) | (793) | (612) | (514) | (764) | (7,407) |
| Beginning Cash Balance | 451 | 2,462 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 451 |
| Net Cash Flow | (489) | (156) | (766) | (163) | (624) | (493) | (841) | (266) | 423 | (1,348) | (793) | (612) | (514) | (764) | (7,407) |
| DIP Borrowing | 2,500 | 194 | 766 | 163 | 624 | 493 | 841 | 266 | (423) | 1,348 | 793 | 612 | 514 | 764 | 9,456 |
| Ending Cash Balance | 2,462 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Minimum Cash Balance | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | |
| **DIP** | | | | | | | | | | | | | | | |
| Beginning Balance | - | 2,538 | 2,732 | 3,498 | 3,661 | 4,285 | 4,778 | 5,619 | 5,885 | 5,462 | 6,810 | 7,604 | 8,215 | 8,729 | - |
| Operating Borrowing | 2,538 | 194 | 766 | 163 | 624 | 493 | 841 | 266 | (423) | 1,348 | 793 | 612 | 514 | 764 | 9,494 |
| Ending Funded DIP Balance | 2,538 | 2,732 | 3,498 | 3,661 | 4,285 | 4,778 | 5,619 | 5,885 | 5,462 | 6,810 | 7,604 | 8,215 | 8,729 | 9,494 | 9,494 |
| Professional Fee Carve-out | - | - | - | 600 | 600 | 600 | 35 | 705 | 705 | 705 | 95 | 840 | 840 | 2,590 | 2,590 |
| 503(b)(9) | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 |
| KEIP | | | | | | | | | | | | | | 500 | 500 |
| Accrued Bankruptcy Admin Obligations | 366 | 366 | 366 | 966 | 966 | 966 | 401 | 1,071 | 1,071 | 1,071 | 461 | 1,206 | 1,206 | 3,456 | 3,456 |
| Total DIP Obligation | 2,904 | 3,098 | 3,864 | 4,627 | 5,251 | 5,744 | 6,020 | 6,956 | 6,533 | 7,881 | 8,065 | 9,421 | 9,936 | 12,950 | 12,950 |
| Net Availability | 12,096 | 11,902 | 11,136 | 10,373 | 9,749 | 9,256 | 8,980 | 8,044 | 8,467 | 7,119 | 6,935 | 5,579 | 5,064 | 2,050 | |
| **Credit Enhancement** | | | | | | | | | | | | | | | |
| Beginning Credit Enhancement Availability | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Use | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Credit Enhancement Availability | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |

# EXHIBIT C – VARIANCE REPORT

SEE ATTACHED

**Signal International**
**14 Week Cash Forecast**
**Forecast Start Date: Week Ending 7/19/15**
**Variance Report**

| $'000s | Actual ($) | Cumulative 4 Week As Budgeted 8/9 | Variance ($) | Variance (%) |
|---|---|---|---|---|
| **Total Receipts** | | | | |
| | | | | |
| **Disbursements** | | | | |
| *Payroll-related* | | | | |
| Weekly | | | | |
| Semi-monthly | | | | |
| Payroll, other | | | | |
| Total Payroll Related | | | | |
| | | | | |
| *Vendor payments* | | | | |
| Material / Sub Contractors | | | | |
| Lease payments | | | | |
| Rent | | | | |
| Tax | | | | |
| Insurance | | | | |
| Utilities | | | | |
| Ordinary Course Professionals | | | | |
| Other | | | | |
| Total Operating Disbursements | | | | |
| | | | | |
| Net Operating Cash Flow | | | | |
| | | | | |
| **Financing Disbursements** | | | | |
| Westport Note | | | | |
| DIP Fees | | | | |
| DIP Interest | | | | |
| | | | | |
| Total Financing Disbursements | | | | |
| | | | | |
| **Total Professional Fees** | | | | |
| | | | | |
| **Other Bankruptcy Payments** | | | | |
| Trustee Fees | | | | |
| Utility Deposits | | | | |
| | | | | |
| Total Other Bankruptcy Payments | | | | |
| | | | | |
| **Net Cash Flow** | | | | |

**SCHEDULE 5.7**

## Schedule 5.7

| Claimant | Case Style |
|---|---|
| Carnival Corporation vs. Signal Ship Repair, et al | US District Court for the Southern District of Alabama - 13-cv-00314-CG-C |
| Kevin Smith vs. Signal International | EEOC Charge No. 846-2014-15884 - Mobile Local Office |
| Hannah Christopher vs. Signal Ship Repair, et al | EEOC Charge No. 425-2012-00526 - Mobile Local Office |
| Fireman's Fund Insurance Company et al vs. Signal International, et al | US Court of Appeals for the Second Circuit - 14-1346-cv (L) c/w 14-2516-cv |
| Big Dawg Services, Inc. vs. Signal International, LLC, et al | Jackson County, Chancery Court, Mississippi - C/A #2014-00324NH |
| Bartlett, Dale, et al vs. Signal International, et al | Northern District of California, US District Court, San Francisco Division - 3:15-CV-00345 MEJ |
| Achari, et al vs. Signal International, LLC, et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06218-SM-DEK |
| Chakkiyattil, et al vs. Signal International, LLC, et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06219-SM-DEK |
| David, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:08-cv-01220-SM-DEK |
| Devassy, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06221-SM-DEK |
| Equal Employment Opportunity Commission vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:12-cv-00557-SM-DEK |
| Joseph, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00324-RC-ZJH |
| Kambala, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00498-RC-ZJH |
| Krishnakutty, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06220-SM-DEK |
| Marimuthu, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00499-MAC-ZJH |
| Megananthan, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00497-MAC-ZJH |
| Samuel, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00323-MAC-ZJH |
| Singh, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:14-cv-00732-SM-DEK |
| Thomas, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:14-cv-01818-SM-DEK |

