## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **SIGNAL INTERNATIONAL, INC., et al.**[1] | Case No. 15-11498 (____) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF CHRISTOPHER S. CUNNINGHAM IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Christopher S. Cunningham, hereby submit this declaration (the "**Declaration**") under penalty of perjury:

1.       I am the chief financial officer of Signal International, Inc. ("**SI Inc.**"),[2] a corporation organized under the laws of the state of Delaware and a debtor and debtor in possession in the above-captioned chapter 11 cases of SI Inc. and its subsidiaries (collectively, "**Signal**" or the "**Debtors**").  In such capacity, I am familiar with Signal's business, day-to-day operations, and financial affairs.

2.       On the date hereof (the "**Petition Date**"), SI Inc. and its direct and indirect wholly owned subsidiaries, Signal International, LLC ("**SI LLC**"), Signal Ship Repair, LLC ("**SSR**"), Signal International Texas GP, LLC ("**SI GP**") and Signal International Texas, L.P. ("**SI Texas**"), commenced cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors also filed the motions and applications described herein for related relief (collectively, the "**First Day Motions**").  The Debtors are operating their business and managing

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Signal International, Inc. (4248); Signal Ship Repair, LLC (2642); Signal International, LLC (5074); Signal International Texas GP, LLC (3050); and Signal International Texas, L.P. (5066).  The Debtors' principal offices are located at RSA Battle House Tower, 11 North Water Street, Mobile, Alabama 36602.

[2]       I am also a minority stockholder of SI Inc., holding 4,650 shares of voting common stock.

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  None of the Debtors are a small business within the meaning of section 101(51D) of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases (the "**Chapter 11 Cases**").

3.     I have reviewed and am familiar with the contents of each of the First Day Motions, and I believe that the approval of the relief requested therein is necessary to minimize disruption to Signal's business operations so as to permit an effective transition into chapter 11, preserve and maximize the value of the Debtors' estates, and, ultimately, achieve a successful restructuring.  I also believe that, absent immediate access to encumbered cash collateral and additional funding, and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as sought and described in greater detail in the First Day Motions, the Debtors would suffer immediate and irreparable harm to the detriment of the Debtors' estates.

4.     Except as otherwise indicated, the facts set forth in this Declaration are based upon:  my personal knowledge of Signal's business operations; my review of relevant documents; information provided to me or verified by other executives or employees, Signal's professional advisors, including Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**"), Hogan Lovells US LLP ("**Hogan Lovells**"), and Mr. Skip Victor, Signal's pre-petition chief restructuring officer; and my experience, knowledge, and information concerning Signal's operations, financials and the oil and gas services industry generally.   Unless otherwise indicated, the financial information contained in this Declaration is presented on a consolidated basis and is unaudited and subject to change.  I am authorized to submit this Declaration on

behalf of Signal, and if called upon to testify, I would testify competently to the facts set forth herein.

## I.     INTRODUCTION AND EVENTS LEADING TO CHAPTER 11

5.     As described in greater detail below, the filing of the Chapter 11 Cases is the consensual culmination of seven years of protracted and highly contentious multi-action litigation and negotiations between Signal and certain of the Litigation Plaintiffs[3] that has finally reached a global resolution and settlement embodied in the plan support agreement attached hereto as Exhibit A (the "**Plan Support Agreement**"), subject to Court approval and implementation through a chapter 11 plan for Signal.  The Plan Support Agreement is joined by the First Lien Lenders and also resolves Signal's default under the First Lien Loan as well as the Litigation Plaintiffs' threatened claims against the First Lien Lenders.  In short, the Plan Support Agreement spares Signal, the First Lien Lenders, and the Litigation Plaintiffs—as well as the Court—from contentious and value-destroying bankruptcy litigation while preserving Signal's assets as a going concern and maximizing the value of Signal's estate.  Specifically, the Plan Support Agreement provides for (i) an open market sale of substantially all of Signal's assets with the RSA serving as stalking horse bidder, (ii) a distribution to the Litigation Plaintiffs of between $20 million and $22 million from proceeds of the Texas Note depending on the performance of the loan, and (iii) a gift payment of $400,000 to be shared pro rata by the holders of allowed general unsecured claims.  Thus, despite Signal's tumultuous litigation and financial history, it enters the Chapter 11 Cases having brokered a global resolution of the most contentious claims against it.  Signal is confident that, given the settlement with its two largest creditor constituencies, it will quickly and with relatively minimal resistance seek approval of a

---

[3]     All capitalized terms not defined in this section are ascribed the meaning given elsewhere in this Declaration.

disclosure statement, begin solicitation of a chapter 11 plan, effectuate the sale of its assets, and confirm a chapter 11 plan.

### A.    Signal's Business and Obligations

6.    Signal primarily engages in the business of offshore drilling rig overhaul, repair, upgrade, and conversion, as well as new shipbuilding construction.    Additionally, Signal provides services to the general marine and heavy fabrication markets for barges, power plants, and modular construction.  SI LLC was organized on December 6, 2002, as a limited liability company after acquiring the assets of the Offshore Division of Friede Goldman Halter from bankruptcy.  SI Inc. was incorporated on October 12, 2007, and began operations with offshore fabrication and repair in Mississippi.  Today, Signal's corporate headquarters are in Mobile, Alabama, with operations in Alabama and Mississippi, and a sales office in Texas.

7.    As of the Petition Date, the Debtors had outstanding obligations under: (i) a term loan (the "**First Lien Loan**") with an outstanding principal amount of approximately $70.1 million plus all other amounts outstanding (the "**First Lien Debt**") under that certain Credit Agreement, dated as of January 31, 2014 (the "**First Lien Credit Agreement**") among SI Inc., as borrower, the Teachers' Retirement System of Alabama ("**TRSA**"), as administrative agent (in such capacity, the "**First Lien Agent**"), the TRSA and the Employees' Retirement System of Alabama ("**ERSA**"), as lender parties thereto (together, the "**First Lien Lenders**" or "**RSA**"), and SI LLC, SSR, SI GP, and SI Texas, as guarantors; (ii) other secured obligations totaling approximately $1.3 million arising from certain equipment lease agreements and/or promissory notes; (iii) a judgment claim in the approximate amount of $4 million held by Max Specialty Insurance Company ("**Max Specialty**"); and (iv) judgment claims held by certain Judgment Plaintiffs (as defined below) totaling approximately $12 million plus costs, fees and expenses.  In addition, the Debtors have approximately $11 million in trade and other unsecured debt.  In

4

connection with the First Lien Debt, the Debtors have granted the First Lien Agent liens on substantially all of the Debtors' assets as security for their obligations under the First Lien Credit Agreement.

8.      The Debtors have experienced liquidity constraints due in large part to a decline in oil and gas prices, resulting in a slowdown of drilling operations in the Gulf region that directly impacts the demand for Signal's oil and gas equipment and marine services.  In addition, as explained in greater detail below, the Debtors have incurred significant legal fees and expenses defending several pending litigations in New York, Texas, and Louisiana.

**B.      Pre-Petition Litigation against Signal**

9.      Since 2008, Signal has been involved in over thirteen (13) separate litigations across three different states resulting in approximately $20 million in litigation fees and expenses.  These litigations, coupled with the decline in the oil and gas industry, have significantly strained Signal's liquidity.  The settlement in the Plan Support Agreement and the chapter 11 process provides Signal with a desperately needed breathing spell to allow it to restructure its debt and maximize value for the benefit of all its creditors.

**1.      The H-2B Litigation**

10.      After Hurricane Katrina in 2005, Signal hired, through a third party recruiting service, approximately 500 men from India (the "**H-2B Workers**") through the federal government's H-2B guestworker program to provide labor and services to Signal.  In 2008, a subset of those H-2B Workers (the "**Litigation Plaintiffs**") filed suits against Signal, among others, for certain alleged violations regarding treatment of the H-2B Workers and quality of working conditions.  The Litigation Plaintiffs were denied class-certification and brought twelve (12) independent actions in Louisiana and Texas.

11.     The first of those actions, *David v. Signal International LLC, et al.*, involved five (5) of the Litigation Plaintiffs and was tried before a jury in the U.S. District Court for the Eastern District of Louisiana (the "**Louisiana District Court**") beginning in January 2015. Following several weeks of trial, the jury found against SI Inc. and SI LLC and awarded damages to the *David* plaintiffs.   On May 11, 2015, the Louisiana District Court entered judgment (the "**H-2B Judgment**") in favor of the *David* plaintiffs (the "**Judgment Plaintiffs**") and against SI Inc. and SI LLC totaling approximately $12 million plus fees, costs, and expenses for various claims relating to the recruitment and treatment of the Judgment Plaintiffs.   There remain 11 pending lawsuits against Signal in which approximately 227 other Litigation Plaintiffs have alleged claims that are substantially similar to those alleged by the Judgment Plaintiffs, with the next trial scheduled to commence on July 20, 2015.   As described further below, subject to the terms of the Plan Support Agreement (including Court approval and implementation through a chapter 11 plan for Signal), Signal has settled with the vast majority of the Litigation Plaintiffs and anticipates more Litigation Plaintiffs joining the Plan Support Agreement post-petition.   However, absent chapter 11, it is possible that any number of other H-2B Workers who have not yet taken action against Signal may institute litigation against it.   Thus, Signal needs the chapter 11 process to sell its assets free and clear of these contingent claims.

### 2.     The EEOC Litigation

12.     In late 2007, two H-2B Workers filed charges of discrimination with the Equal Employment Opportunity Commission ("**EEOC**") on behalf of themselves and other, similarly situated former H-2B Workers.   The EEOC issued its initial determination on these charges in September 2009, declaring that there is "reasonable cause to believe" that Signal discriminated against the H-2B Workers as a class.   Thereafter, in 2011, the EEOC filed an action in the U.S. District Court for the Southern District of Mississippi and the case was later transferred to the

U.S. District Court for the Eastern District of Louisiana.  The EEOC action has been adjourned indefinitely, however, due to a pending appeal in an unrelated case before the United States Court of Appeals for the Fifth Circuit addressing legal issues that may have a direct impact on the EEOC litigation against Signal.  As of the Petition Date, the EEOC has not agreed to become a signatory to the Plan Support Agreement.

### 3.    The Insurance Litigation

13.    A prepetition judgment also was entered against SI LLC in favor of Max Specialty on June 17, 2014 (the "**Insurance Judgment**").  As background, Signal owned a large dry dock that was destroyed in August 2009.  Signal had primary insurance coverage in the amount of $10 million and also an excess insurance policy issued by Max Specialty.  After the dry dock was destroyed, Signal made an insurance claim for $13.6 million for the value of the hull and also another $11.4 million claim for business interruption.  The primary insurance provider paid $10 million under its policy and Max Specialty paid $3.6 million for the hull under the excess policy but refused to pay anything on account of Signal's business interruption claim.  In March 2010, some of Signal's insurers commenced a declaratory judgment action against Signal and other insurers in the United States District Court for the Southern District of New York.  Signal filed a cross-claim against Max Specialty for, among other things, its failure to pay the business interruption claim.  Max Specialty thereafter filed a cross-claim against Signal, asserting that Signal had failed to disclose the condition of the dry dock and seeking to void the insurance policy, which would have the effect of clawing back the $3.6 million Max Specialty previously paid to Signal pursuant to the insurance claim on the hull.  On June 17, 2014, the district court ruled in favor of Max Specialty and entered judgment in the amount of $4 million against SI LLC.  On April 7, 2015, Max Specialty filed petitions to domesticate the foreign judgments in Mississippi, Alabama, and Texas.  Max Specialty has taken no further action to

perfect the Insurance Judgment in those states since filing the petitions to domesticate.  SI LLC has appealed the Insurance Judgment to the United States Court of Appeals for the Second Circuit, which heard oral argument on June 24, 2015.

**C.    Pre-Petition Settlement and the Plan Support Agreement**

14.    Considering the significant litigation against it and other factors, Signal recognized the need to resolve the various litigation claims and restructure its debt.  To that end, Signal began to allocate resources to its restructuring efforts by reducing its litigation costs and exploring options to address its obligations with all relevant constituencies.  Although Signal was preparing for an impending bankruptcy filing, it contacted and met numerous times with counsel for certain of the Litigation Plaintiffs and the RSA in an attempt to pursue global settlement options.  Signal also requested all parties stand down for a period of time to allow Signal additional time to explore a possible resolution.  These extensive and good-faith settlement efforts by all sides resulted in the Plan Support Agreement that provides the framework for a successful and value-maximizing restructuring.

15.    The twin goals of the Plan Support Agreement are to (i) effectuate a sale of substantially all of Signal's assets to the highest and/or otherwise best bidder to permit the business to continue as a going concern and (ii) consummate a chapter 11 plan that provides for a meaningful distribution to Signal's unsecured creditors.  Specifically, the Plan Support Agreement contemplates: (i) Signal entering into a stalking horse asset purchase agreement with the RSA and effectuating an open market process for the sale of substantially all of Signal's assets at an auction; (ii) transferring an interest in the Texas Note to a distribution trust on behalf of the Litigation Plaintiffs and issuing an apology to the Litigation Claimants; and (iii) providing a gift payment to the general unsecured creditors.  Considering the last seven years of highly contentious litigation and recent financial struggles, Signal believes that the Plan

01:17341540.9

8

Support Agreement is a remarkable achievement that resolves nearly all of its major outstanding issues as fairly as possible given the extremely difficult circumstances.  Though the RSA was never named as a defendant in any of the Litigation Plaintiffs' lawsuits, the RSA has helped facilitate the Plan Support Agreement by, among other things, consenting, in accordance with the terms of the Plan Support Agreement, to the transfer of an interest in the Texas Note, which constitutes part of the RSA's Prepetition Collateral (as defined below), to the contemplated distribution trust.  Signal strongly believes that the Plan Support Agreement is in the best interests of its estate, the Litigation Plaintiffs and its other creditors.

16.     To familiarize the Court with Signal, the business, and the initial relief sought to stabilize operations and facilitate Signal's restructuring, this Declaration provides an overview of the prepetition organizational and capital structure, historical capital transactions, Signal's current business operations leading to the chapter 11 filing and the proposed post-petition financing.  Further, sections VI and VII summarize the relief requested in, and the facts supporting, each of the other First Day Motions.

## II.     SIGNAL'S PREPETITION ORGANIZATIONAL AND CAPITAL STRUCTURE

17.     SI Inc. was incorporated under the laws of the State of Delaware and its principal place of business is Mobile, Alabama.  SI LLC and SSR are wholly-owned subsidiaries of SI Inc. and were each formed under the laws of the State of Delaware.  SI GP is a wholly owned subsidiary of SI LLC and was formed under the laws of the State of Delaware.  SI LLC owns 99%, with SI GP owning the remaining 1%, of SI Texas, which was formed under the laws of the State of Delaware.

## III.     HISTORICAL CAPITAL TRANSACTIONS

18.     As discussed above, SI LLC was organized on December 6, 2002, to acquire the assets of the Offshore Division of Friede Goldman Halter out of bankruptcy.  The purchase of

those assets was financed by an equity investment of approximately $18,000,000 and an assumption of outstanding debt of approximately $49,000,000.

