**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| **SIGNAL INTERNATIONAL, INC., et al.** [1] | Case No. 15-11498 (MFW) |
| Debtors. | Jointly Administered |
| | **Sales and Bidding Procedures Hearing Date:** <br> **August 12, 2015 at 11:30 a.m. (ET)** <br> **Sales and Bidding Procedures Objection Deadline:** <br> **August 5, 2015 at 4:00 p.m. (ET)** <br> **Sale Hearing Date: TBD** <br> **Sale Objection Deadline: TBD** |

**DEBTORS' MOTION FOR ENTRY OF: (I) AN ORDER (A) APPROVING SALES AND BIDDING PROCEDURES IN CONNECTION WITH SALE OF ASSETS OF THE DEBTORS, (B) APPROVING BID PROTECTIONS, (C) APPROVING FORM AND MANNER OF NOTICE, (D) SCHEDULING THE AUCTION AND SALE HEARING, (E) AUTHORIZING PROCEDURES GOVERNING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING PURCHASE AGREEMENT, (B) AUTHORIZING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by and through their undersigned counsel, hereby submit this motion (the "**Motion**"),[2] pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 3007, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Signal International, Inc. (4248); Signal Ship Repair, LLC (2642); Signal International, LLC (5074); Signal International Texas GP, LLC (3050); and Signal International Texas, L.P. (5066). The Debtors' principal offices are located at RSA Battle House Tower, 11 North Water Street, Mobile, Alabama 36602.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse APA (as defined herein) or the Sales and Bidding Procedures (as defined herein), as applicable.

"**Local Rules**"), for entry of: (i) an order substantially in the form attached as <u>Exhibit A</u> (the "**Sales and Bidding Procedures Order**") (a) approving sales and bidding procedures (the "**Sales and Bidding Procedures**"), substantially in the form attached as Exhibit 1 to the Sales and Bidding Procedures Order, to govern the sale of substantially all of the Debtors' assets (the "**Acquired Assets**"), (b) approving the bid protections set forth in the proposed asset purchase agreement between the Debtors as sellers, and the Teachers' Retirement System of Alabama, or its designee ("**TRS**") and the Employees' Retirement System of Alabama, or its designee ("**ERS**" and together with TRS, the "**Purchaser**" or the "**Stalking Horse Bidder**") as buyer, dated July 13, 2015 (as may be amended, the "**Stalking Horse APA**"), a copy of which is attached hereto as <u>Exhibit B</u>, (c) scheduling an auction to sell the Acquired Assets (the "**Auction**") and a hearing to consider final approval of the sale of the Acquired Assets (the "**Sale Hearing**"), (d) approving the form and manner of notices in connection with the Sales and Bidding Procedures, (e) authorizing and approving procedures governing the assumption and assignment of executory contracts (each, a "**Contract**") and unexpired leases (each, a "**Lease**"), and (f) granting related relief; and (ii) an order, following the Sale Hearing, the form of which shall be filed with the Court and served by August 7, 2015 on the entities receiving this Motion (the "**Sale Order**") (a) approving asset purchase agreement with the Prevailing Purchaser, (b) authorizing the sale of the Acquired Assets (the "**Sale**") to the Prevailing Purchaser free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Liens**"),[3] other

---

[3]     Specifically, the Debtors seek authority to sell the Acquired Assets to the Prevailing Purchaser, including the Assigned Contracts, free and clear of all Liens of any kind or nature including, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights, encumbrances, mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights,

than any Liens permitted in the Prevailing Purchaser's asset purchase agreement (collectively, the "**Permitted Liens**"), (c) authorizing the assumption and assignment of certain executory contracts and unexpired contracts (collectively, the "**Assigned Contracts**"), and (c) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Christopher S. Cunningham in Support of Chapter 11 Petitions and First Day Motions* [D.I. 12] (the "**First Day Declaration**").  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.  The legal authority for the relief requested herein is sections

---

exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, rights of licensees or sublicensees (if any) under section 365(n) of the Bankruptcy Code or any similar statute, rights of tenants and subtenants (if any) under section 365(h) of the Bankruptcy Code or any similar statute, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this Chapter 11 Case (but, for the avoidance of doubt, in each case arising from the ownership of the Acquired Assets or the operation of the Business prior to the Closing Date), and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability or related theories.  For the avoidance of doubt, the term "claims" includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), with all such claims to attach to the proceeds of the Sale to be received by the Debtors with the same validity, force, priority and effect, if any, which they now have as against the Acquired Assets, subject to any claims and defenses the Debtors and other parties in interest may possess with respect thereto; provided, however, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the Sale.

105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 3007, 6004,

6006, 9007, and 9014, and Local Rule 6004-1.

## GENERAL BACKGROUND

2.　　On July 12, 2015 (the "**Petition Date**"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.　　On July 22, 2015, the Office of the United States Trustee for the District of

Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the

"**Committee**") [D.I. 119].   No request has been made for the appointment of a trustee or

examiner.

4.　　Additional information about the Debtors' business, their capital and debt

structure, and the events leading up to the Petition Date can be found in the First Day

Declaration.

## FACTS SPECIFIC TO THE RELIEF REQUESTED

### Preparing for the Sale Process and the Stalking Horse APA

5.　　Given the Debtors' declining revenue, liquidity constraints, and mounting

litigation expenses and claims, the Debtors and their advisors determined that an out-of-court

restructuring was not achievable.  As a result, the Debtors engaged SSG Capital Advisors, LLC

("**SSG**") as their investment banker with the primary mandate of marketing the Debtors'

business to potential bidders in a section 363 sale process.  While a formal marketing process to

canvas widespread interest in potential bidders for the Acquired Assets did not occur prior to the

Petition Date, SSG had conducted due diligence on the Debtors' assets and operations, including

onsite meetings and extensive dialogue with the Debtors' senior management, and identified

potential strategic and financial acquirers.  Concurrently with SSG's efforts to identify potential

acquirers, SSG also worked to establish an electronic data room and information package for interested parties, including a non-disclosure agreement to access additional information in the data room. The goal of these efforts was to allow for the immediate launch of a fair and transparent marketing process. To that end, the Debtors and their advisors began to actively market the Acquired Assets to maximize creditor recoveries.

6.      In preparation for the commencement of these chapter 11 cases, the Debtors sought out DIP financing and ultimately negotiated with the DIP Lenders to obtain $20 million of postpetition financing, which the Debtors believe will provide them with sufficient liquidity to conduct an orderly sale process. On July 14, 2015, the Court entered an order approving the DIP Facility on an interim basis [D.I. 78]. The DIP Facility contains certain milestones in connection with conducting a section 363 sale process that are intended to provide the Debtors with sufficient runway to conduct a robust marketing and sale process, while ensuring that the process progresses on a timeline that preserves value and minimizes any deterioration of the Debtors' business.

7.      In addition, based upon the determination that the Sale could only be consummated in the context of these bankruptcy proceedings, the Debtors, TRS, and ERS negotiated the Stalking Horse APA, which provides that TRS and ERS will serve as the Stalking Horse Bidder to facilitate a Sale pursuant to section 363 of the Bankruptcy Code.

