**<u>EXHIBIT B</u>**

**Stalking Horse APA**

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

by and between

Teachers' Retirement System of Alabama (or its designee) and

Employees' Retirement System of Alabama (or its designee)

as the Purchaser

and

Signal International, Inc., a Delaware Corporation,

Signal International, LLC, a Delaware Limited Liability Company,

Signal Ship Repair, LLC, a Delaware Limited Liability Company,

Signal International Texas GP, LLC, a Delaware Limited Liability Company, and

Signal International Texas, L.P., a Delaware Limited Partnership,

as the Seller

—————————

**July 13, 2015**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1** DEFINITIONS AND CONSTRUCTION .................................................................. 2
    Section 1.1    Definitions ....................................................................................... 2
    Section 1.2    Construction ................................................................................... 12

**ARTICLE 2** THE TRANSACTION ...................................................................................... 12
    Section 2.1    Sale and Purchase of Acquired Assets ......................................... 12
    Section 2.2    Excluded Assets ............................................................................ 14
    Section 2.3    Assumed Liabilities ...................................................................... 15
    Section 2.4    Excluded Liabilities ...................................................................... 16
    Section 2.5    Consideration ................................................................................ 17
    Section 2.6    Allocation of Purchase Price ........................................................ 17
    Section 2.7    Closing .......................................................................................... 18
    Section 2.8    Closing Deliveries ........................................................................ 18
    Section 2.9    Payment of Cure Amounts ........................................................... 19
    Section 2.10    Consents ........................................................................................ 19

**ARTICLE 3** REPRESENTATIONS AND WARRANTIES OF THE SELLER ........................ 20
    Section 3.1    Organization .................................................................................. 20
    Section 3.2    Authority and Enforceability. ....................................................... 20
    Section 3.3    No Conflict .................................................................................... 20
    Section 3.4    Title to Assets; Liens .................................................................... 21
    Section 3.5    Claims, Litigation and Disputes ................................................... 21
    Section 3.6    Compliance With Laws; Permits and Licenses ............................ 21
    Section 3.7    Employees and Related Matters .................................................... 21
    Section 3.8    Environmental Matters .................................................................. 22
    Section 3.9    Intellectual Property ..................................................................... 23
    Section 3.10    Taxes ............................................................................................. 23
    Section 3.11    Products Liability .......................................................................... 24
    Section 3.12    Insurance ....................................................................................... 24
    Section 3.13    Trade Accounts Payable. ............................................................... 24
    Section 3.14    Disclaimer of Other Representations and Warranties ................... 24

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............... 25
    Section 4.1    Organization and Good Standing .................................................. 25
    Section 4.2    Authority and Enforceability ........................................................ 25
    Section 4.3    No Conflict .................................................................................... 25
    Section 4.4    Legal Proceedings ........................................................................ 26
    Section 4.5    Financial Capacity ........................................................................ 26
    Section 4.6    No Knowledge of Breach or Inaccuracy ...................................... 26
    Section 4.7    Independent Investigation ............................................................. 26

**ARTICLE 5** COVENANTS ................................................................................................ 27
    Section 5.1    Access and Investigation ............................................................... 27

Section 5.2    Operation of the Business .......................................................... 27
Section 5.3    Consents and Filings; Commercially Reasonable Efforts. ........... 28
Section 5.4    Supplements to Disclosure Schedules ......................................... 28
Section 5.5    Confidentiality .......................................................................... 29
Section 5.6    Public Announcements ............................................................... 29
Section 5.7    Further Actions ......................................................................... 29
Section 5.8    Bulk Transfer Laws. .................................................................. 29
Section 5.9    Bankruptcy Court Filings ........................................................... 29
Section 5.10   Exclusivity; Solicitation............................................................. 30
Section 5.11   Purchaser Confidentiality........................................................... 31
Section 5.12   Assumption & Rejection of Executory Contracts......................... 31
Section 5.13   Purchaser as Back-Up Bidder. ................................................... 33

**ARTICLE 6** CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE........................... 33
Section 6.1    Conditions to the Obligation of the Purchaser ............................. 33
Section 6.2    Conditions to the Obligation of the Seller ................................... 34

**ARTICLE 7** TERMINATION........................................................................................ 35
Section 7.1    Termination Events .................................................................... 35
Section 7.2    Effect of Termination.................................................................. 36
Section 7.3    Termination Payment .................................................................. 36

**ARTICLE 8** NO SURVIVAL ....................................................................................... 36
Section 8.1    No Survival of Representations and Warranties and Certain Covenants ........ 36

**ARTICLE 9** TAX MATTERS ...................................................................................... 37
Section 9.1    Transfer Taxes ........................................................................... 37

**ARTICLE 10** EMPLOYEE MATTERS .......................................................................... 37
Section 10.1   Employees.................................................................................. 37
Section 10.2   Defined Contribution Plan. ......................................................... 38
Section 10.3   Welfare Arrangements ................................................................ 39
Section 10.4   WARN Act.................................................................................. 39

**ARTICLE 11** GENERAL PROVISIONS ........................................................................ 39
Section 11.1   Notices ...................................................................................... 39
Section 11.2   Amendment ................................................................................ 40
Section 11.3   Waiver and Remedies .................................................................. 41
Section 11.4   Entire Agreement ........................................................................ 41
Section 11.5   Assignment, Successors and No Third Party Rights ...................... 41
Section 11.6   Severability ................................................................................ 42
Section 11.7   Exhibits and Schedules ............................................................... 42
Section 11.8   Interpretation.............................................................................. 42
Section 11.9   Expenses .................................................................................... 42
Section 11.10  Governing Law ........................................................................... 42
SECTION 11.11 Limitation on Liability ................................................................ 42
Section 11.12  Specific Performance ................................................................... 42

Section 11.13    Jurisdiction and Service of Process.................................................... 43
Section 11.14    Waiver of Jury Trial........................................................................... 43
Section 11.15    No Joint Venture................................................................................ 43
Section 11.16    Counterparts....................................................................................... 44
Section 11.17    Preservation of Records; Post-Closing Access and Cooperation. ............... 44

## Exhibits

Exhibit A – Form of Bill of Sale

Exhibit B – Form of Vessel Bill of Sale

Exhibit C – Form of Assignment and Assumption Agreement

Exhibit D – Form of Bidding Procedures Order

## Schedules

Schedule 2.1(c)(i) – Owned Real Property

Schedule 2.1(c)(ii) – Leased Real Property

Schedule 2.1(d) – Vessels

Schedule 2.1(e) – Acquired Intellectual Property

Schedule 2.1(f) – Contracts

Schedule 2.1(l) – Notes and Receivables

Schedule 2.2(a) – Excluded Contracts and Leases

Schedule 2.2(i) – Specifically Excluded Assets

Schedule 2.3(d) – Cure Amounts

Schedule 2.3(k) – Other Assumed Liabilities

Schedule 2.3(m) – Trade Accounts Payable

Schedule 5.12(a) – Contract & Cure Schedule

Schedule 10.1 – List of Employees

**Seller Disclosure Schedules**

Schedule 3.5 – Claims Litigation and Disputes

Schedule 3.6– Compliance with Laws; Permits and Licenses

Schedule 3.7– Employees and Related Matters

Schedule 3.9(a) – Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements

Schedule 3.13 – Trade Accounts Payable

**Purchaser Disclosure Schedules**

None

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of July 13, 2015, by and between **Signal International, Inc.**, a Delaware corporation ("Signal"), **Signal International, LLC**, a Delaware limited liability company ("Int'l"), and **Signal Ship Repair, LLC**, a Delaware limited liability company ("SSR"), **Signal International Texas GP, LLC**, a Delaware limited liability company ("SGP"), and **Signal International Texas, L.P.**, a Delaware limited partnership ("SLP", collectively with Signal, Int'l, SSR, and SGP, the "Seller"), and **Teachers' Retirement System of Alabama**, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.*, of the Alabama Code (or its designee) ("TRS") and **Employees' Retirement System of Alabama**, a body corporate of the State of Alabama created under Section §§ under Section 36-27-1 *et seq.*, of the Alabama Code (or its designee) ("ERS" and collectively with TRS, the "Purchaser").

## RECITALS

WHEREAS, the Seller is engaged in the business of marine construction, including the upgrade, conversion, repair and new construction of mobile offshore drilling rigs and floating production platforms for the offshore energy industry (the "Business");

WHEREAS, the Seller will file, as a debtor in possession, a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, subject to and upon the terms and conditions herein, the Seller desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the Acquired Assets (as defined below);

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order (as defined below) approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order; and

WHEREAS, the Seller and the Purchaser have negotiated in good faith and at arm's length for the purchase and sale of the Acquired Assets, the assumption of certain liabilities associated therewith and for certain bid protections in connection therewith, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
### DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions.  For the purposes of this Agreement:

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Intellectual Property" has the meaning set forth in Section 2.1(e).

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person.  In addition to the foregoing, if the specified Person is an individual, the term "Affiliate" also includes (a) the individual's spouse, (b) the members of the immediate family (including parents, siblings and children) of the individual or of the individual's spouse and (c) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.    For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, under no circumstance will the Purchaser and the Seller be deemed Affiliates of one another notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Seller.

"Allocation" has the meaning set forth in Section 2.6(a).

"Allocation Statement" has the meaning set forth in Section 2.6(a).

"Alternative Transaction" means any transaction or series of related transactions (other than pursuant to this Agreement), whether proposed to be effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by Seller, pursuant to which the Seller (i) accepts a Qualified Bid, other than that of the Purchaser or its Affiliates, as the highest or best offer, or (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in the Seller or other interests in the Acquired Assets, including a stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than the Purchaser or its Affiliates.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(iv).

"Assumable Executory Contract" has the meaning set forth in Section 5.12(a).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Effective Date" has the meaning set forth in Section 5.12(b).

"Assumption Procedures" has the meaning set forth in Section 5.9(a).

"Auction" means the bankruptcy auction sale of the Seller's assets, conducted by the Seller pursuant to the Bidding Procedures Order.

"Back-Up Bidder" has the meaning set forth in Section 5.13.

"Back-Up Purchaser" has the meaning set forth in Section 5.13.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures" has the meaning set forth in Section 5.9(a).

"Bidding Procedures Order" has the meaning set forth in Section 5.9(a).

"Bill of Sale" has the meaning set forth in Section 2.8(i).

"Break-Up Event" has the meaning set forth in Section 7.3.

"Break-Up Fee" has the meaning set forth in Section 7.3.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in the State of Alabama are closed either under applicable Law or action of any Governmental Authority.

"Challenge" shall mean a complaint, motion, contest, challenge or other pleading filed in the Chapter 11 Case which contests (i) the existence, validity, enforceability or amount of any principal, interest, fees, charges, costs, expenses, reimbursements or other indebtedness owing under the Pre-Petition Loan Documents or the DIP Loan Documents, or (ii) the existence, validity, enforceability or priority of any Lien securing such indebtedness, or (iii) the Purchaser's right to tender the Credit Bid Amount as a component of the Purchase Price pursuant to Section 2.5.

"Chapter 11 Case" means the cases to be commenced by the Seller (sometimes referred to herein as the "Debtor"), under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

3

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the regulations promulgated thereunder.

"Company Owned Intellectual Property" means all Intellectual Property owned by Seller and used or held for use in connection with the Business.

"Company Used Intellectual Property" means all Intellectual Property owned or controlled by a Third Party and used in connection with the Business.

"Confidential Information" means any information that is not generally known to the public or in the maritime construction industry and that is or has been used, developed or obtained by the Seller and its Affiliates to the extent it relates to the Acquired Assets, including (i) products or services, (ii) fees, costs and pricing structures, (iii) designs and specifications, (iv) analyses, (v) drawings, photographs and reports, (vi) computer software, including electronic mail, operating systems, applications and program listings, (vii) flow charts, transaction summaries and models, manuals and documentation, (viii) databases, (ix) financial reports, investment summaries, and accounting and business methods, (x) ideas, formulas, compositions, inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice, (xi) customers and clients and customer, contact or client lists and other marketing data or plans, (xii) know-how, (xiii) manufacturing and production processes and techniques, (xiv) research and development information, (xv) files and records, and (xvi) all similar and related information in whatever form, except that Confidential Information will not include any information that has been published in a form generally available to the public, other than as a result of a disclosure by the parties hereto or their respective representatives.

"Confidentiality Agreement" has the meaning set forth in Section 5.11.

"Contract" means any contract, agreement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation that is legally binding.

"Contract & Cure Schedule" has the meaning set forth in Section 5.12(a).

"Copyrights" means all copyrights, including copyrights in Software and in the content contained on any Web site, and registrations and applications for any of the foregoing, and rights to sue for past Infringement thereof.

"Credit Bid" has the meaning set forth in Section 2.5.

"Credit Bid Amount" means the aggregate amount of all principal, interest, fees, reimbursable expenses and other agreed charges owing under (i) the DIP Loan Documents, and (ii) the Pre-Petition Loan Documents (unless subsumed by the DIP Loan Documents pursuant to a Final Order), as of the date of the Auction.

"Creditors' Committee" means an Official Committee of Unsecured Creditors, if any, appointed in the Chapter 11 Case.

"Cure Amount" means, for any Executory Contract, the amount required to be paid under Section 365 of the Bankruptcy Code or otherwise to effectuate the assumption and assignment of such Executory Contract by the Seller to the Purchaser.

"DIP Lender" means the Purchaser, or any Affiliate of the Purchaser, in its capacity as the holder of any Liens, Claims or indebtedness evidenced or secured by the DIP Loan Documents.

"DIP Loan Documents" means, collectively, that certain Debtor-In-Possession Loan and Security Agreement to be entered into by and between the DIP Lender and the Seller on or after the Petition Date (the "Debtor-in-Possession Loan and Security Agreement"), pursuant to which the DIP Lender will make available the "DIP Loan" therein described, together with all other agreements, instruments or documents evidencing or securing the DIP Loan.

"Employee" has the meaning set forth in Section 10.1(a).

"Environmental Law" means any Law concerning (a) the treatment, disposal, emission, discharge, Release or threatened Release of Hazardous Material or (b) the protection of the environment (including natural resources, air and surface or subsurface land or waters).

"Equipment" has the meaning set forth in Section 2.1(b).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Executory Contract" means a Contract that is an "executory contract" or "unexpired lease", as such terms are used in Section 365 of the Bankruptcy Code.

"Executory Contract Designation Deadline" has the meaning set forth in Section 5.12(a).

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings a fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any (a) nation, region, state, county, city, town, village, district or other jurisdiction, (b) federal, state, local, municipal, foreign or other government, (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal), (d) multinational organization exercising judicial, legislative or regulatory power or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

"Governmental Authorization" means any approval, consent, ratification, waiver, license, permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Included Contracts" has the meaning set forth in Section 2.1(f).

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (a) all patents and applications for patents and all related reissues, reexaminations, divisions, renewals, extensions, provisionals, continuations and continuations in part; (b) all copyrights, copyright registrations and copyright applications, copyrightable works and all other corresponding rights; (c) all mask works, mask work registrations and mask work applications and all other corresponding rights; (d) all trade dress and trade names, logos, Internet addresses and domain names, trademarks and service marks and related registrations and applications, including any intent to use applications, supplemental registrations and any renewals or extensions, all other indicia of commercial source or origin and all goodwill associated with any of the foregoing; (e) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (f) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (g) all databases and data collections; (h) all licenses and permits to the extent transferable; and (i) all other intellectual property rights.

"Interim DIP Order" means the Interim Order (as defined in the Debtor-in-Possession Loan and Security Agreement")

"Inventory" has the meaning set forth in Section 2.1(a).

"IP Agreements" means all agreements (including outstanding decrees, orders, judgments, settlement agreements, or stipulations) to which the Seller is a party which contain provisions (a) granting to any Person rights in Company Owned Intellectual Property or Company Used Intellectual Property; (b) granting to the Seller or any Subsidiary thereof any rights in Company Used Intellectual Property; (c) consenting to another Person's use of Company Owned Intellectual Property or Company Used Intellectual Property, or covenanting not to sue any Person for Infringement of any such Intellectual Property; or (d) restricting the Seller's or any of its Affiliates' use of Company Owned Intellectual Property or any Company Used Intellectual Property.

"IRS" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of Treasury.

"Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of the Seller" or "the Seller's Knowledge" means (i) the actual knowledge of Richard L. Marler, Chris S. Cunningham or Skip Victor after due inquiry into the facts or circumstances supporting any representation, warranty or statement qualified by such terms, and (ii) all such knowledge as would reasonably be obtained by any executive officer of the Seller in the discharge of such officer's duties.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Leased Real Property" has the meaning set forth in Section 2.1(c).

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any possessory or non-possessory lien, encumbrance or charge against or other interest in property, whether voluntary or involuntary and whether statutory or contractual, for the purpose of securing payment of a debt or performance of an obligation, including any mortgage, deed of trust, deed to secure debt, pledge, assignment, hypothecation, security interest, attachment, judgment, levy, conditional sale agreement, right of first refusal, right of first offer or other arrangement, and including any agreement to give any of the foregoing.

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has a material adverse effect on (a) the financial condition or results of operations of the Business, taken as a whole, or (b) the condition or value of any material portion of the Acquired Assets, or (c) the ability of the Seller to consummate timely the transactions contemplated by this Agreement; provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect: any event, change, circumstance, effect or other matter resulting from or related to (i) any outbreak or escalation of war or major hostilities or any act of terrorism, (ii) changes in Laws, GAAP or enforcement or interpretation thereof, (iii) changes that generally affect the industries and markets in which the Business operates, (iv) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs)

or political conditions, (v) any failure, in and of itself, of the Business to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics (it being understood that the facts and circumstances underlying any such failure described in the clause (v) that are not otherwise excluded from the definition of a "Material Adverse Effect" may be considered in determining whether there has been a Material Adverse Effect), (vi) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Purchaser, (vii) the filing of the Chapter 11 Case or any action approved by the Bankruptcy Court (or any other Governmental Authority in connection with any such Proceeding), or (viii) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing.

"Materials of Environmental Concern" means all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or defined as such by, or regulated as such under, any Environmental Law.

"Max Specialty Judgment" means the judgment against the Seller in Fireman's Fund Insurance Company et al v. Great American Insurance Company of New York et al, filed in U.S. District Court for the Southern District of New York (Case No. 10-cv-01653-JPO-JPL).

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Outside Back-Up Date" has the meaning set forth in Section 5.13.

"Owned Real Property" has the meaning set forth in Section 2.1(c).

"Patent" means all patents and industrial designs, including any continuations, divisionals, continuations-in-part, renewals, reissues and applications for any of the foregoing, and rights to sue for past Infringement thereof.

"Permit" means all permits, licenses, consents, approvals, and authorizations related to the operation of the Business.

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Petition" has the meaning set forth in the Recitals.

"Petition Date" means the actual date of filing of the Petition with the Bankruptcy Court.

"Plan" means the chapter 11 plan for the Seller, as amended, supplemented or otherwise modified from time to time subject to, and consistent in all material respects with, the terms of the Plan Support Agreement and the term sheet attached thereto, that is prepared and distributed

in accordance with, among other things, Sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Rule 3018 of Federal Rules of Bankruptcy Procedure and other applicable law.

"Plan Support Agreement" means the Plan Support Agreement dated as of July 12, 2015, by and among Int'l, on behalf of itself and its direct and indirect subsidiaries, the Purchaser, the Employees' Retirement System of Alabama and the Litigation Claimants (as defined therein) signatories thereto.

"Post-Closing Access and Cooperation Period" has the meaning set forth in Section 11.18(a).

"Pre-Petition Lender" means the Purchaser, or any Affiliate of the Purchaser, in its capacity as the holder of any Liens, Claims or indebtedness evidenced or secured by the Pre-Petition Loan Documents.

"Pre-Petition Loan Documents" means, collectively, that certain Credit Agreement dated as of January 31, 2014 (the "Pre-Petition Credit Agreement"), by and among Pre-Petition Lender and the Seller, pursuant to which Pre-Petition Lender has made the "Loan" therein described, together with all other agreements, instruments or documents evidencing or securing the Loan.

"Prevailing Bidder" has the meaning set forth in Section 5.13.

"Prevailing Purchaser" means the party that submits the Prevailing Bid (as such term is defined in the Bidding Procedures) pursuant to the Bidding Procedures.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Products Liability Claim" has the meaning set forth in Section 3.11.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchaser Disclosure Schedule" has the meaning set forth in Article 4.

"Qualified Bid" means competing bids pre-qualified for the Auction in accordance with the Bidding Procedures Order.

"Rejection Effective Date" has the meaning set forth in Section 5.12(c).

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Sale Hearing" means the hearing to be conducted by the Bankruptcy Court to approve this Agreement and seeking entry of the Sale Order.

"Sale and Procedures Motion" has the meaning set forth in Section 5.9(a).

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance reasonably acceptable to the Seller and the Purchaser, entered pursuant to the Sale and Procedures Motion (i) approving the sale of the Business and the Acquired Assets (and the assumption and assignment of the Included Contracts) to the Purchaser, or such other winning bidder chosen at the Auction pursuant to the asset purchase agreement submitted by such other winning bidder, free and clear of all Claims and Liens pursuant to Section 363(f) and/or Section 1123 of the Bankruptcy Code, on the terms and conditions set forth in this Agreement, (ii) approving the back-up bidder chosen at the Auction and the asset purchase agreement submitted by such back-up bidder, (iii) authorizing Purchaser to make the Credit Bid, (iv) authorizing consummation of the transactions contemplated hereby, and (v) containing a finding that the transactions contemplated by this Agreement are undertaken by the Seller and the Purchaser at arm's length, without collusion and in good faith by the Purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

"Savings Plan" has the meaning set forth in Section 10.2(a).

"Schedule" means the Seller Disclosure Schedule or the Purchaser Disclosure Schedule, as the context requires.

"Seller Disclosure Schedule" has the meaning set forth in Article 3.

"Seller Employee Benefit Plan" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other material plan, Contract or arrangement involving direct or indirect compensation, including insurance coverage, severance benefits, deferred compensation, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement compensation maintained or contributed to by the Seller for the benefit of any employee.

"Subsidiary" means, with respect to a specified Person, any corporation or other Person of which equity securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the specified Person or one or more of its Subsidiaries. When used in this Agreement without reference to a particular Person, "Subsidiary" means a Subsidiary of the Seller. Notwithstanding the foregoing, under no circumstance will the Seller be deemed a Subsidiary of the Purchaser notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Seller.

"Tax" means (a) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including taxes under Section

59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority, (b) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute and (c) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" means any Person and/or group of Persons other than the Seller, the Purchaser or any of their respective Affiliates.

"Trade Accounts Cut-Off Date" has the meaning set forth in Section 2.3(a).

"Trade Secrets" means all trade secrets (as defined under applicable law) including trade secrets of the following nature:  financing and marketing information, technology, know-how, inventions, proprietary processes, formulae, algorithms, models and methodologies, and rights to sue for past Infringement thereof.

"Trademarks" means trademarks, trade names, service marks, designs, logos, emblems, signs or insignia, slogans, other similar designations of source or origin and general intangibles of like nature, together with the registrations and applications for registrations pertaining to any of the foregoing, any derivations of any of the foregoing, all goodwill associated therewith, and rights to sue for past Infringement thereof.

"Transfer Taxes" has the meaning set forth in Section 9.1.

"Transferred Employees" has the meaning set forth in Section 10.1(a).

"Unsecured Creditors" means the general unsecured creditors of Seller that are not a party to or subject to the Plan Support Agreement or the settlement contemplated by the plan term sheet attached thereto as Exhibit A.

"Unsecured Creditor Claim Cash" means the sum of Four Hundred Thousand Dollars ($400,000.00) which sum shall be funded on the Closing Date by the Purchaser to the Debtor's bankruptcy estate to fund the payment of claims of the Unsecured Creditors under the Plan.

"Vessel" has the meaning set forth in Section 2.1(d).

"Vessel Bill of Sale" has the meaning set forth in Section 2.8(a)(iii).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, and any similar foreign, state or local Law.

"Welfare Plans" has the meaning set forth in Section 10.3.

Section 1.2    Construction.   Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise.  The table of contents and the headings of Articles and Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  All words used in this Agreement are to be construed to be of such gender or number as the circumstances require.  The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.  Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement.  Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time.  Any reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date.

## ARTICLE 2
### THE TRANSACTION

Section 2.1    Sale and Purchase of Acquired Assets.   In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at the Closing, the Seller will, to the extent transferable under applicable Law, sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to all of the properties and assets of the Seller, free and clear of all Liens and Claims (all of the assets to be sold, assigned, transferred and delivered to the Purchaser are referred to as the "Acquired Assets"):

(a)     Inventory.  All inventory owned by or owing to, consigned by or consigned to, leased from or leased to, the Seller as of the Closing Date, including all finished goods, work in process and raw materials, regardless of where located (the "Inventory");

(b)     Equipment.  All furniture, fixtures, equipment, machinery, rolling stock and other personal property owned by or owing to, consigned by or consigned to, leased from or leased to, the Seller including all trade fixtures, supplies, desks, chairs, tables, furniture, fixtures, machinery, tools, equipment, all computer equipment, applications, systems, motor vehicles, replacement parts, intangible assets, and other personal property, including any substitutions or replacements thereof, which may occur within the ordinary course of business, made between the Execution Date and the Closing Date, regardless of where located (the "Equipment");

(c)     Real Property.  (i) The real property set forth on Schedule 2.1(c)(i) (collectively, the "Owned Real Property") and (ii) all rights in respect of the real property set forth on Schedule 2.1(c)(ii) (collectively, the "Leased Real Property"), to the extent such rights may be transferred under applicable Law;

(d)     Vessels.  The whole of each of the vessels listed on Schedule 2.1(d) hereto, and each other tugboat, barge, pushboat, scow or other vessel or watercraft owned by the Seller and capable of being used to transport goods and/or passengers on water, whether or not such vessel or watercraft is documented with the NVDC and includes any share or interest therein, and their

engines, generators, machinery and equipment, masts, winches, anchors, chains, pumps and pumping equipment, pipe, cables, pipe and cable laying equipment, cranes, lifting equipment, boilers, capstans, outfit, furniture and fittings, boats, tackle, outfit, tools, spare parts, fuel, consumables or other stores, belongings and all other property and appurtenances whatsoever whether attached to a vessel, on board or ashore, and whether now owned or hereafter acquired, and all additions, improvements and replacements hereafter made in or to said vessels or any part thereof and all of their freight, hires, earnings, insurance proceeds, and all other proceeds of any of the above (collectively, the "Vessels");

(e)    Intellectual Property.    All Company Owned Intellectual Property and all Company Used Intellectual Property, including any patents, patent applications, copyrights, trademarks, service marks, trade names, domain names, websites, logos, or designs of the Seller, including the Intellectual Property set forth on Schedule 2.1(e) (collectively, the "Acquired Intellectual Property");

(f)    Contracts.    All of the rights of the Seller under all Contracts to which the Seller is a party, by which the Seller or any of the Acquired Assets is bound or affected or pursuant to which the Seller is a beneficiary, including any rights the Seller may have under nondisclosure, confidentiality, non-solicitation, non-competition and similar agreements, and those Contracts set forth in Schedule 2.1(f) to the extent such Contracts are assumed pursuant to Section 5.12 (collectively, the "Included Contracts"); provided, however, that if any Contract is recharacterized by a Final Order as a secured financing, then the real property or personal property that is subject to such Contract shall be an Acquired Asset;

(g)    Authorizations.    To the extent transferable under applicable Law, all Governmental Authorizations held by the Seller;

(h)    Books and Records.    To the extent transferable under applicable Law, all books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, vessel information and records, personnel and employment records, tax returns and tax records, all records and documents relating to the Seller Employee Benefit Plans, and financial and accounting records other than the corporate books and records of the Seller;

(i)    Benefit Plans.    All the assets of the Seller Employee Benefit Plans transferred pursuant to Article 10 of this Agreement;

(j)    Claims.    All of the Seller's claims, rights, credits, causes of action, defenses and rights of set-off against third parties relating to or arising from any of the Business, the Acquired Assets, or Assumed Liabilities, including any commercial tort claims and unliquidated rights under manufacturers' and vendors' warranties;

(k)    Accounts and Deposits.    (i) All cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items; and (ii) all deposits and pre-payments made by the Seller;

(l) <u>Notes and Receivables</u>. All notes, accounts receivable and other receivables, including those set forth on <u>Schedule 2.1(l)</u>, subject, however, to the extent applicable, to the participation rights set forth in the Plan Support Agreement and the term sheet attached thereto;

(m) <u>Insurance</u>. All insurance policies, binders and claims and rights thereunder and proceeds thereof;

(n) <u>Tax Refunds</u>. All rights to refunds, credits or similar benefits in respect of the Acquired Assets relating to Taxes and other governmental charges of whatever nature for any period, or portion of any period, ending on or prior to the Closing Date;

(o) <u>Business Plans</u>. All plans, specifications, engineering studies, marketing studies, surveys and similar items with respect to the Business;

(p) <u>Claims and Causes of Action</u>. To the extent not otherwise excluded pursuant to <u>Section 2.2(f)</u> below, any and all claims or causes of action, whether filed or not, (i) against the Purchaser or its Affiliates and against the Debtors' present and former directors, officers or employees, or any other Person, including any causes of action arising as a result of the Bankruptcy Code or otherwise, and including all proceeds therefrom, to the extent related to activities or time periods prior to the Closing Date, (ii) that are property of the Debtor or any of the Debtor's estates, and (iii) arising under any state or federal law, including Chapter 5 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the Purchaser agrees and covenants not to sue, prosecute, or otherwise assert, any such claims against a Released Party (as defined in the Plan Support Agreement), to the extent prohibited by the Plan Support Agreement or any plan confirmed in accordance with the Plan Support Agreement;

(q) <u>Good Will</u>. All good will associated with the Business and the ownership, use and operation of the Assets; and

(r) <u>Name</u>. The right to use the names "Signal", "International", "Ship" and "Repair" or any combination thereof in connection with the ownership, use and operation of the Acquired Assets subsequent to the Closing Date.

<u>Section 2.2</u>    <u>Excluded Assets</u>. Notwithstanding the terms of <u>Section 2.1</u>, the Seller will retain and will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the Acquired Assets do not include, any of the following assets described below (the "<u>Excluded Assets</u>"):

(a) <u>Contracts</u>. All rights under all Contracts set forth on <u>Schedule 2.2(a)</u>, including the leases described on <u>Schedule 2.2(a)</u> and the machinery, equipment, furniture and other items of tangible personal property located on the properties subject to such leases, and all rights under all Contracts that are not assumed pursuant to <u>Section 5.12</u>;

(b) <u>Books and Records</u>. All minute books, records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain; provided, however, that at the Closing, the Seller shall provide a copy to the Purchaser of any such materials it is required by Law to retain;

(c)     Benefit Plans.  All assets of the Seller Employee Benefit Plans which are not transferred pursuant to Article 10 of this Agreement;

(d)     D&O Insurance.  All of the Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon);

(e)     Claims Related to Excluded Assets.  All claims that the Seller may have against any Person solely with respect to any other Excluded Assets;

(f)     Claims and Causes of Action.  Any and all claims or causes of action, whether filed or not, that arise under Chapter 5 of the Bankruptcy Code arising from or relating to the Max Specialty Judgment that are property of the Debtor or the Debtor's estates;

(g)     DIP Fundings.  All amounts funded under the Debtor-in-Possession Loan and Security Agreement;

(h)     This Agreement.  All of the Seller's rights under this Agreement (including, without limitation, any payments comprising part of the Purchase Price); and

(i)     Specifically Excluded Assets.  All assets specifically listed as Excluded Assets on Schedule 2.2(i).

