**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| **SIGNAL INTERNATIONAL, INC., et al.**[1] | Case No. 15-11498 (MFW) |
| Debtors. | Jointly Administered |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF LIQUIDATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: September 3, 2015
      Wilmington, Delaware

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP** | **HOGAN LOVELLS US LLP** |
| M. Blake Cleary (No. 3614) | Christopher R. Donoho III |
| Kenneth J. Enos (No. 4544) | Christopher R. Bryant |
| Jaime Luton Chapman (No. 4936) | John D. Beck |
| Rodney Square | 875 Third Avenue |
| 1000 North King Street | New York, NY 10022 |
| Wilmington, Delaware 19801 | Telephone: (212) 918-3000 |
| Telephone: (302) 571-6600 | |
| | *Special Counsel for the Debtors and* |
| *Counsel for the Debtors and the Debtors in Possession* | *the Debtors in Possession* |

---

**PLEASE NOTE THAT THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, AND HAS NOT YET BEEN APPROVED, BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF VOTES WITH RESPECT TO THE DEBTORS' JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE OR AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH SOLICITATION OR OFFER WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT, AND WILL NOT, BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THE INFORMATION CONTAINED HEREIN IS SUBJECT TO CHANGE.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Signal International, Inc. (4248); Signal Ship Repair, LLC (2642); Signal International, LLC (5074); Signal International Texas GP, LLC (3050); and Signal International Texas, L.P. (5066). The Debtors' principal offices are located at RSA Battle House Tower, 11 North Water Street, Mobile, Alabama 36602.

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT AND DISCLAIMERS ................................................. 1

II.   BACKGROUND ......................................................................................................... 5

    A.    Business Operations .......................................................................................... 5

    B.    Prepetition Organizational and Capital Structure ............................................. 6

    C.    Historical Capital Transactions ........................................................................ 6

    D.    Events Leading to the Filing of the Bankruptcy Cases .................................... 7

        1.    Prepetition Litigation Against Signal ................................................... 8

        2.    Prepetition Settlement and the Plan Support Agreement ..................... 9

    E.    Summary of Significant Postpetition Events and Orders ................................ 10

        1.    Debtors' Retention of Professionals ................................................... 10

        2.    Formation of the Committee and the Retention of Its Professionals ... 10

        3.    Cash Collateral and DIP Financing .................................................... 10

        4.    Schedules, Claims Bar Dates and Claim Objections ......................... 11

        5.    PSA Motion ........................................................................................ 11

        6.    Bidding Procedures Motion ................................................................ 11

        7.    Committee Settlement ......................................................................... 12

        8.    Executory Contracts ........................................................................... 13

III.  THE PLAN .............................................................................................................. 13

    A.    General Overview of the Plan ......................................................................... 13

    B.    Classification and Treatment of Claims and Equity Interests ........................ 13

        1.    Classification Generally ...................................................................... 13

        2.    Unclassified Claims ............................................................................ 14

        3.    Classified Claims ................................................................................ 14

        4.    General Provisions in Respect of Distributions Under the Plan
            Applicable to all Claims ..................................................................... 16

        5.    Plan Provisions for Treatment of Contingent Claims ........................ 17

        6.    Objection to Claims and Prosecution of Disputed Non-Litigation Claims .......... 17

        7.    Distributions on Account of Contingent and Disputed Non-Litigation
            Claims ................................................................................................. 18

        8.    Cash Reserves ..................................................................................... 18

        9.    Estimation of Non-Litigation Claims ................................................. 18

        10.   Objections to Litigation Settlement Trust Claims .............................. 19

        11.   Special Provisions Regarding Unimpaired Claims ............................. 19

    C.    Litigation Settlement Trust ............................................................................. 19

1.    Establishment and Administration of the Litigation Settlement Trust ................ 19

2.    Litigation Settlement TDP ........................................................................... 19

3.    Imposition of Channeling Injunction ............................................................ 20

4.    Release of Liabilities to Litigation Claimants ............................................... 21

5.    Assumption of Certain Liabilities ................................................................. 21

6.    Appointment of the Litigation Settlement Trustee .......................................... 22

7.    Litigation Settlement Trust Assets ................................................................ 22

8.    Litigation Settlement TAC ........................................................................... 24

9.    Cooperation; Transfer of Books and Records ................................................. 24

10.   Transfer of Privileged Information ............................................................... 25

11.   Institution and Maintenance of Legal and Other Proceedings ........................... 25

D.    Signal Liquidating Trust ...................................................................................... 25

1.    Establishment and Purpose of the Signal Liquidating Trust .............................. 25

2.    Authority and Role of the Signal Liquidating Trustee ...................................... 25

3.    Appointment of the Signal Liquidating Trustee .............................................. 26

4.    Signal Liquidating Trust Assets ................................................................... 26

5.    Treatment of Signal Liquidating Trust for Federal Income Tax Purposes .......... 26

6.    Signal Liquidating Trust as a "Grantor Trust" ............................................... 26

7.    Signal Liquidating Trustee's Right and Power to Invest ................................... 27

8.    Responsibilities of the Signal Liquidating Trustee .......................................... 27

9.    Expenses of the Signal Liquidating Trustee ................................................... 27

10.   Bonding of the Signal Liquidating Trustee .................................................... 27

11.   Fiduciary Duties of the Signal Liquidating Trustee ......................................... 28

12.   Cooperation; Transfer of Books and Records ................................................. 28

13.   Transfer of Privileged Information ............................................................... 28

14.   Dissolution of the Signal Liquidating Trust ................................................... 29

15.   Full and Final Satisfaction against Signal Liquidating Trust ............................. 29

E.    Injunctions, Releases and Discharge ...................................................................... 29

1.    Term of Certain Injunctions and Automatic Stay ............................................ 29

2.    Debtors' Releases ...................................................................................... 29

3.    Releases by Holders of Claims and Interests .................................................. 30

4.    Plan Injunction .......................................................................................... 31

F.    Executory Contracts ........................................................................................... 33

1.    Assumption or Rejection of Executory Contracts ........................................... 33

2.    Approval by Confirmation Order .................................................................. 33

3.    Cure of Defaults ........................................................................................ 33

|  |  | 4. | Notice of Proposed Cure | 33 |
|  |  | 5. | Rejection Damages Bar Date | 34 |
|  | G. | | Conditions | 34 |
|  |  | 1. | Conditions Precedent to Confirmation | 34 |
|  |  | 2. | Conditions Precedent to the Effective Date | 35 |
|  |  | 3. | Effect of Failure of Conditions | 36 |
|  | H. | | Retention of Jurisdiction | 37 |
|  |  | 1. | General Jurisdiction | 37 |
|  |  | 2. | Specific Jurisdiction | 37 |
|  |  | 3. | Litigation Settlement TDP Controlling | 39 |
|  | I. | | Miscellaneous Plan Provisions | 39 |
|  |  | 1. | Exculpation | 39 |
|  |  | 2. | Severability | 39 |
|  |  | 3. | Successors and Assigns | 40 |
|  |  | 4. | Further Assurances | 40 |
|  |  | 5. | Post-Effective Date Service List | 40 |
|  |  | 6. | Conflicts | 40 |
|  |  | 7. | Maintenance of Books and Records | 40 |
|  |  | 8. | Determination of Tax Liability | 41 |
|  |  | 9. | Entire Agreement | 41 |
|  |  | 10. | Change of Control Provisions | 41 |
|  |  | 11. | Substantial Consummation | 41 |
|  |  | 12. | Preservation of Insurance | 41 |
|  |  | 13. | Asset Purchase Agreement | 41 |
|  |  | 14. | Powers of Purchaser | 41 |
| IV. | | | IMPLEMENTATION OF THE PLAN | 41 |
|  | A. | | Consummation of the Asset Purchase Agreement | 42 |
|  |  | 1. | Transfer of Acquired Assets | 42 |
|  |  | 2. | Payment of Purchase Price and Discharge of Purchaser Assumed Liabilities | 42 |
|  |  | 3. | Good Faith of the Purchaser | 42 |
|  |  | 4. | No Successor Liability for the Purchaser | 43 |
|  | B. | | Substantive Consolidation of the Debtors for Plan Purposes Only | 43 |
|  | C. | | Effective Date | 43 |
|  | D. | | Operations of the Debtors Between the Confirmation Date and the Effective Date | 44 |
|  | E. | | Term of Injunctions or Stays | 44 |

F.    Setoffs ................................................................................................... 44

G.    Corporate Action ................................................................................... 44

H.    Cancellation of Existing Agreements and Existing Equity Interests ............... 44

I.    Authorization of Plan-Related Documentation ........................................ 45

J.    Dissolution of Committee ...................................................................... 45

K.    Exemption from Certain Fees and Taxes ................................................ 45

V.    ACCEPTANCE OR REJECTION OF THE PLAN ......................................... 46

A.    Voting ................................................................................................... 46

B.    Voting Instructions ................................................................................ 47

C.    Confirmation Hearing ............................................................................ 48

D.    Other Important Information .................................................................. 49

E.    Non-Consensual Confirmation .............................................................. 50

F.    Deemed Acceptance if No Votes Cast .................................................... 50

G.    Elimination of Vacant Classes ............................................................... 50

VI.    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ............... 50

A.    Immediate Binding Effect ...................................................................... 50

B.    Modification of the Plan ........................................................................ 50

C.    Revocation or Withdrawal of the Plan ................................................... 51

VII.    EFFECT OF NO CONFIRMATION .............................................................. 51

VIII.    CONFIRMATION AND CONSUMMATION PROCEDURE .............................. 51

A.    Confirmation Hearing ............................................................................ 51

B.    Requirements of section 1129(a) of Bankruptcy Code ........................... 51

1.    Best Interests Test ...................................................................... 52

2.    Feasibility .................................................................................. 52

3.    Acceptance by Impaired Classes ................................................ 53

4.    Confirmation Without Acceptance by All Impaired Classes .......... 53

IX.    RISK FACTORS ....................................................................................... 54

A.    General ................................................................................................. 54

B.    Allowed Claims May Exceed Estimates .................................................. 54

C.    Plan May Not Be Accepted or Confirmed ............................................... 54

X.    ALTERNATIVES TO THE PLAN ................................................................. 55

A.    Liquidation under Chapter 7 .................................................................. 55

B.    Alternative Plan of Reorganization ........................................................ 55

XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 55

A.    Federal Income Tax Consequences to the Debtors .................................. 56

1.    Sale of Assets ............................................................................ 56

       2.     Cancellation of Indebtedness and Reduction of Tax Attributes ........................... 57

B.     Classification, Reporting, and Taxation of the Litigation Settlement Trust and the Signal Liquidating Trust and Beneficiaries ........................................................... 57

C.     Federal Income Tax Consequences to Holders of Claims ................................................ 58

XII.    CONCLUSION .................................................................................................................................... 60

**DISCLOSURE STATEMENT EXHIBITS**

Exhibit 1:        Debtors' Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code Dated as of September 3, 2015

Exhibit 2:        Liquidation Analysis

NOTHING CONTAINED IN THIS DOCUMENT SHALL CONSTITUTE AN OFFER, ACCEPTANCE OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST AS THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW INCLUDING THE BANKRUPTCY CODE.  <u>YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED HEREIN OR THE TERMS OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT</u>.  THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND DEVELOPMENTS MAY OCCUR THAT REQUIRE MODIFICATIONS OR ADDITIONS TO, OR DELETIONS FROM, THIS DISCLOSURE STATEMENT AND/OR TO THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES.

## I.    PRELIMINARY STATEMENT AND DISCLAIMERS[2]

THIS DISCLOSURE STATEMENT RELATES TO THE PLAN FILED BY THE DEBTORS WITH THE BANKRUPTCY COURT ON SEPTEMBER 3, 2015.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT THAT CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST SHOULD CONSIDER IN CONNECTION WITH THE PLAN INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN.  NO REPRESENTATIONS HAVE BEEN AUTHORIZED CONCERNING THE DEBTORS, THEIR ASSETS, CLAIMS AGAINST THE DEBTORS, OR EQUITY INTERESTS IN THE DEBTORS, EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN.  ACCORDINGLY, CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST SHOULD NOT RELY ON ANYTHING OTHER THAN THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN THE EXHIBITS ATTACHED TO THE DISCLOSURE STATEMENT AND THE PLAN, IN CONSIDERING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  ALL INFORMATION IN THIS DISCLOSURE STATEMENT IS FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY.  IT CONTAINS A SUMMARY OF THE PLAN, IMPORTANT INFORMATION CONCERNING THE DEBTORS, INCLUDING THEIR HISTORY AND BUSINESS OPERATIONS, CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND HOW CLAIMS AND EQUITY INTERESTS WILL BE TREATED IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT ALSO PROVIDES INFORMATION REGARDING ALTERNATIVES TO THE PLAN.

THE DESCRIPTION OF THE PLAN IN THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS, PROVISIONS AND CONDITIONS SET FORTH IN THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF ALL

---

[2] Unless otherwise defined in this Disclosure Statement, all capitalized terms used and not defined herein have the meanings given to them in the *Debtors' Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**").

THE TERMS, PROVISIONS AND CONDITIONS SET FORTH IN THE PLAN.  THE PLAN ITSELF ALSO SHOULD BE READ CAREFULLY AND INDEPENDENTLY OF THIS DISCLOSURE STATEMENT.

IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

YOU ALSO SHOULD CONSIDER CONSULTING WITH YOUR OWN COUNSEL AND/OR OTHER ADVISORS IN CONNECTION WITH YOUR CLAIM(S) AGAINST, AND/OR EQUITY INTEREST(S) IN, THE DEBTORS, THE TREATMENT TO BE AFFORDED TO YOUR CLAIM(S) AND/OR EQUITY INTEREST(S) UNDER THE PLAN, AND ANY TAX CONSEQUENCES TO YOU, IF ANY, ATTENDANT TO CONFIRMATION OF THE PLAN.

THE DEBTORS CANNOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY OR ERROR BUT THEY DO BELIEVE THAT THE INFORMATION CONTAINED HEREIN IS THE MOST ACCURATE INFORMATION AVAILABLE TO THEM AT THIS TIME.  NOTHING CONTAINED HEREIN IS AN ADMISSION OF ANY FACT OR LIABILITY NOR SHALL IT BE ADMISSIBLE IN ANY MATTER OR PROCEEDING ARISING IN OR RELATED TO THIS BANKRUPTCY CASE OR IN ANY OTHER ACTION, PROCEEDING OR LITIGATION INVOLVING THE PROPONENTS.

NO REPRESENTATIONS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT ARE AUTHORIZED WITH RESPECT TO THE PLAN AND ANY SUCH REPRESENTATIONS ARE NOT ADOPTED BY THE DEBTORS AND SHOULD NOT BE RELIED ON IN MAKING YOUR DECISION WHETHER TO ACCEPT OR TO REJECT THE PLAN.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO ALL CREDITORS OF, AND HOLDERS OF EQUITY INTERESTS IN, EACH OF THE DEBTORS PURSUANT TO 11 U.S.C. § 1125.

| THE DEADLINE TO CAST BALLOTS EVIDENCING VOTES EITHER TO ACCEPT OR TO REJECT THE PLAN IS NOVEMBER 17, 2015, BY 4:00 P.M. (PREVAILING EASTERN TIME). |
|---|

THE BANKRUPTCY CODE PROVIDES THAT ONLY THE BALLOTS OF CREDITORS THAT ACTUALLY VOTE ON THE PLAN WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE ACCEPTANCES REQUIRED FOR CONFIRMATION OF THE PLAN HAVE BEEN ATTAINED.  FAILURE TO DELIVER A PROPERLY COMPLETED BALLOT BY THE VOTING DEADLINE WILL CONSTITUTE AN ABSTENTION (I.E., WILL NOT BE COUNTED AS EITHER AN ACCEPTANCE OR A REJECTION), AND ANY IMPROPERLY COMPLETED OR LATE BALLOT WILL NOT BE COUNTED.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THE DEBTORS' CREDITORS, HOLDERS OF EQUITY INTERESTS IN THE DEBTORS AND ALL OTHER PARTIES IN INTEREST.  THE PLAN IS SUPPORTED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED

**IN THE DEBTORS' BANKRUPTCY CASES.  ACCORDINGLY, THE DEBTORS URGE YOU, FOR THE REASONS WHICH FOLLOW, TO VOTE IN FAVOR OF THE PLAN.**

<u>**TREATMENT AND CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT**</u>

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class & Description | Estimated Remaining Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1: Other Priority Claims | $0.00 | *Unimpaired – Deemed to Accept.*  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser. | 100% |
| Class 2: Other Secured Claims | $0.00 | *Unimpaired – Deemed to Accept.*  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, receive delivery of collateral securing any such Claim and payment of any interest requested under section 506(b) of the Bankruptcy Code, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser. | 100% |
| Class 3: First Lien Loan Agreement Claims | Approximately $70,088,952.00 | *Potentially Impaired – Entitled to Vote.*  Unless otherwise repaid through proceeds of the DIP Facility, on the Effective Date, the Senior Notes shall each be cancelled, and on account of the First Lien Loan Agreement Claims, the TRSA and ERSA shall either (i) acquire the Acquired Assets as the Purchaser in accordance with the Asset Purchase Agreement or (ii) be paid in full, in Cash, the total amount outstanding under the First Lien Loan Agreement from the proceeds received in accordance with the Asset Purchase Agreement. | N/A |
| Class 4: Litigation Claims | Approximately $200.0 million | *Impaired – Entitled to Vote.*  Each Litigation Claimant shall receive its share of the Litigation Settlement Trust Assets, which share shall be determined in accordance with the terms, provisions, and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  Litigation Claims shall be | Approximately [TBD] |

