## Exhibit 6

**Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **SIGNAL INTERNATIONAL, INC., et al.**[1] | Case No. 15-11498 (MFW) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Dated: October _____, 2015
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Kenneth J. Enos (No. 4544)
Jaime Luton Chapman (No. 4936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600

*Counsel for the Debtors and the Debtors in Possession*

**HOGAN LOVELLS US LLP**
Christopher R. Donoho III
Christopher R. Bryant
John D. Beck
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000

*Special Counsel for the Debtors
and the Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Signal International, Inc. (4248); Signal Ship Repair, LLC (2642); Signal International, LLC (5074); Signal International Texas GP, LLC (3050); and Signal International Texas, L.P. (5066). The Debtors' principal offices are located at RSA Battle House Tower, 11 North Water Street, Mobile, Alabama 36602.

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT AND DISCLAIMERS ....................................... 1

II.    BACKGROUND ...................................................................................... 6

    A.  Business Operations ........................................................................... 6

    B.  Prepetition Organizational and Capital Structure ................................... 7

    C.  Historical Capital Transactions ............................................................ 7

    D.  Events Leading to the Filing of the Bankruptcy Cases ........................... 9

        1.  Prepetition Litigation Against Signal ............................................ 9

        2.  Prepetition Settlement and the Plan Support Agreement ................ 11

    E.  Summary of Significant Postpetition Events and Orders ....................... 11

        1.  Debtors' Retention of Professionals ............................................ 11

        2.  Formation of the Committee and the Retention of Its Professionals ........ 12

        3.  Cash Collateral and DIP Financing ............................................. 12

        4.  Schedules, Claims Bar Dates and Claim Objections ...................... 13

        5.  PSA Motion .............................................................................. 13

        6.  Bidding Procedures Motion ....................................................... 14

        7.  Committee Settlement ............................................................... 14

        8.  Executory Contracts .................................................................. 15

III.   THE PLAN ............................................................................................ 15

    A.  General Overview of the Plan ............................................................ 15

    B.  Classification and Treatment of Claims and Equity Interests ................. 16

        1.  Classification Generally ............................................................. 16

        2.  Unclassified Claims .................................................................. 16

        3.  Classified Claims ...................................................................... 16

        4.  General Provisions in Respect of Distributions Under the Plan Applicable to all Claims ................................................................... 19

        5.  Plan Provisions for Treatment of Contingent Claims ..................... 20

        6.  Objection to Claims and Prosecution of Disputed Non-Litigation Claims21

        7.  Distributions and Reserves on Account of Contingent and Disputed Non-Litigation Claims .......................................................... 21

        8.  Cash Reserves .......................................................................... 22

        9.  Estimation of Non-Litigation Claims .......................................... 22

        10. Objections to Litigation Settlement Trust Claims ......................... 22

| | 11. | Special Provisions Regarding Unimpaired Claims | 22 |
| C. | | Litigation Settlement Trust | 22 |
| | 1. | Establishment and Administration of the Litigation Settlement Trust | 22 |
| | 2. | Litigation Settlement TDP | 23 |
| | 3. | Imposition of Channeling Injunction | 23 |
| | 4. | Release of Liabilities to Litigation Claimants | 25 |
| | 5. | Assumption of Certain Liabilities | 26 |
| | 6. | Appointment of the Litigation Settlement Trustee | 26 |
| | 7. | Litigation Settlement Trust Assets | 26 |
| | 8. | Litigation Settlement TAC | 29 |
| | 9. | Cooperation; Transfer of Books and Records | 29 |
| | 10. | Transfer of Privileged Information | 29 |
| | 11. | Institution and Maintenance of Legal and Other Proceedings | 30 |
| D. | | Signal Liquidating Trust | 30 |
| | 1. | Establishment and Purpose of the Signal Liquidating Trust | 30 |
| | 2. | Authority and Role of the Signal Liquidating Trustee | 30 |
| | 3. | Appointment of the Signal Liquidating Trustee | 31 |
| | 4. | Signal Liquidating Trust Assets | 31 |
| | 5. | Treatment of Signal Liquidating Trust for Federal Income Tax Purposes | 31 |
| | 6. | Signal Liquidating Trust as a "Grantor Trust" | 32 |
| | 7. | Signal Liquidating Trustee's Right and Power to Invest | 32 |
| | 8. | Responsibilities of the Signal Liquidating Trustee | 32 |
| | 9. | Expenses of the Signal Liquidating Trustee | 33 |
| | 10. | Bonding of the Signal Liquidating Trustee | 33 |
| | 11. | Fiduciary Duties of the Signal Liquidating Trustee | 33 |
| | 12. | Cooperation; Transfer of Books and Records | 33 |
| | 13. | Transfer of Privileged Information | 34 |
| | 14. | Dissolution of the Signal Liquidating Trust | 34 |
| | 15. | Full and Final Satisfaction against Signal Liquidating Trust | 34 |
| E. | | Injunctions, Releases and Discharge | 35 |
| | 1. | Term of Certain Injunctions and Automatic Stay | 35 |
| | 2. | Debtors' Releases | 35 |
| | 3. | Consensual Releases by Non-Debtor Released Parties | 36 |
| | 4. | Releases by Holders of Claims | 37 |

|  | 5. | Non-Discharge of the Debtors; Plan Injunction | 38 |
|  | 6. | Injunction Against Barred Claims | 39 |
| F. |  | Executory Contracts | 41 |
|  | 1. | Rejection of Executory Contracts | 41 |
|  | 2. | Approval by Confirmation Order | 41 |
|  | 3. | Rejection Damages Bar Date | 41 |
| G. |  | Conditions | 42 |
|  | 1. | Conditions Precedent to Confirmation | 42 |
|  | 2. | Conditions Precedent to the Effective Date | 42 |
|  | 3. | Effect of Failure of Conditions | 44 |
| H. |  | Retention of Jurisdiction | 44 |
|  | 1. | General Jurisdiction | 44 |
|  | 2. | Specific Jurisdiction | 45 |
|  | 3. | Litigation Settlement TDP Controlling | 47 |
| I. |  | Miscellaneous Plan Provisions | 47 |
|  | 1. | Exculpation | 47 |
|  | 2. | Severability | 48 |
|  | 3. | Successors and Assigns | 48 |
|  | 4. | Further Assurances | 48 |
|  | 5. | Post-Effective Date Service List | 48 |
|  | 6. | Conflicts | 48 |
|  | 7. | Maintenance of Books and Records | 49 |
|  | 8. | Determination of Tax Liability | 49 |
|  | 9. | Entire Agreement | 49 |
|  | 10. | Change of Control Provisions | 49 |
|  | 11. | Substantial Consummation | 49 |
|  | 12. | Preservation of Insurance | 49 |
|  | 13. | Asset Purchase Agreement | 49 |
|  | 14. | Powers of Purchaser | 50 |
| IV. |  | IMPLEMENTATION OF THE PLAN | 50 |
| A. |  | Implementation of the Plan | 50 |
| B. |  | Consummation of the Asset Purchase Agreement | 50 |
|  | 1. | Transfer of Acquired Assets | 51 |
|  | 2. | Payment of Purchase Price and Discharge of Purchaser Assumed Liabilities | 51 |

3.    Good Faith of the Purchaser ................................................................. 51
4.    No Successor Liability for the Purchaser.................................................. 51
C.    Substantive Consolidation of the Debtors................................................... 52
D.    Effective Date ................................................................................. 53
E.    Operations of the Debtors Between the Confirmation Date and the Effective Date
      ................................................................................................. 53
F.    Term of Injunctions or Stays................................................................ 53
G.    Setoffs ........................................................................................ 53
H.    Corporate Action.............................................................................. 54
I.    Cancellation of Existing Agreements and Existing Equity Interests.................... 54
J.    Authorization of Plan-Related Documentation.............................................. 54
K.    Dissolution of Committee .................................................................... 54
L.    Exemption from Certain Fees and Taxes...................................................... 55
M.    Closing the Bankruptcy Cases ............................................................... 55
V.        ACCEPTANCE OR REJECTION OF THE PLAN ............................................... 55
A.    Voting ........................................................................................ 55
B.    Voting Instructions........................................................................... 57
C.    Confirmation Hearing ........................................................................ 58
D.    Other Important Information.................................................................. 59
E.    Non-Consensual Confirmation ............................................................... 60
F.    Deemed Acceptance if No Votes Cast........................................................ 60
G.    Elimination of Vacant Classes .............................................................. 60
VI.       MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ....................... 60
A.    Immediate Binding Effect..................................................................... 60
B.    Modification of the Plan ..................................................................... 61
C.    Revocation or Withdrawal of the Plan ...................................................... 61
VII.      EFFECT OF NO CONFIRMATION .................................................................. 61
VIII.     CONFIRMATION AND CONSUMMATION PROCEDURE ........................................... 62
A.    Confirmation Hearing ........................................................................ 62
B.    Requirements of section 1129(a) of Bankruptcy Code....................................... 62
1.    Best Interests Test.......................................................................... 62
2.    Feasibility.................................................................................... 64
3.    Acceptance by Impaired Classes ............................................................ 64
4.    Confirmation Without Acceptance by All Impaired Classes.................................. 65
IX.       RISK FACTORS .................................................................................... 66

|   | A. | General | 66 |
|   | B. | Allowed Claims May Exceed Estimates | 66 |
|   | C. | Plan May Not Be Accepted or Confirmed | 66 |
| X. |   | ALTERNATIVES TO THE PLAN | 66 |
|   | A. | Liquidation under Chapter 7 | 66 |
|   | B. | Alternative Plan | 67 |
| XI. |   | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 67 |
|   | A. | Federal Income Tax Consequences to the Debtors | 68 |
|   |   | 1. Sale of Assets | 68 |
|   |   | 2. Cancellation of Indebtedness and Reduction of Tax Attributes | 69 |
|   | B. | Classification, Reporting, and Taxation of the Litigation Settlement Trust and the Signal Liquidating Trust and Beneficiaries | 69 |
|   | C. | Federal Income Tax Consequences to Holders of Claims | 70 |
| XII. |   | CONCLUSION | 72 |

## DISCLOSURE STATEMENT EXHIBITS

Exhibit 1:    Debtors' First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code Dated as of October __, 2015

Exhibit 2:    Liquidation Analysis

NOTHING CONTAINED IN THIS DOCUMENT SHALL CONSTITUTE AN OFFER, ACCEPTANCE OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST AS THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW INCLUDING THE BANKRUPTCY CODE. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED HEREIN OR THE TERMS OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT.   THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND DEVELOPMENTS MAY OCCUR THAT REQUIRE MODIFICATIONS OR ADDITIONS TO, OR DELETIONS FROM, THIS DISCLOSURE STATEMENT AND/OR TO THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES.

## I.   PRELIMINARY STATEMENT AND DISCLAIMERS[2]

THIS DISCLOSURE STATEMENT RELATES TO THE PLAN FILED BY THE DEBTORS WITH THE BANKRUPTCY COURT ON OCTOBER ___, 2015.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT THAT CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST SHOULD CONSIDER IN CONNECTION WITH THE PLAN INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN.  NO REPRESENTATIONS HAVE BEEN AUTHORIZED CONCERNING THE DEBTORS, THEIR ASSETS, CLAIMS AGAINST THE DEBTORS, OR EQUITY INTERESTS IN THE DEBTORS, EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN.   ACCORDINGLY, CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST SHOULD NOT RELY ON ANYTHING OTHER THAN THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN THE EXHIBITS ATTACHED TO THE DISCLOSURE STATEMENT AND THE PLAN, IN CONSIDERING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  ALL INFORMATION IN THIS DISCLOSURE STATEMENT IS FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY.   IT CONTAINS A SUMMARY OF THE PLAN, IMPORTANT INFORMATION CONCERNING THE DEBTORS, INCLUDING THEIR HISTORY AND BUSINESS OPERATIONS, CLAIMS AGAINST AND EQUITY INTERESTS IN

---

[2] Unless otherwise defined in this Disclosure Statement, all capitalized terms used and not defined herein have the meanings given to them in the *Debtors' First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**").

THE DEBTORS, AND HOW CLAIMS AND EQUITY INTERESTS WILL BE TREATED IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT ALSO PROVIDES INFORMATION REGARDING ALTERNATIVES TO THE PLAN.

THE DESCRIPTION OF THE PLAN IN THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS, PROVISIONS AND CONDITIONS SET FORTH IN THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF ALL THE TERMS, PROVISIONS AND CONDITIONS SET FORTH IN THE PLAN. THE PLAN ITSELF ALSO SHOULD BE READ CAREFULLY AND INDEPENDENTLY OF THIS DISCLOSURE STATEMENT.

IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

YOU ALSO SHOULD CONSIDER CONSULTING WITH YOUR OWN COUNSEL AND/OR OTHER ADVISORS IN CONNECTION WITH YOUR CLAIM(S) AGAINST, AND/OR EQUITY INTEREST(S) IN, THE DEBTORS, THE TREATMENT TO BE AFFORDED TO YOUR CLAIM(S) AND/OR EQUITY INTEREST(S) UNDER THE PLAN, AND ANY TAX CONSEQUENCES TO YOU, IF ANY, ATTENDANT TO CONFIRMATION OF THE PLAN.

THE DEBTORS CANNOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY OR ERROR BUT THEY DO BELIEVE THAT THE INFORMATION CONTAINED HEREIN IS THE MOST ACCURATE INFORMATION AVAILABLE TO THEM AT THIS TIME. NOTHING CONTAINED HEREIN IS AN ADMISSION OF ANY FACT OR LIABILITY NOR SHALL IT BE ADMISSIBLE IN ANY MATTER OR PROCEEDING ARISING IN OR RELATED TO THIS BANKRUPTCY CASE OR IN ANY OTHER ACTION, PROCEEDING OR LITIGATION INVOLVING THE PROPONENTS.

NO REPRESENTATIONS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT ARE AUTHORIZED WITH RESPECT TO THE PLAN AND ANY SUCH REPRESENTATIONS ARE NOT ADOPTED BY THE DEBTORS AND SHOULD NOT BE RELIED ON IN MAKING YOUR DECISION WHETHER TO ACCEPT OR TO REJECT THE PLAN.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO ALL CREDITORS OF, AND HOLDERS OF EQUITY INTERESTS IN, EACH OF THE DEBTORS PURSUANT TO 11 U.S.C. § 1125.

| |
|---|
| THE DEADLINE TO CAST BALLOTS EVIDENCING VOTES EITHER TO ACCEPT OR TO REJECT THE PLAN IS NOVEMBER 12, 2015, BY 4:00 P.M. (PREVAILING EASTERN TIME). |

THE BANKRUPTCY CODE PROVIDES THAT ONLY THE BALLOTS OF CREDITORS THAT ACTUALLY VOTE ON THE PLAN WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE ACCEPTANCES REQUIRED FOR CONFIRMATION OF THE PLAN HAVE BEEN ATTAINED. FAILURE TO DELIVER A PROPERLY COMPLETED BALLOT BY THE VOTING DEADLINE WILL CONSTITUTE AN ABSTENTION (I.E., WILL NOT BE COUNTED AS EITHER AN ACCEPTANCE OR A REJECTION), AND ANY IMPROPERLY COMPLETED OR LATE BALLOT WILL NOT BE COUNTED.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THE DEBTORS' CREDITORS, HOLDERS OF EQUITY INTERESTS IN THE DEBTORS AND ALL OTHER PARTIES IN INTEREST. THE PLAN IS SUPPORTED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THE DEBTORS' BANKRUPTCY CASES. ACCORDINGLY, THE DEBTORS URGE YOU, FOR THE REASONS WHICH FOLLOW, TO VOTE IN FAVOR OF THE PLAN.

## TREATMENT AND CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class & Description | Estimated Remaining Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1: Other Priority Claims | $0.00 | *Unimpaired – Deemed to Accept.* On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser. | 100% |

| | | | |
|---|---|---|---|
| Class 2: Other Secured Claims | $0.00 | *Unimpaired – Deemed to Accept.* On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, receive delivery of collateral securing any such Claim and payment of any interest requested under section 506(b) of the Bankruptcy Code, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser. | 100% |
| Class 3: First Lien Loan Agreement Claims | $0.00 | *Unimpaired – Deemed to Accept.* All First Lien Loan Agreement Claims have been satisfied in full and repaid through the borrowings under the DIP Facility. | N/A |
| Class 4: Litigation Claims | Approximately $200.0 million | *Impaired – Entitled to Vote.* Each Litigation Claimant shall receive its share of the Litigation Settlement Trust Assets, which share shall be determined in accordance with the terms, provisions, and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  Litigation Claims shall be resolved by the Litigation Settlement Trust in accordance with the terms of the Litigation Settlement TDP.  On the Effective Date, the Litigation Claims shall be deemed Allowed in the total aggregate amount of no less than $200 million.  On the Effective Date, all Litigation Claims shall be released as against the Debtors and their Related Parties pursuant to the terms and conditions of the Plan and the Litigation Settlement Trust Documents.  Pursuant to the Channeling Injunction, each Litigation Claimant shall have its Claim permanently channeled to the Litigation Settlement Trust, and such Litigation Claim may thereafter be asserted exclusively against the Litigation Settlement Trust and resolved in accordance with the terms, provisions and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP. For the avoidance of doubt, Litigation Claimants are not entitled to receive Distributions or other payment of funds from the Signal Liquidating Trust on behalf of, related to or with respect to such Litigation Claims. Litigation Claimants are, subject to the Litigation Settlement Trust | Approximately 10-15% |

| | | | |
|---|---|---|---|
| | | Agreement and the Litigation Settlement TDP, enjoined from filing any future litigation, claims or causes of action arising out of such Litigation Claims against the Debtors and/or any of the Plan Participants or their Related Parties, and may not proceed in any manner against the Debtors and/or any of the Plan Participants or their Related Parties, in any forum whatsoever, including, without limitation, any state or federal court or administrative or arbitral forum, and are required to pursue their Litigation Claims against the Litigation Settlement Trust solely as provided in the Litigation Settlement Trust Agreement and the Litigation Settlement TDP. | |
| Class 5: General Unsecured Claims | Approximately $6.0 million | *Impaired – Entitled to Vote.* On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, on account of its claim, its Pro Rata share of that portion of the Excess Sale Overpayment allocated to the Holders of General Unsecured Claims, and, each Holder of an Allowed General Unsecured Claim that votes to accept the Plan and does not opt out of the releases set forth in Section 11.H of the Plan shall also receive, on account of its claim, its Pro Rata share (determined without taking the Litigation Claimants into account) of the GUC Payment Amount. All distributions to Holders of General Unsecured Claims shall be net of the Signal Liquidating Trust Expenses. The GUC Payment Amount shall be an aggregate amount equal to the lesser of (i) $900,000, or (ii) an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto. For the avoidance of any doubt, Holders of General Unsecured Claims are not entitled to receive Distributions or other payment of funds from the Litigation Settlement Trust on behalf of, related to or with respect to such General Unsecured Claims. | Approximately 15% |
| Class 6: Intercompany Claims | All Intercompany Claims | *Impaired – Deemed to Reject.* Intercompany Claims against the Debtors shall not be entitled to any Distribution under the Plan and such claims shall be cancelled and discharged on the Effective Date. | 0% |

| Class 7: Equity Interests | All issued and outstanding Equity Interests | *Impaired – Deemed to Reject.* Holders of Equity Interests in the Debtors shall neither receive nor retain any property under the Plan. On the Effective Date, all Equity Interests in the Debtors shall be cancelled and of no further force or effect and all Claims filed on account of Equity Interests shall be deemed disallowed by operation of the Plan. | 0% |

## II.   BACKGROUND

On the July 12, 2015 (the "**Petition Date**"), Signal International, Inc. ("**SI Inc.**"), a corporation organized under the laws of the state of Delaware, and its wholly owned subsidiaries, Signal International, LLC ("**SI LLC**"), Signal Ship Repair, LLC ("**SSR**"), Signal International Texas GP, LLC ("**SI GP**") and Signal International Texas, L.P. ("**SI Texas**"), commenced cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). SI Inc. and its affiliates shall be collectively referred to herein as "**Signal**" or the "**Debtors**".

### A.   Business Operations

Signal primarily engages in the business of offshore drilling rig overhaul, repair, upgrade, and conversion, as well as new shipbuilding construction. Additionally, the Debtors provided services to the general marine and heavy fabrication markets for barges, power plants and modular construction.

SI LLC was organized on December 6, 2002 as a limited liability company after acquiring the assets of the Offshore Division of Friede Goldman Halter from bankruptcy. SI Inc. was incorporated on October 12, 2007 and began operations with offshore fabrication and repair in Mississippi. Signal's corporate headquarters are in Mobile, Alabama with operations in Alabama and Mississippi, and a sales office in Texas. As of the Petition Date, the Debtors had approximately 302 full-time employees and 15 contract personnel and have not experienced any strikes or work stoppages.

Signal is known in the industry for its outstanding safety record. For the past eleven years, Signal has earned the Shipbuilder's Council of America Award for Excellence in Safety, which is awarded to shipyard members with the lowest total recordable incidence rates based on a quarterly injury and illness survey conducted by the association. Signal's safety record is due to its effective company-wide safety program, including focused management led efforts to eliminate safety incidents, comprehensive permit to work/job risk assessment, and an incentive program initiated in April 2003.

With a family of three yards strategically located along the Gulf of Mexico in Alabama and Mississippi, Signal offers new construction, rig and ship repair, and offshore and technical services. Marine construction and repair needs are complimented by 3 dry docks, a 30,000-ton heavy lift dock, a 22,000-ton Panamax dry dock, and a 4,500-ton lift dry dock.

In Mobile, Alabama, SSR offers more than 4,400 feet of water frontage along the Mobile River with a channel maintained to 44 feet. This ship repair facility specializes in vessel repairs and conversions and houses two floating dry docks. The Pascagoula, Mississippi facility, which handles rig fabrication and repair, also has significant automation as well as a deep hole 500' x 300' x 60' for thruster work and space for storage of offshore equipment. Additionally, the facility houses a 30,000-ton Dual Carrier/heavy lift dry dock.

Signal's strategic geographical positioning, quality workforce, and stellar safety record make Signal an industry leader in new construction, rig and ship repair, and offshore and technical services.

Because of the anticipated decline in oil prices during 2013, there was a reduction in oil and gas exploration and production conducted in the Gulf region. This reduction in exploration and production had a corresponding negative effect on the demand for Signal's services, causing Signal's revenues to fall sharply from $175,872,243 in 2012 to $74,425,920 in 2013. Although the Debtors were able to reduce expenses, their revenue for 2014 was $152,531,800.

Signal's earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") similarly declined considerably over the last two years. For the twelve months ended December 31, 2014, Signal's EBITDA was $19.2 million, compared to EBITDA of $41.6 million for the same time period in 2012. This reduction in Signal's EBITDA is due primarily to lower revenues. This sharp decline from 2012 in revenue and EBITDA has imposed a significant strain on Signal's liquidity.

## B.    Prepetition Organizational and Capital Structure

SI Inc. was incorporated under the laws of the State of Delaware and its principal place of business is Mobile, Alabama. SI LLC and SSR are wholly-owned subsidiaries of SI Inc. and were each formed under the laws of the State of Delaware. SI GP is a wholly owned subsidiary of SI LLC and was formed under the laws of the State of Delaware. SI LLC owns 99%, with SI GP owning the remaining 1%, of SI Texas, and SI Texas was formed under the laws of the State of Delaware.

## C.    Historical Capital Transactions

SI LLC was organized on December 6, 2002, to acquire the assets of the Offshore Division of Friede Goldman Halter out of bankruptcy. The purchase of those assets was financed by an equity investment of approximately $18,000,000 and an assumption of outstanding debt of approximately $49,000,000.

In 2008, Signal then incurred indebtedness from Wachovia Bank, N.A. (the "**Wachovia Debt**") consisting of a revolving credit and term loan facility in the total principal amount of $80,000,000. In March 2011, to refinance the Wachovia Debt, Signal entered into a certain Credit Agreement (the "**Regions Bank Credit Agreement**") and related security documents dated as of March 1, 2011, with Regions Bank, as administrative agent for certain lender parties thereto, which extended a revolving credit and term loan facility in the total principal amount of $80,000,000 (the "**Regions Bank Debt**") and Regions Bank took a security interest in substantially all of Signal's assets.

Signal subsequently defaulted under the Regions Bank Credit Agreement by, among other things, failing to make a mandatory prepayment due on April 16, 2013. On or about May 17, 2013, Regions Bank and Signal entered into a forbearance agreement, which was subsequently extended for an indefinite period so long as certain termination events were not triggered.

To address liquidity concerns at that time, on August 26, 2013, SI Inc. issued shares of Series A preferred stock (the "**Preferred Stock**"), par value $0.01 per share, on a fully diluted, as-converted basis, pursuant to the terms and conditions set forth in that certain Securities Purchase Agreement to the TRSA Teachers' Retirement System of Alabama (the "**TRSA**") (13,400,000 shares) and the Employees' Retirement System of Alabama (the "**ERSA**") (6,600,000 shares) for a total issuance price of $20,000,000. The TRSA and ERSA also received warrants for the purchase of 10% of the fully diluted common stock of SI Inc. By a certain Subordination Agreement dated August 26, 2013, the lenders under the Regions Bank Credit Agreement consented to SI Inc.'s issuance of the Preferred Stock despite SI Inc. being in default under the Regions Bank Credit Agreement. In exchange, the TRSA and ERSA agreed to expressly subordinate their rights under the Preferred Stock to the Regions Bank Debt.

On January 31, 2014, Signal refinanced the Regions Bank Debt and entered into the First Lien Credit Agreement evidenced by (i) a $50,250,000 Term Loan Note held by the TRSA and (ii) a $24,750,000 Term Loan Note held by the ERSA, both subject to the terms and conditions of the First Lien Loan Agreement. As required by the First Lien Loan Agreement, the proceeds from the First Lien Loan were used to satisfy in full the Regions Bank Debt.

In connection with the First Lien Credit Agreement, the Debtors entered into: (i) that certain Security Agreement dated as of January 31, 2014 (the "**First Lien Security Agreement**"), whereby each of the Debtors granted the TRSA, as the First Lien Agent (the "**First Lien Agent**"), a security interest in substantially all of their respective assets, including cash collateral; (ii) that certain Pledge Agreement dated as of January 31, 2014 (the "**First Lien Pledge Agreement**"), whereby each of the Debtors pledged their equity interests in their respective subsidiaries to the First Lien Agent; (iii) certain other mortgages and deeds of trust granting security interests to the First Lien Agent to all real property held by the Debtors (the "**First Lien Mortgages**"); and (iv) that certain Deposit Account Control Agreement dated February 21, 2014, granting the First Lien Agent a security interest in and control over all the Debtors' bank accounts (the "**Bank Accounts**" and collectively, the "**Prepetition Collateral**").

On October 3, 2014, SI Texas sold substantially all of its assets (the "**Texas Transaction**") to Westport Orange Shipyard, LLC ("**Westport**") in a partially seller-financed transaction for a total purchase price of $35,900,000. As part of the Texas Transaction, Westport provided a down payment of $7,000,000 and delivered a promissory note in the principal amount of $28,900,000 to SI Texas due on or before October 3, 2019 (the "**Westport Note**").[3]

On September 15, 2014, after winning an arbitration award in the amount of $24,000,000, the Debtors used the cash proceeds to redeem in full the Preferred Stock from the TRSA and

---

[3] The Westport Note constitutes part of the Prepetition Collateral.

ERSA for a redemption price of $1.01793 per share, resulting in repurchase payments of $13,640,262 to the TRSA and $6,718,338 to the ERSA.

**D.   Events Leading to the Filing of the Bankruptcy Cases**

The filing of the Bankruptcy Cases was the consensual culmination of seven years of protracted and highly contentious multi-action litigation and negotiations between Signal and the Supporting Litigation Plaintiffs (defined below) that has reached a global resolution through the settlement embodied in the Plan Support Agreement (as described in greater detail below), subject to Bankruptcy Court approval and implementation through the Plan. The Plan Support Agreement was entered into prior to the Petition Date by the Debtors, the Supporting Litigation Plaintiffs, and the TRSA and ERSA, the lender parties under the First Lien Loan Agreement, and also resolves the Debtors' default thereunder as well as the Litigation Plaintiffs' threatened claims against the TRSA and ERSA. As described in greater detail below, following the Petition Date, the Plan Support Agreement was joined by the Committee.

In short, the Plan and Plan Support Agreement avoids the need for contentious and value-destroying bankruptcy litigation and preserves the Assets as a going concern and maximizes the value of the Estates. Thus, despite the Debtors' tumultuous litigation and financial history, they filed the Bankruptcy Cases having reached a global resolution of the most contentious pending claims.

1.   Prepetition Litigation Against Signal

Since 2008, Signal has been involved in over thirteen (13) separate litigations across three different states resulting in approximately $20 million in litigation fees and expenses. These litigations, coupled with the decline in the oil and gas industry, have significantly strained Signal's liquidity. The settlement in the Plan Support Agreement and the chapter 11 process provides Signal with a desperately needed breathing spell to allow it to restructure its debt and maximize value for the benefit of all its creditors.

(a)   H-2B Litigation

After Hurricane Katrina in 2005, Signal hired, through a third party recruiting service, approximately 500 men from India (the "**H-2B Workers**") through the federal government's H-2B guestworker program to provide labor and services to Signal. In 2008, a subset of those H-2B Workers (the "**Litigation Plaintiffs**") filed suits against Signal, among others, for certain alleged violations regarding treatment of the H-2B Workers and quality of working conditions. The Litigation Plaintiffs were denied class-certification and brought twelve (12) independent actions in Louisiana and Texas.

The first of those actions, *David v. Signal International LLC, et al.*, involved 5 of the Litigation Plaintiffs and was tried before a jury in the United States District Court for the Eastern District of Louisiana (the "**Louisiana District Court**") beginning in January 2015. Following several weeks of trial, the jury found against SI Inc. and SI LLC and awarded damages to the *David* plaintiffs. On May 11, 2015, the Louisiana District Court entered judgment (the "**H-2B Judgment**") in favor of the *David* plaintiffs (the "**Judgment Plaintiffs**") and against SI Inc. and SI LLC totaling approximately $12 million plus fees, costs, and expenses for various claims

relating to the recruitment and treatment of the Judgment Plaintiffs. There remain 11 pending lawsuits against Signal in which approximately 227 other Litigation Plaintiffs have alleged claims that are substantially similar to those alleged by the Judgment Plaintiffs. Subject to the terms of the Plan Support Agreement (including Bankruptcy Court approval and implementation through the Plan), Signal has settled with the vast majority of the Litigation Plaintiffs.

### (b)    EEOC Litigation

In late 2007, two H-2B Workers filed charges of discrimination with the Equal Employment Opportunity Commission ("**EEOC**") on behalf of themselves and other, similarly situated former H-2B Workers. The EEOC issued its initial determination on these charges in September 2009, declaring that there is "reasonable cause to believe" that Signal discriminated against the H-2B Workers as a class. Thereafter, in 2011, the EEOC filed an action in the United States District Court for the Southern District of Mississippi and the case was later transferred to the United States District Court for the Eastern District of Louisiana. The EEOC action has been adjourned indefinitely, however, due to a pending appeal in an unrelated case before the United States Court of Appeals for the Fifth Circuit addressing legal issues that may have a direct impact on the EEOC litigation against Signal. The Debtors have continued discussions with the EEOC following the Petition Date, and are hopeful that the EEOC will ultimately support confirmation of the Plan.

### (c)    Insurance Litigation

A prepetition judgment also was entered against SI LLC in favor of Max Specialty Insurance ("**Max Specialty**") on June 17, 2014 (the "**Insurance Judgment**"). As background, Signal owned a large dry dock that was destroyed in August 2009. Signal had primary insurance coverage in the amount of $10 million and also an excess insurance policy issued by Max Specialty. After the dry dock was destroyed, Signal made an insurance claim for $13.6 million for the value of the hull and also another $11.4 million claim for business interruption. The primary insurance provider paid $10 million under its policy and Max Specialty paid $3.6 million for the hull under the excess policy but refused to pay anything on account of Signal's business interruption claim. In March 2010, some of Signal's insurers commenced a declaratory judgment action against Signal and other insurers in the United States District Court for the Southern District of New York. Signal filed a cross-claim against Max Specialty for, among other things, its failure to pay the business interruption claim. Max Specialty thereafter filed a cross-claim against Signal, asserting that Signal had failed to disclose the condition of the dry dock and seeking to void the insurance policy, which would have the effect of clawing back the $3.6 million Max Specialty previously paid to Signal pursuant to the insurance claim on the hull. On June 17, 2014, the district court ruled in favor of Max Specialty and entered judgment in the amount of $4 million against SI LLC. On April 7, 2015, Max Specialty filed petitions to domesticate the foreign judgments in Mississippi, Alabama, and Texas.

Signal appealed the Insurance Judgment to the United States Court of Appeals for the Second Circuit (the "**Second Circuit**"). On September 10, 2015, the Bankruptcy Court entered its *Order Modifying the Automatic Stay to the Extent Necessary to Permit Continued Consideration of Appeal to the Second Circuit* [Docket No. 314] to permit continuation of the Second Circuit's consideration of Signal's appeal despite the filing of the Bankruptcy Cases.

2.     <u>Prepetition Settlement and the Plan Support Agreement</u>

Considering the significant litigation against it and other factors, Signal recognized the need to resolve the various litigation claims and restructure its debt. To that end, Signal began to allocate resources to its restructuring efforts by reducing its litigation costs and exploring options to address its obligations with all relevant constituencies.

Prior to the Petition Date, the Debtors contacted and met with counsel for certain of the Litigation Plaintiffs and had multiple discussions with the TRSA and ERSA in an attempt to pursue global settlement options. To that end, the Debtors also requested all parties stand down for a period of time to allow the Debtors additional time to explore a possible resolution. These extensive and good-faith settlement efforts by all sides, after a substantial and complicated series of discussions and negotiations, ultimately resulted in the Plan Support Agreement that provides the framework for a successful and value-maximizing restructuring. Specifically, the Plan Support Agreement provides for (i) an open market sale of substantially all of the Assets with the TRSA and ERSA serving as stalking horse bidder, (ii) a Distribution to Litigation Claimants of between $20 million and $22 million from proceeds of the Westport Note depending on the performance of the loan, and (iii) a gift payment to be shared Pro Rata by the Holders of Allowed General Unsecured Claims. As set forth in greater detail below, subsequent to the Petition Date, the Committee became a party to the Plan Support Agreement.

As a result of the Plan Support Agreement, the Plan enjoys broad support from the Debtors' major creditor constituencies. In addition to the TRSA, ERSA and the Committee, the vast majority of the approximately [227] Litigation Plaintiffs are party to the Plan Support Agreement (such Litigation Claimants, the "**Supporting Litigation Plaintiffs**") and have agreed to support the Plan. The Supporting Litigation Plaintiffs include all five (5) of the Judgment Plaintiffs.[4]

**E.**     **Summary of Significant Postpetition Events and Orders**

As in any major chapter 11 case, many motions, applications and orders have been filed and entered on the Bankruptcy Court's official docket for the Bankruptcy Cases. The following information relates to certain significant events and orders in the Bankruptcy Cases.

1.     <u>Debtors' Retention of Professionals</u>

The Debtors retained, pursuant to orders of the Bankruptcy Court, the following professionals: (i) Young Conaway Stargatt & Taylor, LLP as bankruptcy counsel; (ii) Hogan Lovells US LLP as general corporate and special litigation and transactional counsel; (iii) GGG Partners, LLC as financial advisors; (iv) SSG Advisors, LLC ("**SSG**") as investment banker; and (vi) Kurtzman Carson Consultants LLC ("**KCC**") as administrative advisor. During the pendency of the Bankruptcy Cases, these professionals will be paid approximately 80%–100% of their fees and 100% of their expenses on a monthly basis, pursuant to the professional fee procedures approved by the Bankruptcy Court.

---

[4] For the avoidance of doubt, among Litigation Plaintiffs, the Plan Support Agreement itself only binds the Supporting Litigation Plaintiffs and is without prejudice to the rights, claims and defenses of other, non-signatory Litigation Plaintiffs.

