**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| SIGNAL INTERNATIONAL, INC., *et al.*[1], | ) | Case No. 15-11498 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Docket Nos. 120 and 280** |

**OBJECTION OF PINTO ISLAND LAND COMPANY, INC. TO
DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING SALES
AND BIDDING PROCEDURES IN CONNECTION WITH SALE OF ASSETS OF
THE DEBTORS, (B) APPROVING BID PROTECTIONS, (C) APPROVING
FORM AND MANNER OF NOTICE, (D) SCHEDULING THE AUCTION AND
SALE HEARING, (E) AUTHORIZING PROCEDURES GOVERNING ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A)
APPROVING PURCHASE AGREEMENT, (B) AUTHORIZING SALE FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND
<u>OTHER INTERESTS, AND (C) GRANTING RELATED RELIEF</u>**

Pinto Island Land Company, Inc. ("Pinto")  submits this objection (the "Objection") to

the Debtors' Motion for Entry of (I) An Order (A) Approving Sales and Bidding Procedures in

Connection with Sale of Assets of the Debtors, (B) Approving Bid Protections, (C) Approving

Form and Manner of Notice, (D) Scheduling the Auction and Sale Hearing, (E) Authorizing

Procedures Governing Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases, and (F) Granting Related Relief; and (II) An Order (A) Approving Purchase

Agreement, (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other

Interests, and (C) Granting Related Relief (the "Sale Motion", D.I. 120).   In support of its

Objection, Pinto avers as follows:

---

[1] The debtors in these jointly administered Chapter 11 cases are:  Signal International, Inc., Signal Ship Repair, LLC, Signal International, LLC, Signal International Texas GP, LLC, and Signal International Texas, L.P.

## FACTUAL BACKGROUND

1.      Pinto, as lessor, and Bender Shipbuilding & Repair Co, Inc. ("Bender"), as tenant, entered into a lease of nonresidential real property dated July 1, 1998 (the "Original Lease").  A copy of the Original Lease is attached hereto as Exhibit "1".

2.      The premises subject to the Original Lease comprise land, water and certain improvements (the "Premises") located in Mobile, Alabama, which is used for the repair and maintenance of ship vessels, boats and related maritime equipment.

3.      In 2009, Bender commenced a chapter 11 case, *In re Bender Shipbuilding & Repair Co., Inc.*, Chapter 11 Case No. 09-12616-MAM in the United States Bankruptcy Court for the Southern District of Alabama.  Pursuant to those proceedings, the Debtors, or some of them, acquired substantially all of the assets of Bender.

4.      By lease amendment dated January 14, 2010 (the "Lease Amendment", Exhibit "2" hereto (without exhibits)), Debtor Signal Ship Repair, LLC ("Signal Repair") became the tenant under the Original Lease, as amended by the Lease Amendment. (The Original Lease, as amended by the Lease Amendment, is referred to herein as the "Lease").

5.      Signal Repair, and the Debtors generally, is in the business of repairing and maintaining ships, boats and related maritime equipment.  On information and belief, the core of Debtors' business operations is located on the Premises.

6.      The identity of the lessee—Signal Repair—is an essential and material term of the Lease for Pinto.  The operation and maintenance of a maritime dry dock of this scale requires an operator with significant financial resources, experience and knowhow.  Failure of a prospective tenant to abide strictly to the terms of the Lease could be very costly for Pinto.  Moreover, use of

the Premises for some other purpose could materially and dramatically affect the value of the Premises.

7.    Also on January 14, 2010, Debtor Signal International, Inc. ("SII") executed a guaranty (the "Guaranty") in favor of Pinto of Signal Repair's obligations under the Lease.  A copy of the Guaranty is attached as Exhibit "3".

8.    Some of the salient terms of the Lease are as follows:[2]

a.  The term of the Lease, subject to a five year renewal option, expires on January 1, 2035.  Lease Amendment, § 3.

b.  The current base monthly rent under the Lease is $64,245.00.  Lease Amendment, § 4(b), subject to future indexing.

c.  In addition, tenant is responsible to pay for all utilities and related services (Lease, § 10); maintain insurance on the premises and indemnify landlord for any loss (Lease, § 11); and to bear maintenance and repair costs (Lease, § 14).

d.  The Lease requires that the tenant use the Premises "only for the drydocking, repair, construction and conversion of boats and ships and all work attendant thereto."  Lease, p. 2.

e.  The Lease prohibits the tenant from subletting or assigning the Premises, or any part thereof, without the express written consent of the landlord (Lease, § 21).

f.  The Lease sets forth detailed and substantial reporting, access, indemnification, warranty and other obligations related to environmental issues and hazardous substances.  Lease, § 23.