| Signal Entity | Description | Status |
|---|---|---|
| Signal International, LLC | The US EPA sent an Opportunity to Show Cause letter to Signal International, LLC on 11/13/2014 regarding inspections performed on 03/28/2013 and 01/28/2014.  Based on observations made during the inspections, the EPA has determined that Signal may not be in compliance with the requirements of the Mississippi Solid Waste Disposal Law of 1974 and the Mississippi Hazardous Waste Management Regulations. | Pending |
| Signal International, LLC | Equal Employment Opportunity Commission vs. Signal International, LLC et al - US District Court for the Eastern District of Louisiana - 12-557 | Pending |

**EXHIBIT C**

**DIP Budget**

**Signal International**

**14 Week Cash Forecast**

**Forecast Start Date: Week Ending 7/19/15**

| $'000s | 1 Forecast 7/19 | 2 Forecast 7/26 | 3 Forecast 8/2 | 4 Forecast 8/9 | 5 Forecast 8/16 | 6 Forecast 8/23 | 7 Forecast 8/30 | 8 Forecast 9/6 | 9 Forecast 9/13 | 10 Forecast 9/20 | 11 Forecast 9/27 | 12 Forecast 10/4 | 13 Forecast 10/11 | 14 Forecast 10/18 | Bankruptcy Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Receipts:** | | | | | | | | | | | | | | | |
| AR Aging Collections | $ 599 | $ 541 | $ 279 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,419 |
| Mississippi Receipts | - | - | 172 | 33 | 212 | 97 | 75 | 302 | 281 | 300 | 306 | 300 | 33 | 300 | 2,410 |
| Alabama Receipts | 0 | 420 | 320 | 501 | 906 | 388 | 883 | 301 | 908 | 300 | 300 | 300 | 301 | 1,198 | 7,025 |
| Non-Operating Receipts | 429 | - | - | 206 | - | - | - | - | 206 | - | - | - | 206 | - | 1,046 |
| Total Receipts | 1,029 | 961 | 770 | 739 | 1,118 | 485 | 958 | 808 | 1,189 | 600 | 606 | 600 | 539 | 1,498 | 11,901 |
| **Disbursements** | | | | | | | | | | | | | | | |
| **Payroll-related** | | | | | | | | | | | | | | | |
| Weekly | 265 | 299 | 243 | 295 | 246 | 253 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 3,634 |
| Semi-monthly | - | - | 400 | - | 400 | - | 400 | - | - | 400 | - | 400 | - | 400 | 2,400 |
| Payroll, other | 124 | 62 | 62 | 62 | 124 | 62 | 62 | 62 | 62 | 124 | 62 | 62 | 62 | 124 | 1,115 |
| Total payroll-related | 390 | 361 | 704 | 357 | 770 | 315 | 715 | 316 | 316 | 779 | 316 | 716 | 316 | 779 | 7,149 |
| **Vendor payments** | | | | | | | | | | | | | | | |
| Material / Sub Contractors | 325 | 324 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 4,110 |
| Lease payments | 5 | 12 | 62 | - | 32 | 12 | 1 | 61 | 27 | 9 | 8 | 62 | 27 | 5 | 323 |
| Rent | 595 | 18 | 158 | 17 | 2 | 18 | - | 105 | - | 2 | 18 | 88 | 17 | 2 | 1,037 |
| Tax | - | 244 | - | - | - | 26 | - | 65 | - | - | 26 | - | 65 | 26 | 452 |
| Insurance | 159 | - | 23 | - | 100 | 159 | 23 | - | 100 | 159 | - | 23 | 100 | 159 | 1,005 |
| Utilities | 24 | 149 | 24 | 24 | 24 | 149 | 24 | 24 | 24 | 149 | 24 | 24 | 24 | 24 | 716 |
| Ordinary Course Professionals | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 140 |
| Total Operating Disbursements | 1,118 | 757 | 566 | 340 | 457 | 662 | 347 | 553 | 450 | 643 | 349 | 496 | 532 | 515 | 7,784 |
| Net Operating Cash Flow | $ (479) | $ (156) | $ (500) | $ 42 | $ (110) | $ (493) | $ (104) | $ (61) | $ 423 | $ (821) | $ (59) | $ (612) | $ (309) | $ 205 | $ (3,032) |
| Cumulative Cash Flow | (479) | (635) | (1,135) | (1,093) | (1,203) | (1,695) | (1,799) | (1,860) | (1,437) | (2,258) | (2,317) | (2,928) | (3,237) | (3,032) | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Texas Principal Transfer | - | - | - | 206 | - | - | - | 206 | - | - | - | - | 206 | - | 617 |