19.     In 2008, Signal then incurred indebtedness from Wachovia Bank, N.A. (the "**Wachovia Debt**") consisting of a revolving credit and term loan facility in the total principal amount of $80,000,000. In March 2011, to refinance the Wachovia Debt, Signal entered into a certain Credit Agreement (the "**Regions Bank Credit Agreement**") and related security documents dated as of March 1, 2011, with Regions Bank, as administrative agent for certain lender parties thereto, which extended a revolving credit and term loan facility in the total principal amount of $80,000,000 (the "**Regions Bank Debt**") and Regions Bank took a security interest in substantially all of Signal's assets.

20.     Signal subsequently defaulted under the Regions Bank Credit Agreement by, among other things, failing to make a mandatory prepayment due on April 16, 2013. On or about May 17, 2013, Regions Bank and Signal entered into a forbearance agreement, which was subsequently extended for an indefinite period so long as certain termination events were not triggered.

21.     To address liquidity concerns at that time, on August 26, 2013, SI Inc. issued shares of Series A preferred stock (the "**Preferred Stock**"), par value $0.01 per share, on a fully diluted, as-converted basis, pursuant to the terms and conditions set forth in that certain Securities Purchase Agreement to the TRSA (13,400,000 shares) and the ERSA (6,600,000 shares) for a total issuance price of $20,000,000. The TRSA and ERSA also received warrants for the purchase of 10% of the fully diluted common stock of SI Inc. By a certain Subordination Agreement dated August 26, 2013, the lenders under the Regions Bank Credit Agreement consented to SI Inc.'s issuance of the Preferred Stock despite SI Inc. being in default under the

Regions Bank Credit Agreement.    In exchange, the TRSA and ERSA agreed to expressly subordinate their rights under the Preferred Stock to the Regions Bank Debt.

22.    On January 31, 2014, Signal refinanced its Regions Bank Debt and entered into the First Lien Credit Agreement evidenced by (i) a $50,250,000 Term Loan Note held by the TRSA (the "**TRSA Note**") and (ii) a $24,750,000 Term Loan Note held by the ERSA (the "**ERSA Note**"), both subject to the terms and conditions of the First Lien Credit Agreement.    As required by the First Lien Credit Agreement, the proceeds from the First Lien Loan were used to satisfy in full the Regions Bank Debt.

23.    In connection with the First Lien Credit Agreement, the Debtors entered into: (i) that certain Security Agreement dated as of January 31, 2014 (the "**First Lien Security Agreement**"), whereby each of the Debtors granted the First Lien Agent a security interest in substantially all of their respective assets, including cash collateral; (ii) that certain Pledge Agreement dated as of January 31, 2014 (the "**First Lien Pledge Agreement**"), whereby each of the Debtors pledged their equity interests in their respective subsidiaries to the First Lien Agent; (iii) certain other mortgages and deeds of trust granting security interests to the First Lien Agent to all real property held by the Debtors (the "**First Lien Mortgages**"); and (iv) that certain Deposit Account Control Agreement dated February 21, 2014, granting the First Lien Agent a security interest in and control over all the Debtors' bank accounts (the "**Bank Accounts**" and collectively, the "**Prepetition Collateral**").[4]

24.    On October 3, 2014, SI Texas sold substantially all of its assets (the "**Texas Transaction**") to Westport Orange Shipyard, LLC ("**Westport**") in a partially seller-financed

---

[4]    The First Lien Credit Agreement, the First Lien Security Agreement, the First Lien Mortgages, and all other Loan Documents (as defined in the First Lien Credit Agreement) are referred to as the "**First Lien Loan Documents**."

transaction for a total purchase price of $35,900,000. As part of the Texas Transaction, Westport

provided a down payment of $7,000,000 and delivered a promissory note in the principal amount

of $28,900,000 to SI Texas due on or before October 3, 2019 (the "**Texas Note**").[5]

25.     On September 15, 2014, after winning an arbitration award in the amount of

$24,000,000, the Debtor used the cash proceeds to redeem in full the Preferred Stock from the

TRSA and ERSA for a redemption price of $1.01793 per share, resulting in repurchase payments

of $13,640,262 to the TRSA and $6,718,338 to the ERSA.

## IV.    CURRENT CAPITAL STRUCTURE

### A.      Equity

26.     As of the Petition Date, SI Inc. is a private corporation with only one class of

voting common stock held by the parties (and in the amounts) set forth on Exhibit B attached

hereto. As of the Petition Date, an affiliate of the TRSA and the ERSA, RSA-Signal Holdings,

LLC, holds approximately 47.44% of SI Inc.'s common voting stock. In addition, as of the

Petition Date, the officers and directors of SI Inc., including me, collectively owned

approximately 8.6% of the outstanding shares of common stock.

### B.      Assets

27.     The Debtors have approximately $102,411,753 in assets, including: (i) as of May

31, 2015, $68,678,657 (book value) in property, plants, and equipment; (ii) as of May 31, 2015,

$2,833,096 in accounts receivable; and (iii) as of the Petition Date, approximately $450,000 in

cash on hand. Additionally, SI Texas is the holder of the Seller Note in the principal amount of

$29,900,000.

---

[5]        The Texas Note constitutes part of the Prepetition Collateral.

### C.      Secured Debt

28.      The Debtors have outstanding First Lien Debt in the approximate amount of $70,089,000 in principal plus all other amounts outstanding provided for in the First Lien Credit Agreement.  Further, SI GP delivered a promissory note in the principal amount of $441,103.99 to Buckley & Son Fabrication & Construction secured by certain equipment furnished to SI GP in connection therewith.  In addition, certain of the Debtors are parties to the following equipment capital leases: (i) SI Inc. is party to an Equipment Lease Buyback Agreement with NewStar Equipment Finance I, LLC in the amount of $481,410; (ii) SI Inc. and SSR are parties to an Equipment Lease Buyback Agreement with NewStar Equipment Finance I, LLC in the amount of $154,792; and (iii) SI LLC and SI Texas are parties to an Equipment Lease with Varilease Finance I, LLC in the amount of $55,880 per month.

### D.      Unsecured Debt

29.      As of the Petition Date, the Debtors' unsecured obligations consist of approximately $11 million of accounts payable and accrued liabilities, of which approximately $6 million is owed to various trade creditors, and approximately $16 million to certain judgment creditors, as described above.  In addition, there are 11 pending litigations against Signal in which approximately 227 other Litigation Claimants have alleged claims that, while unliquidated, are substantively similar to those asserted by the Judgment Plaintiffs and represent significant claims against Signal.

## V.      DEBTORS' CURRENT BUSINESS OPERATIONS

30.      As noted above, Signal is an independent oil and gas services provider operating in Alabama and Mississippi, with a sales office in Texas.  As of the Petition Date, the Debtors have approximately 302 full-time employees and 15 contract personnel and have not experienced any strikes or work stoppages.

31.     Signal is known in the industry for its outstanding safety record.  For the past eleven years, Signal has earned the Shipbuilder's Council of America Award for Excellence in Safety, which is awarded to shipyard members with the lowest total recordable incidence rates based on a quarterly injury and illness survey conducted by the association.  Signal's safety record is due to its effective company-wide safety program, including focused management led efforts to eliminate safety incidents, comprehensive permit to work/job risk assessment, and an incentive program initiated in April 2003.

32.     With a family of three yards strategically located along the Gulf of Mexico in Alabama and Mississippi, Signal offers new construction, rig and ship repair, and offshore and technical services.  Marine construction and repair needs are complimented by 3 dry docks, a 30,000-ton heavy lift dock, a 22,000-ton Panamax dry dock, and a 4,500-ton lift dry dock.

33.     In Mobile, Alabama, SSR offers more than 4,400 feet of water frontage along the Mobile River with a channel maintained to 44 feet.  This ship repair facility specializes in vessel repairs and conversions and houses two floating dry docks.  The Pascagoula, Mississippi facility, which handles rig fabrication and repair, also has significant automation as well as a deep hole 500' x 300' x 60' for thruster work and space for storage of offshore equipment.  Additionally, the facility houses a 30,000-ton Dual Carrier/heavy lift dry dock.

34.     Signal's strategic geographical positioning, quality workforce, and stellar safety record make Signal an industry leader in new construction, rig and ship repair, and offshore and technical services.  As described in detail above, as of the Petition Date, Signal had outstanding First Lien Debt of approximately $70.1 million in principal.  Because of the anticipated decline in oil prices during 2013, there was a reduction in oil and gas exploration and production conducted in the Gulf region.  This reduction in exploration and production had a corresponding

negative effect on the demand for Signal's services, causing Signal's revenues to fall sharply from $175,872,243 in 2012 to $74,425,920 in 2013. Although the Debtors were able to reduce expenses, their revenue for 2014 was $152,531,800.

35.    Signal's earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") similarly declined considerably over the last two years. For the twelve months ended December 31, 2014, Signal's EBITDA was $19.2 million, compared to EBITDA of $41.6 million for the same time period in 2012. This reduction in Signal's EBITDA is due primarily to lower revenues. This sharp decline from 2012 in revenue and EBITDA has imposed a significant strain on Signal's liquidity.

## VI.    DIP FINANCING

36.    On March 6, 2015, the board of directors of SI Inc. approved the Debtors' retention of Mr. Victor to serve as their pre-petition chief restructuring officer and financial advisor to assist with analyzing restructuring alternatives. The Debtors and Mr. Victor began to consider potential sources of debtor in possession ("**DIP**") financing. Naturally, the Debtors asked the First Lien Agent whether the First Lien Lenders would be willing to extend DIP financing in the Chapter 11 Cases. As part of the DIP financing discussions, the Debtors also asked the First Lien Agent whether the First Lien Lenders would agree to allow a priming DIP loan provided by a third party lender. The First Lien Agent advised the Debtors that the First Lien Lenders would not agree to a priming DIP facility.

### A.    Financing Negotiations and Alternatives

37.    In addition to seeking a financing proposal from the First Lien Lenders, the Debtors did consider obtaining DIP financing from other sources. During these efforts to identify potential DIP lenders, Mr. Victor, in consultation with myself, contacted several potential DIP lenders, including Crystal Financial, LLC and Cerberus Business Finance, LLC, both of whom

are not only familiar with the Debtors and their operations, but also are market leaders with the ability to  promptly evaluate potential investment opportunities.  Unfortunately, despite these efforts, the Debtors were unable to obtain any alternative proposals for DIP financing.

38.     The Debtors and the First Lien Lenders, as proposed DIP lenders (in such capacity, the "**DIP Lenders**"), negotiated a Post-Petition Superpriority Loan Agreement (the "**DIP Credit Agreement**").  These negotiations, which were extensive and at arm's length, culminated in the proposed DIP financing facility (the "**DIP Facility**") in a principal amount of up to $90,088,952 comprised of: (i) revolving credit in the amount of up to $15,000,000 to be used for general working capital and liquidity purposes and for the payment of administrative expenses (under section 503 of the Bankruptcy Code)  of the Debtors' estates; (ii) revolving credit in the amount of up to $5,000,000 to be used for credit enhancement obligations under customer contracts as described in the DIP Credit Agreement; and (iii) up to $70,088,952 to be used for repayment of the indebtedness owing under the First Lien Credit Agreement as described in the DIP Credit Agreement.

39.     The DIP Credit Agreement permits the Debtors to incur expenditures in accordance with an approved budget (the "**DIP Budget**").  The DIP Budget is attached to the DIP Motion as Exhibit C.  The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to finance the Chapter 11 Cases, will be used (i) for working capital and general corporate purposes of the Debtors and (ii) to pay fees and expenses related to the DIP Facility and the Chapter 11 Cases.

40.     The terms of the DIP Facility require the Debtors to complete a sale of their assets in accordance with certain milestones.  To maximize the value of their estates, and in compliance with the milestones under the proposed DIP Facility, the Debtors will file a motion seeking

authority to conduct an auction process (the "**Sale Motion**") by which the Debtors will solicit offers and ultimately seek approval to sell substantially all of their assets to the bidder with the highest or otherwise best offer.  The Debtors also will seek authority to retain SSG Capital Advisors, LLC to serve as their investment bankers to assist with conducting the marketing and sale of their assets.

41.     The Debtors and their advisors considered a variety of potential transactions, including refinance and sale options.  Based on all of the factors described herein, the Debtors deemed that it was in the best interests of their business to commence the Chapter 11 Cases and effectuate a comprehensive restructuring.  The Debtors also have determined that the DIP Facility presents the only viable mechanism for providing the liquidity that the Debtors require to continue their operations during the Chapter 11 Cases.  In addition, the Debtors have determined that a prompt and open sale of their assets in which all interested buyers are encouraged to participate is the best way to maximize value for their estates under the circumstances.

**B.      The DIP Facility**

42.     As part of the First Day Motions, the Debtors filed the *Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition First Lien Lenders, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing* (the "**DIP Motion**"), seeking approval of the DIP Facility.

43.     Importantly, I believe the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the extensive negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing.  As the DIP Facility proceeds are necessary and the only financing available at this

time, I believe that sufficient justification exists for agreeing to these provisions. Moreover, it is my understanding that the DIP Lenders would not have been amenable to providing financing without the heavily bargained-for protections contained in the DIP Credit Agreement.

### C.    The Terms of the DIP Facility are Fair and Reasonable

44.    The proceeds of the DIP Facility are sized to support the Debtors through the anticipated pendency of the Chapter 11 Cases and preserve and promote the health and viability of the business. Moreover, I believe that the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind. Based on the negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing.

45.    Specific to the Chapter 11 Cases, the DIP Facility sets certain milestones for certain restructuring initiatives (e.g., obtaining approval of bid and sale procedures, conducting an auction, consummating a sale of all or substantially all of the Debtors' assets) and entitles the DIP Lenders to certain fees. Based on the extensive negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing. In addition, I am generally aware that terms similar to those included in the DIP Credit Agreement have been approved in other recent and/or ongoing cases.

46.    The Debtors and the DIP Lenders engaged in discussions prior to the Petition Date concerning the provisions of the DIP Facility. I believe that the terms of the DIP Credit Agreement and associated loan documents (collectively, the "**DIP Loan Documents**") constitute, on the whole, the most favorable terms the Debtors could achieve upon which the DIP Lenders will extend the necessary postpetition financing. Although the Debtors explored whether the DIP Lenders would provide the DIP Facility without certain provisions, in the course of negotiations, the DIP Lenders indicated they would not be willing to provide the DIP Facility without such terms. In particular, it is my understanding that the provisions requiring:

01:17341540.9

(i) the achievement of certain sale milestones, including the filing of the Sale Motion; and (ii) the Roll-Up Advance (as defined in the DIP Credit Agreement) are key components of consideration for the DIP Lenders without which they have indicated they are unwilling to provide the DIP Facility.

47.     It is my further understanding that any alternative financing arrangement, including an arrangement provided by other potential DIP lenders, likely would have led to a lengthy and almost certain value-destroying priming fight.  Moreover, I understand that the DIP Lenders would not have been amenable to providing financing without the bargained-for provisions.  In the course of negotiations with the DIP Lenders, the Debtors explored whether the DIP Lenders would provide the DIP Facility with lower or no associated fees and free from procedural milestones.  The DIP Lenders made clear that they would not be willing to provide the DIP Facility on more favorable terms.

48.     Accordingly, the Debtors, in consultation with their advisors—recognizing the absence of favorable competing proposals and the benefits to be provided under the DIP Facility—determined in their sound business judgment that the terms of the DIP Credit Agreement were and remain superior to any other set of terms reasonably available to the Debtors at this time.  I therefore believe that the DIP Facility provides the Debtors with the best, most feasible, and most value-maximizing financing option available at this time.

**D.     The Terms of the Debtors' Cash Collateral Use are Fair and Reasonable**

49.     In addition to the DIP Facility, the Debtors require the continued use of cash collateral (as defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**").  The First Lien Lenders have consented to the Debtors' continued use of Cash Collateral subject to the terms of the form of order approving the DIP Facility on an interim basis (the "**Interim DIP Order**").

01:17341540.9

50.      I believe that continued access to Cash Collateral will (i) ensure that the Debtors have access to sufficient working capital to, among other things, pay their employees, vendors, and suppliers, (ii) enable the Debtors to continue honoring their prepetition obligations under and in accordance the "first-day" orders entered by the Court, and (iii) satisfy administrative expenses incurred in connection with the commencement of the Chapter 11 Cases.

**E.     The Adequate Protection Package is Justified under the Circumstances**

51.      The Debtors and the First Lien Lenders have agreed that the Debtors will provide the following primary forms of adequate protection (the "**Adequate Protection Package**"):

(i)      As adequate protection of the interests of the First Lien Agent and First Lien Lenders in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral, the Debtors shall grant to the First Lien Agent, for the benefit of themselves and the Prepetition Lenders, continuing, valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the DIP Motion); and

(ii)     As further adequate protection of the interests of the First Lien Agent and First Lien Lenders in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral, to the extent any obligations are outstanding, the First Lien Agent and First Lien Lenders shall be granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Chapter 11 Cases and any successor cases.

(iii)    As additional adequate protection, the Debtors shall pay to the Pre-Petition Credit Parties all interest accrued or accruing on the Pre-Petition Debt, which may be paid through advances of DIP Loan proceeds in accordance with the DIP Loan Agreement and as set forth in the Budget.

(iv)     As additional adequate protection, Debtors shall pay (i) the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, financial advisors, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising prior to the Petition Date, and (ii) on a current basis, the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising on or subsequent to the Petition Date, in each case in

compliance with the Budget. At the option of the Pre-Petition Credit Parties, all such amounts may be added to the Pre-Petition Debt in lieu of current payment thereof by the Debtors.

52.     The Adequate Protection Package will adequately protect the First Lien Lenders' interests in the Prepetition Collateral from diminution in value caused by the Debtors' use of the Cash Collateral, as well as for any decline in, or diminution of, the value of the First Lien Lenders' liens or security interests under any of the First Lien Loan Documents.

53.     Further, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection. I believe that the Debtors' secured creditors will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent diminution of the value of the Prepetition Collateral and enhance the likelihood of preserving and maximizing the Debtors' overall going concern value. In light of the likely disruptive effects of any priming fight, as well as the Debtors' desire to administer these cases on a consensual basis, I believe that entering into the DIP Facility with the DIP Lenders best maximizes estate value at this time and I, therefore, support authorization and approval of the priming liens and superpriority claims contemplated in the interim order approving the DIP Motion.

**F.     The DIP Facility Was Negotiated in Good Faith**

54.     The Debtors and their advisors have determined that the DIP Agent and the DIP Lenders offered the most viable option for obtaining the postpetition financing the Debtors require. I believe that the DIP Credit Agreement is the result of the Debtors' reasonable and informed determination that the DIP Agent and the DIP Lenders offered the most favorable terms on which to timely obtain needed postpetition financing, and reflective of arm's length, good faith negotiations between the Debtors, the DIP Agent, and DIP Lenders.

**G.    The Debtors Require Immediate Access to Cash Collateral and the DIP Facility**

55.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested in the DIP Motion is not granted, including authorizing the Debtors' use of Cash Collateral and borrowings of $2.5 million on an interim basis under the DIP Credit Agreement.  I further believe that the commencement of the Chapter 11 Cases will materially increase demands on the Debtors' free cash as a result of, among other things, the costs of administering the Chapter 11 Cases and addressing key customers' concerns regarding the Debtors' financial health and ability to continue operations.

56.    Without Court approval of the DIP Facility, the Debtors will not have sufficient cash to make timely payments to vendors and employees that are required to support the Debtors' continued operations.  Failure to pay these expenses would result in immediate cessation of the Debtors' operations.  The Debtors' ability to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the DIP Facility and use of Cash Collateral is vital to the confidence of the Debtors' employees and vendors and to the preservation and maintenance of the going-concern value of the Debtors' estates.  The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business in an orderly manner, maintain business relationships with customers and vendors, pay employees, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful restructuring.  Based on these circumstances, the Debtors require the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to their operations, business and estates.

01:17341540.9

## VII.    FIRST DAY MOTIONS

57.    I have formed opinions as to:  (i) the necessity of obtaining the relief sought by the Debtors in the First Day Motions; (ii) the need for the Debtors to continue to effectively operate; (iii) the adverse impact on the Chapter 11 Cases if the Debtors do not obtain the requested relief; and (iv) the immediate and irreparable harm that the Debtors will be exposed to in the event that the Court does not approve the relief requested in the First Day Motions.  My opinions are based on my first-hand experience as chief financial officer, through my general review of various materials and information, discussions with other executives of the Debtors, and discussions with the Debtors' outside advisors.

58.    As described more fully below, the Debtors carefully tailored the relief requested in the First Day Motions in consultation with their professionals to ensure that the Debtors' immediate operational needs are met and that the Debtors will not suffer any immediate and irreparable harm.  I personally participated in the analysis that led to the creation of each of the First Day Motions and assisted in the drafting and development of the relief requested therein. The relief requested is narrowly tailored to address those issues that require urgent relief to sustain the Debtors' immediate operability.

### A.    Joint Administration

59.    The Debtors request entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of parent company SI Inc.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases of the Debtors to indicate the joint administration of the Chapter 11 Cases.

60.     The Debtors operate as an integrated business with common ownership and control.  SI Inc. is the parent entity, directly or indirectly wholly owning each of SI LLC, SSR, SI GP, and SI Texas.  Additionally, each of the Debtors is directly liable for, or a guarantor of, the approximately $70.1 million in outstanding prepetition debt obligations that the Debtors seek to restructure as part of the Chapter 11 Cases.

61.     Given the integrated nature of Signal's operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each Debtor.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  For these reasons, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**B.     Cash Management Motion**

62.     The Debtors request authority to continue to use their existing cash management system, maintain their existing bank accounts, and continue to use existing business forms.  In addition, the Debtors request the Court to authorize and direct all applicable banking institutions to accept and hold or invest such funds in accordance with the Debtors' prepetition practices, without the need for any additional agreements not otherwise utilized prior to the Petition Date. The Debtors further request that administrative priority status be granted to certain of their intercompany claims and that the Debtors be allowed to continue to perform under certain intercompany arrangements and historical practices.

63. In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions. If the Debtors were required to comply with the U.S. Trustee's Operating Guidelines for Chapter 11 Cases, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect monthly payments, and the immediate ordering of new checks with a "Debtor in Possession" legend would disrupt the Debtors' business at this critical time.

64. The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing cash management system, including their existing bank accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

65. The relief requested in the motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their cash management system will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial period of the Chapter 11 Cases.

### C. Employees Motion

66. The Debtors request the authority, in their sole discretion, to pay prepetition claims, honor obligations, and continue programs, in the ordinary course of business and consistent with past practices, relating to employee wages and benefits.

67. As of the Petition Date, the Debtors employ approximately 320 employees (collectively, the "**Employees**"). In addition, the Debtors engage numerous independent contractors and contract personnel.

68. At this critical stage, the Debtors simply cannot risk the substantial disruption of their business and affairs that, in all likelihood, would accompany any decline in workforce

morale attributable to the Debtors' failure to honor obligations for unpaid compensation, benefits, and reimbursable expenses in the ordinary course of business. Absent the requested relief, the Employees would suffer great hardship and, in many instances, financial difficulties, because these monies are needed to enable them to meet their personal obligations and daily living expenses. Additionally, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment. Similarly, independent contractors may choose to end their relationships with the Debtors, resulting in disruptions to the services provided to the Debtors' clients at a crucial time.

69.    I believe that the relief requested in the motion is in the best interests of the Debtors' estates, and necessary to preserve and maximize the going-concern value of the Debtors' business and enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

### D.    Critical Vendor Motion

70.    In the ordinary course of their operations, the Debtors rely on numerous suppliers, service providers, and vendors for the delivery of raw materials, components, and other goods and/or services. With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting management, reviewing contracts, and analyzing historical practice to identify those vendors that are critical to the continued and uninterrupted operation of the Debtors' business (collectively, the "**Critical Vendors**").

71.    Through this analysis, the Debtors identified those goods and services absolutely essential to the Debtors' continued operations. Based on this exercise, the Debtors estimate that having authority to pay up to $890,000 in prepetition critical trade claims will ensure that they can perform on their customer commitments, keep their supply chain intact, and preserve the going-concern value of their operations.

01:17341540.9

26

72.     As a quid pro quo, the Debtors propose that Critical Vendors whose claims are paid under the authority requested in motion also continue providing goods and services to the Debtors on customary trade terms.

73.     I believe that the relief requested in the motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

E.      **Customer Programs Motion**

74.     In the ordinary course of their business, the Debtors, like most service providers, engage in certain activities to develop and sustain a positive reputation with their customers.  To that end, the Debtors maintain various customer programs, practices, and policies (collectively, the "**Customer Programs**") designed to ensure customer satisfaction, drive sales, meet competitive pressures, develop and sustain customer loyalty, improve profitability, and generate goodwill for the Debtors and their broad scope of services, thereby retaining current customers, attracting new ones, and, ultimately, enhancing net income.  The Debtors request the authority to maintain and administer the Customer Programs and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice.

75.     The benefits of the Customer Programs are integral to the Debtors' efforts to stabilize their business and ultimately deliver the most value to all stakeholders in the Chapter 11 Cases.  To maintain their valuable customer relationships following the commencement of the Chapter 11 Cases, the Debtors believe that they must quickly assure their customers of the Debtors' continued ability to fulfill their obligations under the Customer Programs.  The Debtors' inability to fully honor their obligations under the Customer Programs would place them at a disadvantage relative to their competitors and put them at risk of losing profitable engagements.  At this critical juncture, the Debtors cannot risk any loss of their customers'

confidence or business development as a result of the Debtors' failure to honor obligations under the Customer Programs.

76.     I believe that the continuation of the Customer Programs is in the best interests of the Debtors' estates, avoids disruptions to relationships with valuable customers, and will enable the Debtors to continue to operate their business in chapter 11 seamlessly.

**F.     Taxes Motion**

77.     In the ordinary course of their business, the Debtors incur sales, use, franchise, and property taxes, as well as other taxes, fees, and governmental obligations necessary to operate their business.  The motion seeks the authority, but not the direction, to pay claims for such taxes and fees to the applicable taxing and governmental authorities, including such taxes and fees determined to be owed prior to the Petition Date.

78.     Failure to pay all the fees and taxes could have a material adverse impact on the Debtors, resulting in additional interest and penalty charges, as well as potentially distracting efforts by the taxing authorities to collect.  Accordingly, I believe that the relief requested in the motion is necessary to prevent immediate and irreparable harm to the Debtors.

**G.     Insurance Motion**

79.     The Debtors request authority, but not direction, to (i) continue to maintain and administer prepetition insurance policies and revise, extend, renew, supplement, or change such policies, as needed, (ii) pay or honor obligations outstanding on account of prepetition insurance policies, if any, and (iii) continue their insurance premium financing program.

80.     In connection with the operation of the Debtors' business and the management of their property, the Debtors maintain a comprehensive insurance program that provides them with coverage for, among other things, general liability, the Debtors' property, vessel pollution liability, marine general liability, workers' compensation, hull and machinery, inland marine,

boiler and machinery, international/foreign liability, automobile liability, and D&O liability (collectively, the "**Policies**").  These Policies are provided by several different insurance carriers.

81.    The uninterrupted maintenance of the Policies is essential to the continued operation of the Debtors' business and to the preservation of the Debtors' estates' value.  Any lapse in coverage would expose the Debtors to significant potential liabilities and losses to the detriment of all parties in interest.  Furthermore, the loss of insurance coverage would require the Debtors to obtain replacement insurance on an expedited basis and likely pay a lump-sum, advance premium.

82.    Not only is insurance coverage such as that provided by the Policies required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities, but also the U.S. Trustee's Operating Guidelines for Chapter 11 Cases require the Debtors to maintain insurance coverage throughout the Chapter 11 Cases.

83.    I believe that the relief requested in the motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

**H.    Utilities Motion**

84.    In connection with the operation of their business, the Debtors obtain electricity, sewer, water, telecommunications, waste disposal, and other similar services (collectively, the "**Utility Services**") from various utility companies (the "**Utility Companies**").  The Debtors are requesting that the Court enter an order (i) prohibiting the Debtors' utility service providers from altering, refusing, or discontinuing utility services on account of unpaid prepetition invoices, (ii) deeming the Debtors' utility service providers adequately assured of future performance, and (iii) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Debtors' utility

service providers. The Debtors intend to pay when due all undisputed postpetition charges for Utility Services. And the Debtors expect their available cash—including cash made available under the proposed DIP Facility—will be more than sufficient to pay for the Debtors' postpetition use of Utility Services. Nonetheless, the Debtors propose to deposit a sum equal to 50% of the Debtors' estimated monthly cost of Utility Services into a newly-created segregated bank account as adequate assurance of future payment.

85.    It is vitally important to the Debtors' restructuring efforts that their Utility Services continue uninterrupted after the expiration of the stay period mandated by section 366 of the Bankruptcy Code. If the Utility Services are discontinued or altered, even briefly, the Debtors' ability to continue operations could be jeopardized. Such a result could potentially impair the Debtors' sale efforts and, ultimately, the value of the Debtors' business.

86.    I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the Utility Companies' rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their business depends.

## Conclusion

87.    To minimize any loss of value to their business, the Debtors' immediate objective is to engage in business as usual following the commencement of the Chapter 11 Cases with as minimal interruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, creditors, and parties in interest—will be substantially enhanced.

01:17341540.9

88.     I submit this Declaration in support of the Debtors' Petitions and the First Day Motions.   I have reviewed the Petitions and the First Day Motions and participated in the preparation thereof.   I believe, to the best of my knowledge and with reliance on certain information provided by other executives affiliated with the Debtors, that the facts set forth in the Petitions and the First Day Motions are true and correct.   This representation is based upon information and belief and through my general review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.   Based upon the foregoing, if called to testify, I could and would testify competently to the key facts set forth in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other relief as the Court deems just.

Dated: July 12, 2015

Christopher S. Cunningham

**EXHIBIT A**

Plan Support Agreement

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (together with all exhibits and attachments hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of July 12, 2015, is entered into, on their own behalf and not on behalf of any other party (except as noted with respect to Signal International Incorporated), by and among (a) Signal International, Inc. ("SI Inc."), on behalf of itself and its direct and indirect subsidiaries (collectively, the "Company"); (b) the Teachers' Retirement System of Alabama (the "TRSA") and the Employees' Retirement System of Alabama (the "ERSA" and together with the TRSA, the "RSA"); and (c) the Litigation Claimants (as defined below) signatories hereto (the "Supporting Litigation Claimants").

The Company, the RSA, the Supporting Litigation Claimants and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "Parties" and individually as a "Party." The RSA and Supporting Litigation Claimants are collectively referred to herein as the "Supporting Parties". For the avoidance of any doubt, each of the undersigned counsel for the Supporting Litigation Claimants has executed this Agreement solely on behalf of the Supporting Litigation Claimants and not in its own capacity. The undersigned counsel is not, and shall not be deemed to be, a Party and shall not have any obligation under this Agreement. Any obligations of the Supporting Litigation Claimants under this Agreement are those of the Supporting Litigation Claimants.

Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan Term Sheet (as defined below). Notwithstanding anything herein to the contrary, this Agreement shall not be binding upon the Company until the PSA Order (as defined below) is entered. Votes on a plan shall not be solicited from any of the Supporting Parties until a Disclosure Statement (as defined below) is approved by the Bankruptcy Court (as defined below).

## PRELIMINARY STATEMENTS

**WHEREAS**, as of the date hereof, the RSA (in such capacity, the "Secured Lenders") owns or controls, in the aggregate, 100% of the amounts outstanding (the "First Lien Debt") under that certain Credit Agreement, dated as of January 31, 2014, (as amended and restated, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among SI Inc., as borrower, Signal International, LLC ("SI LLC"), Signal Ship Repair, LLC ("SSR"), Signal International Texas GP, LLC ("SI GP") and Signal International Texas, L.P. ("SI Texas"), as guarantors, the Secured Lenders party thereto, and the Administrative Agent (as defined below);

**WHEREAS**, the TRSA, as administrative agent under the Credit Agreement (in such capacity, the "Administrative Agent"), has agreed to (i) consent to the Company's post-petition use of its cash collateral and (ii) provide post-petition DIP financing in the approximate aggregate principal amount of $91 million (consisting of a roll-up of the entire First Lien Debt plus $20 million of new money) (the "DIP Facility");

**WHEREAS**, there are approximately 475 former employees and recruits (together with any and all similarly situated plaintiffs, the "H-2B Workers") of the Company hired and/or recruited through the United States H-2B immigration program who, along with the Equal Employment

Opportunity Commission, have asserted or may assert certain legal and equitable claims against the Company which claims the Company denies;

**WHEREAS**, certain of the H-2B Workers and the Equal Employment Opportunity Commission (together with any H-2B Workers that assert subsequent claims, the "Litigation Claimants") have commenced litigation currently pending against the Company  and, on May 11, 2015, five of those Litigation Claimants obtained judgment against the Company in the amount of $12,258,600 (plus pre-judgment interest and post-judgment interest, fees costs and expenses) in *David v. Signal International LLC* (Case No. 08-1220) in the United States District Court for the Eastern District of Louisiana;

**WHEREAS**, the Supporting Litigation Claimants have threatened on behalf of themselves certain legal and equitable actions against the Company, certain representatives of the Company, and the RSA (as Secured Lenders);

**WHEREAS,** the Company, the RSA, and the Supporting Litigation Claimants have engaged in negotiations in an effort to settle all issues and claims among themselves (the "Settlement") and to implement a financial restructuring (the "Restructuring") of the Company, each consistent with the terms and conditions set forth herein and in the term sheet (the "Plan Term Sheet") attached hereto as "Exhibit A";

**WHEREAS**, in order to implement the Settlement and Restructuring, the Company has agreed, on the terms and conditions set forth in this Agreement, to use reasonable best efforts to consummate the Settlement and Restructuring through the Plan (as defined below), the requisite acceptances of which shall be solicited following commencement of the Company's voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, the RSA and the Supporting Litigation Claimants are prepared to commit, on the terms and subject to the conditions of this Agreement, and to the extent legally permissible, to, if and when solicited in accordance with applicable bankruptcy law, vote to accept the Plan and support its confirmation;

**WHEREAS**, the Plan Term Sheet is the product of arm's-length, good faith negotiations among the Parties and their respective professionals and sets forth the material terms and conditions of the Settlement and Restructuring, as supplemented by the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**1.  Plan Term Sheet.** The principal terms and conditions of the Settlement and Restructuring are set forth in the Plan Term Sheet and shall be incorporated by the Company in the Plan.

**2.  Certain Definitions**. As used in this Agreement, the following terms have the following meanings:

(a)  "Alternative Transaction" means any plan, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company, other than as described herein and in the Plan Term Sheet.

(b)  "Claims" means all claims as such term is defined in section 101(5) of the Bankruptcy Code, and individually referred to as a "Claim."

(c)  "Confirmation Order" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(d)  "Disclosure Statement" means the disclosure statement for the Plan, as amended, supplemented or otherwise modified from time to time subject to the terms of this Agreement, that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure and other applicable law.

(e)  "Disclosure Statement Order" means an order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation, which order shall be materially consistent with this Agreement.

(f)  "Effective Date" means the effective date of the confirmed Plan.

(g)  "First Lien Debt" means any and all Claims arising under the Credit Agreement and the other Loan Documents (as defined in the Credit Agreement).

(h)  "H-2B Claims" means any and all legal or equitable Claims or causes of action of any nature or description whatsoever, whether known or unknown, and whether the same have previously been asserted, could previously have been asserted, or could in the future be asserted by or on behalf of any H-2B Worker against the Company or RSA.

(i)  "Plan" means the chapter 11 plan for the Company, as amended, supplemented or otherwise modified from time to time subject to, and consistent in all material respects with, the terms of this Agreement and the Plan Term Sheet, that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure and other applicable law.

(j)  "Plan Documents" means the Plan, the Disclosure Statement, the Disclosure Statement Order, the related solicitation materials, the Confirmation Order, the PSA Assumption Motion, the PSA Order, and each other agreement, instrument, pleading, order or certificate or other related document utilized to implement the Plan, including any exhibits, amendments, modifications or supplements made from time to time thereto but in each case excluding the Plan Supplement Documents (as defined below).

(k)  "Plan Supplement Documents" means the Plan Supplement (as defined in the Plan), and such other definitive documentation relating to the Company as is necessary to consummate the Restructuring and the transactions contemplated hereby or thereby.

(l)  "Plan Support Effective Date" means the date upon which this Agreement becomes effective and binding on the Parties in accordance with the provisions of Section 13 hereof.

(m) "Plan Support Period" means the period commencing on the Plan Support Effective Date and ending on the earlier of (i) the Effective Date and (ii) the date on which this Agreement is terminated in accordance with Section 8 hereof.

(n) "PSA Assumption Motion" means the motion and proposed form of order to be filed by the Company with the Bankruptcy Court within five (5) business days after the Petition Date seeking the approval and assumption of this Agreement pursuant to section 365 of the Bankruptcy Code and granting related relief.

(o) "PSA Order" means an order of the Bankruptcy Court approving the PSA Assumption Motion.

(p) "Requisite H-2B Workers" means (i) a majority in number of the H-2B Workers voting on the Plan and (ii) two-thirds (2/3) of the aggregate amount of the H-2B Claims voting on the Plan.

(q) "Restructuring Documents" means the Plan Documents, the motions and orders, the Plan Supplement Documents, and each other agreement, instrument, pleading, order, instrument or certificate or other related document utilized to implement the Restructuring, or the transactions contemplated hereby or thereby, and to obtain confirmation of the Plan.

(r) "RSA's Advisors" means (i) Burr & Forman LLP, as legal counsel to the RSA, (ii) Morris, Nichols, Arsht & Tunnell LLP, as Delaware legal counsel to the RSA, and (iii) Houlihan Lokey Capital, as financial advisor to the RSA.

(s) "Solicitation" means the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(t) "Termination Events" means the events of termination listed in section 8 hereof, with each event individually referred to herein as a "Termination Event".

(u) "Westport Loan" has the meaning set forth in the Plan Term Sheet.

**3. Condition Precedent.** It is a condition precedent to the effectiveness of this Agreement that voluntary petitions (the "Petitions") are filed with the Bankruptcy Court and the Chapter 11 Cases are commenced no later than 11:59 p.m. (EDT) on July 12, 2015, unless previously extended by the Company, the RSA and the Supporting Litigation Claimants in writing (the time and date of filing of the Petitions being hereinafter called the "Petition Date") and there is no payment default under the Westport Loan (determined without giving effect to any alleged waiver by the Company or any other party), without giving effect to any alleged waiver by the Company or any other party, as of the Petition Date (which condition may be waived by the Supporting Litigation Claimants in their sole discretion). If these conditions are not satisfied, this Agreement shall be void and of no effect.

**4. Means for Effectuating the Settlement and Restructuring.** The Company shall seek to effectuate the Settlement and Restructuring through the commencement of the voluntary Chapter 11 Cases and the confirmation and consummation of the Plan in accordance with this Agreement and the Plan Term Sheet.

**5. Preparation of Restructuring Documents.** The Company shall, in consultation with the RSA's Advisors and the Supporting Litigation Claimants through their advisors, prepare all of the Restructuring Documents necessary for the Company to commence the Chapter 11 Cases and obtain confirmation and consummation of the Plan in a form reasonably acceptable to the RSA and the Supporting Litigation Claimants through their advisors, provided any Plan shall provide the Company and RSA with a full

release of all H-2B Claims, including any and all derivative claims by the Equal Employment Opportunity Commission.

**6.        Agreements of the Company**.

(a) <u>Affirmative Covenants</u>.  The Company, jointly and severally, agrees that for the duration of the Plan Support Period, subject to the terms and conditions hereof (including, without limitation, the Fiduciary Out provided for in Section 25 of this Agreement) and except as otherwise consented to in writing by the RSA and the Supporting Litigation Claimants, the Company shall do, and shall cause to be done, the following:

(i)  (A) complete the preparation, as soon as reasonably practicable after the Plan Support Effective Date, of each of the Plan, the Disclosure Statement and the other Restructuring Documents (including, without limitation, all motions, applications, orders, agreements and other documents, each of which, for the avoidance of doubt, shall contain terms and conditions materially consistent with this Agreement and acceptable to the Supporting Parties), (B) provide the Restructuring Documents or any documents relating to post-petition financing or cash collateral to, and afford reasonable opportunity of comment and review of such documents by, the RSA's Advisors and the Supporting Litigation Claimants through their advisors no less than three (3) business days in advance of any filing, execution, distribution or use (as applicable) thereof and (C) consult with the RSA's Advisors and the Supporting Litigation Claimants through their advisors in good faith and with reasonable and ample notice regarding the form and substance of any of such documents in advance of the filing, execution, distribution or use (as applicable) thereof;

(ii)  commence the Chapter 11 Cases in the Bankruptcy Court no later than the "<u>Petition Date</u> and file the Plan and Disclosure Statement with the Bankruptcy Court by August 19, 2015;

(iii) Prepare and file with the Bankruptcy Court no later than 5:00 p.m. on the first business day following the Petition Date first day motions, which are not inconsistent with the terms and conditions in the Plan Term Sheet and are reasonably acceptable to the RSA and the Supporting Litigation Claimants through their advisors;

(iv) Prepare and file with the Bankruptcy Court statements of financial affairs and required schedules under chapter 11 of the Bankruptcy Code for the Company no later than August 4, 2015;

(v)  (A) support, and take all reasonable actions necessary to facilitate, the implementation and consummation of the Settlement and Restructuring (including, but not limited to, the timely preparation, filing and approval of the Restructuring Documents, the Solicitation and confirmation of the Plan and the consummation of the Restructuring) in accordance with this Agreement; (B) take all reasonable actions necessary to oppose in good faith any objection to the Settlement, the Restructuring, and/or the Restructuring Documents; and (C) not take any action that is inconsistent with, or that would be reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of the Settlement and Restructuring;

(vi) obtain final approval of the DIP financing by the Bankruptcy Court as soon as reasonably practicable but in no event later than August 19, 2015;

(vii)         obtain entry of the PSA Order by the Bankruptcy Court as soon as reasonably practicable but in no event later than the earlier of (a) the date of entry of an order by the Bankruptcy Court granting final relief with respect to the DIP Facility; or (b) August 15, 2015;

(viii)       obtain entry of the Bid Procedures Order by the Bankruptcy Court no later than August 19, 2015, which Bid Procedures Order must contain a requirement that, in order to participate in the Auction, each bidder must agree to abide by the terms of the Westport Participation Agreement (as defined in the Plan Term Sheet);

(ix) obtain entry of the Disclosure Statement Order no later than September 23, 2015;

(x)  commence Solicitation no later than 5 business days after entry of the Disclosure Statement Order by the Bankruptcy Court;

(xi) hold the Auction no later than October 3, 2015;

(xii)       obtain entry of the Sale Approval Order and Confirmation Order by the Bankruptcy Court no later than November 24, 2015;

(xiii)       the effective date of the Plan and the closing on the sale shall have occurred no later than 20 days after the Bankruptcy Court's entry of the Confirmation Order;

(xiv)       prior to the Confirmation Hearing, commence avoidance actions against Max Specialty Insurance Company to avoid any avoidable liens;

(xv)       timely file a formal written objection to and contest in good faith any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(xvi)       timely file a formal written objection to and contest in good faith any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan;

(xvii)       (A) support and take any and all actions necessary, appropriate or reasonably requested by the Supporting Parties to facilitate the Settlement and Restructuring, including the solicitation, confirmation, and consummation of the Plan, (B) not take any action that is inconsistent with, or that would delay or impede the Restructuring, including, without limitation, Solicitation, confirmation, or consummation of the Plan and (C) perform its obligations under this Agreement in accordance with its terms and as set forth in the Plan;

(xviii)       operate the business of the Company in the ordinary course (giving effect to the existence of the Chapter 11 Cases);

(xix)       keep the Supporting Parties regularly informed about the operations of the Company and the status of the Westport Loan and provide the Supporting Parties any information that is reasonably requested regarding the Company or the Westport Loan (including all reports, compliance certificates, and any other documents or information required to be delivered pursuant to the terms of the Westport Documents);

(xx)       promptly notify the Supporting Parties in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened) against the Company or of any related correspondence received;

(xxi)    comply in all material respects with applicable laws (including making or obtaining all required consents and/or appropriate filings or registrations with, notifications to, or authorizations, consents or approvals of any regulatory or governmental authority, and paying all taxes as they become due and payable);

(xxii)    maintain the good standing (or equivalent status under the laws of its incorporation or organization) under the laws of the state or other jurisdiction of the Company and the Company's affiliates in which they are incorporated or organized; and

(xxiii)    use reasonable best efforts to obtain any and all required governmental, regulatory and/or third party approvals necessary or required for the implementation or consummation of the Restructuring or the approval by the Bankruptcy Court of the Restructuring Documents.

(b)    Negative Covenants.  The Company agrees that for the duration of the Plan Support Period, subject to the terms and conditions hereof (including, without limitation, the Fiduciary Out provided for in Section 25 of this Agreement) and except as otherwise consented to in writing by the RSA and the Supporting Litigation Claimants, the Company shall not, directly or indirectly, do or permit to occur any of the following:

(i)  seek, solicit, propose, support, make an agreement to, or take steps or actions that are reasonably likely or intended to result in the submission of an Alternative Transaction, including without limitation, the dismissal or conversion of the Chapter 11 Cases;

(ii)  modify the Plan, in whole or in part, in a manner that is inconsistent with any material aspect of this Agreement;

(iii) withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan;

(iv) take any action or file any motion, pleading or other Restructuring Document with the Bankruptcy Court (including any modifications or amendments thereof) that is inconsistent with any material aspect of this Agreement, the Plan Term Sheet or any other Restructuring Document and is not otherwise reasonably satisfactory in all respects to the RSA and the Supporting Litigation Claimants through their advisors;

(v)  commence an avoidance action or other legal proceeding that challenges the validity, enforceability, or priority of the First Lien Debt and/or the H-2B Claims;

(vi) other than as required by this Agreement or the Plan, amend their respective certificates or articles of incorporation, bylaws or comparable organizational documents;

(vii)    (A) merge with or into, or consolidate or amalgamate with, any other person, (B) permit any other person to merge with or into, or consolidate or amalgamate with, it, or (C) purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person;

(viii)    change materially their respective financial or tax accounting methods, except insofar as may be required by a change in generally accepted accounting principles in the U.S. or applicable law, or revalue any of its material assets;

(ix) (A) hire, after the date hereof, any officer, (B) enter into, adopt or amend any employment agreements or any management compensation or incentive plans, or increase in any manner the

compensation or benefits (including severance) of any director, officer or management level employee of the Company;

(x)  pay any post-petition trade payable or other post-petition expense prior to the date such trade payable or expense is due and payable, except to the extent in the ordinary course of business consistent with past practice;

(xi) incur or suffer to exist any indebtedness or any guarantee of any indebtedness of any person, except (A) indebtedness and guarantees existing and outstanding immediately prior to the date hereof and (B) trade payables, and liabilities arising and incurred in the ordinary course of business consistent with past practices;

(xii)       (A) purchase or acquire any indebtedness, debt securities or equity securities of any person, or (B) make any loans or advances to, or investments in, any person, other than in the ordinary course of business;

(xiii)       incur any liens or security interests, except any liens or security interests or otherwise arising by operation of law in the ordinary course of business; or

(xiv)       pursue, consent to, or encourage any claim or cause of action against the Supporting Litigation Claimants, the RSA or their respective representatives.

(c)  <u>Automatic Stay</u>. The RSA and the Supporting Litigation Claimants are authorized to take any actions necessary to effectuate the termination of this Agreement in accordance with its terms notwithstanding section 362 of the Bankruptcy Code or any other applicable law and no cure period contained in this Agreement shall be extended pursuant to sections 105, 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the RSA and the Supporting Litigation Claimants through their advisors.

### 7.    <u>Agreements of the Supporting Parties</u>.

(a)  <u>Support of Settlement and Restructuring</u>.  Each of the Supporting Parties agrees that, for the duration of the Plan Support Period, subject to the terms and conditions hereof, such Supporting Party shall:

(i)  support, and take all reasonable actions necessary to facilitate the implementation and consummation of, the Restructuring (including, but not limited to, supporting the Company's commencement of the Chapter 11 Cases, the Company's entry into a commitment or agreement with respect to debtor-in-possession financing or the use of cash collateral, the Company's requests for the relief sought pursuant to first-day motions, the Bankruptcy Court's approval of the Restructuring Documents, the Solicitation and confirmation of the Plan and the consummation of the Restructuring pursuant to the Plan so long as each of the foregoing is not inconsistent with this Agreement); <u>provided</u>, <u>however</u>, that the Supporting Litigation Claimants shall not be required to take any affirmative action under this Agreement or any provision thereof other than to vote in favor of the Plan as described in clause 7(a)(ii) below or vote against an Alternative Transaction as described in clause 7(a)(iv) below;

(ii) (A) subject to the receipt by the Supporting Parties of the Disclosure Statement approved by the Disclosure Statement Order, timely vote, or cause to be voted, its Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following commencement of the Solicitation, pursuant to the terms of the Disclosure Statement Order and not

opt out of or object to the releases provided for in the Plan, and (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn).

(iii) not (A) directly or indirectly seek, propose, support, assist, solicit, or vote for any Alternative Transaction, (B) support or encourage the termination or modification of the Company's exclusive period for the filing of a chapter 11 plan or the Company's exclusive period to solicit a chapter 11 plan, or (C) take any other action, including but not limited to initiating any legal proceedings or enforcing rights as a holder of Claims, that is inconsistent with this Agreement or the Restructuring Documents, or that would prevent, interfere with, delay or impede the implementation or consummation of the Restructuring (including, but not limited to, the Bankruptcy Court's approval of the Restructuring Documents, the Solicitation and confirmation of the Plan and the consummation of the Restructuring pursuant to the Plan); and

(iv) subject to the receipt of a disclosure statement and other solicitation materials approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code, timely vote or cause to be voted its Claims against any Alternative Transaction;

provided, however, that, except for legal fees incurred in furtherance of seeking approval and enforcement of this Agreement, nothing in this Section 7(a) shall require any Supporting Party to incur any expenses (other than *de minimis*), liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses (other than *de minimis*), liabilities or other obligations to any such Supporting Party; provided further, that under no circumstance shall the RSA or the Supporting Litigation Claimants be obligated to support or prohibited from objecting to any Plan, Restructuring Documents, settlement, or any other aspect of the Chapter 11 Cases which does not fully dispose of all H-2B Claims to the RSA's or the Supporting Litigation Claimants' reasonable satisfaction, as applicable; [and, provided further, notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Supporting Litigation Claimant to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such Supporting Litigation Claimant's fiduciary obligations under applicable law as a member of an official committee of unsecured creditors in the Company's chapter 11 cases.]

(b)  Rights of Supporting Parties Unaffected.  Nothing contained herein shall limit (i)(A) the ability of any of the Supporting Parties to consult with other Supporting Parties or the Company or advisors or (B) the rights of the Supporting Parties under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is not inconsistent with the Supporting Parties' obligations hereunder or under the terms of the Plan and is not intended or reasonably likely to materially delay or prevent confirmation or the consummation of the Restructuring (including, but not limited to, the Bankruptcy Court's approval of the Restructuring Documents, the Solicitation and confirmation of the Plan); (ii) limit the ability of the Secured Lenders to enter into any transactions in connection with the First Lien Debt, subject to the terms hereof; or (iii) any right of the Secured Lenders under (x) the Credit Agreement and (y) any other applicable agreement, instrument or document that gives rise to a Claim of the Secured Lenders.

(c)  Additional Claims.  To the extent any Supporting Party (i) acquires additional Claims, or (ii) holds or acquires any other claims against or equity interests in the Company, such Supporting Party agrees that any such Claims, or other claims or equity interests shall be subject to this Agreement including the obligations with respect to Claims set forth in Section 7(a) hereof.  For the avoidance of doubt, if any Supporting Party transfers or assigns any claims against or equity interests in the Company, this

Agreement shall be binding on such transferee or assignee in all respects as if a Supporting Party to this Agreement.

**8.    Termination of Agreement.**

(a) Supporting Parties' Termination Events.  Upon written notice from a Supporting Party  delivered in accordance with Section 22 hereof (with a copy of such written notice delivered to all Parties), at any time (X) after the receipt by a Supporting Party of a Fiduciary Out Notice or (Y) the occurrence of, and during the continuation of, any of the following events, in each case, unless waived in writing by the Supporting Party (each, a "Supporting Party Termination Event"), the respective Supporting Party may terminate this Agreement with respect to all Parties, and no failure or delay by the Supporting Party in exercising its right to terminate this Agreement shall operate as a waiver thereof or limit in any way such termination right:

(i)   the breach in any material respect by the Company of any of its obligations, undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including under Sections 6(a), 6(b) or 11 of this Agreement, and such breach remains uncured for a period of three (3) business days from the receipt of written notice of such breach from the Supporting Party;

(ii) at 5:00 p.m. prevailing Eastern Time on the first business day after the failure of the Company to satisfy any of the milestones set forth in Subsections (ii), (vi), (vii), (viii), (ix), or (x) of Section 6(a) hereof, provided that such failure is not the result of a material breach by any of the Supporting Party of the terms of this Agreement; and provided further, that the Company shall have three (3) business days from receipt of a written notice from a Supporting Party to cure the failure to satisfy such milestones in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement;

(iii) the issuance by any governmental authority, including any regulatory authority, or court of competent jurisdiction, of any ruling, judgment or order preventing the consummation of a material portion of the Restructuring;

(iv) the Plan is amended or otherwise modified so as to be inconsistent with this Agreement or modified so as to have a material impact on a Supporting Party;

(v)  the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof);

(vi) the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) terminating exclusivity under section 1121 of the Bankruptcy Code, (E) making a finding of fraud, dishonesty or misconduct by any executive, manager, officer or director of the Company, regarding or relating to the Company;

(vii)       upon the withdrawal, waiver, amendment or modification by the Company of the Plan or any of the Restructuring Documents or the filing of a pleading seeking to withdraw, waive, amend or modify any term or condition of the Plan or any of the Restructuring Documents, which withdrawal, waiver, amendment, modification or filing is materially inconsistent with this Agreement, the Plan or the Restructuring Documents (in each case, as this Agreement, Plan and the Restructuring Documents may be amended from time to time in accordance with the terms hereof) or is materially adverse to the RSA or the Supporting Litigation Claimants, or, if the Company files any motion or pleading with

the Bankruptcy Court that is not consistent with this Agreement, the Plan or the Restructuring Documents (in each case, as this Agreement, the Plan or the Restructuring Documents may be amended from time to time in accordance with the terms hereof) in a material substantive respect, and such motion or pleading has not been withdrawn prior to the earlier of (A) three (3) business days after the Company receives written notice from the RSA or the Supporting Litigation Claimants that such motion or pleading is inconsistent with this Agreement or the Restructuring Documents, as applicable and (B) the entry of an order of the Bankruptcy Court approving such motion;

(viii)      the Company seeks, solicits, proposes, supports, or makes an agreement to, or takes steps or actions that are reasonably likely or intended to result in the submission of an Alternative Transaction;

(ix) the failure to satisfy any material condition to effectiveness set forth in the Plan by the deadlines set forth in such Plan, except as such conditions may be waived by the Company and the Supporting Parties;

(x)  a payment default under the Westport Loan (determined without giving effect to any alleged waiver by the Company or any other party) (which occurrence or continuance, as the case may be, is a Supporting Party Termination Event solely with respect to the Supporting Litigation Claimants and may be waived by the Supporting Litigation Claimants in their sole discretion);

(xi) the denial of either interim or final authority for DIP financing from the RSA, denial of the PSA Order, the Bid Procedures Order, the Disclosure Statement Order, Sale Approval Order, or Confirmation Order; and

(xii)      the occurrence of any Event of Default under, and as defined in, the DIP Facility.

Notwithstanding the above, upon written notice delivered in accordance with Section 22 to all of the Parties either (x) the RSA or (y) the Supporting Litigation Claimants may terminate this Agreement as to themselves upon the occurrence of the events in Sections 8(a)(ii) or if any of the Plan Documents, motions and orders, the Plan Supplement Documents and the other Restructuring Documents is not materially consistent with the treatment of such Party as set forth in this Agreement, the Plan or the Disclosure Statement.  Moreover, upon written notice delivered in accordance with Section 22 to all of the Parties, the RSA ot the Supporting Litigation Claimants, as applicable, may terminate this Agreement upon the filing by the Company of a motion to convert or dismiss the Chapter 11 Cases or the assertion of any claims against the RSA or the Supporting Litigation Claimants, as applicable.  The termination by the RSA or the Supporting Litigation Claimants as contemplated in this paragraph, shall be a Supporting Party Termination Event and the Supporting Party shall have a right to terminate this Agreement with respect to all Parties.

(b)  Company Termination Events.  The Company may terminate this Agreement as to all Parties, upon written notice (the "Company Termination Notice") delivered in accordance with Section 22 hereof, upon the occurrence of any of the following events, unless waived in writing by the Company:

(i)  the breach in any material respect by the RSA or the Supporting Litigation Claimants of any of the covenants, obligations, representations or warranties under this Agreement, which breach remains uncured for a period of three (3) business days from the receipt of the Company Termination Notice;

(ii) the failure of the Requisite H-2B Workers to affirmatively vote in favor of the Plan;

(iii) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring;

(iv) the entry by the Bankruptcy Court of an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing the Chapter 11 Cases;

(v) the failure to confirm the Plan due to the failure of the class of the H-2B Workers to meet the requirements set forth in section 1126(c) of the Bankruptcy Code or due to the Bankruptcy Court otherwise denying confirmation of the Plan; or

(vi) the entry of a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable or preventing consummation of the Plan or the Restructuring or any material portion thereof by any governmental authority, including the Bankruptcy Court, or any other regulatory authority or court of competent jurisdiction.

(c) <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company, the RSA and the Supporting Litigation Claimants.

(d) <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this Section 8, and except as provided in Section 16 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as otherwise expressly provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement. Notwithstanding anything to the contrary herein, any of the Termination Events may be waived in accordance with the procedures established by Section 12 hereof, in which case the Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver. If this Agreement has been terminated in accordance with this Agreement at a time when permission of the Bankruptcy Court shall be required for a Supporting Party to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall not oppose any attempt by such Supporting Party to change or withdraw (or cause to change or withdraw) such vote at such time.

## 9. **Good Faith Cooperation; Further Assurances; Acknowledgement**.

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters concerning the implementation of the Settlement and Restructuring and (b) the pursuit and support of the Settlement and Restructuring (including confirmation of the Plan).  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary and appropriate to carry out the purposes

and intent of this Agreement, including making and filing any required governmental or regulatory filings and voting any claims against or securities of the Company in favor of the Plan (provided that, except for legal fees incurred in furtherance of seeking approval and enforcement of this Agreement, none of the Supporting Parties shall be required to incur any expenses, liabilities or other obligations in connection therewith other than *de minimis*), and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.  This Agreement is not, and shall not be deemed, a solicitation for consents of a chapter 11 plan or reorganization or a solicitation to tender or exchange any securities.  The acceptance of the Plan by the Supporting Parties will not be solicited until the Supporting Parties have received the Disclosure Statement and related ballot(s), as approved by the Bankruptcy Court.

##### 10.    Restructuring Documents.

Each Party hereby covenants and agrees, subject to the proviso contained in section 7(a)(i) hereof, (i) to negotiate in good faith the Restructuring Documents each of which shall, to the extent applicable (A) contain the same terms as, and be otherwise consistent with, this Agreement (as this Agreement may be amended from time to time in accordance with the terms hereof) in all respects and (B) be in form and substance acceptable to the Parties to the extent required herein and section 6(a), and (ii) to execute (to the extent such Party is a party thereto) and otherwise support the Restructuring Documents, as applicable.  For the avoidance of doubt, each Party agrees to (a) act in good faith and use commercially reasonable efforts to support and complete successfully the implementation of the Plan and the Restructuring in accordance with the terms of this Agreement, (b) do all things reasonably necessary and appropriate in furtherance of consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement, and (c) not take any actions inconsistent with this Agreement or the Restructuring Documents.

##### 11.    Representations and Warranties.

(a)  Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(i)   If the Party is an entity, such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated under this Agreement and the Plan and perform its obligations contemplated under this Agreement and the Plan, and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement and the Plan have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii) If the Party is an entity, the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) with respect to the Company, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it or any of its subsidiaries or affiliates is a party, or to which its or any of its subsidiaries' or affiliates' assets are bound, other than breaches that arise from the filing of the Chapter 11 Cases;

(iii) If the Party is an entity, the execution, delivery and performance by such Party of this Agreement and the consummation of the Restructuring does not and will not require any registration or filing with, consent, authorization or approval of, or notice to, or other action to, with or by, any federal, state or

governmental authority or regulatory body except such filings as may be necessary or required under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended or any rule or regulation promulgated thereunder, "blue sky" laws, the Bankruptcy Code or by the Bankruptcy Court in connection with the Chapter 11 Cases, the Plan and the Disclosure Statement; and

(iv) subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b) Each Party has such knowledge and experience in financial and business matters of this type, or has been adequately advised by competent counsel, and is capable of evaluating the merits and risks of entering into this Agreement and of making an informed decision, and has conducted, or has had its counsel conduct, an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement.

### 12.    **Amendments and Waivers**.

Any provision of this Agreement, including the exhibits attached hereto, may be amended or waived if, and only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by the Company, the RSA and the Supporting Litigation Claimants, or in the case of a waiver, by the Party against whom the waiver is to be effective. Any amendment to this Agreement made in accordance with this section 12 shall become effective and binding upon all Parties whether or not such Party consented to such amendment; provided, however that no amendment shall be effective against any Secured Lender or Supporting Litigation Claimant if such amendment materially adversely impacts such Party with respect to Restructuring as compared to that contemplated by this Agreement unless consented to in writing by such adversely affected Party.

No failure or delay by any party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A Supporting Parties' Termination Event may not be waived except in a writing signed by the Supporting Party adversely affected. Any waiver of any condition, term or provision to this Agreement must be in writing signed by the Parties entitled to waive such condition, term or provision.

### 13.    **Effectiveness**.

Subject to section 3 herein, this Agreement shall become effective and binding upon the Parties when counterpart signature pages to this Agreement have been executed and delivered by the Company, the Administrative Agent, TRSA, ERSA, and a majority in number and two-thirds in amount of the Litigation Claimants (individually or by counsel). With respect to any party that becomes a Party to this Agreement by executing and delivering a signature page to this Agreement after the Plan Support Effective Date, this Agreement shall become effective vis-à-vis such party on the date such signature page is delivered to the Company.

### 14.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT

REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS OF COMPETENT JURISDICTION LOCATED IN THE STATE AND COUNTY OF DELAWARE OR IN THE BANKRUPTCY COURT (FOR SO LONG AS THE COMPANY IS SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT) AND EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, GENERALLY AND UNCONDITIONALLY, AND WAIVES ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

Nothing in this Agreement shall constitute a waiver by any Party of any (i) right to have final orders in any and all non-core matters entered only after de novo review by a United States District Judge; (ii) right to trial by jury in any proceeding as to any and all matters so triable therein, or in any case, controversy or proceeding related hereto, whether or not such jury trial right is pursuant to statute or the United States Constitution; (iii) right to have the reference withdrawn by the United States District Court in any matter or proceeding subject to mandatory or discretionary withdrawal; or (iv) other rights, claims, actions, defenses, setoffs, recoupments or other matters to which any Litigation Claimant is entitled under any agreements or at law or in equity or under the United States Constitution. All of the above rights are expressly reserved and preserved without exception and with no purpose of conceding jurisdiction in any way by this filing or by any other participation in this matter.

### 15.    Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive relief as a remedy of any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder, and no remedy other than specific performance shall be available to the non-breaching Party.  Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

### 16.    Survival.

Notwithstanding the termination of this Agreement pursuant to section 8 hereof, the agreements and obligations of the Parties in this section 16 and sections 8(d), 11, 12, 14, 15, 18, 19, 20,

23, 24, 25 and 26 hereof (and any defined terms used in any such section) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

17. **Headings**.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

18. **Successors and Assigns; Severability; Several Obligations**.

(a)  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the Settlement and Restructuring contemplated hereby are not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the Settlement and Restructuring contemplated hereby is consummated as originally contemplated to the greatest extent possible.

(b)  The agreements, representations and obligations of each of the Supporting Parties under this Agreement are, in all respects, several and not joint and several.

19. **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof or have any rights hereunder.

20. **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto (including the Plan Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations (oral or written), with respect to the subject matter hereof, _provided_, _however_, that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and any Supporting Party shall continue in full force and effect.

21. **Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, which shall be deemed to be an original for the purposes of this section 21.

22.    **Notices**.

All notices hereunder shall be deemed given if in writing, in the English language, and delivered by electronic mail to the following addresses (or at such other electronic mail addresses as shall be specified by like notice):

**Signal International, Inc. and its subsidiaries**
RSA Battle House Tower
11 North Water Street
Suite 16250
Mobile, Alabama 36602
Telephone: (251) 544-2623
Facsimile: (251) 544-2643
Attention: Chris Cunningham, CFO
Email: ccunningham@signalint.com

with a copy to:

Hogan Lovells US, LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile:  (212) 918-3100
Attention:   Christopher R. Donoho III
Email: christopher.donoho@hoganlovells.com

And a copy to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Attention:  M. Blake Cleary
Email: mbcleary@ycst.com

**Fredrikson & Byron P.A., plaintiffs' counsel in Marimuthu v. Signal Int'l, LLC**
Sten-Erik Hoidal: shoidal@fredlaw.com
Steven R. Kinsella: skinsella@fredlaw.com
Lousene M. Hoppe: lhoppe@fredlaw.com

**Kilpatrick Townsend & Stockton LLP, plaintiffs' counsel in Samuel v. Signal Int'l, LLC**
Shane G. Ramsey: sramsey@kilpatricktownsend.com

**Sutherland Asbill & Brennan LLP, plaintiffs' counsel in Joseph v. Signal Int'l, LLC**
John H. Fleming: john.fleming@sutherland.com
Bryan M. Ward: bryan.ward@sutherland.com

**DLA Piper LLP, plaintiffs' counsel in Meganathan v. Signal Int'l, LLC**
     Timothy H. Birnbaum: timothy.birnbaum@dlapiper.com

**Equal Justice Center, plaintiffs' counsel in Kambala v. Signal Int'l, LLC**
     Christopher J. Willett: cwillett@equaljusticecenter.org

**SPLC / Crowell & Moring LLP / Nussbaum Law Group, P.C., plaintiffs' counsel in David v. Signal Int'l, LLC**
     Alan Howard: ahoward@crowell.com
     Leslie A. Davis: ldavis@crowell.com
     Meredith Stewart: meredith.stewart@splcenter.org
     Daniel Werner: daniel.werner@splcenter.org
     Hugh D. Sandler: hsandler@nussbaumpc.com

**Latham & Watkins LLP, plaintiffs' counsel in Achari v. Signal Int'l, LLC**
     Daniel D. Adams: daniel.adams@lw.com
     Mark A. Broude: mark.broude@lw.com
     David F. McElhoe: david.mcelhoe@lw.com
     Rahel Kohn: rachel.kohn@lw.com

**Skadden, Arps, Slate, Meagher & Flom LLP, plaintiffs' counsel in Chakkiyattil v. Signal Int'l, LLC**
     Eben P. Colby: eben.colby@skadden.com
     David M. Turetsky: david.turetsky@skadden.com
     Anthony W. Clark: anthony.clark@skadden.com
     Jason M. Liberi: jason.liberi@skadden.com

**McDermott Will & Emery LLP, plaintiffs' counsel in Krishnakutty v. Signal Int'l, LLC**
     Nathan F. Coco: ncoco@mwe.com

**Manatt, Phelps & Phillips, LLP, plaintiffs' counsel in Devassy v. Signal Int'l, LLC**
     Christopher Rheinheimer: crheinheimer@manatt.com
     Stephen T. Raptis: sraptis@manatt.com

**Covington & Burling LLP, plaintiffs' counsel in Singh v. Signal Int'l, LLC**
     José E. Arvelo: jarvelo@cov.com

**Kaye Scholer LLP, plaintiffs' counsel in Thomas v. Signal Int'l, LLC**
     Michael Bullerman: michael.bullerman@kayescholer.com
     Tricia M. Beckles: tricia.beckles@kayescholer.com

**The Retirement Systems of Alabama**
     201 South Union Street
     Montgomery, AL 36130
     Attn: M. Hunter Harrell: Hunter.Harrell@rsa-al.gov
     Attn: Leura Canary: Leura.Canary@rsa-al.gov
     Telephone: (334) 517-7109
     Facsimile: (334) 517-7099

with a copy to:

Burr & Forman LLP
Derek F. Meek, Esq.
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Telephone:  (205) 458-5471
Facsimile:  (205) 244-5679
Email: dmeek@burr.com

Any notice shall be effective upon confirmation of the electronic mail transmission.

**23. Reservation of Rights; No Admission; Common Interest Privilege; Tolling of Claims**.

Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy proceeding filed by the Company.  Except as expressly provided in this Agreement and in any amendment among the Parties, if the transactions contemplated by the Settlement and Restructuring are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, remedies, and Claims.  This Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation claims among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, the Restructuring Documents and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement or the applicable Restructuring Documents.  This Agreement and the Restructuring Documents shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  The parties hereto intend to establish and have established a common interest privilege with respect to the subject matter of and communications regarding or relating to this Agreement and the documents and transactions contemplated by this Agreement.  Each of the Parties agrees that the running of the statutes of limitations or doctrines of laches applicable to all claims that any Party may be entitled to take or bring in order to enforce its rights and remedies, if any, against any other Party at law or equity is, to the fullest extent permitted by law, tolled and suspended during the Plan Support Period.

**24. Prevailing Party**.

If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be entitled to the reimbursement of all reasonable fees and expenses incurred, including reasonable attorneys', accountants' and financial advisors fees in connection with such action or proceeding, from the non-prevailing Party.

**25. <u>Fiduciary Duties</u>**.

(a)  The Company shall notify the Supporting Parties  in writing as promptly as practicable after receipt by the Company or its representatives or agents of any proposal or offer from any person or entity to effect a restructuring of the Company, any Alternative Transaction or a transaction in conflict with the Restructuring or any request for confidential information relating to the Company, which notice shall indicate the identity of the person or entity making the proposal, offer, or request and the material terms of any such proposal, offer, or request to the extent permitted by applicable law.

(b)  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company, or any of its respective directors or officers (in such Person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such Person's fiduciary obligations under applicable law (the rights of the Company and its respective directors and officers under this section 25(b), the "<u>Fiduciary Out</u>"); provided that the Company shall promptly notify the Secured Lenders and the Supporting Litigation Claimants if any such action is taken, or refrained from being taken, that would otherwise be in violation of this Agreement (a "<u>Fiduciary Out Notice</u>").

(c)  None of the Supporting Parties shall have any fiduciary duty or other duties or responsibilities in any kind or form to each other, the Company, or any of the Company's creditors or other stakeholders as a result of this Agreement or the transactions contemplated hereby.  Each of the Supporting Parties has negotiated this Agreement on its own behalf and not on behalf of any other party.  Except as expressly provided in this Agreement, there are no commitments among or between the Supporting Parties.  Further, the Parties agree that, except as set forth in the Plan, and/or any Plan Supplement Documents, or the Disclosure Statement, this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing or credit support.

## 26.    <u>Representation by Counsel</u>.

Each Party acknowledges that it has been represented by, or provided a reasonable period of time to obtain access to and advice by, counsel with this Agreement and the Settlement and Restructuring contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

## 27.    <u>Independent Analysis</u>.

Each of the Parties hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

## 28. <u>Publicity</u>.

Each Party shall not (a) use the name of any other Party in any press release or other publication (which excludes court pleadings, case name and litigation references, and communications with interested parties in connection with the Chapter 11 Cases) without such other Party's prior written consent, such consent not to be unreasonably withheld, or (b) disclose to any person the principal amount or percentage of its Claims held by any other Party; <u>provided</u>, <u>however</u>, that nothing herein shall limit the right of any

Party to discuss litigation relating to the H-2B Claims in any publication or to use the Company names in connection with such discussion; provided, further, that no such discussion or publication shall include use of the names or acronyms "Teachers' Retirement System of Alabama", "TRSA", "Employee's Retirement System of Alabama", "ERSA", "Retirement Systems of Alabama" or "RSA", or identify by name any officer, director or employee thereof.  Notwithstanding the foregoing, the Supporting Parties consent to the disclosure by the Supporting Parties in the Restructuring Documents, motions and orders, as applicable, or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Supporting Party.

**29.** **Rule of Interpretation**.

Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a chapter 11 plan under the Bankruptcy Code.  Time is of the essence in the performance of the obligations of each of the Parties.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to any Articles, Sections, exhibits, annexes, and schedules are to such Articles, Sections, exhibits, annexes, and schedules of this Agreement unless otherwise specified. All exhibits and schedules annexed hereto or referred to herein (including any exhibits, schedules or attachments thereto) are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers or agents, solely in their respective capacity as officers or agents of the undersigned and not in any other capacity, as of the date first set forth above.

Signal International, Inc., *on behalf of itself and each of its direct and indirect subsidiaries*

By: _____

Name: Christopher S. Cunningham

Title: CFO

**TEACHERS' RETIREMENT SYSTEM OF
ALABAMA,** *as Secured Lender and Administrative
Agent*

By: _____

M. Hunter Harrell
Director of Private Placements

**EMPLOYEES' RETIREMENT SYSTEM OF
ALABAMA,** *as Secured Lender*

By: _____

M. Hunter Harrell
Director of Private Placements

[Signature Page to Plan Support Agreement]

Pravin Kumar Singh, and
Radhakrishnan Nair Mangalathu Malayil
Vasukuttan,
*as Supporting Litigation Claimants by their
attorney*

By: _____

    Name: Jonathan Gimblett
    Title: Attorney for ~~Pravin Kumar~~ Singh
    and Radhakrishnan Nair Mangalathu
    Malayil Vasukuttan
    Firm: Covington & Burling LLP

RAJU MEGANATHAN,
SARAVANAN RAMASAMY,
SARAVANACHELVAN NARAYANASAMY,
MARUTHAMUTHU MAYAVU,
*as Supporting Litigation Claimants by their*
*attorney*

**DLA PIPER LLP (US)**

By: _____
          Timothy H. Birnbaum

Srinivasa Rao Kambala
Srinivasa Rao Gonna
Amandeep Singh Kang
Saravanan Arunachalam
Chandra Sekhar Dwadasi Rama
Harbans Singh
Ponniah Muthu Kumar
Malkiah Paul
Abdulla Keepurath Maideen
Francis Sequira
Unnikrishna Pilla Balakrishna Pillai
Ramana Palika
Ragukumar Chinnian
*as Supporting Litigation Claimants by their*
*attorney*

By: _____

Name: Kayvon Sabourian
Title: Attorney
Firm: Equal Justice Center

Balamurugan Marimuthu,
Moorthy Nadhamuni,
Muralidharan Arumugam,
Muruganandam Arumugam,
Rajendran Sappani,
Rajendran Subramani,
Sammanasunathan Siluvaimuthu,
Satheesh Kannan Marimuthu,
Satyanarayana Ellapu
*as Supporting Litigation Claimants by their attorney*

By: _____
        Name: Sten-Erik Hoidal
        Title: Attorney
        Firm:  Fredrikson & Byron, P.A.

56328989_1.docx

George Kutty Puthiya Parampil Thomas, Ravi Thammina, Zakir Husain Ghulam Husain, Joshy Kaiprampattu Joseph, Reghunadhan Palachuvattilputhenpura Narayanannair, Sivakumar Ramakrishnan Nair, Antoney Tharayil Xavier, Yacob Thachil Varghese, Davis Antony, Gogy Joseph, Mathew Jackson, Philip Pindakadavil George, Sunny Cherian, Krishnan Thankappan Assari, Venkatarao Buridi, Sarma Venkata Satyanarayana Bhiri, Maheshwara Rao Molletti, Bhaskararao Nimmadala, Ganapathi Rao Akkireddi, Satyanarayana Vangapandu, Srinu Kalla, Baiju Paul, Rajan Pazhambalakode, Babu Karippai Ouseph, Subranarayana Karuppiah, David Raju Tuloori, Saji Chettiyara Baby, Joseph Thomas Kanjiraparambil, Shanoj Joseph, Kantibhai Khemabhai Prajapati *as Supporting Litigation Claimants by their attorney*

By: _____

Benjamin Mintz
Partner
Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Fax (212) 836-8689

Aby Karickathara Raju, Atha Mohammad Abdul, Belthazar Peter, Biju Perumpilly George, Chandran Shaju Thanissery, Galla Venkata Rama Krishna, Johny Mandy Mathai, Kesavarao Bundankayala, Krishna Gonthina, Lohithakshan Madampet, Nayappulli Jayachandran, Raju Divakaran, Reji Samuel, Samuel Jose Kumrumthodathil, Santhosh Kumar Rajendran Pillai, Sumesh Porambathuparam Subramanian

*as Supporting Litigation Claimants by their attorney*

By: _____

    William E. Dorris
    Georgia Bar No. 225987

KILPATRICK TOWNSEND &
STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone: (404) 815-6500
Facsimile: (404)-815-6555
bdorris@kilpatricktownsend.com

*Attorney for Plaintiffs*

Varghese Varkey Abraham,
Lakshmanan Ponnayan Achari,
Subhashithan Bahuleyan,
Kodakeril Baby Biji,
Rajankunju Geevarghese,
Jomon George,
Shaiju Vadakkal George,
Praveen Kulathum Muriyi Gopalakrishnan,
Mouleswararao Guntamukkala,
Eldose Isac,
Raveendranathan Mookaparambil Itty,
Joy Jacob,
Biju John,
Shibu Joseph,
Thansilas Joseph,
Kulath Somanathan Kalayam,
Sunilkumar Marottikkal Kuttan,
Bhaskaran Sreedharan Kutty,
Parshottam Ramchandra Mangani,
Prakash Moses Kanagiah Manonmoni,
Adharsan Manuel,
Jacob Mazhukkattu Mathew,
Johny Mathew,
Nandhakumar Nagaraj,
Shaji Veluthalakuzhiyil Nanoo,
Mangalan Chandrasekharan Pillai,
Radhakrishna Pillai Sivarama Pillai,
Aby Molathu Poulose,
Justin Poulose,
Appunni Arul Prakash,
Nibu Raju,
Sreenivasarao Raparthy,
Balwinder Singh,
Ranjit Singh,
Savinder Singh,
Ninan John Tharakan,
Kittayi Sunil Kumar Therattil,
Moni Panikulangara Thomas,
Thenooran Kumaran Unnikrishnan,
Benny Chittilappilly Vareed,
George Pulikkeparambil Varghese,
Estate of Kuliyanickal Paily Varghese,
Benny Kattukariyil Varkey, and
Shahi Vijayan

*as Supporting Litigation Claimants by their attorney*

By: _____
     Name:  Mark A. Broude
     Title:  Partner
     Firm:  Latham & Watkins LLP

Varghese Kurisinkal Devassy,
George Chacko Edavazhickal,
Prasad Kunju Kunju,
Ampattu Varughese Mathew,
Antony Sajan Oottuparambil-Michael,
Sivan Raghavan,
Vijayan Nair Sankara-Pillai,
Anil Scaria,
Mandeep Singh,
John Malakaran Thomas,
Saju Christy Vallarian,
Isaac Wilson Vazhikudilil, and
Benny Yohannan,
as *Supporting Litigation Claimants by their attorney*

By: _____

    Name: Stephen Raptis
    Title: Attorney
    Firm: Manatt, Phelps & Phillips, LLP

Sabu Puthukkuttumel Veede Krishnakutty, and

Thampy Putham Parambil Edicula,

*as Supporting Litigation Claimants by their attorney*

By: _____

Steven G. Spears
Nathan Coco
John C. Low
McDERMOTT WILL & EMERY LLP
1000 Louisiana St., Suite 3900
Houston, Texas 77002
Tel: 713.653.1700
Fax: 713.739.7592
Email: sspears@mwe.com
Email: ncoco@mwe.com
Email: jlow@mwe.com

Pradeep Chembil Raman,
John Abraham Kalampukatt,
Gopalakrishnan Unniampathu Vettical Nair,
Davis Mathai Meledan,
Thomas Baby Madakkameprathu,
Francis Kottackal Ouseph,
Sudheeran Panayamthatta,
Telson Joseph Pazhampilly,
Ajith Chellayyan Swarnamma,
Shawkat Ali Shaikh,
Anthony Marian,
Jaison Antony Thekkumpuram,
Shaju Olangattu Mathew,
Roy Punakkattu George,
Arunkumar Shaw Narayan Shaw,
George Paily Paulose Chakkiyattil,
Sukumar Moses Dokka,
Jeegan Joseph Cheruthalakal Michael,
Shajan Varghese,
Prakash Kuttiyil Chandrasekharan Nair,
Chandrasekhara Pillai Rajesh
Chemmanappilly,
Jacob Mathew,
Shibu Thankachan,
Sreekumar Janardhanan Pillai,
Subash Chandra Shukla,
Radhakrishnan Kakkathiruthi,
*as Supporting Litigation Claimants by their*
*attorney*

By: *Eben Colby* (by Nick Kodes)
    Name:  Eben P. Colby
    Title:  Partner
    Firm:  Skadden, Arps, Slate, Meagher, &
    Flom LLP

KURIAN DAVID,
SONY VASUDEVAN SULEKHA,
PALANYANDI THANGAMANI,
MURUGANANTHAM KANDHASAMY,
HEMANT KHUTTAN,
PADAVEETTIYIL ISSAC ANDREWS,
KECHURU DHANANJAYA,
SABULAL VIJAYAN,
KRISHAN KUMAR,
JACOB JOSEPH
KADDAKKARAPPALLY,
KULDEEP SINGH, and
THANASEKAR CHELLAPPAN

*as Supporting Litigation Claimants by their
attorney*

By: _____
    Daniel Werner
    Senior Supervising Attorney
    Southern Poverty Law Center
    1989 College Ave., NE
    Atlanta, GA 30317

Joy Joseph Attayil
Sreedharan Babu
Vasavan Babu
Philip Baby
Kiran Mohan Baki
Bijay Kumar Biswas
George Arackal Devassy
Varghese Kannampuzha Devassy
John Charuvila George
Omanakuttan Govindan [Kakkanthara]
Iju James
Gijo John
Biju Mukrukkattu Joseph
Francis Joseph
Paulose Chirackal Airookaran Joseph
Varghese Kainikkeril [Yohannan]
Suresh Kakkoth
Sojan Paul Kaliyadan
Eswara R. Kanithi
Krishnan Kannayan
Suresh Kumar Pillai Kavalamkuzhi
Vavachan Mathai Koottalil
Varghese Kunjachan
Pankajakshan Madhavan
Babu Lal Mali
George Kutty Vadakkekoottu Mathew
Ramachandran Murugaiyan
Shogy Vezhaparambil Ousephkutty
Sebastian George Pananjikal
Haridas Sankara Panicker
Varghese Pappachan
Joseph Boban Peruvelil
Prabhakaran Balakrishna Pillai
Kannankutty Ponnan
Biju Potrayil
Viswamithran Raghavan
Subburaj Rengasamy
Melvin Joseph Rodrigues
Ravi Rowthu
Jagannadha Rao Saragadam
Lakhbir Singh
Surje Prasad Tamang
Abraham Varghese
Joy Kallachiyil Varkey
Kunhikrishn Kaniyamkulam Veetil
Krishnan Venugopal

*as Supporting Litigation Claimants by their attorney*

By: _____

Name: Kara D. Ford

Title: Associate

Firm: Sutherland Asbill & Brennan LLP

**EXHIBIT A**

**PLAN TERM SHEET**

**THIS TERM SHEET DOES NOT CONSTITUTE A SOLICITATION OF VOTES FOR A PLAN OF REORGANIZATION FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR AN OFFER OR SOLICITATION OF AN OFFER WITH RESPECT TO ANY SECURITIES. SUCH OFFERS OR SOLICITATIONS MAY ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND/OR SECURITIES LAWS AND AFTER PUBLICATION AND DELIVERY OF THE PLAN AND DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN.**

SIGNAL INTERNATIONAL, INC., ET AL.

<u>CHAPTER 11 PLAN TERM SHEET</u>

*This non-binding term sheet (the "<u>Term Sheet</u>") describes the material terms of a proposed chapter 11 plan of reorganization (the "<u>Plan</u>") for Signal International, Inc. ("<u>SI Inc.</u>") and its subsidiaries.  This Term Sheet does not constitute a contractual commitment of any party but merely represents the proposed terms for a restructuring of the Debtors' (as defined below) capital structure and obligations and is subject in all respects to the negotiation, execution and delivery of definitive documentation, including entry into an acceptable plan support agreement (the "<u>PSA</u>") between the Debtors and certain of their creditors or potential creditors party hereto (collectively, the "<u>PSA Creditor Parties</u>"). This Term Sheet does not include a description of all the relevant terms and conditions of the restructuring contemplated herein.*

*This Term Sheet shall not constitute a commitment to exchange any debt, lend funds to any of the Debtors (defined below), vote in a certain way or otherwise negotiate or engage in the transactions contemplated herein.*

*This Term Sheet is strictly confidential and may not be shared with anyone other than its intended recipients. It is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and all other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.*

**<u>SUMMARY OF PRINCIPAL TERMS AND CONDITIONS</u>**

**<u>Transaction Overview</u>**

| | |
|---|---|
| *Proposed Debtors:* | Signal International, Inc., Signal Ship Repair, LLC, Signal International, LLC, Signal International Texas GP, LLC, and Signal International Texas, L.P. (collectively, the "<u>Debtors</u>"), in chapter 11 cases to be filed in the Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). |
| *Chapter 11 Plan:* | The Debtors will propose the Plan that implements all of the terms set forth in this Term Sheet. |
| *Debt and Claims to be Restructured:* | (a) $75 million in principal plus all other amounts outstanding evidenced by (i) a $50,250,000 Term Loan Note held by the Teacher's Retirement System of Alabama (the "<u>TRSA</u>" and such note, the "<u>TRSA Note</u>") and (ii) a $24,750,000 Term Loan Note held by the Employees' Retirement System of Alabama (the "<u>ERSA</u>" and such note, the "<u>ERSA Note</u>", and together with the TRSA Note, the "<u>Senior Notes</u>"), both subject to the terms and conditions of that certain Credit Agreement dated as of January 31, 2014 (as may be amended, modified, supplement and extended from time to time, the "<u>Credit Agreement</u>") between SI Inc., as Borrower, and TRSA, as |

Administrative Agent and Collateral Agent (such debt, the "First Lien Debt").

(b) Claims pursuant to a pre-petition judgment against the Debtors in the approximate estimated amount of $15 million entered in favor of 5 former workers of the Debtors (the "Judgment Claims").

(c) Claims pursuant to a pre-petition judgment against the Debtors in the approximate estimated amount of $4 million entered in favor of Max Specialty Insurance Company ("Max Specialty").

(d) All potential, threatened or pending claims against the Debtors by approximately 500 former employees and recruits of the Debtors hired and/or recruited by the Debtors through the United States H-2B immigration program arising out of or related to such employment or recruitment, which are contingent, unliquidated and disputed (collectively with the Judgment Claims, the "Litigation Claims" and the holders thereof, the "Litigation Claimants"). For plan purposes only, the Litigation Claims shall be estimated in the total aggregate amount of no less than $200 million.

(e) General unsecured claims, other than the Max Specialty judgment, totaling approximately $3.1 million or such other amount as the Bankruptcy Court may determine such that the Litigation Claims constitute no less than 95% of all unsecured claims..

| | |
|---|---|
| **Post-Petition Financing** | The TRSA shall (i) consent to the Debtors' post-petition use of its cash collateral and (ii) provide post-petition DIP financing in the amount of up to $20 million plus a roll-up of the First Lien Debt (the "DIP Facility"); provided that if the Bankruptcy Court has not granted the PSA Order (as defined in the PSA) prior to final relief being granted by the Bankruptcy Court with respect to the DIP Facility, the Litigation Claimants shall be entitled to object to such final relief and/or terminate the PSA. |
| **Sale of the Assets; Closing** | a) As part of the Plan, the Debtors shall sell substantially all of their assets at an auction (the "Auction") pursuant to court approved bid procedures (the "Bid Procedures"). The TRSA and ERSA shall serve as the stalking horse bidder (the "Stalking Horse Bidder") and be entitled to credit bid all amounts outstanding under the DIP Facility (the "Stalking Horse Credit Bid"). |
| | b) The Bid Procedures shall require any "Qualified Bid" (to be defined in the Bid Procedures) to, among other things, include cash proceeds sufficient to: (i) provide for payment of all outstanding obligations of the First Lien Debt and the DIP Facility in full on the Effective Date (the "Secured Debt Cash Obligations"); (ii) provide for a break-up fee not exceeding $2 million to the Stalking Horse Bidder; provided that the Bankruptcy Court's authorization of a break-up fee in any form or amount shall not be a condition precedent to the effectiveness of the PSA; (iii) fund a distribution payment to the general unsecured creditors, including Max Specialty (the "GUC Payment Amount" and together with the Secured Debt Cash Obligations and Break-Up Fee, the "Plan Cash Amount"); and (iv) overbid |

the Plan Cash Amount by no less than $1 million (the "Required Overbid", and together with the Plan Cash Amount, the "Minimum Qualified Bid").

c) The party submitting the highest or otherwise best Minimum Qualified Bid at the Auction shall be selected as the prevailing bidder (the "Prevailing Bidder"), subject to approval by order of the Bankruptcy Court (the "Sale Approval Order") at the hearing on confirmation of the Plan.

d) The Prevailing Bidder shall take all purchased assets free and clear of all liens, claims and encumbrances.

e) The closing shall occur within 20 days following confirmation of the Plan by the Bankruptcy Court.

**Estate Avoidance Actions**

The Prevailing Bidder shall purchase the estates' causes of action, including any avoidance actions under the Bankruptcy Code. For the avoidance of doubt, the Prevailing Bidder shall agree to waive and release any and all causes of action against the Released Parties (as defined below).

Within a reasonably prompt time, the Debtors or the Prevailing Bidder shall commence an avoidance action against Max Specialty to avoid any avoidable liens against the assets of the Debtors.

**Treatment of Claims**

*Administrative Expense Claims (including 503(b)(9) Claims):*

Payable in full in cash on the effective date of the Plan (the "Effective Date") or on such other terms as agreed between the Debtors and the holder thereof, subject to the reasonable consent of the Prevailing Bidder.

Unclassified – Non-Voting

*Priority Tax Claims:*

Payable in full in cash on the Effective Date of the Plan or on such other terms as agreed between the Debtors and the holder thereof, subject to the reasonable consent of the Prevailing Bidder.

Unclassified – Non-Voting

*Other Priority Claims:*

Payable in full in cash on the Effective Date or on such other terms as agreed between the Debtors and the holder thereof, subject to the reasonable consent of the Prevailing Bidder.

Unimpaired – Deemed to Accept

*First Lien Debt:*

On the Effective Date, the Senior Notes shall each be cancelled, and on account of the allowed claim of the TRSA in respect of the First Lien Debt, the TRSA, as administrative agent, shall either (i) acquire substantially all of the Debtors' assets as the Prevailing Bidder at the Auction or (ii) be paid in full, in cash, the total amount under the DIP Facility (including the roll-up of the First Lien Debt) by the Prevailing Bidder at the Auction.

Potentially Impaired – Entitled to Vote

*Other Secured Claims:*

On the Effective Date, all allowed secured claims ("Other Secured Claims") shall be either paid in full in cash, receive delivery of collateral securing any such claim and payment of any interest requested under section 506(b) of the Bankruptcy Code, or be treated on such other terms as agreed between the Debtors and the holder thereof, subject to the reasonable consent of the Prevailing Bidder.

Unimpaired – Not Entitled to Vote.

*Litigation Claims:*

On the Effective Date of the Plan, the claims of the Litigation Claimants shall be deemed allowed in full, and shall be deemed to have been settled as herein provided.

The Debtors shall establish a settlement trust (which form shall be satisfactory to the Southern Poverty Law Center) in respect of the claims of the Litigation Claimants (the "Litigation Settlement Trust"). On the Effective Date, the Prevailing Bidder will receive, free and clear of liens, claims or encumbrances (including, without limitation, the pre-petition liens of TRSA and ERSA) other than the participating interest of the Litigation Settlement Trust described below, all right, title and interest of the Debtors in and to certain purchase money indebtedness currently owing to Signal International Texas, LP, by Westport Orange Shipyard, LLC, in the principal amount of up to $29,894,469 (the "Westport Loan"), together with all instruments or documents evidencing, securing, governing or otherwise pertaining to the Westport Loan (the "Westport Documents"). The Westport Loan and the Westport Documents will be transferred to the Prevailing Bidder subject to a continuing participation interest in favor of the Litigation Settlement Trust, which shall be governed by a loan participation agreement (the "Westport Participation Agreement"), in form and content reasonably acceptable to the Litigation Settlement Trust and the Prevailing Bidder (collectively, the "Westport Participants"). For the avoidance of doubt, upon the Effective Date of the Plan, TRSA, ERSA and the Collateral Agent under the Credit Agreement will execute any documents necessary to effect a release and discharge of their respective liens, encumbrances and security interests on the Westport facility.

The Westport Participation shall provide that each Westport Participant share on a pro rata basis in all proceeds derived from the Westport Loan (including scheduled payments of principal and interest, prepayments, proceeds of enforcement or proceeds of liquidation of collateral) as follows:

- The Litigation Settlement Trust shall receive a 66.9% participating interest, and the Prevailing Bidder shall receive a 33.1% participating interest, in and to the Westport Loan and the Westport Loan Documents. The participating interests described above are referred to herein as each Westport Participant's "Sharing Ratio".

  - If the Westport Loan is prepaid in full, in accordance with its terms, prior to its scheduled maturity date, and the application of the Litigation Settlement Trust's Sharing

Ratio to such prepayment results in an aggregate recovery of less than $20 million by the Litigation Settlement Trust, then the Litigation Settlement Trust shall be entitled to receive additional proceeds from such prepayment in an amount sufficient to increase its aggregate recovery from the Westport Loan to $20 million.

- The maximum aggregate amount payable to the Litigation Settlement Trust by virtue of its Sharing Ratio shall for all purposes be capped at $22 million. Upon receipt of said amount by the Litigation Settlement Trust, all further payments or other recoveries with respect to the Westport Loan will be payable solely to the Prevailing Bidder.

Pursuant to the Westport Participation Agreement, if TRSA, ERSA or an affiliate or designee thereof is the Prevailing Bidder, TRSA and ERSA will be responsible for the collection and distribution of the proceeds of the Westport Loan and, if necessary, the enforcement thereof, for the ratable benefit of the Westport Participants. All out-of-pocket costs and expenses reasonably and actually incurred by TRSA and ERSA in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any distribution to the Westport Participants in accordance with their respective Sharing Ratios.

Pursuant to the Westport Participation Agreement, if none of TRSA, ERSA or an affiliate or designee thereof is the Prevailing Bidder, the Litigation Settlement Trust will be responsible for the collection and distribution of the proceeds of the Westport Loan and, if necessary, the enforcement thereof, for the ratable benefit of the Westport Participants. All out-of-pocket costs and expenses reasonably and actually incurred by the Litigation Settlement Trust in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any distribution to the Westport Participants in accordance with their respective Sharing Ratios.

All internal costs and expenses incurred in connection with the administration of the Litigation Settlement Trust following the Effective Date shall be borne solely by the Litigation Settlement Trust.

Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Effective Date of the Plan, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Effective Date of the Plan, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

Any cash bid amounts in excess of the Plan Cash Amount (such amount the "Sale Overpayment") made on the Effective Date and not subject to a valid and perfected lien shall be paid as follows:

- *First*, to the Litigation Settlement Trust to reduce, on a dollar-for-dollar basis, its participating interest in the Westport Loan (not to exceed a total of $20 million). In such event, the Sharing Ratio of the Litigation Settlement Trust shall be recalculated to account for all sums received from such Sale Overpayment. If the Sale Overpayment is in an amount adequate to result in the immediate payment of the sum of $20 million to the Litigation Settlement Trust, then the Westport Loan will be transferred to the Prevailing Bidder not subject to a continuing participation interest by any party.

- *Second*, any Sale Overpayment greater than $20 million (such amount the "Excess Sale Overpayment") will be shared *pro rata* by the Litigation Claimants and the other unsecured creditors.

For the avoidance of doubt, the Litigation Settlement Trust shall not receive any guarantee or other credit support as to the Westport Loan from the Prevailing Bidder, the Debtors or any PSA Creditor Party.

The trustee of the Litigation Settlement Trust will be selected by the Southern Poverty Law Center and will be responsible for establishing a claims allowance and allocation process with respect to distributions under the Litigation Settlement Trust.

Impaired – Entitled to Vote

| | |
|---|---|
| *General Unsecured Claims:* | On the Effective Date, each holder of an allowed general unsecured claim, other than the Litigation Claimants, shall receive, on account of its claim (each, a "General Unsecured Claim"), its *pro rata* share (determined without taking the Litigation Claimants into account) of GUC Payment Amount and its *pro rata* share (determined after taking the Litigation Claimants into account) of the Excess Sale Overpayment, if any. |

The GUC Payment amount will be determined during the Plan process so as to provide a greater aggregate percentage recovery to the holders of General Unsecured Claims than to the Litigation Claimants.

Impaired – Entitled to Vote

| | |
|---|---|
| *Intercompany Claims:* | All intercompany claims between and among SI Inc. and its direct and indirect subsidiary Debtors shall be released and discharged on the Effective Date of the Plan. There shall be no distributions on account of Intercompany Claims. |

Impaired – Entitled to Vote

| | |
|---|---|
| *Equity Interests:* | All rights of existing holders of shares of stock, options, warrants and common equity interests in SI Inc. shall be extinguished as of the Effective Date, and owners thereof shall receive no distribution on account of such stock, options, warrants and equity interests. |

Impaired – Deemed to Reject

**General Provisions**

*Allowance of Claims:*  The Debtors and the PSA Creditor Parties stipulate to and shall not challenge in any respect the approval of the DIP Facility, including the roll-up of the First Lien Debt.

The trustee of the Litigation Settlement Trust shall be solely responsible for determining the mechanism for distribution of the Trust assets to the Litigation Claimants.

The Debtors reserve the right to challenge the amount, validity or extent of all claims against the Debtors other than the claims of the PSA Creditor Parties.

*Incorporation:*  Each of the Debtors shall remain incorporated in the State of Delaware.

**Release and Related Provisions**

*Exculpations:*  Subject to Bankruptcy Court approval, the Plan Participants shall be exculpated from liability for their actions in connection with the chapter 11 cases, with customary carve-outs for gross negligence and willful misconduct

*Releases:*  Subject to Bankruptcy Court approval, the Plan shall provide that the Released Parties (as defined below), be released from liability for all Released Claims (as defined below).

"Released Parties" shall mean (i) the Plan Participants, (ii) the Related Parties of the Plan Participants, and (iii) the Related Parties of any Related Parties of the Plan Participants.

"Plan Participants" shall mean (i) the Debtors, (ii) the PSA Creditor Parties, (iii) the Litigation Claimants, (iv) the Litigation Settlement Trust, and (v) the holders of all H-2B Claims (as defined in the PSA).

"Related Parties" shall mean, with respect to any person or entity, any past, present or future representative, controlling person, officer, director, agent, attorney, advisor, employee, subsidiary or affiliate, shareholder, partner (general or limited), member, manager, equity holder, trustee, executor, predecessor in interest, successor or assign of any such person or entity.

"Case Professionals" shall mean the attorneys, accountants, consultants, financial advisors and other third party professionals who have represented the Plan Participants in connection with the negotiation and implementation of the Plan and the Plan Documents, each as defined in the PSA.

"Released Claims" shall mean any and all claims or causes of action, other than Retained Claims, by or among the Released Parties relating to any prepetition date acts or omissions, whether known or unknown, pertaining to the business activities and operations of the Debtors, the debts, liabilities, obligations and assets of the Debtors,

the ownership, management, direction or control of the Debtors, prosecution of the Litigation Claims, settlement efforts and negotiations related to the Litigation Claims, negotiation of and entry into this Agreement (including all exhibits and addenda hereto), or any transactions or communications among the Released Parties with respect to any of the foregoing.

"Retained Claims" shall mean the following claims or causes of action held by certain of the Plan Participants, which shall be retained by such Plan Participants and shall not be Released Claims: (i) the claims or causes of action of the Litigation Claimants against Malvern C. Burnett, Law Offices of Malvern C. Burnett, A.P.C., Gulf Coast Immigration Law Center, L.L.C., Sachin Dewan, and Dewan Consultants Pvt. Ltd. (a/k/a/ Medtech Consultants), and (ii) the claims or causes of action of any Plan Participant against its own Related Parties, other than the Released Related Party Claims.

"Released Related Party Claims" means any claims or causes of action against (i) the officers, directors, shareholders or other equity holders of the Debtors, or (ii) the Case Professionals, all of which shall be Released Claims and shall not be Retained Claims.

| | |
|---|---|
| *Director and Officer Indemnification*: | Director and officer insurance will continue in place for the directors and officers of all of the Debtors during the chapter 11 cases on existing terms.  The Debtors shall be permitted to purchase tail coverage for current and former directors and officers, subject to funding availability under the DIP Facility. |
| *Injunction:* | Ordinary and customary injunction provisions shall be included in the Plan. |

**Conditions to Closing**

This restructuring and all compromises herein shall be subject to (i) commencement of the Chapter 11 cases, (ii)  the absence of any payment default under the Westport Loan (determined without giving effect to any alleged waiver by the Debtors or any other party), (iii) after approval of a disclosure statement as containing adequate information, solicitation of votes approving the Plan, (iv) the execution of definitive documentation mutually acceptable to, and signed on to by, the parties to the PSA, each in their sole discretion, (v) the entry of an order confirming the Plan, which order is not subject to a stay of execution and otherwise final according to its terms and under applicable law, (vi) all actions, documents and agreements necessary to implement the Plan shall have been effected or executed and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and (vii) the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtors or the PSA Creditor Parties to be necessary to implement the Plan and that are required by law, regulation or order.

**Apology by the Debtors**

Within 2 weeks from the entry of the PSA Order the Debtors shall issue a formal letter of apology to the Litigation Claimants for the Debtors' conduct that gave rise to the Litigation Claims, such letter to be in form and substance reasonably satisfactory to the Litigation Claimants through their advisors.  For the avoidance of doubt, such letter of apology shall for all purposes be deemed a Restructuring

Document under the PSA, and shall be subject to the effect of Section 23 of the PSA.

## **EXHIBIT B**

Stockholder Shares of SI Inc.

Stockholder Shares of Signal International, Inc.

| Holder | Shares of Common Stock | % of Shares |
|---|---|---|
| RSA-Signal Holdings, LLC | 460,532.40 | 47.44% |
| Touradji Private Equity Master Fund, Ltd. | 211,844.90 | 21.82% |
| GoldenTree Partners, LP | 55,485.40 | 5.72% |
| ACON Offshore Partners, L.P. | 52,470.01 | 5.40% |
| Gerald J. St. Pe | 48,690.96 | 5.02% |
| ACON Offshore, LLC | 20,963.86 | 2.16% |
| Richard Marler | 20,000.00 | 2.06% |
| Johnette Colingo | 19,345.37 | 1.99% |
| Mr. & Mrs. Jerry Lee | 18,691.24 | 1.93% |
| Ronald Schnoor | 10,000.00 | 1.03% |
| Davidoff Investments, LP | 9,345.62 | 0.96% |
| Carl Marks & Co. Inc. | 9,345.62 | 0.96% |
| GoldenTree Partners II, L.P. | 9059.10 | 0.93% |
| Dr. Austin Taylor | 4,672.89 | 0.48% |
| Chris S. Cunningham | 4,650.00 | 0.48% |
| GoldenTree Partners (100), L.P. | 4535.30 | 0.47% |
| Dajalis Ltd | 3,271.08 | 0.34% |
| A.R. Blatt Holdings Ltd. | 2,336.45 | 0.24% |
| Mark S. Lyell | 1,868.98 | 0.19% |
| Brooksam, Inc. | 1,868.97 | 0.19% |
| Judson Traphagen | 1,401.80 | 0.14% |
| Michael Brodsky | 467.16 | 0.05% |
| **Total:** | **970,847.11** | **100%** |