## **Terms of the Proposed Sale**

8.      Pursuant to Local Rule 6004-1, the following summary highlights the material terms of the Stalking Horse APA, and all parties in interest are referred to the text of the attached Stalking Horse APA for additional information:[4]

   i.  ***Proposed Purchaser***:  Teachers' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1, *et seq.*, of the Alabama Code (or its designee) and Employees' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 36-27-1 *et seq.*, of the Alabama Code (or its designee).[5]

   ii.  ***Seller***:    Signal International, Inc., a Delaware corporation; Signal International, LLC, a Delaware limited liability company; Signal Ship Repair, LLC, a Delaware limited liability company; Signal International Texas GP, LLC, a Delaware limited liability company; and Signal International Texas, L.P., a Delaware limited partnership.

   iii.  ***Purchase Price***:  As set forth in Section 2.5 of the Stalking Horse APA, the aggregate consideration for the sale and transfer of the Acquired Assets (the "**Purchase Price**") shall consist of (a) cash in the amount of the Unsecured Creditor Claim Cash in the sum of $400,000, (b) the assumption of the Assumed Liabilities, and (c) a credit bid against the indebtedness owing under the DIP Loan Documents and the Pre-Petition Loan Documents in an amount equal to the Credit Bid Amount (the "**Credit Bid**").  The Credit Bid Amount means the aggregate amount of all principal, interest, fees, reimbursable expenses and other agreed charges owing under (i) the DIP Loan Documents, and (ii) the Pre-Petition Loan Documents (unless subsumed by the DIP Loan Documents pursuant to a Final Order), as of the date of the Auction.  Not less than two (2) days prior to the Date of the Auction, the Purchaser will confirm the amount of the Credit Bid in writing.  The current outstanding principal amount under the Pre-Petition Loan Documents is in excess of $70 million.

   iv.  ***Sale to Insider***:  Not applicable.

   v.  ***Agreements with Management***:  Not applicable.

---

[4] This summary is qualified in its entirety by reference to the Stalking Horse APA and Sale Order, and the Stalking Horse APA and Sale Order shall control to the extent of any conflict.  This Motion contemplates the filing of proposed form of Sale Order on or before August 7, 2015.  At the time of filing the proposed form of Sale Order, the Debtors will provide supplemental disclosures relating the proposed form of Sale Order in accordance with Local Rule 6004-1, as applicable.

[5] The Stalking Horse Bidder is an indirect equity holder of Signal International, Inc.

vi.  ***Releases***:  Sections 2.1(j) and 2.1(p) of the Stalking Horse APA provide for the Purchaser to acquire all claims and causes of action of the Debtors and their estates (including Chapter 5 avoidance actions), but excluding claims and cause of action (i) arising from or relating to the Max Specialty Judgment and (ii) that the Debtors may have against any Person solely with respect to any Excluded Assets. *See* §§ 2.2(e) and 2.3(f). In addition, the Purchaser has agreed and covenanted not to sue, prosecute, or otherwise assert acquired claims and causes of action against any Released Party (as defined in the Plan Support Agreement) to the extent prohibited by the Plan Support Agreement or any plan confirmed in accordance with it. *See* § 2.1(p).  Further, the proposed Sale Order may provide for the release of certain claims and causes of action.

vii.  ***Private Sale/No Competitive Bidding***:  Not applicable.

viii.  ***Closing and Other Deadlines***:  As set forth in Section 2.7 of the Stalking Horse APA, Closing shall occur as soon as practicable, but in no event later than 20 days after entry of the Sale Order.

ix.  ***Good Faith Deposit***:  Not applicable.

x.  ***Termination Payment***:  As set forth in Section 7.3 of the Stalking Horse APA, upon acceptance of any Alternative Transaction, whether or not consummated (a "**Break-Up Event**"), the Purchaser shall be entitled to a cash payment of $2,000,000.00 (the "**Break-Up Fee**").  The Break-Up Fee shall be paid in immediately available funds upon the occurrence of any Break-Up Event, without need for any further order of the Court, *provided*, (a) if a Break-Up Event is consummated, the Break-Up Fee shall be paid from the cash proceeds of the Break-Up Event upon the occurrence of the Break-Up Event, and (b) if the Break-Up Event is not consummated, the Break-Up Fee shall be allowed as a superpriority administrative expense claim against the Seller's bankruptcy estate, but only in an amount equal to the deposit (if any) actually forfeited by the counterparty to such Break-Up Event in accordance with the Sales and Bidding Procedures, and the Sales and Bidding Procedures Order, and shall be subject to the further conditions that the Purchaser shall have complied with its obligations as Back-Up Bidder (if applicable) under Section 5.13 of the Stalking Horse APA.

xi.  ***Interim Arrangements with Proposed Buyer***:  As set forth in further detail in the Debtors' motion seeking authority to approve the DIP Facility filed on the Petition Date, the Stalking Horse Bidder has agreed to provide funding during these chapter 11 cases for working capital and general corporate purposes, in an amount not to exceed $15 million and for credit enhancement obligations under customer contracts in an amount not to exceed $5 million, plus a roll-up of approximately $70.1 million in prepetition debt.

xii.    ***Use of Proceeds***:  Section 2.6 of the Stalking Horse APA provides that the Purchase Price, applicable Assumed Liabilities, and other relevant items shall be allocated by the Buyer within sixty (60) days after the Closing Date, and prepared in accordance with Section 1060 of the Internal Revenue Code of 1986 and the regulations thereunder.

xiii.    ***Tax Exemption***:  The Debtors and Stalking Horse Bidder intend to implement the Sale through the Plan and seek a determination that the Sale is exempt from transfer taxes under section 1146(a) of the Bankruptcy Code.

xiv.    ***Record Retention***:  As set forth in Section 11.18 of the Stalking Horse APA, for a period equal to the lesser of (a) three (3) years and thirty (30) days after the Closing Date and (b) the closing of these chapter 11 cases by the Court (the "**Post-Closing Access and Cooperation Period**"), the Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the operation of Business and the Acquired Assets prior to the Closing Date. During the Post-Closing Access and Cooperation Period, the Purchaser shall afford promptly to the Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) reasonable access during normal business hours to the offices, facilities, books, records, officers and employees of the Business as reasonably requested by the Seller for the purpose of winding-up its affairs and finalizing the administration of these chapter 11 cases.  In addition, during the Post-Closing Access and Cooperation Period, the Purchaser shall provide the Seller (or, its designee or successors), at no cost to the Seller, with reasonable access to various personnel to whom the Seller may need continued access after Closing during regular business hours of the Purchaser and at the Purchaser's business locations to assist the Seller in furtherance of the purposes set forth in the Stalking Horse APA; provided, that such access does not unreasonably interfere with the Purchaser's business operations.  During the Post-Closing Access and Cooperation Period, the Purchaser shall cooperate with, and shall permit and use its reasonable efforts to cause, its personnel to cooperate with the Seller (or, its designee or successors) after the Closing, in furnishing information, testimony and other assistance with respect to the Business or Acquired Assets for periods prior to the Closing Date in connection with any action or proceeding in furtherance of the purposes set forth in the Stalking Horse APA.

xv.    ***Sale of Avoidance Actions***:  As set forth in Section 2.1(p) of the Stalking Horse APA, the Acquired Assets include, to the extent not otherwise excluded pursuant to Section 2.2(f) of the Stalking Horse APA, any and all claims or causes of action, whether filed or not, (a) against the Purchaser

or its Affiliates and against the Debtors' present and former directors, officers or employees, or any other Person, including any causes of action arising as a result of the Bankruptcy Code or otherwise, and including all proceeds therefrom, to the extent related to activities or time periods prior to the Closing Date, (b) that are property of the Debtor or any Debtor's estate, and (b) arising under any state or federal law, including Chapter 5 of the Bankruptcy Code; *provided*, *however*, that the Purchaser agrees and covenants not to sue, prosecute, or otherwise assert, any such claims against a Released Party (as defined in the Plan Support Agreement), to the extent prohibited by the Plan Support Agreement or any plan confirmed in accordance with the Plan Support Agreement.

xvi.    ***Requested Findings as to Successor Liability***:  As set forth in Section 6.1(e) of the Stalking Horse APA, the Sale Order must include language that the Purchaser will not be subject to successor liability for any claims or causes of action of any kind or character against the Seller, whether known or unknown, including, without limitation, any claims held or asserted by, for, or on behalf of, any H-2B Worker (as defined herein), unless expressly assumed pursuant to the Stalking Horse APA.

xvii.    ***Sale Free and Clear of Unexpired Leases***:  As set forth in Section 2.1 of the Stalking Horse APA, Purchaser agrees to purchase and acquire from Seller on such basis, all right, title, and interest in and to the Acquired Assets, free and clear of all Liens.  The Stalking Horse APA contemplates that certain Leases may be assumed and assigned as part of the Sale.

xviii.    ***Credit Bid***:  As set forth in Section 2.5 of the Stalking Horse APA and in the proposed Sales and Bidding Procedures Order, the Stalking Horse Bidder is allowed to include a Credit Bid as part of the Purchase Price.

xix.    ***Relief from Bankruptcy Rule 6004(h)***:  The Sale Order will provide for a waiver of the 14-day stay thereof, including the parties' ability to close the Sale and assign the Assigned Contracts in connection therewith, arising under Bankruptcy Rules 6004(h) and 6006(d).

9.    The sale of the Acquired Assets to the Stalking Horse Bidder (or to such other Qualified Bidder that provides a higher or better offer for the Acquired Assets in accordance with the Sales and Bidding Procedures) is the best method to obtain the maximum value for the Debtors' estates and creditors.  The DIP Facility is designed to provide liquidity sufficient to allow the Debtors to maintain their operations, and going-concern value, until the sale of the Acquired Assets can be completed.

**The Sales and Bidding Procedures, the Auction, and the Sale Hearing**

10.     The Debtors request that the Sales and Bidding Procedures be established to govern the sale process.  To maximize recovery for their estates, the Debtors negotiated with TRS and the ERS the terms of the Sales and Bidding Procedures, which are designed to establish a fair, open, and competitive postpetition bidding process, subject to the sale milestones required under the DIP Facility.  The Debtors will solicit bids for the Acquired Assets to ensure that the Debtors achieve the best price for the Acquired Assets under all of the circumstances.

11.     Other than as specifically provided in the Stalking Horse APA or the prevailing Bidder APA, any Sale of the Acquired Assets shall be without representation or warranties of any kind, nature or description by the Debtors, their agents, or their estates.  Other than as specifically provided in the Stalking Horse APA or prevailing Bidder APA, as applicable, all of the Acquired Assets shall be transferred "as is," "where is" and "with all faults."  **THE DEBTORS EXPRESSLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY ASSETS, IN EACH CASE OTHER THAN AS SPECIFICALLY PROVIDED IN THE STALKING HORSE APA OR PREVAILING BIDDER APA, AS APPLICABLE.**

12.     The following sets forth a summary of the key provisions of the Sales and Bidding Procedures, including those provisions required to be highlighted under Local Rule 6004-1:[6]

> i.     ***Potential Bidders***:  To be considered a "**Potential Bidder**" and participate in the bidding process and receive access to due diligence materials, a party must execute a confidentiality agreement with the Debtors in a form

---

[6]     This summary is qualified in its entirety by the Sales and Bidding Procedures.  To the extent there are any conflicts or inconsistencies between this summary and the Sales and Bidding Procedures, the terms of the Sales and Bidding Procedures shall govern in all respects.

and substance reasonably satisfactory to the Debtors and provide evidence, reasonably acceptable to the Debtors, in consultation with SSG and the Committee, that the party has a legitimate interest in acquiring the assets of the Debtors (the "**Debtors' Assets**") and has the financial ability to do so.

ii.     *Qualified Bid Requirements*:  To be considered a "**Qualified Bid**" under the Sales and Bidding Procedures, any bid submitted by a Potential Bidder, other than the bid of the Stalking Horse Bidder, must (x) be delivered in writing to the Bid Notice Parties **by no later than 5:00 p.m. (Prevailing Eastern Time) on October 13, 2015** (the "**Bid Deadline**") and (y) satisfy the following requirements (the "**Qualified Bid Requirements**"):

(a)   states such Bidder's offer to purchase some or all or substantially all the Debtors' Assets, with a specific indication of which Debtors' Assets are subject to the bid;[7]

(b)   is based on the Stalking Horse APA and contains executed transaction documents, including a definitive purchase agreement and all schedules and exhibits thereto (in the same detail as those attached to the Stalking Horse APA), signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate a transaction for some or all or substantially all of the Debtors' Assets (as the terms thereof may have been improved or otherwise modified prior to the conclusion of the Auction, the "**Bidder APA**"), and such Bidder APA shall also include a copy of the Bidder APA marked against the Stalking Horse APA to show all changes requested by the Bidder, if any;

(c)   includes a summary term sheet with the material terms of the bid;

(d)   provides for the immediate payment at closing of all obligations, including principal, fees, interest and expenses, arising under or related to the DIP Facility;

(e)   is irrevocable unless and until the Debtors accept a higher or otherwise better bid and the Bidder is not selected as the Back-Up Bidder, and if the Bidder is selected as the Back-Up Bidder, is irrevocable until 11:59 p.m. (Prevailing Eastern time) on the date that is the earlier of: (x) 60 days after the date of the Sale Hearing, and (y) the closing of the Sale with the Prevailing Purchaser;

(f)   does not request any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment;

---

[7]     Less than all or substantially all of the Debtors' Assets may be sold, provided any and all debt owed by the Debtors to the DIP Lender is paid in full from the proceeds of such sale at the closing of the sale transaction.

(g)  otherwise contains terms and conditions that are substantially similar to, or more favorable to, the Debtors than those set forth in the Stalking Horse APA in each case as determined by the Debtors in their exercise of reasonable discretion;

(h)  contains such financial and other information that will reasonably allow the Debtors, in consultation with the Committee and the DIP Lender (together, the "**Creditor Constituencies**"), to make a determination as to the Bidder's financial and other capabilities to consummate the transactions contemplated by the Bidder APA, including:

(i)  contact names and numbers for verification of financing sources;

(ii)  evidence of such Bidder's internal resources and proof of unconditional debt or equity funding commitments from a recognized financial institution in the amount of the bid or the posting of an irrevocable letter of credit from a recognized financial institution issued in favor of the Debtors in the amount of the bid, in each case, as are needed to consummate the Bidder APA;

(iii)  such Bidder's current financial statements (audited, if they exist) or other similar financial information reasonably acceptable to the Debtors;

(iv)  such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code, in a form that will allow the Debtors to serve on counterparties to any Contracts or Leases being assumed and assigned in connection with the proposed sale in a timely manner so as to not disrupt the sale process; and

(v)  any such other financial disclosure or credit-quality support information or enhancement, demonstrating that such Bidder has the ability to consummate the Bidder APA;

(i)  indicates which Contracts and Leases that the Bidder wishes to have assigned to it pursuant to the Bidder APA, and provides that the Bidder will (x) pay all cure costs necessary to assign such Contracts and Leases at the closing of the Sale and (y) provide adequate assurance of performance to the non-Debtor counterparties to such Contracts and Leases;

(j)  contains the identity of each entity that will be bidding for the Debtors' Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(k) includes evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Bidder APA;

(l) provides that, under no circumstances, is the bid conditioned on the obtaining or the sufficiency of financing or any internal or credit committee approval, syndication requirements, or on the outcome or review of due diligence, but such bid may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, all of which shall be specifically set forth in the Bidder APA; and

(m) is accompanied by a good faith certified check payable to Signal International, Inc. or cash deposit in an amount no less than 10% of the purchase price set forth in the Bidder APA (the "**Good Faith Deposit**"), which shall be deposited in a master escrow account to be established by the Debtors subject to a master escrow agreement satisfactory to the Debtors, and which will be credited against the purchase price to be paid by the Prevailing Purchaser; if a Prevailing Purchaser fails to consummate an approved Sale because of a breach or failure to perform on the part of such Prevailing Purchaser, the Debtors shall be entitled to retain the Good Faith Deposit, in addition to being entitled to exercise all other remedies provided for in the applicable Bidder APA.

iii. ***Qualification as Bidder***: A "**Qualified Bidder**" is a Potential Bidder that (a) submits a Qualified Bid meeting all of the Qualified Bid Requirements by the Bid Deadline and (b) has the financial and other capabilities to consummate the transactions contemplated by the applicable Bidder APA, as determined by the Debtors, in consultation with SSG and the Committee. Each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors regarding such Bidder and its contemplated transaction. Failure by a Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with SSG and the Creditor Constituencies, to determine that such Bidder is not a Qualified Bidder. The Stalking Horse Bidder is a Qualified Bidder for all purposes under the Sale and Bidding Procedures.

iv. ***Break-up Fee***: As consideration for the value of the Stalking Horse Bidder's bid, in the event that the Debtors consummate the Sale of the Debtors' Assets with any party other than the Stalking Horse Bidder, subject to the terms of the Stalking Horse APA and Sale and Bidding Procedures Order, the Debtors shall pay to the Stalking Horse Bidder a Break-up Fee in the amount of $2,000,000.00 out of the cash portion of the consideration of the Prevailing Bid.

v.  **Credit Bidding**:  The Stalking Horse Bidder shall have the right to credit bid (a) the full amount of the outstanding obligations under the DIP Loan Documents and the Pre-Petition Loan Documents (unless subsumed by the DIP Loan Documents pursuant to a Final Order), as of the date of the Auction and (b) the Break-Up Fee.

vi.  **Auction**:

(a)  *Auction Date and Time.*  If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtors prior to the Bid Deadline from a Qualified Bidder, the Debtors shall conduct an Auction with respect to the Debtors' Assets.  If the Auction will occur, the Auction shall be conducted at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 **at 10:00 a.m. (Prevailing Eastern Time) on October 21, 2015**,[8] or such other place and time as the Debtors timely communicate to all entities entitled to attend the Auction.

(b)  *Auction Procedures.*  The Auction will be governed by the following procedures:

(i)  The Auction will be conducted openly by the Debtors, and only the Qualified Bidders and the Stalking Horse Bidder will be entitled to: (A) make any subsequent bids at the Auction; (B) make statements on the record at the Auction; or (C) otherwise participate at the Auction in any manner whatsoever;

(ii)  each Qualified Bidder will be required to represent that it has not engaged in any collusion with respect to the bidding or the sale;

(iii)  all Qualified Bidders will appear in person at the Auction, through a duly authorized representative, or as otherwise agreed by the Debtors;

(iv)  bidding will commence and proceed as determined by the Debtors, in consultation with the Creditor Constituencies;

(v)  the Auction will be transcribed or videotaped, at the Debtors' election;

(vi)  all Qualified Bidders will have the right to submit additional bids and make additional modifications to their respective Bidder

---

[8]     The Plan Support Agreement currently requires the Auction to be held by no later than October 3, 2015. However, the parties thereto anticipate amending the Plan Support Agreement to extend such deadline to October 23, 2015.

APA at the Auction, provided that any such modifications to the Bidder APA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than such Qualified Bidder's previous bid in the Debtors' discretion, in consultation with SSG and the Creditor Constituencies, and the fact that a Qualified Bidder shall have made any such modifications or improvements, including those made at the request of the Seller, shall not be an indication that such Qualified Bid was not qualified prior to the Bid Deadline;

(vii) the Auction will continue until the Debtors determine, in consultation with the Creditor Constituencies, that a Qualified Bid or Overbid, as applicable, is the highest or otherwise best offer from among the Qualified Bids (including Overbids) (the "**Prevailing Bid**," and the party or parties that submitted such Prevailing Bid, the "**Prevailing Purchaser**"), which shall be subject to Court approval; and

(viii) in selecting the Prevailing Bid, the Debtors, in consultation with the Creditor Constituencies, may consider all factors, including the amount of the purchase price, the likelihood of each Qualified Bidder's ability to close a transaction and the timing thereof, the form and substance of the respective Bidder APA, and the net benefit to the Debtors' estates.

(c) *Opening Bid*. At the commencement of the Auction, the Debtors will announce the then-existing highest or otherwise best Qualified Bid (the "**Auction Baseline Bid**").

(d) *Bidding at the Auction*. The Auction will begin initially with the Auction Baseline Bid and the Debtors will solicit overbids. An "**Overbid**" is any bid or bids made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid. The Auction shall proceed according to the following conditions:

(i) The initial Overbid after and above the Auction Baseline Bid shall be an amount equal to or greater than the Auction Baseline Bid *plus* $1,000,000;

(ii) each subsequent Overbid shall be made in increments valued at not less than $500,000 (or such other amount that the Debtors, in consultation with SSG and the Creditor Constituencies, determine appropriate to facilitate the Auction);

(iii) any Overbid shall remain open and binding on the Qualified Bidder until and unless (A) the Debtors accept as an Overbid a

higher Qualified Bid for the Debtors' Assets and (B) such Overbid is not selected as the Back-Up Bid;

(iv)  to the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence demonstrating such Qualified Bidder's ability to close the transactions proposed by such Overbid; and

(v)  the Debtors reserve the right, in their business judgment and in consultation with the Creditor Constituencies, to make one or more continuances of the Auction to, among other things: facilitate discussions among the Debtors and Qualified Bidders; allow Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors and Creditor Constituencies with such additional information as the Debtors in their business judgment, after consultation with the Creditor Constituencies, may require.

(e)  *Treatment of Break-up Fee*.  In subsequent bids at the Auction, the Stalking Horse Bidder shall get a dollar-for-dollar credit for the maximum amount of the Break-up Fee, which may be used as part of any Credit Bid by the Stalking Horse Bidder.

(f)  *Closing with Back-up Bidder*.  If an Auction is conducted, the Qualified Bidder (including, but not limited to the Stalking Horse Bidder) with the Qualified Bid that is next highest or otherwise best to the Prevailing Bid at the Auction, as determined by the Debtors in consultation with the Creditor Constituencies, shall be required to serve as the back-up bidder (the "**Back-Up Bid**" and the "**Back-Up Bidder**," respectively) and keep such bid open and irrevocable until 11:59 p.m. (prevailing Eastern time) on the date that is the earlier of (i) 60 days after the date of the Sale Hearing and (ii) the closing of the Sale with the Prevailing Purchaser.

Following the Sale Hearing, if the Prevailing Purchaser fails to consummate a Sale in accordance with the Prevailing Bid because of a breach or failure to perform on the part of such Prevailing Purchaser, the Debtors, in consultation with the Creditor Constituencies, are authorized to deem the Back-Up Bidder to be the new "Prevailing Purchaser," and the Debtors will be authorized, but not required, to consummate a Sale with the Back-Up Bidder as contemplated by the Back-Up Bid without further order of the Court upon at least three days written notice to the Creditor Constituencies and the Back-Up Bidder.

vii.  ***Bankruptcy Court Approval***:  The transactions contemplated by any bid, including the bid of the Stalking Horse Bidder (whether through the

Stalking Horse APA or otherwise), shall be subject to the approval of the Court.

viii.    ***Modification of Bidding and Auction Procedures***:  The Debtors reserve their rights, in the exercise of their fiduciary obligations, and in consultation with the Creditor Constituencies, (a) to impose, at or prior to the Auction,  additional terms and conditions on the sale of the Debtors' Assets, and (b) to announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction; *provided, however,* that the Debtors shall not materially modify the Sales and Bidding Procedures in any manner adverse to the rights or interests of the Stalking Horse Bidder without the prior written consent of the Stalking Horse Bidder, which consent shall not be unreasonably withheld.

**Notice of the Sale, the Sales and Bidding Procedures, the Auction, and the Sale Hearing**

13.    The Debtors propose to give notice of the proposed Sale, the Sales and Bidding Procedures Order, the Auction, and the Sale Hearing in the following manner:

i.    No later than five (5) business days after the entry of the Sales and Bidding Procedures Order (the "**Mailing Date**"), the Debtors (or their agents) shall serve by first class mail, postage prepaid, a copy of the Sales and Bidding Procedures Order, which includes the Sales and Bidding Procedures, and the notice regarding the Sale, substantially in the form attached hereto as Exhibit C (the "**Sale Notice**"), on the following entities that also will receive notice of this Motion (collectively, the "**Motion Notice Parties**"):

(a)    the DIP Lender and its counsel;

(b)    the Stalking Horse Bidder and its counsel;

(c)    the Office of the United States Trustee for the District of Delaware;

(d)    Counsel to the Committee (and any other statutorily-appointed committee in these chapter 11 cases);

(e)    the United States Attorney for the District of Delaware;

(f)    the Internal Revenue Service;

(g)    the Environmental Protection Agency;

(h)    all known taxing authorities for the jurisdictions to which the Debtors are subject;

(i)    all entities known or reasonably believed to have asserted a Lien on any of the Debtors' Assets;

(j)    all creditors who are known to have or have asserted in writing secured claims;

(k)    the Equal Opportunity Employment Commission;

(l)    all entities reasonably known to have expressed a bona fide interest in acquiring the Debtors' Assets during the six (6) months preceding the date of this Motion;

(m)    the non-Debtor counterparties to the Contracts and Leases; and

(n)    those parties who have formally filed requests for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

ii.    The Debtors shall cause the Sale Notice to be translated into Tamil, Hindi, and Malayalam by an interpreter who has been certified in the applicable language by a reputable certification organization (or who possesses a comparable level of skill as to one who has been so certified) (the "**Translated Sale Notices**").  On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a copy of the Sale Notice and the Translated Sale Notices upon any H-2B Worker[9] who has not formally filed a request for notice in these chapter 11 cases at the last address known to the Debtors.  The Translated Sale Notices shall also be provided to any other party upon request.

iii.    On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a copy of the Sale Notice upon all other known creditors of the Debtors.  The Debtors shall also post this Motion, the Sales and Bidding Procedures Order, the Sales and Bidding Procedures, the Sale Notice, the Translated Sale Notices, and the Sale Order on the website maintained by the Debtors' claims and noticing agent.

iv.    Within five (5) days after the entry of the Sales and Bidding Procedures Order (or as soon as reasonably practicable thereafter, but no later than twenty-five (25) days prior to the Sale Objection Deadline), the Debtors (or their agents) will cause: (i) the Sale Notice, as modified for publication (the "**Publication Notice**") to be published once in *The New York Times* (national edition), the Mississippi *SunHerald*, the *Houston Chronicle*, and

---

[9]    For purposes of this Order, "H-2B Workers" means any and all former employees and recruits of any Debtor hired and/or recruited through the United States H-2B immigration program who, independently or through the Equal Employment Opportunity Commission, have asserted or may assert certain legal and equitable claims against any Debtor.

an English language newspaper of general circulation in India and (ii) the Publication Notice translated in Malayalam to be published once in *Malayala Manorama.*[10]

14.     In addition, the Debtors request the establishment of an objection deadline, prior to the Sale Hearing, such that any objections related to the proposed Sale be served so as to be **received** by the following parties (the "**Bid Notice Parties**") **on or before 4:00 p.m. (prevailing Eastern Time) on September 30, 2015** (the "**Sale Objection Deadline**"):

    i.      Investment Banker to the Debtors:  SSG Advisors, LLC, 300 Barr Harbor Drive, West Conshohocken, PA 19428, Attn: J. Scott Victor (jsvictor@ssgca.com) and Teresa C. Kohl (tkohl@ssgca.com);

    ii.     Counsel to the Debtors: Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: M. Blake Cleary, Esq. (mbcleary@ycst.com) and Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, Attn:  Christopher R. Donoho III, Esq. (chris.donoho@hoganlovells.com);

    iii.    Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Tiiara N.A. Patton, Esq. (tiiara.patton@usdoj.gov);

    iv.     Counsel to the Stalking Horse Bidder and DIP Lender: Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, AL 35203 (Attn: Derek F. Meek, Esq., (dmeek@burr.com) and Morris Nichols Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899, Attn: Eric D. Schwartz, Esq. (eschwartz@mnat.com) and Gregory W. Werkheiser, Esq. (gwerkheiser@mnat.com); and

    v.      Counsel for the Committee: Pachulski Stang Ziehl & Jones, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Bradford J. Sandler, Esq. (bsandler@pszjlaw.com).

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

15.     To facilitate and consummate the sale of the Acquired Assets, the Debtors seek authority, pursuant to section 365(f) of the Bankruptcy Code, to assume and assign certain

---

[10]    The Debtors reserve the right to elect to publish a combined Sale Notice and notice regarding any Court-approved bar dates.  The Debtors will file a proposed form of notice prior to the hearing on this Motion and provide it to counsel for the Litigation Claimants, if known, the RSA, the U.S. Trustee, and any statutorily-appointed committee in these chapter 11 cases.

Contracts and Leases consistent with the procedures set forth on Exhibit 2 to the Sales and Bidding Procedures Order (the "**Assumption and Assignment Procedures**").  Due to the nature of the bidding process, it is impossible for the Debtors to currently identify which such Contracts or Leases will require assumption and assignment to the Prevailing Purchaser.  As such, the Debtors propose that the Assumption and Assignment Procedures apply whether the Stalking Horse Bidder or another party is the Prevailing Purchaser.  The proposed Assumption and Assignment Procedures are as follows:[11]

    i.    *Cure Notice*.  Within five (5) business days of entry of the Sales and Bidding Procedures Order, the Debtors will file with the Court and serve a cure notice, substantially in the form attached to the Assumption and Assignment Procedures as Exhibit A (the "**Cure Notice**") on each non-Debtor counterparty under each potential Assigned Contract (a "**Contract Party**") and its attorney, if known, in each case, at the last known address available to the Debtors provided, however, that the presence of any Contract or Lease on a Cure Notice does not constitute an admission that such Contract or Lease is an executory contract or unexpired lease or that the Debtors have any liability thereunder.  The determination whether a Contract or Lease is to be assumed and assigned is subject to a subsequent decision by the Prevailing Purchaser to be made prior to the Executory Contract Designation Deadline and approval by the Court.  Until the Executory Contract Designation Deadline, the Prevailing Purchaser, in its sole and absolute discretion, may amend the Contract & Cure Schedule to (a) add or remove any Contract or Lease or (b) modify the treatment of any Contract or Lease.  The Debtors reserve all of their rights, claims, and causes of action with respect to any Contract or Lease.

    ii.    *Contents of the Cure Notice*.  The Cure Notice shall set forth the following information:  (a) the title of the Contract or Lease that may be assumed by the Debtors and assigned to the Stalking Horse Bidder or other Prevailing Purchaser(s); (b) the name of the Contract Party thereto; (c)  the amount, if any, determined by the Debtors to be necessary to be paid to cure and compensate for any existing default, whether arising prepetition or postpetition, in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (as such amounts may be amended from time to time through the filing and service to each affected Contract Party of an amended Cure Notice prior to the Sale Hearing, the "**Cure**

---

[11]    This summary is qualified in its entirety by the Sales and Bidding Procedures Order.  To the extent there are any conflicts or inconsistencies between this summary and the Sales and Bidding Procedures Order, the terms of the Sales and Bidding Procedures Order shall govern in all respects.

01:17111520.6

**Amount**"); and (d) the deadline by which any such Contract Party must file an objection to the assumption or assignment of such Contract or Lease, including the proposed Cure Amount to be paid to such Contract Party; and (e) other objection-related requirements.

iii.     ***Objections Related to the Cure Notice***.  Objections to the proposed Cure Amount, adequate assurance of future performance of obligations to be provided to the Contract Parties, and any other objections to the assumption and assignment of the Contracts or Leases must:  (a) be in writing; (b) set forth the nature of the objector's claims against or interests in the Debtors' estates; (c) the basis for the objection; (d) comply with all applicable Bankruptcy Rules and orders of the Court; and (e) be filed with the Court and served upon the Bid Notice Parties.  **Objections to the proposed Cure Amount, the adequate assurance of future performance by the Stalking Horse Bidder, and any other objections to the assumption and assignment of the Contract or Lease, other than to adequate assurance of future performance by Qualified Bidders other than the Stalking Horse Bidder (collectively, the "<u>Contract Objections</u>") must be filed and served by no later than the Sale Objection Deadline**.  Any objections to the adequate assurance of future performance obligations by Qualified Bidders other than the Stalking Horse Bidder ("**<u>Adequate Assurance Objections</u>**") must be filed and served no later than **4:00 p.m. (prevailing Eastern Time) on October 29, 2015** (the "**<u>Adequate Assurance Objection Deadline</u>**").

iv.     ***Effects of Objecting to a Cure Notice***.  If a Contract Party does not object to the Cure Amount, such Contract Party shall be deemed to have agreed to the Cure Amount.  A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors with respect to the specific objections stated therein but will not constitute an objection to the remaining relief requested in this Motion.  If any validly filed objection is not consensually resolved, the Court shall adjudicate such objection at the Sale Hearing or on such other date and time as agreed to by the Debtors and the Prevailing Purchaser or as may be fixed by the Court.

iii.     ***Supplemental Cure Notice Procedures***.

(a)     If, at any time after the entry of the Sales and Bidding Procedures Order, the Debtors or any Qualified Bidder identify additional Contracts or Leases that may be assumed and assigned to the Stalking Horse Bidder or other Prevailing Purchaser as Assigned Contracts (whether before or after closing of the Sale), as applicable, the Debtors shall file with the Court and serve a supplemental Cure Notice on the applicable Contract Party (and its attorney, if known) by overnight mail (the "**<u>Supplemental Cure Notice</u>**").

(b)      For a Contract Party listed on a Supplemental Cure Notice, (i) the deadline to file Contract Objections shall be the later of (A) fourteen (14) days after the date the Supplemental Cure Notice is filed and (B) the Sale Objection Deadline and (ii) the deadline to file Adequate Assurance Objections shall be the later of (A) the Contract Party's deadline to file Contract Objections and (B) the Adequate Assurance Objection Deadline.

(c)      If the Supplemental Cure Notice provides for a deadline to file Contract Objections that is after the date of the Sale Hearing, unless the Contract Party timely files and serves an objection to the Supplemental Cure Notice, the Debtors shall be authorized to assume and assign the applicable Contract or Lease, subject to the occurrence of the Closing, without further order or notice of hearing.  If a validly filed objection is not consensually resolved, then the Debtors will schedule a hearing to consider the objection on the next scheduled omnibus hearing date.

iv.      ***Notice of Auction Results***.  After the conclusion of the Auction, the Debtors shall file with the Court a supplement (the "**Supplement**") that will, among other things, identify (a) the Prevailing Purchaser, (b) the amount and form of consideration to be paid by the Prevailing Purchaser for the Acquired Assets, (c) the Assumed Liabilities to be assumed by the Prevailing Purchaser, and (d) the Contracts and Leases to be assumed by the Debtors and assigned to the Prevailing Purchaser in connection with the Sale, subject only to the Prevailing Purchaser's right prior to the Executory Contract Designation Deadline to amend the Contract & Cure Schedule to (i) add or remove any Executory Contract or (ii) modify the treatment of any Executory Contract.  The Supplement also will include similar information relating to the Back-Up Bidder and the Back-Up Bid. In addition, the Debtors will attach to the Supplement (a) any revised proposed order approving the Sale to the Prevailing Purchaser, (b) copies of the Bidder APA of the Prevailing Purchaser and Back-Up Bidder submitted to the Debtors, and (c) any additional information or documentation relevant to the Prevailing Bid and/or Back-Up Bid. Within 48 hours of the conclusion of the Auction, the Debtors will file the Supplement with the Court and post the same on the website maintained by the Debtors' claims and noticing agent, but no further notice of the Supplement will be provided to any parties-in interest in the Debtors' chapter 11 cases.

**RELIEF REQUESTED**

16.      The Debtors request:    (i) entry of the Sales and Bidding Procedures Order (a) approving the Sales and Bidding Procedures, (b) approving the Break-up Fee,

(c)  scheduling an Auction and Sale Hearing, (d) approving the form and manner of notices in connection with the Sales and Bidding Procedures, (e) authorizing and approving the Assumption and Assignment Procedures, and (f) granting related relief; and (ii) following the Sale Hearing, entry of the Sale Order (a) approving the asset purchase agreement with the Prevailing Purchaser, (b) authorizing the Sale of the Acquired Assets to the Prevailing Purchaser free and clear of Liens, other than any Permitted Liens, (c) authorizing the assumption and assignment of the Assigned Contracts, and (d) granting related relief.

## BASIS FOR RELIEF

**I.     APPROVAL OF THE SALES AND BIDDING PROCEDURES IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.**

> **A.     The Sales and Bidding Procedures are Appropriate and Will Maximize the Value Received for the Acquired Assets.**

17.     Bidding procedures should be approved when they provide a benefit to a debtor's estate by maximizing the value of the assets.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535–37 (3rd Cir.1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate.); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  Additionally, courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  *See In re Asarco, L.L.C.*, 650 F.3d 593, 602–03 (5th Cir. 2011) (stating that the application of the business judgment standard was appropriate where the bankruptcy court issued its expense reimbursement order before any potential qualified bidders had incurred due diligence and work fees).

18.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g.*, *In re Mushroom Transp. Co.*, 382 F.3d 325, 339

(3d Cir. 2004) (stating that debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) (noting that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand")

19.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales.  *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (stating such procedures should be used "to encourage bidding and to maximize the value of the debtor's assets").

20.     The Debtors believe that the Sales and Bidding Procedures will establish sound parameters by which the proffered sale price of the Acquired Assets may be tested at the Auction, as well as the ensuing Sale Hearing, and evaluated as described herein.  Such procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Acquired Assets in a sale because they will ensure a competitive and fair bidding process.  The Sales and Bidding Procedures also will allow the Debtors to undertake the sale and auction process expeditiously, which the Debtors believe is necessary to preserve and maximize the value of their estates.

21.     The Debtors believe that the Sales and Bidding Procedures will promote active bidding amongst interested parties and will dispel any doubt as to the best or otherwise highest offer reasonably available at this time for the purchase of the Acquired Assets.  Moreover, the Sales and Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, orderly, fair, and open fashion that will encourage participation by financially-capable bidders

who demonstrate the ability to quickly close a transaction.  The Debtors believe that the Sales and Bidding Procedures will encourage bidding for the Acquired Assets, that they are consistent with other procedures previously approved by the Court, and that they are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

22.     Based on the foregoing, the Debtors submit that the Sales and Bidding Procedures are reasonable, appropriate, and within the Debtors' sound business judgment because they are designed to maximize the value to be received by the Debtors' estates for the Acquired Assets.

**B.      The Break-Up Fee is Reasonable and Appropriate.**

23.     The Break-Up Fee was negotiated at arms' length and in good faith, and is necessary to secure the Stalking Horse Bidder's participation in the Debtors' sale process.  The Debtors have determined that pursuing a going-concern sale transaction for the Acquired Assets is in the best interests of the Debtors, their estates, and their creditors, and therefore submit that agreeing to the Break-Up Fee is an appropriate exercise of the Debtors' business judgment and is an actual and necessary cost of preserving the value of their estates.

24.     In the Third Circuit, bid protections, including traditional break-up fees, will be approved where they are necessary for the preservation of a debtor's estate.  *See, e.g.*, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527 (3d Cir. 1999)).  Accordingly, bid protections may be awarded where they induce the stalking horse bidder to make an initial bid or adhere to its bid after the court orders an auction and where they promote more competitive bidding.  *In re O'Brien*, 181 F.3d at 537.

25.     In recognition of the expenditure of time, energy, and resources, as well as the benefits to the Debtors' estates of securing a "stalking horse" or minimum bid, the Debtors have

agreed to seek approval of the Break-Up Fee for the Stalking Horse Bidder.  The Debtors' ability to offer the Break-Up Fee enables the Debtors to ensure the Sale of the Acquired Assets to a contractually-committed bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of a greater return to their estates.  Moreover, the Stalking Horse Bidder has spent, and likely will continue to spend, considerable time, money, and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations under extremely stressful time pressure.  The amount of the Break-Up Fee is reasonable compared to the Purchase Price, and is not so high that it would cause any chilling effect on other prospective purchasers, and will have no adverse effect on any stakeholders.  Absent authorization of the payment of the Break-Up Fee, the Debtors might lose the opportunity to obtain the highest or best available offer for the Acquired Assets and the downside protection that will be afforded by the Stalking Horse APA.

26.     The Debtors believe that the Break-Up Fee is fair and reasonable, given the benefits to the estate of having a definitive Stalking Horse APA and the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Bidder with the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted.  The Debtors' payment of the Break-Up Fee, under the circumstances described herein, is necessary to preserve and enhance the value of the Debtors' estates.  Thus, the Debtors request that the Court approve and authorize payment of the Break-Up Fee pursuant to the terms of the Stalking Horse APA.

**C.      The Proposed Notice Procedures of the Sale, Sales and Bidding Procedures, Auction, and Sale Hearing are Appropriate.**

27.     Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed Sale of the Acquired Assets, including disclosure of the time and place

of the Auction, the terms and conditions of the Sale, and the deadline for filing any objections. The Debtors submit that the notice procedures described herein fully comply with Bankruptcy Rule 2002 and are reasonably calculated to facilitate the sale process and provide timely and adequate notice of the Sales and Bidding Procedures, the Auction, the Sale Hearing, and related matters to the Debtors' creditors and other parties in interest, including any additional entities that have a legitimate interest in bidding on and purchasing the Acquired Assets. The Debtors submit that such notice constitutes good and sufficient notice under the circumstances of the Sales and Bidding Procedures, the Auction, the Sale Hearing and the proposed Sale and that no further notice is necessary or required.

28.　　Accordingly, the Debtors respectfully request that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice.

**D.　The Proposed Notice Procedures for the Assumption and Assignment of Contracts and Leases and the Identification of Related Cure Amounts are Appropriate.**

29.　　Pursuant to this Motion, the Debtors also seek authority to assume and assign the Assigned Contracts to the Prevailing Purchaser in connection with the Prevailing Bid. To facilitate such assumption and assignment, the Debtors also seek approval of the related Assumption and Assignment Procedures. The Assumption and Assignment Procedures, as detailed above, outline the process by which the Debtors will serve the Cure Notice and the procedures and deadlines for Contract Parties to file and serve related objections.

30.　　The Assumption and Assignment Procedures ensure that each Contract Party will have sufficient notice of the potential assumption and assignment of its Contract or Lease, and an opportunity to contest any asserted Cure Amount, as well as the ability of the Stalking Horse Bidder or other Qualified Bidder to provide adequate assurance of future performance.

31.     Accordingly, the Debtors submit that the Assumption and Assignment Procedures are fair and reasonable, and respectfully request that the Court approve such procedures.

## II.    APPROVAL OF THE PROPOSED SALE IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.

32.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside the ordinary course of business may be by private sale or public auction.    The Debtors determined that a public auction of the Acquired Assets will enable the Debtors to obtain the highest or otherwise best offer in a sale of the Acquired Assets at this time and is in the best interests of the Debtors, their estates, and their creditors.

### A.     Sale of the Acquired Assets is a Sound Exercise of the Debtors' Business Judgment.

33.     Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."    11 U.S.C. § 363(b).    Further, section 105(a) of the Bankruptcy Code provides, in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."    11 U.S.C. § 105(a).

34.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor.    *See Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991); *In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *10–11 (Bankr. D. Del. Apr. 2. 2001).

35.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:    (i) whether a sound business justification exists for the sale;

(ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.  *See, e.g., In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. at 176).

36.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the debtor's estate, its creditors, or interest holders.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (stating that the paramount goal in any proposed sale of property of the estate is to maximize value).

37.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors* v. *Johns-Manville Corp. (In re Johns-Manville Corp)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith* v. *Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions.  *See Pitt* v. *First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").  Thus, if a debtor's actions satisfy the business judgment

rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

38.     The Sale will be consummated only after thorough consideration of all viable alternatives and after concluding that such transactions are supported by sound business justifications.  The value of the Acquired Assets will be established through the Auction and the sale process consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and applicable law pursuant to the Sales and Bidding Procedures.  *See, e.g.*, *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) (stating that "the best way to determine value is exposure to a market"); *Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 960 (1997) (holding that "the value of the property . . . is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller").  Consequently, the fairness and reasonableness of a sale to the Prevailing Purchaser ultimately will be considered in light of "market exposure" through an open and fair auction process.

39.     Thus, the Debtors submit that the Stalking Horse APA (or the applicable Bidder APA submitted by the Prevailing Purchaser) will constitute the highest or otherwise best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Acquired Assets through an auction and sale process, as provided for in the Sales and Bidding Procedures, is a valid and sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Sale be approved.

**B.     Sale of the Acquired Assets Free and Clear is Authorized by Section 363(f) of the Bankruptcy Code.**

40.     To attract the best bids for the Acquired Assets, the Debtors submit that the Sale should be free and clear of Liens (except for any Permitted Liens) pursuant to section 363(f) of

the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Sale, as and

to the extent applicable.

41.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and

clear of liens, claims, interests, and encumbrances if:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

42.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive,

satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired

Assets "free and clear" of Liens (except for Permitted Liens).  *See, e.g.*, *In re Kellstrom Indus.,*

*Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not

the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct

the sale free and clear of all liens.").

43.     The Debtors believe that one or more of the conditions set forth in section 363(f)

of the Bankruptcy Code will be satisfied with respect to the Sale.  In particular, the Debtors

believe that at least section 363(f)(2) of the Bankruptcy Code will be met in connection with the

transactions proposed hereunder because each of the parties holding Liens on the Acquired

Assets, if any, will consent, or, absent any objection to this Motion, will be deemed to have

consented, to the Sale.  Any holder of a Lien also will be adequately protected by having its

Liens, if any, attach to the proceeds of the Sale in the same order of priority, with the same

validity, force, and effect that such creditor had prior to such Sale, subject to any claims and

defenses that the Debtors and their estates may possess with respect thereto.

44.    The Debtors submit that a sale of the Acquired Assets free and clear of all Liens

(except for any Permitted Liens), includes free and clear of successor liability.  Courts frequently

hold that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from

successor liability relating to the debtor's business.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*,

322 F.3d 283, 288–90 (3d Cir. 2003) (determining that a sale of assets pursuant to section 363(f)

barred successor liability claims for employment discrimination and rights under travel voucher

program); *In re NE Opco, Inc.*, 513 B.R. 871, 877 (Bankr. D. Del. 2014) (finding that a "free and

clear" finding under section 363(f) barred successor liability claims against the purchaser of the

debtors' assets).

45.    Such a "free and clear" finding allows the Debtors to maximize the value of the

Acquired Assets by ensuring that the Prevailing Purchaser is protected from any claims or

lawsuits premised on the theory that the Prevailing Purchaser is a successor in interest to one or

more of the Debtors.  *See In re NE Opco*, 513 B.R. at 876 (recognizing that a free and clear

finding "'maximizes the value of the assets that are sold'" (quoting Morgan *Olson, LLC v.*

*Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011))).

Moreover, to obtain the maximum price for the Acquired Assets, the Debtors agreed that the

Prevailing Purchaser would not be subject to any successor liability for any claims or causes of

action against the Debtor.  *See* Stalking Horse APA § 6.1(e); *see also Emoral, Inc. v. Diacetyl (In*

*re Emoral, Inc.*), 740 F.3d 875, 882 (finding that the successor liability claims were generalized claims belonging to the bankruptcy estate that could be released by the bankruptcy trustee).

46.     Accordingly, the Debtors respectfully request that the Acquired Assets be sold free and clear of any and all Liens (except for Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code.

     **C.**     **Consistent with Section 363(k) of the Bankruptcy Code, Credit Bidding by the Stalking Horse Bidder is Embodied in the Sales and Bidding Procedures.**

47.     The Stalking Horse Bidder is entitled to a credit bid up to the full value of its claims under section 363(k) of the Bankruptcy Code.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 459–60 (3d Cir. 2006) (providing that it is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k) of the Bankruptcy Code).

48.     Here, the Sales and Bidding Procedures recognize the rights of the Stalking Horse Bidder to credit bid up to the full amount of its total claims pursuant to section 363(k) of the Bankruptcy and provides that the Stalking Horse Bidder shall be deemed to be a Qualified Bidder under the Sales and Bidding Procedures.

**D.     Assumption and Assignment of the Assigned Contracts is Authorized by Section 365 of the Bankruptcy Code.**

49.     Sections 365 of the Bankruptcy Code authorizes a debtor in possession, subject to court approval, to assume executory contracts or unexpired leases of the debtor.   11 U.S.C. § 365(a).  The requirements for assuming an unexpired lease or executory contract are set forth in section 365(b)(1), which provides:

> If there has been a default in an executory contract or unexpired lease of the Debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default...;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

50.     The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp.* v. *Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

51.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  *See In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the

business judgment standard."); *Official Comm. for Unsecured Creditors* v. *Aust (In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule.").

52.     To determine if the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009).  "This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate." *Id.* (citations omitted).  Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *In re Network Access Solutions*, 330 B.R. 67, 75 (Bankr. D. Del. 2005).  Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion.  *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003).

53.     In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Prevailing Purchaser will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment is necessary for the Prevailing Purchaser to conduct business going forward, and since no purchaser would take the Acquired Assets without certain executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or otherwise best offer for the Acquired Assets.  Further, upon consummation of the Sale, the Debtors will no longer continue to operate their business and, therefore, will have no use for any of the Contracts and Leases.

54.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  *See* 11 U.S.C. § 365(f)(2).  Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc*., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance to be present where prospective assignee had financial resources and expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp.*  (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993).

55.     Pursuant to the Sales and Bidding Procedures, Qualified Bidders are required to provide the Debtors with such financial and other information providing adequate assurance of future performance under the Assigned Contracts, in a form requested by the Debtors to allow the Debtors to provide such information, subject to certain protections, to the applicable Contract Party that has requested it in writing.  Moreover, under the Assumption and Assignment Procedures, the Contract Parties will have the opportunity to object to adequate assurance of future performance by any Qualified Bidder (including the Stalking Horse Bidder).

56.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts as set forth herein should be approved pursuant to section 365 of the Bankruptcy Code.

57.     To assist in the assumption, assignment, and sale of the Assigned Contracts, the Debtors also request that the Sale Order provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

58.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

59.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp.* (*In re The Circle K Corp.*), 127 F.3d 904, 910–11 (9th Cir. 1997) ("[N]o principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."). Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73, 77–78 (Bankr. S.D.N.Y. 1996) (providing that section 365 of the Bankruptcy Code prohibits

enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor and subjecting all lease provisions, not merely those entitled anti-assignment clauses, to a court's scrutiny regarding anti- assignment effect).

60.     Courts in this and other districts also have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer, Inc.*, 77 B.R. 349 (Bankr. D.N.H. 1987), the court noted that:

> case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

*Id.* at 354.

61.     Accordingly, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and be deemed and found to be unenforceable, anti-assignment, provisions within the meaning of section 365(f) of the Bankruptcy Code.

## WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)

62.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of

the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." *Id.* at 6006(d). As described above and in the First Day Declaration, it is imperative that the Sale be timely consummated. Accordingly, to maximize the value of the Acquired Assets and minimize administrative expenses of the Debtors' estates, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

63.     The Debtors will provide notice of this Motion on the Motion Notice Parties. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such further relief as may be just and proper under the circumstances.

Dated:   July 22, 2015                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
         Wilmington, Delaware

                                          */s/ Jaime Luton Chapman*
                                          M. Blake Cleary (No. 3614)
                                          Jaime Luton Chapman (No. 4936)
                                          Travis G. Buchanan (No. 5595)
                                          Rodney Square
                                          1000 North King Street
                                          Wilmington, Delaware 19801
                                          Telephone: (302) 571-6600
                                          Facsimile: (302) 571-1253

                                          *Proposed Counsel to the Debtors and*
                                          *Debtors in Possession*