Section 2.3     Assumed Liabilities.  In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due the following Liabilities of the Seller, in each case other than the Excluded Liabilities (the "Assumed Liabilities"):

(a)     Administrative Expenses.  All allowed administrative expenses, other than professional fees and expenses, incurred in the ordinary course of business from the Petition Date through the Closing which remain unpaid as of the Closing, including Liabilities arising under Section 503(b)(9) of the Bankruptcy Code up to an amount not to exceed $500,000.00;

(b)     Transfer Taxes.  All Liabilities for Taxes imposed on the Purchaser pursuant to Section 9.1;

(c)     Contractual Liabilities.  All Liabilities of the Seller arising after the Closing under the Included Contracts and the Governmental Authorizations included in the Acquired Assets;

(d)     Cure Amounts.  To the extent set forth next to any Included Contract on Schedule 2.3(d), any Cure Amount with respect to such Included Contract;

(e)     Transferred Employees.  All Liabilities relating to the employment of Transferred Employees arising after the Closing;

(f)     Benefit Plans.  All Liabilities assumed by the Purchaser pursuant to Article 10 of this Agreement;

(g)     Real Property.  All Liabilities associated with the Owned Real Property and the Leased Real Property arising after the Closing;

(h)     Vessels.  All Liabilities associated with the Vessels arising after the Closing.

(i)     Environmental.  All Liabilities associated with the Acquired Assets relating to or arising out of environmental matters, including those arising under any Environmental Law, and arising after the Closing Date;

(j)     Other Assumed Liabilities.  All Liabilities specifically identified on Schedule 2.3(j);

(k)     Post-Closing Taxes.  Any and all Liabilities for Taxes related to the operation of the Business or the ownership of the Acquired Assets on or after the Closing Date; and

(l)     Post-Closing Liabilities.  All other Liabilities arising out of, relating to or incurred in connection with the Business or the Acquired Assets arising after the Closing including (i) the operation of the Business after the Closing, (ii) the use by the Purchaser or its permitted licensees of Acquired Intellectual Property and (iii) any other condition arising after the Closing with respect to the Acquired Assets; provided, that any Liability resulting from any action, activity or operation, whether or not in the ordinary course of the Business, that occurred prior to the Closing Date, shall be deemed an Excluded Liability.

(m)     Trade Accounts Payable.  Any trade accounts payable of the Seller to third parties, as listed an in such amounts as set forth on Schedule 2.3(m), which Schedule 2.3(m) shall be determined by the Purchaser in its sole discretion and delivered to the Seller not less than fifteen (15) days prior to date of the Auction (the "Trade Accounts Cut-Off Date"). For the avoidance of doubt, only the trade accounts payable set forth on Schedule 2.3(m) as of the Trade Accounts Cut-Off Date shall be included and assumed as an Assumed Liability under this Section 2.3(m).

Section 2.4     Excluded Liabilities.  Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming any other Liability of the Seller of whatever nature, whether presently in existence or arising hereafter (the "Excluded Liabilities"). Such Excluded Liabilities include, without limitation, the following:

(a)     Operating Liabilities.  All Liabilities with respect to claims arising in any way with respect to the operation of the Business prior to the Closing Date including, without limitation, as a result of the manufacture, design, use, operation, storage, acquisition, development or construction of an Acquired Asset during the period prior to and through the Closing Date;

(b)     Taxes.  Any Liability for Taxes of the Seller or attributable to the Business or the Acquired Assets for any period, or any portion of any period, ending on or prior to the Closing Date (other than Taxes imposed on the Purchaser pursuant to Section 9.1) except to the extent specifically identified on Schedule 2.3(k);

(c) <u>Employment Matters</u>. All Liabilities of the Seller or any Affiliate under all the Seller Employee Benefit Plans, except those Liabilities assumed by the Purchaser pursuant to <u>Article 10</u>;

(d) <u>Injury and Damage</u>. All Liabilities and obligations of the Seller for personal injury, property damage or legal, administrative or regulatory claims, fines or assessments that occur, have occurred, relate to an occurrence or which arose prior to the Closing Date;

(e) <u>Incidents and Events</u>. All Liabilities and obligations arising out of, relating to or in connection with incidents or events occurring prior to the Closing Date by any person employed by, or acting as an independent contractor on the property of or on behalf of, the Seller for payment, claims or benefits under workers' compensation laws or any other law;

(f) <u>Costs</u>. All Liabilities of the Seller for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby;

(g) <u>Litigation Claims</u>. Any litigation claims arising prior to the Closing Date, including, without limitation, any tort claims, breach of contract claims, employment claims, discrimination claims, environmental claims and assessments, whether currently pending, or brought in a subsequent action commenced on a date following the Closing Date;

(h) <u>Creditors' Committee Professionals</u>. Any Liability for amounts incurred by the Creditors' Committee's professionals (or members);

(i) <u>Debtor's Professionals</u>. Any Liability for amounts incurred by the Debtor's Professionals;

(j) <u>Trade Accounts Payable</u>. Any Liability for trade accounts payable not set forth and listed on <u>Schedule 2.3(m)</u> as of the Trade Accounts Cut-Off Date;

(k) <u>Environmental</u>. Any Liabilities arising prior to Closing under any Environmental Law;

(l) <u>Excluded Assets</u>. Any Liability arising out of or related to any Excluded Asset; and

(m) <u>Other</u>. Any Liabilities that are not Assumed Liabilities.

Section 2.5    Consideration. The consideration for the Acquired Assets (the "<u>Purchase Price</u>") consists of (a) cash in the amount of the Unsecured Creditor Claim Cash, (b) the assumption of the Assumed Liabilities, and (c) a credit bid against the indebtedness owing under the DIP Loan Documents and the Pre-Petition Loan Documents in an amount equal to the Credit Bid Amount (the "<u>Credit Bid</u>"). Not less than two (2) days prior to the date of the Auction, the Purchaser will confirm the Credit Bid Amount in writing.

Section 2.6    Allocation of Purchase Price.

(a)      Within sixty (60) days after the Closing Date, the Purchaser will deliver to the Seller an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities among the Acquired Assets, in accordance with Section 1060 of the Code and any comparable provisions of state or local law (the "Allocation"). The Seller will review the Allocation Statement and the Allocation, and, to the extent the Seller disagrees with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within thirty (30) days after receipt of the Allocation Statement. The Seller and the Purchaser will attempt in good faith to resolve any such disagreement. If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within ninety (90) days of the Closing Date, the Seller and the Purchaser will each use its own allocation statement.

(b)      If the Purchaser and the Seller agree on the Allocation Statement, the Purchaser and the Seller will report the Allocation of the Purchase Price in a manner consistent with the Allocation Statement and will act in accordance with the Allocation Statement in the preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

(c)      The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to the Allocation made pursuant to this Section 2.6 and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.7      Closing. The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, at 10:00 a.m., local time, as soon as practicable, but in no event later than twenty (20) days after entry of the Sale Order. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.8      Closing Deliveries.

(a)      At the Closing, the Seller will deliver or cause to be delivered to the Purchaser:

(i)      a bill of sale in the form of Exhibit A (the "Bill of Sale") executed by the Seller;

(ii)      for each parcel of Owned Real Property, a recordable quit claim deed or such other appropriate document or instrument of transfer in accordance with local custom, each in form and substance as reasonably satisfactory to the Purchaser and its counsel and executed by the Seller;

(iii)      for each Vessel, a recordable bill of sale or such other appropriate document or instrument of transfer in accordance with local custom, executed by the Seller, each in form and substance as set forth on Exhibit B (the "Vessel Bill of Sale");

(iv)      an assignment and assumption agreement in the form of Exhibit C (the "Assignment and Assumption Agreement") executed by the Seller;

(v)     a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b); and

(vi)     such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

(b)     At the Closing, the Purchaser will deliver or cause to be delivered to the Seller or for the Seller's benefit:

(i)     the Purchase Price by delivery of (a) cash to the Seller in an amount equal to the Unsecured Creditor Claim Cash; (b) an Assignment and Assumption Agreement executed by the Purchaser; and (c) the Credit Bid;

(ii)     the Bill of Sale executed by the Purchaser;

(iii)     a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b); and

(iv)     such other instruments of assumption as the Seller reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

Section 2.9     Payment of Cure Amounts.  The Purchaser will pay any and all Cure Amounts with respect to the Included Contracts, in cash on the Assumption Effective Date (as defined herein), or in such other manner as agreed by the Purchaser and the counterparty to such Included Contract.

Section 2.10     Consents.  Notwithstanding any other provision of this Agreement, this Agreement does not effect an assignment of any Included Contract to the extent that such Included Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable, as of the Closing.  As to any such Included Contract so designated in writing by the Purchaser, the Seller and the Purchaser will use commercially reasonable efforts to obtain as promptly as practicable after the Closing the consent of the other parties to such Included Contract or, if required, novation thereof to the Purchaser or, alternatively, written confirmation from such parties reasonably satisfactory to the Seller and the Purchaser that such consent is not required.  In no event, however, will the Seller be obligated to pay any money to any Person or to offer or grant financial or other accommodations to any Person in connection with obtaining any consent, waiver, confirmation, novation or approval with respect to any such Included Contract. If any consent, waiver, confirmation, novation or approval is not obtained with respect to any such Included Contract, then to the extent permitted by applicable Law, the Seller and the Purchaser will cooperate to establish an agency type or other similar arrangement reasonably satisfactory to the Seller and the Purchaser under which the Purchaser would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Liabilities thereunder or under which the Seller would enforce, for the benefit of the Purchaser, with the Purchaser assuming and agreeing to pay the Seller's Liabilities and expenses, any and all rights of the Seller against a third party to any such Included Contract.  In such event (i) the Seller will promptly pay to the Purchaser when received

all moneys relating to the period on or after the Closing Date received by it under any Included Contract not transferred pursuant to this Section 2.10 and (ii) the Purchaser will promptly pay, perform or discharge when due any Liabilities arising thereunder after the Closing Date but not transferred to the Purchaser pursuant to this Section 2.10. The failure by the Purchaser or the Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Included Contract will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement. The Purchaser acknowledges that no adjustment to the Purchase Price will be made for any such Included Contracts that are not assigned and that the Purchaser will have no claim against the Seller in respect of any such unassigned Contracts.

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as follows, except as set forth on the disclosure schedule delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

Section 3.1    Organization. Signal is a corporation, SLP is a limited partnership and Int'l and SGP are limited liability companies, each of which is duly organized and validly existing under the Laws of the State of Delaware. Except as a result of the filing of the Petition, the Seller has all requisite power and authority to conduct the Business as presently conducted.

Section 3.2    Authority and Enforceability.

(a)    Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, the Seller has all requisite corporate, partnership or company, as applicable, power, authority and capacity to execute and deliver this Agreement and to perform its obligations under this Agreement. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement by the Seller have been duly authorized by all necessary action on the part of the Seller. The Seller has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry and effectiveness of the Sale Order, this Agreement constitutes the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

(b)    Subject to the terms of this Agreement, and the obligation of the Seller to accept the highest and best offer for the Acquired Assets, the Board of Directors of the Seller has resolved to recommend that the Bankruptcy Court approve this Agreement, and the transactions contemplated hereby.

Section 3.3    No Conflict. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order and except in any case that would not have a Material Adverse Effect, neither the execution, delivery and performance of this Agreement by the Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement, will (a)

conflict with or violate the Seller's organizational documents, (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any material Contract, (c) violate any Law or Judgment applicable to the Seller, the Business or the Acquired Assets or (d) require the Seller to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 3.4    Title to Assets; Liens.  The Seller has exclusive possession or control of, and at the Closing will have good and marketable title to, or in the case of leaseholds, valid leasehold interests in, the Acquired Assets, and subject to the entry of the Sale Order, the Purchaser will be vested with good and marketable title to all of the Acquired Assets, free and clear of any Liens, encumbrances, restrictions, charges and equities whatsoever, to the fullest extents permissible under Section 363 of the Bankruptcy Code.

Section 3.5    Claims, Litigation and Disputes.  Except as set forth on Schedule 3.5, there are currently no pending or, to the Knowledge of the Seller, threatened in writing lawsuits, administrative or regulatory proceedings, actions, orders, or reviews, or formal or informal complaints or investigations or inquiries, including without limitation, grand jury subpoenas by any individual, corporation, partnership, Governmental Authority or other entity concerning or against the Seller or to which the Business or any of the Acquired Assets may be subject.

Section 3.6    Compliance With Laws; Permits and Licenses.  Except as disclosed on Schedule 3.6, the Seller is in compliance with all Laws, Orders, ordinances, decrees, rules or regulations of any Governmental Authority applicable to the Business, except where the failure to be in compliance would not have a Material Adverse Effect.  The Seller has not received any written notice of any proceeding, inquiry, investigation, violation or alleged violation or defaults of any Laws or Orders that would affect the Acquired Assets.  The Seller has in effect all Permits necessary to conduct the Business as it is currently being conducted in accordance with the Laws of any Governmental Authority having jurisdiction over its properties or activities except for such Permits, the failure of which to obtain, individually or in the aggregate, would not reasonably be expected to have, a Material Adverse Effect.

Section 3.7    Employees and Related Matters.

(a)    To the Seller's Knowledge, that it is in compliance, in all material respects, with all applicable Laws, statutes, ordinances, regulations, orders or rules of any applicable Governmental Authority, relating to labor, employment, employment practices, terms and conditions of employment, wages, hours of work, employee benefits, immigration, non-discrimination, collective bargaining, plant closings, layoffs, terminations, and occupational safety and health, and the Seller is not engaged in any unfair labor practice or unlawful employment practice in any applicable jurisdiction.  All Employees of the Seller have been properly compensated and properly classified as exempt or non-exempt, and all individuals who are classified as "consultants" or "independent contractors" are properly classified and properly excluded from eligibility for benefits under any Seller Employee Benefit Plan.

(b)    Except as set forth on Schedule 3.7, (i) none of the Employees are represented by a labor union or labor organization; (ii) the Seller is not subject and is not a party to any collective bargaining agreement or other agreement with a labor union or labor organization

covering any Employee or the Business; (iii) within the past five (5) years, there have been no union organizing campaigns, labor strikes, slowdowns, work stoppages or lockouts currently affecting or, to the Seller's Knowledge, threatened in writing against the Seller with respect to any Employees or the Business; (iv) there are no pending or unremedied labor or employment charges, complaints, or lawsuits (including without limitation, claims or charges relating to labor, employment, employment practices, wages, hours, terms and conditions of employment, employee benefits, immigration, non-discrimination, collective bargaining, plant closings, lay-offs, terminations, and occupational safety and health), unfair labor practices, arbitrations or grievances pending against the Seller with respect to any Employees or the Business or, to the Seller's Knowledge, threatened in writing before the National Labor Relations Board, any other federal, state, or local Governmental Authority, or any other tribunal; and (v) there is no pending or, to the Knowledge of the Seller, threatened in writing, governmental investigation, proceeding, complaint, charge, claim, suit, audit, notice of noncompliance, or any other legal action by any Governmental Authority against or concerning the Seller or the Business, or which could impose liability or obligations on the Seller or the Business, relating to labor, employment, employment practices, wages, hours, terms and conditions or employment, employee benefits, immigration, non-discrimination, collective bargaining, plant closings, layoffs, terminations, and occupational safety and health.

(c)    Except as set forth on <u>Schedule 3.7</u>, the consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event: (i) entitle any Employee to severance pay, unemployment compensation or any other payment for which the Purchaser will be liable or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Employee for which in each case the Purchaser will be liable.

<u>Section 3.8</u>    <u>Environmental Matters</u>.    The operations conducted by the Seller are currently being conducted under all environmental, health and safety Permits and other authorizations required under all applicable Environmental Laws to operate the Business as it is being operated, except for such Permits and other authorizations, the failure of which to obtain, individually or in the aggregate, has not had and would not reasonably be expected to have, a Material Adverse Effect. All such Permits and authorizations are in full force and effect. No written notice, notification, demand, request for information, citation, summons or order has been issued to the Seller or any Affiliates thereof with respect to any such properties. No written complaint has been filed against the Seller or any Affiliates thereof. No material penalty has been assessed and no investigation or review is pending or threatened in writing by any Governmental Authority with respect to any alleged failure by the Seller to comply with any Environmental Law or to have any material environmental, health or safety permit, license or other authorization required under any applicable Environmental Law in connection with the operation of the Business. To the Seller's Knowledge, there are no past or present facts, circumstances or conditions, including the Release of any Materials of Environmental Concern that could reasonably be expected to result in a material claim under the Environmental Laws against the Seller or Affiliate of the Seller. The Seller has made available to the Purchaser prior to the execution of this Agreement all environmental audits, assessments and documentation regarding environmental matters pertaining to, or the environmental condition of, the Acquired Assets or the compliance (or non-compliance) by the Seller or any of their Affiliates, with any

Environmental Laws with respect to the Business or the Acquired Assets, to the extent such audits, assessments and documentation are in the Seller's possession.

Section 3.9    Intellectual Property.

(a)    Schedule 3.9(a) sets forth all of the Company Owned Intellectual Property, Company Used Intellectual Property, and IP Agreements including a complete list of all United States, foreign, international and state: (i) Patents and Patent applications including serial numbers for each filed application; (ii) Trademark registrations, applications and material unregistered Trademarks; (iii) Domain Names; and (iv) Copyright registrations, applications and material unregistered Copyrights. The Seller has provided to the Purchaser copies of all IP Agreements together with all written notices and amendments relating thereto. The listing of IP Agreements set forth on Schedule 3.9(a) will include for each agreement the title, the parties and the date executed.

(b)    Each of the filed Patent applications correctly and completely lists all persons who the Seller in good faith believes contributed significantly enough to the inventions therein described to be considered an inventor or co-inventor of the Patents.

(c)    The Seller owns all Company Owned Intellectual Property and is properly licensed under or has the valid and enforceable right to use all Company Used Intellectual Property, free and clear of all Liens and none of such rights will be materially adversely affected by the consummation of the transactions contemplated by this Agreement. There are no inquiries, investigations or Claims, and the Seller has not received written notice from any third party: (i) alleging Infringement by the Seller of Intellectual Property rights of any Person; or (ii) challenging or threatening to challenge the Seller's right, title, or interest with respect to its ownership, use of, or continued use or right to preclude others from using any Company Owned Intellectual Property or Company Used Intellectual Property as currently used, or the validity, enforceability or registrability of any such Intellectual Property.

(d)    The Seller has not brought or threatened in writing a Claim against any Person: (i) alleging Infringement of Company Owned Intellectual Property or Company Used Intellectual Property; or (ii) challenging any Person's ownership or use of, or the validity, enforceability or registrability of any Company Owned Intellectual Property or Company Used Intellectual Property.

(e)    The Company Owned Intellectual Property and the Company Used Intellectual Property is the only Intellectual Property used in the operation of Business by the Seller. Except as would not have, individually or in the aggregate, a Material Adverse Effect, the Company Owned Intellectual Property: (i) has been duly maintained; (ii) is subsisting, in full force and effect; (iii) has not been cancelled, expired or abandoned; and (iv) is valid and enforceable.

Section 3.10    Taxes. (i) The Seller has filed or has caused to be filed on a timely basis all Tax Returns that are or were required to be filed with respect to the Acquired Assets; (ii) all such Tax Returns accurately reflect all Liabilities required to be reflected thereon; (iii) all Taxes due and payable by the Seller with respect to the Acquired Assets shown in such Tax Returns have been paid, other than those Taxes which have been stayed by the filing of the Petition; (iv)

the Seller has not requested or consented to extend to a date later than the Closing Date the time in which any Tax may be assessed or collected by any Governmental Authority with respect to the Acquired Assets; (v) no deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Tax has been proposed, asserted or assessed by any Governmental Authority against the Seller with respect to the Acquired Assets and there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to the Knowledge of the Seller, threatened in writing against or with respect to the Seller with respect thereto; and (vi) there are no Liens for Taxes (other than for current Taxes not yet due and payable or Liens for Taxes filed as a result of the Chapter 11 Case) upon the Acquired Assets.

Section 3.11    Products Liability.  The Seller is not subject to or a part of any present material Product Liability Claim (as defined below) by a Third Party as a result of the development, manufacturing, processing, marketing, advertising, distribution or sale of any product on or before the Closing Date and no reasonable basis for such claim exists.  For the purposes of this Agreement, "Products Liability Claim" means any claim, suit, action, or proceeding by a Third Party claiming liability on behalf of the Seller to which the Seller is subject insofar as such liability is based upon, arises out of or is otherwise in respect of any express or implied representation, warranty, agreement or guaranty to a customer, user or purchaser made or claimed to have been made by the Seller or arising out of or due to, or asserted to be arising out of or due to, the development, manufacturing, processing, marketing, advertising, distribution or sale of any product, vessel or maritime equipment by the Seller on or before the Closing Date.

Section 3.12    Insurance.  The Seller maintains the insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect and will continue in full force and effect immediately following the Closing Date. The Seller has paid all premiums on such policies due and payable prior to the Closing Date.  To the Knowledge of the Seller, the Seller has not done anything by way of action or inaction that invalidates any coverage under any such policies in whole or in part.

Section 3.13    Trade Accounts Payable.  Schedule 3.13 attached hereto sets forth and constitutes a full and complete list of trade accounts payable of the Seller owed to third parties, incurred by the Seller in the ordinary course of business and entered in the Seller's accounts payable system on or prior to June 30, 2015 and which remain unpaid as of the date of this Agreement.

Section 3.14    Disclaimer of Other Representations and Warranties.  The representations and warranties set forth in this Article 3 are the only representations and warranties made by the Seller with respect to the Business, the Acquired Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement.  Except as specifically set forth in this Article 3, (a) the Seller is selling the Acquired Assets to the Purchaser "as is" and "where is" and with all faults, and makes no warranty, express or implied, as to any matter whatsoever relating to the Business, the Acquired Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by the Purchaser after the Closing in any manner or (iii) the probable success or profitability of the

Business after the Closing, and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have, or will be subject to, any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as follows, except as set forth on the disclosure schedule delivered by the Purchaser to the Seller concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Purchaser Disclosure Schedule"):

Section 4.1    Organization and Good Standing. TRS is a body corporate of the State of Alabama created pursuant to §§ 16-25-1 *et seq.*, of the Alabama Code, duly organized, validly existing and in good standing under the Laws of the State of Alabama and has all requisite company power and authority to conduct its business as it is presently conducted.  ERS is a body corporate of the State of Alabama created pursuant to §§ Section 36-27-1 *et seq.*, of the Alabama Code, duly organized, validly existing and in good standing under the Laws of the State of Alabama and has all requisite company power and authority to conduct its business as it is presently conducted

Section 4.2    Authority and Enforceability. The Purchaser has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser. The Purchaser has duly and validly executed and delivered this Agreement.  Assuming the due authorization, execution and delivery of this Agreement by the Seller, this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

Section 4.3    No Conflict. Except in any case that would not have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement or on the ability of the Purchaser to consummate the transactions contemplated by this Agreement, neither the Purchaser's execution, delivery and performance of this Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement, will (a) conflict with or violate the Purchaser's organizational documents, (b) result in a breach or default under or create in any Person the right terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Contract to which the Purchaser is a party or by which the Purchaser is bound,

in any case with or without due notice or lapse of time or both, (c) result in the imposition of any lien or other encumbrance on any of the assets of the Purchaser, (d) violate any Law or Judgment applicable to the Purchaser or (e) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 4.4    Legal Proceedings.    There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement.

Section 4.5    Financial Capacity.    The Purchaser (i) has immediately available cash in an amount sufficient to allow the Purchaser to perform all of its obligations under this Agreement and (ii) immediately prior to Closing will own the indebtedness included in the Credit Bid Amount and be entitled to exercise the Credit Bid.

Section 4.6    No Knowledge of Breach or Inaccuracy.    The Purchaser has no knowledge of any breach of, or inaccuracy in, or any fact, event, breach, condition or occurrence that may constitute a breach of, or inaccuracy in, any representation or warranty made by the Seller in this Agreement.

Section 4.7    Independent Investigation.    The Purchaser has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Business as it has deemed appropriate, which investigation, review and analysis was done by the Purchaser and its representatives. The Purchaser acknowledges that it and its representatives have been provided adequate access to the personnel, properties, premises and records of the Business for such purpose. In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Seller or its representatives (except the representations and warranties set forth in Article 3). The Purchaser hereby acknowledges and agrees that (a) other than the representations and warranties set forth in Article 3, none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the Acquired Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by the Purchaser after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have or will be subject to any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions

submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5
COVENANTS

Section 5.1    Access and Investigation.    Until the Closing and upon reasonable advance notice from the Purchaser, the Seller will allow the Purchaser and its representatives reasonable access during normal business hours and without unreasonable interference with the operation of the Business to (a) such materials and information about the Business as the Purchaser may reasonably request and (b) specified members of management of the Business as the parties may reasonably agree.

Section 5.2    Operation of the Business.

(a)    Until the Closing, except (i) as required by Law or as a result of the Chapter 11 Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (ii) as otherwise set forth in this Agreement or the Seller Disclosure Schedule or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will operate, and will conduct the Business in the ordinary course of the Business in all material respects and use its commercially reasonable efforts to keep available the services of the Employees and to preserve the Business' relationships with its customers and others doing business with it.

(b)    Until the Closing, except (i) as required by Law or as a result of the Chapter 11 Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (ii) as otherwise set forth in this Agreement or the Seller Disclosure Schedule, (iii) as a result of the terms of any DIP Loan Document provided to the Seller by the Purchaser or any of its Affiliates, or (iv) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will not:

(i)    incur any indebtedness for borrowed money that constitutes an Assumed Liability other than in the ordinary course of the Business;

(ii)    materially and adversely amend any material Contract;

(iii)    waive or release any right or claim of a material value to the Business other than in the ordinary course of the Business;

(iv)    sell, lease or license, or permit any Lien on, any material portion of the Acquired Assets other than in the ordinary course of the Business;

(v)    acquire, by merger or consolidation with, or by purchase of all or a substantial portion of the assets or stock of, or by any other manner, any business or

entity, or enter into any joint venture, partnership or other similar arrangement for the conduct of the Business;

(vi)    materially change the remuneration or terms of employment of any Employee other than (A) in the ordinary course of the Business, (B) as required by Law or as a result of the Chapter 11 Case or (C) for retention, incentive and similar payments relating to the consummation of the transactions contemplated by this Agreement; or

(vii)    agree in writing to take any of the foregoing actions.

Section 5.3    Consents and Filings; Commercially Reasonable Efforts.

(a)    Subject to the terms and conditions of this Agreement, each of the parties will use their respective commercially reasonable efforts (i) to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and (ii) as promptly as practicable after the date of this Agreement, to obtain all Governmental Authorizations from, and make all filings with, all Governmental Authorities, and to obtain all other consents, waivers, approvals and other authorizations from, all other third parties, that are necessary or advisable in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

(b)    The Seller and the Purchaser will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority. Neither party will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such meeting. The Seller and the Purchaser will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing. The Seller and the Purchaser will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

Section 5.4    Supplements to Disclosure Schedules. The Seller may, from time to time prior to the Closing by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement. Subject to this Section 5.4, none of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to satisfaction of the conditions set forth in Section 6.1(a) or otherwise affect any other term or condition contained in this Agreement; provided, however, that unless

the Purchaser will have delivered a notice of termination with respect to such matter as contemplated by Section 7.1(b) (to the extent the Purchaser is entitled to deliver such notice pursuant to Section 7.1(b)) within ten (10) Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedule pursuant to this Section 5.4, then the Purchaser will have waived any and all rights to terminate this Agreement pursuant to Section 7.1(b) or otherwise arising out of or relating to the contents of such supplement and the resulting breach or breaches of the representations and warranties and the Purchaser will be deemed to have accepted the contents of such supplement for all purposes of this Agreement; and provided, further, that from and after the Closing, the Seller will have no Liability pursuant to this Agreement for any matters arising out of or relating to any of the matters disclosed on the Seller Disclosure Schedule, as supplemented or amended by the Seller prior to the Closing.

Section 5.5    Confidentiality. Following the Closing, the Seller will, and will instruct its directors, officers, employees and advisors to, hold in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all Confidential Information relating to the Business, except to the extent that such Confidential Information (i) must be disclosed in connection with the obligations of the Seller pursuant to this Agreement, (ii) can be shown to have been in the public domain through no fault of the Seller, (iii) becomes a matter of public record as a result of the Chapter 11 Case and filings made with the Bankruptcy Court with respect thereto or (iv) was later lawfully acquired by the Seller from sources other than those related to its prior ownership of the Business. Notwithstanding the foregoing, in no event will this Section 5.5 limit or otherwise restrict the right of the Seller to disclose such Confidential Information (w) to its and its Affiliates' respective directors, officers, employees, agents and advisors to the extent reasonably required to facilitate any delivery or performance of this Agreement, and (x) to any Governmental Authority or arbitrator to the extent reasonably required in connection with any Proceeding relating to the enforcement of this Agreement.

Section 5.6    Public Announcements. Prior to the Closing, neither the Purchaser nor the Seller will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by applicable Law. Prior to issuing any such press release or making any such other public announcement as required by applicable Law, the disclosing party will give the other party a copy of the proposed press release or other announcement and reasonable opportunity to comment on the same.

Section 5.7    Further Actions.    Subject to the other express provisions of this Agreement, upon the request of either party to this Agreement, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

Section 5.8    Bulk Transfer Laws. The Purchaser hereby waives compliance by the Seller with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

Section 5.9    Bankruptcy Court Filings.

(a)    The Seller will file with the Bankruptcy Court on the Petition Date a motion in form and content acceptable to the Purchaser (the "Sale and Procedures Motion"), seeking entry of an order substantially in the form attached hereto as Exhibit D and otherwise acceptable in form and content to the Purchaser (the "Bidding Procedures Order") approving, among other things, (i) bidding procedures to govern the solicitation of bids and the conduct of an auction for the Acquired Assets under the supervision of the Bankruptcy Court (the "Bidding Procedures"); and (ii) procedures for the assumption and assignment of Executory Contracts as contemplated in this Agreement (the "Assumption Procedures").

(b)    The Seller will use its good faith and commercially reasonable efforts to have the Bankruptcy Court (i) file the Sale and Procedures Motion as promptly as practicable following the date of this Agreement but in no event later than July 15, 2015, (ii) enter the Bidding Procedures Order as promptly as practicable following the date of this Agreement but in no event later than August 19, 2015, (iii) cause the Bidding Procedures Order to provide that the Auction will be held no later than October 3, 2015, and the Seller will use its good faith and commercially reasonable efforts to (x) obtain entry of the Sale Order as promptly as practicable following the date on which the Auction is closed, but in no event later than November 24, 2015, and (y) consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event less than twenty (20) days thereafter.  The Purchaser and the Seller will use their respective good faith and commercially reasonable efforts to cause the Bidding Procedures Order and the Sale Order to become Final Orders as soon as practicable after their entry.

(c)    The Purchaser will cooperate with and promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement, adequate assurance of performance by the Purchaser from and after the Closing under the Included Contracts, and the Purchaser shall have the burden of demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Except as required by Section 5.9(a), the Seller will not, without the prior written consent of the Purchaser, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder.

(d)    If an appeal is taken, or a stay pending appeal is requested from either the Bidding Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal or stay request and the Purchaser and the Seller will take all steps as may be reasonable or appropriate to defend against such appeal or stay request.  Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Purchaser, in its sole discretion, waives in writing the condition set forth in Section 6.1(e) that the Sale Order be a Final Order.

Section 5.10    Exclusivity; Solicitation.

(a)    The Purchaser and the Seller acknowledge that under the Bankruptcy Code the sale of Acquired Assets is subject to approval of the Bankruptcy Court. The Purchaser and the Seller acknowledge that to obtain such approval the Seller must demonstrate that it has taken

reasonable steps to obtain the highest or best value possible for the Acquired Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Acquired Assets to prospective bidders, entertaining higher or better offers from prospective bidders and, if necessary, conducting an Auction.

(b)    As consideration for substantial expenditures of time, effort and expense undertaken and continuing by the Purchaser in connection with the completion of its due diligence review of the Business and the preparation, negotiation, and execution of this Agreement, the Seller acknowledges and agrees that (i) subject to the entry of the Bidding Procedures Order, the Purchaser will be the stalking horse bidder at the Auction, (ii) the Seller will not participate in any negotiations for the purpose of naming any Person other than the Purchaser as the stalking horse bidder in the Auction, and subject to the entry of the Bidding Procedures Order, no Person other than the Purchaser will be the stalking horse bidder at the Auction and (iii) the Seller will actively oppose any effort by any other Person to be the stalking horse bidder; provided, however, that consistent with its fiduciary duties to elicit the highest and best offer for the Acquired Assets and to conduct the Auction, notwithstanding any provision in this Agreement to the contrary, the Seller and its representatives and Affiliates may (x) following the entry of the Bidding Procedures Order, solicit, encourage and negotiate higher or better offers for the Acquired Assets under the terms of the Bidding Procedures Order, (y) prior to the entry of the Bidding Procedures Order, in response to an Alternative Transaction for some or all of the Acquired Assets that was not solicited after the date hereof, continue to participate in negotiations or discussions with, request clarifications from, or furnish information to, any Person which made such Alternative Transaction, and (z) solicit bids from other prospective purchasers for the sale of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement (or improved terms).

Section 5.11    Purchaser Confidentiality.    The Purchaser acknowledges that the information provided to it in connection with this Agreement and the transactions contemplated hereby is subject to the terms of Section 10.17 of the Pre-Petition Credit Agreement (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Acquired Assets; provided, however, that the Purchaser acknowledges that any and all other Confidential Information provided to it by the Seller or its representatives concerning the Seller shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

Section 5.12    Assumption & Rejection of Executory Contracts.

(a)    Schedule 5.12 (the "Contract & Cure Schedule") sets forth a list of Executory Contracts that the Seller may assume and assign to the Purchaser in accordance with Section 5.12(b) below (each, an "Assumable Executory Contract") or reject under Section 365 of the Bankruptcy Code. The cure amounts in respect of each Assumable Executory Contract shall be determined by the Seller and the Purchaser prior to the filing of the Sale and Procedures Motion, and shall be as set forth as Exhibit I to the Notice of Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases (the form of which is attached to the Sale and

Procedures Motion). From the date of this Agreement until the Executory Contract Designation Deadline, the Purchaser in its sole and absolute discretion may amend the Contract & Cure Schedule to (i) add or remove any Executory Contract or (ii) modify the treatment of any Executory Contract. The term "Executory Contract Designation Deadline" means the later of (x) the Closing Date or (y) the third Business Day following the date upon which any objection to assumption and assignment of the Executory Contract or the proposed cure amount is resolved pursuant to the Final Order.

(b)     All Executory Contracts that are assumed will be deemed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Closing Date or (ii) (A) the date following expiration of the deadline for objecting to assumption and assignment of the Executory Contract or to a proposed cure amount, if no such objection is submitted or (B) the third Business Day following the date of resolution of any such objection. On the Assumption Effective Date, such Executory Contract will be deemed to be an Included Contract under this Agreement. If it is determined that the Seller may not assume and assign to the Purchaser any Executory Contract under the Assumption Procedures or the Sale Order, then such Executory Contract will be deemed to be an Excluded Contract under this Agreement. From the date of this Agreement until the Executory Contract Designation Deadline, the Purchaser in its sole and absolute discretion may amend Schedule 2.1(f) or Schedule 2.3(d) to add or remove any Executory Contract or modify the Assumption Effective Date for any Executory Contract listed therein, if such date has not passed.

(c)     All Executory Contracts that are listed on the Contract & Cure Schedule, but are not assumed under Section 5.12(b) (unless the Seller elects by written notice to the Purchaser to retain the right to assume any such Executory Contract and treat it as an Excluded Contract), will be rejected on the date (the "Rejection Effective Date") that is the later of (i) the Closing Date or (ii) (A) the date following expiration of the deadline for objecting to assumption and assignment of the Executory Contract, if no such objection is submitted or (B) the date of resolution of any such objection provided the contract is not assumed. On the Rejection Effective Date, such Executory Contract will be deemed to be an Excluded Contract under this Agreement.

(d)     At and after Closing and until the Executory Contract Designation Deadline, the Purchaser will be obligated to pay or cause to be paid all amounts due in respect of the Seller's performance under each Executory Contract listed on the Contract & Cure Schedule until the Rejection Effective Date or the removal of such Executory Contract from the Contract & Cure Schedule.

(e)     The Seller and the Purchaser will comply with the procedures set forth in the Assumption Procedures and the Bidding Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this Section 5.12.

(f)     No designation of any Executory Contract for assumption and assignment or rejection in accordance with this Section 5.12 will give rise to any right to any adjustment to the Purchase Price.

Section 5.13    Purchaser as Back-Up Bidder. If an Auction is conducted, and the Seller does not choose the Purchaser as the bidder as having submitted the highest or otherwise best bid at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder"), but instead chooses the Purchaser (based on the terms and conditions set forth in this Agreement) as the bidder as having submitted the next highest or otherwise best bid at the conclusion of such Auction, the Purchaser shall be required to serve as the back-up bidder (the "Back-Up Bidder") and the Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement shall remain open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is the sixtieth (60th) day after the hearing conducted by the Bankruptcy Court approving such Alternative Transaction (the "Outside Back-Up Date") and (ii) the date of closing of such Alternative Transaction with the Prevailing Bidder.  Following the Auction and prior to the Outside Back-Up Date, if the Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-Up Bidder will be deemed to have the new prevailing bid and be the Prevailing Purchaser (the "Back-Up Purchaser"), and the Seller will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement with the Back-Up Bidder.  For the avoidance of doubt, in the event the Purchaser consummates the transaction contemplated by this Agreement as the Back-Up Purchaser pursuant to this Section 5.13, the Purchaser (x) shall be entitled to the Break-Up Fee to the extent set forth in Section 7.3 of this Agreement and (y) shall be required to purchase the Acquired Assets or consummate the transaction contemplated by this Agreement at a purchase price no greater than the Purchase Price.

**ARTICLE 6**
CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

Section 6.1    Conditions to the Obligation of the Purchaser.  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion):

(a)    Accuracy of Representations and Warranties.  The representations and warranties of the Seller in Article 3 must be true and correct in all respects as of the Closing (except to the extent any such representation or warranty speaks as of the date of this Agreement or any other specific date, in which case such representation or warranty must have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (without regard for any "material," "Material Adverse Effect" or similar qualification) would not, individually or in the aggregate, constitute a Material Adverse Effect;

(b)    Performance of Covenants.  All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)    No Action.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)    <u>Bidding Procedures Order</u>.  The Bidding Procedures Order must not be stayed, vacated, modified, or subject to a request for such relief and shall be in form and content reasonably satisfactory to the Purchaser;

(e)    <u>Sale Order</u>.  The Sale Order (i) must be a Final Order, (ii) must include language satisfactory to the Purchaser, in its reasonable discretion, assuring that the Purchaser will not be subject to successor liability for any claims or causes of action of any kind or character against the Seller, whether known or unknown, unless expressly assumed pursuant to this Agreement, and (iii) must otherwise be reasonably satisfactory to the Purchaser in form and content;

(f)    <u>No Material Adverse Effect</u>.  There shall not have occurred any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty, or covenant of the Seller under this Agreement) after the date of this Agreement which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(g)    <u>Transaction Documents</u>.  The Seller must have delivered or caused to be delivered each document that <u>Section 2.8(a)</u> requires it to deliver;

(h)    <u>Credit Bid</u>.  No Challenge shall then be pending, and no Challenge shall have been resolved by Final Order in a manner which would limit, curtail, reduce, suspend, stay or enjoin the right of the Purchaser to tender the Credit Bid in the full Credit Bid Amount; and

(i)    <u>Plan Support Agreement</u>.  The Plan Support Agreement has not been terminated, and the Bankruptcy Court has entered a Final Order approving the Plan.

<u>Section 6.2</u>    <u>Conditions to the Obligation of the Seller</u>.  The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of the Purchaser in <u>Article 4</u> must be true and correct in all material respects as of the Closing (except to the extent any such representation or warranty speaks as of the date of this Agreement or any other specific date, in which case such representation or warranty must have been true and correct in all material respects as of such date);

(b)    <u>Performance of Covenants</u>.  All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)    <u>No Action</u>.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)    <u>Bidding Procedures Order</u>.  The Bidding Procedures Order must have been entered and must not have been stayed as of the Closing Date;

(e)    Sale Order.  The Sale Order must be a Final Order and must be reasonably satisfactory to the Seller in form and content; and

(f)    Transaction Documents.  The Purchaser must have delivered or caused to be delivered to the Seller each document that Section 2.8(b) requires it to deliver.

## ARTICLE 7
## TERMINATION

Section 7.1    Termination Events.  This Agreement may, by written notice given before or at the Closing, be terminated:

(a)    by mutual consent of the Purchaser and the Seller;

(b)    by the Purchaser (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if (i) there has been a breach of any of the Seller's representations or warranties contained in this Agreement, which would result in the failure of a condition set forth in Section 6.1(a) or (ii) there has been a breach of any of the Seller's covenants contained in this Agreement, which would result in the failure of a condition set forth in Section 6.1(b), and which breach, in case of either clause (i) or (ii) of this Section 7.1(b) has not been cured within ten (10) days after written notice of the breach has been delivered to the Seller from the Purchaser;

(c)    by the Seller (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement, which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), and which breach has not been cured within ten (10) days after written notice of the breach has been delivered to the Purchaser from the Seller;

(d)    by either the Purchaser or the Seller, if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(d) will not be available to any party whose failure to fulfill any covenant under this Agreement has been the cause of or resulted in the action or event described in this Section 7.1(d) occurring;

(e)    by either the Purchaser or the Seller, if the Seller accepts an Alternative Transaction with any Person other than the Purchaser or its Affiliates;

(f)    by either the Purchaser or the Seller, if the Sale Order has not been entered by the Bankruptcy Court on or prior to seven (7) days after the Sale Hearing;

(g)    by the Purchaser, if the Closing has not occurred (other than through the failure of the Purchaser to comply fully with its obligations under this Agreement) on or before thirty (30) days following entry of the Sale Order;

(h)     by the Seller, if the Closing has not occurred (other than through the failure of the Seller to comply fully with its obligations under this Agreement) on or before forty-five (45) days following entry of the Sale Order; or

(i)     by the Purchaser, if (x) the Seller's Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, or (y) there is appointed in the Seller's Chapter 11 Case a trustee or examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code.

Section 7.2     Effect of Termination.   If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any party or its Affiliates, except that (i) Section 5.6 (*Public Announcements*), Section 5.11 (*Purchaser Confidentiality*), Section 5.13 (*Back-Up Bidder*), Section 7.3 (*Termination Payment*), Article 11 (*General Provisions*) (except for Section 11.12 (*Specific Performance*)) and this Section 7.2 will remain in full force and survive any termination of this Agreement, (ii) if this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired, and (iii) the Seller shall remain liable for any prepetition debt obligation and any DIP Loan facility obligation owed to the Purchaser.

Section 7.3     Termination Payment.   In consideration of the substantial commitment of time and resources by the Purchaser the preparation, negotiation, execution and performance of this Agreement, the Seller hereby agrees that upon acceptance of any Alternative Transaction, whether or not consummated (a "Break-Up Event"), the Purchaser shall be entitled to a cash payment of $2,000,000.00 (the "Break-Up Fee"); provided, however, that in the event that the Break-Up Event is not consummated, the Break-Up Fee shall only be payable (i) to the extent of any deposit that has been actually forfeited by the counterparty to such Break-Up Event in accordance with the Bidding Procedures and Bidding Procedures Order and (ii) the Purchaser shall have complied with its obligations as Back-Up Bidder (if applicable) under Section 5.13. The Break-Up Fee shall be paid in immediately available funds upon the occurrence of any Break-Up Event and without need for any further Order of the Bankruptcy Court.   For the avoidance of doubt, (x) if a Break-Up Event is consummated, the Break-Up Fee shall be paid from the cash proceeds of the Break-Up Event upon the occurrence of the Break-Up Event, and (y) if the Break-Up Event is not consummated, the Break-Up Fee shall be allowed as a superpriority administrative expense claim against the Seller's bankruptcy estate, but only in an amount equal to the deposit (if any) actually forfeited by the counterparty to such Break-Up Event in accordance with the Bidding Procedures and Bidding Procedures Order, and shall be subject to the further conditions that the Purchaser shall have complied with its obligations as Back-Up Bidder (if applicable) under Section 5.13.

## ARTICLE 8
## NO SURVIVAL

Section 8.1     No Survival of Representations and Warranties and Certain Covenants. The representations, warranties and covenants (other than covenants that, by their terms, survive

36

the Closing or termination of this Agreement) in this Agreement terminate at the Closing, or upon termination of this Agreement pursuant to Section 7.1 and, following the Closing or the termination of this Agreement, as the case may be, no party will make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Section 7.2.

## ARTICLE 9
## TAX MATTERS

Section 9.1    Transfer Taxes. The Purchaser will pay in a timely manner all applicable sales, use, ad valorem, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering Acquired Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Acquired Assets or the Seller. Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten (10) Business Days prior to the applicable due date. The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

## ARTICLE 10
## EMPLOYEE MATTERS

Section 10.1    Employees.

(a)    On or before the Closing, the Purchaser will (i) extend a written offer of employment to the individuals holding senior management positions as identified on Schedule 10.1 and (ii) offer at will employment to all other categories of employees identified in Schedule 10.1 who are employed by the Seller on the Closing Date (collectively, the "Employees") (which schedule will be updated by the Seller prior to the Closing Date by deleting those individuals no longer employed in connection with the Business and adding any individuals who have become so employed since the schedule was first prepared or the last revision thereto, as the case may be). Effective as of the Closing Date, the Purchaser will hire each Employee who timely accepts an offer of employment extended by the Purchaser (such Employees, the "Transferred Employees"). An offer of employment extended by the Purchaser to an Employee in accordance with the foregoing provisions of this Section 10.1 will be for a position with job duties substantially similar to the job duties of the position that the Employee held immediately prior to the Closing Date and on at least the same terms and conditions as those in effect immediately prior to the Closing Date including any terms and conditions required by any applicable employment agreement; provided, however, that such offer of employment (x) shall include and carry-over any accrued, but unpaid vacation, sick and personal days that were in existence prior to the Closing Date, and (y) shall not include any option or equity benefits that were in existence prior to the Closing Date. The Purchaser will extend an offer of employment to Employees who

37

are on an approved leave of absence for workers compensation, disability, military, family illness or parental leave as of the Closing Date to at least the same extent, if any, as such Employees would be entitled to reemployment under either applicable Law or the Seller's policies and procedures in existence immediately prior to the Closing Date, and any such Person who accepts such an offer will be treated as a Transferred Employee.

(b)    To the extent that length of service is relevant for purposes of eligibility, vesting or benefit accrual under any employee benefit plan, program or arrangement established or maintained by the Purchaser for the benefit of Transferred Employees, such plan, program or arrangement will credit such employees or former employees for service on or prior to the Closing with the Seller and its Affiliates.

Section 10.2    Defined Contribution Plan.

(a)    Effective as of the Closing Date, the Transferred Employees will no longer participate in the Signal International, Inc. 401(k) Plan (the "Savings Plan"), and the Seller will have taken all such action prior to the Closing Date as may be required to achieve this result. As of the Closing Date, the Seller will cause each Transferred Employee to be one hundred percent (100%) vested in his or her account balance. As soon as practicable after the Closing Date, the Seller will cause the transfer of an amount representing the entire account balances of the Transferred Employees who participated in the Savings Plan immediately prior to the Closing Date determined as of the plan valuation date coinciding with or next preceding the date of the account balance transfer, together with the actual return thereon from such valuation date to the date of account balance transfer, to the trustee, designated by the Purchaser, of the qualified trust established or maintained by the Purchaser in accordance with the following sentence.

(b)    After the Closing Date, the Purchaser will establish or provide the Transferred Employees with a new savings plan intended to be qualified under Sections 401(a) and 401(k) of the Code, which shall provide (i) for immediate eligibility for participation for each Transferred Employee who participated in the Savings Plan immediately prior to the Closing Date, (ii) each such Transferred Employee with an initial account balance equal to the amount transferred to the Purchaser's savings plan in respect of such Transferred Employee's interest in the Savings Plan (iii) vesting and eligibility provisions that are no less favorable than those of the Savings Plan as in effect immediately prior to the Closing Date, applied by aggregating service with the Seller and its Affiliates prior to the Closing Date with service with the Purchaser and its Affiliates on and after the Closing Date and (iv) to the extent applicable, loan roll-overs from the Savings Plan to the new savings plan with respect to any Transferred Employees.  The Seller and the Purchaser agree to cooperate fully with respect to the actions necessary to effect the transactions contemplated in this Section 10.2, including the provision of records and information as each may reasonably request from the other.

(c)    Following the date of the asset transfer described in this Section 10.2, the Purchaser will assume all Liabilities of the Seller and its Affiliates under the Savings Plan with respect to accrued benefits of the Transferred Employees, and the Seller and its Affiliates will have no further Liability to the Purchaser or any Transferred Employees with respect thereto following the date of transfer.

Section 10.3    Welfare Arrangements.    To the extent that any medical, dental, hospitalization, life or other similar health, welfare or insurance benefits are provided to Transferred Employees through one or more of the Seller Employee Benefit Plans (the "Welfare Plans"), the Purchaser agrees to designate or establish, effective as of the Closing, one or more benefit plans, programs or arrangements for the purpose of providing such benefits to Transferred Employees. The Purchaser will cause such benefit plans, programs or arrangements to (i) waive any preexisting condition limitations for conditions covered under the applicable Welfare Plans available to the Transferred Employees immediately prior to the Closing and any applicable waiting periods, and (ii) credit Transferred Employees with any deductible and out-of-pocket expenses incurred by such employees and their dependents under the Welfare Plans during the portion of 2015 preceding the Closing Date for purposes of satisfying any applicable deductible or out-of-pocket requirements under any similar plan, program or arrangement in which such employees may be eligible to participate after the Closing Date. With respect to aggregate lifetime maximum benefits available under the Purchaser's welfare benefit plans, a Transferred Employee's prior claim experience under any of the Welfare Plans will not be taken into account. Effective as of the Closing Date, the Transferred Employees (and their dependents) will no longer participate in the Welfare Plans and the Seller will have taken all such action prior to the Closing Date as may be required to achieve this result. For the avoidance of doubt, effective as of the Closing Date, Purchaser shall assume (i) the Seller's COBRA obligations relating to M&A Qualified Beneficiaries (as such term is defined in 26 C.F.R. § 54.4980B-9, Q&A-4) and (ii) any claims incurred under Seller's Employee Benefit Plan prior to the Closing Date with respect to the Transferred Employees.

Section 10.4    WARN Act.    The Purchaser and the Seller agree to cooperate in good faith to determine whether any notification may be required under the WARN Act as a result of the transactions contemplated by the Agreement and, if such notices are required, to provide such notice in a manner that is reasonably satisfactory to each of the Purchaser and the Seller. The Purchaser hereby agrees that it shall not fail to re-hire more than 49 of the Seller's employees, and the Seller agrees that upon confirmation of such agreement no WARN Act notification shall be required. For the avoidance of doubt, the Purchaser shall not be responsible for any WARN Act violations by the Seller and is not assuming any liabilities of the Seller related to such Warn Act violations.

## ARTICLE 11
### GENERAL PROVISIONS

Section 11.1    Notices.    All notices and other communications under this Agreement must be in writing and are deemed duly delivered when (a) delivered if delivered personally or by nationally recognized overnight courier service (costs prepaid), (b) sent by facsimile with confirmation of transmission by the transmitting equipment (or, the first Business Day following such transmission if the date of transmission is not a Business Day) or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number or individual as a party may designate by notice to the other party):

If to the **Seller**:

Signal International, Inc.
RSA Battle House Tower
11 North Water Street
Suite 16250
Mobile, Alabama 36602
Telephone: (251) 544-2623
Facsimile: (251) 544-2643
Attention: Chris Cunningham, CFO

with a copy (which will not constitute notice) to:

Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Attention:   Christopher R. Donoho III

If to the **Purchaser**:

Teachers' Retirement System of Alabama
The Retirement Systems of Alabama
201 South Union Street
Montgomery, Alabama  36130
Telephone: (334) 517-7109
Facsimile: (334) 517-7099
Email: hunter.harrell@rsa-al.gov
Attention: M. Hunter Harrell

with a copy (which will not constitute notice) to:

Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 458-5471
Facsimile: (205) 244-5679
Email: dmeek@burr.com
Attention: Derek F. Meek


    Section 11.2    Amendment.  Except as contemplated by Sections 2.3(a), 5.4 or 5.12, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party to be bound by the amendment and that identifies itself as an amendment to this Agreement.

Section 11.3    Waiver and Remedies.    The parties may (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement, (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement. Except as contemplated by Section 5.4: (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a written document signed on behalf of the party against whom the extension or waiver is to be effective; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Except as provided in Section 5.4, any enumeration of a party's rights and remedies in this Agreement is not intended to be exclusive, and a party's rights and remedies are intended to be cumulative to the extent permitted by law and include any rights and remedies authorized in law or in equity. Notwithstanding anything to the contrary herein, any deadline set forth in this Agreement that (i) does not fall on a Business Day shall automatically be extended to the next Business Day, or (ii) requires the Bankruptcy Court to either (x) hold a hearing on or by a specified date, or (y) enter an order by a specified date, shall be subject to the Bankruptcy Court's availability and calendar and such deadline shall automatically be extended to such date as the Bankruptcy Court is available or its calendar shall permit it to hold such hearing or enter such order, as applicable.

Section 11.4    Entire Agreement.    This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement.

Section 11.5    Assignment, Successors and No Third Party Rights.    This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any entity appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan). No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations (other than the obligation to pay the Purchase Price) to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation. The Purchaser may designate one or more Affiliates, including any special purpose entities that may be organized by the Purchaser for such purpose, to take title to the Acquired Assets or any portion thereof and operate the business going forward, and upon written notice to the Seller of any such designation by the Purchaser, the Seller agrees to execute and deliver all instruments of transfer with respect to the Acquired Assets directly to, and in the name of, the Purchaser's designees. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement

41

or any provision of this Agreement except such rights as may inure to a successor or permitted assignee under this <u>Section 11.5</u>.

Section 11.6    <u>Severability</u>. If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions of this Agreement remain in full force and effect, if the essential terms and conditions of this Agreement for each party remain valid, binding and enforceable.

Section 11.7    <u>Exhibits and Schedules</u>. The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement. The Seller Disclosure Schedule and the Purchaser Disclosure Schedule are arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of <u>Article 3</u> and <u>Article 4</u>, respectively. The disclosure in any section or paragraph of the Seller Disclosure Schedule or the Purchaser Disclosure Schedule, and those in any amendment or supplement thereto, will be deemed to relate to each other provision of <u>Article 3</u> or <u>Article 4</u>, respectively.

Section 11.8    <u>Interpretation</u>. In the negotiation of this Agreement, each party has received advice from its own attorney. The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

Section 11.9    <u>Expenses</u>. Except as set forth in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, each party will pay its own direct and indirect expenses incurred by it in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

Section 11.10    <u>Governing Law</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, the internal laws of the State of Alabama (without giving effect to any choice or conflict of law provision or rule (whether of the State of Alabama or any other jurisdiction) that would cause the application of laws of any other jurisdiction) govern all matters arising out of or relating to this Agreement and its Exhibits and Schedules and the transactions contemplated by this Agreement, including its validity, interpretation, construction, performance and enforcement and any disputes or controversies arising therefrom or related thereto.

Section 11.11    <u>Limitation on Liability</u>. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT WILL ANY PARTY OR ANY OF ITS AFFILIATES BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS, LOSS OF REVENUE OR LOST SALES) IN CONNECTION WITH ANY CLAIMS, LOSSES, DAMAGES OR INJURIES ARISING OUT OF THE CONDUCT OF SUCH PARTY PURSUANT TO THIS AGREEMENT REGARDLESS OF WHETHER THE NONPERFORMING PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR NOT.

Section 11.12    <u>Specific Performance</u>. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by either party in accordance with such party's specific terms or were otherwise breached by such party. The parties accordingly agree that, prior to the termination of this Agreement pursuant to <u>Section</u>

7.1, in addition to any other remedy to which a non-breaching party is entitled at law or in equity, the non-breaching party is entitled to injunctive relief to prevent breaches of this Agreement by the breaching party and otherwise to enforce specifically the provisions of this Agreement against the breaching party; provided that, the non-breaching party shall only be entitled to injunctive relief if such non-breaching party is not otherwise in breach of this Agreement or if the breaching party is not otherwise entitled to terminate this Agreement. Each party expressly waives any requirement that the other party obtains any bond or provides any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

Section 11.13   Jurisdiction and Service of Process.   Any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement must be brought in the Bankruptcy Court; provided, however, that if the Chapter 11 Case is closed, any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement must be brought in the courts of the State of Alabama, County of Montgomery, or, if it has or can acquire jurisdiction, in the United States District Court for the Middle District of Alabama. Each of the parties knowingly, voluntarily and irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding and waives any objection it may now or hereafter have to venue or to convenience of forum. Each party to this Agreement may make service on the other party by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Section 11.1. Nothing in this Section 11.13, however, affects the right of a party to serve legal process in any other manner permitted by law.

Section 11.14   Waiver of Jury Trial.   **EACH OF THE PARTIES KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ACTIONS OF EITHER PARTY TO THIS AGREEMENT IN NEGOTIATION, EXECUTION AND DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT.**

Section 11.15   No Joint Venture.   Nothing in this Agreement creates a joint venture or partnership between the parties. This Agreement does not authorize either party (a) to bind or commit, or to act as an agent, employee or legal representative of, the other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of the other party. The parties are independent contractors with respect to each other under this Agreement. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 11.15.

Section 11.16   Joint and Several.   In the context of this Agreement (a) the representations, warranties, covenants and obligations of the Seller shall be construed as the joint and several representations, warranties, covenants and obligations of each of Signal, Int'l, SSR, SGP and SLP, and (b) the representations, warranties, covenants and obligations of the Purchaser shall be construed as the joint and several representations, warranties, covenants and obligations of each of TRS and ERS.

Section 11.17  Counterparts.  The parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement.  This Agreement is effective upon delivery of one executed counterpart from each party to the other party.  The signatures of all parties need not appear on the same counterpart.  The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

Section 11.18  Preservation of Records; Post-Closing Access and Cooperation.

(a)    For a period equal to the lesser of (i) three (3) years and thirty (30) days after the Closing Date and (ii) the closing of the Chapter 11 Case by the Bankruptcy Court (the "Post-Closing Access and Cooperation Period"), the Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the operation of Business and the Acquired Assets prior to the Closing Date.

(b)    During the Post-Closing Access and Cooperation Period, the Purchaser shall afford promptly to the Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) reasonable access during normal business hours to the offices, facilities, books, records, officers and employees of the Business as reasonably requested by the Seller for the purpose of winding-up its affairs and finalizing the administration of the Chapter 11 Case. In addition, during the Post-Closing Access and Cooperation Period, the Purchaser shall provide the Seller (or, its designee or successors), at no cost to the Seller, with reasonable access to various personnel to whom the Seller may need continued access after Closing during regular business hours of the Purchaser and at the Purchaser's business locations to assist the Seller in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with the Purchaser's business operations. During the Post-Closing Access and Cooperation Period, the Purchaser shall cooperate with, and shall permit and use its reasonable efforts to cause, its personnel to cooperate with the Seller (or, its designee or successors) after the Closing, in furnishing information, testimony and other assistance with respect to the Business or Acquired Assets for periods prior to the Closing Date in connection with any action or proceeding in furtherance of the purposes set forth herein.

**[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK; SIGNATURES APPEAR ON THE FOLLOWING PAGES]**

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**SELLER:**

**SIGNAL INTERNATIONAL, INC.**

By: _____
Print Name: _Christopher S. Cunningham_
Title: _CFO_

**SIGNAL INTERNATIONAL, LLC**

By: _____
Print Name: _Christopher S. Cunningham_
Title: _CFO_

**SIGNAL SHIP REPAIR, LLC**

By: _____
Print Name: _Christopher S. Cunningham_
Title: _CFO_

**SIGNAL INTERNATIONAL TEXAS, L.P.**

By: _____
Print Name: _Christopher S. Cunningham_
Title: _CFO_

**SIGNAL INTERNATIONAL TEXAS GP, LLC**

By: _____
Print Name: _Christopher S. Cunningham_
Title: _CFO_

PURCHASER:

**TEACHERS' RETIREMENT SYSTEM
OF ALABAMA**

By: _____
David G. Bronner
Its: CEO


**EMPLOYEES' RETIREMENT
SYSTEM OF ALABAMA**

By: _____
David G. Bronner
Its: CEO

46

**EXHIBIT A**

**FORM OF BILL OF SALE**

This Bill of Sale (the "Bill of Sale") is delivered pursuant to the Closing under the Asset Purchase Agreement (the "Purchase Agreement") dated as of [●], 2015, by and among Signal International, Inc., a Delaware corporation, Signal International, LLC, a Delaware limited liability company, Signal Ship Repair, LLC, a Delaware limited liability company, Signal International Texas GP, LLC, a Delaware limited liability company, and Signal International Texas, L.P., a Delaware limited partnership, as the "Seller," and _____, as the "Purchaser." Capitalized terms used in this Bill of Sale without definition have the respective meanings given to them in the Purchase Agreement.

Pursuant to the Purchase Agreement, the Purchaser has agreed to acquire the Acquired Assets. The Purchaser and the Seller now seek to consummate the assignment, conveyance and transfer of such Acquired Assets.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Bill of Sale and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1    Sale and Transfer of Acquired Assets. The Seller hereby sells, assigns, conveys, transfers and delivers to the Purchaser all of the Acquired Assets.

Section 2    Power of Attorney. The Seller hereby constitutes and appoints the Purchaser as the Seller's true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, in whole or in part, in the name and stead of the Seller but on behalf and for the benefit of the Purchaser and its successors and assigns, to demand, receive and collect any and all of the Acquired Assets and to give receipts and releases for and in respect of the same, and from time to time to institute and prosecute in the Seller's name, or otherwise for the benefit of the Purchaser and its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser or its successors or assigns may deem proper for the collection or recovery of any of the Acquired Assets or for the collection and enforcement of any claim or right of any kind hereby sold, assigned, conveyed and transferred, or intended so to be, and to take any other actions and make, sign, execute, acknowledge and deliver any documents and instruments as may from time to time be necessary or appropriate to assign to the Purchaser and its successors and assigns the Acquired Assets and all rights granted to the Purchaser under the Purchase Agreement. The Seller declares that the foregoing powers are coupled with an interest and are and will be irrevocable by the Seller or by its dissolution or in any manner or for any reason whatsoever. Nothing in this Section 2 will be deemed a waiver of any remedies otherwise available.

Section 3    General. This Bill of Sale (a) is irrevocable and effective upon the Seller's signature to and delivery of a manually signed copy of this Bill of Sale or facsimile or email transmission of the signature to this Bill of Sale in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their

47

respective successors and assigns, (c) does not modify or affect, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Section 11.16 of the Purchase Agreement.  In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Bill of Sale, the provisions of the Purchase Agreement will control.

*[Signature page follows.]*

The undersigned has signed this Bill of Sale on [●], 2015.

**PURCHASER:**
**[_____]**

By:_____
Name:_____
Title:_____

**SELLER:**

**SIGNAL INTERNATIONAL, INC.**

By:_____
Name:_____
Title:_____
]

**SIGNAL INTERNATIONAL, LLC**

By:_____
Name:_____
Title:_____

**SIGNAL SHIP REPAIR, LLC**

By:_____
Name:_____
Title:_____

**SIGNAL INTERNATIONAL TEXAS GP, LLC**

By:_____
Name:_____
Title:_____

**SIGNAL INTERNATIONAL TEXAS, L.P.**

By:  Signal International Texas GP, LLC
Its:  General Partner


By:_____
Name:_____
Title:_____

## EXHIBIT B

## FORM OF VESSEL BILL OF SALE

To be attached

# DEPARTMENT OF HOMELAND SECURITY
## U.S. Coast Guard
## BILL OF SALE

OMB No: 1625-0027
Expires: 08/30/2016

| 1. VESSEL NAME | 2. OFFICIAL NUMBER OR HULL ID NUMBER |
|---|---|
| | |

**3. NAME(S) AND ADDRESS(ES) OF SELLERS**

3A. TOTAL INTEREST OWNED *(IF LESS THAN 100%):* _____%

**4. NAME(S) AND ADDRESS(ES) OF BUYER(S) AND INTEREST TRANSFERRED TO EACH**

4A. TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED): _____%

4B. MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP      ☐ TENANCY BY THE ENTIRETIES      ☐ COMMUNITY PROPERTY

☐ OTHER *(DESCRIBE)*

5. CONSIDERATION RECEIVED *(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)*

6. I (WE) DO HEREBY SELL TO THE BUYER(S) NAMED ABOVE, THE RIGHT, TITLE AND INTEREST IDENTIFIED IN BLOCK 4 OF THIS BILL OF SALE, IN THE PROPORTION SPECIFIED HEREIN.

VESSEL IS SOLD FREE AND CLEAR OF ALL LIENS, MORTGAGES, AND OTHER ENCUMBRANCES OF ANY KIND AND NATURE, EXCEPT AS STATED ON THE REVERSE HEREOF. VESSEL IS SOLD TOGETHER WITH AN EQUAL INTEREST IN THE MASTS, BOWSPRIT, SAILS, BOATS, ANCHORS, CABLES, TACKLE, FURNITURE, AND ALL OTHER NECESSARIES THERETO APPERTAINING AND BELONGING, EXCEPT AS STATED ON THE REVERSE HEREOF.

| 7. SIGNATURES OF SELLER(S) OR PERSON(S) SIGNING ON BEHALF OF SELLER(S). | 8. DATE SIGNED |
|---|---|
| | |

9. NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED *(E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)*

10. ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OR THE UNITED STATES TO TAKE OATH.)

ON _____   THE PERSON(S) NAMED IN SECTION 9      STATE: _____
_____*(DATE)*
ABOVE ACKNOWLEDGED EXECUTION OF THE FOREGOING INSTRUMENT      COUNTY: _____
IN THEIR STATED CAPACITY(IES) FOR THE PURPOSE THEREIN CONTAINED.

NOTARY PUBLIC: _____

_____

MY COMMISSION EXPIRES: _____
_____*(DATE)*

## VESSEL DATA

*(COMPLETE THIS SECTION ONLY IF VESSEL HAS NEVER BEEN DOCUMENTED AND DOES NOT HAVE A HULL IDENTIFICATION NUMBER.)*

| | |
|---|---|
| A. BUILDER | B. BUILDER'S HULL NUMBER |
| C. FORMER NAME(S) | D. FORMER MOTORBOAT NUMBERS |
| E. FORMER ALIEN REGISTRATIONS | F. DIMENSIONS<br><br>L=          B=          D= |
| G. PERSON FROM WHICH SELLER OBTAINED VESSEL | SIGNATURE OF SELLER |

## WARRANTIES/APPURTENANCES/LIMITATIONS/EXCEPTIONS

## INSTRUCTIONS

1. INDICATE CURRENT DOCUMENTED NAME. (IF VESSEL HAS NEVER BEEN DOCUMENTED SELLER MUST COMPLETE AND SIGN DATA SECTION ABOVE.)

2. INDICATE OFFICIAL NUMBER AWARDED TO VESSEL OR HULL IDENTIFICATION NUMBER ASSIGNED BY MANUFACTURER. (IF THE VESSEL HAS NO HULL IDENTIFICATION NUMBER AND HAS NEVER BEEN DOCUMENTED, SELLER MUST COMPLETE AND SIGN THE VESSEL DATA SECTION ABOVE.)

3. INSERT NAMES AND ADDRESSES OF ALL PERSONS SELLING VESSEL, ALONG WITH TOTAL INTEREST OWNED BY THOSE PERSONS. IF MORE ROOM IS NEEDED, AN ATTACHMENT MAY BE MADE SHOWING THE ADDRESSES OF THE SELLERS.

3A. SELF-EXPLANATORY.

4. INSERT NAMES AND ADDRESSES OF ALL BUYERS, ALONG WITH THE INTEREST TRANSFERRED TO EACH. IF THERE IS MORE THAN ONE BUYER AND NO DIVISION OF INTEREST IS SHOWN, THIS BILL OF SALE WILL RESULT IN EACH BUYER HOLDING AN EQUAL INTEREST. (IF MORE ROOM IS NEEDED, AN ATTACHMENT MAY BE MADE SHOWING THE ADDRESSES OF THE BUYERS.)

4A. SELF-EXPLANATORY.

4B. CHECK ONE OF THE BLOCKS TO CREATE A FORM OF OWNERSHIP OTHER THAN A TENANCY IN COMMON. IF "OTHER" IS CHECKED, THE FORM OF OWNERSHIP MUST BE DESCRIBED.

5. OPTIONAL IF THE AMOUNT PAID FOR THE VESSEL IS INSERTED, IT WILL BE NOTED ON THE VESSEL'S GENERAL INDEX.

6. SELF-EXPLANATORY. USE "REMARKS" SECTION ABOVE IF VESSEL IS NOT SOLD FREE AND CLEAR, OR TO LIST VESSEL APPURTENANCES WHICH ARE NOT SOLD WITH THE VESSEL.

7. SELF-EXPLANATORY.

8. SHOW THE DATE ON WHICH THE INSTRUMENT IS SIGNED.

9. IN ADDITION TO THE PRINTED OR TYPED NAME OF THE SIGNER, SHOW WHETHER THAT PERSON WAS ACTING AS AN OWNER, AS AN AGENT FOR AN OWNER, AS TRUSTEE, AS THE PERSONAL REPRESENTATIVE OR EXECUTOR OF AN ESTATE, OR OTHER CAPACITY WHICH ENTITLED THAT PERSON TO SIGN THE BILL OF SALE.

10. ANY ACKNOWLEDGMENT IN SUBSTANTIAL COMPLIANCE WITH THE LAW OF THE STATE WHERE TAKEN MAY BE ATTACHED TO THIS INSTRUMENT IN LIEU OF THE PREPRINTED ACKNOWLEDGMENT.

## PRIVACY ACT STATEMENT

IN ACCORDANCE WITH 5 USC 552(A), THE FOLLOWING INFORMATION IS PROVIDED TO YOU WHEN SUPPLYING PERSONAL INFORMATION TO THE U.S. COAST GUARD.

  1. AUTHORITY: SOLICITATION OF THIS INFORMATION IS AUTHORIZED BY 46 USC, CHAPTER 313 AND 46 CFR, PART 67.

  2. THE PRINCIPAL PURPOSES FOR WHICH THIS INSTRUMENT IS TO BE USED ARE:

    (A) TO PROVIDE A RECORD, AVAILABLE FOR PUBLIC INSPECTION AND COPYING, OF THE SALE OR OTHER CHANGE IN OWNERSHIP OF A VESSEL WHICH IS DOCUMENTED, WILL BE DOCUMENTED, OR HAS BEEN DOCUMENTED PURSUANT TO 46 USC, CHAPTER 121.

    (B) PLACEMENT OF THIS INSTRUMENT IN A BOOK FOR EXAMINATION BY GOVERNMENTAL AUTHORITIES AND MEMBERS OF THE GENERAL PUBLIC.

  3. THE ROUTINE USE WHICH MAY BE MADE OF THIS INFORMATION INCLUDES DEVELOPMENT OF STATISTICAL DATA CONCERNING DOCUMENTED VESSELS.

  4. DISCLOSURE OF THE INFORMATION REQUESTED ON THIS FORM IS VOLUNTARY. HOWEVER, FAILURE TO PROVIDE THE INFORMATION COULD PRECLUDE FILING OF A BILL OF SALE AND DOCUMENTATION OF THE VESSEL NAMED HEREIN PURSUANT TO 46 USC, CHAPTER 121. MOREOVER, BILLS OF SALE WHICH ARE NOT FILED ARE NOT DEEMED TO BE VALID AGAINST ANY PERSON EXCEPT THE GRANTOR OR A PERSON HAVING ACTUAL KNOWLEDGE OF THE SALE. (46 USC 31321(A)).

AN AGENCY MAY NOT CONDUCT OR SPONSOR, AND A PERSON IS NOT REQUIRED TO RESPOND TO A COLLECTION OF INFORMATION UNLESS IT DISPLAYS A VALID OMB CONTROL NUMBER.

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN FOR THIS FORM IS 20 MINUTES. YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGESTIONS FOR REDUCING THE BURDEN TO: U.S. COAST GUARD, NATIONAL VESSEL DOCUMENTATION CENTER, 792 T J JACKSON DRIVE, FALLING WATERS, WEST VIRGINIA 25419, OR OFFICE OF MANAGEMENT AND BUDGET, PAPERWORK REDUCTION PROJECT (1625-0027), WASHINGTON, DC 20503.

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (the "Agreement") is delivered pursuant to the Closing under the Asset Purchase Agreement (the "Purchase Agreement") dated as of [●], 2015, by and among Signal International, Inc., a Delaware corporation, Signal International, LLC, a Delaware limited liability company, and Signal Ship Repair, LLC, a Delaware limited liability company, Signal International Texas GP, LLC, a Delaware limited liability company, and Signal International Texas, L.P., a Delaware limited partnership, as the "Seller," and _____, as the "Purchaser." Capitalized terms used in this Agreement without definition have the respective meanings given to them in the Purchase Agreement.

Pursuant to the Purchase Agreement, the Seller has agreed to assign and the Purchaser has agreed to assume the Assumed Liabilities. The Purchaser and the Seller now seek to consummate the assignment and assumption of such Assumed Liabilities.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1    Assignment and Assumption of Assumed Liabilities. The Seller hereby assigns, sells, transfers and sets over (collectively, the "Assignment") to the Purchaser the Assumed Liabilities. The Purchaser hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants of, and to pay and discharge when due, all of the Assumed Liabilities. Notwithstanding the foregoing, the Purchaser does not assume, or agree to pay, perform or discharge, any Liabilities of the Seller (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities, and the parties hereto agree that all such Liabilities, other than the Assumed Liabilities, will remain the sole responsibility of the Seller.

Section 2    General. This Agreement (a) is irrevocable and effective upon the Purchaser's signature to and delivery of a manually signed copy of this Agreement or facsimile or email transmission of the signature to this Agreement in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their respective successors and assigns, (c) does not modify or affect, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Section 11.17 of the Purchase Agreement. In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Agreement, the provisions of the Purchase Agreement will control.

*[Signature page follows.]*

The undersigned have signed this Agreement on [●], 2015.

**PURCHASER:**
[_____]


By:_____
Name:_____
Title:_____



**SELLER:**

**SIGNAL INTERNATIONAL, INC.**

By:_____
Name:_____
Title:_____
]

**SIGNAL INTERNATIONAL, LLC**


By:_____
Name:_____
Title:_____


**SIGNAL SHIP REPAIR, LLC**


By:_____
Name:_____
Title:_____


**SIGNAL INTERNATIONAL TEXAS
GP, LLC**


By:_____
Name:_____
Title:_____

**SIGNAL INTERNATIONAL TEXAS, L.P.**

By:  Signal International Texas GP, LLC
Its:  General Partner


By:_____
Name:_____
Title:_____

# EXHIBIT D

## FORM OF BIDDING PROCEDURES ORDER

Execution Version
July 13, 2015

DISCLOSURE SCHEDULES TO THE

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

TEACHERS' RETIREMENT SYSTEM OF ALABAMA (OR ITS DESIGNEE) AND
EMPLOYEES' RETIREMENT SYSTEM OF ALABAMA (OR ITS DESIGNEE),
AS THE PURCHASER

AND

SIGNAL INTERNATIONAL, INC., SIGNAL INTERNATIONAL, LLC, SIGNAL SHIP
REPAIR, LLC, SIGNAL INTERNATIONAL TEXAS GP, LLC AND SIGNAL
INTERNATIONAL TEXAS, L.P., AS THE SELLER

## Schedule 2.1(c)(i)

### Owned Real Property

The Owned Real Property described below is owned by Signal Ship Repair, LLC.

YARD 1C (formerly Yard 12) (601 South Royal St., Mobile, AL)

Lot 2, Gilligan Subdivision according to plat thereof recorded in Map Book 57, Page 27 of the records in the office in the Judge of Probate, Mobile County, Alabama, which said parcel may also be described as follows: Beginning at the Southwest corner of Lot 2, Gilligan Subdivision according to plat thereof recorded in Map Book 57, Page 27 of the records in the office in the Judge of Probate, Mobile County, Alabama, said point also being the Southeast corner of Lot 1 in said subdivision, run Northwardly along the common boundary between Lots 1 and 2 of said subdivision as follows: North 08°-04'-45" East, 445.70 feet; North 13°-13'-41" East, 97.97 feet; North 15°-03'-55" East, 83.22 feet; North 07°-59'-30" East, 51.02 feet to the Northwest corner of said Lot 2, said point also being the Northeast corner of said Lot 1; thence leaving said common boundary, run South 81°-56'-42" East, along the North boundary of said Lot 2, a distance of 121.82 feet; thence South 07°-47'-08" West, along the East boundary of said Lot 2, a distance of 444.53 feet; thence South 81°-50'-16" East, along the South boundary of said Lot 2, a distance of 139.49 feet to the Point of Beginning.

YARD 2 (311 South Water St., Mobile, AL):

Beginning at a point on the East right-of-way of Water Street, said point being North 02°-44'-05" West, 96.6 feet from the Northeast intersection of Water Street (50 foot right-of-way) and Canal Street (50 foot right-of-way) (apparently vacated) in Mobile, Alabama run South 85°-53'-40" East, 272.8 feet to a point on the Mobile Harbor pierhead and bulkhead line, along the Western margin of the Mobile River, thence following said pierhead and bulkhead line, run South 03°-51'-37" West, 236.80 feet; thence run North 86°-33'-41" West and parallel with the Southern right-of-way of vacated Canal Street, 244.80 feet to a point on the Eastern right-of-way of Water Street; thence run North 02°-44'-05" West, along said Eastern right-of-way of Water Street, 241.32 feet to the Point of Beginning.

YARD 3 (365 South Water St., Mobile, AL):

From the Southeast corner of Canal (50 foot right-of-way) and Water (50 foot right-of-way) Streets in the City of Mobile, Alabama; run South 02°-45'-37" East, along the East line of Water Street, a distance of 97.0 feet to the Southwest corner of property now or formerly of Alabama Dry Dock and Shipbuilding Company for the Point of Beginning of the property herein described; thence South 86°-33'-41" East, 208.35 feet to a point hereinafter referred to as Point A; thence continue South 86°-33'-41" East, 11.7 feet, more or less, to a point on the West margin of Mobile River; thence Southwardly and Westwardly along said West margin, 393.0 feet, more or less, to a point on the projected centerline of Palmetto Street (50 foot right-of-way) (apparently vacated); thence North 81°-54'-40" West, along said projection, a distance of 5.0 feet, more or less, to a point hereinafter referred to as Point B; (mathematical tie from Point A to Point B bears: South 00°-56'-06" East, 392.93 feet); thence continue North 81°-54'-40" West, along said centerline, 198.16 feet to a point on said East right-of-way line of Water Street; thence

2

North 02°-45'-37" West, along said East right-of-way line, a distance of 377.94 feet to the Point of Beginning.

YARD 4 (415 South Water St., Mobile, AL):

Beginning at a point where the East right-of-way line of Water Street (50 foot right-of-way) intersects the South right-of-way line of Palmetto Street (50 foot right-of-way) (apparently vacated); thence run South 08°-05'-20" West, along the East line of said Water Street, a distance of 616.96 feet to a point; thence run South 81°-52'-27" East, along the North line formerly of Dundee Cement Company, a distance of 207.0 feet to a point hereinafter referred to as Point D; thence continue South 81°-52'-27" East, 20.0 feet, more or less, to the West margin of the Mobile River; thence Northwardly and Eastwardly along the meanders of said West margin, a distance of 642.0 feet, more or less, to a point on the projected centerline of Palmetto Street; thence North 81°-54"-40" West, along said projection, a distance of 5 feet, more or less, to a point hereinafter referred to as Point B (mathematical tie from Point D to Point B bears: North 07°-10'-59" East, 642.17 feet); thence continue North 81°-54'-40" West, along said centerline, 198.16 feet; thence South 02°-45'-37" East, along the East right-of-way line of Water Street, 6.98 feet; thence continue along said East right-of-way line, South 08°-05'-20" West, 18.14 feet to the Point of Beginning.

YARD 4S/5N (Holnam Yard) (425 South Water St, Mobile, AL)

TRACT 1:

Commencing at a point on the Eastern right-of-way line of Water Street (50 foot right-of-way) where said Eastern right-of-way line intersects with a projection of the Southern right-of-way line of Palmetto Street (50 foot right-of- way); thence run South 08°-07'-33" West, along the said Eastern right-of-way line of Water Street, a distance of 616.96 feet to the Point of Beginning of the property herein described; thence continue along said Eastern right-of-way line of Water Street, South 08°-07'-33" West, a distance of 602.5 feet to a point; thence run South 82°-23'-27" East, a distance of 262.5 feet to a point on the Western margin of the Mobile River; thence run Northwardly along said Western margin of Mobile River 602.0 feet, more or less, to a point that bears South 81°-52'-27" East 215.0 feet from the Point of Beginning; thence North 81°-52'-27" West, 215 feet to the Point of Beginning.

TRACT 2:

Commencing at a point on the Eastern right-of-way line of Water Street (50 foot right-of-way) where said Eastern line intersects with a projection of the Southern right-of-way line of Palmetto Street (50foot right-of-way); thence run South 08°-07'-33" West, along said Eastern right-of-way line of Water Street, a distance of 616.92 feet to a point; thence from said point run South 81°-52'-27" East, 215.0 feet to the Western margin of Mobile River and the Point of Beginning of the property herein described; from said Point of Beginning, run thence South 81°-52'-27" East, 35 feet to a point of intersection with the West pierhead and bulkhead line for the Mobile River; thence run Southwardly along said pierhead and bulk head line 499.75 feet to a point; thence run Westwardly and at right angles, or nearly so, to said pierhead and bulkhead line, a distance of 30 feet to a point; thence Southwardly 100 feet to a point; thence Westwardly

3

12.5 feet to an iron pin set at a point on the Western margin of Mobile River; thence run Northwardly along the Western margin of Mobile River 602.0 feet, more or less, to the Point of Beginning.

YARD 5 (601 South Water St., Mobile, AL):

Commencing at the intersection of the center line of Elmira Street (50 foot right-of-way, vacated) and the projected East right of way line of South Water Street (50 foot right-of-way) in the City of Mobile, Alabama, run North 08°-08'-29" East, along the East right-of-way line of said South Water Street, a distance of 209.06 feet to the Point of Beginning of the property herein described; thence continue North 08°-08'-29" East, along said East right-of-way line, 450.0 feet; thence South 81°-52'-21" East, 251.48 feet to a point hereinafter referred to as Point A; thence continue South 81°-52'-21" East, 44.33 feet to a point on the West pierhead and bulkhead line for the Mobile River; thence along said pierhead and bulkhead line as follows:  South 03°-51'-37" West, 38.09 feet; South 12°-26'-28" East, 440.04 feet; thence leaving said pierhead and bulkhead line, run North 81°-52'-21" West, 68.42 feet to a point hereinafter referred to as Point B (mathematical tie from Point A to Point B bears South 08°-22'-38" East, 469.30 feet); thence continue North 81°-52'-21" West, 384.92 feet to the Point of Beginning.

YARD 6 (631 South Water St., Mobile, AL):

Beginning at the intersection of the center line of Elmira Street (50 foot right-of-way, vacated) and the projected East right of way line of South Water Street (50 foot right-of-way) in the City of Mobile, Alabama, run North 08°-08'-29" East, along the East right-of-way line of said South Water Street, a distance of 209.06 feet; thence South 81°-52'-21" East, 384.92 feet to a point hereinafter referred to as Point B; thence continue South 81°-52'-21" East, 68.42 feet to a point on the West pier head and bulk head line for the Mobile River; thence South 12°-26'-28" East, along said pier head and bulk head line 225.95 feet; thence North 81°-36'-21" West, along the projected center line of said Elmira Street (vacated), 80.47 feet to a point hereinafter referred to as Point C (mathematical tie from Point B to Point C bears South 09°-44'-48" East, 221.88 feet); thence continue North 81°-36'-21" West, along said center line, 453.07 feet to the Point of Beginning.

BUCKLEY PROPERTY (65 E. Green Ave., Orange, TX):

TRACT I:

Being a part of the JOHN FRANCIS SURVEY, A-76 and the ALEXANDER WRIGHT SURVEY, in Orange County, Texas, and being a portion of the land described in conveyance from W. H. Stark, et al, to A. F. Wilson, dated June 22, 1931, of record in Volume 51, Page 436; E. W. Brown, Jr. to A. F. Wilson dated August 20, 1941, of record in Volume 68, Page 178; H. J. L. Stark to A. F. Wilson dated August 21, 1941, of record in Volume 68, Page 179, Deed Records of Orange County, Texas, and Judgment dated June 14, 1943, of record in Volume "T", Page 57, of the District Court Minutes of Orange County, Texas, reference to all of which is hereby made, being more particularly described as follows;

4

BEGINNING at the intersection of the East right of way line of Navy Street and the South right of way line of Green Avenue in the City of Orange, Orange County, Texas;

THENCE East along the South, right of way line of said Green Avenue a distance of 550 feet, more or less, to the intersection of a 40 foot right of way easement described in easement dated August 28, 1947, from A. F. Wilson to the United States of America of record in Volume _____, Page ___, Deed Records of Orange County, Texas, to which reference is made;

THENCE South 40 feet, more or less, along the West line of said 40 foot right of way easement to a point in the North line of Consolidated Steel Corporation, Ltd. tract described in conveyance of record in Volume 66, Page 529, Deed Records of Orange County, Texas, to which reference is made;

THENCE West 550 feet, more or less, along the North line of said Consolidated Steel Corporation, Ltd. tract to a point in the East right of way line of Navy Street;

THENCE North 40 feet, more or less, along the East right of way line of Navy Street to the PLACE OF BEGINNING, together with all rights and ingress and egress to and from said tract;

TRACT II:

PARCEL 6: BEING a 1.221 acre tract or parcel of land, a portion of Tract A (7.695 acres) and a portion of Tract C (3.429 acres) of those certain several tracts of land as conveyed by deed from Lamar University to the Orange County Navigation and Port District dated February 24, 1986, recorded in Volume 612, Page 39, of the Official Public Records of Real Property, County Clerk's Office, Orange County, Texas as situated in and a part of the John Francis Survey, Abstract No. 76, Orange County, Texas and being more particularly described by metes and bounds as follows;

FOR LOCATIVE PURPOSES, commence at a 1/2" steel rod found located at the intersection of the East line of Simmons Drive, based on a width of 100.00 feet with the North line of Green Avenue, (Right-of-Way varies) marking the Southwest corner of that certain tract of land (called Tract B-0.523 acres) as conveyed by deed to Trinity Industrial International, Inc., (formerly Friede Goldman now Signal International, LLC) recorded in Volume 849, Page 583 of said Official Public Records;

THENCE North 89 deg. 51 min. 45 sec. East along the said North Right-of-Way line a distance of 99.97 feet to a concrete monument with disc marked M13 found marking the Southeast corner of said 0.523 acre tract and the Southwest corner and PLACE OF BEGINNING of the herein described tract of land, this point also marks the most Westerly Southwest corner of said Tract C;

THENCE North 00 deg. 21 min. 51 sec. West, departing said North Right-of-Way line along the East line of said 0.523 acre tract with the West line of said Tract C and this tract, passing at a distance. of 70.00 feet, the most Westerly Northwest corner of said Tract C and the

5

Southwest comer of said Tract A and continuing for a total distance of 150.00 feet to a 1/2" steel rod set marking the Northwest comer of the herein described tract of land;

THENCE North 89 deg. 38 min. 09 sec. East along the North line of this tract a distance of 338.81 feet to an "X" in concrete set located on the Easterly line of said Tract A and the Westerly line of Pier Road, a public Dedicated Right-of-Way (width varies) called 5.45 acres as conveyed by deed to the City of Orange, recorded in Volume 481, Page 450 of the deed records of said County;

THENCE South 10 deg. 11 min. 30 sec. East along said Westerly Right-of-Way line with the East line of this tract a distance of 81.19 feet to a 1/2" steel rod set located on the lower North line of said Tract C marking the Southeast comer of said Tract A and an angle point for comer of the herein described tract of land;

THENCE South 19 deg. 31 min. 14 sec. East continuing along said Westerly Right-of-Way with the East line of this tract a distance of 74.10 feet to a concrete monument with disc marked M12 and found located on the North line of said Green Avenue and the most Westerly South line of said Tract C marking the Southeast comer of the herein described tract of land;

THENCE South 89 deg. 38 min. 09 sec. West along the North line of said Green Avenue with the most Westerly South line of said Tract C and South line of this tract a distance of 376.98 feet to the Southwest comer and PLACE OF BEGINNING and containing in area 53,197 square feet or 1.221 acres of land, more or less.

## Schedule 2.1(c)(ii)

## Leased Real Property

<u>Mississippi</u>

1.     Real property (East Yard) leased by Signal International, LLC pursuant to the Lease Agreement dated June 30, 1997 and currently scheduled to expire on June 30, 2027, by and between HAM Marine, Inc. (predecessor in interest to Signal International, LLC) and Jackson County Port Authority, recorded in Book 1116, Page 879 of the Public Records of Jackson County, Mississippi, as amended and assigned to Signal International, LLC, which property is more particularly described as follows:

Being a parcel of land situated in Claim Section 18, Township 8 South, Range 5 West, and what would be the Southwest 1/4 of Section 17, the Southeast 1/4 of Section 18, the Northeast 1/4 of Section 19 and the Northwest 1/4 of Section 20, Township 8 South, Range 5 West, if surveyed into Regular Governmental Sections, City of Pascagoula, Jackson County, Mississippi and being more particularly described as follows:

Commencing for reference at an iron pin found marking the common mid section point of said Regular Section 17 and 18, Township 8 South, Range 5 West, Jackson County, Mississippi, as shown on previous survey recorded in Deed Book 619, Page 520 in the Chancery Clerk's Office of said county;

Thence South, 723.52 feet to a point;

Thence East, 55.65 feet to a iron pin found marking a Westerly Northwest corner of a 28.96 acres tract of land conveyed to Trinity Marine Pascagoula, Inc., as described in Deed Book 1075, Page 161, in the Chancery Clerk's Office of said county;

Thence S 00° 31' 19" E along the West line of the above 28.96 acre tract of land, a distance of 571.11 feet to a 1/2 inch iron pin found for the most Northerly Northeast corner and the Point of Beginning of the herein described parcel;

Thence S 00° 31' 19" E, continuing along the said West line, a distance of 199.51 feet to a 1/2 inch iron pin found marking the Southwest corner of said 28.96 acre tract;

Thence N 89° 31' 07" E along the South line of said 28.96 acre tract, a distance of 667.95 feet to a point. Said point being 600 feet Westerly of and perpendicular to the Westerly Harbor Line of Bayou Casotte Channel as per the U.S. Army Corps of Engineers;

Thence S 13° 06' 53" W, along a line 600 feet Westerly and parallel to the Westerly Harbor Line of said Bayou Casotte Channel, a distance of 2033.09 feet to a point;

Thence N 76° 53' 07" W a distance of 75.43 feet to point on the existing shoreline of said Bayou Casotte as said shoreline existed on March 30, 2000.

Thence along the existing shoreline of said Bayou Casotte the following bearings and distances:

S 48° 48' 39" W, a distance of 246.18 feet to a point;

S 64° 16' 54" W, a distance of 403.02 feet to a point;

S 07° 20' 06" W, a distance of 142.54 feet to a point;

S 18° 37' 46" E, a distance of 407.65 feet to a point;

S 14° 20' 47" W, a distance of 80.28 feet to a 1/2 inch iron pin found;

Thence departing said existing shoreline, N 76° 53' 13" W, a distance of 578.34 feet to a 1/2" iron pin found;

Thence S 44° 35' 21" W, a distance of 109.51 feet to a 1/2 inch iron pin found;

Thence S 63° 56' 44" W, a distance of 289.88 feet to a 1/2 inch iron pin found for the most Southerly Southwest corner of the herein described parcel;

Thence N 06° 38' 53" E, a distance of 2237.87 feet to a 1/2 inch iron pin found;

Thence N 14° 30' 45" E, a distance of 985.92 feet to a 1/2 inch iron pin found for the Northwest corner of the herein described parcel;

Thence S 89° 41' 15" E a distance of 715.68 feet to the Point of Beginning.

2.    Real property (West Yard) leased by Signal International, LLC pursuant to the Lease Agreement dated June 21, 1995 between HAM Marine, Inc. (predecessor in interest to Signal International, LLC) and Jackson County Port Authority recorded in the public records of Jackson County, Mississippi in Book 1066, Page 805, as amended by (i) a First Amendment to the June 21, 1995 Amended Lease Agreement dated January 6, 1997, recorded in the public records of Jackson County, Mississippi in Book 1106, Page 30, (ii) a Second Amendment to the June 21, 1995 Amended Lease Agreement dated October 24, 2000, recorded in the public records of Jackson County, Mississippi in Book 1235, Page 725, (iii) an unrecorded Third Amendment to the June 21, 1995 Amended Lease Agreement dated February 11, 2003, and as assigned to Signal International, LLC, (iv) a letter dated October 18, 2004 exercising Signal International, LLC's option to renew the Amended Lease Agreement, and (v) a letter dated October 21, 2014 exercising Signal International, LLC's option to renew the Amended Lease Agreement for the second ten year renewal term extending the expiration date to May 1, 2025, which property is more particularly described as follows:

PARCEL I – WEST BANK SHIPYARD PROPERTY:

A parcel of land situated in the NE 1/4 of Section 10, Township 8 South, Range 6 West, Jackson County, Mississippi, being more particularly described as follows:

Commencing at the NW corner of said Section 10; thence along the West line of Section 10 South for a distance of 1039.31 feet to a point; thence S 89° 59' 54" E for a distance of 3720.98 feet to a point on the East right of way of CSX Transportation Railroad Watts Spur, said point also being the Point of Beginning; thence along said East right of way, N 00° 09' 27" W for a distance of 651.26 feet to a point; thence along a curve to the right, having a radius of 344.26 feet and an arc length of 420.77 feet (prior descriptions called 420.76 feet), to a point being N 32° 29' 56" E 395.06 feet, said point lying on the South right of way of the CSX Transportation Railroad Mainline; thence along said South right of way, S 77° 40' 40" E for a distance of 1143.85 feet to a point on the West bank of the Pascagoula River; thence Southerly along the West bank of the Pascagoula River to a point being S 21° 38' 34" W (prior description called S 21° 38' 49" W) 53.17 feet; thence N 77° 33' 15" W for a distance of 195.00 feet to a point; thence S 60° 30' 00" W for a distance of 900.00 feet to a point; thence S 21° 05' 00" E for a distance of 150.00 feet to a point at the NE corner of Terminal "D", said point also being located N 21° 05' 00" W, 1450.00 feet from the SE corner of Terminal "C"; thence S 68° 55' 00" W for a distance of 416.46 feet to the Point of Beginning.

8

LESS AND EXCEPT FROM PARCEL I: (Railroad Spur)

Commencing at the Point of Beginning of the above described property; thence N 68° 55' 00" E for a distance of 180.41 feet to a point on the West right of way of the Jackson County Port Authority Railroad Spur, said point being the Point of Beginning; thence along said West right of way, N 30° 56' 22" W for a distance of 75.00 feet to a point; thence along a curve to the right, having a radius of 495.40 feet and an arc length of 61.84 feet, to a point being N 27° 21' 48" W 61.80 feet; thence N 23° 47' 12" W for a distance of 82.00 feet to a point; thence N 30° 56' 22" W for a distance of 53.26 feet to a point; thence along a curve to the right, having a radius of 518.94 feet and an arc length of 97.47 feet, to a point being N 25° 33' 31" W 97.32 feet, said point lying on the East right of way of CSXT's Watts Spur; thence along said East right of way, N 00° 09' 27" W for a distance of 176.08 feet to a point; thence along the East right of way of aforesaid Jackson County Port Authority Rail Spur, S 07° 19' 24" E for a distance of 66.57 feet to a point; thence along a curve to the left, having a radius of 461.34 feet and an arc length of 190.15 feet, to a point being S 19° 07' 53" E 188.81 feet; thence S 30° 56' 24" E for a distance of 282.00 feet to a point on the South line of the above described property, said point being S 68° 55' 00" W 187.33 feet from the NE corner of Dock "D"; thence along said South property line, S 68° 55' 00" W for a distance of 48.72 feet to the Point of Beginning.


PARCEL II - WEST BANK OFFICE AND TRAINING AREA PROPERTY:

A parcel of land situated in the West 1/2 of the NE 1/4 of Section 10, Township 8 South, Range 6 West, Jackson County, Mississippi, being more particularly described as follows:

Commencing at the NW corner of said Section 10; thence along the West line of Section 10, South for a distance of 1039.31 feet to a point; thence East for a distance of 3287.74 feet to a point on the East margin of Ingall's Access Road, also known as Jerry St. Pe' Boulevard, said point also being the Point of Beginning; thence along said East margin of Ingall's Access Road, N 00° 08' 55" W (prior description called N 00° 07' 55") for a distance of 690.96 feet (prior description called 690.93 feet) to a point; thence N 89° 52' 06" E for a distance of 200.30 feet to a point; thence N 01° 24' 47" W for a distance of 147.97 feet to a point; thence N 89° 52' 06" E for a distance of 97.34 feet to a point lying on the West margin of a 10 foot wide easement; thence along said West margin of a 10 foot wide easement, S 00° 10' 41" E (prior description called S 00° 10' 42") for a distance of 839.11 feet (prior description called 838.86 feet) to a point; thence further along said West margin of 10 foot wide easement, S 00° 14' 39" E for a distance of 517.83 feet to the North margin of a 30 foot wide federal government pipeline easement; thence along said North margin of said 30 foot wide pipeline easement, West 295.45 feet to the aforesaid East margin of Ingall's Access Road; thence along said East margin of Ingall's Access Road, N 00° 10' 23" W (prior description called N 00° 11' 46" W) for a distance of 517.37 feet (prior description called 517.15) to the Point of Beginning.

    3.      Signal International, LLC's right, title and interest in the improvements to the above properties leased pursuant to the foregoing leases: (i) Pascagoula West - Shipyard, (ii) 3500 Port Authority Road; (iii) Corporate Office, 3400 Litton Road; and (iv) Training Center, 3401 Litton Road.

    4.      Real property leased pursuant to Lease No. HSCG82-09-L-8N3001 dated October 1, 2008 by and between Jackson County, Port of Pascagoula whose interest in the property hereinafter described is that of Owner/Lessor, and Signal International, LLC (Lessee) and the United States of America, hereinafter described as the United States Coast Guard (Government). This lease term expires on September 30, 2028. The Lessor leases to the Government the following described premises.

USCG Lease

Site address: for use of Lessor's land to locate the Bayou Casotte Rear Range Light at 3020-36.297N, 88-30-45.703W. The land, 50' X 50' will contain the Lessee's 65' tower.

The light will be solar powered and require no easement for power lines. It will be serviced by shore and require access from Louise Street, Pascagoula, Mississippi.

5.      Rights of Signal International, LLC pursuant to that certain Dry-Dock Facility Operating Agreement dated March 10, 2009 by and between Signal International, LLC and the Jackson County Port Authority for real and personal property described below. The term of this agreement will expire on May 11, 2017.

Dry-Dock Facility Operating Agreement

The facility to he operated by Signal International, LLC pursuant to this Agreement is a 400' wide by 600' long (including side-slope) by 55'deep dry-dock and stability testing basin. The location of the facility shall be east of the Signal Bayou Casotte shipyard bulkhead, and west of the federal navigation project, (Section 19, Township 8 South, Range 5 West, Latitude 30°20' 19.2"N, Longitude 88° 30' 42.6"W).

6.      Real property leased by Ham Marine, Inc. pursuant to Property Lease Agreement No. CSX-027354 dated December 12, 1995 assigned to Signal International, LLC by that certain Assumption Agreement and Amendment dated February 15, 2003 (with an effective date of January 29, 2003) by and between Signal International, LLC and CSX Transportation, Inc. as more particularly described below.  The Land Lease shall continue in effect unless and until terminated by either party upon thirty (30) days written notice.

7.      Wireline Crossing Agreement by and between CSX Transportation and Ham Marine, Inc. dated June 9, 1997 and assigned to Signal International, LLC pursuant to that certain Assumption Agreement dated February 15, 2003 (with an effective date of January 29, 2003) by and between Signal International, LLC and CSX Transportation, Inc.  There is no specific expiration/termination date in the Wireline Crossing Agreement.

8.      Pipeline Crossing Agreement by and between CSX Transportation and Ham Marine, Inc. dated June 9, 1997 and assigned to Signal International, LLC pursuant to that certain Assumption Agreement dated February 15, 2003 (with an effective date of January 29, 2003) by and between Signal International, LLC and CSX Transportation, Inc.  There is no specific expiration/termination date in the Pipeline Crossing Agreement.

9.      Rights of Signal International, LLC, as Landlord pursuant to a lease contract dated June 5, 2003 between Signal International, LLC and John J. McMullen Associates, Inc. as amended by and between Signal International, LLC and Alion Science and Technology Corporation successor in interest to John J. McMullen Associates, Inc. on October 6, 2008, April 28, 2011, December 14, 2011 and October 20, 2014 with an expiration date of January 31, 2018 for the corporate office building and parking area located at 3400 Jerry St. Pe Highway, Pascagoula, Mississippi (3400 Litton Road).

Alabama

10.      Real property leased by Signal Ship Repair, LLC pursuant to a Lease Agreement by and between Signal Ship Repair, LLC and Complete Equipment, Inc. dated February 1, 2010 and recorded in Real Property Book 6623, Page 1266, as amended by a letter dated October 21,

2014 extending the expiration date to January 31, 2020 and as more particularly described as follows:

**YARD 1A (formerly Yard 12):**

Lot 1, Gilligan Subdivision according to plat thereof recorded in Map Book 57, Page 27 of the records in the office in the Judge of Probate, Mobile County, Alabama, which said parcel may also be described as follows: Beginning at the Southwest corner of Lot 1, Gilligan Subdivision according to plat thereof recorded in Map Book 57, Page 27 of the records in the office in the Judge of Probate, Mobile County, Alabama, run North 07°-53'-14" East, along the West line of said Lot 1, a distance of 359.74 feet; thence North 07°-50'-51" East, along the West line of said Lot 1, a distance of 316.89 feet to the Northwest corner of said Lot 1; thence South 81°-56'-42" East, along the North line of said Lot 1, a distance of 161.5 feet to the Northeast corner of said Lot 1, said point also being the Northwest corner of Lot 2 in said subdivision; thence along the common boundary between Lots 1 and 2 of said subdivision as follows: South 07°-59'-30" West, 51.02 feet; South 15°-03'-55" West, 83.22 feet; South 13°-13'-41" West, 97.97 feet; South 08°-04'-45" East, 445.70 feet; thence leaving said common boundary, run North 81°-50'-16" West, along the South boundary of said Lot 1, a distance of 140.19 feet to the Point of Beginning.

11.   Real property leased by Signal Ship Repair, LLC pursuant to an Amended and Restated Lease Agreement by and between Morriss River Property, LLC, Thames Jackson Harris Co., Inc. and Signal Ship Repair, LLC dated February 1, 2010, and recorded in Real Property Book 6623, Page 1218, as amended by a letter dated February 1, 2010 extending the expiration date to October 31, 2019 and as more particularly described as follows:

**YARD 7:**

Beginning at the intersection of the centerline of Elmira Street (50 foot right-of-way, vacated) and the projected East Right of way line of South Water Street (50 foot right-of-way); thence run South 81°-36'-21" East, along the centerline of said Elmira Street, 453.07 feet to a point hereinafter referred to as Point C; thence continue South 81°-36'-21" East, 80.47 feet to a point on the Western pierhead and bulkhead line for the Mobile River; thence South 12°-26'-28" East, along said pierhead and bulkhead line, a distance of 263.16 feet to a point on the projected South boundary of Lot 5, Block 166, of the Bernoudy Tract, as recorded in the office of the Judge of Probate Court, Mobile County, Alabama; thence North 81°-36'-21" West, along said projection, a distance of 54.39 feet to a point hereinafter referred to as Point D (mathematical tie from Point C to Point D bears South 17°-21'-37" East, 273.08 feet); thence North 81°-36'-21" West, along said projection and along the South line of Lot 4, Block 166, and along the South line of Lot 10 and Lot 5, Block 165, of said Bernoudy Tract, a distance of 570.61 feet; thence North 08°-07'-39" East, along the East right-of-way line of said South Water Street, a distance of 245.95 feet to the Point of Beginning.

12.   Property leased by Signal Ship Repair, LLC pursuant to a Lease Agreement between Pinto Island Land Company, Inc. and Bender Shipbuilding & Repair Co. Inc. (predecessor in interest to Signal Ship Repair, LLC) dated April 20, 1999 and recorded in Real Property Book 4704, Page 0793, and assigned to Signal Ship Repair, LLC by instrument dated

11

February 1, 2010 and recorded in Real Property Book 6623, Page 1230, and amended by instrument dated February 1, 2010 and recorded in Real Property Book 6623, Page 1258, with a current expiration date of January 31, 2035, as more particularly described as follows:

**YARD 8:**

Beginning at the intersection of the centerline of New Jersey Street (50 foot right-of-way, vacated) and projected East right of way line of South Water Street (50 foot right-of-way); run South 88°-05'-41" East along the center line of said New Jersey Street, 388.05 feet; thence South 02°-15'-27" West along the East right-of-way line of Old Water Street (50 foot right-of-way, not open), a distance of 442.53 feet; thence South 81°-46'-07" East, 613.32 feet to a point herein after referred to as Point "E"; thence continue South 81°-46'-07" East, 518.09 feet to a point on the Western pierhead and bulkhead line for the Mobile River; thence North 28°-54'-47" West

along said pierhead and bulkhead line, 1499.72 feet; thence North 12°-26'-28" West along said pierhead and bulkhead line, 113.81 feet to a point on the projected South boundary of Lot 5, Block 166, of the Bernoudy Tract, as recorded in the office of the Judge of Probate Court, Mobile County, Alabama; thence North 81°-36'-21" West along said projection a distance of 54.39 feet to a point herein after referred to as Point "D" (mathematical tie from Point "E" to Point "D" bears North 12°-7'-26" West, 1386.78 feet);thence continue North 81°-36'-21" West along said projection and along the South line of Lot 4, Block 166, and along the South line of Lot 10 and Lot 5, Block 165, of said Bernoudy Tract, a distance of 570.61 feet; thence South 07°-43'-47" West along the Eastern right-of-way of said South Water Street, a distance of 904.46 feet to the Point of Beginning.

13.     Rights of Signal Ship Repair, LLC to a Sublease dated August 1, 2001 between Bender Shipbuilding & Repair Co., Inc. and Waterways Towing & Offshore Services, Inc. ("Sublessee") and assigned to Signal Ship Repair, LLC by instrument dated February 1, 2010. (Signal Ship Repair, LLC is the Lessee under that certain Lease Agreement (Yard 8) between Pinto Island Land Company, Inc. and Bender Shipbuilding & Repair Co. Inc. (predecessor in interest to Signal Ship Repair, LLC) dated April 20, 1999 and recorded in Real Property Book 4704, Page 0793, and assigned to Signal Ship Repair, LLC by instrument dated February 1, 2010 and recorded in Real Property Book 6623, Page 1230, and amended by instrument dated February 1, 2010 and recorded in Real Property Book 6623, Page 1258). This lease will expire on July 31, 2021.

14.     Rights of Signal Ship Repair, LLC, as Landlord, pursuant to a Lease dated May 1, 2014 with AEP River Operations LLC. (Signal Ship Repair, LLC is the Lessee under that certain Lease Agreement (Yard 8) between Pinto Island Land Company, Inc. and Bender Shipbuilding & Repair Co. Inc. (predecessor in interest to Signal Ship Repair, LLC) dated April 20, 1999 and recorded in Real Property Book 4704, Page 0793, and assigned to Signal Ship Repair, LLC by instrument dated February 1, 2010 and recorded in Real Property Book 6623, Page 1230, and amended by instrument dated February 1, 2010 and recorded in Real Property Book 6623, Page 1258). This lease will expire on November 1, 2016.

15.     Real property leased by Signal Ship Repair, LLC pursuant to a Lease Agreement between RAP, LLC and Signal Ship Repair, LLC dated February 1, 2010 and recorded in Real

Property Book 6623, Page 1326, as amended by letter dated October 21, 2014 extending the expiration date to January 31, 2020 and as more particularly described as follows:

### North Baldwin Warehouse Yard:

Beginning at the Southeast corner of Elmira and Royal Street; thence run South along a parallel line of Royal Street, a distance of 309.2 feet to the Northeast corner of Texas Street; thence running 20 feet eastwardly along the North side of Texas Street to a point; thence Northwestwardly to the line along the South side of Elmira Street; thence Westwardly 100 feet to the point of beginning.

16.    Real property leased by Signal International, Inc. pursuant to a Lease Agreement by and between Signal International, Inc. and The Employees' Retirement System of Alabama, an instrumentality of the State of Alabama and the Teachers' Retirement System of Alabama, an instrumentality of the State of Alabama, (collectively, "RSA") dated May 4, 2009. This lease is for office space. It will expire on May December 31, 2016.

Texas

17.    Real property leased by Signal International Texas, L.P. pursuant to a Lease Agreement by and between Signal International Texas, L.P. and the City of Orange dated November 16, 2007 for the use of City property as described below:

0.523 acres of property at 400 Simmons Drive and described in Orange County Abstract 76 of the J. Frances Survey - Lot 1, 80.48 x 100 & 36.99 x 100' TR003 SEE 62000-807952 - IMP

0.69 acre tract of land situated in the John Francis Survey, Abstract No. 76 and the I.G.&N.R.R. Survey, Section No. 22, Abstract No. 225, Orange County, Texas

18.    Real property leased by Signal International, LLC pursuant to a Lease Agreement by and between Signal International, LLC and MLCFC 2007-7 Highway 6 Office, LLC dated April 16, 2004, as amended on September 17, 2007, January 12, 2011 and December 31, 2013. This lease is for office space. It will expire on December 31, 2016.

## Schedule 2.1(d)

## Vessels

| Vessel | Current Location | Status/Ownership |
|---|---|---|
| Maggie D (599351) | MS East Yard, Pascagoula, MS | Idle  - Signal International, LLC |
| Miss Tiff (687129) | MS East Yard, Pascagoula, MS | Operating - Signal International, LLC |
| Dual Carrier (1062576) | MS East Yard, Pascagoula, MS | Operating - Signal International, LLC |
| Mr. T (1162687) | MS East Yard, Pascagoula, MS | Operating - Signal International, LLC |
| Jack King (517314) | MS East Yard, Pascagoula, MS | Operating - Signal International, LLC |
| 20' Yamaha 150 | MS East Yard, Pascagoula, MS | Operating - Signal International, LLC |
| 16' Lowe | MS East Yard, Pascagoula, MS | Operating - Signal International, LLC |
| Crunch Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Crunch Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Crunch Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Deck Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Deck Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Deck Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Deck Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Deck Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Deck Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Deck Barge | MS East Yard, Pascagoula, MS | Idle - Signal International, LLC |
| Drydock #1 (665130) | Yard 8, Mobile, AL | Operating - Signal Ship Repair, LLC |
| Drydock #2 (1207249) | Yard 7, Mobile, AL | Operating - Signal Ship Repair, LLC |
| Pelican (544914) | Yard 3, Mobile AL | Operating - Signal Ship Repair, LLC |
| TL99 (1243850) | Yard 8, Mobile, AL | Operating - Signal Ship Repair, LLC |
| Deck Barge | Yard 7, Mobile, AL | Idle - Signal Ship Repair, LLC |
| Deck Barge | Yard 8, Mobile, AL | Idle - Signal Ship Repair, LLC |
| Work Barge | Yard 8, Mobile, AL | Idle - Signal Ship Repair, LLC |
| Work Barge | Yard 8, Mobile, AL | Idle - Signal Ship Repair, LLC |

### Schedule 2.1(e)

### Acquired Intellectual Property

**Used Intellectual Property (Software)**

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| 1099 Pro | 5 | 3DMark | 1 |
| 7-Zip | 3 | ABB Industrial Robot Communication Runtime | 1 |
| ABBYY FineReader for ScanSnap | 1 | AccXES | 1 |
| Acrobat.com | 1 | Active Directory | 3 |
| Acumen Fuse | 1 | AD Free Edition | 2 |
| Adobe | 76 | ADP PC/Payroll for Windows Server | 2 |
| Advanced Installer/Scanner | 2 | Advantage ODBC Driver | 1 |
| AFT Fathom | 1 | Agere Systems PCI Soft Modem | 1 |
| Akamai NetSession Interface | 1 | Aladdin DiagnostiX | 1 |
| Alcor Micro Smart Card Reader Driver | 1 | Amazon Cloud Drive | 1 |
| AMD Catalyst Install Manager | 1 | Americom Technology VXTracker | 1 |
| AMR MP3 Converter | 1 | Angry IP Scanner | 1 |
| ANSYS SCDM | 1 | Any PDF to DWG Converter | 1 |
| Apache Tomcat | 1 | APIndexer | 2 |
| Apple Application/Software Support | 5 | Application Insights Agent/Verifier | 2 |
| ArcSoft | 2 | Arena Student Version | 1 |
| Ask Toolbar Updater | 1 | Asmedia | 1 |
| Aspera Connect | 1 | Asset Keeper | 4 |
| AT&T AllAccess | 1 | ATI | 2 |
| Audacity | 1 | Auslogics Disk Defrag | 2 |
| AuthenTec TrueSuite | 1 | AutoCAD | 9 |
| Autodesk | 77 | AutoHotkey | 1 |
| AutoIt | 1 | AVG SafeGuard toolbar | 1 |
| Windows 7 Drivers | 1 | AXIS Camera Media Control Management | 2 |
| Battery Recalibration | 1 | BeamPro | 1 |
| Bentley IEG License Service | 3 | Beyond Compare | 1 |
| Bible Study | 2 | Bidata | 1 |
| Bing Bar | 1 | Bluetooth Stack for Windows | 1 |
| Bomgar | 10 | Bonjour | 1 |
| Boot Services | 1 | Broadcom | 10 |

15

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| Brother Editor | 3 | BrowserSafeguard with RocketTab | 1 |
| BT-PlotAssistant | 1 | BtwMfcMM | 1 |
| BUFFALO NS-SHFT | 1 | BusinessObjects Enterprise | 1 |
| Camera Finder | 1 | Canon Camera Software | 27 |
| Capn Voyager Mosaic | 1 | Cardiris | 1 |
| CardMinder | 1 | CardScan | 3 |
| CASIO USB Driver | 2 | Catalyst Control Center | 1 |
| CCleaner | 1 | CHMC USB Driver | 1 |
| Cisco Software | 23 | Citrix | 37 |
| ClockTerminal_II | 5 | CloneCD | 1 |
| CMenuExtender | 1 | Combined Community Codec | 1 |
| Cometdocs | 1 | Commercial Series Customer Programming Software | 1 |
| Compatibility Pack forOffice system | 1 | Component Checker | 1 |
| Composite | 1 | Concealed Mode Utility | 1 |
| Conexant HD Audio | 1 | Config Advisor/Mgr | 2 |
| ControlAP | 1 | Corel | 2 |
| Cortona® | 1 | Coupon Printer for Windows | 1 |
| CPUID CPU-Z | 1 | Crosby | 2 |
| Crystal | 13 | CyberLink | 6 |
| DameWare | 5 | Data Lifeguard Diagnostic for Windows | 1 |
| Datacard IDCentre Silver Software | 2 | DataGrid | 5 |
| DCA1B4C0-98A5-418B-8293-45663180B6C5 | 1 | Debugging Tools for Windows | 2 |
| DefaultTab | 1 | Dell Software | 6 |
| Deltek Acumen | 2 | Desktop Software | 2 |
| Device Access Manager for HP ProtectTools | 1 | DeviceLock | 4 |
| DevUp Service | 1 | DHTML Editing Component | 1 |
| Diagnostics for Card Printers | 1 | Digital Photo/Voice Navigator | 2 |
| DIRECTV Player | 1 | Diskeeper EnterpriseServer | 1 |
| DisplayFusion | 4 | DMUninstaller | 1 |
| docuPrinter | 2 | Dotfuscator Software Services | 1 |
| Drive Encryption For HP ProtectTools | 1 | DriverToolkit | 3 |
| Dropbox | 1 | DualServer | 1 |
| DWG TrueView | 5 | EASEUS Partition Recovery | 1 |

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| Easy Rafters | 1 | EasyMP Monitor | 1 |
| eBeam | 1 | eBrowser Uninstallation | 1 |
| Eco Materials Adviser | 1 | Elo Universal Driver | 2 |
| Embedded Security for HP ProtectTools | 1 | Energy Star Digital Logo | 1 |
| Entity Framework | 3 | EPSON Printer Driver | 3 |
| Eusing Free Registry Cleaner | 1 | Everio MediaBrowser | 1 |
| Evernote | 3 | Everything | 1 |
| Exam Software | 2 | ExcelToDBF | 1 |
| Exchange System Manager | 1 | Explorer Suite III | 1 |
| EZ Macros | 1 | Face Recognition for HP ProtectTools | I |
| FARO | 3 | FastCGI | 1 |
| FCL USB Pen Tablet | 1 | ffdshow | 1 |
| FileZilla | 5 | Finesse | |
| FolderSizes | 1 | FoxTab PDF Reader | 1 |
| freeFTPd | 1 | FUJIFILM MyFinePix Studio | 1 |
| Futuremark SystemInfo | 1 | Garmin Software | 2 |
| GetSavin | 1 | Glary Utilities | 3 |
| GNS3 | 1 | GNU Ghostscript | 2 |
| Google | 5 | GoToAssist Corporate | 1 |
| GoToMeeting | 9 | GoToMyPC | 1 |
| GPL Ghostscript | 2 | Hand Writing Utility | 1 |
| HandBrake | 1 | HASP Device Driver | 2 |
| HDAUDIO Soft Data Fax Modem with SmartCP | 1 | Headless Server Registry Update | 1 |
| HelpSTAR SQL Web Portal | 1 | High Definition Audio Driver Package | 1 |
| HighMAT Extension to Microsoft Windows XP CD Writing Wizard | 1 | Hotkey | 2 |
| HP Software | 97 | HPSSupply | 1 |
| HTMLDOC Open Source | 1 | HWiNFO64 | 1 |
| HyperBac Compression Engine Components | 1 | I.R.I.S. OCR | 1 |
| iCloud | 1 | IDT Audio | 1 |
| iExplorer | 1 | IIS | 4 |
| Image Plugin | 1 | ImgBurn | 1 |
| IMS | 5 | Infragistics | 14 |
| Inkscape | 1 | InstallShield | 1 |
| Intel(R) Software | 39 | Intelli-M Access | 1 |

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| Internet Explorer Developer Toolbar | 1 | Inter-Tel Collaboration Client | 1 |
| InterVideo WinDVD | 2 | ipMonitor | 1 |
| IPTInstaller | 1 | IP-Tools | 1 |
| IrfanView | 1 | iSkysoft Data Recovery | 1 |
| ITESetup | 1 | iTunes | 1 |
| J2SE | 4 | Java | 58 |
| JHelioviewer | 1 | JMB36X Raid Configurer | 1 |
| JMicron | 3 | join.me | 1 |
| Kaspersky Lab Network Agent | 1 | KeePass Password Safe | 4 |
| Kernel for Outlook PST Repair | 1 | Kiwi Syslog Server | 1 |
| Klever PumpKIN 2.7.2 | 1 | K-Lite Codec Pack | 2 |
| Kodak EasyShare software | 1 | KONICA MINOLTA SOFTWARE | 3 |
| KRANENDONK Software Products | 1 | Kyocera Product Software | 2 |
| Lab On Demand Hyper-V VMConnect ActiveX | 1 | LAME | 1 |
| Lansweeper | 2 | LaserJet 1020 Software | 1 |
| LEADTOOLS Raster Imaging | 1 | Lexmark Printable Web | 1 |
| LG USB Modem driver | 1 | LightScribe Software | 4 |
| Link Shell Extension | 1 | Livescribe | 2 |
| LiveUpdate | 2 | LizardTech | 2 |
| Load CAPN DVD Chart Regions | 1 | Logitech Software | 8 |
| LogMeIn | 1 | LogMeTT | 1 |
| LogonExpert | 1 | Lotus Notes | 1 |
| Loupe Utility | 1 | LSI HDA Modem | 1 |
| M86 Security Authenticator | 2 | Magical Jelly Bean KeyFinder | 1 |
| MagicDisc | 1 | Malwarebytes' Anti-Malware | 6 |
| Management Console | 1 | Manitowoc Compu-Crane | 1 |
| MassPlus | 2 | Masterdock | 2 |
| MatchWare MindView | 1 | McAfee Security Scan Plus | 1 |
| Media Player | 1 | MemInfo | 1 |
| MetaFrame Presentation Server Client | 1 | Microsoft .NET | 25 |
| Microsoft Office Products | 305 | Midaps | 1 |
| MINITAB 14 Student | 1 | MobileMe Control Panel | 1 |
| MobileOffice S800 | 1 | MotoCast | 1 |
| Motorola Software | 6 | Mozilla Firefox | 18 |
| MPM | 1 | MrvlUsgTracking64 | 2 |

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| MSDN Library | 2 | MSXML Service Pack | 12 |
| MT for Windows | 4 | MTCSqlJobService | 1 |
| MTP Porting Kit | 1 | MVO | 2 |
| MyFreeCodec | 1 | MySpeed | 2 |
| MySQL Server 5.5 | 2 | My-T-Touch | 1 |
| NavisWorks Freedom | 2 | NEC Electronics USB Host Controller Driver | 1 |
| Nero Update | 4 | NetApp | 2 |
| Netcam Watcher Player | 1 | NetMos Multi-IO Controller | 1 |
| NetStress | 1 | Network Notepad | 1 |
| Nitro Pro | 4 | Notepad++ | 1 |
| NTFS Permissions Reporter Free Edition | 1 | NTI Backup Now EZ | 1 |
| Nuance | 3 | NVIDIA Drivers | 65 |
| OCR Software by I.R.I.S. | 1 | One-click AMR to MP3 Converter | 2 |
| OneTouch | 2 | OpenSSL | 3 |
| OpenTFTPServer | 1 | Oracle | 2 |
| OrderReminder | 1 | Outlook Recovery Toolbox | 1 |
| Paint Shop Pro 7 | 1 | Panasonic Device Software | 2 |
| Panini | 2 | PANTECH UML290 | 1 |
| PaperPort | 4 | PBLPeeper | 1 |
| PC Information Viewer | 1 | pcProx | 1 |
| PDF Complete Corporate Edition | 2 | PDF Split-Merge | 1 |
| PDF24 Creator | 1 | Pdf995 | 1 |
| PDQ Deploy | 1 | Peer Monitor | 1 |
| PelcoMediaPlayer | 1 | PENPOWER WorldCard | 1 |
| Pertmaster8x | 1 | PFA Server Registry Update | 1 |
| Photo Explosion | 1 | PHP | 1 |
| Picasa 3 | 1 | PIPE-FLO | 2 |
| PipeLink for STAAD.Pro | 2 | PL-2303 USB-to-Serial | 1 |
| Pointools | 2 | Power Plan Extension Utility | 1 |
| Powerprint | 2 | PowerVault Modular Disk Storage Manager | 1 |
| Prerequisites for SSDT | 1 | Primavera | 6 |
| PrimoPDF | 2 | Print | 1 |
| Print Screen Deluxe | 1 | PrintCounts NSDP Client | 2 |
| PrintKey2000 | 1 | Privacy Manager for HP ProtectTools | 1 |

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| Product Improvement Study for HP DJ 1510 Series | 1 | Programmer's Notepad | 1 |
| ProNest | 3 | PuTTY | 1 |
| Python | 1 | Quest | 2 |
| QuickBooks | 2 | QuickTime | 2 |
| QuiskScaf | 1 | Quotation | 2 |
| RADVISION Conference Client | 1 | Raptr | 1 |
| RCA Software | 2 | RealLegal E-Transcript Bundle Viewer | 1 |
| RealPlayer | 1 | Realtek | 7 |
| Real-Time Monitoring Tool | 1 | Relativity Web Client | 2 |
| Relay Test Program | 1 | Remote Desktop | 2 |
| Renesas Electronics USB Host Controller Driver | 1 | Request | 1 |
| RescuePRO | 1 | Restore Agent | 1 |
| Rhinoceros | 7 | RICOH Media Driver | 1 |
| Rosetta Stone | 1 | Roxio | 14 |
| RVTools | 1 | Safari | 1 |
| SafeNet Authentication Client | 1 | Samsung Device Software | 2 |
| Scalable WinINSTALL LE | 1 | ScanLite2 | 1 |
| ScanRouter | 1 | ScanSnap | 2 |
| ScanSoft PaperPort | 1 | SCENE | 3 |
| SciTE4AutoIt3 | 1 | Scott Gas Monitor | 1 |
| SCR3xxx Smart Card Reader | 1 | Search App by Ask | 1 |
| Secure Gateway | 1 | Security Update for Windows Search | 1 |
| Sendori | 1 | Sentinel | 5 |
| Serif MontagePlus | 1 | SES Driver | 1 |
| Setup1 | 1 | Sharepod | 1 |
| SHARP Driver | 2 | ShipConstructor | 6 |
| Shop for HP Supplies | 1 | ShopAtHome.com | 2 |
| SI Network Desktop | 1 | SigmaTel Audio | 1 |
| SigTool Imager Plus v1.3 | 1 | Silent Install Builder | 1 |
| Silicon Laboratories CP210x USB to UART Bridge | 1 | Single Mailbox Recovery | 1 |
| Sinister City | 1 | SiSoftware Sandra Lite | 1 |
| SiteSurveyPlugin | 1 | Skillpipe Reader | 1 |
| Skype | 4 | SmartSound | 2 |
| Smart-X SignatureOne | 1 | SMSC | 2 |
| SnapDrive | 1 | SnapManager | 2 |

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| SNMPv3 agent | 1 | Soft Data Fax Modem with SmartCP | 1 |
| Software Setup | 1 | SolarWinds | 21 |
| Sony Device Software | 1 | Sound Organizer | 1 |
| SoundMAX | 1 | SpatialAnalyzer | 2 |
| Specops Gpupdate | 1 | Spiceworks | 1 |
| Spotify | 1 | Spotlight | 2 |
| Sprint SmartView | 1 | Spybot - Search & Destroy | 1 |
| SQL | 17 | SSI Licensing | 1 |
| SSL Diagnostics | 1 | SSMS Integration | 1 |
| STAAD | 5 | Startup Delayer | 1 |
| Stellar Phoenix | 2 | Sybase | 10 |
| Symantec | 9 | Synaptics Pointing Device Driver | 1 |
| SyncToy | 1 | System Requirements Lab for Intel | 1 |
| Tablet Button Manager | 1 | TamoSoft Throughput Test | 1 |
| Tanks409d | 1 | TeamViewer | 2 |
| TellerScan Driver | 1 | Tera Term | 4 |
| Tftpd32 Standalone Edition | 1 | Tftpd64 Standalone Edition | 1 |
| TFTPUtil GUI Installer | 1 | The Dude | |
| The Penn State Alumni Association | 1 | The Weather Channel | 3 |
| Theft Recovery for HP ProtectTools | 1 | Tier2Submit | 1 |
| TightVNC | 2 | Topaz Software | 3 |
| Torch | 2 | touchpad | 1 |
| TranslatorX | 1 | Trusteer Endpoint Protection | 1 |
| TTLEditor | 1 | Tutorial Macro Creation | 1 |
| Tweak UI | 2 | Ubiquiti UniFi | 1 |
| UltraVnc | 1 | Unlocker | 3 |
| Update for Windows Server | 1 | Update for Windows XP | 1 |
| USB Display Device | 1 | USB Ethernet Adapter | 1 |
| User Profile Hive Cleanup Service | 2 | Vafmusic8 Toolbar | 1 |
| Validity Fingerprint Driver | 2 | VCE Exam Simulator Demo | 1 |
| Verizon Device Software | 6 | Video Booth | 1 |
| ViewSonic Device Software | 4 | ViewSpan | 1 |
| VIP Access SDK | 1 | Virtual Machine Manager Self-Service Client | 1 |
| VirtualCloneDrive | 1 | Visioneer Strobe XP 220 Driver | 1 |

| Description | No of Licenses | Description | No of Licenses |
|---|---|---|---|
| VisionX Multi-Function System Extensions | 1 | Visual Studio | 6 |
| Visual Subst | 1 | VitalSource Bookshelf | 1 |
| VLC media player | 5 | Vmware | 14 |
| Volume Activation Management Tool | 1 | VZAccess Manager | 1 |
| Wasp Bar Code ActiveX & DLL | 1 | WCF RIA Services | 2 |
| WD Drive Manager | 1 | Web Deployment Tool | 1 |
| WebEx | 1 | WebPAMPRO | 1 |
| WebSlingPlayer ActiveX | 1 | WIMGAPI | 1 |
| WinBatch | 1 | Windows | 61 |
| WinMerge | 1 | WinPcap | 3 |
| WinRAR | 2 | WinSCP | 1 |
| WinZip | 3 | Wireless Switch Utility | 1 |
| Wireshark | 3 | xAssets Collection Server | 1 |
| XBMC | 1 | Xerox Device Software | 3 |
| XLS to DBF Converter | 1 | XMediusFAX | 2 |
| XnView | 1 | Yahoo! | 4 |
| Zoo | 2 | Zoo 5.0 | |

**Schedule 2.1(e) - continued**

**Acquired Intellectual Property**

**Owned Intellectual Property**

Information Management System (IMS) - is an in-house program written to expand the use of Finesse, the ERP software used by Signal. IMS uses data entry throughout the Company to compile and generate reports. Finesse and IMS run on a 2005 SQL database. IMS was programmed using PowerBuilder (Version 12.5). The plan is to upgrade IMS to run in an internet environment utilizing Appeon/PowerBuilder. IMS will eventually replace Finesse as Signal's ERP software.

**Domain Names**

oilrigrepair.com
signalint.com
signalinternational.com
signalshiprepair.com
signalshiprep.com
signalshiprepairllc.com
signalshipreps.com

## Schedule 2.1(f)

### Contracts

1.      Reference is made to the Leases set forth on <u>Schedule 2.1(c)(ii)</u>.

2.      Reference is made to the Contracts set forth on <u>Schedule 2.1(l)</u>.

3.      Reference is made to the Contracts and Leases set forth on <u>Schedule 5.12</u>.

4.      Reference is made to the Finance Agreements set forth on <u>Schedule 5.12</u>.

**Schedule 2.1(l)**

**Notes and Receivables**

1.     Promissory Note dated effective October 3, 2014, from Westport Orange Shipyard LLC to Signal International Texas, L.P. in the stated principal sum of $23,900,000.00, evidencing the loan made pursuant to the terms of the Credit Agreement between Westport Orange Shipyard LLC and Signal International Texas, L.P. dated effective October 3, 2014. Such loan is secured by, among other things, a Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents and Financing Statement dated effective October 3, 2014 given by Westport Orange Shipyard LLC in favor of Signal International Texas, L.P., and recorded in the Official Public Records of Real Property of Orange County, Texas as Instrument No. 412086, together with a Second Preferred Fleet Mortgage given by Westport Orange Shipyard LLC in favor of Signal International Texas, L.P., and recorded at the United States Coast Guard, National Vessel Documentation Center on October 7, 2014 as Batch No. 23076900, Document No. 24.

2.     List of Accounts Receivable as of or prior to June 30, 2015

| | |
|---|---|
| AUSTAL USA, LLC | 27,619.00 |
| BRO-TEX INTERNATIONAL METALS | 5,449.56 |
| DIAMOND OFFSHORE | 76,188.00 |
| DIXSTONE HOLDINGS LIMITED | 10,976.00 |
| E SOURCE HOLDING, LLC | 55,135.16 |
| ENTERPRISE MARINE SERVICES | 77,968.10 |
| FOSS MARITIME COMPANY | 595,504.10 |
| HERCULES DRILLING COMPANY | 1,000.00 |
| HERCULES OFFSHORE DRILLING | 6,000.00 |
| MORAN TOWING CORPORATION | 122,355.00 |
| OLYMPIC SHIPPING AS | 102,422.75 |
| PATTI MARINE ENTERPRISES | 56,276.00 |
| ROWAN COMPANIES INC. | 35,765.00 |
| RYERSON | 1,060.37 |
| SIGNET MARINE CORP. | 6,771.00 |
| TRANSOCEAN OFFSHORE DEEPWATER | 1,995.23 |
| USCG FINANCE CTR-CO 0466 | 119,910.00 |
| VT HALTER MARINE, INC. | 195,644.10 |
| WESTPORT ORANGE SHIPYARD, LLC | 1,335.00 |

**Schedule 2.2(a)**

**Excluded Contracts and Leases**

1.    The following engagement agreements:

| Name/Entity | Date Signed |
|---|---|
| Hogan Lovells US LLP | March 6, 2015 |
| Victor, Samuel | March 6, 2015 |
| Young Conaway Stargatt & Taylor, LLP | March 6, 2015 |
| GGG Partners, LLC | May 13, 2015 |
| SSG Capital Advisors, LLC | May 8, 2015 |
| Kurtzman Carson Consultants LLC | June 18, 2015 |

2.    All Contracts and rights therein not assumed and assigned to Purchaser pursuant to Section 5.12.

## Schedule 2.2(i)

## Specifically Excluded Assets

**None**

**Schedule 2.3(d)**

**Cure Amounts**

**See Schedule 5.12**

## Schedule 2.3(j)

## Other Assumed Liabilities

All the following Liabilities of the Seller as of the Closing Date, to the extent incurred in the ordinary course of business and consistent with past practices:

| Description |
| --- |
| Reserve for FICA Taxes |
| United Way |
| 125 Child Care |
| Reserve for 125 FLEX MEDICAL PLAN |
| Reserve for HR/SAL Section 125 Plan |
| Reserve for 401K Plan |
| Garnishments |
| Reserve for Federal Unemployment Taxes |
| Accrued  SUI Payable - AL |
| Reserve for State Unemployment |
| Accrued SUI Payable - TX |
| Accrued Payroll |
| Accrued Workers Comp |
| Unclaimed Wages |
| Accrued Group Medical Insurance Liability |
| Accrued Vacation Pay |
| Accrued Property Taxes |
| Accrued Interest - Notes Payable* |

**\*Accrued Interest is assumed only to the extent (and in such amounts) as the same relates to a Note Payable that is assumed by Purchaser.**

## Schedule 2.3(m)

## Trade Accounts Payables

To be determined by Purchaser at least 15 days prior to the date of the Auction.

## Schedule 5.12

## Contract & Cure Schedule

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Property Lease | Signal International, Inc. | The Employees' Retirement System of Alabama, an instrumentality of The State of Alabama and The Teachers' Retirement System of Alabama, an instrumentality of the State of Alabama<br>135 South Union Street<br>Montgomery, AL 36104 | Property Lease - Office Space - Located in Mobile, AL | |
| Property Lease | Signal International, LLC | MLCFC 2007-7 Highway 6 Office, LLC<br>c/o PM Realty Group<br>1011 Highway 6 South, Suite 111<br>Houston, TX 77077 | Property Lease - Office Space - Located in Houston, TX | |
| Property Lease | Signal International, LLC | Alion Science and Technology Corporation<br>1000 Burr Ridge Parkway<br>Burr Ridge, IL 60527 | Property Lease - Office Building and Parking Lot - Located in Pascagoula, MS | |
| Property Lease | Signal International, LLC | Jackson County Port Authority<br>P.O. Box 70<br>Pascagoula, MS 39568 | Property Lease - MS East Yard - Located in Pascagoula, MS | |
| Property Lease | Signal International, LLC | Jackson County Port Authority<br>P.O. Box 70<br>Pascagoula, MS 39568 | Property Lease - USCG Aid to Navigation Lease No. HSCG82-09-L-8N3004 - Located in Pascagoula, MS | |
| Property Lease | Signal International, LLC | Jackson County Port Authority<br>P.O. Box 70<br>Pascagoula, MS 39568 | Property Lease - MS West Yard - Located in Pascagoula, MS | |
| Property Lease | Signal International, LLC | CSX Transportation, Inc.<br>P.O. Box 116628<br>Atlanta, GA 30368-6628 | Property Lease - MS West Yard, CSX Agreement No. CSX-027354 - Land Only - Located in Pascagoula, MS | |

31

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Property Lease | Signal International, LLC | CSX Transportation, Inc. P.O. Box 116628 Atlanta, GA 30368-6628 | Property Lease - MS West Yard, CSX Agreement No. CSX-029422 Wireline Crossing Agreement - Located in Pascagoula, MS | |
| Property Lease | Signal International, LLC | CSX Transportation, Inc. P.O. Box 116628 Atlanta, GA 30368-6628 | Property Lease - MS West Yard, CSX Agreement No. CSX-029423 - Pipeline Crossing Agreement - Located in Pascagoula, MS | |
| Property Lease | Signal International, LLC | Jackson County Port Authority P.O. Box 70 Pascagoula, MS 39568 | Property Lease - MS Dry-dock Facility Operating Agreement - Located in Pascagoula, MS | |
| Property Lease | Signal International Texas, L.P. | City of Orange P.O. Box 520 Orange, TX 77631-0520 | Property Lease - TX - Parking Lot at the corner of Simmons and Green Avenue - Located in Orange, TX | |
| Property Lease | Signal Ship Repair, LLC | Complete Equipment, LLC P.O. Box 1864 Mobile, AL 36633 | Property Lease - Yard 1 - Located in Mobile, AL | |
| Property Lease | Signal Ship Repair, LLC | Morriss River Property, LLC c/o Thames Jackson Harris Company, Inc., as Agent 60 St. Francis Street Mobile, AL 36602 | Property Lease - Yard 7 - Located in Mobile, AL | |
| Property Lease | Signal Ship Repair, LLC | Pinto Island Land Company 6110 Parklane Blvd Cleveland, OH 44124-4187 | Lease of Yard 8 - Located in Mobile, AL | |
| Property Lease | Signal Ship Repair, LLC | Waterways Towing & Offshore Services, Inc. P.O. Box 1821 Mobile, AL 36633 | Sublease of Yard 8 100' x 250' (approx.) parcel of land with a non-exclusive easement measuring approx. 10' x 2000' through Yard 8 for ingress and egress - Located in Mobile, AL | |
| Property Lease | Signal Ship Repair, LLC | AEP River Operations LLC 8386 Jonesboro Road, Suite D Daphne, AL 36526 | Sublease of Barge Mooring Facility South of Yard 8 - Located in Mobile, AL | |

32

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Property Lease | Signal Ship Repair, LLC | RAP, LLC<br>P.O. Box 1444<br>Mobile, AL 36633 | Lease of Yard 12 - Located in Mobile, AL | |
| Property | Signal International, Inc. | Jerry Hughes Realty, Inc.<br>1304 16th St.<br>Orange, TX 77630 | Commercial Real Estate Listing Agreement | |
| Utility Agreement | Signal International, LLC | Mississippi Power Company<br>Joint Use Administrator,<br>Distribution & Division Services<br>2992 West Beach Blvd.<br>Post Office Box 4079<br>Gulfport, MS 39502-4079 | | |
| Utility Agreement | Signal Ship Repair, LLC | Alabama Power Company<br>600 N. 18th Street<br>Birmingham, AL 35291 | | |
| Utility Agreement | Signal Ship Repair, LLC | Alabama Power Company<br>600 N. 18th Street<br>Birmingham, AL 35291 | | |
| Utility Agreement | Signal Ship Repair, LLC | Alabama Power Company<br>600 N. 18th Street<br>Birmingham, AL 35291 | | |
| Utility Agreement | Signal Ship Repair, LLC | Alabama Power Company<br>600 N. 18th Street<br>Birmingham, AL 35291 | | |
| Service Agreement | Signal International, LLC | Mississippi Coast Foreign Trade Zone, Inc.<br>c/o Harrison County Development Commission<br>12292 Intraplex Parkway<br>Gulfport, MS 30503 | Service Agreement - Foreign Trade Zone User Agreement | |
| Service Agreement | Signal International, Inc. | Praxair, Inc.<br>900 Westpark Drive, Suite 100<br>Peachtree City, GA 30269 | Bulk Gas/Product Supply Agreement | |
| Service Agreement | Signal International, LLC | Talk South<br>7379 US Hwy 98<br>Hattiesburg, MS 39402 | Telecommunications invoice management and cost savings solutions | |

33

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Service Agreement | Signal Ship Repair, LLC | Beerman Precision<br>P.O. Box 6018<br>Metairie, LA 70009 | Consignment Agreement | |
| Service Agreement | Signal Ship Repair, LLC | Matheson Tri-Gas, Inc.<br>150 Allen Road, Suite 302<br>Basking Ridge, NJ 07920 | Bulk Gas/Product Supply Agreement | |
| Service Agreement | Signal Ship Repair, LLC | G&K Services, Inc.<br>701 St. Anthony St.<br>Mobile, AL 36603 | Uniform Services Agreement | |
| Service Agreement | Signal Ship Repair, LLC | Mobile Foreign-Trade Zone Corp.2062 Old Shell RoadMobile, AL 36607 | Foreign Trade Zone User Agreement | |
| Service Agreement | Signal International, Inc. | AISG, Inc.<br>P.O. Box 2607<br>Brentwood, TN 27024 | PRI Services and Equipment | |
| Service Agreement | Signal International, LLC | Teklinks, Inc.<br>201 Summit Parkway<br>Birmingham, AL 35209 | Internet and MPLS Services | |
| Service Agreement | Signal International, LLC | Teklinks, Inc.<br>201 Summit Parkway<br>Birmingham, AL 35209 | SIP Trunk services | |
| Service Agreement | Signal International, LLC | Deltacom<br>P.O. Box 2252<br>Birmingham, AL 35246-1058 | Services for local telephone numbers | |
| Service Agreement | Signal International, LLC | ACC Business<br>400 West Ave.<br>Rochester, NY 14611 | Internet, MPLS and SIP Trunk services | |
| Service Agreement | Signal International, LLC | Bullseye Telecom<br>25925 Telegraph Road<br>Suite 210<br>Southfield, MI 48033-2527 | Replaces AT&T POTS lines | |
| Service Agreement | Signal International, LLC | Gulf Coast Marine Supply, Inc.<br>P.O. Box 2088<br>Mobile, AL 36652 | Price and Delivery Agreement for Goods | |
| Service Agreement | Signal International, LLC | Gulf Sales & Supply Inc.<br>1909 Kenneth Ave.<br>Pascagoula, MS 39567 | Price and Delivery Agreement for Goods | |

34

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Service Agreement | Signal International, LLC | Shipyard Supply, Inc.<br>5495 East Rite Rd.<br>Theodore, AL 36582 | Price and Delivery Agreement for Goods | |
| Service Agreement | Signal International, LLC | Weaver Supply Company, LLC<br>3813 Richard Street<br>Moss Point, MS 39563 | Price and Delivery Agreement for Goods | |
| Service Agreement | Signal Ship Repair, LLC | Canal Barge Company, Inc.<br>835 Union Street<br>New Orleans, LA 70112 | Master Barge Bareboat Charter Agreement | |
| Service Agreement | Signal International, LLC | Signet Maritime Corporation<br>1330 Post Oak Blvd., Suite 2150<br>Houston, TX 77056-3059 | Master Time Charter Agreement | |
| Service Agreement | Signal Ship Repair LLC | Federal Communications Commission<br>P.O. Box 358290<br>Pittsburgh, PA 15251-5290 | FCC Radio Service Authorization | |
| Service Agreement | Signal International, LLC | Federal Communications Commission<br>P.O. Box 358290<br>Pittsburgh, PA 15251-5290 | FCC Radio Service Authorization | |
| Service Agreement | Signal International, LLC | Wegmann Dazet & Company<br>New Orleans Office:<br>111 Veterans Blvd., Suite 800<br>Metairie, LA 70005<br>Northshore Office:<br>180 New Camellia Blvd.<br>Suite 200<br>Covington, LA 70433 | Auditors for 401(k) Plan | |
| Equipment Lease | Signal Ship Repair, LLC | Red-D-Arc Inc.<br>6065B Rangeline Road<br>Theodore, AL  36582-5204 | Lease of Welders | |
| Equipment Lease | Signal International, Inc. | NewStar Equipment Finance I, LLC (assigned from Regions Commercial Equipment Finance, LLC)<br>500 Boylston Street, Suite 1250<br>Boston, MA  02116 | Master Lease Agr - Schedule EFA-2 - Kramendonk | |

35

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Equipment Lease | Signal International, Inc. | NewStar Equipment Finance I, LLC (assigned from Regions Commercial Equipment Finance, LLC) 500 Boylston Street, Suite 1250 Boston, MA 02116 | Master Lease Agr - Schedule EFA-3 - Barge | |
| Equipment Lease | Signal International, LLC | Cisco Systems Capital Corp Lease Processing Center 1111 Old Eagle School Road Wayne, PA 19087 | Fiber Optic Cable | |
| Equipment Lease | Signal International, LLC | Cisco Systems Capital Corp Lease Processing Center 1111 Old Eagle School Road Wayne, PA 19087 | Computer Equipment | |
| Equipment Lease | Signal International, Inc. | CIT Technology Financing Svcs 21146 Network Place Chicago, IL 60673-1211 and Wade Office Equipment 1045 Downtowner Blvd. Mobile, AL 36602 | Copiers - 900-0222081-000 | |
| Equipment Lease | Signal Ship Repair LLC | CIT Technology Financing Svcs 21146 Network Place Chicago, IL 60673-1211 and Wade Office Equipment 1045 Downtowner Blvd. Mobile, AL 36602 | Copiers - 900-0222080-000 | |
| Equipment Lease | Signal International, Inc. | GE Capital P.O. Box 3083 Cedar Rapids, IA 52406-3083 and DEX imaging, Inc. 1045 Downtowner Blvd. Mobile, AL 36602 | Copiers - 7711396-002 | |

36

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Equipment Lease | Signal International, Inc. | GE Capital<br>P.O. Box 3083<br>Cedar Rapids, IA 52406-3083<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 7711396-003 | |
| Equipment Lease | Signal International, Inc. | GE Capital<br>P.O. Box 3083<br>Cedar Rapids, IA 52406-3083<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 7711396-004 | |
| Equipment Lease | Signal Ship Repair LLC | GE Capital<br>P.O. Box 3083<br>Cedar Rapids, IA 52406-3083<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 7801617-001 | |
| Equipment Lease | Signal Ship Repair LLC | GE Capital<br>P.O. Box 3083<br>Cedar Rapids, IA 52406-3083<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 7801617-002 | |
| Equipment Lease | Signal Ship Repair LLC | GE Capital<br>P.O. Box 3083<br>Cedar Rapids, IA 52406-3083<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 7801617-003 | |

37

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Equipment Lease | Signal International, Inc. | GreatAmerica Leasing Corp<br>P.O. Box 660831<br>Dallas, TX 75266-0831<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 009-0930035-000 | |
| Equipment Lease | Signal International, LLC | GreatAmerica Leasing Corp<br>P.O. Box 660831<br>Dallas, TX 75266-0831<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 010-0932107-000 | |
| Equipment Lease | Signal International, Inc. | GreatAmerica Leasing Corp<br>P.O. Box 660831<br>Dallas, TX 75266-0831<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 010-0952467-000 | |
| Equipment Lease | Signal International, LLC | GreatAmerica Leasing Corp<br>P.O. Box 660831<br>Dallas, TX 75266-0831<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 010-0941108-000 | |
| Equipment Lease | Signal International, Inc. | GreatAmerica Leasing Corp<br>P.O. Box 660831<br>Dallas, TX 75266-0831<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL  36602 | Copiers - 014-0773545-000 | |

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Equipment Lease | Signal International, Inc. | GreatAmerica Leasing Corp<br>P.O. Box 660831<br>Dallas, TX 75266-0831<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | Copiers - 014-0798909-000 | |
| Equipment Lease | Signal Ship Repair LLC | GreatAmerica Leasing Corp<br>P.O. Box 660831<br>Dallas, TX 75266-0831<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | Copiers - 010-0930806-000 | |
| Equipment Lease | Signal International, Inc. | U.S. Bank Equipment Finance<br>1310 Madrid Street, Suite 101<br>Marshall, MN 56258-4002<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | Copiers - 500-0380342-000 | |
| Equipment Lease | Signal International, Inc.,<br>Signal International, LLC &<br>Signal International Texas, LP | Varilease Finance Inc.<br>6340 South 3000 East, Suite 400<br>Salt Lake City, UT 84121 | Lease/Buyback - Cincinnati Press<br>Brake and Kranendonk | |
| Equipment Lease | Signal International, LLC | Wells Fargo Financial Leasing<br>Leasing Customer Service<br>MAC N0005-055<br>800 Walnut Street<br>Des Moines, IA 50309-3605<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | Copiers - 603-0906773 Pt A | |
| Equipment Lease | Signal International, Inc. | Wells Fargo Financial Leasing<br>Leasing Customer Service<br>MAC N0005-055<br>800 Walnut Street | Copiers - 603-0906773 Pt B | |

39

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| | | Des Moines, IA 50309-3605 and DEX imaging, Inc. 1045 Downtowner Blvd. Mobile, AL 36602 | | |
| Equipment Lease | Signal International, Inc. | Wells Fargo Financial Leasing Leasing Customer Service MAC N0005-055 800 Walnut Street Des Moines, IA 50309-3605 and DEX imaging, Inc. 1045 Downtowner Blvd. Mobile, AL 36602 | Copiers - 603-0906373-002 | |
| Equipment Lease | Signal International, LLC | Wells Fargo Financial Leasing Leasing Customer Service MAC N0005-055 800 Walnut Street Des Moines, IA 50309-3605 and DEX imaging, Inc. 1045 Downtowner Blvd. Mobile, AL 36602 | Copiers - 603-0906373-004 | |
| Equipment Lease | Signal International, LLC | Wells Fargo Financial Leasing Leasing Customer Service MAC N0005-055 800 Walnut Street Des Moines, IA 50309-3605 and DEX imaging, Inc. 1045 Downtowner Blvd. Mobile, AL 36602 | Copiers - 603-0906373-005 | |
| Equipment Lease | Signal International, LLC | Wells Fargo Financial Leasing Leasing Customer Service MAC N0005-055 800 Walnut Street Des Moines, IA 50309-3605 and | Copiers - 603-0906373-006 | |

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| | | DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | | |
| Equipment Lease | Signal International, Inc. | Wells Fargo Financial Leasing<br>Leasing Customer Service<br>MAC N0005-055<br>800 Walnut Street<br>Des Moines, IA 50309-3605<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | Copiers - 603-0906373-008 | |
| Equipment Lease | Signal International, Inc. | Wells Fargo Financial Leasing<br>Leasing Customer Service<br>MAC N0005-055<br>800 Walnut Street<br>Des Moines, IA 50309-3605<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | Copiers - 603-0032948 | |
| Equipment Lease | Signal International, LLC | Wells Fargo Financial Leasing<br>Leasing Customer Service<br>MAC N0005-055<br>800 Walnut Street<br>Des Moines, IA 50309-3605<br>and<br>DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | Copiers - 603-0032948-005 | |
| Equipment Lease | Signal International, LLC | Wells Fargo Financial Leasing<br>Leasing Customer Service<br>MAC N0005-055<br>800 Walnut Street<br>Des Moines, IA 50309-3605<br>and | Copiers - 603-0033186-001 | |

41

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| | | DEX imaging, Inc.<br>1045 Downtowner Blvd.<br>Mobile, AL 36602 | | |
| Equipment Lease | Signal International, LLC | Pitney Bowes Global Financial Services<br>3001 Summer St.<br>Stamford, CT 06926 | Postage Machine in Pascagoula, MS | |
| Equipment Lease | Signal International, Inc. | Pitney Bowes Global Financial Services<br>3001 Summer St.<br>Stamford, CT 06926 | Postage Machine - Corporate Office in Mobile, AL | |
| Equipment Lease | Signal International, LLC | Leaf Capital Funding, LLC<br>1720A Crete Street<br>Moberly, MO 65270 | Copiers - 100-1705647-001 - Orange, TX (Buckley) | |
| Equipment Lease | Signal International, LLC | Leaf Capital Funding, LLC<br>1720A Crete Street<br>Moberly, MO 65270 | Copiers - 100-1705647-002 - Orange, TX (Buckley) | |
| Equipment Lease (Rental) | Signal International, LLC | Mobile Modular Management Corp.<br>P.O. Box 45043<br>San Francisco, CA 94145-0043 | Rental of 8 x 40 Container Office | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Advanced Technical Staffing Solutions<br>P.O. Box 1844<br>Mobile, AL 36633 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Alliance Mechanical Solutions<br>33981 Highway 59<br>Loxley, AL 36551 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Ameri-Force Craft Services<br>9485 Regency Square Blvd.<br>Suite 300<br>Jacksonville, FL 32225 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Core Group Resources<br>410 W. Grand Parkway S.<br>Suite 205 | Staffing agreements for executive/admin workers | |

42

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| | | Katy, TX 77494 | | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Empire Scaffold 4505 Halls Mill Road Mobile, AL 36693 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | F&S Marine 3305 Old Mobile Avenue Pascagoula, MS 39581 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Flexicrew Staffing, Inc. 3517 Laughlin Drive Mobile, AL 36693 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Genesis Technical Staffing, Inc. 3521 Lakefront Drive Mobile, AL 36695 | Staffing agreements for engineers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Hutco Inc. 114 Park Center Street Broussard, LA 70518 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Impact Marine & Industrial Services 1940 Jackson Ave. Pascagoula, MS 39567 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Jerry Pitman 12504 Hwy. 54 Vancleave, MS 39565 | Staffing agreements for engineers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Knights Marine & Industrial Services 3421 Industrial Road Pascagoula, MS 39581 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | MCG Contracting 308 Saint Michael Street Mobile, AL 36602 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Maxum Industries, LLC 1307 Tool Dr. New Iberia, LA 70560 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | NSC Technologies, Inc. 660 Mt. Vernon Avenue Portsmouth, VA 23707 | Staffing agreements for production workers | |

43

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Permanent Workers, LLC 7702 East Hwy. 182 Morgan City, LA 70380 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Shore Construction, LLC 1311 Market Street Pascagoula, MS 39567 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Sirius Technical Services, Inc. 6215 Rangeline Road, Suite 201 Theodore, AL 36582 | Staffing agreements for engineers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | South Marine Systems, Inc. 4126 Government Blvd, Suite A Mobile, AL 36693 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Southland Energy Services, LLC 202 Lyndenwood Drive Houma, LA 70364 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Steel Personnel | Staffing agreements for executive/admin workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Technical Marine Maintenance Mississippi, LLC 5437 West Park Ave. Houma, LA 70364 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Tradesmen Services, LLC 9760 Shepard Road Macedonia, OH 44056 | Staffing agreements for production workers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | Trev-Co. 15543 Davids Ct. Biloxi, MS 39532 | Staffing agreements for engineers | |
| Contract Labor Agreement | Signal International, LLC and Signal Ship Repair, LLC | United Labor Group 653 Burlington Avenue P.O. Box 1084 Logansport, IN 46947 | Staffing agreements for production workers | |
| Employment Contract | Signal International, Inc. | Robert A. Beckmann 11 N. Water St., Suite 16250 Mobile, AL 36602 | Sr VP/General Manager | |
| Employment Contract | Signal International, Inc. | Christopher Cunningham 11 N. Water St., Suite 16250 | Sr VP & CFO | |

44

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| | | Mobile, AL 36602 | | |
| Employment Contract | Signal International, Inc. | Richard L. Marler 11 N. Water St., Suite 16250 Mobile, AL 36602 | President & CEO | |
| Employment Contract | Signal International, Inc. | Ronald Schnoor 11 N. Water St.., Suite 16250 Mobile, AL 36602 | Sr. VP/General Manager | |
| Consulting Agreement | Signal Ship Repair, LLC | Peter C. Maschke 16 Lakeshore Drive Daphne, AL 36526 | Ship Repair Sales | |
| Consulting Agreement | Signal Ship Repair, LLC | Manuel Otano 10208 Summerlake Ct. Mobile, AL 36608 | Sales efforts in Mexico, Central and South America | |
| Consulting Agreement | Signal International, Inc. | Sara Weyant-Bunn 26 Elwyn Rd Portsmouth, NH 03801 | IT Consultant | |
| Finance Agreement | Signal International Texas, L.P. | Westport Orange Shipyard LLC 91 West Front Street Orange, TX 77630 | Consent and Intercreditor dated March 3, 2015, among Westport Orange Shipyard LLC, Signal International Texas, L.P., The Teachers' Retirement System of Alabama and CommunityBank of Texas, N.A. | |
| | | The Teachers' Retirement System of Alabama, an instrumentality of the State of Alabama 135 South Union Street Montgomery, AL 36104 | | |
| | | CommunityBank of Texas, N.A. 4690 Sweetwater Blvd Suite 100 Sugarland, TX 77479 | | |

45

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Finance Agreement | Signal International Texas, L.P. | The Teachers' Retirement System of Alabama, an instrumentality of the State of Alabama<br>135 South Union Street<br>Montgomery, AL 36104 | Collateral Assignment of Deed of Trust, Preferred Fleet Mortgage and Other Loan Documents dated as of October 3, 2014 by Signal International Texas, L.P., in favor of The Teachers' Retirement System of Alabama, as administrative agent and collateral agent for certain lenders, and recorded in the Office of the County Clerk of Orange County, Texas as Instrument No. 412087 and recorded with the U.S. Coast Guard National Vessel Documentation Center on October 7, 2014 as Batch No. 23076900, Document No. 23. | |
| Finance Agreement | Signal International Texas, L.P. | Westport Orange Shipyard LLC<br>91 West Front Street<br>Orange, TX 77630<br><br>The Teachers' Retirement System of Alabama, an instrumentality of the State of Alabama<br>135 South Union Street<br>Montgomery, AL 36104 | Recognition Agreement dated effective as of October 3, 2014 by and between Signal International Texas, L.P., Westport Orange Shipyard LLC and The Teachers' Retirement System of Alabama, as administrative agent and collateral agent for certain lenders, recorded in the Office of the County Clerk of Orange County, Texas as Instrument No. 412088 and recorded with the U.S. Coast Guard National Vessel Documentation Center on October 10, 2014 as Batch No. 231592000, Document No. 9. | |
| Finance Agreement | Signal International Texas GP, LLC | Buckley & Son Fabrication & Construction, Inc.<br>P.O. Box 3004<br>Orange, TX 77631-3004 | Deed of Trust dated August 24, 2007 by and between Signal International Texas GP, LLC and Buckley & Son Fabrication & Construction, Inc. | |

46

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Finance Agreement | Signal International Texas GP, LLC | Buckley & Son Fabrication & Construction, Inc. P.O. Box 3004 Orange, TX 77631-3004 | Security Agreement dated August 24, 2007 by and between Signal International Texas GP, LLC and Buckley & Son Fabrication & Construction, Inc. | |
| Finance Agreement | Signal International Texas GP, LLC | Buckley & Son Fabrication & Construction, Inc. P.O. Box 3004 Orange, TX 77631-3004 | Promissory Note dated August 24, 2007 signed by Signal International Texas GP, LLC for the purchase of the property from Buckley & Son Fabrication & Construction, Inc. | |
| Customer Contracts | Signal Ship Repair LLC | Trailer Bridge, Inc. 10405 New Berlin Rd. East Jacksonville, FL 32226 | Repairs to the Atlanta Bridge (A186), including all purchase orders and subcontracts | |
| Customer Contracts | Signal Ship Repair LLC | A.P. Moller- Maersk A/S Esplanaden 50 1098 Copenhagen K Denmark | Framework Agreement for the storage of a thruster unit. (A156L), including all purchase orders and subcontracts | |
| Customer Contracts | Signal Ship Repair LLC | US Army Corps of Engineers Vicksburg Contracting Office 4156 Clay Street Vicksburg, MS 39183-3435 | Repairs to the M/V Benyaurd & Barge 8602 (A206L), including all purchase orders and subcontracts | |
| Customer Contracts | Signal Ship Repair LLC | Linea Peninsular, Inc. 5323 West Highway 98 Panama City, FL 32401 | Repairs to the M/V Guadalupe (A204L), including all purchase orders and subcontracts | |
| Customer Contracts | Signal Ship Repair LLC | Precious Shipping PCL Cathay House 8 North Sathorn Road Bangkok 10500, Thailand | Repairs to the M/V Fonthida Naree (A209L), including all purchase orders and subcontracts | |
| Customer Contracts | Signal Ship Repair LLC | Eidesvik A/S 5443 BØMLO Vestvikveien 1, Norway | Repairs to the M/V Viking Poseidon (A208L), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Transocean Offshore Deepwater, Sonat Tower, 4, Greenway Plaza, Houston TX 77046-0400, USA | Master Services Agreement | |

47

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Customer Contracts | Signal International, LLC | Diamond Offshore Company 15415 Katy Freeway, Suite 100 Houston TX 77094 | Master Services Agreement | |
| Customer Contracts | Signal International, LLC | Rowan Drilling US Limited 2800 Post Oak Blvd, Suite 5450 Houston TX 77056 | Master Services Agreement | |
| Customer Contracts | Signal International, LLC | Helix Energy Solutions Group, Inc. (formerly Cal Dive International Inc.) 400 North Sam Houston Parkway East, Suite 400 Houston, TX 77060 | Master Services Agreement | |
| Customer Contracts | Signal International, Inc. | Cal Dive Offshore Contractors, Inc. 2500 CityWest Blvd, Suite 2200 Houston, TX 77042 | Master Services Agreement | |
| Customer Contracts | Signal Ship Repair LLC | Manson Construction Co. P.O. Box 24067 Seattle, WA 98124 | Master Services Agreement | |
| Customer Contracts | Signal Ship Repair LLC | Hornbeck Offshore Operators, LLC 103 Northpark Blvd, Suite 300 Covington, LA 70433 | Master Services Agreement | |
| Customer Contracts | Signal Ship Repair LLC | Seacor Marine LLC 7910 Main Street, 2nd Floor Houma, LA 70360 | Vendor Master Services Agreement and Hold Harmless | |
| Customer Contracts | Signal International, LLC and Signal International Texas, LP | Noble Drilling (U.S.) Inc. 13135 South Dairy Ashford Suite 800 Sugar Land, TX 77478 | Master Services Agreement | |
| Customer Contracts | Signal International, LLC | Transocean Offshore Deepwater, Sonat Tower, 4, Greenway Plaza, Houston TX 77046-0400, USA | Stacking Agreement for the TOI Sovereign Explorer (S451), including all purchase orders and subcontracts. | |
| Customer Contracts | Signal International, LLC | Hercules Offshore Corp 9 Greenway Plaza, Suite 2200 Houston TX 77046 | Stacking Agreement for the Hercules - H265 (S552), including all purchase orders and subcontracts | |

48

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Customer Contracts | Signal International, LLC | Transocean Offshore Deepwater, Sonat Tower, 4, Greenway Plaza, Houston TX 77046-0400, USA | Offshore T&M Work for the TOI Deepwater Invictus (S579), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Rowan Drilling US Limited 2800 Post Oak Blvd, Suite 5450 Houston TX 77056 | Contract for work on the Rowan Cecil Provine Rig #39 (S613), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | VT Halter Marine 900 Bayou Casotte Parkway Pascagoula MS 39568 | Fabrication and assembly of 4 B135 Crowley module units (S617), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Dixstone Holdings LTD Lyford Manor, Lyford Cay, West Bay Street, PO Box N10051, Nassau, Bahamas | Stacking Agreement for the TIKO-1 (S621), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Transocean Offshore Deepwater, Sonat Tower, 4, Greenway Plaza, Houston TX 77046-0400, USA | Offshore T&M Work for the TOI Deepwater Asgard (S623), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Rowan Drilling US Limited 2800 Post Oak Blvd, Suite 5450 Houston TX 77056 | Crane Boom Rest Fabrication for the Joe Douglas Rig #78 (S626), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Bro-Tex International Metals 4690 Mar Street Brownsville, TX 78521 | Refloat and Mobilize Rig - Ocean Saratoga (S627), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Rowan Drilling US Limited 2800 Post Oak Blvd, Suite 5450 Houston TX 77056 | RC Drive Pipe Platform Fabrication for the Joe Douglas Rig #78 (S628), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | Transocean Offshore Deepwater, Sonat Tower, 4, Greenway Plaza, Houston TX 77046-0400, USA | 12 inch Flare Boom Fabrication and Offshore Installation work (S629), including all purchase orders and subcontracts | |
| Customer Contracts | Signal International, LLC | The Dutra Group 2350 Kerner Blvd #200 San Rafael, CA 94901 | Repairs and berthing of Dredge Stuyvesant (S630), including all purchase orders and subcontracts | |

49

| Type of Contract | Signal Entity | Name and Address of Other Party or Parties | Description | Cure Amounts |
|---|---|---|---|---|
| Customer Contracts | Signal International, LLC | VT Halter Marine<br>900 Bayou Casotte Parkway<br>Pascagoula MS 39568 | Bollard Pull Test (S632), including all purchase orders and subcontracts | |
| Agency Agreement | Signal Ship Repair, LLC | Atra Holland B.V.<br>Kastanjelaan 6<br>1272 HT Huizen<br>Netherlands | Non-exclusive Agent for purposes of soliciting repair services on Netherlands/Belgium registered or controlled vessels | |
| Agency Agreement | Signal International, Inc. | BKG & Company, Inc. | Non-exclusive Agent for purposes of soliciting repair services from Brazilian companies | |
| Agency Agreement | Signal Ship Repair, LLC | Dassler Schiffahrts-und Handelsgesellschaft mbH<br>Hamburg Branch, Alsterwiete 5<br>D-2009 Hamburg | Exclusive Agent for purposes of soliciting repair services on German registered or controlled vessels | |
| Agency Agreement | Signal Ship Repair, LLC | L. Zambounis & Associates Co. LTD<br>Mr. George Zambounis<br>7-9 Dexamenis str.<br>P. Faliro 17561<br>Athens, Greece | Non-exclusive Agent for purposes of soliciting repair services on Greek registered or controlled vessels | |
| Agency Agreement | Signal Ship Repair, LLC | Marland Technical Services Ltd.<br>702 Fortress Tower<br>250 King's Road, Hong Kong | Non-exclusive Agent for purposes of soliciting repair services on Hong Kong registered or controlled vessels | |
| Agency Agreement | Signal Ship Repair, LLC | Martechnik Spares Engineering<br>No. 1 North Bridge Road<br># 22-07 High Street Centre<br>Singapore 179094 | Non-exclusive Agent for purposes of soliciting repair services on Singaporean/Malaysian registered or controlled vessels | |
| Agency Agreement | Signal Ship Repair, LLC | Quilha Engenharia Navale Representacoes<br>Rua Bogari, 115<br>Lagoa - Rio de Janeiro - RJ<br>CEP - 22471-340 Brazil | Exclusive Agent for purposes of soliciting repair services on Brazilian registered or controlled vessels | |
| Agency Agreement | Signal Ship Repair, LLC | Victoria Maritime Services<br>7, avenue des Papalins<br>MC 98000 - PRINCIPAUTE DE MONACO | Non-exclusive Agent for purposes of soliciting repair services on Monaco/Italy/Switzerland registered or controlled vessels | |

50

[Additional contracts may exist and will be added upon discovery.]

51

## Schedule 10.1

## List of Employees

| Name | Title |
|------|-------|
| BECKMANN, ROBERT | SR VP/GENERAL MGR |
| CUNNINGHAM, CHRISTOPHER | SR VP & CFO |
| MARLER, RICHARD | PRESIDENT & CEO |
| SCHNOOR, RONALD | SR VP/GENERAL MGR |
| ALICEA NEGRON, JUAN | SHIPFITTER-1ST |
| ALLEN, BOBBY | PROJECT MGR,SR-SSR |
| ALVERDIN, JORGE | STRUCTURAL WELDER-1ST |
| ANDERSON, LEONARD | OUTSIDE MACHINIST-1ST |
| ARNOLD, STEVEN | GEN SUPT/DEPT HEAD |
| ASHLEY, DEE | PLANNER I |
| BALL, PAUL | STRUCTURAL WELDER-1ST |
| BARAJAS, JOSE | SCAFFOLD CARPENTER-1ST |
| BARFIELD, JUDY | BENEFITS MANAGER |
| BARFIELD, RANDY | MATERIAL CTRL MGR |
| BARNES, SUSAN | ADMIN ASSISTANT |
| BARNETT, HAROLD | RIGGER/OPERATOR-1ST |
| BARNETTE, DONALD | FOREMAN (SALARY) SSR |
| BARTIMUS, BRENDA | SUBCONTRACT ADMINISTRATOR |
| BEAVER, CHRISTOPHER | SAFETY REP II |
| BENDOLPH, RUSSELL | FOREMAN (SALARY) SSR |
| BENNETT, DONALD | SHIPFITTER COMBO |
| BERNARDO, TRACY | ACCTS PAYABLE MANAGER |
| BINION, TRACEY | DIRECTOR OF HR, CORP |
| BITLOY, PAUL | STRUCTURAL WELDER-1ST |
| BJORKNER, ERIK | VP OPERATIONS SUPPORT |
| BLACKWELL, ALVIN | SHIPFITTER-1ST |
| BLAKE, WILLIAM | SCHEDULER III |
| BLANCO, EDDIE | SAFETY ENGINEER, DIV |
| BLAVOS, DANIEL | NETWORK ADMINISTRATOR III |
| BLONDE, MATTHEW | SCHEDULER, SR |
| BOND, WILLIAM | FOREMAN/SUPR(HOURLY) |
| BOUDREAUX, BRION | FOREMAN/SUPR(HOURLY) |
| BOUDREAUX, KENNETH | SHIPFITTER-1ST |
| BOWER, MARTIN | PURCHASING MANAGER |
| BOWER, PATRICIA | TOOLROOM/REPAIRER |
| BRANCH, GLENN | ENGINEERING SUPERVISOR |
| BROWNLEE, RAY | SECURITY GUARD |
| BRYAN, LISA | AR BILLING COORDINATOR |
| BRYAN, STEPHEN | PLAN&SCHED MGR, DIVISION |
| BRYANT, MATT | QA INSPECTOR I |
| BURROUGHS, CALVIN | BLASTER/PAINTER-1ST |
| BUSBY, ROBERT | VP BUS DEVELOPMENT |
| BUTLER, SCOTTIE | SHIPFITTER-1ST |
| CANTERBURY, ANDREW | SHIPFITTER-3RD |
| CANTERBURY, DAVID | GEN SUPT/DEPT HEAD |
| CANTERBURY, KIMBERLY | STRUCTURAL WELDER-3RD |
| CHANCE, JASON | OUTSIDE MACHINIST-2ND |
| CHANCE, JEFFERY | FOREMAN/SUPR(HOURLY) |

| Name | Title |
|---|---|
| CHAPPELL, CLINTON | SCAFFOLD CARPENTER-1ST |
| CHAVIS SR, RANDY | STRUCTURAL WELDER-1ST |
| CLARK, BRANDY | HR SUPERVISOR |
| CLARK, DAVID | FOREMAN/GENERAL |
| COCHRAN, DAVID | GEN SUPT/DEPT HEAD |
| COLEMAN, JAMES | ESTIMATOR, SR |
| CONE, CLEVELAND | PIPEFITTER-1ST |
| COOK, MICHAEL | VP ADMIN & TECH SUPP |
| COOK, MICHAEL | SHIPFITTER-1ST |
| COOPER, STEVEN | DOCKMASTER |
| COWAN, CALVIN | STRUCTURAL WELDER-1ST |
| COXWELL, JANE | STRUCTURAL WELDER-1ST |
| COYNE, CARLO | QA INSPECTOR III |
| CRUZ ORTIZ, MIGUEL | SHIPFITTER-1ST |
| CURRY, SHERRI | PROJECT ADMIN ASST I |
| CURRY, TOMMIE | SCAFFOLD CARPENTER-3RD |
| DALEY, JAMES | FOREMAN/SUPR(HOURLY) |
| DAVIS, LISA | ADMIN ASSISTANT |
| DAVIS, WILLIAM | RIGGER/OPERATOR-1ST |
| DELGADO MARTINEZ, JORGE | SHIPFITTER-1ST |
| DELLACER, KYLE | STRUCTURAL WELDER-1ST |
| DESTINVIL, MANIEL | STRUCTURAL WELDER-1ST |
| DICKINSON, MONTREE | FOREMAN/SUPR(HOURLY) |
| DIXON, LEE | SHIPFITTER-1ST |
| DOBSON, ASHTON | NETWORK ADMINISTRATOR III |
| DOVE, STEVE | PROG/ANALYST,SR |
| DUBOSE, EMMITT | SECURITY GUARD |
| DUDLEY, ROBERT | RIGGER/OPERATOR-1ST |
| DUFAULT, GREGORY | BLASTER/PAINTER-1ST |
| DUROCHER, GLORIA | SAFETY REP I |
| EATMON, LARRY | FOREMAN/SUPR(HOURLY) |
| EDDINS, GLENN | FOREMAN/SUPR(HOURLY) |
| ELEY, TERRY | SAFETY MANAGER, DIV |
| ELLERBE, LLOYD | PIPEFITTER-1ST |
| ELLISON, THOMAS | PRODUCTION MANAGER |
| FERRELL, RICHARD | ELECTRICIAN-1ST |
| FINCH, DAVID | STRUCTURAL WELDER-1ST |
| FINKLEA, JOHN | STRUCTURAL WELDER-1ST |
| FLOYD, WILLIAM | RIGGER/OPERATOR-1ST |
| FORSMAN, FRANCIS | PLANNER, SR |
| FORTENBERRY, TIM | FOREMAN/GENERAL |
| FRANCESCHI ROMAN, GERARDO | SHIPFITTER-1ST |
| FRESH, AMY | HR SUPERVISOR |
| GAMBLE, RUBIN | OUTSIDE MACHINIST-1ST |
| GEHRMANN, JEFFREY | ENGINEERING MANAGER |
| GEORGE, RHONDA | HIRING MANAGER |
| GIBSON, JAMES | DESIGNER, SR |
| GODWIN, CLAUDE | SHIPFITTER-1ST |
| GOODMAN, DAVID | RIGGER/OPERATOR-1ST |
| GOODWIN, JON | MECHANIC-1ST |
| GOPINATHAN PILLAI, SANTHOSH KUMAR | STRUCTURAL WELDER-1ST |
| GORDON, JACK | STRUCTURAL WELDER-1ST |

| Name | Title |
|------|-------|
| GRAHAM, BENJAMEN | FOREMAN (SALARY) SSR |
| GRAHAM, JOSEPH | RIGGER/OPERATOR-1ST |
| GREGORY, CLIFFORD | DIRECTOR OF IT |
| GUICE, MICHAEL | STRUCTURAL WELDER-1ST |
| GUNISETTI, RAMESH | SAFETY REP II |
| HALL, JOHN | SHIPFITTER-1ST |
| HARMON, JENNIFER | PAYROLL REPRESENTATIVE |
| HARPER, CARRIE | CONTROLLER, CORPORATE |
| HARRIS, EDDIE | FOREMAN/SUPR(HOURLY) |
| HARRIS, ERNEST | STRUCTURAL WELDER-1ST |
| HARRIS, JAMES | SHIPFITTER-1ST |
| HARRIS, VONNIE | FACILITIES MANAGER |
| HARWOOD, JOHN | INSIDE MACHINIST 1ST |
| HATAWAY, JODY | PROJECT MGR II |
| HATTON, RICHARD | SHIPFITTER-1ST |
| HAYES, CHARLES | DOCK CREW |
| HAYNIE, JAMES | FOREMAN/SUPR(HOURLY) |
| HEBERT, DANIEL | QA/QC MANAGER |
| HENDERSON, JEREMY | FOREMAN (SALARY) SSR |
| HERNANDEZ, JOSE | STRUCTURAL WELDER-1ST |
| HEWITT, KATHLEEN | EXEC ADMIN ASST TO CEO |
| HIGGINS, MICHAEL | FOREMAN (SALARY) SSR |
| HILLIARD, WENDIE | EXECUTIVE ADMIN ASST |
| HOLDEN, SIMON | QA SR INSPECTOR, COATING |
| HOLLAND, LLOYD | SHIPFITTER-1ST |
| HOLLOWAY, COREY | SECURITY GUARD |
| HORNE, JASON | MECHANIC-1ST |
| HOWARD, JOSEPH | FOREMAN/SUPR(HOURLY) |
| HOWARD, VAN | ESTIMATING MANAGER |
| HOWELL, TRACY | CL STRUCTURAL FITTER |
| HUFF, RUDELL | STRUCTURAL WELDER-1ST |
| HURST, ROBERT | QA/QC MANAGER |
| INGLE, BILLY | RIGGER/OPERATOR-1ST |
| JAMES, RANDOLPH | TOOLROOM/REPAIRER |
| JAMES, RODERICK | DOCK CREW |
| JOE, DARRYL | GEN SUPT/DEPT HEAD |
| JOHNSON, ANDREW | STRUCTURAL WELDER-1ST |
| JOHNSON, CARLOS | QA INSPECTOR 1 |
| JOHNSON, CLYDE | FOREMAN (SALARY) SSR |
| JOHNSON, KRISTIE | PAYROLL MANAGER |
| JOHNSON, NONA | SECURITY GUARD |
| JOHNSON, PAUL | FOREMAN (SALARY) SSR |
| JOHNSTON, SAMANTHA | PARALEGAL II |
| JOINER, QUITMAN | PIPEFITTER-1ST |
| JONES, GARY | BLASTER/PAINTER-1ST |
| JONES, GEORGE | BLASTER/PAINTER-1ST |
| JONES, MARVIN | OUTSIDE MACHINIST-1ST |
| JONES, MICHAEL | STRUCTURAL WELDER-1ST |
| JORDAN, ANTHONY | STRUCTURAL WELDER-1ST |
| JORDAN, JOHN | FOREMAN/SUPR(HOURLY) |
| JOSEY, JASON | SHIPFITTER-1ST |
| KELLEY, MICHAEL | SECURITY GUARD |

| Name | Title |
|------|-------|
| KILLEEN, PATRICK | DIRECTOR OF EH&S |
| KILPATRICK, DENNIS | SECURITY GUARD |
| KING, ANTHONY | PLANNER II |
| KREBS, SONJA | ACCTS PAYABLE MANAGER |
| LACY, RICHARD | SECURITY GUARD |
| LADNIER, RONALD | ESTIMATOR, SR |
| LANDRUM, ROBERT | SAFETY REP II |
| LANE, WESLEY | PROJECT MGR I |
| LANGLEY, LESLEY | DOCK CREW |
| LANGLEY, LINDSAY | ACCOUNTING CLERK |
| LEE, VELVET | JANITOR (OFFICE) |
| LIGGINS, DAMON | QA INSPECTOR II |
| LOGAN, OLIVER | FOREMAN/GENERAL |
| LOTT, JOSEPH | ESTIMATOR, SR |
| LOVE, DONALD | STRUCTURAL WELDER-1ST |
| LU, KINH | OUTSIDE MACHINIST-1ST |
| MACK, WILLIAM | NETWORK ADMINISTRATOR III |
| MADDEN, DANIEL | DOCK CREW |
| MALDONADO, LUIS | SHIPFITTER-1ST |
| MALLETTE, GARY | FOREMAN/SUPR(HOURLY) |
| MANLEY, CHAMP | PROJECT MGR,II-SSR |
| MARTINS, GEORGE | CONTRACTS ADMINISTRATOR |
| MASON, JENNIFER | PURCHASING SUPERVISOR |
| MAYHALL, JOSEPH | VP OF SALES & MARKETING |
| MAYO, NATHANIEL | FOREMAN (SALARY) SSR |
| MCCALL, RANDALL | STRUCTURAL WELDER-1ST |
| MCGOWAN, BRIAN | MATERIAL CTRL 1ST CLASS |
| MCKENZIE, WINDLE | RIGGER/OPERATOR-1ST |
| MELTON, DAVID | MEDICAL MANAGER, DIV |
| MERCADO, ALBERTO | SHIPFITTER-1ST |
| MIDDLETON, JIMMY | PROJECT MGR,I-SSR |
| MIGHTY, FRANKLIN | INSIDE MACHINIST 1ST |
| MILTON, PAUL | CONTRACTS ADMINISTRATOR |
| MITCHELL, JERMAINE | BLASTER/PAINTER-1ST |
| MITCHELL, KRISTA | SECURITY SUPERVISOR |
| MORALES, ROMEL | SECURITY GUARD, LEAD |
| MORGAN, JOSEPH | FOREMAN (SALARY) SSR |
| MOULDS, TOMMY | OUTSIDE MACHINIST-1ST |
| MURRAY, LENORE | ESTIMATOR II |
| MYERS, CLAIBORNE | ESTIMATOR, SR |
| NEWELL, ANTHONY | FOREMAN/SUPR(HOURLY) |
| NICHOLAS, ANDRE | FOREMAN/SUPR(HOURLY) |
| NOBLE, LUCIAN | ACCOUNTANT, SR |
| OLSON, MARK | CONTRACTS ADMINISTRATOR |
| OVERSTREET, CHADWICK | PROJECT SUPERINTENDENT |
| PARKER, DAVID | BLASTER/PAINTER-1ST |
| PARKER, JOHN | SECURITY GUARD |
| PARNELL, JEFFREY | SUPERINTENDENT |
| PERKINS, ISOM | FOREMAN/SUPR(HOURLY) |
| PERRY, CYNTHIA | COURIER |
| PHILLIPS, TIMOTHY | PROJECT MGR,I-SSR |
| PHILLIPS, TIMOTHY | RIGGER/OPERATOR-1ST |

| Name | Title |
|------|-------|
| POOLE, LESLEY | EXECUTIVE ADMIN ASST |
| POOLE, MARCUS | LABOR, GENERAL |
| PRINCE, MICHAEL | LABOR, GENERAL |
| PROPER, ARTHUR | BLASTER/PAINTER-1ST |
| QUINLEY, RICHARD | MATERIAL CTRL MGR |
| RANDOLPH, LEBARON | OUTSIDE MACHINIST-1ST |
| RAY, EDDIE | FOREMAN/SUPR(HOURLY) |
| RETINAN, MITCHY | STRUCTURAL WELDER-1ST |
| RIVERA RODRIGUEZ, REINALDO | SHIPFITTER-1ST |
| RIVERA-GARCIA, LUIS | SHIPFITTER-1ST |
| ROBERTS, GROVER | OUTSIDE MACHINIST-1ST |
| ROBERTSON, RUSSELL | PC MAINT TECHNICIAN III |
| ROCHE, JOSEPH | VP OF SALES & MARKETING |
| RODGERS, MELVIN | BLASTER/PAINTER-1ST |
| RODRICK, CHARLES | DOCKMASTER |
| RODRIGUEZ, LYNDA | TIMEKEEPER |
| ROGERS, JEFFREY | GEN SUPT/DEPT HEAD |
| ROTH, RYAN | DIRECTOR BUS DEVELP |
| ROWAN, MARTY | SHIPFITTER-1ST |
| ROWAN, MICHAEL | STRUCTURAL WELDER-1ST |
| ROWELL, ANTHONY | DOCK CREW |
| SCHNOOR, RYAN | PROJECT MGR II |
| SCHOLLIAN, JOHNNY | FOREMAN/SUPR(HOURLY) |
| SCOGGIN, KENNETH | PROGRAMMER/ANAL I |
| SCOTT, CHRISTOPHER | SHIPFITTER-2ND |
| SCRUGGS, HAROLD | GEN SUPT/DEPT HEAD |
| SEIGNIOUS, JOHN | SUBCONTRACT ADMINISTRAT |
| SELLERS, JASON | RIGGER/OPERATOR-1ST |
| SENTELLE, TIMOTHY | SHIPFITTER-1ST |
| SEROKA, JOHN | SAFETY REP III |
| SHAH, DERRICK | SECURITY GUARD |
| SHARLOW, JEFFREY | PROJECT SUPERINTENDENT |
| SHEPPARD, JIMMY | BLASTER/PAINTER-1ST |
| SHOEMAKER, JERRY | DOCK CREW |
| SHOEMAKER, THOMAS | PROJECT SUPERINTENDENT |
| SHOUSE, WILBUR | VP OF PRODUCTION |
| SIMS, BRADLEY | RIGGER/OPERATOR-1ST |
| SMITH, BRENDA | SECURITY GUARD |
| SMITH, CHARLES | OUTSIDE MACHINIST-1ST |
| SMITH, CURTIS | FOREMAN/GENERAL |
| SMITH, FRANK | TOOLROOM/REPAIRER |
| SMITH, JERRY | SUPERINTENDENT |
| SMITH, ROGER | RIGGER/OPERATOR-1ST |
| SMITH, STEVE | RIGGER/OPERATOR-1ST |
| SMITH, SUMMER | MATERIAL CTRL 1ST CLASS |
| SMITH, TIMOTHY | CARPENTER-1ST |
| SPANN, ANDREW | DOCK CREW |
| SPRADLING, RANDY | SHIPFITTER-1ST |
| STAFFORD, ALBERT | FOREMAN (SALARY) SSR |
| STANTON, PRENTICE | PIPEFITTER-1ST |
| STEIN, GREGORY | ELECTRICIAN-1ST |
| STEPHENSON, MICHAEL | PLANNER I |

| Name | Title |
|------|-------|
| STEVISON, JARRED | ENGINEER |
| STEWART, DEBORAH | ELECTRICIAN-1ST |
| STEWART, GEORGE | FOREMAN/GENERAL |
| STEWART, JONATHAN | QA INSPECTOR III |
| STOKES, HOWELL | VP COST ENGINEERING |
| STOLLENWERCK, SEBASTIAN | PLANNER II |
| STORK, DOUGLAS | SAFETY REP III |
| SUTTON, EDDIE | ELECTRICIAN-1ST |
| SWINSON, GARLAND | FOREMAN (SALARY) SSR |
| SYKES, BARRY | DOCK CREW |
| TAFT, ALBERT | FOREMAN/GENERAL |
| TANNER, RICKY | STRUCTURAL WELDER-1ST |
| TANNER, WILLIAM | GEN SUPT/DEPT HEAD |
| TAYLOR, CHARLES | OUTSIDE MACHINIST-1ST |
| TEASLEY, WILLIAM | PRESS BRAKE OPERATOR |
| THEPPHANORINH, SOMCHANH | STRUCTURAL WELDER-1ST |
| THIBAULT, SHERRY | SECURITY GUARD |
| THOMAS, CYRILLE | SHIPFITTER-1ST |
| THOMPSON, FLOYD | CARPENTER-1ST |
| THORNTON, JOSEPH | RIGGER/OPERATOR-1ST |
| TOLBERT, AMOS | SECURITY GUARD |
| TRAWICK, JEFFERY | SHIPFITTER-1ST |
| TULLIS, WILLIAM | ACCOUNTING MANAGER |
| TURNBULL, TARIM | DOCK CREW |
| VALLELY, EUGENE | MECHANIC-1ST |
| VAUGHN, CLAYTON | PROJECT SUPERINTENDENT |
| VAUGHN, HAROLD | TOOLROOM/REPAIRER |
| VENDEIRO, LISA | DOCUMENT CTRL SUPV |
| WADE, OLIVER | SAFETY MANAGER, DIV |
| WALTERS, PHILLIP | SHIPFITTER-1ST |
| WALTMAN, ALBERT | FOREMAN/GENERAL |
| WARD, JIMMY | PROJECT SUPERINTENDENT |
| WARREN, ANTHONY | BLASTER/PAINTER-1ST |
| WASHINGTON, SHANICKA | JANITOR (OFFICE) |
| WEAVER, ANTHONY | SHIPFITTER-1ST |
| WEBB, KENNETH | SECURITY SUPERVISOR |
| WHEELER, DAVID | PROJECT SUPERINTENDENT |
| WHITE, RODERICK | FOREMAN/SUPR(HOURLY) |
| WIIK, WILLIAM | HR MANAGER |
| WILBURN, JONATHAN | SCAFFOLD CARPENTER-1ST |
| WILKINS, JOSEPH | OUTSIDE MACHINIST-1ST |
| WILLIAMS, BILLIE | SHIPFITTER-1ST |
| WILLIAMS, HARVEY | STRUCTURAL WELDER-1ST |
| WILLIAMS, JACKIE | BLASTER/PAINTER-1ST |
| WOOD, JERRY | FOREMAN/SUPR(HOURLY) |
| YOUNCE, WILLIAM | DOCK CREW |
| YOUNG, TIMOTHY | STRUCTURAL WELDER-1ST |

## Seller Disclosure Schedule

### As of July 13, 2015

Reference is hereby made to the Asset Purchase Agreement, dated as of July 13, 2015 (the "Asset Purchase Agreement") made by and between Signal International, Inc., a Delaware corporation ("Signal"), Signal International, LLC, a Delaware limited liability company ("Int'l"), Signal Ship Repair, LLC, a Delaware limited liability company ("SSR"), Signal International Texas GP, LLC, a Delaware limited liability company ("SGP"), and Signal International Texas, L.P., a Delaware limited partnership ("SLP," collectively with Signal, Int'l and SSR, the "Seller"), and Teachers' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.*, of the Alabama Code (or its designee) and Employees' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.*, of the Alabama Code (or its designee) (the "Purchaser"). Capitalized terms used and not otherwise defined herein shall have the meanings attributed thereto in the Asset Purchase Agreement.

Pursuant to the Asset Purchase Agreement, attached hereto are the schedules comprising the Seller Disclosure Schedule referred to in the Asset Purchase Agreement and, in accordance with Section 11.7 of the Asset Purchase Agreement, this Schedule is deemed to be part of the entire agreement among the parties with respect to the subject matter of the Asset Purchase Agreement. This Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article 3 of the Asset Purchase Agreement. The disclosure in any section or paragraph of this Schedule, and those in any amendment or supplement hereto, will be deemed to relate to each other provision of Article 3 of the Asset Purchase Agreement.

Certain agreements, documents, information and other matters are listed in this Schedule for purposes of providing information only, and items referenced in this Schedule referring to sections of the Asset Purchase Agreement containing qualifications as to "Material Adverse Effect" or "materiality" are in no way meant to reflect an interpretation by the Seller that such items rise to the level of having implications with respect to such Material Adverse Effect or materiality references and are not intended to establish a standard of materiality for any purpose. In addition, the disclosure of any item is not to be deemed an admission that such information actually constitutes noncompliance with, or a breach or violation of, any Law, Judgment, Permit, Governmental Authorization or Contract to which such disclosure is applicable.

All references in this Schedule to the enforceability of agreements with third parties, the existence or non-existence of third-party rights, the absence of breaches or defaults by third parties, or similar matters or statements, are intended only to allocate rights and risks among the parties to the Asset Purchase Agreement and are not intended to be admissions against interests, give rise to any inference or proof of accuracy, be admissible against any party to the Asset Purchase Agreement by any Person who is not a party to the Asset Purchase Agreement, or give rise to any claim or benefit to any Person who is not a party to the Asset Purchase Agreement.

In no event shall the listing of such agreements, documents, information or other matters in this Schedule be deemed or interpreted to broaden the Seller's representations and warranties, obligations, covenants, conditions or agreements contained in the Asset Purchase Agreement. The headings contained in this Schedule are for convenience of reference only and shall not be deemed to modify or influence the interpretation of the information contained in this Schedule or the Asset Purchase Agreement.

*(The remainder of this page is intentionally left blank.)*

\NY - 087760/000006 - 4324730 v2

**Schedule 3.5**

Claims, Litigation and Disputes

| Claimant | Case Style |
|---|---|
| Carnival Corporation vs. Signal Ship Repair, et al | US District Court for the Southern District of Alabama - 13-cv-00314-CG-C |
| Kevin Smith vs. Signal International | EEOC Charge No. 846-2014-15884 - Mobile Local Office |
| Hannah Christopher vs. Signal Ship Repair, et al | EEOC Charge No. 425-2012-00526 - Mobile Local Office |
| Fireman's Fund Insurance Company et al vs. Signal International, et al | US Court of Appeals for the Second Circuit - 14-1346-cv (L) c/w 14-2516-cv |
| Big Dawg Services, Inc. vs. Signal International, LLC, et al | Jackson County, Chancery Court, Mississippi - C/A #2014-00324NH |
| Achari, et al vs. Signal International, LLC, et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06218-SM-DEK |
| Chakkiyattil, et al vs. Signal International, LLC, et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06219-SM-DEK |
| David, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:08-cv-01220-SM-DEK |
| Devassy, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06221-SM-DEK |
| Equal Employment Opportunity Commission vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:12-cv-00557-SM-DEK |
| Joseph, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00324-RC-ZJH |
| Kambala, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00498-RC-ZJH |
| Krishnakutty, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06220-SM-DEK |
| Marimuthu, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00499-MAC-ZJH |
| Megananthan, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00497-MAC-ZJH |
| Samuel, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00323-MAC-ZJH |
| Singh, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:14-cv-00732-SM-DEK |
| Thomas, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:14-cv-01818-SM-DEK |

\\NY - 087760/000006 - 4324730 v2

**Schedule 3.5 - Continued**

Claims, Litigation and Disputes

| | |
|---|---|
| AmeriGas, L.P. | Payment Demand Letter |
| City Electric Supply Co. | Payment Demand Letter |
| CraneWorks, Inc. | Payment Demand Letter |
| Governor Control Systems, Inc. | Payment Demand Letter |
| Jordan Pile Driving Inc. | Payment Demand Letter |
| Sunbelt Rentals | Payment Demand Letter |
| Surface Jet, Inc. | Payment Demand Letter |

\\NY - 087760/000006 - 4324730 v2

## Schedule 3.6

### Compliance with Laws; Permits and Licenses

| ENVIRONMENTAL ISSUES | | |
|---|---|---|
| Signal Entity | Description | Status |
| Signal International, LLC | The US EPA sent an Opportunity to Show Cause letter to Signal International, LLC on 11/13/2014 regarding inspections performed on 03/28/2013 and 01/28/2014.  Based on observations made during the inspections, the EPA has determined that Signal may not be in compliance with the requirements of the Mississippi Solid Waste Disposal Law of 1974 and the Mississippi Hazardous Waste Management Regulations. | Pending |
| | | |

| LITIGATION ISSUES | | |
|---|---|---|
| Signal Entity | Description | Status |
| Signal International, LLC | Equal Employment Opportunity Commission vs. Signal International, LLC et al - US District Court for the Eastern District of Louisiana - 12-557 | Pending |

\\NY - 087760/000006 - 4324730 v2

**Schedule 3.7**

Employees and Related Matters

| Claimant | Case Style |
|---|---|
| Kevin Smith vs. Signal International | EEOC Charge No. 846-2014-15884 - Mobile Local Office |
| Hannah Christopher vs. Signal Ship Repair, et al | EEOC Charge No. 425-2012-00526 - Mobile Local Office |
| Achari, et al vs. Signal International, LLC, et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06218-SM-DEK |
| Chakkiyattil, et al vs. Signal International, LLC, et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06219-SM-DEK |
| David, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:08-cv-01220-SM-DEK |
| Devassy, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06221-SM-DEK |
| Equal Employment Opportunity Commission vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:12-cv-00557-SM-DEK |
| Joseph, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00324-RC-ZJH |
| Kambala, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00498-RC-ZJH |
| Krishnakutty, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:13-cv-06220-SM-DEK |
| Marimuthu, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00499-MAC-ZJH |
| Megananthan, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00497-MAC-ZJH |
| Samuel, et al vs. Signal International, LLC et al | US District Court, Eastern District of Texas - 1:13-cv-00323-MAC-ZJH |
| Singh, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:14-cv-00732-SM-DEK |
| Thomas, et al vs. Signal International, LLC et al | US District Court for the Eastern District of Louisiana - 2:14-cv-01818-SM-DEK |

## Schedule 3.9(a)

Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements

See Schedule 2.1(e)

\\NY - 087760/000006 - 4324730 v2

## Schedule 3.13

## **Trade Accounts Payable**

List of Trade Accounts Payable as of or prior to June 30, 2015

| VENDOR NAME | AMOUNT |
|---|---|
| A PRECISION AUTO GLASS, INC | 2,620.59 |
| A&B VALVE & PIPING SYSTEMS | 9,349.19 |
| AAA COOPER TRANSPORTATION | 151.09 |
| Aaron Oil Company Inc | 132,021.45 |
| ABRASIVE PRODUCTS & EQUIP LLC | 2,100.04 |
| ABS AMERICAS | 4,231.00 |
| ACCU-FAB & CONSTRUCTION INC. | 52,400.00 |
| ACME TRUCK LINE INC | 2,057.70 |
| ADVANCE AUTO PARTS | 1,798.36 |
| Advanced Technical Staffing Solutions | 18,965.56 |
| AIR LIQUIDE AMERICA L.P. | 1,000.00 |
| AIRDYNE LAFAYETTE INC. | 38,064.00 |
| AIRGAS SOUTH, INC. | 33,427.67 |
| ALABAMA MEDIA GROUP | 394.00 |
| ALBERT`S TRANSPORTATION SVCS | 3,460.10 |
| ALL PLASTICS & FIBERGLASS, INC. | 3,984.00 |
| ALLEN-SOUTHERN ELECTRIC MOTOR INC | 8,735.24 |
| ALLIANCE MECHANICAL SOLUTIONS LLC | 31,329.28 |
| AMERICAN CHEMICAL TECHNOLOGIES, INC. | 12,216.04 |
| AMERICAN PIPING PRODUCTS INC. | 4,342.37 |
| AMERI-FORCE-AL | 210.23 |
| AMERIGAS CORP. | 2,731.22 |
| AMJ SERVICES | 5,800.00 |
| ANALYTICAL CHEMICAL TESTING, INC. | 2,995.50 |
| ANSYS, INC. | 10,753.67 |
| APPLIED SOFTWARE | 30,375.00 |
| ARC CONTROLS, INC. | 49,235.58 |
| ARCENEAUX & GATES, INC | 1,515.50 |
| AZZ GALVANIZING | 558.20 |
| B & B INDUSTRIAL SUPPLY CO., INC. | 1,106.32 |
| BATTERY SOURCE | 65.90 |
| BAUER VISUAL GRAPHICS | 691.20 |
| BAY AREA SCREW AND SUPPLY | 1,849.35 |
| BAY PAPER COMPANY, INC. | 4,598.30 |
| BAY STEEL CORP. | 4,360.00 |
| BAYSIDE RUBBER & PRODUCTS, INC | 12,474.74 |
| BEARD EQUIP CO | 335.89 |
| BEERMAN PRECISION INC | 16,523.98 |
| BELL & CO | 8,764.05 |
| BELLCO, INC. | 8,500.00 |
| B-FAST BOLT & SUPPLY A DIVISION OF B'HAM FASTENER | 81.00 |
| BOLAND INDUSTRIAL CONSULTING SERVICES, INC. | 5,250.00 |

\\NY - 087760/000006 - 4324730 v2

| | |
|---|---:|
| BOLTTECH MANNINGS, INC. | 905.00 |
| BOSARGE DIVING, INC. | 14,000.00 |
| BRIGGS EQUIPMENT | 29.78 |
| BROWNLEE-MORROW ENGR. CO.,INC. | 1,252.00 |
| BRUCE DUHE TIRES | 4,246.89 |
| C & C DEMOLITION, INC. | 13,374.00 |
| CANAL BARGE CO INC | 107,876.20 |
| CAROL CRANE RIGGING & LIFTING TECHNOLOGY, INC | 9,150.00 |
| CDW | 9,379.32 |
| CERTEX GULF COAST | 7,668.66 |
| CHANCELLOR SUPPLY, INC | 1,519.87 |
| CINTAS CORPORATION #240 | 966.80 |
| CISCO SYSTEMS | 1,718.81 |
| CITY ELECTRIC SUPPLY | 1,830.09 |
| CLUTCH & POWERTRAIN | 1,532.00 |
| COASTAL ELECTRIC SUPPLY OF ALABAMA LLC | 39.98 |
| COASTAL WEATHER RESEARCH | 3,300.00 |
| COASTAL WELDING SUPPLY INC | 33,872.97 |
| CONSOLIDATED PIPE & SUPPLY CO | 118,611.84 |
| COOPER FAMILY MED CENTER | 2,400.00 |
| COOPER MARINE & TIMBERLANDS CORP. | 5,166.89 |
| COUNSELMAN AUTOMOTIVE RECYCLING LLC | 150.00 |
| COWIN EQUIPMENT COMPANY | 1,384.35 |
| COYOTE LOGISTICS | 8,962.45 |
| CRANEWORKS INC. | 2,832.00 |
| CRESCENT TOWING & SALVAGE CO. | 36,931.66 |
| CRYSTAL CLEAN | 9,752.28 |
| CRYSTAL ICE COMPANY | 954.80 |
| CUMMINS MID SOUTH, L.L.C. | 2,242.89 |
| D&M STEEL LLC | 42,985.65 |
| D.H. TECHNOLOGY | 6,588.00 |
| DAVIS MOTOR SUPPLY CO., INC. | 1,379.19 |
| DEEP SOUTH CRANE RENTALS INC. | 47,457.25 |
| DEEP SOUTH EQUIPMENT CO | 13,938.74 |
| DEHUMIDIFICATION TECHNOLOGIES | 15,111.75 |
| DELTA RIGGING & TOOLS | 5,431.07 |
| DELTEK, INC. | 20,040.74 |
| DESHAZO CRANE COMPANY LLC | 1,194.73 |
| DEX IMAGING OF ALABAMA LLC | 8,829.69 |
| DIESEL ENGINE & PARTS CO, INC | 21,180.00 |
| DIXIE RUBBER & BELTING CO | 480.40 |
| DOLPHIN SAFETY SUPPLY | 45.00 |
| DONOVAN MARINE, INC. | 514.06 |
| DXP ENTERPRISES, INC. | 17,793.88 |
| DYNAMIC MEASUREMENT SYSTEMS | 2,080.83 |
| EAGLE INDUSTRIES | 20,300.48 |
| EMPIRE SCAFFOLD LLC | 72,474.98 |
| ENVIRONMENTAL COMPLIANCE SERVICES, INC | 2,796.00 |
| ESAB WELDING & CUTTING PRODUCTS | 8,199.19 |
| F&S MARINE MS, INC. | 4,006.24 |

\\NY - 087760/000006 - 4324730 v2

| | |
|---|---:|
| FAIRCLOTH METALLURGICAL SVC. | 4,800.00 |
| FARMER'S COPPER & INDUSTRIAL SUPPLY CO., INC. | 7,944.13 |
| FAX CARDS | 76.00 |
| FIBERGRATE | 73,781.88 |
| G & K SERVICES | 6,476.24 |
| GCR TIRES & SERVICE | 328.96 |
| GE CAPITAL | 7,751.79 |
| GE INSPECTION TECHNOLOGIES, L | 1,990.00 |
| GENERAL INSULATION, INC. | 15,117.00 |
| GENERAL MACHINERY CO | 1,160.40 |
| GENESIS TECHNICAL STAFFING, INC. | 7,788.00 |
| GIANT RESOURCE RECOVERY | 6,092.75 |
| GIBSON ELECTRIC MOTOR SERVICE | 3,000.00 |
| GOTTA GO PORTABLES | 4,525.16 |
| GOVERNOR CONTROL SYSTEMS, INC. | 11,144.70 |
| GREATAMERICA LEASING CORP | 1,627.45 |
| GULF COAST AIR & HYDRAULICS INC | 30,472.51 |
| GULF COAST BUSINESS SUPPLY CO | 4,769.33 |
| GULF COAST CRANE & EQUIPMENT, LLC. | 20,784.32 |
| GULF COAST MARINE SUPPLY CO | 5,843.72 |
| GULF ENGINE & EQUIPMENT INC | 3,277.80 |
| GULF HAULING, INC. | 3,960.00 |
| GULF MARINE CHEMIST, INC. | 9,680.00 |
| GULF SALES & SUPPLY | 32,019.03 |
| GULF SOUTH SERVICES, INC | 130,640.00 |
| GULF STATES SHIPBUILDERS | 600.00 |
| GULF SUPPLY, INC. | 499.85 |
| GULFPORT CHEMIST SERVICES | 4,382.50 |
| H&E EQUIPMENT SERVICES L.L.C. | 12,804.33 |
| HEMPEL USA INC | 10,696.19 |
| HILL MARINE REFRIGERATION,INC. | 157.50 |
| HILLER SYSTEMS, INC. | 4,574.36 |
| HILTI INC | 3,314.92 |
| HOIST & CRANE SERVICE GROUP | 3,551.68 |
| HORIZON FREIGHT SYSTEMS | 16,668.53 |
| HYDRADYNE LLC | 4,638.90 |
| HYDRALIFT AMCLYDE, INC. | 2,489.12 |
| HYTORC | 13,200.64 |
| ID SUPERSTORE | 1,257.67 |
| IMPACT MARINE & INDUSTRIAL SVC | 9,683.11 |
| INFIRMARY OCCUPATIONAL HEALTH, PC | 3,963.00 |
| INNOVATIVE IDM, LLC | 728.80 |
| INTEGRATED TECHNOLOGIES CORPORATION | 50,650.20 |
| INTERNATIONAL PAINT | 13,555.00 |
| INTERNATIONAL WORKBOAT SHOW | 5,437.50 |
| J.J. KELLER & ASSOC., INC. | 945.00 |
| JACKSON COUNTY ECONOMIC | 20,000.00 |
| JAMESTOWN METAL MARINE SALES INC | 256,872.83 |
| JO-MAR DELIVERY | 5,185.15 |
| JORDAN PILE DRIVING INC | 98,931.00 |

\\NY - 087760/000006 - 4324730 v2

| | |
|---|---|
| JOSEPH T. RYERSON | 5,768.80 |
| JOTUN PAINTS, INC. | 106,026.59 |
| KARL SENNER INC | 2,532.50 |
| KENTWOOD SPRING WATER CO. | 37.79 |
| KIBRO INC | 1,221.70 |
| KINGS, INC. | 4,245.07 |
| KONECRANES INC. | 1,990.65 |
| KRANENDONK PRODUCTION SYSTEMS | 227.07 |
| L & L INDUSTRIAL SUPPLY, INC. | 371.60 |
| L & M WELDING SUPPLY | 5,793.41 |
| LINCOLN ELECTRIC COMPANY | 424.06 |
| LINDE, INC. / BOC GAS | 26,780.14 |
| LIQUID ENVIRONMENTAL SOLUTIONS | 22,943.06 |
| LOWE'S OF S.W. MOBILE (#1599) | 988.78 |
| LYLE MACHINERY CO. | 11,702.50 |
| MACLAND DISPOSAL CENTER, INC. | 6,709.25 |
| MAGNETECH INDUSTRIAL SERVICES | 3,172.00 |
| MAGNOLIA BOLT INC. | 785.40 |
| MAIN INDUSTRIES, INC. | 4,970.89 |
| MARCO | 21,863.00 |
| MARINE & INDUSTRIAL SUPPLY | 6,010.18 |
| MARINE CONTRACTING GROUP, LLC | 11,256.94 |
| MARINE LOG | 1,000.00 |
| MARINE RIGGING, INC. | 7,820.57 |
| MARITECH MARINE & INDUSTRIAL SERVICES | 68,190.14 |
| MARITIME REPORTER | 4,560.00 |
| MARTIN ENERGY SERVICES, LLC | 11,452.23 |
| MATHESON TRI-GAS | 28,612.65 |
| MAY METALS, INC. | 526.46 |
| MAYER ELECTRIC SUPPLY CO.,INC. | 6,979.26 |
| McCOY OUTDOOR COMPANY,INC. | 1,255.50 |
| MCDONOUGH CONSTR. RENTALS | 5,533.33 |
| MCDONOUGH MARINE SERVICE | 176,012.60 |
| MCMASTER CARR SUPPLY CO. | 2,207.13 |
| MEITEC, INC. | 468,111.47 |
| METALS USA-HEAVY CARBON GROUP | 14,320.22 |
| MIDWAY FOREST PRODUCTS | 4,368.50 |
| MILL AND MARINE SUPPLY LLC. | 5,571.96 |
| MMIF, LLC | 186,493.75 |
| MOBILE ABRASIVES | 17,960.91 |
| MOBILE BAR PILOTS ASSOC. | 3,597.22 |
| MOBILE INSTRUMENT CO.,INC | 27,298.00 |
| MOBILE MODULAR MANAGEMENT CORP | 324.75 |
| MOBILE PAINT MFG. CO., INC. | 629.09 |
| MODSPACE | 5,354.00 |
| MOTION INDUSTRIES | 3,504.77 |
| NATIONAL OILWELL | 3,738.90 |
| NES EQUIPMENT RENTAL LP | 55,227.81 |
| NETWORK CRAZE TECHNOLOGIES INC. | 11,713.00 |
| NEW WAVE MEDIA INTERNATIONAL | 1,275.00 |

\\NY - 087760/000006 - 4324730 v2

| | |
|---|---|
| NICHOLAS INSULATION SERVICES | 7,436.00 |
| NORTH AMERICAN CRANE BUREAU, INC | 5,195.63 |
| NORTHERN TOOL & EQUIPMENT CO. | 1,053.17 |
| NSC TECHNOLOGIES, INC. | 9,406.36 |
| NUDRAULIX, INC. | 1,876.18 |
| NVI, LLC | 6,238.50 |
| OCCUPATIONAL HEALTH CENTER | 10,279.00 |
| ODESSA BABBITT BEARING COMPANY | 13,600.00 |
| OEC BUSINESS INTERIORS & SUPPLY | 1,352.53 |
| OFFICE DEPOT INC. | 1,061.69 |
| OGDEN WELDING SYSTEMS | 5,155.32 |
| OIL RECOVERY CO., INC. OF ALABAMA | 67,013.00 |
| OLENSKY BROS., INC. | 1,013.93 |
| OLIVER H. VAN HORN CO.,INC. | 132.30 |
| ONEAL STEEL INC | 30,667.81 |
| P & G MACHINE & SUPPLY CO. INC | 20,024.50 |
| PARKWEST STAFFING INC | 2,096.20 |
| PASCAGOULA SHEET METAL WORK | 1,250.00 |
| PATRIOT CRANE & HOIST | 1,078.00 |
| PATRIOT SECURITY SYSTEMS | 17,008.57 |
| PERKINS TIRE SERVICE INC | 456.54 |
| PERMADUR INDUSTRIES, INC. | 316.72 |
| PITNEY BOWES GLOBAL FINANCIAL | 1,439.05 |
| PORT OF PASCAGOULA | 595,645.96 |
| PPE RENTALS, INC. | 512.00 |
| PPG ARCHITECTURAL FINISHES | 5,329.80 |
| PRAXAIR, INC. | 50,111.81 |
| PRECISION PRODUCTS, INC. | 2,475.00 |
| PRECISION TOOL & GRINDING, INC. | 2,734.18 |
| PRESSURE PRODUCTS | 148.40 |
| PRINT KING | 3,077.00 |
| PROFORMA | 8,098.73 |
| PROPULSION SYSTEM, INC | 41,067.42 |
| PUCKETT MACHINERY | 1,651.00 |
| PUCKETT RENTS | 8,972.10 |
| R. CARTER & ASSOCIATES, INC. | 7,000.00 |
| RAIN FOR RENT | 4,985.89 |
| RAINBOW WATER INC | 1,009.40 |
| RAM TOOL & SUPPLY CO. INC. | 7,450.92 |
| REDD PEST SOLUTIONS | 385.00 |
| RED-D-ARC INC. | 19,581.35 |
| REGIONS COMMERCIAL BANKCARD | 27,120.92 |
| RESEARCH SOLUTIONS GROUP, INC | 9,059.20 |
| RETIF OIL & FUEL | 5,435.48 |
| RIGZONE.COM | 1,875.00 |
| ROYAL CUP, INC. | 1,785.06 |
| RTJ GOLF FOUNDATION | 25,000.00 |
| RUBBER HOSE & GASKET COMPANY | 5,125.54 |
| RUTTY & MORRIS L.L.C. | 4,748.93 |
| SABEL STEEL SERVICE, INC. | 5,636.16 |

\\NY - 087760/000006 - 4324730 v2

| | |
|---|---:|
| SAFETY PLUS INC. | 1,800.00 |
| SAFETY SOURCE, INC. | 5,791.18 |
| SCHAMBO MANUFACTURING, LLC | 677.81 |
| SEABULK TOWING | 23,888.87 |
| SEQUEL ELECTRICAL SUPPLY | 1,512.80 |
| SEVEN C'S MARINE, INC. | 13,455.90 |
| SHELL OFFSHORE INC. | 1,250.00 |
| SHERWIN WILLIAMS | 3,879.71 |
| SHIPBUILDER'S COUNCIL | 7,875.00 |
| SHIPYARD SUPPLY | 29,444.70 |
| SHRED IT | 250.00 |
| SIGNET MARITIME CORPORATION | 148,774.50 |
| SIGNS NOW | 90.00 |
| SIRIUS TECHNICAL SERVICES,INC. | 20,484.93 |
| SOCIETY FOR HUMAN RESOURCE | 190.00 |
| SOUTHERN GAS AND SUPPLY | 133,008.44 |
| SOUTHERN REPRO GRAPHICS | 391.68 |
| STANDARD EQUIPMENT CO., INC. | 1,050.00 |
| STERICYCLE ENVIRONMENTAL SOLUTIONS, INC | 15,373.15 |
| STRACHAN SERVICE INC | 525.00 |
| SUDDEN SERVICE INC. | 41,134.42 |
| SUMMIT ELECTRIC SUPPLY CO INC | 6,827.21 |
| SUNBELT RENTALS, INC. | 20,007.39 |
| SURFACEJET, INC. | 128,109.75 |
| SWEETWATER COUNTRY CLUB | 1,050.14 |
| TALKSOUTH | 11,250.00 |
| TECHNICAL MARINE MAINT MS, LLC | 4,046.86 |
| TECHWELD, INC. | 3,221.06 |
| TEKLINKS INC. | 3,712.10 |
| TEST CALIBRATION CO., INC. | 3,192.75 |
| THE PROPELLER CLUB OF THE U.S. | 120.00 |
| THE TERMINIX INTL CO LP | 1,521.00 |
| THOMPSON CAT RENTAL | 3,895.00 |
| THOMPSON TRACTOR CO., INC. | 111.56 |
| THREADED FASTENERS, INC. | 5,037.90 |
| TIGER DIRECT INC | 6,431.26 |
| TIGER TANKS | 66,056.27 |
| TOOL-SMITH COMPANY, INC. | 7,134.53 |
| TRADESMEN INTERNATIONAL INC. | 1,224.50 |
| TRANS TECH, INC. | 1,696.00 |
| TURNER SUPPLY COMPANY | 2,154.69 |
| ULINE INC. | 1,086.61 |
| UNITED LABOR GROUP, LLC | 3,260.83 |
| UNITED RENTALS | 70,935.31 |
| UNITED SITE SERVICES OF MS, LL | 840.00 |
| UNITED VISION LOGISTICS | 3,154.28 |
| US JOINER LLC | 25,952.00 |
| VARILEASE FINANCE, INC. | 55,880.00 |
| W & O SUPPLY, INC. | 9,443.58 |
| WALASHEK INDUSTRIES/SEATTLE OPERATION | 83,921.00 |

\\NY - 087760/000006 - 4324730 v2

| | |
|---|---:|
| WALKER ELECTRIC SUPPLY, LLC | 63,117.65 |
| WASTE OIL COLLECTORS | 21,633.02 |
| WATERWAYS TOWING & OFFSHORE SERVICES, INC. | 3,706.05 |
| WEAVER SUPPLY CO | 8,483.42 |
| WELLS FARGO FINANCIAL LEASING | 921.20 |
| WESCO DISTRIBUTION INC. | 4,240.93 |
| WESCO GAS & WELDING SUPPLY, INC. | 86,515.59 |
| WHOLESALE ELECTRIC SUPPLY CO. | 2,105.00 |
| WIGMANS HARDWARE & LUMBER | 743.02 |
| WILLIAMS MACHINE WORKS, INC. | 5,000.00 |
| WORLD NEWS INTERNATIONAL, INC. | 1,275.00 |
| WORLDWIDE DIESEL POWER, INC. | 142,301.50 |
| WORTH INDUSTRIES INC | 14,676.00 |
| YARBROUGH CABLE LLC | 2,110.36 |
| ZADOK TECHNOLOGIES, INC | 51,792.68 |

\\NY - 087760/000006 - 4324730 v2

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT** (the "Amendment") is made and entered into the 15th day of July, 2015 ("Effective Date"), by and among **Signal International, Inc.**, a Delaware corporation ("Signal"), **Signal International, LLC**, a Delaware limited liability company ("Int'l"), and **Signal Ship Repair, LLC**, a Delaware limited liability company ("SSR"), **Signal International Texas GP, LLC**, a Delaware limited liability company ("SGP"), and **Signal International Texas, L.P.**, a Delaware limited partnership ("SLP", collectively with Signal, Int'l, SSR, and SGP, the "Seller"), and **Teachers' Retirement System of Alabama**, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.*, of the Alabama Code (or its designee) ("TRS") and **Employees' Retirement System of Alabama**, a body corporate of the State of Alabama created under Section §§ under Section 36-27-1 *et seq.*, of the Alabama Code (or its designee) ("ERS" and collectively with TRS, the "Purchaser"). Purchaser and Seller are hereinafter referred to as the "Parties" or individually, as a "Party". Capitalized terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

**WHEREAS,** the Parties did enter into that certain Asset Purchase Agreement dated as of July 13, 2015 (the "Purchase Agreement");

**WHEREAS,** Section 5.9(b) of the Purchase Agreement contains and sets forth certain covenants relating to certain Bankruptcy Court Filings;

**WHEREAS,** pursuant to Section 11.2 of the Purchase Agreement, the Parties may amend the Purchase Agreement by a written document signed by each party to be bound by such amendment; and

**WHEREAS,** the Parties are willing to amend Section 5.9(b) of the Purchase Agreement in accordance with the terms and conditions set forth in this Amendment.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants herein contained, and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the Parties hereby agree to amend the Purchase Agreement as follows:

1.     Section 5.9 of the Purchase Agreement is amended by replacing subparagraph (b) in its entirety with the following:

(b)     The Seller will use its good faith and commercially reasonable efforts to have the Bankruptcy Court (i) file the Sale and Procedures Motion as promptly as practicable following the date of this Agreement but in no event later than July 22, 2015, (ii) enter the Bidding Procedures Order as promptly as practicable following the date of this Agreement but in no event later than August 19, 2015, (iii) cause the Bidding Procedures Order to provide that the Auction will be held no later than October 23, 2015, and the Seller will use its good faith and commercially reasonable efforts to (x) obtain entry of the Sale Order as promptly as practicable following the date on which the Auction is closed, but in no event later than November 24, 2015, and (y) consummate the Closing as promptly as

practicable after entry of the Sale Order, but in no event less than twenty (20) days thereafter. The Purchaser and the Seller will use their respective good faith and commercially reasonable efforts to cause the Bidding Procedures Order and the Sale Order to become Final Orders as soon as practicable after their entry.

2.      Except as provided herein, the terms of the Purchase Agreement shall remain unchanged.

3.      The parties may execute this Amendment in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Amendment is effective as of the Effective Date upon delivery of one executed counterpart from each party to the other party. The signatures of all parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

*[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK;*
*SIGNATURES APPEAR ON THE FOLLOWING PAGES*

2

The parties have executed and delivered this Amendment as of the Effective Date.

**SELLER:**

**SIGNAL INTERNATIONAL, INC.**

By: _____
       Chris Cunningham
Its: CFO

**SIGNAL INTERNATIONAL, LLC**

By: _____
       Chris Cunningham
Its: CFO

**SIGNAL SHIP REPAIR, LLC**

By: _____
       Chris Cunningham
Its: CFO

**SIGNAL INTERNATIONAL TEXAS GP, LLC**

By: _____
       Chris Cunningham
Its: CFO

**SIGNAL INTERNATIONAL TEXAS. L.P.**

By:    Signal International Texas GP, LLC
Its:  General Partner

By: _____
       Chris Cunningham
Its: CFO

*Signatures Continue on Next Page*

PURCHASER:

**TEACHERS' RETIREMENT SYSTEM
OF ALABAMA**

By: _____
David G. Bronner
Its:  CEO


**EMPLOYEES' RETIREMENT
SYSTEM OF ALABAMA**

By: _____
David G. Bronner
Its:  CEO