01:17450000.8

| | | | |
|---|---|---|---|
| | | resolved by the Litigation Settlement Trust in accordance with the terms of the Litigation Settlement TDP.  On the Effective Date, the Litigation Claims shall be deemed Allowed in the total aggregate amount of no less than $200 million.  On the Effective Date, all Litigation Claims shall be released as against the Debtors and their Related Parties pursuant to the terms and conditions of the Plan and the Litigation Settlement Trust Documents.  Pursuant to the Channeling Injunction, each Litigation Claimant shall have its Claim permanently channeled to the Litigation Settlement Trust, and such Litigation Claim may thereafter be asserted exclusively against the Litigation Settlement Trust and resolved in accordance with the terms, provisions and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  For the avoidance of doubt, Litigation Claimants are not entitled to receive Distributions or other payment of funds from the Signal Liquidating Trust on behalf of, related to or with respect to such Litigation Claims.  Litigation Claimants are, subject to the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, enjoined from filing any future litigation, claims or causes of action arising out of such Litigation Claims against the Debtors and/or any of the Plan Participants or their Related Parties, and may not proceed in any manner against the Debtors and/or any of the Plan Participants or their Related Parties, in any forum whatsoever, including, without limitation, any state or federal court or administrative or arbitral forum, and are required to pursue their Litigation Claims against the Litigation Settlement Trust solely as provided in the Litigation Settlement Trust Agreement and the Litigation Settlement TDP. | |
| Class 5: General Unsecured Claims | Approximately $6.0 million | *Impaired – Entitled to Vote*.  On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, on account of its claim, its Pro Rata share (determined without taking the Litigation Claimants into account) of the GUC Payment Amount and its Pro Rata share of that portion of the Excess Sale Overpayment allocated to the holders of General Unsecured Claims.  The GUC Payment Amount shall be an aggregate amount equal to the lesser of (i) $900,000, or (ii) an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all | Approximately [TBD] |

01:17450000.8

| | | | |
|---|---|---|---|
| | | assumption and cure has been implemented with respect thereto.  For the avoidance of any doubt, Holders of General Unsecured Claims are not entitled to receive Distributions or other payment of funds from the Litigation Settlement Trust on behalf of, related to or with respect to such General Unsecured Claims. | |
| Class 6: Intercompany Claims | To Be Provided | *Impaired – Deemed to Reject.*  Intercompany Claims against the Debtors shall not be entitled to any distribution under the Plan and such claims shall be cancelled and discharged on the Effective Date. | 0% |
| Class 7:  Equity Interests | All issued and outstanding Equity Interests | *Impaired – Deemed to Reject.*  Holders of Equity Interests in the Debtors shall neither receive nor retain any property under the Plan.  On the Effective Date, all Equity Interests in the Debtors shall be cancelled and of no further force or effect and all Claims filed on account of Equity Interests shall be deemed disallowed by operation of the Plan. | 0% |

## II.    BACKGROUND

On the July 12, 2015 (the "**Petition Date**"), Signal International, Inc. ("**SI Inc.**"), a corporation organized under the laws of the state of Delaware, and its wholly owned subsidiaries, Signal International, LLC ("**SI LLC**"), Signal Ship Repair, LLC ("**SSR**"), Signal International Texas GP, LLC ("**SI GP**") and Signal International Texas, L.P. ("**SI Texas**"), commenced cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  SI Inc. and its affiliates shall be collectively referred to herein as "**Signal**" or the "**Debtors**".

### A.    Business Operations

Signal primarily engages in the business of offshore drilling rig overhaul, repair, upgrade, and conversion, as well as new shipbuilding construction.  Additionally, the Debtors provided services to the general marine and heavy fabrication markets for barges, power plants and modular construction.

SI LLC was organized on December 6, 2002 as a limited liability company after acquiring the assets of the Offshore Division of Friede Goldman Halter from bankruptcy.  SI Inc. was incorporated on October 12, 2007 and began operations with offshore fabrication and repair in Mississippi.  Signal's corporate headquarters are in Mobile, Alabama with operations in Alabama and Mississippi, and a sales office in Texas.  As of the Petition Date, the Debtors had approximately 302 full-time employees and 15 contract personnel and have not experienced any strikes or work stoppages.

Signal is known in the industry for its outstanding safety record.  For the past eleven years, Signal has earned the Shipbuilder's Council of America Award for Excellence in Safety, which is awarded to shipyard members with the lowest total recordable incidence rates based on a quarterly injury and illness survey conducted by the association.  Signal's safety record is due to its effective company-wide safety program, including focused management led efforts to eliminate safety incidents, comprehensive permit to work/job risk assessment, and an incentive program initiated in April 2003.

With a family of three yards strategically located along the Gulf of Mexico in Alabama and Mississippi, Signal offers new construction, rig and ship repair, and offshore and technical services.

Marine construction and repair needs are complimented by 3 dry docks, a 30,000-ton heavy lift dock, a 22,000-ton Panamax dry dock, and a 4,500-ton lift dry dock.

In Mobile, Alabama, SSR offers more than 4,400 feet of water frontage along the Mobile River with a channel maintained to 44 feet. This ship repair facility specializes in vessel repairs and conversions and houses two floating dry docks. The Pascagoula, Mississippi facility, which handles rig fabrication and repair, also has significant automation as well as a deep hole 500' x 300' x 60' for thruster work and space for storage of offshore equipment. Additionally, the facility houses a 30,000-ton Dual Carrier/heavy lift dry dock.

Signal's strategic geographical positioning, quality workforce, and stellar safety record make Signal an industry leader in new construction, rig and ship repair, and offshore and technical services.

Because of the anticipated decline in oil prices during 2013, there was a reduction in oil and gas exploration and production conducted in the Gulf region. This reduction in exploration and production had a corresponding negative effect on the demand for Signal's services, causing Signal's revenues to fall sharply from $175,872,243 in 2012 to $74,425,920 in 2013. Although the Debtors were able to reduce expenses, their revenue for 2014 was $152,531,800.

Signal's earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") similarly declined considerably over the last two years. For the twelve months ended December 31, 2014, Signal's EBITDA was $19.2 million, compared to EBITDA of $41.6 million for the same time period in 2012. This reduction in Signal's EBITDA is due primarily to lower revenues. This sharp decline from 2012 in revenue and EBITDA has imposed a significant strain on Signal's liquidity.

**B.      Prepetition Organizational and Capital Structure**

SI Inc. was incorporated under the laws of the State of Delaware and its principal place of business is Mobile, Alabama. SI LLC and SSR are wholly-owned subsidiaries of SI Inc. and were each formed under the laws of the State of Delaware. SI GP is a wholly owned subsidiary of SI LLC and was formed under the laws of the State of Delaware. SI LLC owns 99%, with SI GP owning the remaining 1%, of SI Texas, and SI Texas was formed under the laws of the State of Delaware.

**C.      Historical Capital Transactions**

SI LLC was organized on December 6, 2002, to acquire the assets of the Offshore Division of Friede Goldman Halter out of bankruptcy. The purchase of those assets was financed by an equity investment of approximately $18,000,000 and an assumption of outstanding debt of approximately $49,000,000.

In 2008, Signal then incurred indebtedness from Wachovia Bank, N.A. (the "**Wachovia Debt**") consisting of a revolving credit and term loan facility in the total principal amount of $80,000,000. In March 2011, to refinance the Wachovia Debt, Signal entered into a certain Credit Agreement (the "**Regions Bank Credit Agreement**") and related security documents dated as of March 1, 2011, with Regions Bank, as administrative agent for certain lender parties thereto, which extended a revolving credit and term loan facility in the total principal amount of $80,000,000 (the "**Regions Bank Debt**") and Regions Bank took a security interest in substantially all of Signal's assets.

Signal subsequently defaulted under the Regions Bank Credit Agreement by, among other things, failing to make a mandatory prepayment due on April 16, 2013. On or about May 17, 2013, Regions

Bank and Signal entered into a forbearance agreement, which was subsequently extended for an indefinite period so long as certain termination events were not triggered.

To address liquidity concerns at that time, on August 26, 2013, SI Inc. issued shares of Series A preferred stock (the "**Preferred Stock**"), par value $0.01 per share, on a fully diluted, as-converted basis, pursuant to the terms and conditions set forth in that certain Securities Purchase Agreement to the TRSA Teachers' Retirement System of Alabama (the "**TRSA**") (13,400,000 shares) and the Employees' Retirement System of Alabama (the "**ERSA**") (6,600,000 shares) for a total issuance price of $20,000,000. The TRSA and ERSA also received warrants for the purchase of 10% of the fully diluted common stock of SI Inc. By a certain Subordination Agreement dated August 26, 2013, the lenders under the Regions Bank Credit Agreement consented to SI Inc.'s issuance of the Preferred Stock despite SI Inc. being in default under the Regions Bank Credit Agreement. In exchange, the TRSA and ERSA agreed to expressly subordinate their rights under the Preferred Stock to the Regions Bank Debt.

On January 31, 2014, Signal refinanced the Regions Bank Debt and entered into the First Lien Credit Agreement evidenced by (i) a $50,250,000 Term Loan Note held by the TRSA and (ii) a $24,750,000 Term Loan Note held by the ERSA, both subject to the terms and conditions of the First Lien Loan Agreement. As required by the First Lien Loan Agreement, the proceeds from the First Lien Loan were used to satisfy in full the Regions Bank Debt.

In connection with the First Lien Credit Agreement, the Debtors entered into: (i) that certain Security Agreement dated as of January 31, 2014 (the "**First Lien Security Agreement**"), whereby each of the Debtors granted the TRSA, as the First Lien Agent (the "**First Lien Agent**"), a security interest in substantially all of their respective assets, including cash collateral; (ii) that certain Pledge Agreement dated as of January 31, 2014 (the "**First Lien Pledge Agreement**"), whereby each of the Debtors pledged their equity interests in their respective subsidiaries to the First Lien Agent; (iii) certain other mortgages and deeds of trust granting security interests to the First Lien Agent to all real property held by the Debtors (the "**First Lien Mortgages**"); and (iv) that certain Deposit Account Control Agreement dated February 21, 2014, granting the First Lien Agent a security interest in and control over all the Debtors' bank accounts (the "**Bank Accounts**" and collectively, the "**Prepetition Collateral**").

On October 3, 2014, SI Texas sold substantially all of its assets (the "**Texas Transaction**") to Westport Orange Shipyard, LLC ("**Westport**") in a partially seller-financed transaction for a total purchase price of $35,900,000. As part of the Texas Transaction, Westport provided a down payment of $7,000,000 and delivered a promissory note in the principal amount of $28,900,000 to SI Texas due on or before October 3, 2019 (the "**Westport Note**").[3]

On September 15, 2014, after winning an arbitration award in the amount of $24,000,000, the Debtors used the cash proceeds to redeem in full the Preferred Stock from the TRSA and ERSA for a redemption price of $1.01793 per share, resulting in repurchase payments of $13,640,262 to the TRSA and $6,718,338 to the ERSA.

## D.    Events Leading to the Filing of the Bankruptcy Cases

The filing of the Bankruptcy Cases was the consensual culmination of seven years of protracted and highly contentious multi-action litigation and negotiations between Signal and the Supporting Litigation Plaintiffs (defined below) that has reached a global resolution through the settlement embodied in the Plan Support Agreement (as described in greater detail below), subject to Bankruptcy Court approval and implementation through the Plan. The Plan Support Agreement was entered into prior to the

---

[3] The Westport Note constitutes part of the Prepetition Collateral.

Petition Date by the Debtors, the Supporting Litigation Plaintiffs, and the TRSA and ERSA, the lender parties under the First Lien Loan Agreement, and also resolves the Debtors' default thereunder as well as the Litigation Plaintiffs' threatened claims against the TRSA and ERSA. As described in greater detail below, following the Petition Date, the Plan Support Agreement was joined by the Committee.

In short, the Plan and Plan Support Agreement avoids the need for contentious and value-destroying bankruptcy litigation and preserves the Assets as a going concern and maximizes the value of the Estates. Thus, despite the Debtors' tumultuous litigation and financial history, they filed the Bankruptcy Cases having reached a global resolution of the most contentious pending claims.

    1.    <u>Prepetition Litigation Against Signal</u>

Since 2008, Signal has been involved in over thirteen (13) separate litigations across three different states resulting in approximately $20 million in litigation fees and expenses. These litigations, coupled with the decline in the oil and gas industry, have significantly strained Signal's liquidity. The settlement in the Plan Support Agreement and the chapter 11 process provides Signal with a desperately needed breathing spell to allow it to restructure its debt and maximize value for the benefit of all its creditors.

    *(a)*    *H-2B Litigation*

After Hurricane Katrina in 2005, Signal hired, through a third party recruiting service, approximately 500 men from India (the "**H-2B Workers**") through the federal government's H-2B guestworker program to provide labor and services to Signal. In 2008, a subset of those H-2B Workers (the "**Litigation Plaintiffs**") filed suits against Signal, among others, for certain alleged violations regarding treatment of the H-2B Workers and quality of working conditions. The Litigation Plaintiffs were denied class-certification and brought twelve (12) independent actions in Louisiana and Texas.

The first of those actions, *David v. Signal International LLC, et al.*, involved 5 of the Litigation Plaintiffs and was tried before a jury in the United States District Court for the Eastern District of Louisiana (the "**Louisiana District Court**") beginning in January 2015. Following several weeks of trial, the jury found against SI Inc. and SI LLC and awarded damages to the *David* plaintiffs. On May 11, 2015, the Louisiana District Court entered judgment (the "**H-2B Judgment**") in favor of the *David* plaintiffs (the "**Judgment Plaintiffs**") and against SI Inc. and SI LLC totaling approximately $12 million plus fees, costs, and expenses for various claims relating to the recruitment and treatment of the Judgment Plaintiffs. There remain 11 pending lawsuits against Signal in which approximately 227 other Litigation Plaintiffs have alleged claims that are substantially similar to those alleged by the Judgment Plaintiffs. Subject to the terms of the Plan Support Agreement (including Bankruptcy Court approval and implementation through the Plan), Signal has settled with the vast majority of the Litigation Plaintiffs.

    *(b)*    *EEOC Litigation*

In late 2007, two H-2B Workers filed charges of discrimination with the Equal Employment Opportunity Commission ("**EEOC**") on behalf of themselves and other, similarly situated former H-2B Workers. The EEOC issued its initial determination on these charges in September 2009, declaring that there is "reasonable cause to believe" that Signal discriminated against the H-2B Workers as a class. Thereafter, in 2011, the EEOC filed an action in the United States District Court for the Southern District of Mississippi and the case was later transferred to the United States District Court for the Eastern District of Louisiana. The EEOC action has been adjourned indefinitely, however, due to a pending appeal in an unrelated case before the United States Court of Appeals for the Fifth Circuit addressing legal issues that may have a direct impact on the EEOC litigation against Signal. The Debtors have continued discussions

with the EEOC following the Petition Date, and are hopeful that the EEOC will ultimately support confirmation of the Plan.

*(c)    Insurance Litigation*

A prepetition judgment also was entered against SI LLC in favor of Max Specialty on June 17, 2014 (the "**Insurance Judgment**").  As background, Signal owned a large dry dock that was destroyed in August 2009.  Signal had primary insurance coverage in the amount of $10 million and also an excess insurance policy issued by Max Specialty.  After the dry dock was destroyed, Signal made an insurance claim for $13.6 million for the value of the hull and also another $11.4 million claim for business interruption.  The primary insurance provider paid $10 million under its policy and Max Specialty paid $3.6 million for the hull under the excess policy but refused to pay anything on account of Signal's business interruption claim.  In March 2010, some of Signal's insurers commenced a declaratory judgment action against Signal and other insurers in the United States District Court for the Southern District of New York.  Signal filed a cross-claim against Max Specialty for, among other things, its failure to pay the business interruption claim.  Max Specialty thereafter filed a cross-claim against Signal, asserting that Signal had failed to disclose the condition of the dry dock and seeking to void the insurance policy, which would have the effect of clawing back the $3.6 million Max Specialty previously paid to Signal pursuant to the insurance claim on the hull.  On June 17, 2014, the district court ruled in favor of Max Specialty and entered judgment in the amount of $4 million against SI LLC.  On April 7, 2015, Max Specialty filed petitions to domesticate the foreign judgments in Mississippi, Alabama, and Texas.

Signal appealed the Insurance Judgment to the United States Court of Appeals for the Second Circuit (the "**Second Circuit**").  On _____, 2015, the Bankruptcy Court entered its *Order Modifying the Automatic Stay to the Extent Necessary to Permit Continued Consideration of Appeal to the Second Circuit* [Docket No.____] to permit continuation of the Second Circuit's consideration of Signal's appeal despite the filing of the Bankruptcy Cases.

     2.    <u>Prepetition Settlement and the Plan Support Agreement</u>

Considering the significant litigation against it and other factors, Signal recognized the need to resolve the various litigation claims and restructure its debt.  To that end, Signal began to allocate resources to its restructuring efforts by reducing its litigation costs and exploring options to address its obligations with all relevant constituencies.

Prior to the Petition Date, the Debtors contacted and met with counsel for certain of the Litigation Plaintiffs and had multiple discussions with the TRSA and ERSA in an attempt to pursue global settlement options.  To that end, the Debtors also requested all parties stand down for a period of time to allow the Debtors additional time to explore a possible resolution.  These extensive and good-faith settlement efforts by all sides, after a substantial and complicated series of discussions and negotiations, ultimately resulted in the Plan Support Agreement that provides the framework for a successful and value-maximizing restructuring.  Specifically, the Plan Support Agreement provides for (i) an open market sale of substantially all of the Assets with the TRSA and ERSA serving as stalking horse bidder, (ii) a distribution to Litigation Claimants of between $20 million and $22 million from proceeds of the Westport Note depending on the performance of the loan, and (iii) a gift payment to be shared pro rata by the Holders of Allowed General Unsecured Claims.  As set forth in greater detail below, subsequent to the Petition Date, the Committee became a party to the Plan Support Agreement.

As a result of the Plan Support Agreement, the Plan enjoys broad support from the Debtors' major creditor constituencies.  In addition to the TRSA, ERSA and the Committee, the vast majority of the approximately 227 Litigation Plaintiffs are party to the Plan Support Agreement (such Litigation

Claimants, the "**Supporting Litigation Plaintiffs**") and have agreed to support the Plan.  The Supporting Litigation Plaintiffs include all five (5) of the Judgment Plaintiffs.[4]

**E.      Summary of Significant Postpetition Events and Orders**

As in any major chapter 11 case, many motions, applications and orders have been filed and entered on the Bankruptcy Court's official docket for the Bankruptcy Cases.  The following information relates to certain significant events and orders in the Bankruptcy Cases.

1.      Debtors' Retention of Professionals

The Debtors retained, pursuant to orders of the Bankruptcy Court, the following professionals:  (i) Young Conaway Stargatt & Taylor, LLP as bankruptcy counsel; (ii) Hogan Lovells US LLP as general corporate and special litigation and transactional counsel; (iii) GGG Partners, LLC as financial advisors; (iv) SSG Advisors, LLC ("**SSG**") as investment banker; and (vi) Kurtzman Carson Consultants LLC ("**KCC**") as administrative advisor.  During the pendency of the Bankruptcy Cases, these professionals will be paid approximately 80%–100% of their fees and 100% of their expenses on a monthly basis, pursuant to the professional fee procedures approved by the Bankruptcy Court.

Pursuant to 28 U.S.C. §156(c), Bankruptcy Rule 2002(f), Local Rule 2002-1(f), and the order of the Bankruptcy Court, the Debtors retained KCC as claims, notice and balloting agent.  Pursuant to Bankruptcy Court order, KCC will be paid for its fees and expenses in full, as billed to the Debtors in the ordinary course of business.

2.      Formation of the Committee and the Retention of Its Professionals

The United States Trustee appointed the Committee on or about July 22, 2015, which consists of the following parties:   Max Specialty Insurance Company n/k/a Alterra Excess Company; Hemant Khuttan; Jamestown Metal Marine Sales, Inc.; Marmac, LLC dba McDonough Marine Service; Canal Barge Company, Inc.; Aby Karickathara Raju; and Iju James.

The Committee retained, pursuant to orders of the Bankruptcy Court, Pachulski Stang Ziehl & Jones LLP, as bankruptcy counsel, and GlassRatner Advisory & Capital Group LLC, as financial advisor.  During the pendency of the Bankruptcy Cases, these professionals will be paid approximately 80%–100% of their fees and 100% of their expenses on a monthly basis, pursuant to the professional fee procedures approved by the Bankruptcy Court.

3.      Cash Collateral and DIP Financing

On July 13, 2015, the Bankruptcy Court entered an interim order (the "**Interim DIP Order**") that authorized the Debtors, on an interim basis, to:  (i)  borrow $2.5 million in post-petition financing from the TRSA and ERSA, (ii) use cash collateral (iii) grant adequate protection to the TRSA and ERSA, and (iv) modify the automatic stay as related thereto.  On August 11, 2015 and September 1, 2015, the Bankruptcy Court entered amendments to the Interim DIP Order that, among other things, increased the amount of interim post-petition financing to $4.0 million.

On September __, 2015, the Bankruptcy Court entered its *Final Order Authorizing Debtors In Possession to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (ii)*

---

[4] For the avoidance of doubt, among Litigation Plaintiffs, the Plan Support Agreement itself only binds the Supporting Litigation Plaintiffs and is without prejudice to the rights, claims and defenses of other, non-signatory Litigation Plaintiffs.

*Grant Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; (iii) Use Cash Collateral, (iv) Provide Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364; and (v) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2* [Docket No. _____] (the "**Final DIP Order**").  Pursuant to the Final DIP Order, the Debtors were authorized, on a final basis, to, among other things,  obtain post-petition financing from the TRSA and ERSA consisting of (x) a superpriority, secured revolving credit facility in the principal amount of up to $15,000,000.00 to be used for general working capital and liquidity purposes, (y) a superpriority, secured revolving credit facility in the principal amount of up to $5,000,000.00 to be used for credit enhancement obligations under customer contracts as described in the DIP Loan Agreement, and (z) a superpriority, secured term loan facility in an aggregate principal amount of $70,088,952.00.

### 4.    Schedules, Claims Bar Dates and Claim Objections

On August 11, 2015, the Debtors filed their schedules of assets and liabilities ("Schedules").

Upon the Debtors' motion filed on July 22, 2015, the Bankruptcy Court entered an order on August 11, 2015 [Docket No. 205] pursuant to which a deadline of **September 22, 2015 at 4:00 p.m. (Eastern Time)** was established for creditors to file proofs of claim for prepetition claims against the Debtors (including, without limitation, claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code), except for prepetition claims by Governmental Units, which are required to be filed by **January 8, 2016 at 4:00 p.m. (Eastern Time)** (such dates are collectively referred to herein as the "**Bar Date**").

The Debtors, the Signal Liquidating Trustee, and/or the Litigation Settlement Trustee, contemplate filing one or more omnibus objections to Claims to ensure that only valid Claims are Allowed and afforded proper treatment under the Plan.  Nothing herein or in the Plan shall be construed as a waiver of any objections, defenses or setoff to any Claim or as an admission of the validity or allowance of any Claim.

### 5.    PSA Motion

On July 17, 2015, the Debtors filed a motion (the "**PSA Motion**") [Docket No. 112] seeking to assume the Plan Support Agreement.  The Debtors entered into the Plan Support Agreement because of their belief that it provides a well-defined path towards approval of a disclosure statement, solicitation of a chapter 11 plan, the sale of their assets, and confirmation of a chapter 11 plan.  Considering the last seven years of highly contentious litigation and recent financial struggles, the Debtors believe that the Plan Support Agreement is a remarkable achievement that resolves nearly all of their major outstanding issues as fairly as possible given the extremely difficult circumstances.  On September 1, 2015, the Bankruptcy Court entered an order [Docket No. 279] approving the PSA Motion and authorizing the Debtors' assumption of the Plan Support Agreement.

### 6.    Bidding Procedures Motion

Given the Debtors' declining revenue, liquidity constraints, and mounting litigation expenses and claims, the Debtors and their advisors had determined that an out-of-court restructuring was not achievable.  As a result, the Debtors engaged SSG as their investment banker with the primary mandate of marketing the Debtors' business to potential bidders in a section 363 sale process.  Based upon this determination that the sale could only be consummated in the context of these bankruptcy proceedings, the Debtors, the TRSA and ERSA negotiated the Asset Purchase Agreement, which provides that TRSA

and ERSA would serve as the stalking horse bidder to facilitate a sale pursuant to section 363 of the Bankruptcy Code.

On July 22, 2015, the Debtors filed a motion (the "**Sale Motion**") [Docket No. 120] seeking, among other things, (i) entry of the Bidding Procedures Order (a) approving the Bidding Procedures, (b) approving the Break-up Fee, (c)  scheduling an Auction and hearing to consider approval of the Sale Transaction, (d) approving the form and manner of notices in connection with the Bidding Procedures, (e) authorizing and approving assumption and assignment procedures with respect to the Executory Contracts, and (f) granting related relief; and (ii) entry of the Sale Order (a) approving the Asset Purchase Agreement, (b) authorizing the Sale Transaction, (c) authorizing the assumption and assignment of the assigned Executory Contracts, and (d) granting related relief.

On September 1, 2015, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. 280].  Pursuant to the Bidding Procedures Order, the Auction shall take place on October 14, 2015, and the Sale Transaction shall be considered in conjunction with confirmation of the Plan on November 24, 2015.

      7.     <u>Committee Settlement</u>

Subsequent to the Petition Date, the Debtors, the ERSA and TRSA, and the Supporting Litigation Claimants engaged in discussions with the Committee regarding certain informal objections (the "Informal Objections") that the Committee raised regarding approval of the Final DIP Order, the Bidding Procedures Order and Bidding Procedures, and the PSA Motion.  To resolve the Informal Objections:

      (a)     The ERSA and TRSA agreed to increase the gift payment to Holders of General Unsecured Claims from $400,000 to an aggregate amount equal to the lesser of $900,000, or an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto;

      (b)     The Sharing Ratio was revised to provide that 22.5% of the Excess Sale Overpayment shall be paid to holders of General Unsecured Claims, not subject to dilution by the Litigation Claimants, and 77.5% of the Excess Sale Overpayment shall be paid to Litigation Claimants, not subject to dilution by the holders of General Unsecured Claims, provided, that at such time as the holders of General Unsecured Claims (other than the Litigations Claims) have received payment in full of the allowed amount of their claims, 100% of any remaining Excess Sale Overpayment shall be paid to the Litigation Claimants;

      (c)     The ERSA and TRSA agreed that the Final DIP Order would not provide for a lien on Avoidance Actions;

      (d)     The ERSA and TRSA consented to certain revisions to the Bidding Procedures Order and Bidding Procedures, including a reduced Break-Up Fee of $1.0 million and no expense reimbursement;

      (e)     The Committee agreed to waive its right to file any adversary proceeding or contested matter against the ERSA or TRSA subject to the Final DIP Order; and

      (f)     The Committee agreed to become a party to the Plan Support Agreement.

8.    Executory Contracts

As of the Petition Date, the Debtors were parties to numerous Executory Contracts.  Pursuant to the Sale Transaction, the Debtors intend to assume and assign the majority of the Executory Contracts to the Purchaser.  Except as provided by the Plan, any remaining Executory Contracts not assigned to the Purchaser and not assumed by the Debtors shall be rejected pursuant to the Plan as of the Confirmation Date.

## III.    THE PLAN

### A.    General Overview of the Plan

The Plan represents a good faith compromise of certain claims and controversies pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

The principal features of the Plan are the sale of substantially all of the Debtors' assets and distributions to Holders of Claims in accordance with the priorities set forth in the Bankruptcy Code and the establishment of two trusts pursuant to section 105 of the Bankruptcy Code: (i) a Litigation Settlement Trust for payment of Litigation Claims and (ii) a Signal Liquidating Trust for the benefit of all Holders of General Unsecured Claims.  Each of the Litigation Settlement Trust and the Signal Liquidating Trust will be established to administer and resolve specific Claims and each will be subject to its own trust agreement and its own rules with respect to the administration and satisfaction of Claims.

The Litigation Settlement Trust will provide a streamlined system for the resolution of any Litigation Claim.  All Litigation Claims will be channeled to the Litigation Settlement Trust for resolution in accordance with the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  Litigation Claims will receive Distributions from the Litigation Settlement Trust Assets.  The Plan also provides for the Southern Poverty Law Center to select the Litigation Settlement Trustee and for the Litigation Claimants that serve on the Committee to select the members of the Litigation Settlement TAC, all subject to approval by the Bankruptcy Court.

*Section 105(a) of the Bankruptcy Code and other sections of the Bankruptcy Code authorize the Bankruptcy Court to enter the type of "channeling injunction" contemplated by the Plan, pursuant to which all Litigation Claims will be channeled to the Litigation Settlement Trust.  Following issuance of the Channeling Injunction, Holders of Litigation Settlement Claims will be permanently enjoined from seeking satisfaction of their Litigation Settlement against the Debtors or any Plan Participant other than through the processes established in connection with the Litigation Settlement Trust pursuant to the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.*

Non-Litigation Claims against the Debtors shall be administered and treated in accordance with the terms of the Plan, by and through the Signal Liquidating Trust.  The Signal Liquidating Trust will have the responsibility for making Distributions to the Holders of Allowed Non-Litigation Claims against the Debtors.

### B.    Classification and Treatment of Claims and Equity Interests

1.    Classification Generally

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests that are required to be designated in classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class only to the extent that any portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is placed in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.  Notwithstanding any Distribution provided for in the Plan, no Distribution on account of any Claim or Equity Interest is required or permitted unless and until such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be, which might not occur, if at all, until after the Effective Date.

2.      Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and are excluded from the Classes of Claims set forth in Article III of the Plan.  Article II of the Plan governs the treatment and payment of all such unclassified Claims.

3.      Classified Claims

The Plan divides the Claims against and Equity Interests in the Debtors into seven (7) separate Classes and identifies which Classes are entitled to vote on the Plan.  All of the potential Classes for the Debtors are set forth therein.

The following table designates the Classes of Claims against and Equity Interests in the Debtors, and specifies which Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (iii) deemed to accept or reject the Plan.

| Summary of Classification and Treatment of Classified Claims and Equity Interests | | | |
|---|---|---|---|
| Class | Claim | Status | Voting Rights |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | First Lien Loan Agreement Claims | Potentially Impaired | Entitled to Vote |
| 4 | Litigation Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

*Class 1 – Other Priority Claims*

(a)      Classification:  Class 1 consists of Other Priority Claims.

(b)      Treatment:  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser.

(c)      Voting:  Class 1 is Unimpaired and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan.

*Class 2 – Other Secured Claims*

(a)      <u>Classification</u>:  Class 2 consists of Other Secured Claims.

(b)      <u>Treatment</u>:  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, receive delivery of collateral securing any such Claim and payment of any interest requested under section 506(b) of the Bankruptcy Code, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser.

(c)      <u>Voting</u>:  Class 2 is Unimpaired and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan.

*Class 3 – First Lien Loan Agreement Claims*

(a)      <u>Classification</u>:  Class 3 consists of First Lien Loan Agreement Claims.

(b)      <u>Treatment</u>:  Unless otherwise repaid through proceeds of the DIP Facility, on the Effective Date, the Senior Notes shall each be cancelled, and on account of the First Lien Loan Agreement Claims, the TRSA and ERSA shall either (i) acquire the Acquired Assets as the Purchaser in accordance with the Asset Purchase Agreement or (ii) be paid in full, in Cash, the total amount outstanding under the First Lien Loan Agreement from the proceeds received in accordance with the Asset Purchase Agreement.

(c)      <u>Voting</u>:  Class 3 is potentially impaired and Holders of First Lien Loan Agreement Claims are entitled to vote to accept or reject the Plan.

*Class 4 – Litigation Claims*

(a)      <u>Classification</u>:  Class 4 consists of Litigation Claims.

(b)      <u>Treatment</u>:  Each Litigation Claimant shall receive its share of the Litigation Settlement Trust Assets, which share shall be determined in accordance with the terms, provisions, and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  Litigation Claims shall be resolved by the Litigation Settlement Trust in accordance with the terms of the Litigation Settlement TDP.  On the Effective Date, the Litigation Claims shall be deemed Allowed in the total aggregate amount of no less than $200 million. On the Effective Date, all Litigation Claims shall be released as against the Debtors pursuant to the terms and conditions of the Plan and the Litigation Settlement Trust Agreement.  Pursuant to the Channeling Injunction, each Litigation Claimant shall have its Claim permanently channeled to the Litigation Settlement Trust, and such Litigation Claim may thereafter be asserted exclusively against the Litigation Settlement Trust and resolved in accordance with the terms, provisions and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  For the avoidance of doubt, Litigation Claimants are not entitled to receive Distributions or other payment of funds from the Signal Liquidating Trust on behalf of, related to or with respect to such Litigation Claims. ***Litigation Claimants are, subject to the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, enjoined from filing any future litigation, claims or causes of action arising out of such Litigation Claims against the Debtors and/or any of the Plan Participants, and may not proceed in any manner against the Debtors and/or any of the Plan Participants, in any forum whatsoever, including, without limitation, any state or federal court or administrative or arbitral forum, and are required to pursue their Litigation Claims against the***

***Litigation Settlement Trust solely as provided in the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.***

        (c)    <u>Voting</u>:  Class 4 is Impaired and Litigation Claimants are entitled to vote to accept or reject the Plan.

*Class 5 – General Unsecured Claims*

        (a)    <u>Classification</u>:  Class 5 consists of General Unsecured Claims.

        (a)    <u>Treatment</u>:   On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, on account of its claim, its Pro Rata share (determined without taking the Litigation Claimants into account) of the GUC Payment Amount and its Pro Rata share of that portion of the Excess Sale Overpayment allocated to the holders of General Unsecured Claims.  The GUC Payment Amount shall be an aggregate amount equal to the lesser of (i) $900,000, or (ii) an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto.  For the avoidance of any doubt, Holders of General Unsecured Claims are not entitled to receive Distributions or other payment of funds from the Litigation Settlement Trust on behalf of, related to or with respect to such General Unsecured Claims

        (b)    <u>Voting</u>:  Class 5 is Impaired and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

*Class 6 – Intercompany Claims*

        (a)    <u>Classification</u>:  Class 6 consists of Intercompany Claims.

        (b)    <u>Treatment</u>:   Holders of Allowed Intercompany Claims shall not receive any Distributions on account of such Claims.

        (c)    <u>Voting</u>:  Class 6 is Impaired and Holders of Intercompany Claims are deemed to reject the Plan.

*Class 7 – Equity Interests in the Debtors*

        (a)    <u>Classification</u>:  Class 7 consists of all Equity Interests in the Debtors.

        (b)    <u>Treatment</u>:  Holders of Equity Interests in the Debtors shall neither receive nor retain any property under the Plan.  On the Effective Date, all Equity Interests in the Debtors shall be cancelled and of no further force or effect and all Claims filed on account of Equity Interests shall be deemed disallowed by operation of the Plan.

        (c)    <u>Voting</u>:  Class 7 is Impaired and Holders of Equity Interests in the Debtors are deemed to reject the Plan.

        4.    <u>General Provisions in Respect of Distributions Under the Plan Applicable to all Claims</u>

Unless otherwise set forth in the Litigation Settlement TDP, the following general provisions shall apply to distributions on account of Allowed Claims: (i) any Distribution to be made pursuant to the Plan shall be deemed to have been timely made if made within ten (10) business days of the time

specified in the Plan or, if applicable, the Litigation Settlement Trust Agreement and the Litigation Settlement TDP; (ii) unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made under the Plan shall be made by check drawn on a domestic bank, or by wire transfer from a domestic bank; (iii) the Signal Liquidating Trustee or the Litigation Settlement Trustee, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Entity entitled to such assets to the extent required by applicable law; (iv) to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest; (v) unless otherwise specifically provided for in any order approving the DIP Facility, the Plan or Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim; and (vi) interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Effective Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

Except as set forth in the Litigation Settlement Trust Agreement or the Litigation Settlement TDP, any Cash, assets, and other property to be distributed under the Plan that cannot be delivered to the Entity entitled thereto within 90 days after an attempted distribution (including by an Entity's failure to negotiate a check issued to such Entity 90 days after issuance of a check) shall become vested in, and shall be transferred to, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, notwithstanding state or other escheat or similar laws to the contrary.  In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or Distributions under the Plan pursuant to section 1143 of the Bankruptcy Code, shall have no further Claim in respect of such Distribution and shall not participate in any further Distributions under the Plan with respect to such Claim.  Distributions to Holders of Allowed Claims shall be made to the address of the Holder of such Claim as indicated on the records of the Debtors, or if a Proof of Claim has been filed, to the address on the Proof of Claim, unless the Signal Liquidating Trustee or the Litigation Settlement Trustee, as the case may be, is instructed otherwise by a signed writing from the Holder of such Allowed Claim.  Notwithstanding anything to the contrary contained in the Plan, no Cash payments of $50 or less will be made.

5.    Plan Provisions for Treatment of Contingent Claims

Holders of Contingent Claims shall be paid only after such Claims have become fixed and/or liquidated.  No interest shall be paid on account of a Contingent Claim except as provided in section 506(b) of the Bankruptcy Code.  Except as otherwise provided for Litigation Claims under the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, (i) any Contingent Claim that has not become fixed or liquidated on or before two years after the Effective Date shall be deemed waived, disallowed and expunged unless the Holder of such Claim has, on or before two years following the Effective Date, filed a request with the Bankruptcy Court requesting estimation of such Claim for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code and (ii) after the later of two years following the Effective Date and the entry of Final Orders on any timely filed requests for estimation no cash reserves will be held for Contingent Claims and any funds previously held for such purposes may be distributed to the Holders of Allowed Claims.

6.    Objection to Claims and Prosecution of Disputed Non-Litigation Claims

The Debtors and/or the Signal Liquidating Trustee shall object to the allowance of Non-Litigation Claims with respect to which the Signal Liquidating Trustee disputes liability in whole or in part.  The

failure of the Debtors and/or the Signal Liquidating Trustee to object to or to re-examine any Claim shall not be deemed to be a waiver of the right to object to or to re-examine such Claim in whole or in part to determine its allowability. The Debtors and/or the Signal Liquidating Trustee shall not be required to object to any Claim where the Debtors and/or the Signal Liquidating Trustee have determined in their good-faith, reasonable discretion that objection to such Claim would not be in the best interest of the Debtors' Estates or the Signal Liquidating Trust, as the case may be. The Signal Liquidating Trustee shall have the right to compromise and settle any Non-Litigation Claim against the Debtors after the Effective Date without notice to Creditors or order of the Bankruptcy Court.

7.      Distributions on Account of Contingent and Disputed Non-Litigation Claims

Payments and distributions to each Holder of a Contingent Non-Litigation Claim, a Disputed Non-Litigation Claim or any other Non-Litigation Claim that is not an Allowed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the Plan, including the provisions governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that any Disputed Non-Litigation Claim is Allowed or any Contingent Non-Litigation Claim becomes fixed or liquidated, in whole or in part, the Signal Liquidating Trust shall distribute to the Holder of such Claim any Cash that would have been distributed to such Holder if the Claim had been an Allowed Claim on the Effective Date. No distributions shall be made with respect to all or any portion of a Disputed Non-Litigation Claim or Contingent Non-Litigation Claim unless and until all objections to such Claim have been settled, withdrawn, or resolved by Final Order. Nothing in this Section shall affect the allowance, liquidation or payment of the Litigation Claims.

8.      Cash Reserves

On or before the Effective Date, the Debtors or the Signal Liquidating Trust shall establish the Disputed Claims Reserve, the Signal Liquidating Trust Expense Fund, and the GUC Payment Fund.

On or before the Effective Date, the Professional Fee Reserve shall be established. Counsel for the Debtors shall hold the amounts allocated for the Debtors' professionals in trust for the Debtors' professionals. Counsel for the Committee shall hold the amounts allocated for the Committee's professionals in trust for the Committee's professionals.

9.      Estimation of Non-Litigation Claims

The Signal Liquidating Trustee may, at any time, request that the Bankruptcy Court, on proper notice, estimate any Contingent and/or Disputed Non-Litigation Claim pursuant to section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Contingent and/or Disputed Non-Litigation Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Contingent and/or Disputed Non-Litigation Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Signal Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution to such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Contingent and/or Disputed Non-Litigation Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Nothing in this Section shall affect the allowance, liquidation or payment of Litigation Claims.

10.     Objections to Litigation Settlement Trust Claims

Notwithstanding anything to the contrary herein, Litigation Claims shall be channeled to the Litigation Settlement Trust and administered in accordance with the Litigation Settlement Injury Trust Agreement and the Litigation Settlement TDP.

11.     Special Provisions Regarding Unimpaired Claims

Except as otherwise expressly provided in the Plan, nothing in the Plan shall affect the Debtors' or Signal Liquidating Trustee's rights in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## C.     Litigation Settlement Trust

1.     Establishment and Administration of the Litigation Settlement Trust

On the Effective Date, the Litigation Settlement Trust shall be established in accordance with the Plan Documents.  The Litigation Settlement Trust shall be a "Qualified Settlement Fund" within the meaning of section 468B of the Internal Revenue Code and the regulations promulgated thereunder.  The Litigation Settlement Trust shall assume the liability for all Litigation Claims; shall administer, process, settle, resolve and liquidate such Litigation Claims; and shall use the Litigation Settlement Trust Assets and the proceeds and income therefrom, after payment of necessary expenses of the Litigation Settlement Trust, including expenses of the Litigation Settlement Trustee and its retained professionals, to satisfy and make payment to all such Litigation Claims that may qualify for a recovery only in accordance with the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, all in accordance with the Plan, the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  The Litigation Settlement Trust will administer, process, settle, resolve, liquidate, satisfy and/or pay, as applicable, Litigation Claims in such a way that the Holders of Litigation Claims are treated equitably and in a substantially similar manner, subject to the terms of the Plan, the Litigation Settlement Agreement and the Litigation Settlement TDP.  Litigation Claims shall be channeled to the Litigation Settlement Trust pursuant to the Channeling Injunction set forth in Section 6.C of the Plan and may thereafter be asserted only and exclusively against the Litigation Settlement Trust.  All such Litigation Settlement Trust Claims shall be liquidated and paid in accordance with the Litigation Settlement Trust Agreement, the Litigation Settlement TDP, the Plan and the Confirmation Order.  The Litigation Settlement Trust shall be administered and implemented by the Litigation Settlement Trustee as provided in the Litigation Settlement Trust Agreement.

2.     Litigation Settlement TDP

On the Effective Date, the Litigation Settlement Trust shall implement the Litigation Settlement TDP in accordance with the terms of the Litigation Settlement Trust Agreement.  On or after the Effective Date, the Litigation Settlement Trustee, upon notice to the Litigation Settlement TAC, shall have the power to administer, amend, supplement or modify the Litigation Settlement TDP in accordance with the terms thereof; provided however, that such modification is not inconsistent with the Plan or other Plan Documents; provided, further, to the extent that any modifications to the Litigation Settlement Trust Agreement or the Litigation Settlement TDP constitute a material modification that would affect the rights of the Plan Participants, such Plan Participants shall be provided ten (10) days' advance notice of such amendment and an opportunity to contest the proposed amendment before the Bankruptcy Court.  In the event that any of the Plan Participants contests a proposed amendment within the notice period contemplated in this paragraph, such modification shall not become effective until such time as the

Bankruptcy Court has authorized the amendment or the objecting Plan Participant has consented to the proposed amendment.

3.    Imposition of Channeling Injunction

From and after the Effective Date, (i) all Litigation Claims will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order and (ii) the Plan Participants and their Related Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with any Litigation Claims, provided, however that nothing in the Plan shall preclude any action by the Litigation Settlement Trust to enforce the Plan.

To supplement the injunctive effect of the Plan Injunction, and pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, for Litigation Settlement Trust Claims, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

Terms.  *To preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction and the Releases described in Article XI of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Entities that have held or asserted, or that hold or assert any Litigation Claim against the Plan Participants or any of their Related Parties, shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any such Plan Participants or their Related Parties with respect to any such Litigation Claim, including, but not limited to:*

*(i)    commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding of any kind with respect to any such Litigation Claim, against any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

*(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

*(iii)    creating, perfecting or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any of the Plan Participants or their Related Parties, or the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

*(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim; and*

*(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to such Litigation Claim.*

Reservations.  Notwithstanding anything to the contrary in Article XI of the Plan, the Channeling Injunction shall not enjoin:

(i)        the rights of Entities to the treatment afforded them under the Plan, including the right of Entities holding Litigation Claims to assert such Claims in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP solely against the Litigation Settlement Trust whether or not there are funds to pay such Litigation Claims;

(ii)        the rights of Entities to assert any Claim, debt, litigation, or liability for payment of Litigation Settlement Trust Expenses solely against the Litigation Settlement Trust whether or not there are funds to pay such Litigation Settlement Trust Expenses;

(iii)        the Litigation Settlement Trust from enforcing its rights under the Litigation Settlement Trust Agreement, the Litigation Settlement TDP and the Restructuring Documents; and

(iv)        the rights of any Plan Participant to demand the Litigation Settlement Trust to fulfill its obligations to enforce the terms of the Channeling Injunction consistent with Section 6.C of the Plan.

Modifications.   There can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

Nothing in the Plan or in the Litigation Settlement Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Litigation Settlement Trust's assumption of all liability with respect to Litigation Claims.

4.        Release of Liabilities to Litigation Claimants

Except as provided in the Plan, the transfer to, vesting in, and assumption by the Litigation Settlement Trust of the Litigation Settlement Trust Assets as contemplated by the Plan shall, as of the Effective Date, release all obligations and liabilities of and bar recovery or any action against the Plan Participants, and their respective estates, affiliates and subsidiaries, for or in respect of all Litigation Claims (and the Confirmation Order shall so provide for such release).  The Litigation Settlement Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Litigation Claims, and such Claims shall be liquidated, resolved or paid by the Litigation Settlement Trust from the Litigation Settlement Trust Assets or as otherwise directed in the Litigation Settlement Trust Documents.

5.        Assumption of Certain Liabilities

In consideration of the Litigation Settlement Trust Assets transferred to the Litigation Settlement Trust under the Plan and in furtherance of the purposes of the Litigation Settlement Trust and the Plan, the Litigation Settlement Trust shall assume all liability and responsibility for all Litigation Claims, including the administration thereof as described in the Plan and the Debtors and the Signal Liquidating Trust shall have no further financial or other responsibility or liability therefor.  For the avoidance of doubt, the Litigation Claims shall be resolved in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.

01:17450000.8

6.        Appointment of the Litigation Settlement Trustee

The Litigation Settlement Trustee shall be selected by the Southern Poverty Law Center.  The Debtors shall File a notice, as part of the Plan Supplement, naming the Person designated as Litigation Settlement Trustee.  On the Confirmation Date, the Bankruptcy Court shall appoint the initial Litigation Settlement Trustee to serve in accordance with, and shall have the functions and rights provided in, the Litigation Settlement Trust Agreement.  Any successor Litigation Settlement Trustee shall be appointed in accordance with the terms of the Litigation Settlement Trust Agreement.  For purposes of any Litigation Settlement Trustee performing his or her duties and fulfilling his or her obligations under the Litigation Settlement Trust and the Plan, the Litigation Settlement Trust and the Litigation Settlement Trustee shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  The Litigation Settlement Trustee shall be the "administrator" of the Litigation Settlement Trust as that term is used in Treas. Reg. Section 1.468B 2(k)(3).

The Litigation Settlement Trustee may be terminated at any time in accordance with the provisions of the Litigation Settlement Trust Agreement.

The Litigation Settlement Trustee and its professionals and the members of the Litigation Settlement TAC, in their capacity as such, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Litigation Settlement Trust Agreement.

All Litigation Settlement Trust Expenses following the Effective Date shall be borne solely by the Litigation Settlement Trust.

7.        Litigation Settlement Trust Assets

(a)        *Westport Loan Proceeds*

(1)        Westport Participation Agreement

On the Effective Date, the Purchaser will receive, free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and ERSA) other than the participating interest of the Litigation Settlement Trust described below, all right, title and interest of the Debtors in and to certain purchase money indebtedness currently owing to the Debtors under the Westport Loan. The Westport Loan and the Westport Documents will be transferred to the Purchaser subject to the terms of the Westport Participation Agreement, in form and content reasonably acceptable to the Westport Participants.  Upon the Effective Date, the TRSA and ERSA, and the collateral agent under the First Lien Loan Agreement will execute any documents necessary to effectuate a release and discharge of their respective liens, encumbrances and security interests on the Westport Loan facility.

The Westport Participation Agreement shall provide that each Westport Participant share on a Pro Rata basis in all proceeds derived from the Westport Loan (including scheduled payments of principal and interest, prepayments, proceeds of enforcement or proceeds of liquidation of collateral) as follows:

- The Litigation Settlement Trust shall receive a 66.9% participating interest, and the Purchaser shall receive a 33.1% participating interest, in and to the Westport Loan and the Westport Documents.  The participating interests described above are referred to herein as each Westport Participant's "**Sharing Ratio**".

- If the Westport Loan is prepaid in full, in accordance with its terms, prior to its scheduled maturity date, and the application of the Litigation Settlement Trust's

Sharing Ratio to such prepayment results in an aggregate recovery of less than $20 million by the Litigation Settlement Trust, then the Litigation Settlement Trust shall be entitled to receive additional proceeds from such prepayment in an amount sufficient to increase its aggregate recovery from the Westport Loan to $20 million.

- The maximum aggregate amount payable to the Litigation Settlement Trust by virtue of its Sharing Ratio shall for all purposes be capped at $22 million.  Upon receipt of said amount by the Litigation Settlement Trust, all further payments or other recoveries with respect to the Westport Loan will be payable solely to the Purchaser.

For the avoidance of doubt, the Litigation Settlement Trust shall not receive any guarantee or other credit support as to the Westport Loan from the Purchaser, the Debtors, or any party to the Plan Support Agreement.

(2)    Westport Loan Administration Expenses

Pursuant to the Westport Participation Agreement, if the TRSA and ERSA or an affiliate or designee thereof is the Purchaser, the TRSA and ERSA will be responsible for the collection and distribution of the proceeds of the Westport Loan and, if necessary, the enforcement thereof, for the ratable benefit of the Westport Participants.  All out-of-pocket costs and expenses reasonably and actually incurred by the TRSA and ERSA in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any distribution to the Westport Participants in accordance with their respective Sharing Ratios.

Pursuant to the Westport Participation Agreement, if none of the TRSA and ERSA or an affiliate or designee thereof is the Purchaser, the Litigation Settlement Trust will be responsible for the collection and distribution of the proceeds of the Westport Loan and, if necessary, the enforcement thereof, for the ratable benefit of the Westport Participants.   All Litigation Settlement Trust Expenses incurred in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any distribution to the Westport Participants in accordance with their respective Sharing Ratios.

(3)    Westport Loan Payments

Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Effective Date, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Effective Date of the Plan, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

(4)    Enforcement of Westport Loan

[TO BE PROVIDED]

(b)    *Excess Sale Overpayment*

Any Sale Overpayment made on the Effective Date and not subject to a valid and perfected lien shall be paid as follows:

- *First*, to the Litigation Settlement Trust to reduce, on a dollar-for-dollar basis, its participating interest in the Westport Loan (not to exceed a total of $20 million).  In such event, the Sharing Ratio of the Litigation Settlement Trust shall be recalculated to account for all sums received from such Sale Overpayment.  If the Sale Overpayment is in an amount adequate to result in the immediate payment of the sum of $20 million to the Litigation Settlement Trust, then the Westport Loan will be transferred to the Purchaser free and clear of all liens, claims and encumbrances, and shall not be subject to a continuing participation interest by any party.

- *Second*, any Sale Overpayment greater than $20 million paid to the Litigation Settlement Trust as set forth above (such amount the "Excess Sale Overpayment") will be shared as follows:  22.5% of the Excess Sale Overpayment shall be paid to holders of General Unsecured Claims, not subject to dilution by the Litigation Claimants, and 77.5% of the Excess Sale Overpayment shall be paid to Litigation Claimants, not subject to dilution by the holders of General Unsecured Claims, provided, that at such time as the holders of General Unsecured Claims (other than the Litigation Claims) have received payment in full of the allowed amount of their claims, 100% of any remaining Excess Sale Overpayment shall be paid to the Litigation Claimants.

8.    Litigation Settlement TAC

The Litigation Settlement TAC shall have the functions and rights provided in the Litigation Settlement Trust Agreement.  Prior to the Confirmation Hearing, the Supporting Litigation Claimants shall select the initial members of the Litigation Settlement TAC.  On the Confirmation Date, the Bankruptcy Court shall appoint the initial members of the Litigation Settlement TAC, as selected by the Supporting Litigation Claimants.

9.    Cooperation; Transfer of Books and Records

On or before the Effective Date, or as soon thereafter as is practical, the Debtors or the Purchaser, as applicable, will transfer and assign, or cause to be transferred and assigned, to the Litigation Settlement Trustee, copies of all of the books and records of the Debtors that pertain to the Litigation Claims. Following the Effective Date, the Purchaser (to the extent practicable) shall further cooperate to the extent reasonably requested (as determined by the Purchaser in its sole discretion) by the Litigation Settlement Trustee in the handling of Litigation Claims and generally in the operation of the Litigation Settlement Trust for purposes set forth in the Plan and for the duration of the Litigation Settlement Trust, and shall use commercially reasonable efforts (as determined by the Purchaser in its discretion) to request former officers, directors, employees, agents or representatives of the Debtors, employed by the Purchaser, cooperate to the extent that the Litigation Settlement Trustee reasonably requests the Purchaser to make such request to any of the foregoing and deems such persons necessary to appear at any trial or arbitration proceeding relating to the handling of Litigation Claims.  To the extent that the Signal Liquidating Trustee or the Purchaser, as appropriate, require any information from the Litigation Settlement Trustee for preparation of any tax return or financial statement, the Litigation Settlement Trustee shall cooperate in a commercially reasonable manner, to the extent reasonably requested to provide such information to the Signal Liquidating Trustee or the Purchaser, as appropriate.  The Purchaser (and any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser, to the extent that such person is requested to perform act or otherwise perform hereunder) and/or the Signal Liquidating Trust shall be entitled to the advancement and/or reimbursement of any reasonable costs, expenses or fees, including professional fees, and expenses, incurred or to be incurred in compliance with any request of the Litigation Settlement Trust pursuant to the foregoing.

10.    Transfer of Privileged Information

The transfer or assignment of Privileged Information to the Litigation Settlement Trustee does not result in the destruction or waiver of any applicable privileges pertaining to such Privileged Information. Further, with regard to any such privileges, (i) they are transferred or contributed for the sole purpose of enabling the Litigation Settlement Trustee to perform its duties to administer the Litigation Settlement Trust and for no other reason, (ii) they are vested solely in the Litigation Settlement Trustee, and not in the Litigation Settlement Trust, the Litigation Settlement TAC or any other entity, committee or subcomponent of the Litigation Settlement Trust, or any person (including counsel) who has been engaged by, represents or has represented any Litigation Claimant, or any person who alleges or may allege a claim directly or indirectly relating to or arising from the Debtors' premises or operations (iii) they shall be preserved and not waived, (iv) for the avoidance of doubt any such transfer or contribution shall have no effect on any right, claim or privilege of any person other than the Debtors, and (v) no information subject to a privilege or a prior assertion thereof shall be publicly disclosed by the Litigation Settlement Trustee or the Litigation Settlement Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of any such information.

11.    Institution and Maintenance of Legal and Other Proceedings

As of the Effective Date, the Litigation Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Litigation Settlement Trust. The Litigation Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions relating to the Litigation Settlement Trust in the name of the Debtors if deemed necessary or appropriate by the Litigation Settlement Trustee. The Litigation Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred by the Litigation Settlement Trust subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to the Plan. For the avoidance of doubt, the Litigation Settlement Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of all Litigation Claims.

D.    **Signal Liquidating Trust**

The Signal Liquidating Trust Agreement is incorporated into and made a part of the Plan. In the event of any conflict between the terms of the Plan and the terms of the Signal Liquidating Trust Agreement, the terms of the Plan shall control.

1.    Establishment and Purpose of the Signal Liquidating Trust

On or before the Effective Date, the Debtors and the Signal Liquidating Trustee shall execute the Signal Liquidating Trust Agreement and shall have established the Signal Liquidating Trust pursuant to the Plan. The Signal Liquidating Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treas. Reg. § 301.7701 4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Signal Liquidating Trust.

2.    Authority and Role of the Signal Liquidating Trustee

The authority and role of the Signal Liquidating Trustee shall be in accordance with the provisions of the Signal Liquidating Trust Agreement and the Plan. In furtherance of and consistent with

the purpose of the Signal Liquidating Trust Agreement and the Plan, solely for the purpose of carrying out the Plan and discharging the duties in the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest in these Bankruptcy Cases, and pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and the representative of, the Estates for the retention, enforcement, settlement or adjustment of all claims and rights, known and unknown, and all interests belonging to the Debtors or the Estates, which arose prior to the Confirmation Date, except in connection with any proceeding involving, relating to or arising out of, in whole or in part, the Litigation Claims.

3.  Appointment of the Signal Liquidating Trustee

The Signal Liquidating Trustee is set forth in the Signal Liquidating Trust Agreement.  The appointment of the Signal Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date.  In accordance with the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Signal Liquidating Trust is dissolved in accordance with the Signal Liquidating Trust Agreement and/or (ii) the date such Signal Liquidating Trustee resigns, is terminated or is otherwise unable to serve.

4.  Signal Liquidating Trust Assets

On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred the Signal Liquidating Trust Assets to the Signal Liquidating Trust.  In accordance with section 1141 of the Bankruptcy Code, the Signal Liquidating Trust Assets shall automatically vest in the Signal Liquidating Trust free and clear of all Claims, liens, encumbrances, or interests subject only to the Signal Liquidating Trust interests and the Signal Liquidation Trust Expenses, as provided for in the Plan and the Signal Liquidating Trust Agreement.

5.  Treatment of Signal Liquidating Trust for Federal Income Tax Purposes

In accordance with Treas. Reg. § 301.7701-4(d), the Signal Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Post-Effective Date Assets, if any, make timely distributions to the Signal Liquidating Trust Beneficiaries and not unduly prolong its duration.  The Signal Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Signal Liquidating Trust Agreement.

6.  Signal Liquidating Trust as a "Grantor Trust"

The Signal Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Signal Liquidating Trust Beneficiaries treated as grantors and owners of the Signal Liquidating Trust.  For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Signal Liquidating Trustee, and the Signal Liquidating Trust Beneficiaries) shall treat the transfer of the Signal Liquidating Trust Assets by the Debtors to the Signal Liquidating Trust, as set forth in the Signal Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims of Signal Liquidating Trust Beneficiaries entitled to distributions from the Signal Liquidating Trust Assets, followed by a transfer by such Holders to the Signal Liquidating Trust.  Thus, the Signal Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

7.      Signal Liquidating Trustee's Right and Power to Invest

The right and power of the Signal Liquidating Trustee to invest the Signal Liquidating Trust Assets transferred to the Signal Liquidating Trust, the proceeds thereof, or any income earned by the Signal Liquidating Trust, shall be limited to the right and power to invest such Signal Liquidating Trust Assets (pending distributions in accordance with the Plan) in Permissible Investments; provided, however, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701 4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise.

8.      Responsibilities of the Signal Liquidating Trustee

The responsibilities of the Signal Liquidating Trustee shall include, but shall not be limited to:

        (i)      the making of Distributions as contemplated in the Plan;

        (ii)      conducting an analysis of all Non-Litigation Claims, and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate;

        (iii)      preparing and filing post-Effective Date operating reports;

        (iv)      filing appropriate tax returns with respect to the Signal Liquidating Trust and paying taxes properly payable by the Signal Liquidating Trust, if any, in the exercise of its fiduciary obligations;

        (v)      retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations;

        (vi)      taking such actions as are necessary and reasonable to carry out the purposes of the Signal Liquidating Trust;

        (vii)      protecting and enforcing the rights to the Signal Liquidating Trust Assets vested in the Signal Liquidating Trustee by any method reasonably determined to be appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity; and

        (viii)      terminating the Signal Liquidating Trust and seeking to close the Bankruptcy Cases pursuant to Section 350(a) of the Bankruptcy Code.

9.      Expenses of the Signal Liquidating Trustee

Fees and expenses incurred by the Signal Liquidating Trustee shall be paid from the Signal Liquidating Trust Assets.

10.      Bonding of the Signal Liquidating Trustee

The Signal Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his or her sole discretion, in which case the expense incurred by such bonding shall be paid by the Signal Liquidating Trust.

01:17450000.8

11.     Fiduciary Duties of the Signal Liquidating Trustee

Pursuant to the Plan and the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Non Litigation Claims against the Debtors that will receive Distributions pursuant to the terms of the Plan.

12.     Cooperation; Transfer of Books and Records

On or before the Effective Date, or as soon thereafter as is practical, the Debtors or the Purchaser, as applicable, will transfer and assign, or cause to be transferred and assigned, to the Signal Liquidating Trustee, copies of all of the books and records of the Debtors necessary for the handling of the Non-Litigation Claims.  Following the Effective Date, the Purchaser (to the extent practicable) shall cooperate to the extent reasonably requested by the Signal Liquidating Trustee in the handling of Non-Litigation Claims filed against the Debtors, and generally in the operation of the Signal Liquidating Trust for purposes set forth herein and for the duration of the Signal Liquidating Trust, and shall use commercially reasonable efforts (as determined by the Purchaser in its sole discretion) to request any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser cooperate to the extent that the Signal Liquidating Trustee reasonably requests the Purchaser to make such request to any of the foregoing and deems such persons necessary to appear at any trial or arbitration proceeding relating to the liquidation of Non-Litigation Claims against the Debtors.   To the extent that the Litigation Settlement Trustee or the Purchaser, as appropriate, require any information from the Signal Liquidating Trustee for preparation of any tax return or financial statement, the Signal Liquidating Trustee shall cooperate in a commercially reasonable manner, to the extent reasonably requested to provide such information to the Litigation Settlement Trustee or the Purchaser, as appropriate.  The Purchaser (and any former officer, director, employee, agent or representative of the Debtors employed by  the Purchaser to the extent that such person is requested to perform act or otherwise perform hereunder) and the Litigation Settlement Trustee shall be entitled to the advancement and/or reimbursement of any reasonable costs, expenses or fees, including professional fees, and expenses, incurred or to be incurred in compliance with any request of the Litigation Settlement Trust pursuant to the foregoing.

13.     Transfer of Privileged Information

On the Effective Date or as soon thereafter as is reasonably practicable, the Privileged Information of the Debtors needed for the handling of the Non-Litigation Claims shall be transferred, assigned, given over to, and shall vest exclusively in the Signal Liquidating Trustee.  Further, with regard to any such privileges, (i) they are transferred or contributed for the sole purpose of enabling the Signal Liquidating Trustee to perform its duties to administer the Signal Liquidating Trust and for no other reason, (ii) they are vested solely in the Signal Liquidating Trustee, and not in the Signal Liquidating Trust or any other entity, committee or subcomponent of the Signal Liquidating Trust, or any person (including counsel) who has been engaged by, represents or has represented any Litigation Claimant or any person who alleges or may allege a claim directly or indirectly relating to or arising from the Debtors' premises or operations, (iii) they shall be preserved and not waived, (iv) for the avoidance of doubt (if any), any such transfer or contribution shall have no effect on any right, claim or privilege of any person other than the Debtors, and (v) no information subject to a privilege or a prior assertion thereof shall be publicly disclosed by the Signal Liquidating Trustee or the Signal Liquidating Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of any such information.

14.    Dissolution of the Signal Liquidating Trust

The Signal Liquidating Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion Filed with the Bankruptcy Court (the Filing of which shall automatically extend the term of the Signal Liquidating Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Signal Liquidating Trust Assets.  The Signal Liquidating Trust Agreement shall require that each extension be approved by the Bankruptcy Court within six (6) months prior to the conclusion of the extended term.  After (i) the final Distribution to Holders of Allowed Claims, (ii) the Filing by or on behalf of the Signal Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (iii) any other action deemed appropriate by the Signal Liquidating Trustee, the Signal Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

15.    Full and Final Satisfaction against Signal Liquidating Trust

On and after the Effective Date, the Signal Liquidating Trust shall have no liability on account of any Claims except as set forth in the Plan and in the Signal Liquidating Trust Agreement.  All payments and all Distributions made by the Signal Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims against the Signal Liquidating Trust.

**E.    Injunctions, Releases and Discharge**

1.    Term of Certain Injunctions and Automatic Stay

Unless otherwise provided for in Plan or other order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Cases pursuant to sections 105, 362 and 524 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

2.    Debtors' Releases

The Plan, at Section 11.F, provides that the Debtors on behalf of the Debtors' Estates will release the Released Parties from all claims that could be brought by or on behalf of the Debtors' Estates.  Absent the contributions made by the PSA Creditor Parties, the Debtors would be unable to confirm a plan that provides for Distributions to all Holders of Litigation Claims and General Unsecured Claims.  The release provision of Section 11.F of the Plan provides:

**PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE SETTLEMENT REACHED WITH THE PLAN PARTICIPANTS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR**

**UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BANKRUPTCY CASES, THE SALE TRANSACTION, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION THAT CONSTITUTES THE FAILURE TO PERFORM THE DUTY TO ACT IN GOOD FAITH AND WHERE SUCH FAILURE TO PERFORM CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR FRAUD. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY RELEASED PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.**

3.    Releases by Holders of Claims

The Plan, at Section 11.G, provides that all holders of Claims against the Debtors are deemed to release the Released Parties from certain claims that could be brought by such holders of Claims against the Released Parties.  As noted above, absent the contributions made by the PSA Creditor Parties, the Debtors would be unable to confirm a plan that provides for Distributions to all Holders of Litigation Claims and General Unsecured Claims.  The release provision of Section 11.G of the Plan provides:

**AS OF THE EFFECTIVE DATE, TO THE EXTENT THAT A HOLDER OF A CLAIM RECEIVES A DISTRIBUTION, AND AS PERMITTED BY APPLICABLE LAW, EACH HOLDER OF A CLAIM, INCLUDING EACH HOLDER OF A CLAIM DEEMED TO ACCEPT THE PLAN PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF A DEBTOR, WHETHER**

KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE RESTRUCTURING, THE BANKRUPTCY CASES, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION THAT CONSTITUTES THE FAILURE TO PERFORM THE DUTY TO ACT IN GOOD FAITH AND WHERE SUCH FAILURE TO PERFORM CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR FRAUD.   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.

NOTWITHSTANDING ANY OTHER PROVISION OF THE PLAN, NOTHING IN SECTION 11.F OR THIS SECTION 11.G DISCHARGES OR RELEASES THE RETAINED CLAIMS.

4.      Plan Injunction

The Plan also provides, at Section 11.D, for a customary plan injunction, as follows:

ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE XI HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION,

INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE XI HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.F OR 11.G OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS [IN THE PLAN] SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR [IN THE PLAN] OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, OR THE SIGNAL LIQUIDATING TRUST, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION

**OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

**F.    Executory Contracts**

1.    Assumption or Rejection of Executory Contracts

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts shall be deemed to be rejected as of the Confirmation Date, subject to the occurrence of the Effective Date, except for any Executory Contract:  (i) that shall be assumed and assigned to the Purchaser pursuant to the Sale Order; (ii) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (iii) as to which a motion for approval of the assumption and/or assignment of such Executory Contract has been filed and served prior to the Confirmation Date; or (iv) that is specifically designated as an Executory Contract to be assumed and assigned on Schedule 9.1, which schedule shall be contained in the Plan Supplement and shall list corresponding Cure Amounts.

Notwithstanding anything otherwise in the Plan to the contrary, the Debtors reserve the right, on or prior to the Effective Date, to amend Schedule 9.1 to delete any Executory Contract therefrom or add any Executory Contract thereto, in which event such Executory Contract(s) shall be deemed to be, as applicable, rejected or assumed and assigned.  The Debtors shall provide notice of any amendments to Schedule 9.1 to the parties to the Executory Contracts affected thereby.  The listing of a document on Schedule 9.1 shall not constitute an admission by the Debtors that such document is an Executory Contract or that the Debtors have any liability thereunder

2.    Approval by Confirmation Order

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each Executory Contract assumed pursuant to the Plan shall vest in and be fully enforceable by the Signal Liquidating Trustee in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any Executory Contract.

3.    Cure of Defaults

Except as may otherwise be agreed to by the Debtors or the Signal Liquidating Trustee, as the case may be, and the non-Debtor party to the Executory Contract, within thirty (30) days after the Effective Date, the Debtors shall cure any and all undisputed defaults under any Executory Contract assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. Except as otherwise set forth in the Plan, all disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties.

4.    Notice of Proposed Cure

The Debtors shall, prior to the conclusion of the Confirmation Hearing, file and serve on parties to Executory Contracts that may be assumed pursuant to the Plan a notice (the "Plan Cure Notice") listing the proposed Cure Amount to be paid in connection with the Executory Contracts that may be assumed or assumed and assigned pursuant to the Plan.  The non-Debtor parties to such contracts and leases shall have until fifteen (15) days following service of the Plan Cure Notice to object in writing to the proposed

cure and to propose an alternative cure.  In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the cure proposed by the Debtors (including amounts of compensation for actual pecuniary loss) and shall be forever enjoined and barred from seeking from the Debtors and the Signal Liquidating Trustee any additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code.  If an objection is timely filed with respect to the Cure Amount proposed by the Debtors for an Executory Contract, the Bankruptcy Court shall hold a hearing to determine the amount of any disputed cure amount not settled by the parties.  Notwithstanding anything otherwise to the contrary, at all times through the date that is thirty (30) days after the entry of a Final Order resolving and fixing the amount of a disputed cure amount, whether such date is before or after the Effective Date, each of the Debtors shall be authorized to reject such Executory Contract by notice to the non-Debtor party to such Executory Contract.

> 5.     <u>Rejection Damages Bar Date</u>

Claims arising out of the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtors in accordance with the Bar Date Order.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and the Signal Liquidating Trustee.

## G.     Conditions

> 1.     <u>Conditions Precedent to Confirmation</u>

The Plan contains several conditions precedent to confirmation, which must either be satisfied, or waived in accordance with the terms of the Plan.  Section 10.A of the Plan includes the following conditions to confirmation of the Plan:

> (i)     The Confirmation Order, the Plan, and the Restructuring Documents shall be in form and substance consistent in all material respects with the Plan Support Agreement and Plan Term Sheet, and otherwise acceptable to the Debtors, the TRSA and ERSA, the Committee, and the Supporting Litigation Claimants;

> (ii)     The Sale Order shall be in a form reasonably acceptable to the Purchaser, the Debtors, the TRSA and ERSA, the Committee, and the Supporting Litigation Claimants;

> (iii)     There shall be no payment default continuing under the Westport Loan (determined without giving effect to any alleged waiver by the Debtors or any other party);

> (iv)     Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Confirmation Date have been held in trust for the benefit of the Westport Participants;

> (v)     Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Confirmation Date have been held in trust for the benefit of the Westport Participants; and

> (vi)     The Confirmation Order shall have been entered by the Bankruptcy Court.

2.       Conditions Precedent to the Effective Date

The Plan also contains several conditions to the effectiveness of the Plan that, notwithstanding confirmation of the Plan, could prevent consummation of the Plan if not satisfied or waived in accordance with the terms of the Plan. The "substantial consummation," as defined in section 1101 of the Bankruptcy Code, shall not occur, and the Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to satisfaction of each of the following conditions precedent, each of which may be waived by all the Settling Parties in their sole and absolute discretion:

(i)       The Confirmation Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

(ii)      The Sale Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

(iii)     The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors and the Purchaser, authorizing and approving the assumption, assumption and assignment, and rejection of the Executory Contracts by the Debtors as contemplated in the Asset Purchase Agreement, the Plan and the Plan Supplement;

(iv)     The Plan and the Restructuring Documents shall not have been amended or modified other than in a manner in form and substance consistent in all material respects with the Plan Term Sheet or otherwise acceptable to the Debtors, TRSA and ERSA, and the Supporting Litigation Claimants;

(v)      The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case be in full force and effect. All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Asset Purchase Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied or waived concurrently with the occurrence of the Effective Date);

(vi)     The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, any Cash component of the Purchase Price in accordance with the terms and conditions of the Purchase Agreement;

(vii)    The Debtors or the Liquidating Settlement Trust shall have funded the Disputed Claims Reserve and the Signal Liquidating Trust Expense Fund, and the GUC Payment Amount shall have been received by the Signal Liquidating Trust;

(viii)   The Signal Liquidating Trust shall have been formed, and all formation documents for such entity shall have been properly executed and filed as required by the Plan and applicable law;

(ix)     The appointment of the Signal Liquidating Trustee shall have been confirmed by Final Order (which may include the Confirmation Order);

(x)      The Litigation Settlement Trust shall have been formed, and all formation documents for such entity shall have been properly executed and filed as required by the Plan and

applicable law;

(xi)    The appointment of the Litigation Settlement Trustee shall have been confirmed by Final Order (which may include the Confirmation Order);

(xii)    The Litigation Settlement Trust Assets shall have been transferred to the Litigation Settlement Trust;

(xiii)    The Purchaser has received, free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and ERSA) other than the participating interest of the Litigation Settlement Trust, all right, title and interest of the Debtors in and to the Westport Loan;

(xiv)    All consents, actions, documents, certificates and agreements necessary to implement the Plan, including all transfers to the Signal Liquidating Trust and the Litigation Settlement Trust,  and the transactions contemplated by the Asset Purchase Agreement as to the Purchaser shall have closed;

(xv)    All authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the Consummation of the Plan shall have been obtained and not revoked;

(xvi)    There shall be no payment default continuing under the Westport Loan (determined without giving effect to any alleged waiver by the Debtors or any other party);

(xvii)    Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Effective Date have been held in trust for the benefit of the Westport Participants or Cash in an amount equal to the aggregate of such payments is available to be distributed to the Westport Participants under the Plan;

(xviii)    Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Effective Date have been held in trust for the benefit of the Westport Participants or Cash in an amount equal to the aggregate of such payments is available to be distributed to the Westport Participants under the Plan; and

(xix)    The Confirmation Date shall have occurred.

3.    <u>Effect of Failure of Conditions</u>

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (iii) constitute an Allowance of any Claim or Equity Interest; or (iv) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

**H.**     **Retention of Jurisdiction**

1.     <u>General Jurisdiction</u>

The Bankruptcy Court shall retain the fullest and most extensive jurisdiction permissible and necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtors, and to adjudicate and enforce all of the Signal Causes of Action.  Nothing contained in the Plan shall prevent the Debtors, the Signal Liquidating Trust, or the Litigation Settlement Trust, as applicable, from taking such action as may be necessary in the enforcement of any Signal Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive confirmation of the Plan and shall not be affected hereto except as specifically provided in the Plan.

Following the entry of the Confirmation Order, the administration of the Bankruptcy Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date.  Moreover, the Litigation Settlement Trust shall be subject to the continuing jurisdiction of the Bankruptcy Court in accordance with the requirements of section 468(B) of the Internal Revenue Code and the Treasury regulations issued pursuant thereto.  The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed temporarily for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claim, other than Litigation Claims.

2.     <u>Specific Jurisdiction</u>

Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under or related to the Bankruptcy Cases for, among other things, the following purposes:

(i)     To modify the Plan after the Confirmation Date, pursuant to the provisions of the Bankruptcy Code, the Bankruptcy Rules and the terms and conditions of the Plan;

(ii)     To correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided in the Plan so that the intended effect of the Plan may be substantially realized thereby;

(iii)     To hear, determine and resolve controversies related to the Signal Liquidating Trust;

(iv)     To assure the performance by all the Debtors, the Litigation Settlement Trust, and/or the Signal Liquidating Trust, as applicable, of their respective obligations to make Distributions under the Plan;

(v)     To enforce and interpret the terms and conditions of the Plan Documents and any documents issued or executed with respect to the Plan;

(vi)     To enter such orders or judgments, including, but not limited to, the Injunctions (i) as are necessary to enforce the title, rights, and powers of the Debtors, the Signal Liquidating Trust, and/or the Litigation Settlement Trust, and (ii) as are necessary to enable Holders of

Claims to pursue their rights against any Entity that may be liable therefore pursuant to applicable law or otherwise, including but not limited to, Bankruptcy Court orders;

(vii)     To hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or based upon the period of administration of the Bankruptcy Cases;

(viii)    To hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(ix)      To hear and determine any causes of action by, against or involving the Debtors arising during the period from the Petition Date through the Effective Date;

(x)       To hear and determine any causes of action by, against or involving the Signal Liquidating Trust arising during the period from the Effective Date to the date of the order entering a final decree in the Bankruptcy Cases;

(xi)      To hear and determine any cause of action regarding the enforcement of Plan Documents or the transactions contemplated thereby;

(xii)     To hear and determine such other matters as may be provided in the Confirmation Order;

(xiii)    To consider and act on the compromise and settlement of any Claim (other than a Litigation Claim) against or Equity Interest in the Debtors or their Estates including, without limitation, any disputes with respect to the Bar Date;

(xiv)     To hear and determine all questions and disputes regarding title to the assets of the Debtors and their Estates, the Signal Liquidating Trust or the Litigation Settlement Trust;

(xv)      To hear and determine all matters, questions, and disputes with respect to the direct causes of action brought by the Debtors and their Estates, the Signal Liquidating Trust or the Litigation Settlement Trust;

(xvi)     To hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Bankruptcy Cases;

(xvii)    To interpret, enforce, and administer the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP (including all annexes and exhibits to any of the foregoing), only to the extent the documents do not provide for an alternate forum for resolution;

(xviii)   To hear and determine any proceeding that involves the validity, application, construction, interpretation, enforceability or enforcement of the Channeling Injunction or the application of section 105(a) of the Bankruptcy Code to the Channeling Injunction.

(xix)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which a Debtor may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xx)    To hear and determine any proceeding seeking to amend or restate the Litigation Settlement Trust Agreement in accordance with the Plan Documents;

(xxi)    To enjoin any actions in violation of the Injunctions;

(xxii)    To hear and determine all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, after the Effective Date;

(xxiii)    To enter an order or final decree closing the Bankruptcy Cases; and

(xxiv)    To hear and determine all questions, matters, and disputes with respect to the Plan.

3.    <u>Litigation Settlement TDP Controlling</u>

Notwithstanding anything in Article XII to the contrary, the allowance of Litigation Claims and the forum in which such allowance will be determined will be governed by and in accordance with the procedures established by the Litigation Settlement Trust Agreement, the Litigation Settlement TDP and the Plan.

**I.    Miscellaneous Plan Provisions**

1.    <u>Exculpation</u>

The Plan provides that the **EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE BANKRUPTCY CASES, OR RELATED TO FORMULATING, NEGOTIATING, SOLICITING, PREPARING, DISSEMINATING, CONFIRMING, OR IMPLEMENTING THE PLAN OR CONSUMMATING THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPORT AGREEMENT, THE ASSET PURCHASE AGREEMENT OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING EXCEPT FOR ARISING OUT OF ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER, OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.  WITHOUT LIMITING THE FOREGOING "EXCULPATION" PROVIDED UNDER THIS ARTICLE, THE RIGHTS OF ANY HOLDER OF A CLAIM OR EQUITY INTEREST TO ENFORCE RIGHTS ARISING UNDER THE PLAN SHALL BE PRESERVED, INCLUDING THE RIGHT TO COMPEL PAYMENT OF DISTRIBUTIONS IN ACCORDANCE WITH THE PLAN**.

2.    <u>Severability</u>

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court or other court of competent jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum

extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

3.    Successors and Assigns

The Plan shall be binding on, and shall inure to the benefit of the Debtors, and their respective successors and assigns. The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

4.    Further Assurances

The Debtors, the Signal Liquidating Trustee, and the Litigation Settlement Trustee are authorized to execute, deliver, file or record such contracts, agreements, instruments, releases and other documents and take or cause to be taken such action as may be necessary or appropriate to effectuate, implement and further evidence the terms, provisions and intent of the Plan and to consummate the transactions and transfers contemplated by the Plan.

5.    Post-Effective Date Service List

Following the Effective Date, unless otherwise provided in the Plan, all pleadings and notices Filed in the Bankruptcy Cases shall be required to be served only upon (i) the Signal Liquidating Trustee, (ii) the Litigation Settlement TAC, (iii) the Litigation Settlement Trustee, (iv) the United States Trustee, (v) the TRSA and ERSA, (vi) any party whose rights are affected by the applicable pleading or notice, (vii) counsel to the Supporting Litigation Claimants, and (viii) any party that Files a renewed notice of appearance and request for service of notices and papers on or after the Effective Date.

6.    Conflicts

To the extent any provision of the Disclosure Statement or any instrument, document or agreement executed in connection with the Plan or the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan shall govern and control.

7.    Maintenance of Books and Records

Following the Effective Date, the Signal Liquidating Trustee shall maintain records and books relating to the GUC Payment Fund, the Signal Liquidating Trust Expense Fund, the Disputed Claims Reserve, and any Post-Effective Date Assets. The Signal Liquidating Trustee shall prepare, as soon as practicable after the end of each calendar year and each calendar quarter, a financial statement. The Signal Liquidating Trustee shall file or cause to be filed all required tax returns for the Estates and pay any and all taxes, if any when due from the Signal Liquidating Trust Assets.

01:17450000.8

8.      Determination of Tax Liability

The Signal Liquidating Trustee is authorized, but not required, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

9.      Entire Agreement

The Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations with respect to the subjects addressed in the Plan, all of which have become merged and integrated into the Plan.

10.     Change of Control Provisions

Any acceleration, vesting or similar change of control rights under any employment, benefit or other arrangements triggered by the Consummation of the Plan shall be waived or otherwise cancelled under the Plan.

11.     Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.     Preservation of Insurance

Nothing in the Plan shall diminish or impair the enforceability of any policies of insurance that may cover claims or causes of action against any Debtor or any other Entity.

13.     Asset Purchase Agreement

Nothing in the Plan shall be deemed to modify the provisions of the Asset Purchase Agreement or the Sale Order.

14.     Powers of Purchaser

From and after the Effective Date and continuing through the date of entry of a final decree closing these Bankruptcy Cases, the Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to these Bankruptcy Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and an opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court.

## IV.      IMPLEMENTATION OF THE PLAN

The Plan provides for certain actions to be taken, in addition to those set forth and described above, including the creation of the Litigation Settlement Trust and the Signal Liquidating Trust, in the nature of assisting in or otherwise providing for implementation of the Plan and its various terms and provisions, some of which are set forth in more detail below.

01:17450000.8

A.      **Implementation of the Plan**

The Plan will be implemented by the Signal Liquidating Trust and the Signal Liquidating Trustee, and the Litigation Settlement Trust and the Litigation Settlement Trustee, as applicable.

As of the Effective Date, and without the need for any further order of the Bankruptcy Court, action, formality or payment of any fees which might otherwise be required under applicable non-bankruptcy laws, each of the Debtors shall be deemed dissolved without the need for any filings with the Secretary of State or other governmental official in each Debtor's respective state of incorporation; provided, however, that notwithstanding the dissolution of such Debtors, the Signal Liquidating Trustee shall be authorized and empowered to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of and consummate the Plan. Such dissolution of the Debtors shall be deemed to have occurred on a "bottom up" basis, with lower tier Debtor Entities being deemed to have dissolved before higher tier Debtor Entities.

On the Effective Date, each existing member of the boards of directors of the Debtors shall be deemed to have been removed.

B.      **Consummation of the Asset Purchase Agreement**

On the Effective Date, the Debtors shall consummate the transactions contemplated by the Asset Purchase Agreement pursuant to the terms thereof in exchange for the Purchase Price.  Upon entry of the Sale Order and the Confirmation Order by the Bankruptcy Court, all matters provided for under the Asset Purchase Agreement will be deemed authorized and approved without any requirement of further act or action by Holders of Equity Interests or the Debtors' boards of directors.  The Debtors and the Signal Liquidating Trustee (as applicable) are authorized to execute and deliver, and to consummate the transactions contemplated by the Asset Purchase Agreement as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

1.      Transfer of Acquired Assets

On the Effective Date, in consideration and in exchange for the Purchase Price, the Debtors will tender to the Purchaser duly executed bills of sale and assignment or other appropriate instruments and documents transferring title to and interest in the Acquired Assets free and clear of all Liens, Claims and interests (other than the Purchaser Assumed Liabilities and the Litigation Settlement Trust's participation interest in the Westport Note) pursuant to the terms and conditions of the Asset Purchase Agreement.

2.      Payment of Purchase Price and Discharge of Purchaser Assumed Liabilities

The Purchaser shall (i) promptly perform and discharge all Purchaser Assumed Liabilities in the ordinary course of business in accordance with the terms and conditions of any applicable agreements relating thereto and (ii) remit the Purchase Price in accordance with the Asset Purchase Agreement.

3.      Good Faith of the Purchaser

The transactions contemplated by the Asset Purchase Agreement are undertaken by the Debtors and the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including

the assumption, assignment and/or transfer of any Executory Contract), unless such authorization and consummation of such Sale Transaction are duly stayed pending such appeal. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

4.    No Successor Liability for the Purchaser

Except as otherwise expressly provided in the Plan, the Confirmation Order, the Sale Order or the Asset Purchase Agreement, the Purchaser: (i) does not, pursuant to the Plan, the Sale Order or otherwise, assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or Assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity; and (iii) shall not have any successor or transferee liability of any kind or character; provided that the Purchaser shall promptly perform and discharge the obligations specified in the Asset Purchase Agreement, including, without limitation, the Purchaser Assumed Liabilities.

**C.    Substantive Consolidation of the Debtors for Plan Purposes Only**

Entry of the Confirmation Order shall constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Estates solely for the purposes of confirming and consummating the Plan, including but not limited to voting, Confirmation and Distribution. Accordingly, (i) the Assets and liabilities of the Debtors will be deemed to be the Assets and liabilities of a single, consolidated entity, (ii) each and every Claim filed or to be filed in the Bankruptcy Cases against any Debtor shall be considered filed against the consolidated Debtors and shall be considered one Claim against and obligation of the consolidated Debtors on and after the Effective Date, (iii) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations, are considered a single claim against the Debtors and (iv) all guaranties by any of the Debtors of the obligations of any Debtor arising prior to the Effective Date shall be deemed eliminated under the Plan so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors.

Such substantive consolidation of the Estates, however, shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts that were entered into during the Bankruptcy Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Litigation Settlement Trust or the Signal Liquidating Trustee on the Effective Date and, (iv) the Debtors', the Litigation Settlement Trust's, or the Signal Liquidating Trustee's ability to subordinate or otherwise challenge Claims on an entity by entity basis, and (v) the extent to which liens, if any, attach to Assets. Moreover, the Debtors reserve the right to seek confirmation of the Plan on an entity-by-entity basis.

In the event the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates, (i) the Plan shall be treated as a separate plan of liquidation for each Debtor not substantively consolidated and (ii) the Debtors shall not be required to resolicit votes with respect to the Plan.

**D.    Effective Date**

On the Effective Date, the Debtors shall File and serve a notice of Confirmation and occurrence of the Effective Date. Such notice shall contain, among other things, the deadline by which all parties

will be required to File and serve any Proofs of Claim for damages arising out of the rejection of an Executory Contract pursuant to the Plan and for any unpaid Administrative Claims.

On the Effective Date, the Debtors' Retained Professionals shall be deemed to have completed their services to the Debtors, but they shall be authorized to file and be compensated for filing final applications for reasonable compensation and reimbursement of expenses through the Effective Date as permitted by the Plan.

**E.     Operations of the Debtors Between the Confirmation Date and the Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

**F.     Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in another order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Cases pursuant to sections 105, 362 and 524 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

**G.     Setoffs**

Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or Distributions to be made pursuant to the Plan in respect of such Claim, any claims, rights, causes of action and liabilities of any nature that the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as the case may be, of any of such claims, rights, causes of action and liabilities that the Debtors, the Liquidating Trust or the Litigation Settlement Trust has or may have against the Holder of such Claim.

**H.     Corporate Action**

The entry of the Confirmation Order shall constitute the approval of the authorization for the Debtors to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and any documents contemplated to be executed therewith, prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order rule or regulation.

**I.     Cancellation of Existing Agreements and Existing Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates, and other documents evidencing any Claims or Equity Interests shall be

canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

**J.        Authorization of Plan-Related Documentation**

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan and any other agreement or document related to or entered into in connection with the Plan, shall become, and shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

Any responsible officer or director of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**K.        Dissolution of Committee**

The Committee shall continue in existence through and including the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court or in the Plan or the Confirmation Order prior to the Effective Date.  On the Effective Date, the Committee shall be deemed dissolved, and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Bankruptcy Cases or the Plan and its implementation, and the retention or employment of the Committee's Retained Professionals shall terminate.

On the Effective Date, the Committee's Retained Professionals shall be deemed to have completed their services to the Committee, but they shall be authorized to file final applications for reasonable compensation and reimbursement of expenses through the Effective Date as permitted by the Plan.

**L.        Exemption from Certain Fees and Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with the Plan, the Asset Purchase Agreement or the Restructuring Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and the Sale Order and Confirmation Order shall direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under the Plan, the Asset Purchase Agreement, or the Restructuring Documents and (ii) the maintenance or creation of security interests or any Lien as contemplated by the Plan, the Asset Purchase Agreement, or the Restructuring Documents.

**M.        Closing the Bankruptcy Cases**

Upon the Effective Date, the Bankruptcy Cases for the Debtors, except for Signal International Inc., shall be deemed closed, and the Signal Liquidating Trustee shall submit separate orders to the Bankruptcy Court under certification of counsel closing each such Bankruptcy Case.  After all Causes of Action and Disputed Claims have been resolved, all statutory fees have been paid, all of the Assets have been distributed in accordance with this Plan, or at such earlier time as the Signal Liquidating Trustee deems appropriate, the Signal Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Bankruptcy Case for Signal International Inc., in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

## V.   ACCEPTANCE OR REJECTION OF THE PLAN

### A.   Voting

The Plan is being distributed, with Ballots, to Holders of Claims in Classes 3, 4, and 5, which are the Classes of Claims that are potentially, or are, impaired under the Plan and will receive a Distribution under the Plan.  Accordingly, Holders of Claims in Classes 3, 4, and 5 are entitled to vote **either to accept or to reject** the Plan.  Holders of Claims in Classes 1 and 2 are deemed to have **accepted** the Plan because their respective Claims are not impaired, and are therefore not entitled to vote on the Plan.  Holders of Intercompany Claims in Class 6 and Equity Interests in Class 7 are deemed to have **rejected** the Plan because they will neither receive nor retain any property under the Plan.  Accordingly, the Holders of Claims in Classes 1, 2 and 6, and Equity Interests in Class 7, **cannot** vote on the Plan (although they are free to file a written objection to the Plan with the Bankruptcy Court, in accordance with the procedures set forth below).  For a more detailed description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Article III of this Disclosure Statement.

The Debtors have prepared this Disclosure Statement in connection with their solicitation of votes from Holders of Claims in Classes 3, 4, and 5.  On October        , 2015, the Bankruptcy Court entered an order (the "**Disclosure Statement Order**"), approving this Disclosure Statement as containing information of a kind and in sufficient detail to enable a hypothetical, reasonable investor, typical of each of the Holders of Claims in Classes 3, 4, and 5 to make an informed judgment whether to accept or reject the Plan.  Such approval by the Bankruptcy Court does not constitute a recommendation of the Plan by the Bankruptcy Court.

Section 1129(a) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan if certain conditions have been met and, with certain exceptions, if each class of claims or interests that is impaired under the plan has voted to accept the plan.  As stated above, the Classes of Intercompany Claims and of the Equity Interest Holders will be deemed to have rejected the Plan, and therefore the Debtors will seek to confirm the Plan, subject to Bankruptcy Court approval, over those Classes' rejection pursuant to section 1129(b) of the Bankruptcy Code, on the grounds that (i) at least one impaired class of Claims is expected to accept the Plan and (ii) the Plan does not discriminate unfairly and is fair and equitable with respect to Class 6 Intercompany Claims and Class 7 Equity Interests.

Under section 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if such plan has been accepted by claimholders in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class, excluding Holders whose acceptances or rejections were found not to be in good faith.  Under the Bankruptcy Code, only parties that actually vote will be counted for purposes of determining acceptance or rejection by any impaired class.  Therefore, the Plan could be approved by Holders of Claims in Classes 3, 4, and 5 with the affirmative vote of significantly less than two-thirds in total dollar amount and one-half in total number of the Claims of each Class.  However, it should also be noted that even if the Holders of all Claims in Classes impaired under the Plan accept or are deemed to have accepted the Plan, the Plan is subject to certain other requirements

under section 1129(a) of the Bankruptcy Code and might not be confirmed by the Bankruptcy Court. The Debtors are confident, however, that the Plan satisfies those requirements of section 1129(a), and can be confirmed by the Bankruptcy Court.

Any Holder of an impaired Claim (i) whose Claim has been scheduled by the Debtors in the Schedules (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), (ii) who has timely filed a proof of Claim, on or prior to the Bar Date, with respect to which the Debtors have not filed an objection, or (iii) whose claim has been determined or estimated for voting purposes by the Bankruptcy Court, is entitled to accept or reject the Plan (unless such Claim has been disallowed by the Bankruptcy Court for purposes of accepting or rejecting the Plan).

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISPUTED CLAIM WILL BE COUNTED FOR ANY PURPOSE IN DETERMINING WHETHER THE REQUIREMENTS OF SECTION 1126(C) OF THE BANKRUPTCY CODE HAVE BEEN MET, UNLESS A CLAIMANT WHOSE CLAIM IS DISPUTED HAS FILED A MOTION FOR TEMPORARY ALLOWANCE FOR VOTING PURPOSES UNDER BANKRUPTCY RULE 3018(a), AND THE BANKRUPTCY COURT GRANTS SUCH MOTION FOR TEMPORARY ALLOWANCE PRIOR TO THE VOTING DEADLINE.

## B.    Voting Instructions

This Disclosure Statement and other documents described herein are being furnished by the Debtors to certain Holders of Claims against the Debtors pursuant to the Disclosure Statement Order for the purpose of soliciting votes on the Plan. The Debtors are seeking the acceptance of the Plan by Holders of First Lien Loan Agreement Claims (Class 3), Holders of Litigation Claims (Class 4), and Holders of General Unsecured Claims (Class 5).

A Ballot to be used to accept or to reject the Plan has been enclosed with all copies of this Disclosure Statement mailed to Holders of Claims that are impaired by the Plan and entitled to vote. A copy of the Disclosure Statement Order and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "**Notice of the Confirmation Hearing**") are also being transmitted with this Disclosure Statement. The Disclosure Statement Order and the Notice of the Confirmation Hearing set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims, and the assumptions for tabulating ballots. In addition, detailed voting instructions accompany each Ballot for each Class. Each Holder of a Claim within a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

If you hold Claims in more than one Class and are entitled to vote Claims in more than one Class, you must use separate Ballots for each separate Class. Please vote and return your Ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your Ballot(s). PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. To be counted, your vote indicating acceptance or rejection of the Plan must be properly completed in accordance with the instruction on the Ballot.

To be counted, your vote indicating acceptance or rejection of the Plan must actually be received by the Claims and Balloting Agent, Kurtzman Carson Consultants, LLC (the "Claims and Balloting Agent"), no later than 4:00 p.m., prevailing Eastern Time, on November 17, 2015 (the "Voting

Deadline"). Ballots received after that time will not be counted, except to the extent the Debtors so determine or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018.

All Ballots must be sent to the Claims and Balloting Agent at the following address:

<u>VIA U.S. MAIL OR OVERNIGHT DELIVERY</u>
Signal International Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California 90245

Consistent with the provisions of Bankruptcy Rule 3018, the Bankruptcy Court has fixed a Record Date of _____, 2015 (the "**Record Date**"). This is the date for the determination of Holders of record of Claims who are entitled to vote on the Plan. All votes to accept or reject the Plan must be cast by using a Ballot. Votes which are cast in any manner other than by using a Ballot will not be counted.

If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by contacting the Voting Agent at Attn: Signal International Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245 or by calling the Voting Agent at (888) 830-4665 or, for international callers, (310) 751-2648.

After carefully reviewing the Plan, including all schedules thereto, and this Disclosure Statement and its exhibits, please indicate your vote on the enclosed Ballot, sign it, and then return it in the envelope provided. In voting to accept or to reject the Plan, please use only a Ballot sent to you with this Disclosure Statement or by the Claims and Balloting Agent.

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Claims and Balloting Agent, so that the Claims and Balloting Agent actually receives such notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court by filing a motion in accordance with Bankruptcy Rule 3018(a).

## C.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing (the "**Confirmation Hearing**") with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. The Confirmation Hearing has been scheduled to commence at 2:00 p.m. (Eastern Time) on November 24, 2015 before the Honorable Judge Mary F. Walrath, United States Bankruptcy Court, District of Delaware, 824 Market Street, 5th Floor, Courtroom #4, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing.

Any party-in-interest may object to Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set **November 17, 2015, at 4:00 p.m. (Eastern Time)**, as the deadline for filing and serving objections to Confirmation of the Plan. Objections to Confirmation must be timely filed with the Clerk of the Bankruptcy Court and served upon counsel for the Debtors at the addresses specified on the first page of this Disclosure Statement, and counsel to the Committee, counsel to the TRSA and ERSA and the Office of the United States Trustee as the following addresses:

*If to the Committee:*

> Pachulski Stang Ziehl & Jones
> 919 North Market Street, 17th Floor
> Wilmington, DE 19801
> Attn:  Bradford J. Sandler, Esq. (bsandler@pszjlaw.com);

*If to the TRSA and ERSA:*

> Burr & Forman LLP
> 420 North 20th Street, Suite 3400
> Birmingham, AL 35203
> Attn:  Derek F. Meek, Esq. (dmeek@burr.com)
>
>              and
>
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> Attn:  Gregory W. Werkheiser, Esq. (gwerkheiser@mnat.com); and

*If to the Office of the United States Trustee*

> Office of the United States Trustee
> J. Caleb Boggs Federal Building
> 844 King Street, Suite 2207
> Lockbox 35
> Wilmington, DE 19801
> Attn:  Tiiara N.A. Patton, Esq. (tiiara.patton@usdoj.gov)

**D.      Other Important Information**

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT IS PROVIDED FOR USE SOLELY BY HOLDERS OF CLAIMS IN CLASSES 3, 4, AND 5 AND THEIR ADVISORS, IN CONNECTION WITH THEIR DETERMINATION TO ACCEPT OR TO REJECT THE PLAN, OR TO OBJECT TO THE PLAN.  THIS DISCLOSURE STATEMENT, UPON WRITTEN REQUEST, WILL ALSO BE PROVIDED TO OTHER HOLDERS OF CLAIMS AND EQUITY INTERESTS (TO THE EXTENT KNOWN BY THE DEBTORS) IN ORDER FOR SUCH PARTIES TO DETERMINE WHETHER TO OBJECT TO THE PLAN.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD THEREFORE CONSULT WITH HIS, HER, OR ITS OWN LEGAL, BUSINESS, FINANCIAL AND/OR TAX ADVISORS AS TO ANY MATTER CONCERNING THE BANKRUPTCY CASES, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

01:17450000.8

### E.       Non-Consensual Confirmation

In the event that any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite majorities required by section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to (i) modify the Plan in accordance with Section 3.D thereof and/or (ii) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code notwithstanding such lack of acceptance.

### F.       Deemed Acceptance if No Votes Cast

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims.

### G.       Elimination of Vacant Classes

Any Class or sub-Class of Claims or Equity Interests that is not occupied as of the Confirmation Hearing Date by at least one Allowed Claim or Allowed Equity Interest, as applicable, or at least one Claim or Equity Interest, as applicable, temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### VI.       MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.       Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 6006(d) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Signal Liquidating Trust Agreement, the Litigation Settlement Trust Agreement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims against or Equity Interests in the Debtors (regardless of whether the Holders of such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Persons and Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts.  All Claims and debts shall be fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.       Modification of the Plan

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Asset Purchase Agreement, the Litigation Settlement Trust Agreement, or the Confirmation Order.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XIII.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      **Revocation or Withdrawal of the Plan**

The Debtors, in consultation with the PSA Creditor Parties and the Committee, reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date and to file subsequent plans.  If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then with respect to such Debtor:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption and  assignment or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of the Debtors, the Committee or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## VII.      EFFECT OF NO CONFIRMATION

Except as expressly set forth therein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date shall have occurred.  Neither the filing of the Plan, any nor statement or provision contained herein, nor the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or the Committee prior to the Effective Date.  If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Bankruptcy Cases are and shall be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Bankruptcy Cases shall be bound or deemed prejudiced by any such concession or settlement.

## VIII.      CONFIRMATION AND CONSUMMATION PROCEDURE

A.      **Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing is scheduled to commence on November 24, 2015 at 2:00 p.m. (Prevailing Eastern Time) before the Honorable Mary F. Walrath, United States Bankruptcy Court, District of Delaware, 824 Market Street, 5th Floor, Courtroom #4, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

B.      **Requirements of section 1129(a) of Bankruptcy Code**

The Bankruptcy Court will confirm the Plan only if it finds that all of the applicable requirements enumerated in section 1129(a) of the Bankruptcy Code have been met or, if all of the requirements of section 1129(a) other than the requirements of section 1129(a)(8) have been met (i.e., that all impaired classes have accepted the plan), that all of the applicable requirements enumerated in section 1129(b) of the Bankruptcy Code have been met.

Among other things, sections 1129(a) and (b) require that the Plan be (i) accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not

discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

Article III of the Plan provides that Classes 6 and 7 are not receiving any distribution under the Plan and are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, as to such Classes and any other Class that votes to reject the Plan, the Debtors are seeking confirmation of the Plan in accordance with sections 1129(a) and (b) of the Bankruptcy Code either under the terms provided herein or upon such terms as may exist if the Plan is modified in accordance with section 1127(d) of the Bankruptcy Code.

**THE DEBTORS BELIEVE THAT THE PLAN SATISFIES OR WILL SATISFY, AS OF THE CONFIRMATION DATE, ALL OF THE REQUIREMENTS FOR CONFIRMATION.**

1.    Best Interests Test

To confirm the Plan, the Bankruptcy Court must, pursuant to section 1129(a)(7) of the Bankruptcy Code, independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any impaired Class who has not voted to accept the Plan. This is often called the "best interests" test. Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

As more fully set forth in the liquidation analysis attached hereto as Exhibit B, the Debtors believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a Chapter 7 liquidation, and Distributions under the Plan will commence at an earlier point in time than they would if a Chapter 7 trustee were put in place.

Conversion of the Bankruptcy Cases to chapter 7 of the Bankruptcy Code would replace the Signal Liquidating Trustee and Litigation Settlement Trustee with a chapter 7 trustee. As a consequence, the liquidation and completion of this case would be substantially disrupted. Disruption would occur because a chapter 7 trustee would be unfamiliar with the case. A chapter 7 trustee may be required to employ new counsel that might be unfamiliar with the issues requiring resolution in the Estates. Holders of Allowed Claims would bear the cost of educating the chapter 7 trustee, resulting in delays and reduced distributions. Furthermore, all fees of, and expenses incurred by, the chapter 7 trustee and its professionals would have priority over all Administrative Claims and General Unsecured Claims previously incurred in the Bankruptcy Cases under section 726(b) of the Bankruptcy Code.

2.    Feasibility

The Debtors shall cease conducting business upon the closing of the Sale Transaction on the Effective Date, and will not conduct business after the Effective Date. The Plan provides for dissolution of the Debtors, liquidation of the Post-Effective Date Assets, if any, and Distributions to Creditors by the Signal Liquidating Trustee and the Litigation Settlement Trustee, as applicable, in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan, the Liquidation Settlement Trust and the Litigation Settlement Trust Agreement, as applicable. The ability to make the Distributions described in the Plan, the Signal Liquidating Trust, and the Litigation Settlement Trust Agreement does not depend on future earnings or operations of the Debtors. Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

3.    <u>Acceptance by Impaired Classes</u>

By this Disclosure Statement, the Debtors are seeking the affirmative vote of each impaired Class of Claims under the Plan that is proposed to receive a distribution under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, a class that is not "impaired" under a plan will be conclusively presumed to have accepted such plan; solicitation of acceptances with respect to any such class is not required. Pursuant to section 1126(g) of the Bankruptcy Code, a class of claims or interests that does not receive or retain any property under a plan of liquidation is deemed not to have accepted the plan, although members of that class are permitted to consent, or waive objections, to its confirmation.

Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless a plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder thereof, or (ii) (a) cures any default (other than defaults resulting from the breach of an insolvency or financial condition provision), (b) reinstates the maturity of such claim or interest, (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on any contractual provision or applicable law entitling such holder to demand or receive accelerated payments after the occurrence of a default, and (d) does not otherwise alter the legal, equitable or contractual rights to which the holder of such claim or interest is entitled.

Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims has accepted a plan when such plan has been accepted by claimholders (other than an entity designated under section 1126(e) of the Bankruptcy Code) that hold at least two thirds in dollar amount and more than one half in number of the allowed claims of such class held by claimholders (other than any entity designated under section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the plan.  A class of interests has accepted a plan if the plan has been accepted by holders of interests (other than any entity designated under section 1126(e) of the Bankruptcy Code) that hold at least two thirds in amount of the allowed interests of such class held by interest holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the plan.  Section 1126(e) of the Bankruptcy Code allows the Bankruptcy Court to designate the votes of any party that did not vote in good faith or whose vote was not solicited or procured in good faith or in accordance with the Bankruptcy Code.  Holders of claims or interests who fail to vote are not counted as either accepting or rejecting the plan.

4.    <u>Confirmation Without Acceptance by All Impaired Classes</u>

Because Class 6 (Intercompany Claims) and Class 7 (Equity Interests) are deemed not to have accepted the Plan, the Debtors are seeking confirmation of the Plan as to such Classes, and as to any other Class that votes to reject the Plan, pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm a plan at the request of a debtor if, as to each impaired class that has not accepted the plan, the plan "does not discriminate unfairly" and is "fair and equitable."

Section 1129(b)(2)(A) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired secured claims, "fair and equitable" includes the requirement that the plan provides (i) that each holder of a claim in such class (a) retains the liens securing its claim to the extent of the allowed amount of such claim and (b) receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of such plan at least equal to the value of such creditor's interest in the debtor's interest in the property securing the creditor's claim, (ii) for the sale, subject to section 363(k) of the Bankruptcy Code, of the property securing the creditor's claim, free and

clear of the creditor's liens, with those liens attaching to the proceeds of the sale, and such liens on the proceeds will be treated in accordance with clauses (i) or (iii) thereof, or (iii) for the realization by the creditor of the "indubitable equivalent" of its claim.

Section 1129(b)(2)(B) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired unsecured claims, "fair and equitable" includes the requirement that (i) the plan provide that each holder of a claim in such class receives or retains property of a value as of the effective date equal to the allowed amount of its claim, or (ii) the holders of claims or interests in classes that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such junior claim or interest.

Section 1129(b)(2)(C) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired equity interests, "fair and equitable" includes the requirement that (i) the plan provides that each holder of an impaired interest in such class receives or retains property of a value as of the effective date equal to the greatest of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, and (c) the value of such interest, or (ii) the holders of all interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe that the Plan does not discriminate unfairly against, and is fair and equitable as to, each impaired Class under the Plan.

## IX.    RISK FACTORS

### A.    General

Even if an Impaired Class votes to accept the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" under section 1129(b) of the Bankruptcy Code are met, the Bankruptcy Court may exercise substantial discretion and may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, that the value of Distributions to dissenting Holders of Claims or Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.    Allowed Claims May Exceed Estimates

Approximately _____ proofs of claim were filed against the Debtors as of the Bar Date. Objections to certain Claims are likely to be filed by the Debtors, the Signal Liquidating Trustee and/or the Litigation Settlement Trustee as the claims resolution process continues.  However, the aggregate amount of Claims that will ultimately be Allowed is not determinable at this time, and the claims resolution process will not be completed until after the Effective Date.  Individual Distributions to Holders of Allowed General Unsecured Claims and Litigation Claims will depend on the actual amount of General Unsecured Claims and Litigation Claims that are ultimately Allowed.  This amount may differ substantially from the Debtors' estimates.  Any increase in the amount of anticipated Allowed Claims versus the Debtors' estimates could result in decreased recoveries for Holders of Allowed General Unsecured Claims and Litigation Claims.

### C.    Plan May Not Be Accepted or Confirmed

01:17450000.8

-54-

While the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree.

## X.    ALTERNATIVES TO THE PLAN

### A.    Liquidation under Chapter 7

If no chapter 11 plan can be confirmed, then some or all of the Bankruptcy Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor in the converted case and for the proceeds of such liquidation to be distributed in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to Holders of Allowed Claims because of (i) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation proceedings.  Distributions to Holders of Allowed Claims would likely be significantly delayed in a chapter 7 liquidation.

### B.    Alternative Plan

If the Plan is not confirmed, the Debtors and/or other parties in interest could attempt to formulate a different plan under chapter 11 of the Bankruptcy Code.  The Debtors have concluded that the Plan enables Creditors to realize the most value under the circumstances.  If the Plan is rejected, it is possible that an alternative chapter 11 plan could be proposed or conversion to chapter 7 could ensue.  A discussion with respect to chapter 7 liquidation proceedings appears above.  In an alternative plan scenario, it is likely that any such alternative plan would involve extensive further negotiation, formulation and drafting, and, in addition, possible litigation over its confirmability, thereby increasing administrative expenses and possibly reducing distributions to Creditors, and causing further delay in the resolution of the Chapter 11 Cases and in the making of distributions to Creditors.

In any event, if the Plan is not confirmed, the statements contained herein or otherwise in the Plan or any of the other Plan Documents shall not be deemed to have been admissions by the Debtors that may be introduced into evidence against them in the Bankruptcy Cases, any proceedings arising in or related to the Bankruptcy Cases, or any other proceedings.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors and to certain Holders of Claims.  This discussion is based on the Internal Revenue Code, the Treasury regulations thereunder (the "Regulations"), judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof.  Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below.  Furthermore, this discussion is not binding on the IRS or any other tax authority.  There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Plan that differs from the tax consequences described below.  No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of the Plan.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the Tax Code (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and persons that have a functional currency other than the U.S. dollar). This summary does not address state, local, or non-United States tax consequences of the Plan, nor does this summary address federal taxes other than income taxes. Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are Unimpaired under the Plan or that are not entitled to receive or retain any property under the Plan or to persons who are deemed to have rejected the Plan.

References to a Holder of a Claim refer to such Holder in its capacity as a Holder of a Claim, even if such Holder also holds an Equity Interest.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE AND IS NOT A TAX OPINION. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS DEPEND UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. THIS SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE FROM THE HOLDER'S TAX ADVISOR BASED UPON THE HOLDER'S PARTICULAR CIRCUMSTANCES. EACH HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN TO THEM.

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE TAX CODE; (2) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN; AND (III) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON SUCH TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **Federal Income Tax Consequences to the Debtors**

1.    Sale of Assets

The sale of the Assets pursuant to the Sale Order and Plan will constitute a taxable disposition of the Assets. The Debtors will recognize gain or loss equal to the difference between the fair market value of those assets and the adjusted tax basis in those assets. The Debtors expect to have tax losses generated from other activities in the current year that may be used to offset gain from the Sale Transaction. The Debtors also expect that net operating losses ("NOLs") from prior taxable years will be available for carry forward to offset gain from the Sale Transaction, as computed for both regular tax and alternative minimum tax ("AMT") purposes. The Debtors will owe AMT to the extent 20% of alternative minimum taxable income exceeds their regular tax liability. For AMT purposes, only 90% of taxable income may be offset by AMT NOLs. AMT NOLs are NOLs computed under AMT rules that generally limit the

availability of certain tax deductions that are otherwise available and include certain income that is otherwise excludable for regular tax purposes (COD income, which is excluded from regular taxable income, as described below, is also excluded from AMT taxable income). Therefore, AMT may be owed even if regular taxable income is fully offset by NOLs. There is an exception from the 90% AMT NOL limitation, pursuant to which AMT NOLs generated in tax years ending in 2001 or 2002 can be used to offset 100% of alternative minimum taxable income in subsequent years. To the extent current year losses and NOLs and other tax deductions are not available to offset Debtors' gain from the Sale Transaction, Debtors will owe tax on such gains. Any such tax will be an Administrative Claim.

2.    Cancellation of Indebtedness and Reduction of Tax Attributes

For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("COD"). In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to the Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt. Various statutory or judicial exceptions limit the incurrence of COD income (such as where payment of the cancelled debt would have given rise to a tax deduction). COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge. An exception to the recognition of COD income applies to a debtor in a chapter 11 bankruptcy proceeding. Bankrupt debtors generally do not include COD in taxable income, but must instead reduce certain tax benefits (such as NOLs, capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception. Tax benefits are reduced after the tax is determined for the year of discharge. NOLs will therefore be available to offset gains on asset sales in the year of the discharge regardless of the amount by which NOLs are reduced due to COD income.

**B.    Classification, Reporting, and Taxation of the Litigation Settlement Trust and the Signal Liquidating Trust and Beneficiaries**

The Plan provides for title to certain assets and properties and interests in property of the Debtors to vest in the Signal Liquidating Trust or the Litigation Settlement Trust. It is intended that the Signal Liquidating Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and the Signal Liquidating Trust Agreement and the Plan are intended to satisfy the liquidating trust guidelines in Revenue Procedure 94-45, 1994-2 C.B. 684. For U.S. federal income tax purposes, it is thus intended that Holders of General Unsecured Claims against the Debtors will be treated as the grantors of the Signal Liquidating Trust and therefore the beneficial owners of the Signal Liquidating Trust Assets. The Plan requires the Debtors and the Holders of General Unsecured Claims against the Debtors to report consistently with characterization of the Signal Liquidating Trust as a grantor trust and requires the Signal Liquidating Trustee to file tax returns treating the Signal Liquidating Trust as a "grantor trust" pursuant to Treasury Regulation section 1.671-4(a) and to report to each beneficiary a statement of the beneficiary's share of Signal Liquidating Trust income, gain, loss, deduction, and credit for inclusion in the beneficiary's U.S. federal income tax return. Beneficiaries therefore may owe tax on Signal Liquidating Trust income, without regard to whether cash distributions are made to beneficial owners by the Signal Liquidating Trust.

It is contemplated that the Litigation Settlement Trust will be characterized as a "qualified settlement fund" ("**QSF**") within the meaning of Treasury Regulation § 1.468B-1(b). A QSF can be established for contested liabilities. A QSF is subject to federal income taxation on the modified gross income of the QSF at the highest rates imposed upon trusts pursuant to § 1(e) of the Internal Revenue Code. For this purpose, modified gross income is defined as gross income of the QSF under § 61 of the Internal Revenue Code reduced by administrative and incidental expenses incurred in connection with

operation of the QSF.  A QSF is also allowed a deduction for losses sustained in connection with the sale, exchange, or worthlessness of property held in trust as well as net operating losses to the extent such losses would be deductible in calculating the taxable income of a corporation under § 172(a) of the Internal Revenue Code.  Amounts transferred to a QSF by a transferor to satisfy the claims for which the QSF is established are not included in the QSF's modified gross income and amounts that are distributed to or on behalf of claimants are not deductible by a QSF.

For income tax purposes, a QSF is required to report income on a calendar year basis and must maintain the QSF's books and records on the accrual method.  The tax imposed pursuant to § 468B on QSFs is in lieu of any other taxes imposed under the Internal Revenue Code.  Thus, QSFs are not subject to the alternative minimum tax, the accumulated earnings tax, the personal holding company tax or the maximum capital gains rate tax imposed under § 1(h) of the Internal Revenue Code.

The above discussion assumes that the Signal Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes and the Litigation Settlement Trust will be respected as a QSF for U.S. federal income tax purposes.  The Debtors are not requesting an IRS ruling or an opinion of counsel regarding such treatment and there is no assurance that the IRS will agree that the trust should be so treated.  If the IRS were to challenge such treatment, either or both of the Plan trusts may be treated as a different type of taxable entity for U.S. federal income tax purposes and the treatment of the Debtors, the trusts and their beneficiaries may be materially different than the treatment discussed above. BENEFICIARIES OF EACH OF THE PLAN TRUSTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX TREATMENT OF THE PLAN TRUSTS AND OF THEIR INTERESTS IN THE PLAN TRUSTS.

## C.    Federal Income Tax Consequences to Holders of Claims

The tax treatment of Holders of Claims, and the character, amount and timing of income, gain, or loss recognized as a consequence of the Plan and Distributions pursuant to the Plan may vary, depending upon, among other things: (i) whether the Claim (or a portion of the Claim) is for principal or interest; (ii) the type of consideration the Holder receives for the Claim, (iii) whether the Holder receives Distributions under the Plan in more than one taxable year; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to part or all of the Claim; (viii) whether the Holder has previously included in income accrued but unpaid interest on the Claim; (ix) the Holder's method of tax accounting; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim, and any instrument received in exchange for the Claim, is a "security" for U.S. federal income tax purposes; and (xii) whether and the manner in which the "market discount" rules of the Internal Revenue Code apply to the Holder.

Holders of Claims that receive cash and property other than stock and securities for their Claim will recognize gain or loss for U.S. federal income tax purposes equal to the difference between their "amount realized" and their tax basis in the Claim.  The "amount realized" is the sum of the amount of cash and the fair market value of any other property received under the Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest).  The Holder's tax basis in the Claim (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the specific facts of the Holder.  Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder.

Holders that previously included in income accrued but unpaid interest on a Claim may be entitled to a deductible loss to the extent such interest is not satisfied under the Plan.  Conversely, a Holder has ordinary income to the extent of the amount of cash or the fair market value of property

received in respect of a Claim for (or the portion of a Claim treated as allocable to) accrued unpaid interest that was not previously included in income by the Holder. The Plan treats all amounts payable to a Holder as principal until the principal amount of the Claim has been paid in full. The Signal Liquidating Trustee will file the Debtors' tax returns consistent with this allocation, but it is uncertain whether this allocation will be respected by the IRS. The IRS may take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If the IRS prevails in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to their Claims. Each Holder is urged to consult its own tax advisor regarding the amount of its Claim allocable to accrued unpaid interest and the character of any loss with respect to accrued but unpaid interest that the Holder previously included in income.

A Holder of a Claim who receives, in respect of its Claim, an amount that is less than its tax basis in the Claim may be entitled to a bad debt or worthless securities deduction. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation, or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with the Holder's trade or business, or (b) a debt, the loss from worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim may be required to include in income amounts received under the Plan that exceed the Holder's adjusted basis in its Claim.

A Holder of a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of section 453B of the Internal Revenue Code.

A Holder that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the market discount that accrued during the period the Claim was held by the Holder and that was not previously included in income by the Holder.

Amounts paid to Holders are subject to generally applicable withholding, information and backup withholding rules. The Plan authorizes the Debtors, the Signal Liquidating Trustee, and the Litigation Settlement Trustee, as applicable, to withhold and report amounts required by law to be withheld and reported. Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of the Holder will be treated as amounts distributed to the Holder. Holders are required to provide the Debtors, the Signal Liquidating Trustee, and or the Litigation Settlement Trustee, as applicable, with the information necessary to effect information reporting and withholding as required by law. Notwithstanding any other provision of the Plan, Holders that receive a Distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until the Holder has made arrangements satisfactory to the Debtors, the Signal Liquidating Trustee, and or the Litigation Settlement Trustee, as applicable, for the payment and satisfaction of such obligations.

Holders may be subject to backup withholding on payments pursuant to the Plan unless the Holder (i) is not a corporation and is not otherwise exempt from backup withholding and, when required, demonstrates that or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of previous failure to report dividend and interest income. Amounts withheld due to backup

withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and would require such disclosure.

THE FOREGOING SUMMARY IS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XII.    CONCLUSION

It is important that you exercise your right to vote on the Plan. It is the Debtors' belief that the Plan fairly and equitably provides for the treatment of all Claims against and Equity Interests in the Debtors. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, resulting in smaller distributions to the Holders of Claims. Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation of the Plan and vote to accept the Plan by returning their Ballots to the Claims Agent so that they will be received not later than November 17, 2015 at 4:00 p.m. (ET).

Dated:  September 3, 2015
        Respectfully submitted,

                            SIGNAL INTERNATIONAL, INC. AND ITS
                            AFFILIATE DEBTORS

                            By:     */s/ Christopher S. Cunningham*
                            Title:    Chief Financial Officer

01:17450000.8

-60-