Pursuant to 28 U.S.C. §156(c), Bankruptcy Rule 2002(f), Local Rule 2002-1(f), and the order of the Bankruptcy Court, the Debtors retained KCC as claims, notice and balloting agent. Pursuant to Bankruptcy Court order, KCC will be paid for its fees and expenses in full, as billed to the Debtors in the ordinary course of business.

2.    Formation of the Committee and the Retention of Its Professionals

The United States Trustee appointed the Committee on or about July 22, 2015, which consists of the following parties:  Max Specialty Insurance Company n/k/a Alterra Excess Company; Hemant Khuttan; Jamestown Metal Marine Sales, Inc.; Marmac, LLC dba McDonough Marine Service; Canal Barge Company, Inc.; Aby Karickathara Raju; and Iju James.

The Committee retained, pursuant to orders of the Bankruptcy Court, Pachulski Stang Ziehl & Jones LLP, as bankruptcy counsel, and GlassRatner Advisory & Capital Group LLC, as financial advisor. During the pendency of the Bankruptcy Cases, these professionals will be paid approximately 80%–100% of their fees and 100% of their expenses on a monthly basis, pursuant to the professional fee procedures approved by the Bankruptcy Court.

3.    Cash Collateral and DIP Financing

On July 13, 2015, the Bankruptcy Court entered an interim order (the "**Interim DIP Order**") that authorized the Debtors, on an interim basis, to: (i) borrow $2.5 million in post-petition financing from the TRSA and ERSA, (ii) use cash collateral (iii) grant adequate protection to the TRSA and ERSA, and (iv) modify the automatic stay as related thereto.  On August 11, 2015 and September 1, 2015, the Bankruptcy Court entered amendments to the Interim DIP Order that, among other things, increased the amount of interim post-petition financing to $4.0 million.

An objection to, among other things, the entry of the Final DIP Order (defined below) was filed by Max Specialty (the "**Max Specialty Objection**").  *See* Docket No. 239. Specifically, Max Specialty opposed the entry of the Final DIP Order on the grounds that the TRSA and ERSA were seeking to impair Max Specialty's alleged prepetition liens by, among other things, the priming of those liens, the roll up of their First Lien Loan Agreement Claim, and the waiver of the equitable doctrine of "marshalling".  After extensive negotiations involving the Debtors, TRSA and ERSA, and Max Specialty, the parties agreed to resolve the Max Specialty Objection by, among other things, providing adequate protection to Max Specialty in the form of a $4.0 million escrow to be funded from the proceeds of the DIP Credit Enhancement Facility (defined below) upon the occurrence of an MS Escrow Funding Event (as defined in the Final DIP Order).  In the event that a MS Escrow Funding Event occurs and the MS Escrow is not funded, then no priming lien granted to the TRSA and ERSA under the Final DIP Order shall be effective to prime any alleged lien of Max Specialty that would otherwise be senior to or *pari passu* with such lien granted pursuant to the Final DIP Order until such time as the MS Escrow has been funded.  Nothing in the Plan is intended to modify the terms of the Final DIP Order.

On September 11, 2015, the Bankruptcy Court entered its *Final Order Authorizing Debtors In Possession to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362,*

363, and 364, (ii) *Grant Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; (iii) Use Cash Collateral, (iv) Provide Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364; and (v) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2* [Docket No. 316] (the "**Final DIP Order**"). Pursuant to the Final DIP Order, the Debtors were authorized, on a final basis, to, among other things, obtain post-petition financing from the TRSA and ERSA consisting of (x) a superpriority, secured revolving credit facility in the principal amount of up to $15,000,000.00 to be used for general working capital and liquidity purposes, (y) a superpriority, secured revolving credit facility in the principal amount of up to $5,000,000.00 to be used for credit enhancement obligations under customer contracts as described in the DIP Loan Agreement (the "**DIP Credit Enhancement Facility**"), and (z) a superpriority, secured term loan facility in an aggregate principal amount of $70,088,952.00.

4.   Schedules, Claims Bar Dates and Claim Objections

On August 11, 2015, the Debtors filed their schedules of assets and liabilities ("**Schedules**").

Upon the Debtors' motion filed on July 22, 2015, the Bankruptcy Court entered an order on August 11, 2015 [Docket No. 205] pursuant to which a deadline of **September 22, 2015 at 4:00 p.m. (Eastern Time)** was established for creditors to file proofs of claim for prepetition claims against the Debtors (including, without limitation, claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code), except for prepetition claims by Governmental Units, which are required to be filed by **January 8, 2016 at 4:00 p.m. (Eastern Time)** (such dates are collectively referred to herein as the "**Bar Date**").

The Debtors, the Signal Liquidating Trustee, and/or the Litigation Settlement Trustee, contemplate filing one or more omnibus objections to Claims to ensure that only valid Claims are Allowed and afforded proper treatment under the Plan. Objections to all Non-Litigation Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline.

Nothing herein or in the Plan shall be construed as a waiver of any objections, defenses or setoff to any Claim or as an admission of the validity or allowance of any Claim.

5.   PSA Motion

On July 17, 2015, the Debtors filed a motion (the "**PSA Motion**") [Docket No. 112] seeking to assume the Plan Support Agreement. The Debtors entered into the Plan Support Agreement because of their belief that it provides a well-defined path towards approval of a disclosure statement, solicitation of a chapter 11 plan, the sale of their assets, and confirmation of a chapter 11 plan. Considering the last seven years of highly contentious litigation and recent financial struggles, the Debtors believe that the Plan Support Agreement is a remarkable achievement that resolves nearly all of their major outstanding issues as fairly as possible given the extremely difficult circumstances. On September 1, 2015, the Bankruptcy Court entered an

order [Docket No. 279] approving the PSA Motion and authorizing the Debtors' assumption of the Plan Support Agreement.

      6.     Bidding Procedures Motion

Given the Debtors' declining revenue, liquidity constraints, and mounting litigation expenses and claims, the Debtors and their advisors had determined that an out-of-court restructuring was not achievable. As a result, the Debtors engaged SSG as their investment banker with the primary mandate of marketing the Debtors' business to potential bidders in a section 363 sale process. Based upon this determination that the sale could only be consummated in the context of these bankruptcy proceedings, the Debtors, the TRSA and ERSA negotiated the Asset Purchase Agreement, which provides that TRSA and ERSA would serve as the stalking horse bidder to facilitate a sale pursuant to section 363 of the Bankruptcy Code.

On July 22, 2015, the Debtors filed a motion (the "**Sale Motion**") [Docket No. 120] seeking, among other things, (i) entry of the Bidding Procedures Order (a) approving the Bidding Procedures, (b) approving the Break-up Fee, (c) scheduling an Auction and hearing to consider approval of the Sale Transaction, (d) approving the form and manner of notices in connection with the Bidding Procedures, (e) authorizing and approving assumption and assignment procedures with respect to the Executory Contracts, and (f) granting related relief; and (ii) entry of the Sale Order (a) approving the Asset Purchase Agreement, (b) authorizing the Sale Transaction, (c) authorizing the assumption and assignment of the assigned Executory Contracts, and (d) granting related relief.

On September 1, 2015, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. 280]. Pursuant to the Bidding Procedures Order, the Auction shall take place on October 14, 2015, and the Sale Transaction shall be considered in conjunction with confirmation of the Plan on November 24, 2015.

      7.     Committee Settlement

Subsequent to the Petition Date, the Debtors, the ERSA and TRSA, and the Supporting Litigation Claimants engaged in discussions with the Committee regarding certain informal objections (the "Informal Objections") that the Committee raised regarding approval of the Final DIP Order, the Bidding Procedures Order and Bidding Procedures, and the PSA Motion. To resolve the Informal Objections:

      (a)     The ERSA and TRSA agreed to increase the gift payment to Holders of General Unsecured Claims from $400,000 to an aggregate amount equal to the lesser of $900,000, or an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto;

      (b)     The Sharing Ratio was revised to provide that 22.5% of the Excess Sale Overpayment shall be paid to holders of General Unsecured Claims, not subject to dilution by the Litigation Claimants, and 77.5% of the Excess Sale Overpayment shall be paid to Litigation Claimants, not subject to dilution by the holders of General Unsecured Claims, provided, that at such time as the holders of General Unsecured Claims (other than the Litigations Claims) have

received payment in full of the allowed amount of their claims, 100% of any remaining Excess Sale Overpayment shall be paid to the Litigation Claimants;

(c)    The ERSA and TRSA agreed that the Final DIP Order would not provide for a lien on Avoidance Actions;

(d)    The ERSA and TRSA consented to certain revisions to the Bidding Procedures Order and Bidding Procedures, including a reduced Break-Up Fee of $1.0 million and no expense reimbursement;

(e)    The Committee agreed to waive its right to file any adversary proceeding or contested matter against the ERSA or TRSA subject to the Final DIP Order; and

(f)    The Committee agreed to become a party to the Plan Support Agreement.

8.    Executory Contracts

As of the Petition Date, the Debtors were parties to numerous Executory Contracts. Pursuant to the Sale Transaction, the Debtors intend to assume and assign the majority of the Executory Contracts to the Purchaser. Except as provided by the Plan, any remaining Executory Contracts not assigned to the Purchaser and not assumed by the Debtors shall be rejected pursuant to the Plan as of the Confirmation Date.

## III.    THE PLAN

### A.    General Overview of the Plan

The Plan represents a good faith compromise of certain claims and controversies pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

The principal features of the Plan are the sale of substantially all of the Debtors' assets and Distributions to Holders of Claims in accordance with the priorities set forth in the Bankruptcy Code and the establishment of two trusts pursuant to section 105 of the Bankruptcy Code: (i) a Litigation Settlement Trust for payment of Litigation Claims and (ii) a Signal Liquidating Trust for the benefit of all Holders of General Unsecured Claims. Each of the Litigation Settlement Trust and the Signal Liquidating Trust will be established to administer and resolve specific Claims and each will be subject to its own trust agreement and its own rules with respect to the administration and satisfaction of Claims.

The Litigation Settlement Trust will provide a streamlined system for the resolution of any Litigation Claim. All Litigation Claims will be channeled to the Litigation Settlement Trust for resolution in accordance with the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP. Litigation Claims will receive Distributions from the Litigation Settlement Trust Assets. The Plan also provides for the Southern Poverty Law Center to select the Litigation Settlement Trustee and for the Litigation Claimants that serve on the Committee to select the members of the Litigation Settlement TAC, all subject to approval by the Bankruptcy Court.

*Section 105(a) of the Bankruptcy Code and other sections of the Bankruptcy Code authorize the Bankruptcy Court to enter the type of "channeling injunction" contemplated by the Plan, pursuant to which all Litigation Claims will be channeled to the Litigation Settlement Trust. Following the issuance of the Channeling Injunction, (i) Litigation Claimants will be permanently enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any Litigation Claim other than from the Litigation Settlement Trust, and (ii) the Debtors and other Released Parties shall have no obligations or liabilities for or in respect of any Litigation Claims.*

Non-Litigation Claims against the Debtors shall be administered and treated in accordance with the terms of the Plan, by and through the Signal Liquidating Trust. The Signal Liquidating Trust will have the responsibility for making Distributions to the Holders of Allowed Non-Litigation Claims against the Debtors.

## B.    Classification and Treatment of Claims and Equity Interests

### 1.    Classification Generally

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests that are required to be designated in classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class only to the extent that any portion of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is placed in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. Notwithstanding any Distribution provided for in the Plan, no Distribution on account of any Claim or Equity Interest is required or permitted unless and until such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be, which might not occur, if at all, until after the Effective Date.

### 2.    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and are excluded from the Classes of Claims set forth in Article III of the Plan. Article II of the Plan governs the treatment and payment of all such unclassified Claims.

### 3.    Classified Claims

The Plan divides the Claims against and Equity Interests in the Debtors into seven (7) separate Classes and identifies which Classes are entitled to vote on the Plan. All of the potential Classes for the Debtors are set forth therein.

The following table designates the Classes of Claims against and Equity Interests in the Debtors, and specifies which Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (iii) deemed to accept or reject the Plan.

| Summary of Classification and Treatment of Classified Claims and Equity Interests | | | |
|---|---|---|---|
| Class | Claim | Status | Voting Rights |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | First Lien Loan Agreement Claims | Unimpaired | Deemed to Accept |
| 4 | Litigation Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

*Class 1 – Other Priority Claims*

(a)     Classification:  Class 1 consists of Other Priority Claims.

(b)     Treatment:  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser.

(c)     Voting:  Class 1 is Unimpaired and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan.

*Class 2 – Other Secured Claims*

(a)     Classification:  Class 2 consists of Other Secured Claims.

(b)     Treatment:  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, receive delivery of collateral securing any such Claim and payment of any interest requested under section 506(b) of the Bankruptcy Code, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser.

(c)     Voting:  Class 2 is Unimpaired and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan.

*Class 3 – First Lien Loan Agreement Claims*

(a)     Classification:  Class 3 consists of First Lien Loan Agreement Claims.

(b)    Treatment:  All First Lien Loan Agreement Claims have been satisfied in full and repaid through the borrowings under the DIP Facility.

(c)    Voting:  Class 3 is unimpaired and Holders of First Lien Loan Agreement Claims are deemed to accept the Plan.

### Class 4 – Litigation Claims

(a)    Classification:  Class 4 consists of Litigation Claims.

(b)    Treatment:   Each Litigation Claimant shall receive its share of the Litigation Settlement Trust Assets, which share shall be determined in accordance with the terms, provisions, and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  Litigation Claims shall be resolved by the Litigation Settlement Trust in accordance with the terms of the Litigation Settlement TDP.  On the Effective Date, the Litigation Claims shall be deemed Allowed in the total aggregate amount of no less than $200 million. On the Effective Date, all Litigation Claims shall be released as against the Debtors pursuant to the terms and conditions of the Plan and the Litigation Settlement Trust Agreement. Pursuant to the Channeling Injunction, each Litigation Claimant shall have its Claim permanently channeled to the Litigation Settlement Trust, and such Litigation Claim may thereafter be asserted exclusively against the Litigation Settlement Trust and resolved in accordance with the terms, provisions and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  For the avoidance of doubt, Litigation Claimants are not entitled to receive Distributions or other payment of funds from the Signal Liquidating Trust on behalf of, related to or with respect to such Litigation Claims. *Litigation Claimants are, subject to the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, enjoined from filing any future litigation, claims or causes of action arising out of such Litigation Claims against the Debtors and/or any of the Plan Participants, and may not proceed in any manner against the Debtors and/or any of the Plan Participants, in any forum whatsoever, including, without limitation, any state or federal court or administrative or arbitral forum, and are required to pursue their Litigation Claims solely against the Litigation Settlement Trust as provided in the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.*

(c)    Voting:  Class 4 is Impaired and Litigation Claimants are entitled to vote to accept or reject the Plan.

### Class 5 – General Unsecured Claims

(a)    Classification:  Class 5 consists of General Unsecured Claims.

(b)    Treatment:   On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, on account of its claim, its Pro Rata share of that portion of the Excess Sale Overpayment allocated to the Holders of General Unsecured Claims, and, each Holder of an Allowed General Unsecured Claim that votes to accept the Plan and does not opt out of the releases set forth in Section 11.H of the Plan shall also receive, on account of its claim, its Pro Rata share (determined without taking the Litigation Claimants into account) of the GUC

Payment Amount. All distributions to Holders of General Unsecured Claims shall be net of the Signal Liquidating Trust Expenses. The GUC Payment Amount shall be an aggregate amount equal to the lesser of (i) $900,000, or (ii) an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto. For the avoidance of any doubt, Holders of General Unsecured Claims are not entitled to receive Distributions or other payment of funds from the Litigation Settlement Trust on behalf of, related to or with respect to such General Unsecured Claims.

(c)    Voting: Class 5 is Impaired and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

*Class 6 – Intercompany Claims*

(a)    Classification: Class 6 consists of Intercompany Claims.

(b)    Treatment:    Holders of Allowed Intercompany Claims shall not receive any Distributions on account of such Claims.

(c)    Voting: Class 6 is Impaired and Holders of Intercompany Claims are deemed to reject the Plan.

*Class 7 – Equity Interests in the Debtors*

(a)    Classification: Class 7 consists of all Equity Interests in the Debtors.

(b)    Treatment: Holders of Equity Interests in the Debtors shall neither receive nor retain any property under the Plan. On the Effective Date, all Equity Interests in the Debtors shall be cancelled and of no further force or effect and all Claims filed on account of Equity Interests shall be deemed disallowed by operation of the Plan.

(c)    Voting: Class 7 is Impaired and Holders of Equity Interests in the Debtors are deemed to reject the Plan.

4.    General Provisions in Respect of Distributions Under the Plan Applicable to all Claims

Unless otherwise set forth in the Litigation Settlement TDP, the following general provisions shall apply to Distributions on account of Allowed Claims: (i) any Distribution to be made pursuant to the Plan shall be deemed to have been timely made if made within ten (10) business days of the time specified in the Plan or, if applicable, the Litigation Settlement Trust Agreement and the Litigation Settlement TDP; (ii) unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made under the Plan shall be made by check drawn on a domestic bank, or by wire transfer from a domestic bank; (iii) the Signal Liquidating Trustee or the Litigation Settlement Trustee, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Entity entitled to such assets to the extent required by applicable law; (iv) to the extent that any Allowed Claim entitled to a

Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest; (v) unless otherwise specifically provided for in any order approving the DIP Facility, the Plan or Confirmation Order, or required by applicable bankruptcy law (including interest allowed pursuant to section 506 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim; and (vi) except as permitted by applicable bankruptcy law (including interest allowed pursuant to sections 506 and 1129 of the Bankruptcy Code) interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Effective Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

Except as set forth in the Litigation Settlement Trust Agreement or the Litigation Settlement TDP, any Cash, assets, and other property to be distributed under the Plan that cannot be delivered to the Entity entitled thereto within 90 days after an attempted Distribution (including by an Entity's failure to negotiate a check issued to such Entity 90 days after issuance of a check) shall become vested in, and shall be transferred to, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, notwithstanding state or other escheat or similar laws to the contrary. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or Distributions under the Plan pursuant to section 1143 of the Bankruptcy Code, shall have no further Claim in respect of such Distribution and shall not participate in any further Distributions under the Plan with respect to such Claim. Distributions to Holders of Allowed Claims shall be made to the address of the Holder of such Claim as indicated on the records of the Debtors, or if a Proof of Claim has been filed, to the address on the Proof of Claim, unless the Signal Liquidating Trustee or the Litigation Settlement Trustee, as the case may be, is instructed otherwise by a signed writing from the Holder of such Allowed Claim. Notwithstanding anything to the contrary contained in the Plan, no Cash payments of $50 or less will be made.

5.    Plan Provisions for Treatment of Contingent Claims

Holders of Contingent Claims shall be paid only after such Claims have become fixed and/or liquidated. No interest shall be paid on account of a Contingent Claim except as provided in section 506(b) of the Bankruptcy Code. Except as otherwise provided for Litigation Claims under the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, (i) any Contingent Claim that has not become fixed or liquidated on or before two years after the Effective Date shall be deemed waived, disallowed and expunged unless the Holder of such Claim has, on or before two years following the Effective Date, filed a request with the Bankruptcy Court requesting estimation of such Claim for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code and (ii) after the later of two years following the Effective Date and the entry of Final Orders on any timely filed requests for estimation no cash reserves will be held for Contingent Claims and any funds previously held for such purposes may be distributed to the Holders of Allowed Claims.

6.    Objection to Claims and Prosecution of Disputed Non-Litigation Claims

The Debtors and/or the Signal Liquidating Trustee shall object to the allowance of Non-Litigation Claims with respect to which the Signal Liquidating Trustee disputes liability in whole or in part. The failure of the Debtors and/or the Signal Liquidating Trustee to object to or to re-examine any Claim shall not be deemed to be a waiver of the right to object to or to re-examine such Claim in whole or in part to determine its allowability. The Debtors and/or the Signal Liquidating Trustee shall not be required to object to any Claim where the Debtors and/or the Signal Liquidating Trustee have determined in their good-faith, reasonable discretion that objection to such Claim would not be in the best interest of the Debtors' Estates or the Signal Liquidating Trust, as the case may be. The Signal Liquidating Trustee shall have the right to compromise and settle any Non-Litigation Claim against the Debtors after the Effective Date without notice to Creditors or order of the Bankruptcy Court.

7.    Distributions and Reserves on Account of Contingent and Disputed Non-Litigation Claims

Payments and Distributions to each Holder of a Contingent Non-Litigation Claim, a Disputed Non-Litigation Claim or any other Non-Litigation Claim that is not an Allowed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the Plan, including the provisions governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that any Disputed Non-Litigation Claim is Allowed or any Contingent Non-Litigation Claim becomes fixed or liquidated, in whole or in part, the Signal Liquidating Trust shall distribute to the Holder of such Claim any Cash that would have been distributed to such Holder if the Claim had been an Allowed Claim on the Effective Date. No Distributions shall be made with respect to all or any portion of a Disputed Non-Litigation Claim or Contingent Non-Litigation Claim unless and until all objections to such Claim have been settled, withdrawn, or resolved by Final Order. Nothing in Section 7.C of the Plan shall affect the allowance, liquidation or payment of the Litigation Claims.

For purposes of calculating and making Distributions to Holders of Allowed Non-Litigation Claims, the Debtors shall hold in the applicable Cash Reserve at the time of such Distribution an amount sufficient to make Distributions on Non-Litigation Claims that are not Allowed Non-Litigation Claims in such Class in the same Pro Rata percentage as is being made on Allowed Non-Litigation Claims in such Class. For purposes of determining the amount to be reserved, the Debtors shall use the maximum amount set forth in the Proof of Claim, unless a lesser amount is so ordered by the Bankruptcy Court or agreed to by the Debtors, or the Signal Liquidating Trustee, and the Holder of such Non-Litigation Claim. Notwithstanding the foregoing or anything else in the Plan, unless otherwise so ordered by the Bankruptcy Court, no reserve shall be required to be established or maintained with respect to Proofs of Claims or requests for Administrative Claims filed after the applicable Bar Date.

8.    Cash Reserves

On or before the Effective Date, the Debtors or the Signal Liquidating Trust shall establish the Disputed Claims Reserve, the Signal Liquidating Trust Expense Fund, and the GUC Payment Fund.

On or before the Effective Date, the Professional Fee Reserve shall be established. Counsel for the Debtors shall hold the amounts allocated for the Debtors' professionals in trust for the Debtors' professionals. Counsel for the Committee shall hold the amounts allocated for the Committee's professionals in trust for the Committee's professionals.

9.    Estimation of Non-Litigation Claims

The Signal Liquidating Trustee may, at any time, request that the Bankruptcy Court, on proper notice, estimate any Contingent and/or Disputed Non-Litigation Claim pursuant to section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Contingent and/or Disputed Non-Litigation Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Contingent and/or Disputed Non-Litigation Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Signal Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution to such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Contingent and/or Disputed Non-Litigation Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Nothing in Section 7.D of the Plan shall affect the allowance, liquidation or payment of Litigation Claims.

10.    Objections to Litigation Settlement Trust Claims

Notwithstanding anything to the contrary herein, Litigation Claims shall be channeled to the Litigation Settlement Trust and administered in accordance with the Litigation Settlement Injury Trust Agreement and the Litigation Settlement TDP.

11.    Special Provisions Regarding Unimpaired Claims

Except as otherwise expressly provided in the Plan, nothing in the Plan shall affect the Debtors' or Signal Liquidating Trustee's rights in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

C.    **Litigation Settlement Trust**

1.    Establishment and Administration of the Litigation Settlement Trust

On the Effective Date, the Litigation Settlement Trust shall be established in accordance with the Plan Documents. The Litigation Settlement Trust shall be a "Qualified Settlement

Fund" within the meaning of section 468B of the Internal Revenue Code and the regulations promulgated thereunder. The Litigation Settlement Trust shall assume the liability for all Litigation Claims; shall administer, process, settle, resolve and liquidate such Litigation Claims; and shall use the Litigation Settlement Trust Assets and the proceeds and income therefrom, after payment of necessary expenses of the Litigation Settlement Trust, including expenses of the Litigation Settlement Trustee and its retained professionals, to satisfy and make payment to all such Litigation Claims that may qualify for a recovery only in accordance with the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, all in accordance with the Plan, the Litigation Settlement Trust Agreement and the Litigation Settlement TDP. The Litigation Settlement Trust will administer, process, settle, resolve, liquidate, satisfy and/or pay, as applicable, Litigation Claims in such a way that the Holders of Litigation Claims are treated equitably and in a substantially similar manner, subject to the terms of the Plan, the Litigation Settlement Agreement and the Litigation Settlement TDP. Litigation Claims shall be channeled to the Litigation Settlement Trust pursuant to the Channeling Injunction set forth in Section 6.C of the Plan and may thereafter be asserted only and exclusively against the Litigation Settlement Trust. All such Litigation Settlement Trust Claims shall be liquidated and paid in accordance with the Litigation Settlement Trust Agreement, the Litigation Settlement TDP, the Plan and the Confirmation Order. The Litigation Settlement Trust shall be administered and implemented by the Litigation Settlement Trustee as provided in the Litigation Settlement Trust Agreement.

2.    Litigation Settlement TDP

On the Effective Date, the Litigation Settlement Trust shall implement the Litigation Settlement TDP in accordance with the terms of the Litigation Settlement Trust Agreement. On or after the Effective Date, the Litigation Settlement Trustee, upon notice to the Litigation Settlement TAC, shall have the power to administer, amend, supplement or modify the Litigation Settlement TDP in accordance with the terms thereof; provided however, that such modification is not inconsistent with the Plan or other Plan Documents; provided, further, to the extent that any modifications to the Litigation Settlement Trust Agreement or the Litigation Settlement TDP constitute a material modification that would affect the rights of the Plan Participants, such Plan Participants shall be provided ten (10) days' advance notice of such amendment and an opportunity to contest the proposed amendment before the Bankruptcy Court. In the event that any of the Plan Participants contests a proposed amendment within the notice period contemplated in this paragraph, such modification shall not become effective until such time as the Bankruptcy Court has authorized the amendment or the objecting Plan Participant has consented to the proposed amendment.

3.    Imposition of Channeling Injunction

From and after the Effective Date, (i) all Litigation Claims will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order and (ii) the Plan Participants and Related Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with any Litigation Claims, provided, however that nothing in the Plan shall preclude any action by the Litigation Settlement Trust to enforce the Plan.

Courts within the Third Circuit have recognized that a channeling injunction under

-23-

section 105(a) of the Bankruptcy Code is permissible if it is: (i) fair, (ii) necessary to the reorganization, (iii) given in exchange for fair consideration, and (iv) supported by specific findings. *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214–15 (3d Cir. 2000). With respect to the Litigation Claims, the Debtors believe that the Channeling Injunction is appropriate based on the facts and circumstances of the Bankruptcy Cases.

To supplement the injunctive effect of the Plan Injunction, and pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, for Litigation Settlement Trust Claims, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

Terms. *To preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction and the releases described in Article XI of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Entities that have held or asserted, or that hold or assert any Litigation Claim shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Litigation Claim other than from the Litigation Settlement Trust in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, including, but not limited to:*

*(i) commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding of any kind with respect to any such Litigation Claim, against any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

*(ii) enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

*(iii) creating, perfecting or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any of the Plan Participants or their Related Parties, or the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

*(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim; and*

*(v)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to such Litigation Claim.*

Reservations.  Notwithstanding anything to the contrary in Article XI of the Plan, the Channeling Injunction shall not enjoin:

(i)      the rights of Entities to the treatment afforded them under the Plan, including the right of Entities holding Litigation Claims to assert such Claims in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP solely against the Litigation Settlement Trust whether or not there are funds to pay such Litigation Claims;

(ii)      the rights of Entities to assert any Claim, debt, litigation, or liability for payment of Litigation Settlement Trust Expenses solely against the Litigation Settlement Trust whether or not there are funds to pay such Litigation Settlement Trust Expenses;

(iii)      the Litigation Settlement Trust from enforcing its rights under the Litigation Settlement Trust Agreement, the Litigation Settlement TDP and the Restructuring Documents; and

(iv)      the rights of any Plan Participant to demand the Litigation Settlement Trust to fulfill its obligations to enforce the terms of the Channeling Injunction consistent with Section 6.C of the Plan.

Modifications.      There can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

Nothing in the Plan or in the Litigation Settlement Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Litigation Settlement Trust's assumption of all liability with respect to Litigation Claims.

4.      Release of Liabilities to Litigation Claimants

The transfer to, vesting in, and assumption by the Litigation Settlement Trust of the Litigation Settlement Trust Assets as contemplated by the Plan shall, as of the Effective Date, release all obligations and liabilities of and bar recovery or any action against the Plan Participants, and their Related Parties, for or in respect of all Litigation Claims (and the Confirmation Order shall so provide for such release).  The Litigation Settlement Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Litigation Claims, and such Claims shall be liquidated, resolved or paid by the Litigation Settlement Trust from the Litigation Settlement Trust Assets or as otherwise directed in the Litigation Settlement Trust Documents.

5.     <u>Assumption of Certain Liabilities</u>

In consideration of the Litigation Settlement Trust Assets transferred to the Litigation Settlement Trust under the Plan and in furtherance of the purposes of the Litigation Settlement Trust and the Plan, the Litigation Settlement Trust shall assume all liability and responsibility for all Litigation Claims, including the administration thereof as described in the Plan and the Debtors and the Signal Liquidating Trust shall have no further financial or other responsibility or liability therefor. For the avoidance of doubt, the Litigation Claims shall be resolved in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.

6.     <u>Appointment of the Litigation Settlement Trustee</u>

The Litigation Settlement Trustee shall be selected by the Southern Poverty Law Center. The Debtors shall File a notice, as part of the Plan Supplement, naming the Person designated as Litigation Settlement Trustee. On the Confirmation Date, the Bankruptcy Court shall appoint the initial Litigation Settlement Trustee to serve in accordance with, and shall have the functions and rights provided in, the Litigation Settlement Trust Agreement. Any successor Litigation Settlement Trustee shall be appointed in accordance with the terms of the Litigation Settlement Trust Agreement. For purposes of any Litigation Settlement Trustee performing his or her duties and fulfilling his or her obligations under the Litigation Settlement Trust and the Plan, the Litigation Settlement Trust and the Litigation Settlement Trustee shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The Litigation Settlement Trustee shall be the "administrator" of the Litigation Settlement Trust as that term is used in Treas. Reg. Section 1.468B 2(k)(3).

The Litigation Settlement Trustee may be terminated at any time in accordance with the provisions of the Litigation Settlement Trust Agreement.

The Litigation Settlement Trustee and its professionals and the members of the Litigation Settlement TAC, in their capacity as such, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Litigation Settlement Trust Agreement.

All Litigation Settlement Trust Expenses following the Effective Date shall be borne solely by the Litigation Settlement Trust.

7.     <u>Litigation Settlement Trust Assets</u>

    *(a)*     *Westport Loan Proceeds*

        (1)     Westport Participation Agreement

On the Effective Date, the Purchaser will receive, free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and ERSA) other than the participating interest of the Litigation Settlement Trust described below, all right, title and interest of the Debtors in and to certain purchase money indebtedness currently owing to the Debtors under the Westport Loan. The Westport Loan and the Westport Documents will be transferred to the Purchaser subject to the terms of the Westport Participation Agreement, in form and content reasonably acceptable to the Westport Participants. Upon the Effective Date,

the TRSA and ERSA, and the collateral agent under the First Lien Loan Agreement will execute any documents necessary to effectuate a release and discharge of their respective liens, encumbrances and security interests on the Westport Loan facility.

The Westport Participation Agreement shall provide that each Westport Participant share on a Pro Rata basis in all proceeds derived from the Westport Loan (including scheduled payments of principal and interest, prepayments, proceeds of enforcement or proceeds of liquidation of collateral) as follows:

- The Litigation Settlement Trust shall receive a 66.9% participating interest, and the Purchaser shall receive a 33.1% participating interest, in and to the Westport Loan and the Westport Documents. The participating interests described above are referred to herein as each Westport Participant's "**Sharing Ratio**".

- If the Westport Loan is prepaid in full, in accordance with its terms, prior to its scheduled maturity date, and the application of the Litigation Settlement Trust's Sharing Ratio to such prepayment results in an aggregate recovery of less than $20 million by the Litigation Settlement Trust, then the Litigation Settlement Trust shall be entitled to receive additional proceeds from such prepayment in an amount sufficient to increase its aggregate recovery from the Westport Loan to $20 million.

- The maximum aggregate amount payable to the Litigation Settlement Trust by virtue of its Sharing Ratio shall for all purposes be capped at $22 million. Upon receipt of said amount by the Litigation Settlement Trust, all further payments or other recoveries with respect to the Westport Loan will be payable solely to the Purchaser.

For the avoidance of doubt, the Litigation Settlement Trust shall not receive any guarantee or other credit support as to the Westport Loan from the Purchaser, the Debtors, or any party to the Plan Support Agreement.

(2) Westport Loan Administration Expenses

Pursuant to the Westport Participation Agreement, if the TRSA and ERSA or an affiliate or designee thereof is the Purchaser, the TRSA and ERSA will be responsible for the collection and Distribution of the proceeds of the Westport Loan and, if necessary, the enforcement thereof, for the ratable benefit of the Westport Participants. All out-of-pocket costs and expenses reasonably and actually incurred by the TRSA and ERSA in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any Distribution to the Westport Participants in accordance with their respective Sharing Ratios.

Pursuant to the Westport Participation Agreement, if none of the TRSA and ERSA or an affiliate or designee thereof is the Purchaser, the Litigation Settlement Trust will be responsible for the collection and Distribution of the proceeds of the Westport Loan and, if necessary, the enforcement thereof, for the ratable benefit of the Westport Participants. All Litigation

Settlement Trust Expenses incurred in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any Distribution to the Westport Participants in accordance with their respective Sharing Ratios.

(3)     Westport Loan Payments

Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Effective Date, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Effective Date of the Plan, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

(4)     Enforcement of Westport Loan

The transfer of the Debtors' right, title and interest in and to the Westport Loan and the Westport Documents to the Purchaser shall be free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and ERSA) pursuant to section 363(f) of the Bankruptcy Code, other than the participating interest of the Litigation Settlement Trust. The Westport Documents shall remain legal, valid, binding and authorized obligations of the parties obligated thereunder, enforceable in accordance with their terms.  Each of the Purchaser and the Litigation Settlement Trust shall constitute a holder in due course and a "person entitled to enforce instrument" under section 3-301 of the Uniform Commercial Code with respect to the notes, instruments and other Westport Documents.

*(b)     Excess Sale Overpayment*

Any Sale Overpayment made on the Effective Date and not subject to a valid and perfected lien shall be paid as follows:

- *First*, to the Litigation Settlement Trust to reduce, on a dollar-for-dollar basis, its participating interest in the Westport Loan (not to exceed a total of $20 million).  In such event, the Sharing Ratio of the Litigation Settlement Trust shall be recalculated to account for all sums received from such Sale Overpayment.  If the Sale Overpayment is in an amount adequate to result in the immediate payment of the sum of $20 million to the Litigation Settlement Trust, then the Westport Loan will be transferred to the Purchaser free and clear of all liens, claims and encumbrances, and shall not be subject to a continuing participation interest by any party.

- *Second*, any Sale Overpayment greater than $20 million paid to the Litigation Settlement Trust as set forth above (such amount the "Excess Sale Overpayment") will be shared as follows:   22.5% of the Excess Sale Overpayment shall be paid to holders of General Unsecured Claims, not subject to dilution by the Litigation Claimants, and 77.5% of the Excess Sale

Overpayment shall be paid to Litigation Claimants, not subject to dilution by the holders of General Unsecured Claims, provided, that at such time as the holders of General Unsecured Claims (other than the Litigation Claims) have received payment in full of the allowed amount of their claims, 100% of any remaining Excess Sale Overpayment shall be paid to the Litigation Claimants.

8.    Litigation Settlement TAC

The Litigation Settlement TAC shall have the functions and rights provided in the Litigation Settlement Trust Agreement. Prior to the Confirmation Hearing, the Supporting Litigation Claimants shall select the initial members of the Litigation Settlement TAC. On the Confirmation Date, the Bankruptcy Court shall appoint the initial members of the Litigation Settlement TAC, as selected by the Supporting Litigation Claimants.

9.    Cooperation; Transfer of Books and Records

On or before the Effective Date, or as soon thereafter as is practical, the Debtors or the Purchaser, as applicable, will transfer and assign, or cause to be transferred and assigned, to the Litigation Settlement Trustee, copies of all of the books and records of the Debtors that pertain to the Litigation Claims. Following the Effective Date, the Purchaser (to the extent practicable) shall further cooperate to the extent reasonably requested (as determined by the Purchaser in its sole discretion) by the Litigation Settlement Trustee in the handling of Litigation Claims and generally in the operation of the Litigation Settlement Trust for purposes set forth in the Plan and for the duration of the Litigation Settlement Trust, and shall use commercially reasonable efforts (as determined by the Purchaser in its discretion) to request former officers, directors, employees, agents or representatives of the Debtors, employed by the Purchaser, cooperate to the extent that the Litigation Settlement Trustee reasonably requests the Purchaser to make such request to any of the foregoing and deems such persons necessary to appear at any trial or arbitration proceeding relating to the handling of Litigation Claims. To the extent that the Signal Liquidating Trustee or the Purchaser, as appropriate, require any information from the Litigation Settlement Trustee for preparation of any tax return or financial statement, the Litigation Settlement Trustee shall cooperate in a commercially reasonable manner, to the extent reasonably requested to provide such information to the Signal Liquidating Trustee or the Purchaser, as appropriate. The Purchaser (and any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser, to the extent that such person is requested to perform act or otherwise perform hereunder) and/or the Signal Liquidating Trust shall be entitled to the advancement and/or reimbursement of any reasonable costs, expenses or fees, including professional fees, and expenses, incurred or to be incurred in compliance with any request of the Litigation Settlement Trust pursuant to the foregoing.

10.    Transfer of Privileged Information

The transfer or assignment of Privileged Information to the Litigation Settlement Trustee does not result in the destruction or waiver of any applicable privileges pertaining to such Privileged Information. Further, with regard to any such privileges, (i) they are transferred or contributed for the sole purpose of enabling the Litigation Settlement Trustee to perform its duties to administer the Litigation Settlement Trust and for no other reason, (ii) they are vested

-29-

solely in the Litigation Settlement Trustee, and not in the Litigation Settlement Trust, the Litigation Settlement TAC or any other entity, committee or subcomponent of the Litigation Settlement Trust, or any person (including counsel) who has been engaged by, represents or has represented any Litigation Claimant, or any person who alleges or may allege a claim directly or indirectly relating to or arising from the Debtors' premises or operations (iii) they shall be preserved and not waived, (iv) for the avoidance of doubt any such transfer or contribution shall have no effect on any right, claim or privilege of any person other than the Debtors, and (v) no information subject to a privilege or a prior assertion thereof shall be publicly disclosed by the Litigation Settlement Trustee or the Litigation Settlement Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of any such information.

> 11.   Institution and Maintenance of Legal and Other Proceedings

As of the Effective Date, the Litigation Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Litigation Settlement Trust. The Litigation Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions relating to the Litigation Settlement Trust in the name of the Debtors if deemed necessary or appropriate by the Litigation Settlement Trustee. The Litigation Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred by the Litigation Settlement Trust subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to the Plan. For the avoidance of doubt, the Litigation Settlement Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of all Litigation Claims.

## D.   Signal Liquidating Trust

The Signal Liquidating Trust Agreement is incorporated into and made a part of the Plan. In the event of any conflict between the terms of the Plan and the terms of the Signal Liquidating Trust Agreement, the terms of the Plan shall control.

> 1.   Establishment and Purpose of the Signal Liquidating Trust

On or before the Effective Date, the Debtors and the Signal Liquidating Trustee shall execute the Signal Liquidating Trust Agreement and shall have established the Signal Liquidating Trust pursuant to the Plan. The Signal Liquidating Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treas. Reg. § 301.7701 4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Signal Liquidating Trust.

> 2.   Authority and Role of the Signal Liquidating Trustee

The authority and role of the Signal Liquidating Trustee shall be in accordance with the provisions of the Signal Liquidating Trust Agreement and the Plan. In furtherance of and

consistent with the purpose of the Signal Liquidating Trust Agreement and the Plan, solely for the purpose of carrying out the Plan and discharging the duties in the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest in these Bankruptcy Cases, and pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and the representative of, the Estates for the retention, enforcement, settlement or adjustment of all claims and rights, known and unknown, and all interests belonging to the Debtors or the Estates, which arose prior to the Confirmation Date, except in connection with any proceeding involving, relating to or arising out of, in whole or in part, the Litigation Claims.

3.     Appointment of the Signal Liquidating Trustee

The Signal Liquidating Trustee is set forth in the Signal Liquidating Trust Agreement. The appointment of the Signal Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date. In accordance with the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Signal Liquidating Trust is dissolved in accordance with the Signal Liquidating Trust Agreement and/or (ii) the date such Signal Liquidating Trustee resigns, is terminated or is otherwise unable to serve.

The Signal Liquidating Trustee and its professionals, in their capacity as such, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Signal Liquidating Trust Agreement, provided, however, that no such parties shall be indemnified for willful misconduct, actual fraud or gross negligence.

4.     Signal Liquidating Trust Assets

On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred the Signal Liquidating Trust Assets to the Signal Liquidating Trust. In accordance with section 1141 of the Bankruptcy Code, the Signal Liquidating Trust Assets shall automatically vest in the Signal Liquidating Trust free and clear of all Claims, liens, encumbrances, or interests subject only to the Signal Liquidating Trust interests and the Signal Liquidation Trust Expenses, as provided for in the Plan and the Signal Liquidating Trust Agreement.

5.     Treatment of Signal Liquidating Trust for Federal Income Tax Purposes

In accordance with Treas. Reg. § 301.7701-4(d), the Signal Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Post-Effective Date Assets, if any, make timely Distributions to the Signal Liquidating Trust Beneficiaries and not unduly prolong its duration. The Signal Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Signal Liquidating Trust Agreement.

6.      Signal Liquidating Trust as a "Grantor Trust"

The Signal Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Signal Liquidating Trust Beneficiaries treated as grantors and owners of the Signal Liquidating Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Signal Liquidating Trustee, and the Signal Liquidating Trust Beneficiaries) shall treat the transfer of the Signal Liquidating Trust Assets by the Debtors to the Signal Liquidating Trust, as set forth in the Signal Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims of Signal Liquidating Trust Beneficiaries entitled to Distributions from the Signal Liquidating Trust Assets, followed by a transfer by such Holders to the Signal Liquidating Trust. Thus, the Signal Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

7.      Signal Liquidating Trustee's Right and Power to Invest

The right and power of the Signal Liquidating Trustee to invest the Signal Liquidating Trust Assets transferred to the Signal Liquidating Trust, the proceeds thereof, or any income earned by the Signal Liquidating Trust, shall be limited to the right and power to invest such Signal Liquidating Trust Assets (pending Distributions in accordance with the Plan) in Permissible Investments; provided, however, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701 4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise.

8.      Responsibilities of the Signal Liquidating Trustee

The responsibilities of the Signal Liquidating Trustee shall include, but shall not be limited to:

        (i)     the making of Distributions as contemplated in the Plan;

        (ii)    conducting an analysis of all Non-Litigation Claims, and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate;

        (iii)   preparing and filing post-Effective Date operating reports;

        (iv)    filing appropriate tax returns with respect to the Signal Liquidating Trust and paying taxes properly payable by the Signal Liquidating Trust, if any, in the exercise of its fiduciary obligations;

        (v)     retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations;

        (vi)    taking such actions as are necessary and reasonable to carry out the purposes of the Signal Liquidating Trust;

(vii)    protecting and enforcing the rights to the Signal Liquidating Trust Assets vested in the Signal Liquidating Trustee by any method reasonably determined to be appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity; and

(viii)    terminating the Signal Liquidating Trust and seeking to close the Bankruptcy Cases pursuant to Section 350(a) of the Bankruptcy Code.

9.      Expenses of the Signal Liquidating Trustee

Fees and expenses incurred by the Signal Liquidating Trustee shall be paid from the Signal Liquidating Trust Assets.

10.     Bonding of the Signal Liquidating Trustee

The Signal Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his or her sole discretion, in which case the expense incurred by such bonding shall be paid by the Signal Liquidating Trust.

11.     Fiduciary Duties of the Signal Liquidating Trustee

Pursuant to the Plan and the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Non Litigation Claims against the Debtors that will receive Distributions pursuant to the terms of the Plan.

12.     Cooperation; Transfer of Books and Records

On or before the Effective Date, or as soon thereafter as is practical, the Debtors or the Purchaser, as applicable, will transfer and assign, or cause to be transferred and assigned, to the Signal Liquidating Trustee, copies of all of the books and records of the Debtors necessary for the handling of the Non-Litigation Claims. Following the Effective Date, the Purchaser (to the extent practicable) shall cooperate to the extent reasonably requested by the Signal Liquidating Trustee in the handling of Non-Litigation Claims filed against the Debtors, and generally in the operation of the Signal Liquidating Trust for purposes set forth herein and for the duration of the Signal Liquidating Trust, and shall use commercially reasonable efforts (as determined by the Purchaser in its sole discretion) to request any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser cooperate to the extent that the Signal Liquidating Trustee reasonably requests the Purchaser to make such request to any of the foregoing and deems such persons necessary to appear at any trial or arbitration proceeding relating to the liquidation of Non-Litigation Claims against the Debtors. To the extent that the Litigation Settlement Trustee or the Purchaser, as appropriate, require any information from the Signal Liquidating Trustee for preparation of any tax return or financial statement, the Signal Liquidating Trustee shall cooperate in a commercially reasonable manner, to the extent reasonably requested to provide such information to the Litigation Settlement Trustee or the Purchaser, as appropriate. The Purchaser (and any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser to the extent that such person is requested to perform act or otherwise perform hereunder) and the Litigation Settlement Trustee

shall be entitled to the advancement and/or reimbursement of any reasonable costs, expenses or fees, including professional fees, and expenses, incurred or to be incurred in compliance with any request of the Litigation Settlement Trust pursuant to the foregoing.

13.     Transfer of Privileged Information

On the Effective Date or as soon thereafter as is reasonably practicable, the Privileged Information of the Debtors needed for the handling of the Non-Litigation Claims shall be transferred, assigned, given over to, and shall vest exclusively in the Signal Liquidating Trustee. Further, with regard to any such privileges, (i) they are transferred or contributed for the sole purpose of enabling the Signal Liquidating Trustee to perform its duties to administer the Signal Liquidating Trust and for no other reason, (ii) they are vested solely in the Signal Liquidating Trustee, and not in the Signal Liquidating Trust or any other entity, committee or subcomponent of the Signal Liquidating Trust, or any person (including counsel) who has been engaged by, represents or has represented any Litigation Claimant or any person who alleges or may allege a claim directly or indirectly relating to or arising from the Debtors' premises or operations, (iii) they shall be preserved and not waived, (iv) for the avoidance of doubt (if any), any such transfer or contribution shall have no effect on any right, claim or privilege of any person other than the Debtors, and (v) no information subject to a privilege or a prior assertion thereof shall be publicly disclosed by the Signal Liquidating Trustee or the Signal Liquidating Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of any such information.

14.     Dissolution of the Signal Liquidating Trust

The Signal Liquidating Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion Filed with the Bankruptcy Court (the Filing of which shall automatically extend the term of the Signal Liquidating Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Signal Liquidating Trust Assets. The Signal Liquidating Trust Agreement shall require that each extension be approved by the Bankruptcy Court within six (6) months prior to the conclusion of the extended term. After (i) the final Distribution to Holders of Allowed Claims, (ii) the Filing by or on behalf of the Signal Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (iii) any other action deemed appropriate by the Signal Liquidating Trustee, the Signal Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

15.     Full and Final Satisfaction against Signal Liquidating Trust

On and after the Effective Date, the Signal Liquidating Trust shall have no liability on account of any Claims except as set forth in the Plan and in the Signal Liquidating Trust Agreement. All payments and all Distributions made by the Signal Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims against the Signal Liquidating Trust.

E.    **Injunctions, Releases and Discharge**

1.    Term of Certain Injunctions and Automatic Stay

Unless otherwise provided for in Plan or other order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Cases pursuant to sections 105, 362 and 524 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

2.    Debtors' Releases

The Plan, at Section 11.F, provides that the Debtors on behalf of the Debtors' Estates will release the Released Parties from all claims that could be brought by or on behalf of the Debtors' Estates.  Absent the contributions made by the PSA Creditor Parties, the Debtors would be unable to confirm a plan that provides for Distributions to all Holders of Litigation Claims and General Unsecured Claims.  The release provision of Section 11.F of the Plan provides:

**PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE SETTLEMENT REACHED WITH THE PLAN PARTICIPANTS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BANKRUPTCY CASES, THE SALE TRANSACTION, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR**

**ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION THAT CONSTITUTES THE FAILURE TO PERFORM THE DUTY TO ACT IN GOOD FAITH AND WHERE SUCH FAILURE TO PERFORM CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR ACTUAL FRAUD. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY RELEASED PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.**

3.     Consensual Releases by Non-Debtor Released Parties

The Plan, at Section 11.G, provides that all Non-Debtor Released Parties and their Related Parties are deemed to release the Released Parties and their Related Parties from certain claims that could be brought by such Non-Debtor Related Parties or their Related Parties. The release provision of Section 11.G of the Plan provides:

**AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE SETTLEMENT REACHED WITH THE PLAN PARTICIPANTS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, THE RELEASED PARTIES AND THEIR RELATED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE NON-DEBTOR RELEASED PARTIES AND THEIR RELATED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE NON-DEBTOR RELEASED PARTIES OR THEIR RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE**

**BANKRUPTCY CASES, THE SALE TRANSACTION, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY OR ITS RELATED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY RELEASED PARTY OR ITS RELATED PARTIES UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.**

4.    Releases by Holders of Claims

The Plan, at Section 11.H, provides that all holders of Claims against the Debtors are deemed to release the Released Parties from certain claims that could be brought by such holders of Claims against the Released Parties. As noted above, absent the contributions made by the PSA Creditor Parties, the Debtors would be unable to confirm a plan that provides for Distributions to all Holders of Litigation Claims and General Unsecured Claims. The release provision of Section 11.H of the Plan provides:

**AS OF THE EFFECTIVE DATE, AND AS PERMITTED BY APPLICABLE LAW, EACH HOLDER OF A CLAIM SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE RESTRUCTURING, THE BANKRUPTCY CASES, THE SUBJECT**

MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION THAT CONSTITUTES THE FAILURE TO PERFORM THE DUTY TO ACT IN GOOD FAITH AND WHERE SUCH FAILURE TO PERFORM CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR ACTUAL FRAUD. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.

THE RELEASES IN SECTION 11.H OF THE PLAN SHALL APPLY ONLY TO: (1) ANY HOLDER OF A CLAIM IN CLASS 4 (OTHER THAN A RELEASED PARTY); AND (2) ANY HOLDER OF A CLAIM IN CLASS 5 WHO (x) TIMELY AND PROPERLY SUBMITS A BALLOT VOTING IN FAVOR OF THE PLAN AND (y) DOES NOT OPT OUT OF THE RELEASES PROVIDED FOR IN SECTION 11.H OF THE PLAN.

5.     Non-Discharge of the Debtors; Plan Injunction

The Plan also provides, at Section 11.D, for a customary plan injunction, as follows:

IN ACCORDANCE WITH SECTION 1141(D)(3) OF THE BANKRUPTCY CODE, THE PLAN DOES NOT DISCHARGE THE DEBTORS. SECTION 1141(C) OF THE BANKRUPTCY CODE NEVERTHELESS PROVIDES, AMONG OTHER THINGS, THAT THE PROPERTY DEALT WITH BY THE PLAN IS FREE AND CLEAR OF ALL CLAIMS AND EQUITY INTERESTS AGAINST THE DEBTORS. AS SUCH, NO ENTITY HOLDING A CLAIM AGAINST THE DEBTORS MAY RECEIVE ANY PAYMENT FROM, OR SEEK RECOURSE AGAINST,

ANY ASSETS THAT ARE TO BE DISTRIBUTED AND/OR TRANSFERRED UNDER THIS PLAN OTHER THAN ASSETS REQUIRED TO BE DISTRIBUTED TO THAT ENTITY UNDER THE PLAN.    AS OF THE EFFECTIVE DATE, ALL PARTIES ARE PRECLUDED FROM ASSERTING AGAINST ANY PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN ANY CLAIMS, RIGHTS, CAUSES OF ACTION, LIABILITIES, OR EQUITY INTERESTS BASED UPON ANY ACT, OMISSION, TRANSACTION, OR OTHER ACTIVITY THAT OCCURRED BEFORE THE EFFECTIVE DATE EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE XI HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE XI HEREOF, INCLUDING, BUT NOT LIMITED TO: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS.

6.    Injunction Against Barred Claims

To facilitate the settlement reached with the Plan Participants, to implement the Plan, and to supplement the Plan Injunction and the Channeling Injunction, Section 11.J of the Plan provides for an injunction that prevents the Released Parties from providing consideration to settle, among other things, the Litigation Claims while remaining exposed to liability on those

same claims through a contribution or non-contractual indemnity claim asserted by a non-settling party. Section 11.J of the Plan provides as follows:

**All Entities, other than Plan Participants, against which any Litigation Claim or Retained H-2B Claim has been or may be asserted, whether before or after the Effective Date, in any judicial proceeding, arbitration proceeding, administrative agency proceeding, or other adjudicatory proceeding in the United States or elsewhere (such Entities, "H-2B Actors") are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting against any Released Party, whether in the Bankruptcy Court, any federal, state court, other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, any request, claim, or cause of action for or otherwise seeking contribution, indemnification or other remedy, however denominated, against any Released Party arising out of or relating, directly or indirectly, to any Litigation Claim or Retained H-2B Claim where the injury or damage to such H-2B Actor is based upon: (i) such H-2B Actor's alleged liability to any Litigation Claimant or holder of a Retained H-2B Claim or to another H-2B Actor against whom any Litigation Claimant holder of a Retained H-2B Claim has asserted a Litigation Claim or Retained Claim; (ii) the amounts paid, whether by settlement or otherwise, to any Litigation Claimant or holder of a Retained H-2B Claim or another against which any Litigation Claimant or holder of a Retained H-2B Claim has asserted a Litigation Claim or Retained H-2B Claim; or (iii) the costs (including attorneys' fees) incurred defending against such claims (collectively, the "Barred Claims").**

**For the avoidance of doubt, nothing in this Section 11.J of the Plan precludes any Plan Participant from commencing, prosecuting, or asserting any Retained Claims.**

**If a court or tribunal of competent jurisdiction determines that a Barred Claim exists that, if otherwise valid and enforceable, would have given rise to liability of a Released Party to the H-2B Actor holding such Barred Claim but for this Section 11.J of the Plan, the H-2B Actor holding such Barred Claim shall be entitled to the judgment reduction provisions set forth herein. This Section 11.J of the Plan is without prejudice to the position of any Entity as to the existence, validity and enforceability, in the absence of this Section 11.J of the Plan or otherwise, of any Barred Claim.**

**To the extent that a holder of a Barred Claim believes that it is entitled to judgment reduction in any lawsuit (a "Released Party Action") commenced by a Released Party or a Litigation Claimant, such holder of a Barred Claim shall provide notice of this Section 11.J of the Plan to the court or tribunal hearing the Released Party Action. Such court or tribunal shall determine whether the Released Party Action gives rise to Barred Claims on which a Released Party would have been liable to the holder of such Barred Claim in the absence of this Section 11.J of the Plan. If the court or tribunal so**

determines, then, solely to the extent that the holder of a Barred Claim is entitled under applicable non-bankruptcy law to a valid defense for judgment reduction, it shall reduce any judgment against the holder of such Barred Claim in an amount required by the non-bankruptcy law applicable to the Released Party Action. Nothing herein shall prejudice or operate to preclude the right of any H-2B Actor in such Released Party Action to (i) provide notice of this Section 11.J of the Plan to the court or tribunal hearing the Released Party Action at any point, or (ii) raise any issues, claims or defenses regarding judgment reduction or proportionate share of fault in the court or tribunal hearing the Released Party Action at any point in accordance with this Section 11.J of the Plan. Additionally, nothing herein shall prejudice or operate to preclude the right of any Litigation Claimant or holder of a Retained H-2B Claim to oppose any such request for a judgment reduction on any basis, including, but not limited to, that no such right exists and with reference to section 502(e) of the Bankruptcy Code. Nothing in this Section 11.J of the Plan shall impair any Retained H-2B Claim or create any defense to or right to setoff or reduction of any Retained H-2B Claim that would not exist pursuant to applicable non-bankruptcy law but for this Section 11.J of the Plan.

**F.    Executory Contracts**

    1.    Rejection of Executory Contracts

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts shall be deemed to be rejected as of the Confirmation Date, subject to the occurrence of the Effective Date, except for any Executory Contract: (i) that shall be assumed and assigned to the Purchaser pursuant to the Sale Order; (ii) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; or (iii) as to which a motion for approval of the assumption and/or assignment of such Executory Contract has been filed and served prior to the Confirmation Date.

    2.    Approval by Confirmation Order

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any Executory Contract.

    3.    Rejection Damages Bar Date

Claims arising out of the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtors no later than 30 days after service of the notice of Effective Date. All such Claims not Filed within such time will be forever barred from assertion against the Debtors and the Signal Liquidating Trustee.

## G.    Conditions

### 1.    Conditions Precedent to Confirmation

The Plan contains several conditions precedent to confirmation, which must either be satisfied, or waived in accordance with the terms of the Plan.  Section 10.A of the Plan includes the following conditions to confirmation of the Plan:

(i)    The Confirmation Order, the Plan, and the Restructuring Documents shall be in form and substance consistent in all material respects with the Plan Support Agreement and Plan Term Sheet, and otherwise acceptable to the Debtors, the TRSA and ERSA, the Committee, and the Supporting Litigation Claimants;

(ii)    The Sale Order shall be in a form reasonably acceptable to the Purchaser, the Debtors, the TRSA and ERSA, the Committee, and the Supporting Litigation Claimants;

(iii)    There shall be no payment default continuing under the Westport Loan (determined without giving effect to any alleged waiver by the Debtors or any other party);

(iv)    Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Confirmation Date have been held in trust for the benefit of the Westport Participants;

(v)    Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Confirmation Date have been held in trust for the benefit of the Westport Participants; and

(vi)    The Confirmation Order shall have been entered by the Bankruptcy Court.

### 2.    Conditions Precedent to the Effective Date

The Plan also contains several conditions to the effectiveness of the Plan that, notwithstanding confirmation of the Plan, could prevent consummation of the Plan if not satisfied or waived in accordance with the terms of the Plan.  The "substantial consummation," as defined in section 1101 of the Bankruptcy Code, shall not occur, and the Plan shall be of no force and effect, until the Effective Date.  The occurrence of the Effective Date is subject to satisfaction of each of the following conditions precedent, each of which, except for condition (vii), may be waived by all the Settling Parties in their sole and absolute discretion:

(i)    The Confirmation Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

(ii)    The Sale Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

(iii)    The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors and the Purchaser, authorizing and approving the assumption, assumption and assignment, and rejection of the Executory Contracts by the Debtors as contemplated in the Asset Purchase Agreement, the Plan and the Plan Supplement;

(iv)    The Plan and the Restructuring Documents shall not have been amended or modified other than in a manner in form and substance consistent in all material respects with the Plan Term Sheet or otherwise acceptable to the Debtors, TRSA and ERSA, and the Supporting Litigation Claimants;

(v)    The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case be in full force and effect.  All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Asset Purchase Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied or waived concurrently with the occurrence of the Effective Date);

(vi)    The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, any Cash component of the Purchase Price in accordance with the terms and conditions of the Purchase Agreement;

(vii)    The Debtors or the Liquidating Settlement Trust shall have funded, or will fund concurrently with the occurrence of the Effective Date, the Disputed Claims Reserve and the Signal Liquidating Trust Expense Fund, and the GUC Payment Amount shall have been received by the Signal Liquidating Trust;

(viii)    The Signal Liquidating Trust shall have been formed, and all formation documents for such entity shall have been properly executed and filed as required by the Plan and applicable law;

(ix)    The appointment of the Signal Liquidating Trustee shall have been confirmed by Final Order (which may include the Confirmation Order);

(x)    The Litigation Settlement Trust shall have been formed, and all formation documents for such entity shall have been properly executed and filed as required by the Plan and applicable law;

(xi)    The appointment of the Litigation Settlement Trustee shall have been confirmed by Final Order (which may include the Confirmation Order);

(xii)    The Litigation Settlement Trust Assets shall have been transferred to the Litigation Settlement Trust;

(xiii)    The Purchaser has received, free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and

ERSA) other than the participating interest of the Litigation Settlement Trust, all right, title and interest of the Debtors in and to the Westport Loan;

(xiv)    All consents, actions, documents, certificates and agreements necessary to implement the Plan, including all transfers to the Signal Liquidating Trust and the Litigation Settlement Trust,  and the transactions contemplated by the Asset Purchase Agreement as to the Purchaser shall have closed;

(xv)    All authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the Consummation of the Plan shall have been obtained and not revoked;

(xvi)    There shall be no payment default continuing under the Westport Loan (determined without giving effect to any alleged waiver by the Debtors or any other party);

(xvii)    Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Effective Date have been held in trust for the benefit of the Westport Participants or Cash in an amount equal to the aggregate of such payments is available to be distributed to the Westport Participants under the Plan;

(xviii)    Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Effective Date have been held in trust for the benefit of the Westport Participants or Cash in an amount equal to the aggregate of such payments is available to be distributed to the Westport Participants under the Plan; and

(xix)    The Confirmation Date shall have occurred.

3.    Effect of Failure of Conditions

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (iii) constitute an Allowance of any Claim or Equity Interest; or (iv) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## H.    Retention of Jurisdiction

1.    General Jurisdiction

The Bankruptcy Court shall retain the fullest and most extensive jurisdiction permissible and necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtors, and to adjudicate and enforce all of the Signal Causes

of Action. Nothing contained in the Plan shall prevent the Debtors, the Signal Liquidating Trust, or the Litigation Settlement Trust, as applicable, from taking such action as may be necessary in the enforcement of any Signal Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive confirmation of the Plan and shall not be affected hereto except as specifically provided in the Plan.

Following the entry of the Confirmation Order, the administration of the Bankruptcy Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date. Moreover, the Litigation Settlement Trust shall be subject to the continuing jurisdiction of the Bankruptcy Court in accordance with the requirements of section 468(B) of the Internal Revenue Code and the Treasury regulations issued pursuant thereto. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed temporarily for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claim, other than Litigation Claims.

2.    Specific Jurisdiction

Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under or related to the Bankruptcy Cases for, among other things, the following purposes:

(i)    To modify the Plan after the Confirmation Date, pursuant to the provisions of the Bankruptcy Code, the Bankruptcy Rules and the terms and conditions of the Plan;

(ii)    To correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided in the Plan so that the intended effect of the Plan may be substantially realized thereby;

(iii)    To hear, determine and resolve controversies related to the Signal Liquidating Trust;

(iv)    To assure the performance by all the Debtors, the Litigation Settlement Trust, and/or the Signal Liquidating Trust, as applicable, of their respective obligations to make Distributions under the Plan;

(v)    To enforce and interpret the terms and conditions of the Plan Documents and any documents issued or executed with respect to the Plan;

(vi)    To enter such orders or judgments, including, but not limited to, the Injunctions (i) as are necessary to enforce the title, rights, and powers of the Debtors, the Signal Liquidating Trust, and/or the Litigation Settlement Trust, and (ii) as are necessary to enable Holders of Claims to pursue their rights against any Entity that may be liable therefore pursuant to applicable law or otherwise, including but not limited to, Bankruptcy Court orders;

(vii)   To hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or based upon the period of administration of the Bankruptcy Cases;

(viii)   To hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(ix)   To hear and determine any causes of action by, against or involving the Debtors arising during the period from the Petition Date through the Effective Date;

(x)   To hear and determine any causes of action by, against or involving the Signal Liquidating Trust arising during the period from the Effective Date to the date of the order entering a final decree in the Bankruptcy Cases;

(xi)   To hear and determine any cause of action regarding the enforcement of Plan Documents or the transactions contemplated thereby;

(xii)   To hear and determine such other matters as may be provided in the Confirmation Order;

(xiii)   To consider and act on the compromise and settlement of any Claim (other than a Litigation Claim) against or Equity Interest in the Debtors or their Estates including, without limitation, any disputes with respect to the Bar Date;

(xiv)   To hear and determine all questions and disputes regarding title to the assets of the Debtors and their Estates, the Signal Liquidating Trust or the Litigation Settlement Trust;

(xv)   To hear and determine all matters, questions, and disputes with respect to the direct causes of action brought by the Debtors and their Estates, the Signal Liquidating Trust or the Litigation Settlement Trust;

(xvi)   To hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Bankruptcy Cases;

(xvii)   To interpret, enforce, and administer the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP (including all annexes and exhibits to any of the foregoing), only to the extent the documents do not provide for an alternate forum for resolution;

(xviii)   To hear and determine any proceeding that involves the validity, application, construction, interpretation, enforceability or enforcement of the Channeling Injunction or the application of section 105(a) of the Bankruptcy Code to the Channeling Injunction.

(xix)    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which a Debtor may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xx)    To hear and determine any proceeding seeking to amend or restate the Litigation Settlement Trust Agreement in accordance with the Plan Documents;

(xxi)    To enjoin any actions in violation of, or otherwise enforce, the Injunctions and releases provided in the Plan;

(xxii)    To hear and determine all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, after the Effective Date;

(xxiii)    To enter an order or final decree closing the Bankruptcy Cases; and

(xxiv)    To hear and determine all questions, matters, and disputes with respect to the Plan.

3.    <u>Litigation Settlement TDP Controlling</u>

Notwithstanding anything in Article XII to the contrary, the allowance of Litigation Claims and the forum in which such allowance will be determined will be governed by and in accordance with the procedures established by the Litigation Settlement Trust Agreement, the Litigation Settlement TDP and the Plan.

**I.    Miscellaneous Plan Provisions**

1.    <u>Exculpation</u>

The Plan provides that the **EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE BANKRUPTCY CASES, OR RELATED TO FORMULATING, NEGOTIATING, SOLICITING, PREPARING, DISSEMINATING, CONFIRMING, OR IMPLEMENTING THE PLAN OR CONSUMMATING THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPORT AGREEMENT, THE ASSET PURCHASE AGREEMENT OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING EXCEPT FOR ARISING OUT OF ACTUAL FRAUD OR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER, OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.    WITHOUT LIMITING THE FOREGOING**

**"EXCULPATION" PROVIDED UNDER THIS ARTICLE, THE RIGHTS OF ANY HOLDER OF A CLAIM OR EQUITY INTEREST TO ENFORCE RIGHTS ARISING UNDER THE PLAN SHALL BE PRESERVED, INCLUDING THE RIGHT TO COMPEL PAYMENT OF DISTRIBUTIONS IN ACCORDANCE WITH THE PLAN.**

 2. <u>Severability</u>

  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court or other court of competent jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

 3. <u>Successors and Assigns</u>

  The Plan shall be binding on, and shall inure to the benefit of the Debtors, and their respective successors and assigns.  The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

 4. <u>Further Assurances</u>

  The Debtors, the Signal Liquidating Trustee, and the Litigation Settlement Trustee are authorized to execute, deliver, file or record such contracts, agreements, instruments, releases and other documents and take or cause to be taken such action as may be necessary or appropriate to effectuate, implement and further evidence the terms, provisions and intent of the Plan and to consummate the transactions and transfers contemplated by the Plan.

 5. <u>Post-Effective Date Service List</u>

  Following the Effective Date, unless otherwise provided in the Plan, all pleadings and notices Filed in the Bankruptcy Cases shall be required to be served only upon (i) the Signal Liquidating Trustee, (ii) the Litigation Settlement TAC, (iii) the Litigation Settlement Trustee, (iv) the United States Trustee, (v) the TRSA and ERSA, (vi) any party whose rights are affected by the applicable pleading or notice,  (vii) counsel to the Supporting Litigation Claimants, and (viii) any party that Files a renewed notice of appearance and request for service of notices and papers on or after the Effective Date.

 6. <u>Conflicts</u>

  To the extent any provision of the Disclosure Statement or any instrument, document or agreement executed in connection with the Plan or the Confirmation Order (or any exhibits,

schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan shall govern and control.

7.    Maintenance of Books and Records

Following the Effective Date, the Signal Liquidating Trustee shall maintain records and books relating to the GUC Payment Fund, the Signal Liquidating Trust Expense Fund, the Disputed Claims Reserve, and any Post-Effective Date Assets.  The Signal Liquidating Trustee shall prepare, as soon as practicable after the end of each calendar year and each calendar quarter, a financial statement.  The Signal Liquidating Trustee shall file or cause to be filed all required tax returns for the Estates and pay any and all taxes, if any when due from the Signal Liquidating Trust Assets.

8.    Determination of Tax Liability

The Signal Liquidating Trustee is authorized, but not required, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

9.    Entire Agreement

The Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations with respect to the subjects addressed in the Plan, all of which have become merged and integrated into the Plan.

10.    Change of Control Provisions

Any acceleration, vesting or similar change of control rights under any employment, benefit or other arrangements triggered by the Consummation of the Plan shall be waived or otherwise cancelled under the Plan.

11.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.    Preservation of Insurance

Nothing in the Plan shall diminish or impair the enforceability of any policies of insurance that may cover claims or causes of action against any Debtor or any other Entity.

13.    Asset Purchase Agreement

Nothing in the Plan shall be deemed to modify the provisions of the Asset Purchase Agreement or the Sale Order.

14.    Powers of Purchaser

From and after the Effective Date and continuing through the date of entry of a final decree closing these Bankruptcy Cases, the Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to these Bankruptcy Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and an opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court.

## IV.    IMPLEMENTATION OF THE PLAN

The Plan provides for certain actions to be taken, in addition to those set forth and described above, including the creation of the Litigation Settlement Trust and the Signal Liquidating Trust, in the nature of assisting in or otherwise providing for implementation of the Plan and its various terms and provisions, some of which are set forth in more detail below.

**A.    Implementation of the Plan**

The Plan will be implemented by the Signal Liquidating Trust and the Signal Liquidating Trustee, and the Litigation Settlement Trust and the Litigation Settlement Trustee, as applicable.

As of the Effective Date, and without the need for any further order of the Bankruptcy Court, action, formality or payment of any fees which might otherwise be required under applicable non-bankruptcy laws, each of the Debtors shall be deemed dissolved without the need for any filings with the Secretary of State or other governmental official in each Debtor's respective state of incorporation; provided, however, that notwithstanding the dissolution of such Debtors, the Signal Liquidating Trustee shall be authorized and empowered to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of and consummate the Plan. Such dissolution of the Debtors shall be deemed to have occurred on a "bottom up" basis, with lower tier Debtor Entities being deemed to have dissolved before higher tier Debtor Entities.

On the Effective Date, each existing member of the boards of directors of the Debtors shall be deemed to have been removed.

**B.    Consummation of the Asset Purchase Agreement**

On the Effective Date, the Debtors shall consummate the transactions contemplated by the Asset Purchase Agreement pursuant to the terms thereof in exchange for the Purchase Price. Upon entry of the Sale Order and the Confirmation Order by the Bankruptcy Court, all matters provided for under the Asset Purchase Agreement will be deemed authorized and approved without any requirement of further act or action by Holders of Equity Interests or the Debtors' boards of directors.    The Debtors and the Signal Liquidating Trustee (as applicable) are authorized to execute and deliver, and to consummate the transactions contemplated by the Asset Purchase Agreement as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, without further

01:17450000.15

notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

### 1. Transfer of Acquired Assets

On the Effective Date, in consideration and in exchange for the Purchase Price, and subject to the terms of and condition of the Plan and Bankruptcy Court's order authorizing such transaction, the Debtors will tender to the Purchaser duly executed bills of sale and assignment or other appropriate instruments and documents transferring title to and interest in the Acquired Assets free and clear of all Liens, Claims and interests (other than the Purchaser Assumed Liabilities and the Litigation Settlement Trust's participation interest in the Westport Note) pursuant to the terms and conditions of the Asset Purchase Agreement. For the avoidance of doubt, nothing in Section 4.B.1 of the Plan prejudices Max Specialty's ability to object to any such transaction, or modifies the rights provided to Max Specialty under the Final DIP Order. Moreover, nothing in the Plan modifies the obligation under the Plan Support Agreement to commence an avoidance action against Max Specialty to avoid any avoidable liens against the Assets.

### 2. Payment of Purchase Price and Discharge of Purchaser Assumed Liabilities

The Purchaser shall (i) promptly perform and discharge all Purchaser Assumed Liabilities in the ordinary course of business in accordance with the terms and conditions of any applicable agreements relating thereto and (ii) remit the Purchase Price in accordance with the Asset Purchase Agreement.

### 3. Good Faith of the Purchaser

The transactions contemplated by the Asset Purchase Agreement are undertaken by the Debtors and the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including the assumption, assignment and/or transfer of any Executory Contract), unless such authorization and consummation of such Sale Transaction are duly stayed pending such appeal. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

### 4. No Successor Liability for the Purchaser

Except as otherwise expressly provided in the Plan, the Confirmation Order, the Sale Order or the Asset Purchase Agreement, the Purchaser: (i) does not, pursuant to the Plan, the Sale Order or otherwise, assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or Assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity; and (iii) shall not have any successor or transferee liability of any kind or character; provided that the Purchaser shall promptly perform and discharge the obligations specified in the Asset Purchase Agreement, including, without limitation, the Purchaser Assumed Liabilities.

## C.    Substantive Consolidation of the Debtors

Entry of the Confirmation Order shall constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Estates for all purposes, including confirming and consummating the Plan, including but not limited to voting, Confirmation and Distribution. Accordingly, (i) the Assets and liabilities of the Debtors will be deemed to be the Assets and liabilities of a single, consolidated entity, (ii) each and every Claim filed or to be filed in the Bankruptcy Cases against any Debtor shall be considered filed against the consolidated Debtors and shall be considered one Claim against and obligation of the consolidated Debtors on and after the Effective Date, (iii) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations, are considered a single claim against the Debtors and (iv) all guaranties by any of the Debtors of the obligations of any Debtor arising prior to the Effective Date shall be deemed eliminated under the Plan so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors.

Such substantive consolidation of the Estates, however, shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts that were entered into during the Bankruptcy Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Litigation Settlement Trust or the Signal Liquidating Trustee on the Effective Date and, (iv) the Debtors', the Litigation Settlement Trust's, or the Signal Liquidating Trustee's ability to subordinate or otherwise challenge Claims on an entity by entity basis, and (v) the extent to which liens, if any, attach to Assets. For the avoidance of doubt, except as otherwise ordered by the Bankruptcy Court, such substantive consolidation shall be without prejudice to any Entity's position as to: (i) the validity, perfected status, enforceability, priority, or avoidability of any lien held or asserted by Max Specialty; (ii) the validity, enforceability, or amount of any judgment or Claim held or asserted by Max Specialty; (iii) any purported requirement under the Bankruptcy Code or applicable law that the DIP Lenders or Pre-Petition Credit Parties (as defined in the Final DIP Order) be subject to the equitable doctrine of marshaling or any similar doctrine in connection any lien held or asserted by Max Specialty; (iv) the determination of the MS Adequate Protection Amount (as defined in the Final DIP Order); and (v) the value or allocation of any Assets or the proceeds thereof allegedly encumbered by an lien held or asserted by Max Specialty. Moreover, the Debtors reserve the right to seek confirmation of the Plan on an entity-by-entity basis.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) amended by 2005 U.S. App. Lexis 18043 (Aug. 23, 2005). The Third Circuit in *Owens Corning* discussed at length substantive consolidation in bankruptcy proceedings, as well as its genesis and the impact it has on debtors' creditors and their rights and recoveries. Ultimately, the Third Circuit provided two baseline standards for approval of non-consensual substantive consolidation, while leaving the trial court with discretion to assess what facts are necessary to meet these standards: (i) prepetition [the debtors] disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.* at 211. Following

*Owens Corning*, courts in this jurisdiction have clarified that substantive consolidation is also "appropriate" where the parties consent to it. *See Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009).

In the event the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates or the Debtors do not pursue substantive consolidation, (i) the Plan shall be treated as a separate plan of liquidation for each Debtor not substantively consolidated and (ii) the Debtors shall not be required to resolicit votes with respect to the Plan and each Ballot submitted properly in accordance with the Disclosure Statement Order will be counted only as votes with respect to the Plan of the specific Debtor against which Holder has a Claim.  If the Debtors elect to pursue substantive consolidation, their memorandum of law in support of Confirmation of the Plan and the record created at the Confirmation Hearing will establish the bases for substantive consolidation.

## D.    Effective Date

On the Effective Date, the Debtors shall File and serve a notice of Confirmation and occurrence of the Effective Date.  Such notice shall contain, among other things, the deadline by which all parties will be required to File and serve any Proofs of Claim for damages arising out of the rejection of an Executory Contract pursuant to the Plan and for any unpaid Administrative Claims.

On the Effective Date, the Debtors' Retained Professionals shall be deemed to have completed their services to the Debtors, but they shall be authorized to file and be compensated for filing final applications for reasonable compensation and reimbursement of expenses through the Effective Date as permitted by the Plan.

## E.    Operations of the Debtors Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

## F.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in another order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Cases pursuant to sections 105, 362 and 524 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

## G.    Setoffs

Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or Distributions to be made pursuant to the Plan in respect of such Claim, any claims, rights, causes of action and liabilities of any nature that the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust may hold against

the Holder of such Claim; provided, however, that neither the failure to effect such a setoff nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as the case may be, of any of such claims, rights, causes of action and liabilities that the Debtors, the Liquidating Trust or the Litigation Settlement Trust has or may have against the Holder of such Claim.

## H.   Corporate Action

The entry of the Confirmation Order shall constitute the approval of the authorization for the Debtors to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and any documents contemplated to be executed therewith, prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order rule or regulation.

## I.   Cancellation of Existing Agreements and Existing Equity Interests

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates, and other documents evidencing any Claims or Equity Interests shall be canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

## J.   Authorization of Plan-Related Documentation

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan and any other agreement or document related to or entered into in connection with the Plan, shall become, and shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

Any responsible officer or director of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## K.   Dissolution of Committee

The Committee shall continue in existence through and including the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court or in the Plan or the Confirmation Order prior to the Effective Date.  On the Effective Date, the Committee shall be deemed dissolved, and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Bankruptcy Cases or the Plan and its implementation, and the retention or employment of the Committee's Retained Professionals shall terminate.

On the Effective Date, the Committee's Retained Professionals shall be deemed to have completed their services to the Committee, but they shall be authorized to file final applications for reasonable compensation and reimbursement of expenses through the Effective Date as permitted by the Plan.

**L.      Exemption from Certain Fees and Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with the Plan, the Asset Purchase Agreement or the Restructuring Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and the Sale Order and Confirmation Order shall direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the Distributions to be made under the Plan, the Asset Purchase Agreement, or the Restructuring Documents and (ii) the maintenance or creation of security interests or any Lien as contemplated by the Plan, the Asset Purchase Agreement, or the Restructuring Documents.

**M.      Closing the Bankruptcy Cases**

Upon the Effective Date, the Bankruptcy Cases for the Debtors, except for Signal International Inc., shall be deemed closed, and the Signal Liquidating Trustee shall submit separate orders to the Bankruptcy Court under certification of counsel closing each such Bankruptcy Case. After all Causes of Action and Disputed Claims have been resolved, all statutory fees have been paid, all of the Assets have been distributed in accordance with this Plan, or at such earlier time as the Signal Liquidating Trustee deems appropriate, the Signal Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Bankruptcy Case for Signal International Inc., in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

## V.      ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Voting**

The Plan is being distributed, with Ballots, to Holders of Claims in Classes 4 and 5, which are the Classes of Claims that are potentially, or are, impaired under the Plan and will receive a Distribution under the Plan. Accordingly, Holders of Claims in Classes 4 and 5 are entitled to vote **either to accept or to reject** the Plan. Holders of Claims in Classes 1, 2, and 3 are deemed to have **accepted** the Plan because their respective Claims are not impaired, and are therefore not entitled to vote on the Plan. Holders of Intercompany Claims in Class 6 and Equity Interests in Class 7 are deemed to have **rejected** the Plan because they will neither receive nor retain any property under the Plan. Accordingly, the Holders of Claims in Classes 1, 2 3, and 6, and Equity Interests in Class 7, **cannot** vote on the Plan (although they are free to file a written

objection to the Plan with the Bankruptcy Court, in accordance with the procedures set forth below). For a more detailed description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Article III of this Disclosure Statement.

The Debtors have prepared this Disclosure Statement in connection with their solicitation of votes from Holders of Claims in Classes 4 and 5. On October    , 2015, the Bankruptcy Court entered an order (the "**Disclosure Statement Order**"), approving this Disclosure Statement as containing information of a kind and in sufficient detail to enable a hypothetical, reasonable investor, typical of each of the Holders of Claims in Classes 4 and 5 to make an informed judgment whether to accept or reject the Plan. Such approval by the Bankruptcy Court does not constitute a recommendation of the Plan by the Bankruptcy Court.

Section 1129(a) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan if certain conditions have been met and, with certain exceptions, if each class of claims or interests that is impaired under the plan has voted to accept the plan. As stated above, the Classes of Intercompany Claims and of the Equity Interest Holders will be deemed to have rejected the Plan, and therefore the Debtors will seek to confirm the Plan, subject to Bankruptcy Court approval, over those Classes' rejection pursuant to section 1129(b) of the Bankruptcy Code, on the grounds that (i) at least one impaired class of Claims is expected to accept the Plan and (ii) the Plan does not discriminate unfairly and is fair and equitable with respect to Class 6 Intercompany Claims and Class 7 Equity Interests.

Under section 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if such plan has been accepted by claimholders in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class, excluding Holders whose acceptances or rejections were found not to be in good faith. Under the Bankruptcy Code, only parties that actually vote will be counted for purposes of determining acceptance or rejection by any impaired class. Therefore, the Plan could be approved by Holders of Claims in Classes 4 and 5 with the affirmative vote of significantly less than two-thirds in total dollar amount and one-half in total number of the Claims of each Class. However, it should also be noted that even if the Holders of all Claims in Classes impaired under the Plan accept or are deemed to have accepted the Plan, the Plan is subject to certain other requirements under section 1129(a) of the Bankruptcy Code and might not be confirmed by the Bankruptcy Court. The Debtors are confident, however, that the Plan satisfies those requirements of section 1129(a), and can be confirmed by the Bankruptcy Court.

Any Holder of an impaired Claim (i) whose Claim has been scheduled by the Debtors in the Schedules (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), (ii) who has timely filed a proof of Claim, on or prior to the Bar Date, with respect to which the Debtors have not filed an objection, or (iii) whose claim has been determined or estimated for voting purposes by the Bankruptcy Court, is entitled to accept or reject the Plan (unless such Claim has been disallowed by the Bankruptcy Court for purposes of accepting or rejecting the Plan).

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISPUTED CLAIM WILL BE COUNTED FOR ANY PURPOSE IN DETERMINING WHETHER THE REQUIREMENTS OF SECTION 1126(C) OF THE BANKRUPTCY CODE

HAVE BEEN MET, UNLESS A CLAIMANT WHOSE CLAIM IS DISPUTED HAS FILED A MOTION FOR TEMPORARY ALLOWANCE FOR VOTING PURPOSES UNDER BANKRUPTCY RULE 3018(a), AND THE BANKRUPTCY COURT GRANTS SUCH MOTION FOR TEMPORARY ALLOWANCE PRIOR TO THE VOTING DEADLINE.

## B.    Voting Instructions

This Disclosure Statement and other documents described herein are being furnished by the Debtors to certain Holders of Claims against the Debtors pursuant to the Disclosure Statement Order for the purpose of soliciting votes on the Plan. The Debtors are seeking the acceptance of the Plan by Holders of Litigation Claims (Class 4) and Holders of General Unsecured Claims (Class 5).

A Ballot to be used to accept or to reject the Plan has been enclosed with all copies of this Disclosure Statement mailed to Holders of Claims that are impaired by the Plan and entitled to vote. A copy of the Disclosure Statement Order and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "**Notice of the Confirmation Hearing**") are also being transmitted with this Disclosure Statement. The Disclosure Statement Order and the Notice of the Confirmation Hearing set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims, and the assumptions for tabulating ballots. In addition, detailed voting instructions accompany each Ballot for each Class. Each Holder of a Claim within a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

If you hold Claims in more than one Class and are entitled to vote Claims in more than one Class, you must use separate Ballots for each separate Class. Please vote and return your Ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your Ballot(s). PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. To be counted, your vote indicating acceptance or rejection of the Plan must be properly completed in accordance with the instruction on the Ballot.

To be counted, your vote indicating acceptance or rejection of the Plan must actually be received by the Claims and Balloting Agent, Kurtzman Carson Consultants, LLC (the "**Claims and Balloting Agent**"), no later than 4:00 p.m., prevailing Eastern Time, on November 12, 2015 (the "**Voting Deadline**"). Ballots received after that time will not be counted, except to the extent the Debtors so determine or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018.

All Ballots must be sent to the Claims and Balloting Agent at the following address:

-57-

VIA U.S. MAIL OR OVERNIGHT DELIVERY
Signal International Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California 90245

Consistent with the provisions of Bankruptcy Rule 3018, the Bankruptcy Court has fixed a Record Date of October 8, 2015 (the "**Record Date**"). This is the date for the determination of Holders of record of Claims who are entitled to vote on the Plan. All votes to accept or reject the Plan must be cast by using a Ballot. Votes which are cast in any manner other than by using a Ballot will not be counted.

If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by contacting the Voting Agent at Attn: Signal International Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245 or by calling the Voting Agent at (888) 830-4665 or, for international callers, (310) 751-2648.

After carefully reviewing the Plan, including all schedules thereto, and this Disclosure Statement and its exhibits, please indicate your vote on the enclosed Ballot, sign it, and then return it in the envelope provided. In voting to accept or to reject the Plan, please use only a Ballot sent to you with this Disclosure Statement or by the Claims and Balloting Agent.

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Claims and Balloting Agent, so that the Claims and Balloting Agent actually receives such notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court by filing a motion in accordance with Bankruptcy Rule 3018(a).

## C.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing (the "**Confirmation Hearing**") with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. The Confirmation Hearing has been scheduled to commence at 2:00 p.m. (Eastern Time) on November 24, 2015 before the Honorable Judge Mary F. Walrath, United States Bankruptcy Court, District of Delaware, 824 Market Street, 5th Floor, Courtroom #4, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing.

Any party-in-interest may object to Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set **November 12, 2015, at 4:00 p.m. (Eastern Time)**, as the deadline for filing and serving objections to Confirmation of the Plan. Objections to Confirmation must be timely filed with the Clerk of the Bankruptcy Court and served upon counsel for the Debtors at the addresses specified on the first page of this Disclosure Statement, and counsel to the Committee, counsel to the TRSA and ERSA and the Office of the United States Trustee as the following addresses:

*If to the Committee:*

> Pachulski Stang Ziehl & Jones
> 919 North Market Street, 17th Floor
> Wilmington, DE 19801
> Attn:  Bradford J. Sandler, Esq. (bsandler@pszjlaw.com);

*If to the TRSA and ERSA:*

> Burr & Forman LLP
> 420 North 20th Street, Suite 3400
> Birmingham, AL 35203
> Attn:  Derek F. Meek, Esq. (dmeek@burr.com)
>
>     and
>
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> Attn:  Gregory W. Werkheiser, Esq. (gwerkheiser@mnat.com); and

*If to the Office of the United States Trustee*

> Office of the United States Trustee
> J. Caleb Boggs Federal Building
> 844 King Street, Suite 2207
> Lockbox 35
> Wilmington, DE 19801
> Attn:  Tiiara N.A. Patton, Esq. (tiiara.patton@usdoj.gov)

**D.    Other Important Information**

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT IS PROVIDED FOR USE SOLELY BY HOLDERS OF CLAIMS IN CLASSES 4 AND 5 AND THEIR ADVISORS, IN CONNECTION WITH THEIR DETERMINATION TO ACCEPT OR TO REJECT THE PLAN, OR TO OBJECT TO THE PLAN.  THIS DISCLOSURE STATEMENT, UPON WRITTEN REQUEST, WILL ALSO BE PROVIDED TO OTHER HOLDERS OF CLAIMS AND EQUITY INTERESTS (TO THE EXTENT KNOWN BY THE DEBTORS) IN ORDER FOR SUCH PARTIES TO DETERMINE WHETHER TO OBJECT TO THE PLAN.

**HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD THEREFORE CONSULT WITH HIS, HER, OR ITS OWN LEGAL, BUSINESS, FINANCIAL AND/OR TAX ADVISORS AS TO ANY MATTER CONCERNING THE BANKRUPTCY CASES, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

**E.    Non-Consensual Confirmation**

In the event that any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite majorities required by section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to (i) modify the Plan in accordance with Section 3.D thereof and/or (ii) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code notwithstanding such lack of acceptance.

**F.    Deemed Acceptance if No Votes Cast**

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Debtors intend to request that the Court deem that the Plan has been accepted by the Holders of such Claims.

**G.    Elimination of Vacant Classes**

Any Class or sub-Class of Claims or Equity Interests that is not occupied as of the Confirmation Hearing Date by at least one Allowed Claim or Allowed Equity Interest, as applicable, or at least one Claim or Equity Interest, as applicable, temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## VI.    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

**A.    Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 6006(d) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Signal Liquidating Trust Agreement, the Litigation Settlement Trust Agreement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims against or Equity Interests in the Debtors (regardless of whether the Holders of such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Persons and Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts. All Claims and debts shall be fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.      Modification of the Plan**

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Asset Purchase Agreement, the Litigation Settlement Trust Agreement, or the Confirmation Order. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XIII.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.      Revocation or Withdrawal of the Plan**

The Debtors, in consultation with the PSA Creditor Parties and the Committee, reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date and to file subsequent plans. If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then with respect to such Debtor: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption and assignment or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of the Debtors, the Committee or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## VII.    EFFECT OF NO CONFIRMATION

Except as expressly set forth therein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date shall have occurred. Neither the filing of the Plan, any nor statement or provision contained herein, nor the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or the Committee prior to the Effective Date. If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Bankruptcy Cases are and shall be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Bankruptcy Cases shall be bound or deemed prejudiced by any such concession or settlement.

## VIII.  CONFIRMATION AND CONSUMMATION PROCEDURE

### A.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing is scheduled to commence on November 24, 2015 at 2:00 p.m. (Prevailing Eastern Time) before the Honorable Mary F. Walrath, United States Bankruptcy Court, District of Delaware, 824 Market Street, 5th Floor, Courtroom #4, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.    Requirements of section 1129(a) of Bankruptcy Code

The Bankruptcy Court will confirm the Plan only if it finds that all of the applicable requirements enumerated in section 1129(a) of the Bankruptcy Code have been met or, if all of the requirements of section 1129(a) other than the requirements of section 1129(a)(8) have been met (i.e., that all impaired classes have accepted the plan), that all of the applicable requirements enumerated in section 1129(b) of the Bankruptcy Code have been met.

Among other things, sections 1129(a) and (b) require that the Plan be (i) accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

Article III of the Plan provides that Classes 6 and 7 are not receiving any Distribution under the Plan and are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, as to such Classes and any other Class that votes to reject the Plan, the Debtors are seeking confirmation of the Plan in accordance with sections 1129(a) and (b) of the Bankruptcy Code either under the terms provided herein or upon such terms as may exist if the Plan is modified in accordance with section 1127(d) of the Bankruptcy Code.

**THE DEBTORS BELIEVE THAT THE PLAN SATISFIES OR WILL SATISFY, AS OF THE CONFIRMATION DATE, ALL OF THE REQUIREMENTS FOR CONFIRMATION.**

### 1.    Best Interests Test

To confirm the Plan, the Bankruptcy Court must, pursuant to section 1129(a)(7) of the Bankruptcy Code, independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any impaired Class who has not voted to accept the Plan.  This is often called the "best interests" test.  Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan

provides to each member of such impaired Class a recovery on account of the Class member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine the value that a Holder of a Claim or Equity Interest in an impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Assets if any or all of the Bankruptcy Cases were converted to a chapter 7 liquidation case and such Assets were liquidated by a chapter 7 trustee ("**Liquidation Value**"). The Liquidation Value would consist of the net proceeds from the disposition of such Assets, augmented by Cash held by the Debtor and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 case. Any such liquidation would necessarily take place in the future under circumstances that cannot be predicted; the amount of such proceeds is therefore highly speculative and could be significantly impacted as a result of the uncertainty that exists as to whether a chapter 7 trustee could sell the Assets free and clear of any Claims that could be asserted against the Debtors. The amount of proceeds available from the liquidation of Assets is an estimate that assumes conditions that may not be present at the time of the chapter 7 liquidation.

The Debtors believe the best interests test is satisfied here, because the Plan itself provides for the disposition of the Assets and the payment of Claims against the Debtors without the delay and the additional overlay of administrative expense that would occur in a chapter 7 liquidation. Moreover, as more fully set forth in the liquidation analysis attached hereto as Exhibit B, the Debtors believe that they would have insufficient assets to satisfy any Claims, other than those Claims arising under the DIP Facility, absent the settlement embodied in the Plan.

In particular, with respect to the estimated $200 million in Litigation Claims, the Plan provides for the processing, liquidation and payment of such Claims from the Litigation Settlement Trust Assets. The Westport Note may be the only Litigation Settlement Trust Asset, and the Purchaser is not obligated, nor would it likely be willing, to contribute the Westport Note if the Plan is not confirmed. Absent the significant recoveries available to the Holders of Litigation Claims arising from the Plan, there would likely be no possibility of any Distributions to Holders of Litigation Claims. Moreover, even if such Distributions were possible, the road to receiving any such Distributions would be long and winding. For example, the automatic stay provided by section 362 of the Bankruptcy Code would remain in place, and many Holders of Litigation Claims would be forced to seek relief from stay to pursue their Claims. Even if stay relief is available, these Creditors still must prove the merits of their Claims in litigation in a variety of courts across the country. Finally, even if the Claims were ultimately proven, the Debtors would likely not have any funds available from which they could satisfy such Claims. Contrary to the multiple-tiered, and most likely hopeless free-for-all described above, the settlement embodied in the Plan provides Holders of Litigation Claims with a timely and significant Distribution.

For all of the foregoing reasons, and as more fully set forth in the liquidation analysis attached hereto as Exhibit B, the Debtors believe that the Plan satisfies the best interests test.

2.    Feasibility

The Debtors shall cease conducting business upon the closing of the Sale Transaction on the Effective Date, and will not conduct business after the Effective Date. The Plan provides for dissolution of the Debtors, liquidation of the Post-Effective Date Assets, if any, and Distributions to Creditors by the Signal Liquidating Trustee and the Litigation Settlement Trustee, as applicable, in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan, the Liquidation Settlement Trust and the Litigation Settlement Trust Agreement, as applicable. The ability to make the Distributions described in the Plan, the Signal Liquidating Trust, and the Litigation Settlement Trust Agreement does not depend on future earnings or operations of the Debtors. Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

3.    Acceptance by Impaired Classes

By this Disclosure Statement, the Debtors are seeking the affirmative vote of each impaired Class of Claims under the Plan that is proposed to receive a Distribution under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, a class that is not "impaired" under a plan will be conclusively presumed to have accepted such plan; solicitation of acceptances with respect to any such class is not required. Pursuant to section 1126(g) of the Bankruptcy Code, a class of claims or interests that does not receive or retain any property under a plan of liquidation is deemed not to have accepted the plan, although members of that class are permitted to consent, or waive objections, to its confirmation.

Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless a plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder thereof, or (ii) (a) cures any default (other than defaults resulting from the breach of an insolvency or financial condition provision), (b) reinstates the maturity of such claim or interest, (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on any contractual provision or applicable law entitling such holder to demand or receive accelerated payments after the occurrence of a default, and (d) does not otherwise alter the legal, equitable or contractual rights to which the holder of such claim or interest is entitled.

Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims has accepted a plan when such plan has been accepted by claimholders (other than an entity designated under section 1126(e) of the Bankruptcy Code) that hold at least two thirds in dollar amount and more than one half in number of the allowed claims of such class held by claimholders (other than any entity designated under section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the plan. A class of interests has accepted a plan if the plan has been accepted by holders of interests (other than any entity designated under section 1126(e) of the Bankruptcy Code) that hold at least two thirds in amount of the allowed interests of such class held by interest holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the plan. Section 1126(e) of the Bankruptcy Code allows the Bankruptcy Court to designate the votes of any party that did not vote in good faith or whose vote was not solicited or procured in good faith or in accordance

with the Bankruptcy Code. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting the plan.

4.   Confirmation Without Acceptance by All Impaired Classes

Because Class 6 (Intercompany Claims) and Class 7 (Equity Interests) are deemed not to have accepted the Plan, the Debtors are seeking confirmation of the Plan as to such Classes, and as to any other Class that votes to reject the Plan, pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm a plan at the request of a debtor if, as to each impaired class that has not accepted the plan, the plan "does not discriminate unfairly" and is "fair and equitable."

Section 1129(b)(2)(A) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired secured claims, "fair and equitable" includes the requirement that the plan provides (i) that each holder of a claim in such class (a) retains the liens securing its claim to the extent of the allowed amount of such claim and (b) receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of such plan at least equal to the value of such creditor's interest in the debtor's interest in the property securing the creditor's claim, (ii) for the sale, subject to section 363(k) of the Bankruptcy Code, of the property securing the creditor's claim, free and clear of the creditor's liens, with those liens attaching to the proceeds of the sale, and such liens on the proceeds will be treated in accordance with clauses (i) or (iii) thereof, or (iii) for the realization by the creditor of the "indubitable equivalent" of its claim.

Section 1129(b)(2)(B) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired unsecured claims, "fair and equitable" includes the requirement that (i) the plan provide that each holder of a claim in such class receives or retains property of a value as of the effective date equal to the allowed amount of its claim, or (ii) the holders of claims or interests in classes that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such junior claim or interest. Under the Plan Equity Interests are being cancelled. Thus, from the perspective of the Holders of General Unsecured Claims and Litigation Claims, junior classes will not be receiving or retaining on account of such junior interest any property at all under the Plan.

Section 1129(b)(2)(C) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired equity interests, "fair and equitable" includes the requirement that (i) the plan provides that each holder of an impaired interest in such class receives or retains property of a value as of the effective date equal to the greatest of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, and (c) the value of such interest, or (ii) the holders of all interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan on account of such junior interest. Under the Plan, Equity Interests are being cancelled and senior Classes of Claims are not being paid more than the full amount of their Claims.

Based on the foregoing, the Debtors believe that the Plan does not discriminate unfairly against, and is fair and equitable as to, each impaired Class under the Plan.

# IX.   RISK FACTORS

## A.   General

Even if an Impaired Class votes to accept the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" under section 1129(b) of the Bankruptcy Code are met, the Bankruptcy Court may exercise substantial discretion and may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, that the value of Distributions to dissenting Holders of Claims or Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.   Allowed Claims May Exceed Estimates

Approximately 2,050 proofs of claim were filed against the Debtors as of the Bar Date. Objections to certain Claims are likely to be filed by the Debtors, the Signal Liquidating Trustee and/or the Litigation Settlement Trustee as the claims resolution process continues.  However, the aggregate amount of Claims that will ultimately be Allowed is not determinable at this time, and the claims resolution process will not be completed until after the Effective Date.  Individual Distributions to Holders of Allowed General Unsecured Claims and Litigation Claims will depend on the actual amount of General Unsecured Claims and Litigation Claims that are ultimately Allowed.  This amount may differ substantially from the Debtors' estimates.  Any increase in the amount of anticipated Allowed Claims versus the Debtors' estimates could result in decreased recoveries for Holders of Allowed General Unsecured Claims and Litigation Claims.

## C.   Plan May Not Be Accepted or Confirmed

While the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree.

# X.   ALTERNATIVES TO THE PLAN

## A.   Liquidation under Chapter 7

If no chapter 11 plan can be confirmed, then some or all of the Bankruptcy Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor in the converted case and for the proceeds of such liquidation to be distributed in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in smaller, and most likely no, distributions being made to Holders of Allowed Claims, other than DIP Facility Claims, because (i) the settlement and sale process embodied in this Plan would not be implemented; (ii) of additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (iii) of additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation proceedings.  Distributions to Holders of Allowed Claims would likely be

significantly delayed in a chapter 7 liquidation. For additional information, see Section 8.B.1., *supra*.

## B.    Alternative Plan

If the Plan is not confirmed, the Debtors and/or other parties in interest could attempt to formulate a different plan under chapter 11 of the Bankruptcy Code. The Debtors have concluded that the Plan enables Creditors to realize the most value under the circumstances. If the Plan is rejected, it is possible that an alternative chapter 11 plan could be proposed or conversion to chapter 7 could ensue. A discussion with respect to chapter 7 liquidation proceedings appears above. In an alternative plan scenario, it is likely that any such alternative plan would involve extensive further negotiation, formulation and drafting, and, in addition, possible litigation over its confirmability, thereby increasing administrative expenses and likely reducing, and possibly eliminating, distributions to most Classes of Creditors, and causing further delay in the resolution of the Bankruptcy Cases and in the making of distributions to Creditors.

In any event, if the Plan is not confirmed, the statements contained herein or otherwise in the Plan or any of the other Plan Documents may not be deemed to have been admissions by the Debtors that may be introduced into evidence against them in the Bankruptcy Cases, any proceedings arising in or related to the Bankruptcy Cases, or any other proceedings.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors and to certain Holders of Claims. This discussion is based on the Internal Revenue Code, the Treasury regulations thereunder (the "**Regulations**"), judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof. Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below. Furthermore, this discussion is not binding on the IRS or any other tax authority. There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Plan that differs from the tax consequences described below. No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of the Plan.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the Tax Code (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and persons that have a functional currency other than the U.S. dollar). This summary does not address state, local, or non-United States tax consequences of the Plan, nor does this summary address federal

taxes other than income taxes.  Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are Unimpaired under the Plan or that are not entitled to receive or retain any property under the Plan or to persons who are deemed to have rejected the Plan.

References to a Holder of a Claim refer to such Holder in its capacity as a Holder of a Claim, even if such Holder also holds an Equity Interest.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES.  THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE AND IS NOT A TAX OPINION. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS DEPEND UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  THIS SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE FROM THE HOLDER'S TAX ADVISOR BASED UPON THE HOLDER'S PARTICULAR CIRCUMSTANCES.  EACH HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN TO THEM.

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE TAX CODE; (2) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN; AND (III) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON SUCH TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## A.    Federal Income Tax Consequences to the Debtors

### 1.    Sale of Assets

The sale of the Assets pursuant to the Sale Order and Plan will constitute a taxable disposition of the Assets.  The Debtors will recognize gain or loss equal to the difference between the fair market value of those assets and the adjusted tax basis in those assets.  The Debtors expect to have tax losses generated from other activities in the current year that may be used to offset gain from the Sale Transaction.  The Debtors also expect that net operating losses ("**NOLs**") from prior taxable years will be available for carry forward to offset gain from the Sale Transaction, as computed for both regular tax and alternative minimum tax ("**AMT**") purposes.  The Debtors will owe AMT to the extent 20% of alternative minimum taxable income exceeds their regular tax liability.  For AMT purposes, only 90% of taxable income may be offset by AMT NOLs.  AMT NOLs are NOLs computed under AMT rules that generally limit the availability of certain tax deductions that are otherwise available and include certain income that is otherwise excludable for regular tax purposes (COD income, which is excluded from regular taxable income, as described below, is also excluded from AMT taxable income).

Therefore, AMT may be owed even if regular taxable income is fully offset by NOLs. There is an exception from the 90% AMT NOL limitation, pursuant to which AMT NOLs generated in tax years ending in 2001 or 2002 can be used to offset 100% of alternative minimum taxable income in subsequent years. To the extent current year losses and NOLs and other tax deductions are not available to offset Debtors' gain from the Sale Transaction, Debtors will owe tax on such gains. Any such tax will be an Administrative Claim.

2.      Cancellation of Indebtedness and Reduction of Tax Attributes

For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("**COD**"). In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to the Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt. Various statutory or judicial exceptions limit the incurrence of COD income (such as where payment of the cancelled debt would have given rise to a tax deduction). COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge. An exception to the recognition of COD income applies to a debtor in a chapter 11 bankruptcy proceeding. Bankrupt debtors generally do not include COD in taxable income, but must instead reduce certain tax benefits (such as NOLs, capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception. Tax benefits are reduced after the tax is determined for the year of discharge. NOLs will therefore be available to offset gains on asset sales in the year of the discharge regardless of the amount by which NOLs are reduced due to COD income.

**B.     Classification, Reporting, and Taxation of the Litigation Settlement Trust and the Signal Liquidating Trust and Beneficiaries**

The Plan provides for title to certain assets and properties and interests in property of the Debtors to vest in the Signal Liquidating Trust or the Litigation Settlement Trust. It is intended that the Signal Liquidating Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and the Signal Liquidating Trust Agreement and the Plan are intended to satisfy the liquidating trust guidelines in Revenue Procedure 94-45, 1994-2 C.B. 684. For U.S. federal income tax purposes, it is thus intended that Holders of General Unsecured Claims against the Debtors will be treated as the grantors of the Signal Liquidating Trust and therefore the beneficial owners of the Signal Liquidating Trust Assets. The Plan requires the Debtors and the Holders of General Unsecured Claims against the Debtors to report consistently with characterization of the Signal Liquidating Trust as a grantor trust and requires the Signal Liquidating Trustee to file tax returns treating the Signal Liquidating Trust as a "grantor trust" pursuant to Treasury Regulation section 1.671-4(a) and to report to each beneficiary a statement of the beneficiary's share of Signal Liquidating Trust income, gain, loss, deduction, and credit for inclusion in the beneficiary's U.S. federal income tax return. Beneficiaries therefore may owe tax on Signal Liquidating Trust income, without regard to whether cash distributions are made to beneficial owners by the Signal Liquidating Trust.

It is contemplated that the Litigation Settlement Trust will be characterized as a "qualified settlement fund" ("QSF") within the meaning of Treasury Regulation § 1.468B-1(b). A QSF can be established for contested liabilities. A QSF is subject to federal income taxation on the modified gross income of the QSF at the highest rates imposed upon trusts pursuant to § 1(e) of the Internal Revenue Code. For this purpose, modified gross income is defined as gross income of the QSF under § 61 of the Internal Revenue Code reduced by administrative and incidental expenses incurred in connection with operation of the QSF. A QSF is also allowed a deduction for losses sustained in connection with the sale, exchange, or worthlessness of property held in trust as well as net operating losses to the extent such losses would be deductible in calculating the taxable income of a corporation under § 172(a) of the Internal Revenue Code. Amounts transferred to a QSF by a transferor to satisfy the claims for which the QSF is established are not included in the QSF's modified gross income and amounts that are distributed to or on behalf of claimants are not deductible by a QSF.

For income tax purposes, a QSF is required to report income on a calendar year basis and must maintain the QSF's books and records on the accrual method. The tax imposed pursuant to § 468B on QSFs is in lieu of any other taxes imposed under the Internal Revenue Code. Thus, QSFs are not subject to the alternative minimum tax, the accumulated earnings tax, the personal holding company tax or the maximum capital gains rate tax imposed under § 1(h) of the Internal Revenue Code.

The above discussion assumes that the Signal Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes and the Litigation Settlement Trust will be respected as a QSF for U.S. federal income tax purposes. The Debtors are not requesting an IRS ruling or an opinion of counsel regarding such treatment and there is no assurance that the IRS will agree that the trust should be so treated. If the IRS were to challenge such treatment, either or both of the Plan trusts may be treated as a different type of taxable entity for U.S. federal income tax purposes and the treatment of the Debtors, the trusts and their beneficiaries may be materially different than the treatment discussed above. BENEFICIARIES OF EACH OF THE PLAN TRUSTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX TREATMENT OF THE PLAN TRUSTS AND OF THEIR INTERESTS IN THE PLAN TRUSTS.

## C.    Federal Income Tax Consequences to Holders of Claims

The tax treatment of Holders of Claims, and the character, amount and timing of income, gain, or loss recognized as a consequence of the Plan and Distributions pursuant to the Plan may vary, depending upon, among other things: (i) whether the Claim (or a portion of the Claim) is for principal or interest; (ii) the type of consideration the Holder receives for the Claim, (iii) whether the Holder receives Distributions under the Plan in more than one taxable year; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to part or all of the Claim; (viii) whether the Holder has previously included in income accrued but unpaid interest on the Claim; (ix) the Holder's method of tax accounting; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim, and any instrument received in exchange for the

Claim, is a "security" for U.S. federal income tax purposes; and (xii) whether and the manner in which the "market discount" rules of the Internal Revenue Code apply to the Holder.

Holders of Claims that receive cash and property other than stock and securities for their Claim will recognize gain or loss for U.S. federal income tax purposes equal to the difference between their "amount realized" and their tax basis in the Claim. The "amount realized" is the sum of the amount of cash and the fair market value of any other property received under the Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest). The Holder's tax basis in the Claim (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the specific facts of the Holder. Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder.

Holders that previously included in income accrued but unpaid interest on a Claim may be entitled to a deductible loss to the extent such interest is not satisfied under the Plan. Conversely, a Holder has ordinary income to the extent of the amount of cash or the fair market value of property received in respect of a Claim for (or the portion of a Claim treated as allocable to) accrued unpaid interest that was not previously included in income by the Holder. The Plan treats all amounts payable to a Holder as principal until the principal amount of the Claim has been paid in full. The Signal Liquidating Trustee will file the Debtors' tax returns consistent with this allocation, but it is uncertain whether this allocation will be respected by the IRS. The IRS may take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If the IRS prevails in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to their Claims. Each Holder is urged to consult its own tax advisor regarding the amount of its Claim allocable to accrued unpaid interest and the character of any loss with respect to accrued but unpaid interest that the Holder previously included in income.

A Holder of a Claim who receives, in respect of its Claim, an amount that is less than its tax basis in the Claim may be entitled to a bad debt or worthless securities deduction. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation, or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with the Holder's trade or business, or (b) a debt, the loss from worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim may be required to include in income amounts received under the Plan that exceed the Holder's adjusted basis in its Claim.

A Holder of a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of section 453B of the Internal Revenue Code.

A Holder that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the market discount that accrued during the period the Claim was held by the Holder and that was not previously included in income by the Holder.

Amounts paid to Holders are subject to generally applicable withholding, information and backup withholding rules. The Plan authorizes the Debtors, the Signal Liquidating Trustee, and the Litigation Settlement Trustee, as applicable, to withhold and report amounts required by law to be withheld and reported. Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of the Holder will be treated as amounts distributed to the Holder. Holders are required to provide the Debtors, the Signal Liquidating Trustee, and or the Litigation Settlement Trustee, as applicable, with the information necessary to effect information reporting and withholding as required by law. Notwithstanding any other provision of the Plan, Holders that receive a Distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until the Holder has made arrangements satisfactory to the Debtors, the Signal Liquidating Trustee, and or the Litigation Settlement Trustee, as applicable, for the payment and satisfaction of such obligations.

Holders may be subject to backup withholding on payments pursuant to the Plan unless the Holder (i) is not a corporation and is not otherwise exempt from backup withholding and, when required, demonstrates that or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of previous failure to report dividend and interest income. Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and would require such disclosure.

THE FOREGOING SUMMARY IS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XII.   CONCLUSION

It is important that you exercise your right to vote on the Plan. It is the Debtors' belief that the Plan fairly and equitably provides for the treatment of all Claims against and Equity Interests in the Debtors. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, resulting in smaller distributions to the Holders of Claims. Accordingly, the Debtors recommend that Holders of

01:17450000.15

Claims entitled to vote to accept or reject the Plan support Confirmation of the Plan and vote to accept the Plan by returning their Ballots to the Claims Agent so that they will be received not later than November 12, 2015 at 4:00 p.m. (ET).

Dated: October _____, 2015
       Respectfully submitted,

                          SIGNAL INTERNATIONAL, INC. AND ITS
                          AFFILIATE DEBTORS

                          By:    */s/ Christopher S. Cunningham*
                          Title:   Chief Financial Officer

**Exhibit 1**

**JOINT PLAN OF LIQUIDATION**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **SIGNAL INTERNATIONAL, INC., et al.**[1] | |
| Debtors. | Case No. 15-11498 (MFW) |
| | Jointly Administered |

## DEBTORS' FIRST AMENDED JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Dated:  October _____, 2015
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Kenneth J. Enos (No. 4544)
Jaime Luton Chapman (No. 4936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600

*Counsel for the Debtors and the Debtors in Possession*

**HOGAN LOVELLS US LLP**
Christopher R. Donoho III
Christopher R. Bryant
John D. Beck
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000

*Special Counsel for the Debtors and the Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Signal International, Inc. (4248); Signal Ship Repair, LLC (2642); Signal International, LLC (5074); Signal International Texas GP, LLC (3050); and Signal International Texas, L.P. (5066). The Debtors' principal offices are located at RSA Battle House Tower, 11 North Water Street, Mobile, Alabama 36602.

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>**Page**</u></div>

INTRODUCTION.................................................................................................................1

ARTICLE I.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION
OF TIME.......................................................................................................1

    A.    Rules of Interpretation...........................................................................1

    B.    Computation of Time .............................................................................2

    C.    Defined Terms........................................................................................2

ARTICLE II.    PAYMENT OF UNCLASSIFIED CLAIMS ...............................................15

    A.    Administrative Claims ..........................................................................15

    B.    Professional Fee Claims .......................................................................16

    C.    DIP Facility Claims ..............................................................................16

    D.    Priority Tax Claims ..............................................................................17

ARTICLE III.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND
EQUITY INTERESTS.................................................................................17

    A.    Summary ...............................................................................................17

    B.    Classification and Treatment of Claims and Equity Interests .............18

    C.    Non-Consensual Confirmation.............................................................20

    D.    Elimination of Vacant Classes .............................................................20

    E.    Special Provision Governing Unimpaired Claims ...............................20

ARTICLE IV.    IMPLEMENTATION OF THE PLAN.........................................................20

    A.    Implementation of the Plan ..................................................................20

    B.    Consummation of the Asset Purchase Agreement ...............................21

    C.    Substantive Consolidation of the Debtors............................................22

    D.    Cash Reserves .......................................................................................23

    E.    Effective Date........................................................................................23

    F.    Operations of the Debtors Between the Confirmation Date and the Effective Date.........23

    G.    Term of Injunctions or Stays................................................................23

    H.    Setoffs ...................................................................................................23

|  | I. | Corporate Action | 24 |
|  | J. | Cancellation of Existing Agreements and Existing Equity Interests | 24 |
|  | K. | Authorization of Plan-Related Documentation | 24 |
|  | L. | Dissolution of Committee | 24 |
|  | M. | Closing the Bankruptcy Cases | 25 |
|  | N. | Exemption from Certain Fees and Taxes | 25 |
| ARTICLE V. | | THE SIGNAL LIQUIDATING TRUST | 25 |
|  | A. | Signal Liquidating Trust | 25 |
|  | B. | Establishment and Purpose of the Signal Liquidating Trust | 25 |
|  | C. | Authority and Role of the Signal Liquidating Trustee | 25 |
|  | D. | Appointment of the Signal Liquidating Trustee | 26 |
|  | E. | Signal Liquidating Trust Assets | 26 |
|  | F. | Treatment of Signal Liquidating Trust for Federal Income Tax Purposes | 26 |
|  | G. | Signal Liquidating Trust as a "Grantor Trust" | 26 |
|  | H. | Signal Liquidating Trustee's Right and Power to Invest | 27 |
|  | I. | Responsibilities of the Signal Liquidating Trustee | 27 |
|  | J. | Expenses of the Signal Liquidating Trustee | 27 |
|  | K. | Bonding of the Signal Liquidating Trustee | 27 |
|  | L. | Fiduciary Duties of the Signal Liquidating Trustee | 28 |
|  | M. | Cooperation; Transfer of Books and Records | 28 |
|  | N. | Transfer of Privileged Information | 28 |
|  | O. | Dissolution of the Signal Liquidating Trust | 29 |
|  | P. | Full and Final Satisfaction against Signal Liquidating Trust | 29 |
| ARTICLE VI. | | LITIGATION SETTLEMENT TRUST AND DISTRIBUTIONS TO LITIGATION CLAIMANTS | 29 |
|  | A. | Establishment and Administration of the Litigation Settlement Trust | 29 |
|  | B. | Litigation Settlement TDP | 30 |
|  | C. | Imposition of Channeling Injunction | 30 |

D.    Release of Liabilities to Litigation Claimants ................................................... 31

E.    Assumption of Certain Liabilities ...................................................................... 32

F.    Appointment of the Litigation Settlement Trustee ............................................ 32

G.    Litigation Settlement Trust Assets .................................................................... 32

H.    Litigation Settlement TAC ................................................................................ 35

I.    Cooperation; Transfer of Books and Records ................................................... 35

J.    Transfer of Privileged Information .................................................................... 35

K.    Institution and Maintenance of Legal and Other Proceedings .......................... 36

ARTICLE VII.  PROVISIONS FOR TREATMENT OF CONTINGENT CLAIMS AND
DISPUTED NON-LITIGATION CLAIMS ..................................................................... 36

A.    Treatment of Contingent Claims ....................................................................... 36

B.    Objection to Claims and Prosecution of Disputed Non-Litigation Claims ........ 36

C.    Distributions and Reserves on Account of Contingent and Disputed Non-
Litigation Claims .............................................................................................. 36

D.    Estimation of Non-Litigation Claims ................................................................ 37

E.    Certain Objections to Allowance of Litigation Settlement Trust Claims ........... 37

F.    No Postpetition Interest ..................................................................................... 37

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS FOR CLAIMS ................................... 38

A.    Timing of Distributions Under The Plan ........................................................... 38

B.    Manner of Payment Under the Plan ................................................................... 38

C.    Withholding of Taxes ........................................................................................ 38

D.    Allocation of Distribution Between Principal and Interest ................................ 38

E.    Unclaimed Distributions ................................................................................... 38

F.    Transfer of Claim .............................................................................................. 39

G.    Fractional Cents ................................................................................................ 39

H.    Delivery of Distributions in General ................................................................. 39

I.    Minimum Distribution Amount ......................................................................... 39

J.    Disallowance of Claims ..................................................................................... 39

ARTICLE IX.   TREATMENT OF EXECUTORY CONTRACTS ........................................... 40

    A.    Rejection of Executory Contracts ......................................................... 40

    B.    Approval by Confirmation Order ........................................................... 40

    C.    Rejection Damages Bar Date ................................................................ 40

ARTICLE X.   CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE
OF THE PLAN ......................................................................................... 40

    A.    Condition Precedent to Confirmation .................................................... 40

    B.    Conditions Precedent to the Effective Date .......................................... 41

    C.    Waiver of Conditions ........................................................................... 42

    D.    Effect of Nonoccurrence of Conditions................................................. 43

ARTICLE XI.   SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ............... 43

    A.    Binding Effect ...................................................................................... 43

    B.    Release of Liens ................................................................................... 43

    C.    Subordinated Claims ............................................................................ 43

    D.    Non-Discharge of the Debtors; Plan Injunction .................................... 43

    E.    Exculpation .......................................................................................... 44

    F.    Debtors' Release .................................................................................. 45

    G.    Consensual Releases by Non-Debtor Released Parties .......................... 45

    H.    Releases by Holders of Claims.............................................................. 46

    I.    Channeling Injunction .......................................................................... 47

    J.    Injunction Against Barred Claims ......................................................... 47

ARTICLE XII.   RETENTION OF BANKRUPTCY COURT JURISDICTION ....................... 48

    A.    General Jurisdiction ............................................................................. 48

    B.    Specific Jurisdiction ............................................................................ 49

    C.    Litigation Settlement TDP Controlling ................................................. 51

ARTICLE XIII. MODIFICATION AND REVOCATION OF THE PLAN............................... 51

    A.    Immediate Binding Effect ..................................................................... 51

    B.    Modification of the Plan........................................................................ 51

    C.       Revocation or Withdrawal of the Plan ............................................................51

ARTICLE XIV. MISCELLANEOUS PROVISIONS ....................................................................52

    A.       Payment of Statutory Fees....................................................................................52

    B.       Governing Law......................................................................................................52

    C.       Corporate Action...................................................................................................52

    D.       Severability of Plan Provisions ............................................................................52

    E.       Successors and Assigns.........................................................................................53

    F.       Reservation of Rights............................................................................................53

    G.       Further Assurances................................................................................................53

    H.       Post-Effective Date Service List ..........................................................................53

    I.       Other Notices ........................................................................................................53

    J.       Conflicts ................................................................................................................55

    K.       Maintenance of Books and Records......................................................................55

    L.       Determination of Tax Liability .............................................................................55

    M.       Entire Agreement ..................................................................................................55

    N.       Change of Control Provisions ..............................................................................55

    O.       Substantial Consummation....................................................................................55

    P.       Preservation of Insurance. ....................................................................................55

    Q.       Asset Purchase Agreement....................................................................................55

    R.       Powers of Purchaser..............................................................................................56

**INTRODUCTION**

The above-referenced debtors and debtors in possession in the Bankruptcy Cases hereby respectfully propose the Plan pursuant to section 1121(a) of the Bankruptcy Code. Reference is made to the Disclosure Statement distributed contemporaneously herewith, for a discussion of the Debtors' history, business, properties, and operations; a summary and analysis of the Plan; and certain related matters. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I hereof.

The Plan provides for (i) the implementation of the sale of substantially all of the Debtors' assets and distributions to Holders of Claims in accordance with the priorities set forth in the Bankruptcy Code; and (ii) the establishment of two trusts pursuant to section 105 of the Bankruptcy Code: (a) a Litigation Settlement Trust for payment of Litigation Claims and (b) a Signal Liquidating Trust for the benefit of all Holders of General Unsecured Claims. *The Litigation Claims will be channeled to the Litigation Settlement Trust.* The General Unsecured Claims will be marshaled through the Signal Liquidating Trust. The Signal Liquidating Trustee shall administer the Non-Litigation Claims.

The Debtors will seek to confirm the Plan pursuant to section 105(a) and other sections of the Bankruptcy Code to create the Litigation Settlement Trust and the Signal Liquidating Trust. *Section 105(a) of the Bankruptcy Code and other sections of the Bankruptcy Code authorize the Bankruptcy Court to enter a "channeling injunction" pursuant to which the Litigation Claims are channeled to the Litigation Settlement Trust. Following the issuance of the Channeling Injunction, (i) Litigation Claimants will be permanently enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any Litigation Claim other than from the Litigation Settlement Trust in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, and (ii) the Debtors and other Released Parties shall have no obligations or liabilities for or in respect of any Litigation Claims.*

Holders of General Unsecured Claims will receive, on account of their claims, their Pro Rata share of that portion of the Excess Sale Overpayment allocated to the Holders of General Unsecured Claims, and, each Holder of an Allowed General Unsecured Claim that votes to accept the Plan and does not opt out of the releases set forth in Section 11.H will also receive, on account of its claim, its Pro Rata share (determined without taking the Litigation Claimants into account) of the GUC Payment Amount net of Signal Liquidating Trust Expenses.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION**
**AND COMPUTATION OF TIME**

**A.    Rules of Interpretation**

For purposes of the Plan: (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (ii) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified, supplemented or restated; (iv) unless otherwise specified, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (v) the words "hereof", "herein", "hereto", "hereunder" and comparable terms refer to

the Plan in its entirety rather than to a particular portion of the Plan; (vi) the words "include", "includes" and "including" shall not be limiting and shall be deemed to be followed by "without limitation" whether or not they are, in fact, followed by such words or words of like import; (vii) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (viii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (ix) any capitalized term used in the Plan that is not defined herein but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) in the event of any inconsistency between the terms of the Plan and the terms of the Disclosure Statement, the terms of the Plan shall control; and (xi) in the event of any inconsistency between the terms of the Plan and the terms of the Asset Purchase Agreement or the Litigation Settlement Trust Agreement, the terms of the Plan shall control.

**B.    Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**C.    Defined Terms**

When used in capitalized form in the Plan, the following terms shall have the respective meanings assigned to such terms below:

1.    "**Acquired Assets**" means the "Acquired Assets", as defined in the Asset Purchase Agreement.

2.    "**Administrative Claim**" means any cost or expense of administration of the Bankruptcy Cases allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code, excluding Professional Fee Claims and DIP Facility Claims.

3.    "**Administrative Claims Bar Date**" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including, without limitation, the Bar Date Order.

4.    "**Allowed**" means (i) any Claim, proof of which is timely filed by the applicable Bar Date (or for which Claim, under the Plan, the Bankruptcy Code, or a Final Order, is not or shall not be required to be filed); (ii) any Claim that is listed in the Schedules as not contingent, not unliquidated and not disputed, and for which no Proof of Claim has been timely filed; (iii) any Claim that is allowed pursuant to a Final Order; or (iv) any Claim that is allowed pursuant to the Plan; *provided, however,* that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that (a) no objection to the allowance of such Claim or any portion thereof has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, (b) such an objection is filed and the Claim shall have been Allowed by a Final Order, or (c) such Claim is Allowed by agreement of the Claimant and applicable trustee in writing. Except for any Claim that is expressly Allowed herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been filed, is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless specified under the Plan, under the Bankruptcy Code or by order of the Bankruptcy Court, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs,

fees or charges on such Claims from and after the Petition Date. **"Allow"** and **"Allowing"** shall have correlative meanings.

5.    **"Apology Letter"** means that certain formal letter of apology to the Litigation Claimants for the conduct that gave rise to the Litigation Claims, in form and substance reasonably satisfactory to the Litigation Claimants through their advisors, and issued to the Litigation Claimants within two (2) weeks from the entry of the PSA Order.

6.    **"Asset Purchase Agreement"** means that certain Asset Purchase Agreement, dated as of July 13, 2015, among the Debtors and the Purchaser, as the same may have been amended from time to time, or such other purchase agreement with respect to the sale or sales of Assets, as may be approved by the Sale Order.

7.    **"Assets"** means all property owned by the Debtors, including, but not limited to, Cash, real property, personal property, intellectual property, intangible property, and the Signal Causes of Action.

8.    **"Auction"** means the auction conducted pursuant to, and in accordance with, the Bidding Procedures Order.

9.    **"Avoidance Actions"** means (i) any and all actions that are Filed or that may be Filed pursuant to sections 544, 545, 547, 548, 550, and 551 of the Bankruptcy Code, or applicable non-bankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code; or (ii) any other similar actions or proceedings filed to recover property for or on behalf of the Estates or to avoid a lien or transfer.

10.    **"Ballot"** means the ballots accompanying the Disclosure Statement upon which Holders of Claims entitled to vote on the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and procedures approved by the Bankruptcy Court governing the solicitation process.

11.    **"Bankruptcy Cases"** means, collectively, the Debtors' bankruptcy cases under chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court and jointly administered under Case No. 15-11498 (MFW).

12.    **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as the same may be amended from time to time.

13.    **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware, or in the event such court ceases to exercise jurisdiction over any Bankruptcy Case, such court or adjunct thereof that exercises jurisdiction over such Bankruptcy Case in lieu of the United States Bankruptcy Court for the District of Delaware.

14.    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Bankruptcy Cases and as amended from time to time.

15.    **"Bar Date"** means any of the dates fixed by orders of the Bankruptcy Court by which Entities required by such order to file a Proof of Claim must file a Proof of Claim or be forever barred

from asserting such Claim against the Debtors or their property and from voting on the Plan and/or sharing in distributions hereunder.

16.    **"Bar Date Order"** means that certain *Order (i) Establishing Bar Dates for Filing Proofs of Prepetition Claims, Including Section 503(b)(9) Claims and (ii) Approving the Form and Manner of Notice Thereof* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 205].

17.    **"Bidding Procedures"** means the bidding procedures approved by, and attached as Exhibit 1 to, the Bidding Procedures Order.

18.    **"Bidding Procedures Order"** means that certain *Order (a) Approving Sales and Bidding Procedures in Connection With Sale of Assets of the Debtors, (b) Approving Bid Protections, (c) Approving Form and Manner of Notice, (d) Scheduling the Auction and Sale Hearing, (e) Authorizing Procedures Governing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (f) Granting Related Relief,* entered by the Bankruptcy Court on September 1, 2015 [Docket No. 280].

19.    **"Break-Up Fee"** means the $1,000,000 break-up fee payable to the TRSA and ERSA in accordance with the terms of the Bidding Procedures Order.

20.    **"Business Day"** means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in Delaware are required to close.

21.    **"Case Professionals"** mean the attorneys, accountants, consultants, financial advisors and other third party professionals who have represented the Plan Participants in connection with the negotiation and implementation of the Plan, the Plan Documents and the Plan Supplement Documents.

22.    **"Cash"** means legal tender of the United States of America and equivalents thereof.

23.    **"Channeling Injunction"** means the permanent injunction provided for in Section 6.C of the Plan with respect to Litigation Claims to be issued pursuant to the Confirmation Order.

24.    **"Claim"** means a "claim" against a Debtor, as defined in section 101(5) of the Bankruptcy Code, whether or not asserted.

25.    **"Claims Agent"** means Kurtzman Carson Consultants, LLC, the entity designated by order of the Bankruptcy Court during the Bankruptcy Cases to, among other things, receive, maintain, record and otherwise administer Claims against the Debtors, or such other entity as the Debtors may retain to provide such services.

26.    **"Claims Objection Deadline"** means the first Business Day that is 180 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court upon a motion Filed and served in accordance with Section 14.H (which motion to extend the objection deadline shall not be deemed a modification of the Plan).

27.    **"Claims Register"** means the official register of Claims maintained by the Claims Agent.

28.    **"Class"** means a category of Claims or Equity Interests described in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

29.     **"Committee"** means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Bankruptcy Cases pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

30.     **"Committee Members"** means all current and former members of the Committee.

31.     **"Confirmation"** means the entry of the Confirmation Order, subject to all conditions specified in Section 10.A of the Plan having been (i) satisfied or (ii) waived pursuant to Section 10.C.

32.     **"Confirmation Date"** means the date of entry of the Confirmation Order on the docket of the Bankruptcy Cases within the meaning of Bankruptcy Rules 5003 and 9021.

33.     **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

34.     **"Confirmation Hearing Date"** means the date on which the Confirmation Hearing is first commenced.

35.     **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

36.     **"Consummation"** means the occurrence of the Effective Date.

37.     **"Contingent"** means contingent and/or unliquidated.

38.     **"Creditor"** means the Holder of a Claim against any Debtor or its Estate.

39.     **"Debtors"** means Signal International, Inc., Signal Ship Repair, LLC, Signal International, LLC, Signal International Texas GP, LLC, and Signal International Texas, L.P.

40.     **"DIP Facility"** means the senior secured credit facility provided by the DIP Lenders in an aggregate principal amount of up to $90,088,952.00 made pursuant to the DIP Loan Agreement.

41.     **"DIP Facility Claim"** means any Claim arising under or related to the DIP Loan Agreement and/or any other DIP Loan Documents (as defined in the DIP Loan Agreement), including, but, not limited to, the DIP Indemnity Obligations (as hereafter defined). "DIP Indemnity Obligation" means any contingent or unliquidated indemnification obligations to the DIP Lenders and their Representatives of any Debtor under the DIP Loan Agreement (including those described in §§ 8.4, 8.5 and 8.6 of the DIP Loan Agreement) that by their terms survive the satisfaction or payment of the Obligations (as defined in the DIP Loan Agreement) or the termination of the DIP Loan Agreement.

42.     **"DIP Lenders"** means those certain lenders who are lenders under the DIP Facility.

43.     **"DIP Loan Agreement"** means that certain *Debtor-In-Possession Loan and Security Agreement*, dated July 15, 2015, by and among the Debtors, as borrowers, and the TRSA and ERSA as lenders, as the same may have been amended, supplemented, modified, extended, renewed, and/or restated from time to time.

44.     **"Disclosure Statement"** means the disclosure statement for the Plan, as amended, supplemented or otherwise modified from time to time subject to the terms of the Plan Support

Agreement, that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

45.     **"Disclosure Statement Order"** means a Final Order approving the Disclosure Statement and the Debtors' proposed solicitation procedures.

46.     **"Disputed"** means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed and has not yet been disallowed by Final Order. For the avoidance of doubt, any Claim, in whole or in part, that is subject to a pending objection to the Allowance of such Claim shall be considered a Disputed Claim in its entirety until that objection has been resolved by Final Order.

47.     **"Disputed Claims Reserve"** means the reserve account established by the Debtors or the Signal Liquidating Trust on the Effective Date, and maintained by the Signal Liquidating Trust for the payment of: (i) the face value of all Administrative Claims (that are not Purchaser Assumed Liabilities), Priority Tax Claims, Other Priority Claims, and Other Secured Claims as of the Effective Date plus (ii) an amount to be agreed upon by the Debtors, Committee and RSA in an amount necessary to satisfy any Contingent and/or unliquidated Administrative Claims (that are not Purchaser Assumed Liabilities), Priority Tax Claims, Other Priority Claims, and Other Secured Claims, *provided, however*, that such amount shall not be less than the maximum non-contingent and liquidated amount set forth in any Proof of Claim or request for payment of an Administrative Claim; plus (iii) such other amount as determined by order of the Bankruptcy Court.

48.     **"Distribution"** means the distributions to be made in accordance with the Plan of, as the case may be, (i) Cash or (ii) any other consideration or residual value distributed to Holders of Allowed Claims under the terms and provisions of the Plan.

49.     **"EEOC"** means the United States Equal Employment Opportunity Commission or any agency or instrumentality of any Governmental Unit with responsibility for enforcing laws against employment condition or otherwise relating to conditions of employment.

50.     **"Effective Date"** means that date following the Confirmation Date on which all conditions to consummation of the Plan shall have been satisfied or waived as provided in Section 10.B and Section 10.C of the Plan.

51.     **"Entity"** means an "entity," as defined in section 101(15) of the Bankruptcy Code.

52.     **"Equity Interest"** means, with respect to a Debtor, as of the Petition Date, any capital stock or other ownership interest in such Debtor, whether or not transferable, and any option, call, warrant or right to purchase, sell or subscribe for an ownership interest or other equity security in such Debtor, and any redemption, conversion, exchange, voting, participation, dividend rights, and liquidation preferences relating to such capital stock or other ownership interest.

53.     **"ERSA"** means the Employees' Retirement System of Alabama, a corporate body of the State of Alabama created under Section §§ 16-25-1 *et seq.,* of the Alabama Code.

54.     **"ERSA Note"** means the $24,750,000 Term Loan Note held by ERSA.

55.     **"Estate"** means the estate of each of the Debtors created by section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Cases.

56.     **"Excess Sale Overpayment"** has the meaning provided in Section 6.G of the Plan.

57.   **"Exculpated Parties"** means, solely to the extent of the Exculpation, each of (i) the Debtors, and any of their respective Related Parties; (ii) the Committee, and any of its respective Related Parties; (iii) the ERSA and TRSA, and any of their respective Related Parties; and (iv) the Supporting Litigation Claimants, and any of their respective Related Parties.

58.   **"Exculpation"** means the exculpation provision set forth in Section 11.E herein.

59.   **"Executory Contract"** means an executory contract or unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

60.   **"File"** or **"Filed"** means file or filed on the Bankruptcy Court's docket or with the Bankruptcy Court for the Bankruptcy Cases or, in the case of a Proof of Claim, file or filed with the Claims Agent.

61.   **"Final DIP Order"** means *Final Order Authorizing Debtors In Possession to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (ii) Grant Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; (iii) Use Cash Collateral, (iv) Provide Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364; and (v) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2,* entered September 11, 2015 [Docket No. 316].

62.   **"Final Order"** means an order of the Bankruptcy Court: (i) as to which the time to appeal, petition for certiorari, or move for reargument, rehearing or new trial has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing or new trial shall then be pending; (ii) as to which any right to appeal, petition for certiorari, reargue, rehear or retry shall have been waived in writing; or (iii) in the event that an appeal, writ of certiorari, reargument, rehearing or new trial has been sought, as to which (a) such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order is appealed, (b) certiorari has been denied as to such order, or (c) reargument or rehearing or new trial from such order shall have been denied, and the time to take any further appeal, petition for certiorari or move for reargument, rehearing or new trial shall have expired without such actions having been taken.

63.   **"First Lien Loan Agreement"** means the senior secured financing facility governed by the terms of that certain Credit Agreement, dated as of January 31, 2014, by and among Signal International, Inc., as Borrower, Signal International, LLC, Signal Ship Repair, LLC, Signal International Texas GP, LLC, and Signal International Texas, L.P., as Guarantors, the TRSA, as administrative and collateral agent, the TRSA and ERSA, as lenders, as the same may have been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date.

64.   **"First Lien Loan Agreement Claim"** means any Claim arising under or related to the First Lien Loan Agreement and all other documents referred to therein or delivered in connection therewith.

65.   **"General Unsecured Claim"** means any Claim that is (i) not a DIP Facility Claim, Professional Fee Claim, First Lien Loan Agreement Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Litigation Claim, Intercompany Claim, or an Equity Interest, or (ii) otherwise determined by the Bankruptcy Court to be a General Unsecured Claim. General Unsecured Claims shall not include any Claims that are disallowed or released, whether by operation of law or pursuant to a Final Order, written release or settlement, the provisions of the Plan or otherwise.

66.     "**Governmental Unit**" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

67.     "**GUC Payment Amount**" means an aggregate amount equal to the lesser of (i) $900,000, or (ii) an amount equal to fifteen percent (15%) of the total amount of all Allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto. Prior to the first distribution to Holders of Class 5 Allowed General Unsecured Claims, the Signal Liquidating Trust shall refund to the Purchaser the difference between (i) and (ii) of the foregoing sentence, if any.

68.     "**GUC Payment Fund**" means the bank account to be opened and/or maintained by the Signal Liquidating Trust in which the (i) GUC Payment Amount, plus (ii) the Pro Rata share of the Excess Sale Overpayment, if any, payable to the Holders of General Unsecured Claims are deposited.

69.     "**H-2B Workers**" means the workers from India that the Debtors, or any Entity acting or purporting to act on behalf of the Debtors, hired or recruited, or that applied for employment with the Debtors prior to the Petition Date as part of or through the federal government's H-2B guestworker program.

70.     "**Holder**" means any Entity holding a Claim or Equity Interest.

71.     "**Impaired**" means, with respect to a Claim or Equity Interest, or Class of Claims or Equity Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

72.     "**Injunctions**" means the Plan Injunction provided for in Section 11.D of the Plan and the Channeling Injunction provided for in Section 6.C of the Plan.

73.     "**Intercompany Claim**" means any Claim of a Debtor against another Debtor.

74.     "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

75.     "**Litigation Claimants**" means any and all Entities who hold or allege they hold a Litigation Claim.

76.     "**Litigation Claims**" means all Claims against the Debtors or any Released Party by or on behalf of the H-2B Workers or the EEOC arising out of or related to the employment or recruitment of any of the H-2B Workers, excluding, for the avoidance of doubt, the Retained Claims.

77.     "**Litigation Settlement TAC**" means the Litigation Settlement Trust Advisory Committee to be formed to advise the Litigation Settlement Trustee, whose duties and responsibilities are set forth in Section 6.F hereof and in the Litigation Settlement Trust Agreement. Prior to the Confirmation Hearing, the Supporting Litigation Claimants shall select the initial members of the Litigation Settlement TAC.

78.     "**Litigation Settlement TDP**" means the Litigation Settlement Trust Distribution Procedures to be implemented by the Litigation Settlement Trust pursuant to the terms and conditions of the Plan and attached as an Exhibit to the Litigation Settlement Trust Agreement, as it may be amended from time to time.

79. **"Litigation Settlement Trust"** means the trust described in Article VI of the Plan to be established under Delaware law, which form shall be satisfactory to the Southern Poverty Law Center, in respect of the Litigation Claims. With respect to any action required or permitted to be taken by the Litigation Settlement Trust, the term Litigation Settlement Trust includes the Litigation Settlement Trustee or any other person authorized to take such action in accordance with the Litigation Settlement Trust Agreement.

80. **"Litigation Settlement Trust Agreement"** means the agreement establishing the Litigation Settlement Trust in conformity with the provisions of the Plan, which shall be approved in the Confirmation Order and entered into by the Debtors, the TRSA and ERSA, and the Litigation Settlement Trustee on the Effective Date and which shall be Filed as part of the Plan Supplement.

81. **"Litigation Settlement Trust Assets"** means all property transferred to the Litigation Settlement Trust on the Effective Date pursuant to this Plan, including, as set forth in greater detail in Section 6.G of the Plan, the Litigation Settlement Trust's percentage of the Sharing Ratio, the Sale Overpayment, if any, and Pro Rata share of the Excess Sale Overpayment, if any.

82. **"Litigation Settlement Trustee"** means the individual or entity identified in the Signal Liquidating Trust Agreement to be the trustee of the Signal Liquidating Trust pursuant to the terms of the Signal Liquidating Trust Documents to administer the Signal Liquidating Trust, and any successors thereto.

83. **"Litigation Settlement Trust Expenses"** means any and all costs and expenses incurred in connection with the administration of the Litigation Settlement Trust, including litigation expenses and professional fees, pursuant to the Plan, Confirmation Order, and Litigation Settlement Trust Agreement.

84. **"Litigation Settlement Trust Termination Date"** means the date on which the Litigation Settlement Trust is terminated as determined pursuant to the terms of the Litigation Settlement Trust Agreement.

85. **"Non-Litigation Claim"** means any Claim other than a Litigation Claim.

86. **"Official Bankruptcy Forms"** means the Official Bankruptcy Forms, prescribed by the Judicial Conference of the United States, the observance and use of which is required pursuant to Bankruptcy Rule 9009, as such forms may be amended, revised or supplemented from time to time.

87. **"Ordinary Course Professionals Order"** means that certain *Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized in the Ordinary Course of Business, Effective as of the Petition Date* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 207].

88. **"Other Priority Claim"** means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

89. **"Other Secured Claim"** means any Claim, other than a DIP Facility Claim or a First Lien Loan Agreement Claim, that is secured by a lien on property in which an Estate has an interest, which lien is valid, perfected and enforceable under applicable law or pursuant to a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, solely to the extent of the value of the Creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, all as determined pursuant to section 506(a) of the Bankruptcy Code.

90.     **"Permissible Investments"** means (i) short-term direct obligations of, or obligations guaranteed by, the United States of America, (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (iii) demand deposits or certificates of deposit at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000, or (iv) such other investments as the Bankruptcy Court may approve from time to time.

91.     **"Person"** means a "person," as defined in section 101(41) of the Bankruptcy Code.

92.     **"Petition Date"** means July 12, 2015.

93.     **"Plan"** means the Plan, as amended, supplemented or otherwise modified from time to time subject to, and consistent in all material respects with, the terms of the Plan Support Agreement and the Plan Term Sheet, that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

94.     **"Plan Cash Amount"** means the GUC Payment Amount, together with the Secured Debt Cash Obligations, and the Break-Up Fee.

95.     **"Plan Documents"** means the Plan, the Disclosure Statement, the Disclosure Statement Order, the related solicitation materials, the Confirmation Order, the PSA Assumption Motion, the PSA Order, and each other agreement, instrument, pleading, order or certificate or other related document utilized to implement the Plan, including any exhibits, amendments, modifications or supplements made from time to time thereto.

96.     **"Plan Injunction"** means the injunction issued pursuant to Section 11.D of the Plan.

97.     **"Plan Participants"** means (i) the Debtors, (ii) the TRSA and ERSA, and (iii) the Supporting Litigation Claimants.

98.     **"Plan Supplement"** means that certain compilation of documents and forms of documents, schedules and exhibits to the Plan, as such compilation may be amended, supplemented or modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code and Bankruptcy Rules through the Effective Date that shall be filed no later than November 2, 2015.

99.     **"Plan Supplement Documents"** means the Plan Supplement, and such other definitive documentation, as amended, relating to the Debtors as is necessary to consummate the Restructuring and the transactions contemplated hereby or thereby, including, without limitation the Litigation Settlement Trust Agreement, the Signal Liquidating Trust Agreement, the Westport Participation Agreement, the Apology Letter, the Signal Liquidation Trust Documents, and the identities of each of the following: (i) the Litigation Settlement Trustee; (ii) Litigation Settlement TAC; and (iii) the Signal Liquidation Trustee.

100.     **"Plan Support Agreement"** means that certain Plan Support Agreement by and among (i) the Debtors, (ii) the TRSA and ERSA, (iii) the Supporting Litigation Claimants, and (iv) the Committee.

101.     **"Plan Term Sheet"** means the term sheet describing the material terms of a proposed chapter 11 plan of reorganization for the Debtors attached as Exhibit A to the Plan Support Agreement.

102.    **"Post-Effective Date Assets"** means any Assets that are not sold through the Sale Transaction or otherwise disposed of prior to the Effective Date, which shall be administered by the Signal Liquidating Trust.

103.    **"Priority Tax Claim"** means a Claim of a "governmental unit" (as such term is defined in section 101(27) of the Bankruptcy Code) of the kind specified in, and entitled to priority under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

104.    **"Privileged Information"** means any document (as used in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized compilations), communication, or other information subject to any attorney-client privilege, work product protection, common interest privilege or other privilege, protection or immunity held by any or all of the Debtors or the Estates. For purposes of Federal Rules of Evidence 501 and 502, the Litigation Settlement Trustee and/or the Signal Liquidating Trustee, as applicable, shall be deemed a successor in interest to the Debtors with respect to all privileges, protections and immunities held by the Debtors or their Estates.

105.    **"Professional Fees"** means the fees for professional services rendered and expenses incurred in connection with such services by Retained Professionals on and after the Petition Date and prior to and including the Effective Date.

106.    **"Professional Fee Reserve"** means the reserve established from the Cash on hand existing immediately prior to the Effective Date to pay in full in Cash in an amount not to exceed the budget agreed to by the DIP Lenders (i) the Professional Fee Claims incurred on or prior to the Effective Date, plus (ii) the reasonable fees, costs and expenses incurred by the Retained Professionals on or after the Effective Date in connection with the preparation of final fee applications and obtaining Bankruptcy Court approval of their respective Professional Fee Claims. Counsel for the Debtors shall hold the amounts allocated for Debtors' professionals in trust for the Debtors' professionals. Counsel for the Committee shall hold the amounts allocated for the Committee's professionals in trust for the Committee's professionals.

107.    **"Professional Fees Bar Date"** means the Business Day that is forty-five (45) days after the Effective Date or such other date as approved by Final Order.

108.    **"Proof of Claim"** means a proof of Claim Filed against any of the Debtors in the Bankruptcy Cases.

109.    **"Pro Rata"** means, as applicable, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that all Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in such Class and other Classes entitled to share in the same recovery under the Plan.

110.    **"PSA Assumption Motion"** means that certain *Motion for Entry of an Order Authorizing the Debtors to Assume the Plan Support Agreement* [Docket No. 112].

111.    **"PSA Creditor Parties"** means the creditors or potential creditors of the Debtors that are parties to the Plan Support Agreement.

112.    **"PSA Order"** means that certain *Order Authorizing the Debtors to Assume the Plan Support Agreement* entered by the Bankruptcy Court on September 1, 2015 [Docket No. 279].

113.    **"Purchase Price"** means the "Purchase Price", as defined in the Asset Purchase Agreement.

114.    **"Purchaser"** means the prevailing bidder at the Auction, as approved by the Bankruptcy Court in the Sale Order, who shall purchase the Acquired Assets pursuant to the Asset Purchase Agreement.

115.    **"Purchaser Assumed Liabilities"** means the Assumed Liabilities as defined in the Asset Purchase Agreement.

116.    **"Related Parties"** means, with respect to any person or entity, any past, present or future representative, controlling person, officer, director, agent, attorney, advisor, employee, subsidiary or affiliate, shareholder, partner (general or limited), board member, member, manager, equity holder, trustee, executor, predecessor in interest, successor or assign of any such person or entity.

117.    **"Released Claims"** means any and all Claims or causes of action released by Article XI of the Plan, including the Released Related Party Claims, but excluding the Retained Claims.

118.    **"Released Parties"** mean (i) the Plan Participants and (ii) the Related Parties of the Plan Participants.

119.    **"Released Related Party Claims"** means any claims or causes of action against (i) the officers, directors, shareholders or other equity holders of the Debtors, or (ii) the Case Professionals.

120.    **"Released Signal Causes of Action"** means any Causes of Action expressly waived, relinquished, released, sold, compromised or settled by the Debtors under the Plan, the Asset Purchase Agreement, Final DIP Order, or any other Final Order.

121.    **"Releasing Parties"** means all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to Sections 11.G and 11.H of the Plan or are subject to the Exculpation.

122.    **"Restructuring"** means the liquidation and financial restructuring of the Debtors.

123.    **"Restructuring Documents"** means the Plan Documents, the motions and orders, the Plan Supplement Documents, and each other agreement, instrument, pleading, order, instrument or certificate or other related document utilized to implement the Restructuring, or the transactions contemplated hereby or thereby, and to obtain confirmation of the Plan.

124.    **"Retained Claims"** means the following claims or causes of action held by certain of the Plan Participants, which shall be retained by such Plan Participants and shall not be Released Claims: (i) the Retained H-2B Claims and (ii) the claims or causes of action of any Plan Participant against its own Related Parties, other than the Released Related Party Claims.

125.    **"Retained H-2B Claims"** shall mean all claims or causes of action held by or on behalf of the Litigation Claimants and the Plan Participants (including without limitation the TRSA and ERSA, the Debtors or any successor to or assignee of the Debtors under the Plan) against Malvern C. Burnett, Law Offices of Malvern C. Burnett, A.P.C., Gulf Coast Immigration Law Center, L.L.C., Sachin Dewan, Dewan Consultants Pvt. Ltd. (a/k/a/ Medtech Consultants), such other Entities, excluding the Plan Participants, as have been identified in any actions or proceedings commended by or on behalf of any Litigation Claimant, and such Entities' respective successors, assigns and alter egos.

126.    **"Retained Professional"** means any Entity (i) employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code, or (ii) who wishes to apply to the Bankruptcy Court for compensation and reimbursement of expenses pursuant to section 503(b)(4) of the Bankruptcy Code.

127.    **"Sale Order"** means the Final Order approving the Sale Transaction and the Asset Purchase Agreement, which may be the Confirmation Order.

128.    **"Sale Overpayment"** means any cash bid amounts in excess of the Plan Cash Amount.

129.    **"Sale Transaction"** means the transaction between the Debtors and the Purchaser set forth in the Asset Purchase Agreement.

130.    **"Scheduled"** means an entry that appears on the Schedules.

131.    **"Schedules"** means the schedules of assets and liabilities, schedules of executory contracts, and the statements of financial affairs Filed by each Debtor pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms, as such schedules and statements have been or may be supplemented or amended from time to time through the Confirmation Date in accordance with Bankruptcy Rule 1009.

132.    **"Secured Debt Cash Obligations"** means all outstanding obligations owed under the Senior Notes (to the extent not repaid through proceeds of the DIP Facility) and the DIP Facility as of the Effective Date.

133.    **"Securities Act"** means the Securities Act of 1933, as amended.

134.    **"Senior Notes"** means the ERSA Note together with the TRSA Note.

135.    **"Sharing Ratio"** has the meaning provided in Section 6.G of the Plan.

136.    **"Signal Causes of Action"** means all of the Debtors' actions, causes of action, objections to claims, rights of setoff, choses in action, liabilities, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Bankruptcy Cases, through and including the Effective Date; *provided, however*, that the Signal Causes of Action shall not include the Released Signal Causes of Action.

137.    **"Signal Liquidating Trust"** means the Signal Liquidating Trust established by Article 5 of the Plan pursuant to section 105(a) of the Bankruptcy Code and the Signal Liquidating Trust Agreement.

138.    **"Signal Liquidating Trust Agreement"** means the trust agreement establishing and delineating the terms and conditions of the Signal Liquidating Trust.

139.   "**Signal Liquidating Trust Assets**" means (i) all Post-Effective Date Assets, if any, (ii) the GUC Payment Fund, (iii) the Signal Liquidating Trust Expense Fund, and (iv) the Disputed Claims Reserve.

140.   "**Signal Liquidating Trust Beneficiaries**" means the Holders of Allowed General Unsecured Claims under the Plan, excluding, for the avoidance of doubt, the Litigation Claimants.

141.   "**Signal Liquidating Trust Documents**" means the Signal Liquidating Trust Agreement and all documents, attachments and exhibits thereto, and any amendments thereto made in accordance with the Bankruptcy Code, or any other documents that aid in effectuating the Signal Liquidating Trust, which such Signal Liquidating Trust Documents shall be filed with the Bankruptcy Court.

142.   "**Signal Liquidating Trustee**" means the individual or entity initially selected to act as trustee of the Signal Liquidating Trust pursuant to the terms of the Signal Liquidating Trust Documents to administer the Signal Liquidating Trust, and any successors thereto.

143.   "**Signal Liquidating Trust Expenses**" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Signal Liquidating Trustee on account of administration of the Signal Liquidating Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, and reasonable escrow expenses.

144.   "**Signal Liquidating Trust Expense Fund**" means the fund established by the Debtors on or prior to the Effective Date to fund a portion of the Signal Liquidating Trust Expenses.

145.   "**Stamp or Similar Tax**" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

146.   "**Supporting Litigation Claimants**" means those Litigation Claimants signatories to the Plan Support Agreement.

147.   "**TRSA**" means the Teachers' Retirement System of Alabama, a corporate body of the State of Alabama created under Section §§ 16-25-1 *et seq.*, of the Alabama Code.

148.   "**TRSA Note**" means the $50,250,000 Term Loan Note held by the TRSA.

149.   "**Unclassified Claims**" means Administrative Claims, DIP Facility Claims, Priority Tax Claims, and Professional Fee Claims.

150.   "**Unexpired Lease**" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

151.   "**Unimpaired**" means a Claim or Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

152.     "**United States Trustee**" means the United States Trustee appointed under 28 U.S.C. § 581 to serve in the District of Delaware.

153.     "**Westport Loan**" means that certain purchase money indebtedness currently owing to Signal International Texas, LP, by Westport Orange Shipyard, LLC, in the principal amount of up to $29,894,469.

154.     "**Westport Documents**" means all instruments or documents evidencing, securing, governing or otherwise pertaining to the Westport Loan.

155.     "**Westport Participants**" means, collectively, the Litigation Settlement Trust and Purchaser.

156.     "**Westport Participation Agreement**" means the loan participation agreement between the Westport Participants, governing the sharing of their respective interests in the Westport Loan, in form and content reasonably acceptable to the Westport Participants, which shall be Filed as part of the Plan Supplement.

## ARTICLE II.
## PAYMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III hereof.

**A.     Administrative Claims**

Except with respect to Administrative Claims that constitute Professional Fees or DIP Facility Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor, the Signal Liquidating Trustee, or the Purchaser, as applicable, agree to less favorable treatment with such Holder, on, or as soon as reasonably practicable after (i) the Effective Date, if such Administrative Claim is an Allowed Administrative Claim as of the Effective Date, or (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall receive, in full settlement, satisfaction and release of, and in exchange for, such Allowed Administrative Claim, (a) Cash in an amount equal to the unpaid amount of such Allowed Administrative Claim or (b) such other treatment as may be agreed upon in writing by such Holder and the Debtors, the Signal Liquidating Trustee, or the Purchaser, as applicable; *provided, however*, that the Debtors, the Signal Liquidating Trustee or the Purchaser shall be authorized to pay Allowed Administrative Claims that arise in the ordinary course of the Debtors' business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such ordinary course of business transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by this Article II unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the Debtors, the Signal Liquidating Trustee, and the Purchaser no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date and entry of the Confirmation Order. Objections to such requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline. Absent further order of the Bankruptcy Court, Holders of Administrative Claims that are required to File and serve a request for

payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or the Purchaser, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.

Notwithstanding anything in the Plan to the contrary, (i) any Allowed Administrative Claims that constitute Purchaser Assumed Liabilities shall be satisfied subject to the terms of the applicable Asset Purchase Agreement without the necessity of any further action by the Debtors, the Signal Liquidating Trustee or order of the Bankruptcy Court and the Holders of such Administrative Claims shall not receive any Distributions pursuant to the Plan with respect to such Administrative Claims; and (ii) any Allowed Administrative Claims that do not constitute Purchaser Assumed Liabilities shall be satisfied solely from the Disputed Claims Reserve.

## B.    Professional Fee Claims

Retained Professionals asserting a Claim for Professional Fees for services rendered before the Effective Date must File and serve on the Signal Liquidating Trustee and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court, unless otherwise required pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Signal Liquidating Trustee and the requesting party by no later than twenty-four days (24) days after the service of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim. The Professional Fee Reserve shall be comprised of two separate and independent reserves: one reserve to be used exclusively for the Debtors' Retained Professionals, and the other reserve to be used exclusively for the Committee's Retained Professionals. For the avoidance of doubt, the portion of the Professional Fee Reserve allocated to each Retained Professional shall be limited to the specific itemized amount set forth in the Professional Fee Reserve for such applicable Retained Professional.

## C.    DIP Facility Claims

On the Effective Date, in full satisfaction, settlement, discharge and release of, all DIP Facility Claims, the TRSA and ERSA shall either (i) acquire the Acquired Assets as the Purchaser in accordance with the Asset Purchase Agreement, the Plan, and the Sale Order, or (ii) be paid in full, in Cash, the total amount outstanding under the DIP Facility from the proceeds received in accordance with the Asset Purchase Agreement; provided, however, that such satisfaction, settlement, discharge and/or release of DIP Facility Claims shall be without prejudice to any DIP Indemnity Obligations, all of which, subject to further Order of the Bankruptcy Court, shall be reserved for and the obligation to establish such reserve, if any, shall be secured by a DIP Lien (as defined in the Final DIP Order) on any proceeds of the Sale Transaction not paid to the TRSA or ERSA on the Effective Date.

**D.      Priority Tax Claims**

On, or as soon as reasonably practicable after (i) the Effective Date, if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date, or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim against a Debtor shall receive, (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by such Holder and the Debtors or the Signal Liquidating Trustee, as applicable solely from the Disputed Claims Reserve, provided that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date without any further notice to or action, order, or approval of the Bankruptcy Court, or (c) at the sole discretion of the Signal Liquidating Trustee, Cash in the aggregate amount of such Allowed Priority Tax Claim solely from the Disputed Claims Reserve, payable in installment payments over a period not more than five years from the Petition Date with payment of interest at a rate agreed to by the Signal Liquidating Trustee and the Holder of such Allowed Priority Tax Claim, or as determined by the Bankruptcy Court in accordance with section 511 of the Bankruptcy Code and applicable non-bankruptcy law.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.      Summary**

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests that are required to be designated in classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and their treatment is set forth in Article II hereof.  Classification of Claims and Equity Interests in the Plan is for all purposes, including voting, confirmation and distribution pursuant to the Plan.

A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class only to the extent that any portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is placed in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.  Notwithstanding any Distribution provided for in the Plan, no Distribution on account of any Claim or Equity Interest is required or permitted unless and until such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be, which might not occur, if at all, until after the Effective Date.

| Summary of Classification and Treatment of Classified Claims and Equity Interests | | | |
|---|---|---|---|
| Class | Claim | Status | Voting Rights |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | First Lien Loan Agreement Claims | Unimpaired | Deemed to Accept |
| 4 | Litigation Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

**B.**      **Classification and Treatment of Claims and Equity Interests**

1.      Class 1 – Other Priority Claims

(i)      *Classification*:  Class 1 consists of Other Priority Claims.

(ii)      *Treatment*:  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser.

(iii)      *Voting*:  Class 1 is Unimpaired and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan.

2.      Class 2 – Other Secured Claims

(i)      *Classification*:  Class 2 consists of Other Secured Claims.

(ii)      *Treatment*:  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash by the Signal Liquidating Trustee solely from the Disputed Claims Reserve, receive delivery of collateral securing any such Claim and payment of any interest requested under section 506(b) of the Bankruptcy Code, or be treated on such other terms as agreed between the Signal Liquidating Trustee and the Holder thereof, subject to the reasonable consent of the Purchaser.

(iii)      *Voting*:  Class 2 is Unimpaired and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan.

3.      Class 3 – First Lien Loan Agreement Claims

(i)      *Classification*:  Class 3 consists of First Lien Loan Agreement Claims.

(ii)      *Treatment*:  All First Lien Loan Agreement Claims have been satisfied in full and repaid through the borrowings under the DIP Facility.

(iii)      *Voting*:  Class 3 is unimpaired and Holders of First Lien Loan Agreement Claims are deemed to accept the Plan.

4.      Class 4 – Litigation Claims

(i)      *Classification*:  Class 4 consists of Litigation Claims.

(ii)      *Treatment*:  Each Litigation Claimant shall receive its share of the Litigation Settlement Trust Assets, which share shall be determined in accordance with the terms, provisions, and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  Litigation Claims shall be resolved by the Litigation Settlement Trust in accordance with the terms of the Litigation Settlement TDP.  On the Effective Date, the Litigation Claims shall be deemed Allowed in the total aggregate amount of no less than $200 million.  On the Effective Date, all Litigation Claims shall be released as against the Debtors pursuant to the terms and conditions of the Plan and the Litigation Settlement Trust Agreement.  Pursuant to the Channeling Injunction, each Litigation Claimant shall have its Claim permanently channeled to the Litigation Settlement Trust, and such Litigation Claim may thereafter be

asserted exclusively against the Litigation Settlement Trust and resolved in accordance with the terms, provisions and procedures of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP. For the avoidance of doubt, Litigation Claimants are not entitled to receive Distributions or other payment of funds from the Signal Liquidating Trust on behalf of, related to or with respect to such Litigation Claims. **Litigation Claimants are, subject to the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, enjoined from filing any future litigation, claims or causes of action arising out of such Litigation Claims against the Debtors and/or any of the Plan Participants, and may not proceed in any manner against the Debtors and/or any of the Plan Participants, in any forum whatsoever, including, without limitation, any state or federal court or administrative or arbitral forum, and are required to pursue their Litigation Claims against the Litigation Settlement Trust solely as provided in the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.**

(iii)    *Voting*:  Class 4 is Impaired and Litigation Claimants are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – General Unsecured Claims</u>

(i)    *Classification*:  Class 5 consists of General Unsecured Claims.

(ii)    *Treatment*:  On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, on account of its claim, its Pro Rata share of that portion of the Excess Sale Overpayment allocated to the Holders of General Unsecured Claims, and, each Holder of an Allowed General Unsecured Claim that votes to accept the Plan <u>and</u> does not opt out of the releases set forth in Section 11.H shall also receive, on account of its claim, its Pro Rata share (determined without taking the Litigation Claimants into account) of the GUC Payment Amount. All distributions to Holders of General Unsecured Claims shall be net of the Signal Liquidating Trust Expenses. The GUC Payment Amount shall be an aggregate amount equal to the lesser of (i) $900,000, or (ii) an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto. For the avoidance of any doubt, Holders of General Unsecured Claims are not entitled to receive Distributions or other payment of funds from the Litigation Settlement Trust on behalf of, related to or with respect to such General Unsecured Claims.

(iii)    *Voting*:  Class 5 is Impaired and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Intercompany Claims</u>

(i)    *Classification*:  Class 6 consists of Intercompany Claims.

(ii)    *Treatment*:  Holders of Allowed Intercompany Claims shall not receive any Distributions on account of such Claims.

(iii)    *Voting*:  Class 6 is Impaired and Holders of Intercompany Claims are deemed to reject the Plan.

7.      Class 7 – Equity Interests in the Debtors

(i)      *Classification*:  Class 7 consists of all Equity Interests in the Debtors.

(ii)      *Treatment*:  Holders of Equity Interests in the Debtors shall neither receive nor retain any property under the Plan.  On the Effective Date, all Equity Interests in the Debtors shall be cancelled and of no further force or effect and all Claims filed on account of Equity Interests shall be deemed disallowed by operation of the Plan.

(iii)      *Voting*: Class 7 is Impaired and Holders of Equity Interests in the Debtors are deemed to reject the Plan.

**C.      Non-Consensual Confirmation**

In the event that any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite majorities required by section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to (i) modify the Plan in accordance with Section 3.D hereof and/or (ii) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code notwithstanding such lack of acceptance.

**D.      Elimination of Vacant Classes**

Any Class or sub-Class of Claims or Equity Interests that is not occupied as of the Confirmation Hearing Date by at least one Allowed Claim or Allowed Equity Interest, as applicable, or at least one Claim or Equity Interest, as applicable, temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

**E.      Special Provision Governing Unimpaired Claims**

Except as otherwise expressly provided in the Plan, nothing in the Plan shall affect the Debtors' or Signal Liquidating Trustee's rights in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**ARTICLE IV.
IMPLEMENTATION OF THE PLAN**

**A.      Implementation of the Plan**

The Plan will be implemented by the Signal Liquidating Trust and the Signal Liquidating Trustee, and the Litigation Settlement Trust and the Litigation Settlement Trustee, as applicable.

As of the Effective Date, and without the need for any further order of the Bankruptcy Court, action, formality or payment of any fees which might otherwise be required under applicable non-bankruptcy laws, each of the Debtors shall be deemed dissolved without the need for any filings with the Secretary of State or other governmental official in each Debtor's respective state of incorporation; provided, however, that notwithstanding the dissolution of such Debtors, the Signal Liquidating Trustee shall be authorized and empowered to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of and consummate the Plan. Such dissolution of the Debtors

shall be deemed to have occurred on a "bottom up" basis, with lower tier Debtor Entities being deemed to have dissolved before higher tier Debtor Entities.

On the Effective Date, each existing member of the boards of directors of the Debtors shall be deemed to have been removed.

## B.    Consummation of the Asset Purchase Agreement

On the Effective Date, the Debtors shall consummate the transactions contemplated by the Asset Purchase Agreement pursuant to the terms thereof in exchange for the Purchase Price. Upon entry of the Sale Order and the Confirmation Order by the Bankruptcy Court, all matters provided for under the Asset Purchase Agreement will be deemed authorized and approved without any requirement of further act or action by Holders of Equity Interests or the Debtors' boards of directors. The Debtors and the Signal Liquidating Trustee (as applicable) are authorized to execute and deliver, and to consummate the transactions contemplated by the Asset Purchase Agreement as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

1.    Transfer of Acquired Assets

On the Effective Date, in consideration and in exchange for the Purchase Price, and subject to the terms of and condition of the Plan and Bankruptcy Court's order authorizing such transaction, the Debtors will tender to the Purchaser duly executed bills of sale and assignment or other appropriate instruments and documents transferring title to and interest in the Acquired Assets free and clear of all Liens, Claims and interests (other than the Purchaser Assumed Liabilities and the Litigation Settlement Trust's participation interest in the Westport Loan) pursuant to the terms and conditions of the Asset Purchase Agreement. For the avoidance of doubt, nothing in this Section 4.B.1 prejudices Max Specialty's ability to object to any such transaction, or modifies the rights or obligations of Max Specialty, the DIP Lenders, or any other party in interest under the Final DIP Order. Notwithstanding this Section 4.B.1, nothing in the Plan modifies the obligation under the Plan Support Agreement to commence an avoidance action against Max Specialty to avoid any avoidable liens against the Assets.

2.    Payment of Purchase Price and Discharge of Purchaser Assumed Liabilities

The Purchaser shall (i) promptly perform and discharge all Purchaser Assumed Liabilities in the ordinary course of business in accordance with the terms and conditions of any applicable agreements relating thereto and (ii) remit the Purchase Price in accordance with the Asset Purchase Agreement.

3.    Good Faith of the Purchaser

The transactions contemplated by the Asset Purchase Agreement are undertaken by the Debtors and the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including the assumption, assignment and/or transfer of any Executory Contract), unless such authorization and consummation of such Sale Transaction are duly stayed pending such appeal. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

4.    No Successor Liability for the Purchaser

Except as otherwise expressly provided in the Plan, the Confirmation Order, the Sale Order or the Asset Purchase Agreement, the Purchaser: (i) does not, pursuant to the Plan, the Sale Order or otherwise, assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or Assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity; and (iii) shall not have any successor or transferee liability of any kind or character; *provided* that the Purchaser shall promptly perform and discharge the obligations specified in the Asset Purchase Agreement, including, without limitation, the Purchaser Assumed Liabilities.

**C.    Substantive Consolidation of the Debtors**

Entry of the Confirmation Order shall constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Estates for all purposes, including, but not limited to, voting, Confirmation and Distribution. Accordingly, (i) the Assets and liabilities of the Debtors will be deemed to be the Assets and liabilities of a single, consolidated entity, (ii) each and every Claim filed or to be filed in the Bankruptcy Cases against any Debtor shall be considered filed against the consolidated Debtors and shall be considered one Claim against and obligation of the consolidated Debtors on and after the Effective Date, (iii) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations, are considered a single claim against the Debtors and (iv) all guaranties by any of the Debtors of the obligations of any Debtor arising prior to the Effective Date shall be deemed eliminated under the Plan so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors.

Such substantive consolidation of the Estates, however, shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts that were entered into during the Bankruptcy Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Litigation Settlement Trust or the Signal Liquidating Trustee on the Effective Date, (iv) the Debtors', the Litigation Settlement Trust's, or the Signal Liquidating Trustee's ability to subordinate or otherwise challenge Claims on an entity by entity basis, and (v) the extent to which liens, if any, attach to Assets. For the avoidance of doubt, except as otherwise ordered by the Bankruptcy Court, such substantive consolidation shall be without prejudice to any Entity's position as to: (i) the validity, perfected status, enforceability, priority, or avoidability of any lien held or asserted by Max Specialty; (ii) the validity, enforceability, or amount of any judgment or Claim held or asserted by Max Specialty; (iii) any purported requirement under the Bankruptcy Code or applicable law that the DIP Lenders or Pre-Petition Credit Parties (as defined in the Final DIP Order) be subject to the equitable doctrine of marshaling or any similar doctrine in connection any lien held or asserted by Max Specialty; (iv) the determination of the MS Adequate Protection Amount (as defined in the Final DIP Order); and (v) the value or allocation of any Assets or the proceeds thereof allegedly encumbered by an lien held or asserted by Max Specialty. Moreover, the Debtors reserve the right to seek confirmation of the Plan on an entity-by-entity basis.

In the event the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates or the Debtors do not pursue substantive consolidation, (i) the Plan shall be treated as a separate plan of liquidation for each Debtor not substantively consolidated and (ii) the Debtors shall not be required to resolicit votes with respect to the Plan and each Ballot submitted properly in accordance

with the Disclosure Statement Order will be counted only as votes with respect to the Plan of the specific Debtor against which Holder has a Claim.

### D.    Cash Reserves

On or before the Effective Date, the Debtors or the Signal Liquidating Trust shall establish the Disputed Claims Reserve, the Signal Liquidating Trust Expense Fund, and the GUC Payment Fund.

On or before the Effective Date, the Professional Fee Reserve shall be established. Counsel for the Debtors shall hold the amounts allocated for Debtors' professionals in trust for the Debtors' professionals. Counsel for the Committee shall hold the amounts allocated for the Committee's professionals in trust for the Committee's professionals. Payment of Professional Fees from the Professional Fee Reserve are subject to entry of a Bankruptcy Court order approving the applicable Retained Professional's fee application.

### E.    Effective Date

On the Effective Date, the Debtors shall File and serve a notice of Confirmation and occurrence of the Effective Date. Such notice shall contain, among other things, the deadline by which all parties will be required to File and serve any Proofs of Claim for damages arising out of the rejection of an Executory Contract pursuant to the Plan and for any unpaid Administrative Claims.

On the Effective Date, the Debtors' Retained Professionals shall be deemed to have completed their services to the Debtors, but they shall be authorized to file and be compensated for filing final applications for reasonable compensation and reimbursement of expenses through the Effective Date as permitted by the Plan.

### F.    Operations of the Debtors Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

### G.    Term of Injunctions or Stays

Unless otherwise provided herein or in another order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Cases pursuant to sections 105, 362 and 524 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

### H.    Setoffs

Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors, the Signal Liquidating Trust and the Litigation Settlement Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or Distributions to be made pursuant to the Plan in respect of such Claim, any claims, rights, causes of action and liabilities of any nature that the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust may hold against the Holder of such Claim; *provided, however,* that neither the failure to effect such a setoff nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as the case may be, of any of such claims, rights, causes of action and liabilities that the Debtors,

the Signal Liquidating Trust or the Litigation Settlement Trust has or may have against the Holder of such Claim.

## I.    Corporate Action

The entry of the Confirmation Order shall constitute the approval of the authorization for the Debtors to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and any documents contemplated to be executed therewith, prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order rule or regulation.

## J.    Cancellation of Existing Agreements and Existing Equity Interests

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates, and other documents evidencing any Claims or Equity Interests shall be canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

## K.    Authorization of Plan-Related Documentation

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan and any other agreement or document related to or entered into in connection with the Plan, shall become, and shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

Any responsible officer or director of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## L.    Dissolution of Committee

The Committee shall continue in existence through and including the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court or in the Plan or the Confirmation Order prior to the Effective Date.  On the Effective Date, the Committee shall be deemed dissolved, and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Bankruptcy Cases or the Plan and its implementation, and the retention or employment of the Committee's Retained Professionals shall terminate.

On the Effective Date, the Committee's Retained Professionals shall be deemed to have completed their services to the Committee, but they shall be authorized to file final applications for reasonable compensation and reimbursement of expenses through the Effective Date as permitted by the Plan.

**M.      Closing the Bankruptcy Cases**

Upon the Effective Date, the Bankruptcy Cases for the Debtors, except for Signal International Inc., shall be deemed closed, and the Signal Liquidating Trustee shall submit separate orders to the Bankruptcy Court under certification of counsel closing each such Bankruptcy Case, which certification of counsel shall not be filed until all applicable monthly operating reports have been filed and all fees due and payable pursuant to 28 U.S.C. § 1930 have been paid. After all Causes of Action and Disputed Claims have been resolved, all statutory fees have been paid, all of the Assets have been distributed in accordance with this Plan, or at such earlier time as the Signal Liquidating Trustee deems appropriate, the Signal Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Bankruptcy Case for Signal International Inc., in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

**N.      Exemption from Certain Fees and Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with the Plan, the Asset Purchase Agreement or the Restructuring Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and the Sale Order and Confirmation Order shall direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under the Plan, the Asset Purchase Agreement, or the Restructuring Documents and (ii) the maintenance or creation of security interests or any Lien as contemplated by the Plan, the Asset Purchase Agreement, or the Restructuring Documents.

## ARTICLE V.
## THE SIGNAL LIQUIDATING TRUST

**A.      Signal Liquidating Trust**

The Signal Liquidating Trust Agreement is incorporated into and made a part of the Plan. In the event of any conflict between the terms of the Plan and the terms of the Signal Liquidating Trust Agreement, the terms of the Plan shall control.

**B.      Establishment and Purpose of the Signal Liquidating Trust**

On or before the Effective Date, the Debtors and the Signal Liquidating Trustee shall execute the Signal Liquidating Trust Agreement and shall have established the Signal Liquidating Trust pursuant to the Plan. The Signal Liquidating Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Signal Liquidating Trust.

**C.      Authority and Role of the Signal Liquidating Trustee**

The authority and role of the Signal Liquidating Trustee shall be in accordance with the provisions of the Signal Liquidating Trust Agreement and the Plan. In furtherance of and consistent with

the purpose of the Signal Liquidating Trust Agreement and the Plan, solely for the purpose of carrying out the Plan and discharging the duties in the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest in these Bankruptcy Cases and, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and the representative of, the Estates for the retention, enforcement, settlement or adjustment of all claims and rights, known and unknown, and all interests belonging to the Debtors or the Estates, which arose prior to the Confirmation Date, except in connection with any proceeding involving, relating to or arising out of, in whole or in part, the Litigation Claims.

## D.    Appointment of the Signal Liquidating Trustee

The Signal Liquidating Trustee is set forth in the Signal Liquidating Trust Agreement. The appointment of the Signal Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date. In accordance with the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Signal Liquidating Trust is dissolved in accordance with the Signal Liquidating Trust Agreement and/or (ii) the date such Signal Liquidating Trustee resigns, is terminated or is otherwise unable to serve.

The Signal Liquidating Trustee and its professionals, in their capacity as such, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Signal Liquidating Trust Agreement, *provided, however*, that no such parties shall be indemnified for willful misconduct, actual fraud or gross negligence.

## E.    Signal Liquidating Trust Assets

On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred the Signal Liquidating Trust Assets to the Signal Liquidating Trust. In accordance with section 1141 of the Bankruptcy Code, the Signal Liquidating Trust Assets shall automatically vest in the Signal Liquidating Trust free and clear of all Claims, liens, encumbrances, or interests subject only to the Signal Liquidation Trust Expenses, as provided for in the Plan and the Signal Liquidating Trust Agreement.

## F.    Treatment of Signal Liquidating Trust for Federal Income Tax Purposes

In accordance with Treas. Reg. § 301.7701-4(d), the Signal Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Post-Effective Date Assets, if any, make timely distributions to the Signal Liquidating Trust Beneficiaries and not unduly prolong its duration. The Signal Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Signal Liquidating Trust Agreement.

## G.    Signal Liquidating Trust as a "Grantor Trust"

The Signal Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Signal Liquidating Trust Beneficiaries treated as grantors and owners of the Signal Liquidating Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Signal Liquidating Trustee, and the Signal Liquidating Trust Beneficiaries) shall treat the transfer of the Signal Liquidating Trust Assets by the Debtors to the Signal Liquidating Trust, as set forth in the Signal Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims of Signal Liquidating Trust Beneficiaries entitled to distributions from the Signal Liquidating Trust Assets, followed by a transfer by such Holders to the Signal Liquidating Trust. Thus,

the Signal Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

## H.    Signal Liquidating Trustee's Right and Power to Invest

The right and power of the Signal Liquidating Trustee to invest the Signal Liquidating Trust Assets transferred to the Signal Liquidating Trust, the proceeds thereof, or any income earned by the Signal Liquidating Trust, shall be limited to the right and power to invest such Signal Liquidating Trust Assets (pending distributions in accordance with the Plan) in Permissible Investments; *provided, however,* that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise.

## I.    Responsibilities of the Signal Liquidating Trustee

The responsibilities of the Signal Liquidating Trustee shall include, but shall not be limited to:

(i)      the making of Distributions as contemplated herein;

(ii)      conducting an analysis of all Non-Litigation Claims, and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate;

(iii)      preparing and filing post-Effective Date operating reports;

(iv)      filing appropriate tax returns with respect to the Signal Liquidating Trust and paying taxes properly payable by the Signal Liquidating Trust, if any, in the exercise of its fiduciary obligations;

(v)      retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations;

(vi)      taking such actions as are necessary and reasonable to carry out the purposes of the Signal Liquidating Trust;

(vii)      protecting and enforcing the rights to the Signal Liquidating Trust Assets vested in the Signal Liquidating Trustee by any method reasonably determined to be appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity; and

(viii)      terminating the Signal Liquidating Trust and seeking to close the Bankruptcy Cases pursuant to section 350(a) of the Bankruptcy Code.

## J.    Expenses of the Signal Liquidating Trustee

Fees and expenses incurred by the Signal Liquidating Trustee shall be paid from the Signal Liquidating Trust Assets.

## K.    Bonding of the Signal Liquidating Trustee

The Signal Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his or her sole discretion, in which case the expense incurred by such bonding shall be paid by the Signal Liquidating Trust.

**L.      Fiduciary Duties of the Signal Liquidating Trustee**

Pursuant to the Plan and the Signal Liquidating Trust Agreement, the Signal Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Non Litigation Claims against the Debtors that will receive Distributions pursuant to the terms of the Plan.

**M.      Cooperation; Transfer of Books and Records**

On or before the Effective Date, or as soon thereafter as is practical, the Debtors or the Purchaser, as applicable, will transfer and assign, or cause to be transferred and assigned, to the Signal Liquidating Trustee, copies of all of the books and records of the Debtors necessary for the handling of the Non-Litigation Claims.  Following the Effective Date, the Purchaser (to the extent practicable) shall cooperate to the extent reasonably requested by the Signal Liquidating Trustee in the handling of Non-Litigation Claims filed against the Debtors, and generally in the operation of the Signal Liquidating Trust for purposes set forth herein and for the duration of the Signal Liquidating Trust, and shall use commercially reasonable efforts (as determined by the Purchaser in its sole discretion) to request any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser cooperate to the extent that the Signal Liquidating Trustee reasonably requests the Purchaser to make such request to any of the foregoing and deems such persons necessary to appear at any trial or arbitration proceeding relating to the liquidation of Non-Litigation Claims against the Debtors.   To the extent that the Litigation Settlement Trustee or the Purchaser, as appropriate, require any information from the Signal Liquidating Trustee for preparation of any tax return or financial statement, the Signal Liquidating Trustee shall cooperate in a commercially reasonable manner, to the extent reasonably requested to provide such information to the Litigation Settlement Trustee or the Purchaser, as appropriate.  The Purchaser (and any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser to the extent that such person is requested to perform act or otherwise perform hereunder) and the Litigation Settlement Trustee shall be entitled to the advancement and/or reimbursement of any reasonable costs, expenses or fees, including professional fees, and expenses, incurred or to be incurred in compliance with any request of the Litigation Settlement Trust pursuant to the foregoing.

**N.      Transfer of Privileged Information**

On the Effective Date or as soon thereafter as is reasonably practicable, the Privileged Information of the Debtors needed for the handling of the Non-Litigation Claims shall be transferred, assigned, given over to, and shall vest exclusively in the Signal Liquidating Trustee.  Further, with regard to any such privileges, (i) they are transferred or contributed for the sole purpose of enabling the Signal Liquidating Trustee to perform its duties to administer the Signal Liquidating Trust and for no other reason, (ii) they are vested solely in the Signal Liquidating Trustee, and not in the Signal Liquidating Trust or any other entity, committee or subcomponent of the Signal Liquidating Trust, or any person (including counsel) who has been engaged by, represents or has represented any Litigation Claimant or any person who alleges or may allege a claim directly or indirectly relating to or arising from the Debtors' premises or operations, (iii) they shall be preserved and not waived, (iv) for the avoidance of doubt (if any), any such transfer or contribution shall have no effect on any right, claim or privilege of any person other than the Debtors, and (v) no information subject to a privilege or a prior assertion thereof shall be publicly disclosed by the Signal Liquidating Trustee or the Signal Liquidating Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of any such information.

**O.      Dissolution of the Signal Liquidating Trust**

The Signal Liquidating Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion Filed with the Bankruptcy Court (the Filing of which shall automatically extend the term of the Signal Liquidating Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Signal Liquidating Trust Assets.  The Signal Liquidating Trust Agreement shall require that each extension be approved by the Bankruptcy Court within six (6) months prior to the conclusion of the extended term.  After (i) the final Distribution to Holders of Allowed Claims, (ii) the Filing by or on behalf of the Signal Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (iii) any other action deemed appropriate by the Signal Liquidating Trustee, the Signal Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

**P.      Full and Final Satisfaction against Signal Liquidating Trust**

On and after the Effective Date, the Signal Liquidating Trust shall have no liability on account of any Claims except as set forth in the Plan and in the Signal Liquidating Trust Agreement.  All payments and all Distributions made by the Signal Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims against the Signal Liquidating Trust.

<div align="center">

**ARTICLE VI.**
**LITIGATION SETTLEMENT TRUST AND**
**DISTRIBUTIONS TO LITIGATION CLAIMANTS**

</div>

**A.      Establishment and Administration of the Litigation Settlement Trust**

On the Effective Date, the Litigation Settlement Trust shall be established in accordance with the Plan Documents.  The Litigation Settlement Trust shall be a "Qualified Settlement Fund" within the meaning of section 468B of the Internal Revenue Code and the regulations promulgated thereunder.  The Litigation Settlement Trust: shall assume the liability for all Litigation Claims; shall administer, process, settle, resolve and liquidate such Litigation Claims; and shall use the Litigation Settlement Trust Assets and the proceeds and income therefrom, after payment of necessary expenses of the Litigation Settlement Trust, including expenses of the Litigation Settlement Trustee and its retained professionals, to satisfy and make payment to all such Litigation Claims that may qualify for a recovery only in accordance with the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, all in accordance with the Plan, the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  The Litigation Settlement Trust will administer, process, settle, resolve, liquidate, satisfy and/or pay, as applicable, Litigation Claims in such a way that the Holders of Litigation Claims are treated equitably and in a substantially similar manner, subject to the terms of the Plan, the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.  Litigation Claims shall be channeled to the Litigation Settlement Trust pursuant to the Channeling Injunction set forth in Section 6.C of the Plan and may thereafter be asserted only and exclusively against the Litigation Settlement Trust.  All such Litigation Settlement Trust Claims shall be liquidated and paid in accordance with the Litigation Settlement Trust Agreement, the Litigation Settlement TDP, the Plan and the Confirmation Order.  The Litigation Settlement Trust shall be administered and implemented by the Litigation Settlement Trustee as provided in the Litigation Settlement Trust Agreement.

**B.      Litigation Settlement TDP**

On the Effective Date, the Litigation Settlement Trust shall implement the Litigation Settlement TDP in accordance with the terms of the Litigation Settlement Trust Agreement.  On or after the Effective Date, the Litigation Settlement Trustee, upon notice to the Litigation Settlement TAC, shall have the power to administer, amend, supplement or modify the Litigation Settlement TDP in accordance with the terms thereof; *provided, however*, that such modification is not inconsistent with the Plan or other Plan Documents; *provided, further*, to the extent that any modifications to the Litigation Settlement Trust Agreement or the Litigation Settlement TDP constitute a material modification that would affect the rights of the Plan Participants, such Plan Participants shall be provided ten (10) days advance notice of such amendment and an opportunity to contest the proposed amendment before the Bankruptcy Court.  In the event that any of the Plan Participants contests a proposed amendment within the notice period contemplated in this paragraph, such modification shall not become effective until such time as the Bankruptcy Court has authorized the amendment or the objecting Plan Participant has consented to the proposed amendment.

**C.      Imposition of Channeling Injunction**

From and after the Effective Date, (i) all Litigation Claims will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order and (ii) the Plan Participants and Related Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with any Litigation Claims, *provided, however*, that nothing in the Plan shall preclude any action by the Litigation Settlement Trust to enforce the Plan.  *To supplement the injunctive effect of the Plan Injunction, and pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, for Litigation Claims, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date*:

1.      Terms

*To preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction and the releases described in Article XI of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Entities that have held or asserted, or that hold or assert any Litigation Claim shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Litigation Claim other than from the Litigation Settlement Trust in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP, including, but not limited to:*

(i)      *commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding of any kind with respect to any such Litigation Claim, against any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

(ii)      *enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any of the Plan Participants or their Related Parties, or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

(iii)    *creating, perfecting or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any of the Plan Participants or their Related Parties or the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim;*

(iv)    *asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due any of the Plan Participants or their Related Parties or against the property of any of the Plan Participants or their Related Parties with respect to any such Litigation Claim; and*

(v)    *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to such Litigation Claim.*

2.    Reservations

Notwithstanding anything to the contrary in Article XI of the Plan, the Channeling Injunction shall not enjoin:

(i)    the rights of Entities to the treatment afforded them under the Plan, including the right of Entities holding Litigation Claims to assert such Claims in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP solely against the Litigation Settlement Trust whether or not there are funds to pay such Litigation Claims;

(ii)    the rights of Entities to assert any Claim, debt, litigation, or liability for payment of Litigation Settlement Trust Expenses solely against the Litigation Settlement Trust whether or not there are funds to pay such Litigation Settlement Trust Expenses;

(iii)    the Litigation Settlement Trust from enforcing its rights under the Litigation Settlement Trust Agreement, the Litigation Settlement TDP and the Restructuring Documents; and

(iv)    the rights of any Plan Participant to demand the Litigation Settlement Trust to fulfill its obligations to enforce the terms of the Channeling Injunction consistent with Section 6.C of the Plan.

3.    Modifications

There can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

4.    Non-Limitation Channeling Injunction

Nothing in the Plan or in the Litigation Settlement Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Litigation Settlement Trust's assumption of all liability with respect to Litigation Claims.

**D.    Release of Liabilities to Litigation Claimants**

The transfer to, vesting in, and assumption by the Litigation Settlement Trust of the Litigation Settlement Trust Assets as contemplated by the Plan shall, as of the Effective Date, release all obligations and liabilities of and bar recovery or any action against the Plan Participants, and their Related Parties, for or in respect of all Litigation Claims (and the Confirmation Order shall so provide for such release). The Litigation Settlement Trust shall, as of the Effective Date, assume sole and exclusive responsibility and

liability for all Litigation Claims, and such Claims shall be liquidated, resolved or paid by the Litigation Settlement Trust from the Litigation Settlement Trust Assets or as otherwise directed in the Litigation Settlement Trust Agreement.

## E.  Assumption of Certain Liabilities

In consideration of the Litigation Settlement Trust Assets transferred to the Litigation Settlement Trust under the Plan and in furtherance of the purposes of the Litigation Settlement Trust and the Plan, the Litigation Settlement Trust shall assume all liability and responsibility for all Litigation Claims, including the administration thereof as described in the Plan and the Debtors and the Signal Liquidating Trust shall have no further financial or other responsibility or liability therefor.  For the avoidance of doubt, the Litigation Claims shall be resolved in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.

## F.  Appointment of the Litigation Settlement Trustee

The Litigation Settlement Trustee shall be selected by the Southern Poverty Law Center.  The Debtors shall File a notice, as part of the Plan Supplement, naming the Person designated as Litigation Settlement Trustee.  On the Confirmation Date, the Bankruptcy Court shall appoint the initial Litigation Settlement Trustee to serve in accordance with, and shall have the functions and rights provided in, the Litigation Settlement Trust Agreement.  Any successor Litigation Settlement Trustee shall be appointed in accordance with the terms of the Litigation Settlement Trust Agreement.  For purposes of any Litigation Settlement Trustee performing his or her duties and fulfilling his or her obligations under the Litigation Settlement Trust and the Plan, the Litigation Settlement Trust and the Litigation Settlement Trustee shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  The Litigation Settlement Trustee shall be the "administrator" of the Litigation Settlement Trust as that term is used in Treas. Reg. Section 1.468B-2(k)(3).

The Litigation Settlement Trustee may be terminated at any time in accordance with the provisions of the Litigation Settlement Trust Agreement.

The Litigation Settlement Trustee and its professionals and the members of the Litigation Settlement TAC, in their capacity as such, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Litigation Settlement Trust Agreement, *provided, however,* that no such parties shall be indemnified for willful misconduct, actual fraud or gross negligence.

All Litigation Settlement Trust Expenses following the Effective Date shall be borne solely by the Litigation Settlement Trust.

## G.  Litigation Settlement Trust Assets

On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred the Litigation Settlement Trust Assets to the Litigation Settlement Trust.  In accordance with section 1141 of the Bankruptcy Code, the Litigation Settlement Trust Assets shall automatically vest in the Litigation Settlement Trust free and clear of all Claims, liens, encumbrances, or interests, subject only to the Westport Participation Agreement, and as otherwise provided for in the Plan and the Litigation Settlement Trust Agreement.

1.  Westport Loan Proceeds

(i)  Westport Participation Agreement

On the Effective Date, the Purchaser will receive, free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and ERSA) other than the participating interest of the Litigation Settlement Trust described below, all right, title and interest of the Debtors in and to certain purchase money indebtedness currently owing to the Debtors under the Westport Loan. The Westport Loan and the Westport Documents will be transferred to the Purchaser subject to the terms of the Westport Participation Agreement, in form and content reasonably acceptable to the Westport Participants. Upon the Effective Date, the TRSA and ERSA, and the collateral agent under the First Lien Loan Agreement will execute any documents necessary to effectuate a release and discharge of their respective liens, encumbrances and security interests on the Westport Loan facility.

The Westport Participation Agreement shall provide that each Westport Participant share on a Pro Rata basis in all proceeds derived from the Westport Loan (including scheduled payments of principal and interest, prepayments, proceeds of enforcement or proceeds of liquidation of collateral) as follows:

- The Litigation Settlement Trust shall receive a 66.9% participating interest, and the Purchaser shall receive a 33.1% participating interest, in and to the Westport Loan and the Westport Documents. The participating interests described above are referred to herein as each Westport Participant's "**Sharing Ratio**".

- If the Westport Loan is prepaid in full, in accordance with its terms, prior to its scheduled maturity date, and the application of the Litigation Settlement Trust's Sharing Ratio to such prepayment results in an aggregate recovery of less than $20 million by the Litigation Settlement Trust, then the Litigation Settlement Trust shall be entitled to receive additional proceeds from such prepayment in an amount sufficient to increase its aggregate recovery from the Westport Loan to $20 million.

- The maximum aggregate amount payable to the Litigation Settlement Trust by virtue of its Sharing Ratio shall for all purposes be capped at $22 million. Upon receipt of said amount by the Litigation Settlement Trust, all further payments or other recoveries with respect to the Westport Loan will be payable solely to the Purchaser.

For the avoidance of doubt, the Litigation Settlement Trust shall not receive any guarantee or other credit support as to the Westport Loan from the Purchaser, the Debtors, or any party to the Plan Support Agreement.

(ii)     Westport Loan Administration Expenses

Pursuant to the Westport Participation Agreement, if the TRSA and ERSA or an affiliate or designee thereof is the Purchaser, the TRSA and ERSA will be responsible for the collection and distribution of the proceeds of the Westport Loan and, if necessary, the enforcement thereof, for the ratable benefit of the Westport Participants. All out-of-pocket costs and expenses reasonably and actually incurred by the TRSA and ERSA in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any distribution to the Westport Participants in accordance with their respective Sharing Ratios.

Pursuant to the Westport Participation Agreement, if none of the TRSA and ERSA or an affiliate or designee thereof is the Purchaser, the Litigation Settlement Trust will be responsible for the collection and distribution of the proceeds of the Westport Loan and, if necessary, the enforcement

thereof, for the ratable benefit of the Westport Participants. All Litigation Settlement Trust Expenses incurred in connection with the administration of the Westport Loan shall be payable from proceeds thereof prior to any distribution to the Westport Participants in accordance with their respective Sharing Ratios.

(iii)    Westport Loan Payments

Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Effective Date, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Effective Date of the Plan, shall be held in trust for the benefit of the Westport Participants and will be distributed to the Westport Participants on the Effective Date in accordance with their respective Sharing Ratios.

(iv)    Enforcement of Westport Loan

The transfer of the Debtors' right, title and interest in and to the Westport Loan and the Westport Documents to the Purchaser shall be free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and ERSA) pursuant to section 363(f) of the Bankruptcy Code, other than the participating interest of the Litigation Settlement Trust. The Westport Documents shall remain legal, valid, binding and authorized obligations of the parties obligated thereunder, enforceable in accordance with their terms. Each of the Purchaser and the Litigation Settlement Trust shall constitute a holder in due course and a "person entitled to enforce instrument" under section 3-301 of the Uniform Commercial Code with respect to the notes, instruments and other Westport Documents.

2.    Excess Sale Overpayment

Any Sale Overpayment made on the Effective Date and not subject to a valid and perfected lien shall be paid as follows:

- *First*, to the Litigation Settlement Trust to reduce, on a dollar-for-dollar basis, its participating interest in the Westport Loan (not to exceed a total of $20 million). In such event, the Sharing Ratio of the Litigation Settlement Trust shall be recalculated to account for all sums received from such Sale Overpayment. If the Sale Overpayment is in an amount adequate to result in the immediate payment of the sum of $20 million to the Litigation Settlement Trust, then the Westport Loan will be transferred to the Purchaser free and clear of all liens, claims and encumbrances, and shall not be subject to a continuing participation interest by any party.

- *Second*, any Sale Overpayment greater than $20 million paid to the Litigation Settlement Trust as set forth above (such amount the "**Excess Sale Overpayment**") will be shared as follows:    22.5% of the Excess Sale Overpayment shall be paid to holders of General Unsecured Claims (as defined below), not subject to dilution by the Litigation Claimants, and 77.5% of the Excess Sale Overpayment shall be paid to Litigation Claimants, not subject to dilution by the holders of General Unsecured Claims, *provided*, that at such time

as the holders of General Unsecured Claims (other than the Litigation Claims) have received payment in full of the allowed amount of their claims, 100% of any remaining Excess Sale Overpayment shall be paid to the Litigation Claimants.

**H.      Litigation Settlement TAC**

The Litigation Settlement TAC shall have the functions and rights provided in the Litigation Settlement Trust Agreement.  Prior to the Confirmation Hearing, the Supporting Litigation Claimants shall select the initial members of the Litigation Settlement TAC.  On the Confirmation Date, the Bankruptcy Court shall appoint the initial members of the Litigation Settlement TAC, as selected by the Supporting Litigation Claimants.

**I.      Cooperation; Transfer of Books and Records**

On or before the Effective Date, or as soon thereafter as is practical, the Debtors or the Purchaser, as applicable, will transfer and assign, or cause to be transferred and assigned, to the Litigation Settlement Trustee, copies of all of the books and records of the Debtors that pertain to the Litigation Claims. Following the Effective Date, the Purchaser (to the extent practicable) shall further cooperate to the extent reasonably requested (as determined by the Purchaser in its sole discretion) by the Litigation Settlement Trustee in the handling of Litigation Claims and generally in the operation of the Litigation Settlement Trust for purposes set forth herein and for the duration of the Litigation Settlement Trust, and shall use commercially reasonable efforts (as determined by the Purchaser in its discretion) to request former officers, directors, employees, agents or representatives of the Debtors employed by the Purchaser cooperate to the extent that the Litigation Settlement Trustee reasonably requests the Purchaser to make such request to any of the foregoing and deems such persons necessary to appear at any trial or arbitration proceeding relating to the handling of Litigation Claims.  To the extent that the Signal Liquidating Trustee or the Purchaser, as appropriate, require any information from the Litigation Settlement Trustee for preparation of any tax return or financial statement, the Litigation Settlement Trustee shall cooperate in a commercially reasonable manner, to the extent reasonably requested to provide such information to the Signal Liquidating Trustee or the Purchaser, as appropriate.  The Purchaser (and any former officer, director, employee, agent or representative of the Debtors employed by the Purchaser, to the extent that such person is requested to perform act or otherwise perform hereunder) and/or the Signal Liquidating Trust shall be entitled to the advancement and/or reimbursement of any reasonable costs, expenses or fees, including professional fees, and expenses, incurred or to be incurred in compliance with any request of the Litigation Settlement Trust pursuant to the foregoing.

**J.      Transfer of Privileged Information**

The transfer or assignment of Privileged Information to the Litigation Settlement Trustee does not result in the destruction or waiver of any applicable privileges pertaining to such Privileged Information. Further, with regard to any such privileges, (i) they are transferred or contributed for the sole purpose of enabling the Litigation Settlement Trustee to perform its duties to administer the Litigation Settlement Trust and for no other reason, (ii) they are vested solely in the Litigation Settlement Trustee, and not in the Litigation Settlement Trust, the Litigation Settlement TAC or any other entity, committee or subcomponent of the Litigation Settlement Trust, or any person (including counsel) who has been engaged by, represents or has represented any Litigation Claimant, or any person who alleges or may allege a claim directly or indirectly relating to or arising from the Debtors' premises or operations, (iii) they shall be preserved and not waived, (iv) for the avoidance of doubt any such transfer or contribution shall have no effect on any right, claim or privilege of any person other than the Debtors, and (v) no information subject to a privilege or a prior assertion thereof shall be publicly disclosed by the

Litigation Settlement Trustee or the Litigation Settlement Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of any such information.

**K.      Institution and Maintenance of Legal and Other Proceedings**

As of the Effective Date, the Litigation Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Litigation Settlement Trust. The Litigation Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions relating to the Litigation Settlement Trust in the name of the Debtors if deemed necessary or appropriate by the Litigation Settlement Trustee. The Litigation Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred by the Litigation Settlement Trust subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to the Plan. For the avoidance of doubt, the Litigation Settlement Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of all Litigation Claims.

### ARTICLE VII.
### PROVISIONS FOR TREATMENT OF CONTINGENT
### CLAIMS AND DISPUTED NON-LITIGATION CLAIMS

**A.      Treatment of Contingent Claims**

Holders of Contingent Claims shall be paid only after such Claims have become fixed and/or liquidated. No interest shall be paid on account of a Contingent Claim except as provided in section 506(b) of the Bankruptcy Code.

**B.      Objection to Claims and Prosecution of Disputed Non-Litigation Claims**

The Debtors and/or the Signal Liquidating Trustee shall object to the allowance of Non-Litigation Claims with respect to which the Signal Liquidating Trustee disputes liability in whole or in part. The failure of the Debtors and/or the Signal Liquidating Trustee to object to or to re-examine any Claim shall not be deemed to be a waiver of the right to object to or to re-examine such Claim in whole or in part to determine its allowability. Any objections to Non-Litigation Claims shall be Filed no later than the Claims Objection Deadline. The Debtors and/or the Signal Liquidating Trustee shall not be required to object to any Claim where the Debtors and/or the Signal Liquidating Trustee have determined in their good-faith, reasonable discretion that objection to such Claim would not be in the best interest of the Debtors' Estates or the Signal Liquidating Trust, as the case may be. The Signal Liquidating Trustee shall have the right to compromise and settle any Non-Litigation Claim against the Debtors after the Effective Date (i) without notice to Creditors or order of the Bankruptcy Court if the settlement amount is $250,000 or less or within $50,000 of the amount of such Non-Litigation Claim as set forth in the Schedules or applicable proof of Claim or (ii) upon the filing with the Bankruptcy Court of a notice of settlement to be served on the parties set forth in Section 14.H and on the applicable Holder of the Non-Litigation Claim.

**C.      Distributions and Reserves on Account of Contingent and Disputed Non-Litigation Claims**

Payments and distributions to each Holder of a Contingent Non-Litigation Claim, a Disputed Non-Litigation Claim or any other Non-Litigation Claim that is not an Allowed Claim, to the extent that

such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the Plan, including the provisions governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that any Disputed Non-Litigation Claim is Allowed or any Contingent Non-Litigation Claim becomes fixed or liquidated, in whole or in part, the Signal Liquidating Trust shall distribute to the Holder of such Claim any Cash that would have been distributed to such Holder if the Claim had been an Allowed Claim on the Effective Date. No Distributions shall be made with respect to all or any portion of a Disputed Non-Litigation Claim or Contingent Non-Litigation Claim unless and until all objections to such Claim have been settled, withdrawn, or resolved by Final Order. Nothing in this Section shall affect the allowance, liquidation or payment of the Litigation Claims.

For purposes of calculating and making Distributions to Holders of Allowed Non-Litigation Claims, the Debtors shall hold in the applicable Cash Reserve at the time of such Distribution an amount sufficient to make Distributions on Non-Litigation Claims that are not Allowed Non-Litigation Claims in such Class in the same Pro Rata percentage as is being made on Allowed Non-Litigation Claims in such Class. For purposes of determining the amount to be reserved, the Debtors shall use the maximum non-contingent and liquidated amount set forth in the Proof of Claim, unless a lesser amount is so ordered by the Bankruptcy Court or agreed to by the Debtors or the Signal Liquidating Trustee and the Holder of such Non-Litigation Claim. Notwithstanding the foregoing or anything else in this Plan, unless otherwise so ordered by the Bankruptcy Court, no reserve shall be required to be established or maintained with respect to Proofs of Claims or requests for Administrative Claims filed after the applicable Bar Date.

## D.    Estimation of Non-Litigation Claims

The Signal Liquidating Trustee may, at any time, request that the Bankruptcy Court, on proper notice, estimate any Contingent and/or Disputed Non-Litigation Claim pursuant to section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Contingent and/or Disputed Non-Litigation Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Contingent and/or Disputed Non-Litigation Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Signal Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution to such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Contingent and/or Disputed Non-Litigation Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Nothing in this Section shall affect the allowance, liquidation or payment of Litigation Claims.

## E.    Certain Objections to Allowance of Litigation Settlement Trust Claims

Notwithstanding anything to the contrary herein, Litigation Claims shall be channeled to the Litigation Settlement Trust and administered in accordance with the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.

## F.    No Postpetition Interest

Unless otherwise specifically provided for in any order approving the DIP Facility, this Plan or Confirmation Order, or required by applicable bankruptcy law (including interest allowed pursuant to section 506 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim; and except as permitted by applicable bankruptcy law (including interest allowed pursuant to sections 506 and

1129 of the Bankruptcy Code), interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Effective Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

# ARTICLE VIII.
## PROVISIONS GOVERNING DISTRIBUTIONS FOR CLAIMS

**A.     Timing of Distributions Under The Plan**

Any Distribution to be made pursuant to the Plan shall be deemed to have been timely made if made within ten (10) business days of the time specified in the Plan or, if applicable, the Litigation Settlement Trust Agreement and the Litigation Settlement TDP.

**B.     Manner of Payment Under the Plan**

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made under the Plan shall be made by check drawn on a domestic bank, or by wire transfer from a domestic bank.

**C.     Withholding of Taxes**

The Signal Liquidating Trustee or the Litigation Settlement Trustee, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Entity entitled to such assets to the extent required by applicable law.

Except as set forth in the Litigation Settlement Trust Agreement, all distributions hereunder shall be subject to withholding and reporting requirements. Holders of Claims are required to provide any information requested by the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, including returning W-9 forms, to effect the necessary information reporting and withholding of applicable taxes with respect to distributions to be made under the Plan. The Signal Liquidating Trustee or the Litigation Settlement Trustee, as applicable, (i) will make a written request to each Holder of an Allowed Claim requesting a W-9 or similar applicable form to be returned within 90 days and (ii) shall be entitled in its sole discretion to withhold any distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Signal Liquidating Trustee or Litigation Settlement Trustee, as applicable, to such Holder of an Allowed Claim, which timeframe shall not be less than 90 days. The Distribution on account of any Holder of an Allowed Claim that fails to timely respond shall be treated as an unclaimed distribution pursuant to Section 8.E of the Plan.

**D.     Allocation of Distribution Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**E.     Unclaimed Distributions**

Except as set forth in the Litigation Settlement Trust Agreement or the Litigation Settlement TDP, any Cash, assets, and other property to be distributed under the Plan that cannot be delivered to the Entity entitled thereto within 90 days after an attempted distribution (including by an Entity's failure to

negotiate a check issued to such Entity 90 days after issuance of a check) shall become vested in, and shall be transferred to, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, notwithstanding state or other escheat or similar laws to the contrary. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or Distributions under the Plan pursuant to section 1143 of the Bankruptcy Code, shall have no further Claim in respect of such Distribution and shall not participate in any further Distributions under the Plan with respect to such Claim.

## F.    Transfer of Claim

To the extent permitted by law, in the event that the Holder of any Claim shall transfer such Claim on or after the Effective Date, it shall immediately advise the Signal Liquidating Trustee or the Litigation Settlement Trustee, as applicable, in writing of such transfer. The Signal Liquidating Trustee or the Litigation Settlement Trustee, as applicable, shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until written notice of a transfer has been received by the Signal Liquidating Trustee or the Litigation Settlement Trustee and filed with the Bankruptcy Court. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Signal Liquidating Trustee or the Litigation Settlement Trustee, as the case may be, shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim.

## G.    Fractional Cents

Notwithstanding anything to the contrary contained herein, no Cash payments of fractions of cents will be made. Fractional cents shall be rounded to the nearest whole cent (with .5 cent or less to be rounded down).

## H.    Delivery of Distributions in General

Distributions to Holders of Allowed Claims shall be made to the address of the Holder of such Claim as indicated on the records of the Debtors, or if a Proof of Claim has been filed, to the address on the Proof of Claim, unless the Signal Liquidating Trustee or the Litigation Settlement Trustee, as the case may be, is instructed otherwise by a signed writing from the Holder of such Allowed Claim.

## I.    Minimum Distribution Amount

Notwithstanding anything to the contrary contained herein, no Cash payments of $25 or less will be made.

## J.    Disallowance of Claims

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER.

Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Signal Liquidating Trustee, the Litigation Settlement Trustee or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to

disallowance or modification. Nothing in the Plan shall preclude amendments to timely filed Proofs of Claim to the extent permitted by applicable law.

## ARTICLE IX.
## TREATMENT OF EXECUTORY CONTRACTS

**A.    Rejection of Executory Contracts**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts shall be deemed to be rejected as of the Effective Date, except for any Executory Contract:  (i) that shall be assumed and assigned to the Purchaser pursuant to the Sale Order; (ii) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; or (iii) as to which a motion for approval of the assumption and/or assignment of such Executory Contract has been filed and served prior to the Confirmation Date.

**B.    Approval by Confirmation Order**

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.  The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any Executory Contract.

**C.    Rejection Damages Bar Date**

Claims arising out of the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtors no later than 30 days after service of the notice of Effective Date.  All such Claims not Filed within such time will be forever barred from assertion against the Debtors and the Signal Liquidating Trustee.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND EFFECTIVE DATE OF THE PLAN

**A.    Condition Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Section 10.C hereof:

(i)     The Confirmation Order, the Plan, and the Restructuring Documents shall be in form and substance consistent in all material respects with the Plan Support Agreement and Plan Term Sheet, and otherwise acceptable to the Debtors, the TRSA and ERSA, the Committee, and the Supporting Litigation Claimants;

(ii)     The Sale Order shall be in a form reasonably acceptable to the Purchaser, the Debtors, the TRSA and ERSA, the Committee, and the Supporting Litigation Claimants;

(iii)     There shall be no payment default continuing under the Westport Loan (determined without giving effect to any alleged waiver by the Debtors or any other party);

(iv)     Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Confirmation Date have been held in trust for the benefit of the Westport Participants;

(v)     Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Confirmation Date have been held in trust for the benefit of the Westport Participants; and

(vi)     The Confirmation Order shall have been entered by the Bankruptcy Court.

**B.     Conditions Precedent to the Effective Date**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Section 10.C hereof:

(i)     The Confirmation Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

(ii)     The Sale Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

(iii)     The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors and the Purchaser, authorizing and approving the assumption, assumption and assignment, and rejection of the Executory Contracts by the Debtors as contemplated in the Asset Purchase Agreement, the Plan and the Plan Supplement;

(iv)     The Plan and the Restructuring Documents shall not have been amended or modified other than in a manner in form and substance consistent in all material respects with the Plan Term Sheet or otherwise acceptable to the Debtors, TRSA and ERSA, and the Supporting Litigation Claimants;

(v)     The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case be in full force and effect. All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Asset Purchase Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied or waived concurrently with the occurrence of the Effective Date);

(vi)     The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, any Cash component of the Purchase Price in accordance with the terms and conditions of the Asset Purchase Agreement;

(vii)     The Debtors or the Liquidating Settlement Trust shall have funded, or will fund concurrently with the occurrence of the Effective Date, the Disputed Claims Reserve and the Signal Liquidating Trust Expense Fund, and the GUC Payment Amount shall have been received by the Signal Liquidating Trust;

(viii)     The Signal Liquidating Trust shall have been formed, and all formation documents for such entity shall have been properly executed and filed as required by the Plan and applicable law;

(ix)     The appointment of the Signal Liquidating Trustee shall have been confirmed by Final Order (which may include the Confirmation Order);

(x)    The Litigation Settlement Trust shall have been formed, and all formation documents for such entity shall have been properly executed and filed as required by the Plan and applicable law;

(xi)    The appointment of the Litigation Settlement Trustee shall have been confirmed by Final Order (which may include the Confirmation Order);

(xii)    The Litigation Settlement Trust Assets shall have been transferred to the Litigation Settlement Trust;

(xiii)    The Purchaser has received, free and clear of liens, claims or encumbrances (including, without limitation, the prepetition liens of the TRSA and ERSA) other than the participating interest of the Litigation Settlement Trust, all right, title and interest of the Debtors in and to the Westport Loan;

(xiv)    All consents, actions, documents, certificates and agreements necessary to implement the Plan, including all transfers to the Signal Liquidating Trust and the Litigation Settlement Trust, and the transactions contemplated by the Asset Purchase Agreement as to the Purchaser shall have closed;

(xv)    All authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the Consummation of the Plan shall have been obtained and not revoked;

(xvi)    There shall be no payment default continuing under the Westport Loan (determined without giving effect to any alleged waiver by the Debtors or any other party);

(xvii)    Any payments of principal received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from June 30, 2015 through the Effective Date have been held in trust for the benefit of the Westport Participants or Cash in an amount equal to the aggregate of such payments is available to be distributed to the Westport Participants under the Plan;

(xviii)    Any payments of interest received by any of the Debtors, TRSA or ERSA on account of the Westport Loan from November 5, 2015 through the Effective Date have been held in trust for the benefit of the Westport Participants or Cash in an amount equal to the aggregate of such payments is available to be distributed to the Westport Participants under the Plan;

(xix)    The Plan Support Agreement shall be in full force and effect; and

(xx)    The Confirmation Date shall have occurred.

**C.    Waiver of Conditions**

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in this Article X of the Plan, with the exception of condition 10.B(vii) may be waived by the Debtors, with the consent of the TRSA and ERSA, the Supporting Litigation Claimants, and the Committee, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure of the Debtors, the Signal Liquidating Trustee or the Litigation Settlement Trustee, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

**D.**     **Effect of Nonoccurrence of Conditions**

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (iii) constitute an Allowance of any Claim or Equity Interest; or (iv) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

<div align="center">

**ARTICLE XI.**
**SETTLEMENT, RELEASE, INJUNCTION**
**AND RELATED PROVISIONS**

</div>

**A.**     **Binding Effect**

On and after the Effective, the provisions of the Plan, the Plan Supplement, and the Confirmation Order shall bind (i) any Holder of a Claim against, or Equity Interest in, the Debtors and such Holder's respective successors and assigns (whether or not the Claim or Equity Interests are Impaired under the Plan, whether or not such Holder has voted to accept the Plan, and whether or not such holder is entitled to a Distribution under the Plan), (ii) all Entities that are parties to or are subject to the settlements, compromises, releases, and Injunctions described in the Plan, (iii) each Person or Entity acquiring property under the Plan or the Confirmation Order, and (iv) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.**     **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors.

**C.**     **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Debtors, the Signal Liquidating Trustee, or the Litigation Settlement Trustee, as applicable, to re-classify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**D.**     **Non-Discharge of the Debtors; Plan Injunction**

**IN ACCORDANCE WITH SECTION 1141(D)(3) OF THE BANKRUPTCY CODE, THE PLAN DOES NOT DISCHARGE THE DEBTORS.    SECTION 1141(C) OF THE BANKRUPTCY CODE NEVERTHELESS PROVIDES, AMONG OTHER THINGS, THAT THE**

PROPERTY DEALT WITH BY THE PLAN IS FREE AND CLEAR OF ALL CLAIMS AND EQUITY INTERESTS AGAINST THE DEBTORS. AS SUCH, NO ENTITY HOLDING A CLAIM AGAINST THE DEBTORS MAY RECEIVE ANY PAYMENT FROM, OR SEEK RECOURSE AGAINST, ANY ASSETS THAT ARE TO BE DISTRIBUTED AND/OR TRANSFERRED UNDER THIS PLAN OTHER THAN ASSETS REQUIRED TO BE DISTRIBUTED TO THAT ENTITY UNDER THE PLAN. AS OF THE EFFECTIVE DATE, ALL PARTIES ARE PRECLUDED FROM ASSERTING AGAINST ANY PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN ANY CLAIMS, RIGHTS, CAUSES OF ACTION, LIABILITIES, OR EQUITY INTERESTS BASED UPON ANY ACT, OMISSION, TRANSACTION, OR OTHER ACTIVITY THAT OCCURRED BEFORE THE EFFECTIVE DATE EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE XI HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE XI HEREOF, INCLUDING, BUT NOT LIMITED TO: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH RELEASED CLAIMS OR INTERESTS.

E.    **Exculpation**

THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE BANKRUPTCY CASES, OR RELATED TO FORMULATING, NEGOTIATING, SOLICITING, PREPARING, DISSEMINATING, CONFIRMING, OR IMPLEMENTING THE PLAN OR CONSUMMATING THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPORT AGREEMENT, THE ASSET PURCHASE AGREEMENT OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING, EXCEPT FOR ARISING OUT OF ACTUAL FRAUD OR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; *PROVIDED*, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING

HIS, HER, OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT. WITHOUT LIMITING THE FOREGOING "EXCULPATION" PROVIDED UNDER THIS ARTICLE, THE RIGHTS OF ANY HOLDER OF A CLAIM OR EQUITY INTEREST TO ENFORCE RIGHTS ARISING UNDER THE PLAN SHALL BE PRESERVED, INCLUDING THE RIGHT TO COMPEL PAYMENT OF DISTRIBUTIONS IN ACCORDANCE WITH THE PLAN.

F.    Debtors' Release

PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE SETTLEMENT REACHED WITH THE PLAN PARTICIPANTS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BANKRUPTCY CASES, THE SALE TRANSACTION, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION THAT CONSTITUTES THE FAILURE TO PERFORM THE DUTY TO ACT IN GOOD FAITH AND WHERE SUCH FAILURE TO PERFORM CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR ACTUAL FRAUD. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY RELEASED PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.

G.    Consensual Releases by Non-Debtor Released Parties

AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE

CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE SETTLEMENT REACHED WITH THE PLAN PARTICIPANTS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, THE RELEASED PARTIES AND THEIR RELATED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE NON-DEBTOR RELEASED PARTIES AND THEIR RELATED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE NON-DEBTOR RELEASED PARTIES OR THEIR RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BANKRUPTCY CASES, THE SALE TRANSACTION, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY OR ITS RELATED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY RELEASED PARTY OR ITS RELATED PARTIES UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.

H.    **Releases by Holders of Claims**

AS OF THE EFFECTIVE DATE, AND AS PERMITTED BY APPLICABLE LAW, EACH HOLDER OF A CLAIM SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE RESTRUCTURING, THE BANKRUPTCY CASES, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS DURING THE BANKRUPTCY CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN

SUPPLEMENT, THE ASSET PURCHASE AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION THAT CONSTITUTES THE FAILURE TO PERFORM THE DUTY TO ACT IN GOOD FAITH AND WHERE SUCH FAILURE TO PERFORM CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR ACTUAL FRAUD.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT OR THE ASSET PURCHASE AGREEMENT) EXECUTED TO IMPLEMENT THE PLAN, NOR DOES IT RELEASE ANY RETAINED CLAIMS OR OTHER CAUSE OF ACTION, OBLIGATION OR LIABILITY EXPRESSLY PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT.

THE RELEASES IN THIS SECTION 11.H SHALL APPLY ONLY TO: (1) ANY HOLDER OF A CLAIM IN CLASS 4 (OTHER THAN A RELEASED PARTY); AND (2) ANY HOLDER OF A CLAIM IN CLASS 5 WHO (x) TIMELY AND PROPERLY SUBMITS A BALLOT VOTING IN FAVOR OF THE PLAN AND (y) DOES NOT OPT OUT OF THE RELEASES PROVIDED FOR IN THIS SECTION 11.H.

I.      **Channeling Injunction**

NOTWITHSTANDING ANY OTHER PROVISION OF THE PLAN, LITIGATION CLAIMS SHALL BE CHANNELED TO THE LITIGATION SETTLEMENT TRUST AND BE SUBJECT TO THE TERMS OF THE CHANNELING INJUNCTION SET FORTH IN SECTION 6.C. AS SET FORTH IN ARTICLE VI, FROM AND AFTER THE EFFECTIVE DATE, (1) THE SOLE RECOURSE OF ANY LITIGATION CLAIMANT ON ACCOUNT OF A LITIGATION CLAIM SHALL BE TO THE LITIGATION SETTLEMENT TRUST IN ACCORDANCE WITH THE LITIGATION SETTLEMENT TRUST AGREEMENT AND THE LITIGATION SETTLEMENT TDP, AND (2) THE RELEASED PARTIES SHALL BE RELEASED FROM ALL OBLIGATIONS AND LIABILITIES WITH RESPECT TO THE LITIGATION CLAIMS AND ANY LITIGATION CLAIMANT SHALL HAVE NO RIGHT WHATSOEVER AT ANY TIME TO ASSERT ITS LITIGATION CLAIM AGAINST ANY OF THE RELEASED PARTIES OR ANY OF THEIR RESPECTIVE PROPERTY OR INTERESTS IN PROPERTY.

NOTWITHSTANDING ANY OTHER PROVISION OF THE PLAN, NOTHING IN SECTIONS 11.F, 11.G, OR 11.H DISCHARGES OR RELEASES THE RETAINED CLAIMS NOR CHANNELS THE RETAINED CLAIMS TO THE LITIGATION SETTLEMENT TRUST.

J.      **Injunction Against Barred Claims**

All Entities, other than Plan Participants, against which any Litigation Claim or Retained H-2B Claim has been or may be asserted, whether before or after the Effective Date, in any judicial proceeding, arbitration proceeding, administrative agency proceeding, or other adjudicatory proceeding in the United States or elsewhere (such Entities, "H-2B Actors") are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting against any Released Party, whether in the Bankruptcy Court, any federal, state court, other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, any request, claim, or cause of action for or otherwise seeking contribution, indemnification or other remedy, however denominated, against any Released Party arising out of or relating, directly or indirectly,

to any Litigation Claim or Retained H-2B Claim where the injury or damage to such H-2B Actor is based upon: (i) such H-2B Actor's alleged liability to any Litigation Claimant or holder of a Retained H-2B Claim or to another H-2B Actor against whom any Litigation Claimant holder of a Retained H-2B Claim has asserted a Litigation Claim or Retained Claim; (ii) the amounts paid, whether by settlement or otherwise, to any Litigation Claimant or holder of a Retained H-2B Claim or another against which any Litigation Claimant or holder of a Retained H-2B Claim has asserted a Litigation Claim or Retained H-2B Claim; or (iii) the costs (including attorneys' fees) incurred defending against such claims (collectively, the "Barred Claims").

For the avoidance of doubt, nothing in this Section 11.J of the Plan precludes any Plan Participant from commencing, prosecuting, or asserting any Retained Claims.

If a court or tribunal of competent jurisdiction determines that a Barred Claim exists that, if otherwise valid and enforceable, would have given rise to liability of a Released Party to the H-2B Actor holding such Barred Claim but for this Section 11.J of the Plan, the H-2B Actor holding such Barred Claim shall be entitled to the judgment reduction provisions set forth herein. This Section 11.J of the Plan is without prejudice to the position of any Entity as to the existence, validity and enforceability, in the absence of this Section 11.J of the Plan or otherwise, of any Barred Claim.

To the extent that a holder of a Barred Claim believes that it is entitled to judgment reduction in any lawsuit (a "Released Party Action") commenced by a Released Party or a Litigation Claimant, such holder of a Barred Claim shall provide notice of this Section 11.J of the Plan to the court or tribunal hearing the Released Party Action. Such court or tribunal shall determine whether the Released Party Action gives rise to Barred Claims on which a Released Party would have been liable to the holder of such Barred Claim in the absence of this Section 11.J of the Plan. If the court or tribunal so determines, then, solely to the extent that the holder of a Barred Claim is entitled under applicable non-bankruptcy law to a valid defense for judgment reduction, it shall reduce any judgment against the holder of such Barred Claim in an amount required by the non-bankruptcy law applicable to the Released Party Action. Nothing herein shall prejudice or operate to preclude the right of any H-2B Actor in such Released Party Action to (i) provide notice of this Section 11.J of the Plan to the court or tribunal hearing the Released Party Action at any point, or (ii) raise any issues, claims or defenses regarding judgment reduction or proportionate share of fault in the court or tribunal hearing the Released Party Action at any point in accordance with this Section 11.J of the Plan. Additionally, nothing herein shall prejudice or operate to preclude the right of any Litigation Claimant or holder of a Retained H-2B Claim to oppose any such request for a judgment reduction on any basis, including, but not limited to, that no such right exists and with reference to section 502(e) of the Bankruptcy Code. Nothing in this Section 11.J of the Plan shall impair any Retained H-2B Claim or create any defense to or right to setoff or reduction of any Retained H-2B Claim that would not exist pursuant to applicable non-bankruptcy law but for this Section 11.J of the Plan.

## ARTICLE XII.
## RETENTION OF BANKRUPTCY COURT JURISDICTION

**A.      General Jurisdiction**

The Bankruptcy Court shall retain the fullest and most extensive jurisdiction permissible and necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtors, and to adjudicate and enforce all of the Signal Causes of Action. Nothing contained herein shall prevent the Debtors, the Signal Liquidating Trust, or the Litigation Settlement Trust, as applicable, from

taking such action as may be necessary in the enforcement of any Signal Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive confirmation of the Plan and shall not be affected hereto except as specifically provided herein.

Following the entry of the Confirmation Order, the administration of the Bankruptcy Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date. Moreover, the Litigation Settlement Trust shall be subject to the continuing jurisdiction of the Bankruptcy Court in accordance with the requirements of section 468(B) of the Internal Revenue Code and the Treasury regulations issued pursuant thereto. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed temporarily for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claim, other than Litigation Claims.

**B.     Specific Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under or related to the Bankruptcy Cases for, among other things, the following purposes:

(i)     To modify the Plan after the Confirmation Date, pursuant to the provisions of the Bankruptcy Code, the Bankruptcy Rules and the terms and conditions of the Plan;

(ii)     To correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(iii)     To hear, determine and resolve controversies related to the Signal Liquidating Trust;

(iv)     To assure the performance by all the Debtors, the Litigation Settlement Trust, and/or the Signal Liquidating Trust, as applicable, of their respective obligations to make Distributions under the Plan;

(v)     To enforce and interpret the terms and conditions of the Plan Documents and any documents issued or executed with respect to the Plan;

(vi)     To enter such orders or judgments, including, but not limited to, the Injunctions (a) as are necessary to enforce the title, rights, and powers of the Debtors, the Signal Liquidating Trust, and/or the Litigation Settlement Trust, and (b) as are necessary to enable Holders of Claims to pursue their rights against any Entity that may be liable therefore pursuant to applicable law or otherwise, including but not limited to, Bankruptcy Court orders;

(vii)     To hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or based upon the period of administration of the Bankruptcy Cases;

(viii)    To hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(ix)    To hear and determine any causes of action by, against or involving the Debtors arising during the period from the Petition Date through the Effective Date;

(x)    To hear and determine any causes of action by, against or involving the Signal Liquidating Trust arising during the period from the Effective Date to the date of the order entering a final decree in the Bankruptcy Cases;

(xi)    To hear and determine any cause of action regarding the enforcement of Plan Documents or the transactions contemplated thereby;

(xii)    To hear and determine such other matters as may be provided in the Confirmation Order;

(xiii)    To consider and act on the compromise and settlement of any Claim (other than a Litigation Claim) against or Equity Interest in the Debtors or their Estates including, without limitation, any disputes with respect to the Bar Date;

(xiv)    To hear and determine all questions and disputes regarding title to the assets of the Debtors and their Estates, the Signal Liquidating Trust or the Litigation Settlement Trust;

(xv)    To hear and determine all matters, questions, and disputes with respect to the direct causes of action brought by the Debtors and their Estates, the Signal Liquidating Trust or the Litigation Settlement Trust;

(xvi)    To hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Bankruptcy Cases;

(xvii)    To interpret, enforce, and administer the terms of the Litigation Settlement Trust Agreement and the Litigation Settlement TDP (including all annexes and exhibits to any of the foregoing), only to the extent the documents do not provide for an alternate forum for resolution;

(xviii)    To hear and determine any proceeding that involves the validity, application, construction, interpretation, enforceability or enforcement of the Channeling Injunction or the application of section 105(a) of the Bankruptcy Code to the Channeling Injunction.

(xix)    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which a Debtor may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xx)    To hear and determine any proceeding seeking to amend or restate the Litigation Settlement Trust Agreement in accordance with the Plan Documents;

(xxi)    To enjoin any actions in violation of, or otherwise enforce, the Injunctions and releases provided in the Plan;

(xxii)    To hear and determine all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtors, the Signal Liquidating Trust or the Litigation Settlement Trust, as applicable, after the Effective Date;

01:17263822.28

(xxiii)   To enter an order or final decree closing the Bankruptcy Cases; and

(xxiv)   To hear and determine all questions, matters, and disputes with respect to the Plan.

### C.   Litigation Settlement TDP Controlling

Notwithstanding anything in Article XII to the contrary, the allowance of Litigation Claims and the forum in which such allowance will be determined will be governed by and in accordance with the procedures established by the Litigation Settlement Trust Agreement, the Litigation Settlement TDP and the Plan.

## ARTICLE XIII.
## MODIFICATION AND REVOCATION OF THE PLAN

### A.   Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 6006(d) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Signal Liquidating Trust Agreement, the Litigation Settlement Trust Agreement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims against or Equity Interests in the Debtors (regardless of whether the Holders of such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Persons and Entities that are parties to or are subject to the settlements, compromises, releases, and Injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts. All Claims and debts shall be fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.   Modification of the Plan

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Asset Purchase Agreement, the Litigation Settlement Trust Agreement, or the Confirmation Order. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XIII.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C.   Revocation or Withdrawal of the Plan

The Debtors, in consultation with the PSA Creditor Parties and the Committee, reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date and to file subsequent plans. If the Debtors, in consultation with the PSA Creditor Parties, revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then with respect to such Debtor: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an

amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption and assignment or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of the Debtors, the Committee or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930 prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Signal Liquidating Trustee shall pay, in accordance with the Bankruptcy Code and the Bankruptcy Rules, any and all such fees when due and payable from the Signal Liquidating Trust Assets, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee. Notwithstanding any substantive consolidation of the Debtors called for in the Plan, each of the Debtors and the Signal Liquidation Trustee shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed,, or converted under chapter 7 of the Bankruptcy Code.

### B.    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent a schedule or exhibit hereto or instrument, agreement or other document executed under the Plan provides otherwise, the Plan, the rights, duties and obligations arising under the Plan, and any claim or controversy directly or indirectly based upon or arising out of the Plan or the transactions contemplated by the Plan (whether based on contract, tort, or any other theory), including all matters of construction, validity and performance, shall be governed by and interpreted, construed and determined in accordance with, the internal laws of the State of Delaware (without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction).

### C.    Corporate Action

Prior to, on and after the Effective Date, all matters provided for under the Plan that otherwise would require approval of the shareholders or directors of any of the Debtors shall be deemed to have occurred and shall be in effect prior to, on and after the Effective Date pursuant to the applicable general corporation law of the jurisdiction in which the Debtors are organized without any requirement of further action by the shareholders or directors of the Debtors.

### D.    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court or other court of competent jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination

and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## E.   Successors and Assigns

The Plan shall be binding on, and shall inure to the benefit of the Debtors, and their respective successors and assigns. The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

## F.   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date shall have occurred. Neither the filing of the Plan, any nor statement or provision contained herein, nor the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or the Committee prior to the Effective Date. If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Bankruptcy Cases are and shall be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Bankruptcy Cases shall be bound or deemed prejudiced by any such concession or settlement.

## G.   Further Assurances

The Debtors, the Signal Liquidating Trustee, and the Litigation Settlement Trustee are authorized to execute, deliver, file or record such contracts, agreements, instruments, releases and other documents and take or cause to be taken such action as may be necessary or appropriate to effectuate, implement and further evidence the terms, provisions and intent of the Plan and to consummate the transactions and transfers contemplated by the Plan.

## H.   Post-Effective Date Service List

Following the Effective Date, unless otherwise provided herein, all pleadings and notices Filed in the Bankruptcy Cases shall be required to be served only upon (i) the Signal Liquidating Trustee, (ii) the Litigation Settlement TAC; (iii) the Litigation Settlement Trustee, (iv) the United States Trustee, (v) the TRSA and ERSA; (vi) any party whose rights are affected by the applicable pleading or notice, (vii) counsel to the Supporting Litigation Claimants; and (viii) any party that Files a renewed notice of appearance and request for service of notices and papers on or after the Effective Date.

## I.   Other Notices

All notices, requests and demands required or permitted to be provided to the Debtors, the TRSA and ERSA, the Committee, the Signal Liquidating Trustee, the Litigation Settlement TAC, the Litigation Settlement Trust or the Litigation Settlement Trustee under the Plan shall be in writing and shall be deemed to have been duly given or made (a) when actually delivered (i) by certified mail, return receipt requested, (ii) by hand delivery or (iii) by U.S. mail, postage prepaid or, (b) in the case of notice by facsimile transmission, when received and confirmed, addressed as follows:

*If to the Debtors:*

>Young Conaway Stargatt & Taylor, LLP
>Rodney Square
>1000 North King Street
>Wilmington, DE 19801
>Attn: M. Blake Cleary, Esq. (mbcleary@ycst.com)
>
>and
>
>Hogan Lovells US LLP
>875 Third Avenue
>New York, NY 10022,
>Attn: Christopher R. Donoho III, Esq. (chris.donoho@hoganlovells.com);

*If to the TRSA and ERSA:*

>Burr & Forman LLP
>420 North 20th Street, Suite 3400
>Birmingham, AL 35203
>Attn: Derek F. Meek, Esq. (dmeek@burr.com)
>
>and
>
>Morris Nichols Arsht & Tunnell LLP
>1201 North Market Street
>P.O. Box 1347
>Wilmington, DE 19899
>Attn: Gregory W. Werkheiser, Esq. (gwerkheiser@mnat.com);

*If to the Committee:*

>Pachulski Stang Ziehl & Jones
>919 North Market Street, 17th Floor
>Wilmington, DE 19801
>Attn: Bradford J. Sandler, Esq. (bsandler@pszjlaw.com);

*If to the Signal Liquidating Trustee or the Signal Liquidating Trust:*

>To be included in the Plan Supplement;

*If to the Litigation Settlement Trust or the Litigation Settlement Trustee:*

>To be included in the Plan Supplement; and

*If to the Litigation Settlement TAC:*

>To be included in the Plan Supplement

01:17263822.28

J.    **Conflicts**

To the extent any provision of the Disclosure Statement or any instrument, document or agreement executed in connection with the Plan or the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan shall govern and control.

K.    **Maintenance of Books and Records**

Following the Effective Date, the Signal Liquidating Trustee shall maintain records and books relating to the GUC Payment Fund, the Signal Liquidating Trust Expense Fund, the Disputed Claims Reserve, and any Post-Effective Date Assets. The Signal Liquidating Trustee shall prepare, as soon as practicable after the end of each calendar year and each calendar quarter, a financial statement. The Signal Liquidating Trustee shall file or cause to be filed all required tax returns for the Estates and pay any and all taxes, if any when due from the Signal Liquidating Trust Assets.

L.    **Determination of Tax Liability**

The Signal Liquidating Trustee is authorized, but not required, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

M.    **Entire Agreement**

The Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations with respect to the subjects addressed herein, all of which have become merged and integrated into the Plan.

N.    **Change of Control Provisions**

Any acceleration, vesting or similar change of control rights under any employment, benefit or other arrangements triggered by the Consummation of the Plan shall be waived or otherwise cancelled under the Plan.

O.    **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

P.    **Preservation of Insurance.**

Nothing in the Plan shall diminish or impair the enforceability of any policies of insurance that may cover claims or causes of action against any Debtor or any other Entity.

Q.    **Asset Purchase Agreement**

Nothing herein shall be deemed to modify the provisions of the Asset Purchase Agreement or the Sale Order.

**R.     Powers of Purchaser**

From and after the Effective Date and continuing through the date of entry of a final decree closing these Bankruptcy Cases, the Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to these Bankruptcy Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and an opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court.

Dated: October _____, 2015

<div style="margin-left:40%">

SIGNAL INTERNATIONAL, INC. AND ITS
AFFILIATE DEBTORS

By:      _/s/ Christopher S. Cunningham_
Title:    Chief Financial Officer

</div>

**Exhibit 2**

**LIQUIDATION ANALYSIS**

01:17450000.15

## I.    Issues and Qualifying Factors[1]

The Debtors believe, based on the following hypothetical analysis (the "Liquidation Analysis") that the Plan meets the "best interest of creditors" test as set forth in section 1129(a)(7) of the Bankruptcy Code. There is at least one Impaired Class of Claims contemplated to receive recoveries under the Plan. Further, each Holder of an Impaired Claim will receive under the Plan value on the Effective Date that is not less than the value such Holder would receive if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7") on the Effective Date. The Debtors believe the Liquidation Analysis and the conclusions set forth herein are fair and accurate, and represent the Debtors' best judgment with regard to the results of a Chapter 7 liquidation of the Debtors. The analysis was prepared solely to assist the Court in making this determination, and should not be used for any other purpose. The Liquidation Analysis was prepared by the Debtors and is based on the Debtors' unaudited balance sheet as of July 31, 2015.

The Liquidation Analysis is based on a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies that are beyond the control of the Debtors. There can be no assurances that the values assumed in the accompanying analysis would be realized if the Debtors were, in fact, liquidated under Chapter 7. Accordingly, actual recovery values and recovery percentages could vary from the amounts set forth herein and such variances could be material.

The estimated net recovery values presented herein consist of the net proceeds from the hypothetical disposition of the Assets, reduced by certain costs and claims that may arise under a Chapter 7 liquidation. Asset recoveries presented herein are net of estimated direct costs of a Chapter 7 liquidation and related encumbrances. Discounts have been applied to the recovery values of certain Assets to account for the nature and timing of the Chapter 7 liquidation process. The Liquidation Analysis assumes that an orderly wind-down would be substantially completed within approximately six-months. The Debtors believe that six-months is an appropriate time period for liquidation, after taking into account the amount of time it would take to market, sell and dispose of the remaining Assets. There can be no assurances that the liquidation activities could be completed within the time frames outlined above. It is possible that the disposition of the Assets could exceed the assumed liquidation period, which could reduce the hypothetical recoveries.

The Debtors are being substantively consolidated under the Plan, and therefore the Liquidation Analysis is presented on a consolidated basis. The Liquidation Analysis also assumes that the Chapter 7 liquidation process would be uncontested and cooperative. To the extent this were not the case, the recoveries on the Assets could be lower than assumed in this Liquidation Analysis.

The outcome of an orderly liquidation process could be materially different from the estimated recoveries as indicated herein if the Debtors expedited the liquidation of Assets on a forced liquidation basis (i.e. the Chapter 7 trustee disposes of the Assets in fewer than six-months).

The Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. Estimates for various Classes of Claims are based solely upon the Debtors' continuing review of the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected amounts of Claims that are consistent with the estimated Claims reflected in the Disclosure Statement.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances or other causes of action (which the Debtors believe even if pursued would not be

---

[1] Terms not otherwise defined herein shall be given the meanings ascribed to them in the Plan.

material to the analysis) and does not include the estimated costs of pursuing those actions. The Debtors reserve all rights in connection with any preferences, fraudulent conveyances, or other causes of action.

## II.    General Assumptions

The following is a list of key assumptions that were utilized in the Liquidation Analysis:

1.   The basis for the Liquidation Analysis is (i) the Asset values in the Debtors' unaudited balance sheet as of July 31, 2015 presented in the Debtors' monthly operating report filed with the Bankruptcy Court (adjustments have been made to these balances and are further described below), (ii) information included in the Disclosure Statement and the Plan, and (iii) amounts presented in the Schedules filed on August 11, 2015.

2.   The Liquidation Analysis assumes that the liquidation of the Debtors would commence on December 1, 2015 under the direction of a court-appointed Chapter 7 trustee. The Liquidation Analysis reflects the wind-down of operations and liquidation of substantially all of the Assets over a six-month period (the "Liquidation Period"), during which time all of the major Assets would be sold and the Cash proceeds, net of liquidation-related costs, would be distributed to satisfy Claims.

3.   The Liquidation Analysis assumes that the Liquidation Period would not provide sufficient time to maximize value during the sale of the Assets , rather, the Assets would likely be valued and transacted upon at "distressed" levels.

4.   The Liquidation Analysis assumes the Debtors' interests in the Westport Loan would be marketed for sale and liquidated during the six month Liquidation Period. Liquidation values were derived by estimating the potential proceeds from the sale of the Westport Note that a Chapter 7 trustee might achieve. Proceeds are net of all costs assumed to be incurred.

5.   The Liquidation Analysis assumes that proceeds realized from a Chapter 7 liquidation would be further reduced by the administrative costs incurred during the wind-down of the operations, the disposition of Assets and the reconciliation of Claims. These costs include primarily professional fees and fees of the Chapter 7 trustee.

6.   The Liquidation Analysis assumes that net proceeds from the sale of the Assets will be distributed under the absolute priority rule provided in section 1129(b)(2) of the Bankruptcy Code and that no distributions will be made to Holders of Equity Interests until all Creditors are paid in full.

7.   Upon conversion of the Bankruptcy Cases to Chapter 7, it is assumed that the Debtors will be permitted the use of Cash for the purposes of managing a wind-down and liquidation of the Assets.

8.   While the Liquidation Analysis assumes a liquidation over a six-month period commencing December 1, 2015, it is possible that the disposition and recovery from certain Assets could take longer to realize. The potential impact of litigation and actions by other Creditors could increase the amount of time required to realize the recoveries assumed in this analysis. Such events could also add additional costs to the liquidation in the form of higher legal and professional fees to resolve these potential events.

## III.    Liquidation Analysis for the Debtors

Presented in the schedule below is a summary of the estimated net book value of Assets and the related estimated liquidation recoveries ($ in millions):

2

(in thousands)

| Remaining Assets | Reported Book Value at 7/31/2015 | Estimated Book Value at Liquidation Date[1] | Potential Recovery Under Chapter 7 Conversion | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Lower | | Mid | | Higher | |
| | | | ($) | (%) | ($) | (%) | ($) | (%) |
| Cash | 3,247 | - | - | 0% | - | 0% | - | 0% |
| Accounts Receivable | 1,818 | 1,818 | 545 | 30% | 909 | 50% | 1,272 | 70% |
| Claim Receivable | 1,399 | 1,399 | 979 | 70% | 1,119 | 80% | 1,259 | 90% |
| Inventory | 297 | 297 | - | 0% | 15 | 5% | 30 | 10% |
| Deposits & Prepaid Expenses | 3,364 | 3,364 | 1,009 | 30% | 1,346 | 40% | 1,682 | 50% |
| Plant, Property and Equipment - Net | 67,669 | 67,669 | 33,835 | 50% | 40,602 | 60% | 47,368 | 70% |
| Westport Note | 29,894 | 29,894 | 17,937 | 60% | 19,431 | 65% | 20,926 | 70% |
| Other - Net | 798 | 798 | - | 0% | - | 0% | - | 0% |
| Total Remaining Assets | 108,487 | 105,240 | 54,305 | 52% | 63,421 | 60% | 72,538 | 69% |
| | | | | | | | | |
| **Estimated Liquidation Costs and Claims** | | | | | | | | |
| Chapter 7 Trustee Fees | | | 1,624 | | 1,897 | | 2,171 | |
| Chapter 7 Trustee's Professional Fees | | | 1,050 | | 1,050 | | 1,050 | |
| Administrative Claims | | | - | | - | | - | |
| Professional Fee Claims | | | - | | - | | - | |
| Total Estimated Liquidation Costs and Claims | | | 2,674 | | 2,947 | | 3,221 | |
| **Net Estimated Liquidation Proceeds** | | | 51,631 | 49% | 60,474 | 57% | 69,317 | 66% |

| | Est. Claim Amount | Liquidation Distribution | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Net Distribution | % | Net Distribution | % | Net Distribution | % |
| PRELIMINARY[2] | | | | | | | |
| **Estimated Claims** | | | | | | | |
| Unclassified:  DIP Facility Claims | 90,089 | 51,631 | 57% | 60,474 | 67% | 69,317 | 77% |
| Unclassified:  Priority Tax Claims | - | - | 0% | - | 0% | - | 0% |
| Class 1:  Other Priority Claims | - | - | 0% | - | 0% | - | 0% |
| Class 2:  Other Secured Claims | 4,000 | - | 0% | - | 0% | - | 0% |
| Class 3:  First Lien Loan Agreement Claims | 426 | - | 0% | - | 0% | - | 0% |
| Class 4:  Litigation Claims | 200,000 | - | 0% | - | 0% | - | 0% |
| Class 5:  General Unsecured Claims | 6,000 | - | 0% | - | 0% | - | 0% |
| Class 6:  Intercompany Claims | - | - | 0% | - | 0% | - | 0% |
| Class 7:  Equity Interests | - | - | 0% | - | 0% | - | 0% |
| Total | 300,515 | 51,631 | 17% | 60,474 | 20% | 69,317 | 23% |

[1] - Liquidation Date is assumed to be December 1, 2015.
[2] - The information in this table is preliminary and the Debtors reserve all rights with respect to any asserted claim.

[See Section *IV. Notes to Liquidation Analysis* on the following pages]

## IV.    Notes to Liquidation Analysis

Except where noted, the Asset and liability values are assumed to be consistent with the latest available financial data. For the purposes of the Liquidation Analysis, the Debtors have utilized the estimated values presented in the unaudited balance sheet as of July 31, 2015, included in the Debtors' monthly operating report filed with the Bankruptcy Court. That balance sheet was then adjusted to eliminate intercompany balances as well as to reflect the commencement of a hypothetical liquidation on December 1, 2015. In addition, amounts from the Disclosure Statement and amounts presented in the Schedules have been utilized.

### (1)  *Cash*

The Debtors' Cash balance as of the end of July was $3.2 million as reported in the monthly operating report for the period ending July 31, 2015. The Liquidation Analysis assumes that a conversion to Chapter 7 would reduce the Cash balance amount to zero by the commencement of the hypothetical liquidation.

### (2)  *Accounts Receivable*

Accounts Receivable primarily consist of trade receivables. It is assumed that a Chapter 7 trustee would retain certain existing staff of the Debtors to lead an aggressive collection effort for the outstanding accounts receivable of the Debtors. The Debtors' accounts receivable have historically exhibited low loss rates. Company management believes that in the case of liquidation, the Debtors would be able to collect 30% - 70% of outstanding receivables. Recovery percentages were discounted to reflect potential liquidated damages Claims from customers for jobs not completed.

### (3)  *Claim Receivable*

Claim Receivable consists mainly of workers' compensation receivable from previous year audits. Company management believes that in the case of liquidation, Claim Receivable is assumed to have a recovery rate of 70% to 90%.

### (4)  *Inventory*

Inventory primarily consists of raw material located at the Mobile, Alabama shipyard. Company management believes that in the case of liquidation, total inventory is assumed to have a recovery rate of 0%-10%, which reflects net scrap value.

### (5)  *Deposits & Prepaid Expenses*

Deposits & Prepaid Expenses consist of: (i) prepaid insurance, and (ii) security deposits. Company management believes that in the case of liquidation, Deposits & Prepaid Expenses are assumed to have a recovery rate of 30% to 50%.

### (6)  *Property, Plant and Equipment*

Property Plant and Equipment, net of depreciation, consists primarily of: (i) real property in Alabama and Texas, (ii) marine vessels, cranes, machinery & equipment, and cranes & lifts in the Alabama and Mississippi shipyards, (iii) furniture & fixtures, and (iv) computer equipment & software. Company management believes that in the case of liquidation, Property, Plant & Equipment is assumed to have a recovery rate of 50% to 70% based on the latest property and equipment appraisals.

4

*(7)  Westport Loan*

The Westport Loan is a seller note that was entered into by the Debtors as part of a sale transaction that closed on October 3, 2014, through which Assets in Texas were sold to Westport Orange Shipyard, LLC and Westport Orange Shipyard, LLC (collectively, "Westport"). Westport financed the transaction by entering into the Westport Loan in the principal amount of $28.9 million due on or before October 3, 2019. Company management believes that in the case of liquidation, the Westport Loan is assumed to have a recovery rate of 60% to 70%.

*(8)  Other – Net*

Other – Net Assets consists of prepaid loan cost. Company management believes that in the case of liquidation, Other - Net is assumed to have a recovery rate of 0%.

*(9)  Chapter 7 Trustee Fees*

Amount represents the preliminary estimated Chapter 7 trustee costs. The Chapter 7 trustee fees are calculated based upon the statutory scale set forth in section 326(a) of the Bankruptcy Code, which provides for fees equal to 25% of the first $5,000 of distributions; 10% of the next $45,000 of distributions; 5% of the next $950,000 of distributions; and 3% of distributions in excess of $1,000,000.

*(10)  Chapter 7 Trustee's Professional Fees*

It is assumed that the Chapter 7 trustee will hire advisors to assist in the administration of the Chapter 7 liquidation. The Debtors have assumed $175,000 per month during the Liquidation Period for the compensation of the trustee's legal and financial professionals including accounting and tax support.

*(11)  Administrative Claims*

This liquidation analysis assumes Administrative Claims have been paid current during the Bankruptcy Cases.

*(12)  Professional Fee Claims*

This liquidation analysis assumes  Professional Fee Claims have been paid current during the Bankruptcy Cases.

*(13)  DIP Facility Claims*

On the Effective Date, in full satisfaction, settlement, discharge and release of, all DIP Facility Claims, the TRSA and ERSA shall either (i) acquire the Acquired Assets as the Purchaser in accordance with the Asset Purchase Agreement, the Plan, and the Sale Order, or (ii) be paid in full, in Cash, the total amount outstanding under the DIP Facility from the proceeds received in accordance with the Asset Purchase Agreement; *provided, however,* that such satisfaction, settlement, discharge and/or release of DIP Facility Claims shall be without prejudice to any DIP Indemnity Obligations, all of which, subject to further Order of the Bankruptcy Court, shall be reserved for and the obligation to establish such reserve, if any, shall be secured by a DIP Lien (as defined in the Final DIP Order) on any proceeds of the Sale Transaction not paid to the TRSA or ERSA on the Effective Date. Based on the assumptions noted, liquidation would result in a recovery of 57-77% of the DIP Facility.

*(14)  Priority Tax Claims*

This liquidation analysis assumes Priority Tax Claims have been paid current during the Chapter 11 Cases.

*(14)  Class 1:  Other Priority Claims*

In the case of liquidation, Other Priority Claims would have no recovery.

*(15)  Class 2:  Other Secured Claims*

In the case of liquidation, Other Secured Claims would have no recovery.
*(16)  Class 3:  First Lien Loan Agreement Claims*

First Lien Loan Agreement Claims have been satisfied through the proceeds of the DIP Facility.

*(17)  Class 4:  Litigation Claims*

In the case of liquidation, the Litigation Claims would have no recovery.

*(18)  Class 5:  General Unsecured Claims*

In the case of liquidation, the General Unsecured Claims would have no recovery.

*(19)  Class 6:  Intercompany Claims*

Per the Plan, holders of Allowed Intercompany Claims shall not receive any Distributions on account of such Claims.

*(20)  Class 7:  Equity Interests*

Per the Plan, holders of Equity Interests in the Debtors shall neither receive nor retain any property under the Plan. On the Effective Date, all Equity Interests in the Debtors shall be cancelled and of no further force or effect and all Claims filed on account of Equity Interests shall be deemed disallowed by operation of the Plan.

## V.  Comparison to Hypothetical Recovery Under the Plan

The Plan estimates a recovery of 100% to Unclassified:  DIP Facility Claims, Unclassified:  Priority Tax Claims, Class 1:  Other Priority Claims, Class 2:  Other Secured Claims and Class 3:  First Lien Loan Agreement Claims.  The Plan estimates a recovery  for Class 4:  Litigation Claims in excess of ten percent (10%) of the total amount of all allowed Litigation Claims and Class 5:  General Unsecured Claims equal to the lesser of (i) $900,000, or (ii) an amount equal to fifteen percent (15%) of the total amount of all allowed General Unsecured Claims which remain outstanding after all assumption and cure has been implemented with respect thereto.  The Debtors believe the estimates are fair and accurate, and represent the Debtors' best judgment with regard to the results of the confirmation of the Plan.  The estimated recoveries under the Plan are based on a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies and that are beyond the control of the Debtors.  There can be no assurances that the recoveries assumed would be realized if the Plan was, in fact, confirmed.  Accordingly, actual recovery values and recovery percentages could vary from the amounts set forth in the Plan and such variances could be material.

The Plan estimates that each holder of an Impaired Claim will receive value on the Effective Date that is not less than the value such Holder would receive if the Debtors were to be liquidated under Chapter 7 on the Effective Date. The Debtors believe that the Plan meets the "best interest of creditors" test as set forth in section 1129(a)(7) of the Bankruptcy Code.

01:17816389.1