---

[2] This summary of the Lease is meant to be a general description for purposes of background only and shall not be deemed an admission, modification and/or waiver of any provision of the Lease, the express terms of which are controlling.

g.  The Lease provides that the insolvency or bankruptcy of tenant is a default thereunder.  *See* Lease, § 25.  It further provides that in the event of an assignment of the Lease in bankruptcy, all consideration received in connection therewith is property of the Landlord and not the debtor's estate.  *Id.*  Any assignee is to be bound by all provisions of the Lease and must acknowledge same through written instrument.  *Id.*

h.  Pursuant to applicable state law, the Lease further provides that the landlord shall have a lien securing tenant's obligations under the Lease on all of the tenant's property on the Premises.  Lease, § 40.

9.      Pinto has executed a Landlord Consent, Waiver and Estoppel Agreement with The Teachers' Retirement System of Alabama ("TRA") dated as of February 27, 2014 (the "Estoppel Agreement").  A copy of the Estoppel Agreement is attached as Exhibit "4" hereto.

10.     Under the Estoppel Agreement, Pinto consented to the pledge of Signal Repair's leasehold interest in the Premises (the "Leasehold") as collateral under a certain mortgage between Debtors and TRA (the "Mortgage") for financing provided by TRA to the Debtors.  *See* Estoppel Agreement, § 1.  Such consent was made pursuant to, and subject to the limitations of, section 21 of the Lease.  *Id.*  Moreover, the consent was limited to the financing provided under the Mortgage and is otherwise subject to the terms of the Lease, including section 21.

11.     In addition, and subject to the same limitations and conditions, Pinto consented to subordinate its landlord's lien to TRA's lien in certain property of the Debtors.  Estoppel Agreement, § 3.  However, as a point of clarification, paragraph 3 of the Estoppel Agreement expressly excludes from any property that may be subject to TRA's liens "any bulkheads

currently existing on the Premises or constructed on the Premises at any time hereafter." The purpose of that provision was to make clear that bulkheads are part of the Pinto's realty.

12.     The Estoppel Agreement provides that should TRA become successor to Signal Repair as a result of the hypothecation of the Leasehold, TRA shall be "subject to all of the provisions of the Lease." Estoppel Agreement, § 5.

13.     On September 1, 2015, this Court entered the Order (A) Approving Sales and Bidding Procedures In Connection With Sale of Assets of the Debtors, (B) Approving Bid Protections, (C) Approving Form and Manner of Notice, (D) Scheduling the Auction and Sale Hearing, (E) Authorizing Procedures Governing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (F) Granting Related Relief (D.I. 280, the "Procedures Order").

14.     Pursuant to the terms of the Procedures Order:

a.  Debtors were required to identify parties to executory contracts subject to possible assumption and assignment under the Asset Purchase Agreement ("APA") and to identify the cure amount for such contracts, by September 9, 2015.

b.  Debtors were also required to provide information concerning adequate assurance of future performance of any contract subject to assumption and assignment within two (2) business days following a request. *See* ¶5 of Assumption and Assignment Procedures, Exhibit 2 to Procedures Order.

c.  As to Pinto, such information was to include "without limitation, to the extent available, financial statements and tax returns, cash flow projections, bank account statements, information regarding the proposed assignee's operating experience, the identity and qualification of the assignee's management and a

statement of the intended use of the premises subject to such lease; if any such information is deemed confidential, it shall be produced subject to a confidentiality agreement executed by the Debtors and Pinto." Procedures Order, ¶29.

15.     On September 9, 2015, Debtors filed their Notice of Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases" (the "Assumption Notice"). The Assumption Notice identifies the Lease as subject to assumption and assignment with a cure amount of $0.00.

16.     On September 17, 2015, Pinto sent a demand for information concerning adequate assurance of future performance under the Lease by the Stalking Horse[3] (the "Information Demand", Exhibit "5" hereto).

17.     Thereafter, undersigned counsel for Pinto was put into contact with counsel for the Stalking Horse to discuss the production of information. In general, the Stalking Horse disclosed that the assets of the Debtors would be placed into special purpose entities and that the management team of the Debtors would remain in place.

18.     Nevertheless, neither the Stalking Horse nor the Debtors have provided additional information to Pinto concerning adequate assurance of future performance under the Lease[4], including but not limited to:

a.  The proposed structure of the transaction, *i.e.* the identity of the special purpose entities and the identification of assets that will be placed into each such entity;

---

[3] The Stalking Horse is "Teachers' Retirement System of Alabama, or its designee ("TRS") and the Employees' Retirement System of Alabama, or its designee." Sale Motion, D.I. 120.

[4] Counsel for the Stalking Horse did send undersigned counsel a brief responsive letter dated September 30, 2015, which, although not marked confidential, is not attached hereto in an abundance of caution. That letter does not contain specific information other than the Stalking Horse's general intention to acquire the assets in a turnkey manner.

b. The projected revenue, expenses, assets and liabilities of such entities;

c. Whether the Lease will be supported by a guaranty by the parent company, as it is now; and

d. Financial information concerning the Stalking Horse themselves.

19.     Pinto appreciates that the Stalking Horse are quasi-public entities with substantial assets.  However, Pinto stresses that the Stalking Horse will not acquire the assets of the Debtors directly but rather through special purpose entities.  While the Stalking Horse has informed Pinto generally that the anticipated acquisition is to be a "turnkey" process, no specific information about the corporate structure or anticipated financial condition of these entities has been furnished to Pinto.

20.     The Premises are Pinto's sole asset.  Having a complete and detailed picture of the corporate structure and projected financial condition of these entities is of crucial importance to Pinto.

## **OBJECTION**

### A. Debtors have not Furnished Information to Meet their Burden Concerning Adequate Assurance of Future Performance.

21.     Section 365(f)(2)(B) of Title 11 provides that the trustee may assume and assign an executory contract or unexpired lease only if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."

22.     "'Adequate assurance of future performance' are not words of art; the legislative history of the [Bankruptcy] Code shows that they were intended to be given a practical, pragmatic construction.... What constitutes 'adequate assurance of future performance' must be

determined by consideration of the facts of the proposed assumption." *In re Fleming Companies, Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (citations omitted).

23.     Here, the Debtors and the Stalking Horse have provided Pinto with little specific information concerning adequate assurance of future performance.  Accordingly, Pinto is not in a position even to evaluate whether the Debtors can meet their burden under section 365(f).

24.     In particular, the Debtors and the Stalking Horse have provided no information concerning the corporate structure of the proposed transaction; which entities will acquire which assets; financial information about the Stalking Horse themselves; the presence or absence of any guarantees; any anticipated personnel or operational changes; and projections concerning the anticipated liabilities, assets, and revenue and expenses of the special purpose entities.  This information was due to Pinto some time ago under the Procedures Order.

**B.  The Sale Order Cannot Affect Any Property Rights of Pinto**

25.     There is much sweeping language in the proposed order approving the sale (D.I. 317-1) about the broad scope of the Stalking Horse's rights in the purchased property.  Pinto objects and reserves its rights to the extent that any provision of the sale order may be deemed to effect a sale or alienation of any property that is not the property of the Debtors; or which purports to effect an assignment of the Lease other than in accordance with the terms of the Lease and adequate assurance of performance as provided by Title 11.

26.     In particular, without limiting the foregoing and as reflected in the Estoppel Agreement, any bulkheads on the Premises, now existing or hereafter built, are part of Pinto's real estate and are not the property of Signal; hence, any such property cannot be subject to the sale or to any of the pre-petition or post-petition liens of the Stalking Horse or either of them.

### C.  The Sale Order Cannot Affect any Lien Rights or Other Rights of Pinto

27.     As noted above, the Lease provides that Pinto is entitled to a lien on personalty of the Debtors on the Premises.  Lease, ¶ 40.  The Estoppel Agreement, while subordinating those lien rights to those of TRA only, did not waive those lien rights.  In any event, the Estoppel Agreement was signed with TRA only in reference to its then-existing loan to the Debtors.  The Estoppel Agreement does not mean that Pinto agreed to subordinate its lien rights with respect to a new extension of credit, whether provided by TRA or any other party.

28.     If the Lease is assumed and assigned, the personalty purchased by the Stalking Horse located on the Premises would be subject to the lien rights of Pinto for any unpaid obligations under the Lease following the closing of the sale.  Neither section 363(f), nor any other provision of the Bankruptcy Code, can strip off such lien rights for the simple reason that any such rights would be to secure a future default under the Lease as assumed by the Stalking Horse.

29.     Alternatively, if the Lease were rejected, Pinto would have lien rights attaching to the proceeds of sale (but subject to the terms of the Estoppel Agreement).

30.     Pinto otherwise reserves any and all of its rights and defenses.

WHEREFORE, Pinto, while reserving all of its rights, requests that the Court deny the relief sought by the Debtors.

DATED:  October 13, 2015

_/s/ Christopher D. Loizides_
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:     (302) 654-0248
Facsimile:     (302) 654-0728
Email:         loizides@loizides.com

- and -

Lawrence B. Voit, Esquire
SILVER VOIT & THOMPSON, P.C.
4317-A Midmost Drive
Mobile, AL  36609-5589
Telephone:     (251) 343-0800
Facsimile:     (251) 343-0852
E-mail:        lvoit@silvervoit.com

*Counsel for Pinto Island Land Company, Inc.*