| DIP Fees | 8 | - | - | - | 8 | - | - | - | - | 8 | - | - | - | 408 | 430 |
| DIP Interest | - | - | - | - | 507 | - | - | - | - | 519 | - | - | - | 541 | 1,568 |
| Total RSA Payments | 8 | - | - | 206 | 515 | - | - | 206 | - | 527 | - | - | 206 | 949 | 2,615 |
| **Professional Fees** | | | | | | | | | | | | | | | |
| Hogan Lovells | - | - | - | - | - | - | 110 | - | - | - | 110 | - | - | - | 220 |
| Young Conaway | - | - | - | - | - | - | 220 | - | - | - | 220 | - | - | - | 440 |
| Skip Victor | - | - | - | - | - | - | 40 | - | - | - | 40 | - | - | - | 80 |
| GGG | - | - | - | - | - | - | 67 | - | - | - | 67 | - | - | - | 134 |
| Houlihan Lokey | - | - | - | - | - | - | 110 | - | - | - | 110 | - | - | - | 220 |
| SSG | - | - | - | - | - | - | 50 | - | - | - | 50 | - | - | - | 100 |
| UCC Professional Fees | - | - | - | - | - | - | 62 | - | - | - | 62 | - | - | - | 124 |
| KCC Administrative Advisor | - | - | - | - | - | - | 8 | - | - | - | 6 | - | - | - | 14 |
| KCC Noticing Agent | - | - | - | - | - | - | 70 | - | - | - | 70 | - | - | - | 140 |
| Total Professional Fees | - | - | - | - | - | - | 737 | - | - | - | 735 | - | - | - | 1,472 |
| **Other Bankruptcy Payments** | | | | | | | | | | | | | | | |
| Trustee Fees | 2 | | | | | | | | | | | | | 20 | 22 |
| Utility Deposits | | | 266 | | | | | | | | | | | | 266 |
| Total Other Bankruptcy Payments | 2 | - | 266 | - | - | - | - | - | - | - | - | - | - | 20 | 288 |
| Net Cash Flow | (489) | (156) | (766) | (163) | (624) | (493) | (841) | (266) | 423 | (1,348) | (793) | (612) | (514) | (764) | (7,407) |
| Beginning Cash Balance | 451 | 2,462 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 451 |
| Net Cash Flow | (489) | (156) | (766) | (163) | (624) | (493) | (841) | (266) | 423 | (1,348) | (793) | (612) | (514) | (764) | (7,407) |
| DIP Borrowing | 2,500 | 194 | 766 | 163 | 624 | 493 | 841 | 266 | (423) | 1,348 | 793 | 612 | 514 | 764 | 9,456 |
| Ending Cash Balance | 2,462 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Minimum Cash Balance | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | |
| **DIP** | | | | | | | | | | | | | | | |
| Beginning Balance | - | 2,538 | 2,732 | 3,498 | 3,661 | 4,285 | 4,778 | 5,619 | 5,885 | 5,462 | 6,810 | 7,604 | 8,215 | 8,729 | - |
| Operating Borrowing | 2,538 | 194 | 766 | 163 | 624 | 493 | 841 | 266 | (423) | 1,348 | 793 | 612 | 514 | 764 | 9,494 |
| Ending Funded DIP Balance | 2,538 | 2,732 | 3,498 | 3,661 | 4,285 | 4,778 | 5,619 | 5,885 | 5,462 | 6,810 | 7,604 | 8,215 | 8,729 | 9,494 | 9,494 |
| Professional Fee Carve-out | - | - | - | 600 | 600 | 600 | 35 | 705 | 705 | 705 | 95 | 840 | 840 | 2,590 | 2,590 |
| 503(b)(9) | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 |
| KEIP | | | | | | | | | | | | | | 500 | 500 |
| Accrued Bankruptcy Admin Obligations | 366 | 366 | 366 | 966 | 966 | 966 | 401 | 1,071 | 1,071 | 1,071 | 461 | 1,206 | 1,206 | 3,456 | 3,456 |
| Total DIP Obligation | 2,904 | 3,098 | 3,864 | 4,627 | 5,251 | 5,744 | 6,020 | 6,956 | 6,533 | 7,881 | 8,065 | 9,421 | 9,936 | 12,950 | 12,950 |
| Net Availability | 12,096 | 11,902 | 11,136 | 10,373 | 9,749 | 9,256 | 8,980 | 8,044 | 8,467 | 7,119 | 6,935 | 5,579 | 5,064 | 2,050 | |
| **Credit Enhancement** | | | | | | | | | | | | | | | |
| Beginning Credit Enhancement Availability | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Use | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Credit Enhancement Availability | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |